## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD          :

          :

        Plaintiff,         :     Case No. 1:07-cv-00165 (RBW)

          :

          :

       v.              :

          :

THE REPUBLIC OF IRAQ          :

          :

        Defendant.      :

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

**COMES NOW** Plaintiff Agrocomplect, AD (hereinafter ("Plaintiff" or "Agrocomplect") by and through undersigned counsel and, pursuant to F.R.Civ. P. 12 and LCvR 7(b) and opposes Defendant's Motion to Dismiss and, in opposition thereto, respectfully refers this Honorable Court to the annexed memorandum of points and authorities, and exhibits.

WHEREFORE, by all these presents, counsel for Plaintiff prays that the instant motion be denied.

Respectfully submitted,

S JR by _____

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:   (240) 632-0906
*Email*: srolinski@rolinski.com

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AGROCOMPLECT, AD | : | |
| | : | |
| Plaintiff, | : | Case No. 1:07-cv-00165 (RBW) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| THE REPUBLIC OF IRAQ | : | |
| | : | |
| Defendant. | : | |

### ORDER

This matter having come before this Court on Defendant's Motion to Dismiss, and opposition thereto, and after hearing, it is this _____ day of _____, 2007, for cause shown,

ORDERED, that Defendant's Motion to Dismiss the Complaint shall be, and hereby is DENIED, and it is

FURTHER ORDERED, that defendants shall file and serve an answer to the complaint within ___ days of the date of entry of this Order.

SO ORDERED.

_____
Reggie B. Walton, Judge
United States District Court for the
District of Columbia

Philip M. Musolino, Esq.
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski, Esq.
Danielle M. Espinet, Esq.
*Rolinski, Terenzio & Suarez, LLP*
14915 River Road
Potomac, Maryland 20854

Matthew D. Slater, Esq.
*Cleary Gottlieb Steen & Hamilton, LLP*
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006

Jonathan I. Blackman, Esq.
Lisa M. Coyle, Esq.
*Cleary, Gottlieb, Steen & Hamilton, LLP*
One Liberty Plaza
New York, NY 10006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AGROCOMPLECT, AD | : | |
| | : | |
| Plaintiff, | : | Case No. 1:07-cv-00165 (RBW) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| THE REPUBLIC OF IRAQ | : | |
| | : | |
| Defendant. | : | |

## TABLE OF CONTENTS

**SECTION ONE:  BACKGROUND, PROCEDURE, STANDARDS AND BURDENS OF PROOF**..........................................................1

**A.** Statement of the Case..........................................................................1

**B.**  Summary of Argument...........................................................................4

**C.** Applicable Standards and Burden of Proof....................................................5

    1.  Challenges to Subject Matter Jurisdiction Under Fed.R.Civ.P. 12(b)(1)........................................................6

    2.  Assertions that the Complaint Fails to State A Claim Under Fed.R.Civ.P. 12(b)(6)........................................................9

**SECTION TWO:   THIS COURT HAS SUBJECT MATTER JURISDICTION**...................10

**A. The Complaint Alleged Facts Sufficient Under Rule 12(b)(1) to Preclude Dismissal Under the FSIA's Direct Effect Test**.............................10

    1.  *Weltover* and *Nelson* and the Direct Effect Test.................................11

    2.  Treatment of 1605(a)(2) After *Weltover and Nelson*  .........................13

    3.  The Complaint Alleged Direct Effects Under 1605(a)(2).......................14

**B.**  The Arbitration Clause Is A Waiver of Sovereign Immunity...........................19

    1.   The Contract Arbitration Clause Satisfies 28 U.S.C. 1605(a)(1)..............20

    2.   The Contract Arbitration Clause Satisfies 28 U.S.C. 1605(a)(6)(B)..............24

**C.**  The Forum Selection Claus Cannot Serve As the Basis for Dismissal.................25

SECTION THREE: THE COMPLAINT STATES A CLAIM......................................29

    A.  Defendant Failed To Meet Its Burden On the Affirmative
        Defense of the Statute of Limitations...................................................29

    B.  Defendant Failed To Meet Its Burden On the Affirmative Defense of
        Release...............................................................................35

            1. The IDRO Procedures – Definitions.............................................36

            2. Plaintiff's IDRO Submission, Tender and Results..............................40

    C.  The IDRO Documents Did Not Provide For Discharge or
        Release of the Claims in this Case.............................................................41

    D.  Reliance On the Exhibits Appended to Defendant's Motion
        Would Require Conversion to Summary Judgment.......................................42

CONCLUSION .....................................................................................44

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD             :

            :

         Plaintiff,        :       Case No. 1:07-cv-00165 (RBW)

            :

            :

         v.                 :

            :

THE REPUBLIC OF IRAQ        :

            :

         Defendant.       :

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

Aerolineas Argintinas v. U.S., 77 F.3d 1564, 1572 ............................................................. 6

Angola E.P., 2006 WL 3060017*7 (D.D.C. 2006) ............................................................ 13

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) .................. 22

Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank,
     251 F. Supp. 2d 126 (D.D.C. 2003) .................................................................................. 17

Burnett v. Al Baraka Inv. and Development Corp.,
     274 F.Supp.2d 86 (D.D.C. 2003) ...................................................................................... 8

Burnett v. Al Baraka Inv. and Development Corp.,
     292 F.Supp.2d 9, 14 (D.D.C. 2003) .................................................................................. 8

C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian
     Tribe Of Oklahoma, 532 U.S. 411, 121 S.Ct. 1589 (2001) ......................................... 20

Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1018 (2d Cir.1993) .......... 24, 25

Caribbean Broadcasting System Ltd. v. Cable & Wireless P.L.C.,
     331 U.S. App. D.C. 226, 148 F.3d 1080, 1085-1086 (D.C. Cir. 1998) ......................... 7

Chromalloy Aeroservices v. Arab Republic of Egypt, 939 F.Supp. 907, 909 ................. 24

Chung v. Dep't of Justice, 333 F.3d 273, 275-76 (D.C.Cir.2003) .................................... 33

Code Cong. & Ad. News 6604, 6616. See, Arriba Ltd v. Petroleos Mexicanos,
    962 F.2d 528, 533-534 (5th Cir. 1992) ........................................................................ 9

Commercial Bank of Kuwait v. Rafidain Bank and Central Bank of Iraq,
    15 F.3d 238 (2d Cir. 1994).......................................................................................... 13

Creighton Ltd. v. Government of the State of Qatar, 181 F.3d 118 (D.C.Cir. 1999) ....... 20

D/H Oil and Gas Co. v. Commerce and Industry Insurance Company,
    __ F.Supp.2d,__ (N.D.Fla.,2005), 2005 WL 1153332 ................................................ 26

Doe v. U.S. Dept. of Justice 753 F.2d 1092, 1117 (D.C. Cir. 1985) .......................... 29, 30

Exxon Chemical Co. v. N.L.R.B.,  386 F.3d 1160, 1164 (D.C. Cir., 2004)...................... 31

Fifth Street Associates v. U Haul Intern., Inc.148 F.Supp.2d 50, 56 (D.D.C.,2001) ....... 26

Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C.Cir.1996) .............................................. 30

Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438,
    284 U.S.App.D.C. 333 (D.C. Cir. 1990)........................................................................ 8

Forti v. Suarez-Mason, 672 F.Supp. 1531, 1550 (N.D.Cal. 1987) .................................... 34

Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155
    (2nd Cir. 2006)............................................................................................................... 43

Goodman Holdings v. Rafidain Bank 26 F.3d 1143 (D.C.Cir. 1994) ....................... 13, 14

Gupta v. Northrop Grumman Corp.,  462 F.Supp.2d 56, 59(D.D.C................................. 33

Hanes Corp. v. Millard, 531 F.2d 585, 599 (D.C., 1976) .................................................. 32

Hanger v. Abbott, 73 U.S. 532, 541 (1867)........................................................................ 34

Hanil Bank v. Pt. Bank Negara Indonesia, 148 F.3d 127 (2nd Cir. 1988) ...................... 15

Honduras Aircraft Registry, Ltd. v. The Gov't of Honduras, 129 F.3d 543, 559
    (11th Cir. 1997)............................................................................................................... 18

I.T. Consultants Inc. v. The Islamic Republic of Pakistan, 351 F.3d 1184
    (D.C. Cir. 2003) ............................................................................................................. 13

Islamic American Relief Agency v. Gonzales, 477 F.3d 728, 732 (D.C. Cir. 2007) ......... 9

Jones v. Rogers Memorial Hospital 442 F.2d 773, 775 (D.C. Cir. 1971) ........................ 29

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027-28, 325
U.S.App.D.C. 117 (D.C. Cir. 1997)................................................................. 8

Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya,
482 F.Supp. 1175, 1178 (D.D.C., 1980) ..................................................... 25

Libyan American Oil Company v. Socialist People's Libyan Arab Jamahirya,
684 F.2d 1032, 221 U.S.App.D.C. 510 (D.C.Cir. May 06, 1981) ................. 25

Maritime International Nominees Establishment v. The Republic of Guinea,
693 F.2d 1094, 1110, 1111 (D.C.Cir. 1983) ......................................... 13, 23

Marshall County Health Care Authority v. Shalala 988 F.2d 1221, 1226
(D.C. Cir. 1993) ....................................................................................... 43

Material Supply Intern., Inc. v. Sunmatch Indus. Co., Ltd. 146 F.3d 983, 992
(D.C., 1998) ............................................................................................ 32

McDonnell Douglas Corp. v. Islamic Republic of Iran 758 F.2d 341, 345
(8th Cir. 1985)......................................................................................... 26

Meadows v. Dominican Republic, 817 F.2d 517, 522 -523 (9th Cir. 1987),
cert. denied, 484 U.S. 976, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987) ...................... 9

Morrison v. Amway Corp., 323 F.3d 920, 925 fn. 5 (11th Cir. 2003)................................ 6

Mortensen v. First Federal Savings & Loan Ass'n., 549 F.2d 884, 891 (3rd Cir. 1977) .... 6

Osborn v. US, 918 F.2d 724, 729 ........................................................................... 6

Osbourne v. United States, 164 F.2d 767, 767-68 (2d Cir. 1947) .............................. 35, 36

Peterson v. The Royal Kingdom of Saudi Arabia, 416 F.3d 83 (D.C.Cir. 2005) ............. 16

Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40, 342
U.S.App.D.C. 145, 149 (D.C. Cir. 2000).................................................. 6, 9

Potts v. Howard University 240 F.R.D. 14, 17-18
(D.D.C. 2007) ..................................................................................... 30, 31

Prakash v. American University, 727 F.2d 1174 (D.C.Cir.1984)........................................ 8

Protector, 76 U.S. 687 (1869) ............................................................................. 34

Richards v. Mileski, 662 F.2d 65, 72 (D.C.Cir.1981)....................................................... 29

Richardson v. United States, 338 U.S. App. D.C. 265, 193 F.3d 545, 549
(D.C. Cir. 1999) ........................................................................................... 7

Rockwell International Systems v. Citibank, 719 F.2d 583 (2d Cir.1983)....................... 26

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 235, 357 U.S.App.D.C.
107, 114 (D.C. Cir. 2003) ............................................................................ 10

Rosebud Sioux Tribe v. Val-U Constr. Co., 50 F.3d 560, 562 (C.A.8 1995)................... 21

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) .................................................. 12

Sokaogon Gaming Enterprise Corp. v. Tushie-Montgomery Associates, Inc.,
86 F.3d 656, 659-660 (C.A.7 1996)........................................................... 21, 22

Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000) ....................... 7

Taylor v F.D.I.C., 132 F.3d 753, 765 (D.C. Cir. 1997) .................................................. 44

Texas Trading and Mulling Corp. v. Federal Republic of Nigeria, 647 F.2d 300
(2d Cir. 1981), cert.den. 454 U.S. 1148(1982) ............................................. 11

Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998,
247 U.S. App. D.C. 208 (1985) ...................................................................... 8

United States v. Wiley, 78 U.S. 508, (1870)...................................................... 35

United World Trade Inc. v. Mangyshlakneft Oil Prod. Assoc., 33 F.3d 1232,
1236-38 (10th Cir.1994) ............................................................................. 13

Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 239
(2nd Cir. 2002)............................................................................................ 16

Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 148 (2nd Cir. 1991),
aff'd Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 112 S.Ct. 2160,
119 L.Ed.2d 394, 60 USLW 4510 (U.S.N.Y. Jun 12, 1992) ......................... 10

Zipes v. TWA, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)................... 33

**State Cases**

Burgess v. Square 3324 Hampshire Gardens Apartments, Inc. 691 A.2d 1153, 1156
(D.C.,1997) .................................................................................................. 30

Burgos v. Metro-North Commuter R.R. ---- N.Y.S.2d ----, 2007 WL 1412548 *1
(N.Y.A.D. 1 Dept., 2007)..................................................................... 41

Cunningham & Associates v. Dugan, 909 A.2d 1001, 1006 (D.C., 1996)...................... 30

District of Columbia Water and Sewer Authority v. Delon Hampton & Associates,
851 A.2d 410, 417 (D.C.,2004) .................................................... 30

J & A Bayly Construction Company, Inc. v. Village of Castleton-on-Hudson,
248 A.D.2d 766, 767.................................................................... 41

Native Village of Eyak v. GC Contractors, 658 P.2d 756, 760 (Alaska 1983) ............... 21

News World Communications, Inc. v. Thompsen, 878 A.2d 1218, 1222
(D.C., 2005) .............................................................................. 30

Olivarius v. Stanley J. Sarnoff Endowment for Cardiovascular Science,
858 A.2d 457, 463 (D.C., 2004) .................................................... 30

Record v. Royal Globe Ins. Co.83 A.D.2d 154, 443 N.Y.S.2d 755
(N.Y.A.D.,1981) ........................................................................ 41

Val/Del, Inc. v. Superior Court, 145 Ariz. 558, 565, 703 P.2d 502, 509
(Ct.App.1985) .......................................................................... 22

Werber v. Atkinson, 84 A.2d 111, 114 (D.C.App. 1951).................................. 32

**Federal Statutes**

28 U.S.C. § 1330(a) ....................................................................... 10

28 U.S.C. § 1605............................................................................ 10-19

**State Statutes**

D.C.Code § 12-301(6)...................................................................... 30

**Federal Rules**

Fed.R.Civ.P 8.............................................................................7

Fed.R.Civ.P. 12(b)(1)................................................................. i, 1, 5, 6

Fed.R.Civ.P. 12(b)(3)..................................................................... 26

Fed.R.Civ.P. 12(b)(6)................................................................. i, 5, 9

**Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards
  21 U.S.T. 2517 ................................................................................................... 23

Evanoff, Nicholas J., Direct Effect Jurisdiction Under the Foreign Sovereign Immunities
  Act of 1976:  Ending the Chaos in the Circuits
  28 Hous.L.Rev. 629, 639 (May 1991) ........................................................ 11

H.R.Rep. No. 1487 ................................................................................................ 9

Restatement (Third) of the Foreign Relations Law of the United States §
  456(2)(b)(ii) (1987) ......................................................................................... 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD            :

           Plaintiff,            :        Case No. 1:07-cv-00165 (RBW)

           :

           :

           v.            :

           :

THE REPUBLIC OF IRAQ       :

           :

           Defendant.         :

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Defendant the Republic of Iraq ("Defendant" or "Iraq") moves pursuant to

Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss the Complaint. As is more fully set forth

below, that motion should be denied.

### SECTION ONE: BACKGROUND, PROCEDURE, STANDARDS AND BURDENS OF PROOF

#### A. Statement of the Case

Plaintiff Agrocomplect A.D. ("Plaintiff" or "Agrocomplect") filed its two-count

complaint ("Compl.") against Defendant on January 23, 2007. The Complaint seeks

relief in the nature of enforcement of a contract arbitration clause in Count One, and

damages for breach of contract in Count Two, and alleges, *inter alia*, that:

**The Contract**

Defendant entered into a certain written contract (the "Contract") with Plaintiff for the
provision of engineering and construction services to be performed by Plaintiff in Iraq.
Compl., at ¶ 4.

The Contract required Plaintiff to perform work, *inter alia*, on the Hilla- Diwaniya 4
Land Reclamation Project for the State Organization for Land Reclamation, operating
under the authority of Iraq's Ministry of Agriculture and Irrigation of the Republic of
Iraq. Compl., at ¶ 5.

The Contract provided, *inter alia*, that:

> If any dispute or difference of any kind whatsoever shall arise between the Employer and the Contractor in connection with or arising out of the contract or the carrying out of the Works (whether during the progress of the Works or after their completion and whether before or after the termination abandonment or breach of the contract) it shall in the first place be referred to and settled by the Engineer who shall give notice of his decision to the Employer and the Contractor... If the Employer or the Contractor be dissatisfied then with any such decision and in any such case either the Employer or the Contractor may within 30 days after receiving notice of such decision require that the matter be referred to a Committee of Arbitration to be formed in the following manner:

> The Employer and the Contractor shall each appoint one member to the Committee and the two members thus appointed shall agree upon a third member to act as a Chairman of the Committee. If agreement on the appointment of Chairman cannot be reached within 14 days from the last date of their appointment then the Employer or the Contractor shall each have the right to ask a competent court to appoint the third member in accordance with any proceedings provided in a special law of arbitration.

> ... All fees and other costs shall be paid to arbitrators by the party requiring arbitration provided that such fees and costs shall be payable by the party against whom the award has been pronounced.

> The Contract shall be subject to and construed according to the Iraqi Laws regulations and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract.

(the "Contract Arbitration Clause"). Compl., at ¶ 6.

Plaintiff performed pursuant to the terms of the Contract. Compl., at ¶ 7.

In order to perform under the terms of the Contract, Plaintiff was required to and did in fact enter into agreements with suppliers and others in the United States. Compl., at ¶ 8.

The contract time for drafting of design and completion of construction was 44 calendar months. Compl., at ¶ 9.

The gross area was … divided initially into 8 zones.  Subsequently, the contract was amended adding a ninth zone.  Compl., at ¶ 10.

The project commenced on March 12, 1985, and the execution and handover was effectuated zone by zone.  Compl., at ¶ 11.

By August 2, 1990, eight zones were completed and handed over.  Compl., at ¶ 12. Iraq invaded Kuwait on August 2, 1990.  Compl., at ¶ 13.

An international embargo was enacted effective August 6, 1990, and remained in effect through April 3, 1991, and was thereafter extended through 2003. Compl., at ¶1 4.

On or about January 1991, Plaintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the Iraqi invasion and occupation of Kuwait.  Compl., at ¶ 15.

The assault by, *inter alia*, American military on the machinery, production base, and camp facilities was foreseeable by Defendant.  Compl., at ¶ 16.

As a result of breach of the Contract by Defendant, Plaintiff sustained actual, foreseeable and consequential damages in the approximate amount of US$56,000,000, including: contract losses of approximately US$17,000,000; loss of tangible property of approximately US$38,000,000; payment of third party expenses of approximately US$188,000; and, loss of business reputation of approximately US$483,000.00 in interest. Compl., at ¶17.

Notwithstanding repeated notice and demand, Iraq has failed and refused to pay to Plaintiff the sums due and owing under the Contract. Compl., at ¶ 18.

Notwithstanding notice and demand, Iraq has failed and refused to comply with the Contract Arbitration Clause. Compl., at ¶19.

**Administrative Debt Recovery Procedures**
Plaintiff timely submitted its claims under the Contract to the United Nations Compensation Commission (the "UNCC Claims").  Compl., at ¶ 21.

On March 19, 1999, … the UNCC .., rejected on jurisdictional grounds the UNCC Claims other than US$150,790 for the cost of air evacuation of 368 company employees and 56 family members. Compl., at ¶ 22.

The Interim Iraqi Government formed the Iraqi Debt Reconciliation Office (hereinafter "IDRO") for the expressed purpose of resolving certain debts on certain pre-established terms, including discounts and structured payment schedules. Compl., at ¶ 23.

Plaintiff timely submitted its claims to IDRO. Compl., at ¶ 24.

IDRO rejected certain of Plaintiff's Claims as outside of its jurisdiction, including claims where payments were required to be made in local currency. Compl., at ¶25.

IDRO agreed to pay $US 7,505,203.20 on certain of Plaintiff's claims, plus accrued interest at the IDRO rate, reduced to 10.25% of the total amount of the claim plus interest. The net payment received by Plaintiff from and through IDRO was $1,761,875.12. Compl., at ¶ 26.

Defendant remains indebted on the Contract to Plaintiff in the amount of $US 48,500,000, plus accrued interest .... Compl., at ¶27.

**Sovereign Immunity**

The Contract, and performance thereunder, was a commercial activity. Compl., at ¶ 28. The obligations set out in the Contract had a direct effect in the United States, in that goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States and payment was to be made at least in part by and through banking institutions in the United States. Compl., at ¶ 29.

Performance of the contract had a direct effect in the United States, in that the construction projects became foreseeable targets of opportunity and necessity for the United States military. Compl., at ¶ 30.

Defendant has failed and refused to participate in the arbitration process set out in the Contract. Compl., at ¶ 35.

### B. Summary of Argument

Sovereign immunity is unavailable to the Defendant because the action is based on an act or acts connected with the Defendant's commercial activity, and those acts caused a direct effect in the United States. Specifically, Plaintiff's use of American goods and services, the use of American banking institutions for payment, and the nature of the construction projects as American military targets constituted direct effects within

the meaning of 28 U.S.C. 1605 § (a)(2). Defendant incorrectly applies outdated narrow constructions of the statute.

Sovereign immunity is also unavailable to the Defendant because the contract's arbitration clause is a waiver of that immunity under 28 U.S.C. 1605 § (a)(1) and (6). Indeed, the District of Columbia circuit authority upon which the Defendant relies to contest the application of 1605 § (a)(1) explicitly mandates the application to this case of 1605 § (a)(6).

Defendant has failed to meet its burden with respect to the affirmative defense of the statute of limitations, It has failed to: provide any record basis for its proposed statute; provide any record basis for the commencement of the statute; and, has failed to address at all principles of equitable tolling, waiver and estoppel.

Defendant has failed to meet its burden with respect to the affirmative defense of release. In fact, the documents upon which the Defendant relies establish without ambiguity that the limited release into which the parties entered did not include, and was not intended to include, the claims n this case.

### C. Applicable Standards And Burdens Of Proof

Defendant contends under Fed.R.Civ.P. 12(b)(1) that the court lacks subject matter jurisdiction because the defendant is protected by sovereign immunity. Defendant moves to dismiss under Fed.R.Civ.P. 12(b)(6) because it contends that the claim is barred by a three-year statute of limitations and because plaintiff has released the claims.

1. **Challenges to Subject Matter Jurisdiction Under Fed.R.Civ.P. 12(b)(1)**

There are two distinct methods by which a defendant may raise a challenge to subject matter jurisdiction: a facial attack on the pleadings, or a factual attack. "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial' attack and a 'factual' attack." *Osborn v. US*, 918 F.2d 724, 729 at fn. 6 (8th Cir. 1990), citing *Mortensen v. First Federal Savings & Loan Ass'n.*, 549 F.2d 884, 891 (3rd Cir. 1977). And *see Aerolineas Argintinas v. U.S.*, 77 F.3d 1564, 1572 (Fed. Cir. 1996 ("…(C)ourts have exercised care to distinguish between absence of jurisdiction and failure of proof, whether the failure is facial (on the pleadings) or factual (outside the pleadings.)").

> Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint, and the district court takes the allegations as true in deciding whether to grant the motion. Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings. In resolving a factual attack, the district court may consider extrinsic evidence such as testimony and affidavits.

*Morrison v. Amway Corp.*, 323 F.3d 920, 925 fn. 5 (11th Cir. 2003). As this Circuit has held:

> By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception, and how the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge.
>
> If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff.

*Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40, 342 U.S.App.D.C. 145, 149 (D.C. Cir. 2000).

Defendant's motion to dismiss is a facial attack. Thus, the trial court is required to examine the allegations of the complaint in determining whether jurisdiction has been sufficiently pled.

> To survive a motion to dismiss for lack of subject matter jurisdiction, a plaintiff is not required to plead facts sufficient to prove his allegations; rather, a court should only dismiss a complaint for lack of subject matter jurisdiction if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief....

*Richardson v. United States*, 338 U.S. App. D.C. 265, 193 F.3d 545, 549 (D.C. Cir. 1999). In *Caribbean Broadcasting System Ltd. v. Cable & Wireless P.L.C.*, 331 U.S. App. D.C. 226, 148 F.3d 1080, 1085-1086 (D.C. Cir. 1998), cited with approval in *Richardson, supra*, at 549, the Circuit emphasized the limited pleading requirements imposed on a complaint attacked pursuant to 12(b)(1):

> In the notice pleading system established by Federal Rules of Civil Procedure 8, all that is required is a short and plain statement of the claim that will give the defendant fair notice of the plaintiff's claim and the ground upon which it rests.... A complaint satisfies this criterion if it is not so vague or ambiguous that that a party cannot reasonably be expected to frame a responsive pleading.... In other words, *a plaintiff need not allege all the facts necessary to prove its claim so long as it provides enough factual information to make clear the substance of that claim .... Because a plaintiff is not required to plead facts sufficient to prove its allegations, a federal court should not dismiss a complaint either for lack of subject matter jurisdiction or for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.* (internal citations and quotation marks omitted, emphasis added).

And *see Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000)(a plaintiff is not required "... to set out in detail the facts upon which he bases his claim.").

However, courts have also held that, with respect to claims by defendants that they are immune pursuant to the FSIA, the allegations of the complaint should be more

7

carefully examined. *See, e.g. Burnett v. Al Baraka Inv. and Development Corp.*, 274

F.Supp.2d 86 (D.D.C. 2003)( plaintiffs, in a case arising out of the September 11, 2001

attacks, allege that defendants have funded and supported al Qaeda).

> As the *Burnett* court observed:

> "Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." However, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." The district court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."

*Burnett v. Al Baraka Inv. and Development Corp.*, 292 F.Supp.2d 9, 14 (D.D.C.

2003)(citations omitted). *See also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*

115 F.3d 1020, 1027-28, 325 U.S.App.D.C. 117 (D.C. Cir. 1997); *Foremost-McKesson,*

*Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 284 U.S.App.D.C. 333 (D.C. Cir. 1990);

*Prakash v. American University*, 727 F.2d 1174 (D.C.Cir.1984).

> The burden of proof in establishing inapplicability of exceptions to the Foreign

Sovereign Immunities Act is upon the party claiming immunity. *Transamerican S.S.*

*Corp. v. Somali Democratic Republic,* 767 F.2d 998, 247 U.S. App. D.C. 208 (1985).

Once the defendant establishes that it is a foreign state, the burden of going forward shifts

to the plaintiff. The FSIA,

> starts from a premise of immunity and then creates exceptions to the general principle.... Stating the basic principle in terms of immunity may be of some advantage to foreign states in doubtful cases, but, since sovereign immunity is an affirmative defense which must be specially pleaded, the burden will remain on the foreign state to produce evidence in support of its claim of immunity. Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim

8

> relates to a public act of the foreign state--that is, an act not within the exceptions in sections 1605-1607. Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state.

*Meadows v. Dominican Republic*, 817 F.2d 517, 522 -523 (9th Cir. 1987), cert. denied, 484 U.S. 976, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987), citing H.R.Rep. No. 1487, 94th Cong., 2d Sess., reprinted in 1976 Code Cong. & Ad. News 6604, 6616. *See, Arriba Ltd v. Petroleos Mexicanos*, 962 F.2d 528, 533-534 (5th Cir. 1992)("Once the defendant alleges that it is a foreign state, the plaintiff must produce some facts to show that the commercial activity exception to immunity applies, but the defendant retains the ultimate burden of proof on immunity.")(citations and internal quotations omitted.).

"The district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction (internal quotation marks omitted)." *Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C. 2000).

### 2. Assertions that the Complaint Fails to State A Claim Under Fed.R.Civ.P. 12(b)(6)

Claims can be dismissed under Federal Rule of Civil Procedure 12(b)(6) only if "it appears beyond doubt that (plaintiff) can prove no set of facts in support of its claim which would entitle it to relief (internal brackets, citations omitted)." *Islamic American Relief Agency v. Gonzales,* 477 F.3d 728, 732 (D.C. Cir. 2007). The court must accept the complaint's factual allegations as true and give plaintiff the benefit of all inferences that can reasonably be drawn therefrom. *Id.*

9

## SECTION TWO: THIS COURT HAS SUBJECT MATTER JURISDICTION

### A. The Complaint Alleged Facts Sufficient Under Rule 12(b)(1) to Preclude Dismissal Under the FSIA's Direct Effect Test

The Foreign Sovereign Immunities Act ("FSIA") "…provides generally that a foreign state is immune from the jurisdiction of the United States courts unless one of the exceptions listed in 28 U.S.C. § 1605(a) applies." *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 235, 357 U.S.App.D.C. 107, 114 (D.C. Cir. 2003). "When one of these exceptions applies, the foreign sovereign is stripped of immunity, and, pursuant to 28 U.S.C. § 1330(a), subject matter jurisdiction exists in the district court." *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 148 (2nd Cir. 1991), *aff'd Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394, 60 USLW 4510 (U.S.N.Y. Jun 12, 1992).

Plaintiff proceeds in part under 28 U.S.C. §1605(a)(2), which provides that a sovereign state is not immune from suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Thus, the issues generally to be decided by the trial court "…are whether defendants engaged in 'commercial activity,' as opposed to sovereign activity, and whether such activity has caused a 'direct effect in the United States.'" [2] *Weltover, supra,* at p.149.

---

[2] Defendant does not deny that the complaint alleges "commercial activity."

Defendant's motion as it relates to section 1605(a)(2)  is, as is discussed in I.C.1

above,  a facial challenge to the sufficiency of the complaint's direct effect allegations.

Motion, at 5-10, and *see* Compl., at ¶¶ 28-31. That challenge must be rejected.

### 1. *Weltover* and *Nelson* and the Direct Effect Test

Following the FSIA's passage in 1976 "two prevailing views... emerged ...: a

broad view, espoused by the Second Circuit, and a narrow view, developed primarily in

the opinions of the D.C. and the Ninth Circuits." Evanoff, Nicholas J., *Direct Effect*

*Jurisdiction Under the Foreign Sovereign Immunities Act of 1976:  Ending the Chaos in*

*the Circuits* 28 Hous.L.Rev. 629, 639 (May 1991).

The narrow view rested on the "substantial and foreseeable" language of section

18 of the Restatement (2d) Foreign Relations Law. *Id*., at 640.  The Second Circuit

rejected the Restatement's test and adopted a broader formulation in *Texas Trading and*

*Mulling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981), *cert.den*. 454

U.S. 1148(1982).

In *Weltover*, an FSIA breach of contract action arising out of Argentina's

unilateral extension of time to pay bonds, the Supreme Court resolved the split and

designed a simple test, ruling:"...(W)e reject the suggestion that §1605(a)(2) contains an

unexpressed requirement of 'substantiality' or 'foreseeability....' (A)n effect is 'direct' if

it follows as an immediate consequence of the defendant's activity (internal ellipses

omitted)". *Weltover*, at 618, 2168. As the Supreme Court explained:

> We ... have little difficulty concluding that Argentina's unilateral
> rescheduling of the maturity dates on the Bonds had a "direct effect" in the
> United States. Respondents had designated their accounts in New York as
> the place of payment, and Argentina made some interest payments into
> those accounts before announcing that it was rescheduling the payments.
> Because New York was thus the place of performance for Argentina's

11

> ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming. We reject Argentina's suggestion that the "direct effect" requirement cannot be satisfied where the plaintiffs are all foreign corporations with no other connections to the United States.

*Weltover*, at 618-619, 2168-2169.

In *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Supreme Court addressed again the commercial activities exception, and added analysis of the phrase "based upon."

The *Nelson* Court concluded that "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case. At 357. In *Nelson*, however, only the first of 1605(a)(2)'s three clauses was in issue. *Id.* Thus, as the court further explained,

> Distinctions among descriptions juxtaposed against each other are naturally understood to be significant ..., and Congress manifestly understood there to be a difference between a suit "based upon" commercial activity and one "based upon" acts performed "in connection with" such activity.  The only reasonable reading of the former term calls for something more than a mere connection with, or relation to, commercial activity. *Id.*, at 357-358.

The *Nelson* decision made clear that actions, such as the instant claim, which proceeded under the third clause were subjected to a less stringent nexus test than actions which proceeded under the first clause.  Under *Nelson*, actions under the third clause could survive if an act – not necessarily of the sovereign – was connected with or related to the sovereign's commercial activity. *Nelson* also makes establishes that the element of a cause of action test is applicable only to the first clause.  Moreover, none of the three prongs limited the requisite "activities" to the actual breach of contract or breach of duty.

## 2. Treatment of 1605(a)(2) After *Weltover and Nelson*

Shortly after *Weltover and Nelson*, the Second Circuit revisited 1605(a)(2) in *Commercial Bank of Kuwait v. Rafidain Bank and Central Bank of Iraq,* 15 F.3d 238 (2d Cir. 1994). In *Commercial*, plaintiff sued the Iraqi banks because they suspended payments after the invasion of Kuwait. The defendants contended that the direct effect test was not satisfied because "the payments were to be made not directly to Commercial but to New York bank accounts held by the lead banks of the various lending syndicates." At 241. They thus claimed that "because the United States is not the place of performance of any contractual obligations owed to this plaintiff, there is no 'direct effect.'" *Id.*

Relying on *Weltover*, the Second Circuit rejected that argument, and reiterated that the exception applies to "commercial activities of foreign sovereigns that have an impact within the United States." *Id. Commercial* thus establishes that the direct effect is not limited to effects on the plaintiff. And *see United World Trade Inc. v. Mangyshlakneft Oil Prod. Assoc.,* 33 F.3d 1232, 1236-38 (10th Cir.1994), see also *IDAS Resources, N.V. v. Empresa National de Diamantes de Angola E.P.,* 2006 WL 3060017*7 (D.D.C. 2006), and *see Maritime International Nominees Establishment v. The Republic of Guinea,* 693 F.2d 1094, 1110, 1111 (D.C.Cir. 1983) (applies pre-*Weltover* foreseeability test to reject immunity exception, but recognizes that injury to non-party could constitute direct effect.)

The District of Columbia Circuit addressed *Weltover* in *I.T. Consultants Inc. v. The Islamic Republic of Pakistan,* 351 F.3d 1184 (D.C. Cir. 2003). Discussing its earlier decision in *Goodman Holdings v. Rafidain Bank* 26 F.3d 1143 (D.C.Cir. 1994), the Court ruled that:

> a foreign sovereign's failure to make a contractually required deposit in a bank in the United States meets the statute's definition of a "direct effect," without regard to whether the parties considered the place of payment "important," "critical," or "integral."

*I.T. Consultants* at 1186. The court then harmonized its ruling with *Weltover* and *Goodman Holdings* by explaining that the bank account upon which plaintiffs based their argument in *Goodman Holdings* was nothing more than an Iraqi account in the United States which had no connection to the activities in issue, but which had occasionally been used in the past to make payments to creditors. At 1190.

In *Weltover,* by *I.T. Consultant's* dispositive contrast, "(s)everal bondholders balked at (Argentina's election to delay payment) and demanded full payment, naming New York as the place of payment...." At 1189. The court then characterized as a "quibble" Pakistan's dispute about the contractual requirements, and their distinction "from those in *Weltover*, where the payee's specification of payment was *also* not contemporaneous with the signing of the underlying agreement ... (emphasis added)". At 1190. *I.T. Consultants* did not, therefore, insist that the contract documents themselves contain an obligation for performance in the United States.

### 3.  The Complaint Alleged Direct Effects Under 1605(a)(2)

The Complaint alleged three acts or activities which independently satisfy the direct effect requirement: payment was to be made at least in part by and through banking institutions in the United States; Compl., at ¶ 29[3]; goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States; *id.*, and, the construction projects became foreseeable targets of opportunity and necessity for the United States military. Compl., at ¶ 30.

---

[3]  Plaintiff slightly reverses the order of presentation for ease of discussion.

a.    *Payments In American Banks*

Defendant contends that the absence in the complaint of an allegation[4] of "the existence of a contractual obligation for payments to be made in the United States," Motion, at 8, is fatal to reliance on the American bank payments[5]. But no case has so held, nor can such a holding be squared with the language of the statute or the *Weltover* test.

In her concurrence in *Goodman Holdings*, Judge Wald stressed that: "I write separately to emphasize that, for an act to have a 'direct effect' in the United States, there is no prerequisite that that the United States be contractually designated as the place of performance." *Goodman Holdings,* at 1147 (Wald, concurring). Judge Wald's concurrence comports with the opinion in *I.T. Consultants.*

As noted above, the Circuit emphasized in *I.T. Consultants* that the specification of payments in the United States was not contained in the contract. In *Hanil Bank v. Pt. Bank Negara Indonesia*, 148 F.3d 127 (2nd Cir. 1988), on which *I.T. Consultants* in part relied, at 1189, n.2, the Second Circuit wrote:

> Even assuming that Indonesia *is* the place of performance under letter of credit law, *Weltover* does not insist the "place of performance" be in the United States in order for a financial transaction to cause a direct effect in this country. Rather, it only requires an effect in the United States that follows as an immediate consequence of the defendant's actions overseas. At 133.

---

[4] Even assuming the validity of defendant's contention, plaintiff is not required to plead jurisdictional facts with the level of specificity now demanded by defendant. To the extent that such specificity is required in the pleading, rather than in the process that the trial court elects to "ferret out the facts." *Phoenix, supra*, at 40, *Burnett, supra*, at 14. Plaintiff also reserves the right to amend its complaint to address any alleged infirmities.

[5] Plaintiff does not allege that the direct effect test is met by the possibility that payments may have, in the course of banking operations, been routed through American banks without any involvement of the parties. Motion, at 9.

In *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 239 (2nd Cir.

2002), the Second Circuit wrote:

> Every circuit court of which we are aware that has addressed this issue has
> held-without reference to whether the plaintiff was a corporation, a non-
> corporate business entity, or a natural person-that an anticipatory
> contractual breach occurs "in the United States" for the jurisdictional
> purposes of § 1605(a)(2) if performance could have been required in the
> United States and then was requested there.

Nothing in *Weltover* contained the contract clause requirement now demanded by

defendant, and its reliance on *Peterson v. The Royal Kingdom of Saudi Arabia,* 416 F.3d

83 (D.C.Cir. 2005) is unavailing. As the *Peterson* court emphasized:

> These assertions evidence no agreement – implied or express – that
> Peterson was to be paid in the United States. In fact, he was not paid in
> the United States....Peterson not only received his refund in Saudi Arabia,
> but deposited it in a Saudi bank as well – the entire transaction occurred
> outside the United States. At 91.

*Peterson's* recitation of the fact that there was no agreement was not, and under

*Weltover* could not have been, intended as a requirement designed to satisfy *Weltover's*

"immediate consequence" test.

Moreover, as discussed in the proceeding subsection, defendant's challenge to the

sufficiency of the bank payments fails to recognize the import of the Supreme Court's

decision in *Nelson*. Payments made by plaintiff to contractors and suppliers through

banks in the United States for performance of the contract constitute "acts" connected to

Iraq's "commercial activity."

### b.     *American Goods and Services*

Defendant's challenges to the sufficiency of the Complaint's American goods and

services allegations on three grounds: 1) the absence of a contractual obligation; 2) the

16

absence of a direct effect as a consequence of defendant's actions and; 3) the failure to allege a requisite effect on the American supplier. Each contention fails.

First, and as is set forth above, neither this Circuit, nor the Supreme Court has ever imposed a requirement that performance of the foreign state's contract must take place in the United States. Nor can a contractual obligation doctrine comport with the Supreme Court's construction of the third clause of 1605(a)(2). As *Nelson* suggested, analysis of direct effects should begin with an identification of the sovereign's commercial activity, and the act or acts related thereto, upon which the cause of action is based. It is only necessary under *Weltover* and *Nelson* to identify such an act which in turn has the direct effect in the United States. In the context of this case, those acts are identified, not only by reference to the failure of Iraq to meet its obligations to plaintiff, but also by the immediate consequences of the ratification of the contract and its performance by the parties.

For purposes of this motion, and on the record now before the Court, there can be no challenge to the determination that an immediate effect of the ratification of the contract was the contractual retention of, and performance by, various contractors and suppliers in the United States. Both the commitments to perform undertaken by those American contractors and suppliers and their performance pursuant to the terms of the contract, constitute "acts" clearly within the meaning of 1605(a)(2) as refine by the Supreme Court's decision in *Nelson*.

*Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126 (D.D.C. 2003), upon which defendant relies simply overstates the direct effects requirements and overlooks Judge Wald's concurring opinion in *Goodman Holdings*.

17

Secondly, defendant's insistence that plaintiff's retention of American contractors runs afoul of the FSIA's requirement that the immediate consequence flow from the act of defendant, is simply wrong. Again looking to *Nelson*, it is certainly correct that the third clause of 1605(a)(2) points to the commercial activity of the sovereign, but there is no such equivalent requirement with respect to the "act" connected to the sovereign's commercial activity. As *Nelson* emphasized, the addition in the third clause of the "act" terminology significantly lessened from the elements of the claim test in the first clause, the requirements of a direct effect analysis on a plaintiff. Thus, the link between the defendant's commercial activity and the direct effect in the United States is completed by an "act"- whether of the sovereign or not- so long as it was connected or related to the sovereign's commercial activity, and presumably the direct effect in the United States. Because the supplier's and contractor's performance was undertaken in the United States, the requirement of an effect in the United States was satisfied; and, because that performance was the direct result of the sovereign's commercial activity-*i.e.*, in the least, the ratification of the contract. The contractor's performance in the United States was a "direct" effect.

Third, plaintiff does not allege loss by the American contractors and suppliers nor is it required to. The direct effect is comprised of the considerable undertakings in the United States by the suppliers and contractors in order to satisfy the requirements of defendant's commercial contract. *See, e.g., Honduras Aircraft Registry, Ltd. v. The Gov't of Honduras*, 129 F.3d 543, 559 (11th Cir. 1997) (the district court found that jurisdiction was satisfied under § 1605(a)(2) of the FSIA, based an act outside the territory of the United States in connection with commercial activity of Honduras which caused a direct

effect in the United States. Those effects can be easily seen; as the district court noted, the offices and registry database were to be established and maintained in Florida, computers and other equipment were to be purchased in the United States, plaintiffs had DARs in Florida and had established a network of aircraft inspectors in the United States.). As is discussed above, there is no requirement that the immediate consequence be sustained by the Plaintiff.

c.    <em>American Military Targets</em>

Defendant errs when it bases its objection on the absence of any nexus between the destruction of the construction projects and "Iraq's alleged non-payment." Motion at 9. There is no basis for the imposition on the meaning of "act" in 1605(a)(2) of a restriction to the "breach" of the agreement that is part of the sovereign's commercial activity. As *Nelson* makes clear, under even under the more rigorous standard applicable to the first clause of 1605(a)(2), the based upon language includes each of the elements of the pertinent cause of action- in the case of a contract claim- those elements would necessarily include the contract, and allegations of performance thereunder, as well as non-performance.

**B. The Arbitration Clause Is A Waiver of Sovereign Immunity**

The FSIA provides for two circumstances under which an arbitration agreement waives sovereign immunity: 28 U.S.C. 1605(a)(1) rejects sovereign immunity in any case "in which the foreign state has waived its immunity either explicitly or by implication ...;" and 28 U.S.C. 1605(a)(6) rejects sovereign immunity in any case

> in which the action is brought, either to enforce an agreement ... to submit to arbitration all or any differences which have arisen or which may arise between the parties ... or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to

19

take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable....

Defendant relies principally on a 1999 decision from this Circuit [6] which narrowly construed the meaning of waiver as it was derived from arbitration agreements. But, for purposes of its 1605(a)(1) analysis, Defendant ignores a subsequent analogous Supreme Court decision, and, more significantly, is entirely silent on *Creighton*'s determination that, on facts similar to those now before the court, sovereign immunity was unavailable under 1605(a)(6). Each alternative basis for rejection of sovereign immunity is discussed in turn.

### 1.    The Contract Arbitration Clause Satisfies 28 U.S.C. 1605(a)(1)

The Supreme Court, in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe Of Oklahoma,* 532 U.S. 411, 121 S.Ct. 1589 (2001), resolved a split among the circuit courts' treatment of arbitration clauses as waivers of sovereign immunity. Rejecting "the Tribe's[7] contention that an arbitration clause is not a waiver of immunity from suit...," at 413, the Court declared that:

> The clause no doubt memorializes the Tribe's commitment to adhere to the contract's dispute resolution regime. That regime has a real world objective; it is not designed for regulation of a game lacking practical consequences. And to the real world end, the contract specifically authorizes judicial enforcement of the resolution arrived at through arbitration. At 422.

Looking to authority treating foreign sovereign immunity, the Court quoted the Restatement (Third) of the Foreign Relations Law of the United States § 456(2)(b)(ii)

---

[6] *Creighton Ltd. v. Government of the State of Qatar,* 181 F.3d 118 (D.C.Cir. 1999).
[7] The Court treated as "(i)nstructive... the law governing waivers of immunity by foreign sovereigns." At 421, n.3.

(1987) for the principle that "(u)nder the law of the United States ... an agreement to arbitrate is a waiver of immunity from jurisdiction in ... an action to enforce an arbitral award rendered pursuant to the agreement ...." At 421, n.3. The Court reiterated with approval the language in *Native Village of Eyak v. GC Contractors,* 658 P.2d 756, 760 (Alaska 1983) that:

> "[W]e believe it is clear that any dispute arising from a contract cannot be resolved by arbitration, as specified in the contract, if one of the parties intends to assert the defense of sovereign immunity.... The arbitration clause ... would be meaningless if it did not constitute a waiver of whatever immunity [the Tribe] possessed." *C&L,* at 422.

The Court also adopted the Eighth Circuit's conclusion in *Rosebud Sioux Tribe v. Val-U Constr. Co.,* 50 F.3d 560, 562 (C.A.8 1995) that, though the agreement to arbitrate did not contain a provision for court enforcement "disputes could not be resolved by arbitration if one party intended to assert sovereign immunity as a defense"). *C&L,* at 422.

The Supreme Court's decision in *C&L,* therefore, made clear that an arbitration clause constituted a waiver of sovereign immunity.

The Court also concluded that such a waiver was express, rather than implied. Quoting the Seventh Circuit's conclusion in *Sokaogon Gaming Enterprise Corp. v. Tushie-Montgomery Associates, Inc.,* 86 F.3d 656, 659-660 (C.A.7 1996) that "(t)he [tribal immunity] waiver ... is implicit rather than explicit only if a waiver of sovereign immunity, to be deemed explicit, must use the words 'sovereign immunity.' No case has ever held that," *C&L,* at 420, the Supreme Court determined that "(t)hat cogent observation holds as well for the case we confront." At 421.

The Court then emphasized its recognition of the express nature of the immunity waiver by its adoption of the statement in *Val/Del, Inc. v. Superior Court*, 145 Ariz. 558, 565, 703 P.2d 502, 509 (Ct.App.1985) that "because the Tribe has "agree[d] that any dispute would be arbitrated and the result entered as a judgment in a court of competent jurisdiction, we find that there was an express waiver of the tribe's sovereign immunity (brackets in C&L)." *C&L,* at 422.

As noted above, the Supreme Court in *C&L* emphasized the similarities between sovereign immunity principles as they applied to foreign sovereigns and as they applied to Indian tribes. In *Sokaogon, supra*, the Seventh Circuit, discussing examples of language which constituted express waivers, similarly observed:

> These examples are not limited to Indian law. When states or the federal government waive sovereign immunity, as in the Federal Tort Claims Act or the Tucker Act, they do not say they are waiving "sovereign immunity;" they create a right to sue, just as in the arbitration clause here.... These waivers are effective, even through the sovereign immunity of states and the federal government, like that of Indian tribes though presumably for different reasons, may not be waived by implication. At 660.

In *Creighton*, the Circuit agreed that the only Supreme Court consideration on the 1605(a)(1) intention requirement, in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), was based "upon facts rather different from those present here." *Creighton*, at 123. *Creighton* adopted the rationale that "an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit. Internal brackets omitted)." At 122. But, as *C&L* and *Sokaogon* point out, recognition of that intent is unavoidable in the face of an arbitration clause.

*Creighton* survives *C&L* only to the extent that a waiver of sovereign immunity is assessed on a state-by-state forum basis. That is, arbitration agreements imply no general

22

waiver, and a state specific waiver of sovereign immunity turns on whether the agreement

is deemed to "contemplate a role" for the specific state. At 123, citing *Maritime*

*International Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1103

(D.C.Cir. 1982).

But it is here, as well as in the application of section 1605(a)(6), discussed in the

following subsection, that *Creighton* thwarts, rather than supports Defendant. Defendant

contends, as it must, that the court must look to whether the agreement to arbitrate,[8] or

the resulting award, is capable of enforcement in the United States. Motion, at 11.

*Creighton,* however, made clear that an arbitral award entered in a country which was a

signatory to the *Convention on the Recognition and Enforcement of Foreign Arbitral*

*Awards* 21 U.S.T. 2517, 9 U.S.C.§ 201 ( the "New York Convention") is enforceable in

the United States. *Creighton,* at 123, and *see,* generally, Article II of the Federal

Arbitration Act, 9 U.S.C.§§ 202 *et.seq* ( the "FAA").  As set forth in the following

subsection, Defendant's insistence that the Contract should be construed to

"suggest" that the forum for any arbitration proceeding would be Iraq is groundless.

It is certainly true that *Creighton* concluded that an agreement to arbitrate in a

New York Convention signatory was of itself insufficient – "without more"-- to

demonstrate the requisite intent to waive immunity.  At 123. But there is "more" here in

the form of an American role in contract performance. Compl., at ¶¶ 29, 30.

*Creighton,* thus, particularly in light of *C&L,* is not inconsistent with the

conclusion that Iraq waived its immunity in the United States.

---

[8] Defendant's reliance on the forum selection clause for the proposition that the arbitration clause
cannot be enforced in a U.S. court is incorrect.  *See* discussion in III.C below.

## 2. The Contract Arbitration Clause Satisfies 28 U.S.C. 1605(a)(6)(B)

*Creighton's* treatment of Section 1605(a)(6)(B)[9] unequivocally mandates the

rejection of Defendant's sovereign immunity claim. As the Court observed:

> Qatar does not contest Creighton's assertion that because the New York
> Convention calls for enforcement of any arbitral award rendered within
> the jurisdiction of a signatory country, the quoted exception applies by its
> terms to this action. Indeed, it has been said with authority that the New
> York Convention "is exactly the sort of treaty Congress intended to
> include in the arbitration exception." *Cargill Int'l S.A. v. M/T Pavel
> Dybenko*, 991 F.2d 1012, 1018 (2d Cir.1993); *see also Chromalloy
> Aeroservices v. Arab Republic of Egypt*, 939 F.Supp. 907, 909
> (D.D.C.1996). At 123-124.

In *Cargill*, the Second Circuit identified only three requirements for a district

court to find jurisdiction under the New York Convention and Chapter II of the FAA: (1)

the matter must arise out of a legal relationship; (2) which is commercial; and (3) which

is not entirely domestic in scope. At 1018. *Cargill* then concluded:

> Thus, the Convention should be broadly interpreted to effectuate the goals
> of the legislation. Moreover, when the Convention is read together with
> the FSIA's arbitration exception, which gives jurisdiction if an arbitration
> agreement "is or *may be* governed" by a treaty, 28 U.S.C. § 1605(a)(6)(B)
> (emphasis added), it evinces a strong legislative intent to provide
> enforcement for such agreements....(T)he Convention is exactly the sort
> of treaty Congress intended to include in the arbitration exception. If the
> alleged arbitration agreement exists, it satisfies the requirements for
> subject matter jurisdiction under the Convention and FSIA. *Id.*

Defendant is silent on *Creighton*'s treatment of 1605(a)(6)(B). Instead, Defendant

contends only that "The Forum Selection Clause and the Choice of Law Clause ...

strongly indicate the parties' intent that any such arbitration take place in Iraq." Motion,

at 13-14. To the contrary, the Contract contemplated an Arbitration Committee

comprised, after a dispute has arisen which could not be resolved amicably, of three

members –with each party selecting one member. There is no reason to conclude that a

---

[9]  1605(a)(6)(A) and (C) were addressed in II.A above.

disgruntled party would elect a distant forum convenient to its arbitration opponent. As

the court in *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya,*

482 F.Supp. 1175, 1178 (D.D.C., 1980), vacated *Libyan American Oil Company v.*

*Socialist People's Libyan Arab Jamahirya,* 684 F.2d 1032, 221 U.S.App.D.C. 510

(D.C.Cir. May 06, 1981) ruled:

> The 1955 agreement had provided that any eventual arbitration should
> take place in Libya's capitol, Tripoli. The clause that LIAMCO proposed
> in 1966, however, provided that arbitration should take place either where
> the parties agreed, or where the arbitrators might agree. Libya agreed to
> this provision. Although the United States was not named, consent to have
> a dispute arbitrated where the arbitrators might determine was certainly
> consent to have it arbitrated in the United States.

Defendant compounds its error by misreading section 1605(a)(6)(B) to require

"that the Arbitration Clause is 'governed by' the New York Convention." Motion, at 13.

As the *Cargill* court emphasized, the New York Convention gives jurisdiction if an

arbitration agreement "is or *may be* governed" by a treaty. *Cargill, supra,* at 1018.

The statute's less absolute language naturally encompasses those provisions under which

the arbitral forum is to be selected after the controversy develops, and those provisions

cannot be construed to require arbitration in Iraq.

Because this court cannot conclude as a matter of law that any arbitration had to

be conducted only in Iraq, the FSIA's section 1605(a)(6)(B) must be deemed to be

applicable. As result, Defendant does not enjoy the protection of sovereign immunity in

this case.

### C.  The Forum Selection Clause Cannot Serve As the Basis For Dismissal

Defendant, in a passing sentence, suggests that the court is "separately bound" by

the forum selection clause "to dismiss the Complaint." Motion, at 11. The standards

25

applicable to enforcement of a forum selection clause, however, would mandate denial of

a forum selection clause motion under Fed.R.Civ.P. 12(b)(3).[10]

Even if a forum selection clause is mandatory on its face, it will not be enforced if

there is a "compelling and countervailing reason." *McDonnell Douglas Corp. v. Islamic*

*Republic of Iran* 758 F.2d 341, 345 (8th Cir. 1985). As the Eighth Circuit observed:

> In *Rockwell International Systems v. Citibank,* 719 F.2d 583 (2d
> Cir.1983), the Court refused to enforce a contractual provision stipulating
> that disputes "must be settled in accordance with the rules and laws of Iran
> via referring to the competent Iranian courts." Viewing the forum clause
> as mandatory, the Court nevertheless held "[n]either [party] argues that the
> post-revolutionary Iranian judicial system is capable of affording an
> adequate remedy; courts that have passed on this contention have
> consistently rejected it." At 346.

The *McDonnell Douglas* court then took judicial notice of the hostilities and the

dangerous environment in Iran and concluded that the grave difficulties, inconvenience

and danger precluded enforcement of the forum selection clause. As the court wrote:

> (W)e take judicial notice of the recent escalation of the war between Iran
> and Iraq, the bombing of Tehran by the Iraqi Air Force, Iraq's threat to
> shoot down all commercial planes over Iran, and the suspension of flights
> to Iran, by several commercial airlines, which would make it gravely
> difficult, inconvenient and dangerous for McDonnell Douglas to litigate its
> dispute with Iran in the Islamic Court of the First Instance in Tehran. We
> thus take judicial notice that litigation of the dispute in the courts of Iran
> would, at the present time, be so gravely difficult and inconvenient that
> McDonnell Douglas would for all practicable purposes be deprived of its
> day in court." At 346.

---

[10] A motion to dismiss based on a forum selection clause is brought, where no transfer is or can
be sought under 28 U.S.C.§ 1404, under Rule 12(b)(3). *D/H Oil and Gas Co. v. Commerce and
Industry Insurance Company,* __ F.Supp.2d,__ (N.D.Fla.,2005), 2005 WL 1153332*3.
Though 12(b)(3) was not identified by Defendant as one of the bases for its motion, and though
Defendant only briefly referred to the forum selection clause, the contention is arguably
preserved. *See 2215 Fifth Street Associates v. U Haul Intern., Inc.*148 F.Supp.2d 50, 56
(D.D.C.,2001). Plaintiff reserves the right, however, to challenge the use of a Reply as a
substitute for a 12(b)(3) motion.

Prosecution of the claims in this case in Iraq would be gravely difficult, dangerous and inconvenient. The June 4, 2007 U.S. Department of State Travel Warning for Iraq states, in pertinent part, that:

> Remnants of the former Ba'ath regime, transnational terrorists, criminal elements and numerous insurgent groups remain active. Attacks against military and civilian targets throughout Iraq continue, including the International (or "Green") zone. Targets include convoys en route to venues, hotels, restaurants, police stations, checkpoints, foreign diplomatic missions, international organizations and other locations with expatriate personnel....

> There is credible information that terrorists are targeting civilian aviation. Civilian and military aircraft arriving and departing from Baghdad International Airport for other major cities in Iraq have been subjected to small arms and missiles....

> All vehicular travel in Iraq is extremely dangerous. There have been numerous attacks on civilian vehicles, as well as military convoys. PX A-1.

Those conditions alone preclude enforcement of the forum selection clause. But even if Iraq could offer a physical security environment conducive to commercial activity, there is no judicial system capable of providing Plaintiff with a meaningful day in court.

In 2004, the United States Government Accountability Office reported to Congress that:

> ...(T)he security situation hinders the ability of the ministries to provide needed services and maintain daily operations. To reform the rule of law, ongoing efforts have begun to establish a functioning independent judiciary, although courts are not at their pre-war capacity. However, efforts to rebuild Iraq's judicial system and restore the rule of law face multiple challenges. U.S. officials said that rehabilitating and reforming Iraq's judicial system will likely take years.

*Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues*, GAO-04-902R, June 24, 2004. PX A-2.

27

Iraq's judicial system has not been rebuilt, and the rule of law has not been restored. In its July 2006 Judicial Reform Index ("JRI") for Iraq, the Iraq Legal Development Project ("ILDP") of the American Bar Association reported that "(t)he security situation has greatly hindered the operation of the courts." PX A-3, at 1. The ILDP explained:

> Overall, Iraq received a positive correlation on 7 out of 30 JRI factors, a negative correlation on 12 factors, and a neutral correlation on the remaining 11 factors....
>
> It will take many more years...to address the lack of balanced gender, ethnic, and religious representation in the courts and the inadequacy of court buildings, to name but two prominent issues. Much will depend on whether Iraq becomes stable again in the near future and, if it does, whether the Iraqi government that emerges will respect the principle of judicial independence...
>
> Indeed, the most serious issue facing Iraqi judges today is survival. The growing insurgency has made judges and courthouses a centerpiece of attack. Several judges and the family members have been assassinated since 2003....Until security is restored to Iraq, judicial improvements of any sort will be difficult or impossible to implement....
>
> Despite advances related to structural independence of the judiciary, the independence of individual judges remains a concern. Judges face intense pressure from external forces and individuals...and religious loyalties. *Wasta*, the practice of doing favors for persons with whom you have a family or other personal connection, remains widespread...Furthermore, threats against judges and their families from individuals or groups connected to violent fractions in Iraqi society have clearly increased.
>
> Most judges and court employees are unable to access the Internet for legal information, due either to lack of adequate computer equipment, lack of training on how to use this equipment, or lack of steady electricity supply in some instances. *Id.* at 1, 2, 3.

Thus, both the current security environment in Iraq, and the absence of an effective, reliable or credible judicial system, precludes reliance by Iraq on a forum selection clause which identifies Iraq as the judicial forum for resolution of claims.

28

## SECTION THREE:  THE COMPLAINT STATES A CLAIM

**A.  Defendant Failed To Meet Its Burden On the Affirmative Defense of the Statute of Limitations**

Urging the court to apply a three year statute of limitations, Defendant contends that the complaint should be dismissed because the Complaint alleges that plaintiffs "loss of tangible property occurred" in 1991 and that "Iraq failed to render payment under the Contract although plaintiff had 'completed and handed over eight of nine zones' to be completed under the contract by…" 1990. Motion, at 15.  The dispositive defects and gaps in Defendant's contentions, however, are paradigms for this Circuit's reluctance to dispose of statute of limitations arguments by means of a motion to dismiss.

> There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense. The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal. We do not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense.

*Richards v. Mileski,* 662 F.2d 65, 72 (D.C.Cir.1981), cited with approval in *Doe v. U.S. Dept. of Justice* 753 F.2d 1092, 1117 (D.C. Cir. 1985) (Wald, dissenting).

In those rare circumstances where a defendant colorably asserts the statute of limitations in a motion to dismiss, the 12(b)(6) mandate that  "… the complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no state of facts in support of his claim that would entitle him to relief" must be applied by the trial court. *Jones v. Rogers Memorial Hospital* 442 F.2d 773, 775 (D.C. Cir. 1971).  As Judge Urbina

29

recently wrote in *Potts v. Howard University* 240 F.R.D. 14, 17-18

(D.D.C. 2007):

> Because statute of limitations issues often depend on contested questions
> of fact, however, the court should hesitate to dismiss a complaint on
> statute of limitations grounds based solely on the face of the complaint.
> *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C.Cir.1996). Rather, the
> court should grant a motion to dismiss only if the complaint on its face is
> conclusively time-barred. *Id.; Doe v. Dep't of Justice,* 753 F.2d 1092,
> 1115(D.C.Cir.1985).

The statute of limitations is an affirmative defense which the party asserting it

must allege and prove. *Cunningham & Associates v. Dugan,* 909 A.2d 1001, 1006 (D.C.,

1996). "…(T)he statute of limitations begins to run when a claim accrues, and … a cause

of action accrues when its elements are present, so that the plaintiff could maintain a

successful suit." *News World Communications, Inc. v. Thompsen,* 878 A.2d 1218, 1222

(D.C., 2005).

Defendant's motion fails to meet that standard with respect to each of the

elements of a statute of limitations defense.

First, Defendant offers no rationale for its assertion that the court should look to

the statute applicable to simple contracts, rather than contracts under seal.[11]  The

appropriate statute of limitations for actions on an instrument under seal is twelve years.

D.C.Code § 12-301(6).  And *see District of Columbia Water and Sewer Authority v.*

*Delon Hampton & Associates,* 851 A.2d 410, 417 (D.C.,2004) (discussing indicia that

contracts are under seal), and *Burgess v. Square 3324 Hampshire Gardens Apartments,*

*Inc.* 691 A.2d 1153, 1156 (D.C.,1997) (same).

---

[11] A standard choice of law provision in a contract is "generally understood to incorporate only
substantive law, not procedural law such as statutes of limitation." *Olivarius v. Stanley J. Sarnoff*
*Endowment for Cardiovascular Science,* 858 A.2d 457, 463 (D.C., 2004), and *see* Complaint, at ¶
6 (reciting contract provision selecting Iraqi law).

Secondly, Defendant makes no serious attempt to define the actual date of accrual of the claim.

Count One of the Complaint alleges, without the inclusion of particular dates, that "Defendant has failed and refused to participate in the arbitration process set out in the Contract." Complaint, at ¶ 35.[12] The Contract Arbitration Clause sets out a multi-step procedure which can be commenced before or after termination, abandonment or breach of the Contract. Complaint, at ¶ 6. Defendant, however, makes no reference at all to the time or the dates of their breach of the Contract Arbitration Clause.

As the District of Columbia Circuit stated in *Exxon Chemical Co. v. N.L.R.B.*, 386 F.3d 1160, 1164 (D.C. Cir., 2004):

> We address at the outset Exxon's contention that the unfair labor practice charge was barred by the six-month limitations period...The statute begins to run when the unfair labor practice occurs.... Here, the unfair labor practice is Exxon's refusal to arbitrate. As the record makes clear, the Union did not request, and the employer therefore could not have refused, arbitration until March 26, 1999, which was less than six months before the Union filed the charge. Therefore, the unfair labor practice charge is timely.

And *see Williston, supra,* at § 56:63 (cause of action accrues when the grievance procedure is exhausted or breaks down). The statute of limitations applicable to Count One therefore begins to run only upon the refusal by defendant to arbitrate the dispute between the parties as required by the Contract. Neither the Complaint nor the motion identifies that date.

The record now before the court is thus barren of any facts sufficient to enable the court to conclude that Count One is "conclusively time-barred," *Potts, supra*, at 17-18,

---

[12] In suits to compel arbitration, a federal district court borrows the applicable statute of limitations and tolling rules from the state in which it sits. 20 Williston on Contracts, § 56:63 (Fourth Ed. 2001).

nor can it be said that "it appears beyond doubt that the plaintiff can prove no state of facts in support of his claim that would entitle him to relief" under Count One of the Complaint. [13]

Similarly, as to Count Two, Defendant fails to identify the accrual of the breach of contract cause of action. While Defendant conflates the completion of eight out of nine zones in 1990 and the destruction of property in 1991 with its own "failure to render payment," it offers no facts of any kind to suggest, much less conclusively establish, that payment was due immediately upon either event.

"The general rule in the District is that a claim for breach of contract accrues 'when the contract is first breached.'" *Material Supply Intern., Inc. v. Sunmatch Indus. Co., Ltd.* 146 F.3d 983, 992 (D.C.,1998).

> It is fundamental that a cause of action in contract accrues at the time of the breach or failure to do the thing agreed to and that in the case of contracts calling for the payment of money there can be no action at law commenced for the recovery of the money before it becomes payable in accordance with the terms of the contract.

*Werber v. Atkinson,* 84 A.2d 111, 114 (D.C.App. 1951).

Defendant makes no attempt to identify "the terms of the contract" according to which money owed to Plaintiff "becomes payable." Defendant has thus failed to identify the date of its own breach of the Contract, and, as a consequence, cannot be found to have "conclusively" established the running of the statute of limitations, nor to have established beyond doubt that the plaintiff can prove no state of facts in support of its breach of contract claim.

---

[13] Indeed, on its own and in the context of a judicial disposition of the right to submit a dispute to arbitration, a statute of limitations defense is more appropriately submitted to the arbitrator. *Hanes Corp. v. Millard,* 531 F.2d 585, 599 (D.C., 1976).

Clearly, a record far more comprehensive than that now before the court is necessary to enable the court to conclusively determine as a matter of law the correct statute of limitations, and the time of accrual of the separate claims in each of the two counts of the complaint. Equally significant, the record is inadequate to enable the court to assess whether principles of waiver, estoppel or equitable tolling limit or preclude the application of the statute of limitations to the claims in this case.[14]

As Judge Roberts wrote in *Gupta v. Northrop Grumman Corp.*, 462 F.Supp.2d 56, 59(D.D.C., 2006):

> A requirement that Gupta file his administrative complaint in 300 days or his court complaint within three years is not a jurisdictional prerequisite to filing the action in court, however, and may be equitably tolled in extraordinary circumstances. *See Zipes v. TWA,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling."); *Chung v. Dep't of Justice,* 333 F.3d 273, 275-76 (D.C.Cir.2003) ("In litigation between private parties, courts have long invoked waiver, estoppel, and equitable tolling to ameliorate the inequities that can arise from strict application of a statute of limitations.").

The Complaint alleges the implementation of both the UNCC Claims procedure, Complaint, at ¶¶ 21-22, and the IDRO claims procedure, Complaint, ¶¶ 23-26, as well as the imposition of an international embargo. Complaint, at ¶ 14.[15] Each of these

---

[14] As a general rule, federal courts do not apply state tolling rules when "it [is] more appropriate to use federal equitable tolling rules." Wright, Charles Alan, et.al., *Federal Practice and Procedure, §4519*

[15] United Nations Security Council Resolution 661, adopted on August 6, 1990, S/RES/0661(1990), precluded every state and its nationals from, *inter alia,* providing the Government of Iraq or to any commercial, industrial or public utility undertaking in Iraq or Kuwait, any funds or any other financial or economic resources and from remitting any other funds to persons or bodies within Iraq or Kuwait, except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs.

international devices provides a "state of facts" sufficient to preclude on this record and at this stage a conclusive determination as a matter of law that neither waiver, estoppel nor equitable tolling is applicable to the defendant's statute of limitations defense.

Moreover, the war in Iraq and the associated hostilities, dangers and instability tolled the statute, particularly insofar as Iraq was the requisite forum.

"Federal courts have also applied a theory of equitable tolling similar to an 'impossibility' doctrine. Where extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled until the barrier caused by these events is removed." *Forti v. Suarez-Mason*, 672 F.Supp. 1531, 1550 (N.D.Cal. 1987). Even though, nominally, the Argentine courts were open to the plaintiffs, the court in *Forti* recognized that "as a practical matter" the hostile military regime that controlled the courts made it impossible for the claimants to get a fair hearing. *Id.* at 1550.

The Supreme Court has long-recognized the principle that "to say that the courts were shut, is a good excuse on voucher of record." *Hanger v. Abbott*, 73 U.S. 532, 541 (1867). Although it lacked a legislated exception, the *Hanger* Court refused to allow a three year statutory period to operate on a claim in debt that accrued immediately preceding the outbreak of the Civil War, which had closed the court to actions between belligerents for at least three years. *See Hanger*, 73 U.S. at 541-42; *See also The Protector*, 76 U.S. 687 (1869) (tolling limitations period for appeal claim for the length

---

One commentator, perhaps broadly, observed that "(i)n the Iraq case, implementing a stay on the enforcement of creditor's rights to use litigation to collect unpaid sovereign debt was a major priority and was implemented by UNSCR 1483 shortly after the collapse of the Saddam regime" in the Spring of 2003. Weiss, Martin A., *Iraq's Debt Relief: Procedure and Potential Implications for International Debt Relief*, Congressional Research Service, RL33376, at CRS-11 (April 21, 2006).

of the Civil War); *see also United States v. Wiley*, 78 U.S. 508, (1870) ("[Statutes of

limitations] are enacted upon the presumption that one having a well-founded claim will

not delay enforcing it beyond a reasonable time...[b]ut the basis of the presumption is

gone whenever the ability to resort to the courts has been taken away.").

During World War II, the impossibility rule was applied in the context of a

maritime negligence claim brought by a sailor against a merchant vessel-the ship was

captured and the plaintiff spent the duration of the war in a Japanese prison camp. *See*

*Osbourne v. United States,* 164 F.2d 767, 767-68 (2d Cir. 1947). The Second Circuit

applied *Hanger* to toll the limitations period for the duration of the war due to the

"extraordinary circumstance that throughout the period when he ought to have brought

suit, the courts were unavailable to him as a prisoner in the hands of the enemy." *Id.* at

768. In 1987, the *Hanger* doctrine was further extended in *Forti* to apply to claims by

aliens so that the limitations period was tolled for more than a decade.

The impossibility rule applies with equal force to the facts of this case, and

operates to toll the statute of limitations.

## B. Defendant Failed To Meet Its Burden On the Affirmative Defense of Release

Defendant relies on limited release language [16] which neither explicitly nor

implicitly covers the claims asserted in this case. Indeed, IDRO's scope, procedures and

---

[16] Whether Defendant's reliance on extraneous material converts its motion to dismiss into a motion for summary judgment is discussed below.

One commentator has observed, perhaps broadly, that, "(i)n the Iraq case, implementing a stay on the enforcement of creditor rights to use litigation to collect unpaid sovereign debt was a major priority and was implemented by UNSCR 1483 shortly after the collapse of the Saddam regime (in Spring 2003)." Weiss, Martin A., *Iraq's Debt Relief:  Procedure and Potential Implications for International Debt Relief,*
Congressional Research Service (April 21, 2006) RL 33376, at 5, 11.

mechanisms – along with Plaintiff's submissions to IDRO and IDRO's treatment of those submissions -- make clear that the release language was neither designed nor intended by either IDRO party to address the Complaint's claims.

### 1. The IDRO Procedures and Definitions

The final portion of Iraq's debt are commercial claims estimated around $20 billion. These are outstanding commercial claims against various Iraqi guarantors that arose prior to the August 6, 1990 U.N. sanctions imposed when Iraq invaded Kuwait. The Iraqi government retained two U.S. companies, Ernst & Young and Citigroup, to adjudicate these debt claims and to help negotiate various settlements with small and large Iraqi creditors. The Iraq Debt Reconciliation Office was established in Amman, Jordan in May 2004. On December 9, 2004, Iraq's Ministry of Finance posted an official query seeking information about commercial claims, including claims held by financial institutions, outstanding against the Iraqi government.

On July 26, 2005, Iraq announced the terms for its commercial settlement negotiation. For small creditors (less than $35 million) Iraq would settle claims through a cash buyback and cancellation. For larger claims, Iraq would seek a debt-for-debt swap. For small creditors, the cash purchase price would equal 10.25% of the outstanding claim up to a maximum of $4.3 million. Larger creditors would receive ... new bonds carrying a face value of $200 for every $1000 of old debt.

*Weiss, supra*, at CRS-10.

The IDRO process involved three stages: a preliminary determination of eligibility; submission of eligible claims to an auditing process which undertook to reconcile the claimant's documentation with Iraqi records; and an arbitration of eligible claims which went through the reconciliation process but which could not be reconciled.

Ernst & Young issued in July 2005 its Reconciliation Methodology,[17] which stated, *inter alia,* that " 1. <u>Confirmation of Eligibilty</u>   Only those claims that meet the

---

[17] Plaintiff appends hereto as Plaintiff's Exhibit B ("PXB") a copy of the Reconciliation Methodology, but notes that PXB, and the exhibits which follow, are included herein only in response to the attachments to the Defendant's Motion to Dismiss, and without prejudice to Plaintiff's procedural challenge to Defendant's Exhibits. *See* discussion at Subsection D below.

criteria of Specified Debt will be reconciled and deemed eligible for the next step in this process." PXB, at 1.

Specified Debt, in turn was defined according to five required criteria,[18] including a specific and defined type of debt, and a requirement that the debt be "denominated, or at the option of the Holder payable, in a currency other than Iraqi dinars." PXB at 11.

The Reconciliation Methodology then sets out the procedure for submitting eligible claims for reconciliation, the determination of whether the claim is "reconciled," and the methods for calculation of the sum, if any, that is due to the creditor. As the reconciliation Methodology stated:

> Upon receipt of sufficient information from the Holder concerning claims that are eligible for reconciliation, the Reconciliation Agent will proceed to compare the information provided in respect of each submitted Item against the corresponding Iraqi records....

> The Reconciliation Agent will classify each item as either reconciled or not reconciled. An Item will be classified as reconciled when it is matched to Iraqi records. An Item will be classified as not reconciled if ... the Reconciliation Agent is unable to confirm one or more of: (1) the claim's existence; (2) the outstanding principal amount claimed; or, (3) the maturity date claimed.

> The Reconciliation Agent will deliver to the Holder: (i) a notice of reconciled eligible claims, and (ii) a notice of claims not reconciled....

PXB at 2. The Reconciliation Methodology did not address the arbitration stage.

On February 9, 2006, Iraq issued its Invitation to Tender Claims for Cash Purchase and Cancellation (the "Invitation"). PXC. The Invitation provided, in pertinent part, as follows:

### 3.    Reconciliation; Interest Calculation

This Invitation has been preceded by a debt reconciliation process **The**

---

[18] The definition conformed to the definition in the Request for Information ("RFI")

**Reconciled Eligible Claims set out in Schedule I to this Invitation reflect claims meeting the eligibility criteria** described in the RFI that were submitted by the Holder and successfully reconciled by the Reconciliation Agent ...

**If any claims meeting the eligibility criteria of the RFI were submitted by the Holder in response to the RFI but could not be reconciled by the Reconciliation Agent by the date of this Invitation, these are listed on Schedule II** to this Invitation ("Unreconciled Claims")....

By submitting the Tender, the Holder represents and warrants as follows: ...

> (viii)  **the claims that are tendered meet the criteria for eligibility set forth in the RFI;**

By Submitting the Tender, the Holder irrevocably agrees to the terms and conditions of this Invitation. As part hereof, the Holder: ...

> (ix)  agrees (subject only to the resolution of any Unreconciled Claims in accordance with Section 15 below) that the receipt of the Purchase Price with respect to the Reconciled Eligible Claims that are the subject of the Tender on the Closing Date **will fully discharge and satisfy any and all claims for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due, or thereafter falling due, in respect of any Unasserted Claims (as defined in Section 14 below) and will release Iraq or such obligor or guarantor of any Unasserted Claim from such obligation as provided in Section 14 below;**

> (ix)  agrees that any claim that remains unreconciled and is shown as such on the Holder's Statement of Unreconciled Claims will, no later than the Tender Due Date, _either_ be submitted by the Holder to the Arbitration Mechanism described in Exhibit A hereto (the "_Arbitration Mechanism_") pursuant to Section 15 below, or be withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release contained in Section 8(ix) above; and

## 14.  Unasserted Claims

**The RFI to which the Holder responded asked the Holder to identify all claims owned by it that meet the eligibility criteria set out in the RFI. In processing responses to the RFI, Iraq and the**

**Reconciliation Agent have assumed that the Holder complied with this request and that, to the extent any claims meeting the eligibility criteria of the RFI held by the Holder on the date of its response to the RFI (or any supplement thereto) were not identified in its response to the RFI, or were initially identified but were subsequently withdrawn from the Holder's submission to the Reconciliation Agent, the Holder has decided to waive its right to assert a claim for payment or settlement of those amounts. Such unasserted claims are referred to herein as "Unasserted Claims".**

Accordingly, if a Holder's Tender of Reconciled Eligible Claims pursuant to this Invitation is accepted by Iraq and the Holder receives the Purchase Price corresponding to those Reconciled Eligible Claims on the Closing Date then, pursuant to Section 8(ix), the Holder (i) shall be deemed to have simultaneously cancelled and discharged in full all amounts (of whatever description) that may be payable in respect of any Unasserted Claims ....

15.    Unreconciled Claims; Arbitration Mechanism

Schedule II to this Invitation lists any claims submitted for reconciliation by the Holder in response to the RFI that could not be successfully reconciled by the Reconciliation Agent by the date of this Invitation. Any claim that is identified on the Holder's Statement of Unreconciled Claims will, by the Tender Due Date, at the Holder's election, either be submitted to the Arbitration Mechanism or withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.

17.    Governing Law; Submission to Jurisdiction; Waiver of Immunity

This Invitation, the Tender, and any acceptance or rejection thereof by Iraq, shall be governed by and construed in accordance with the law of the State of New York.

(Emphasis added). PXC, at 2, 4, 5, 6, 8, 11 and 17. The Invitation contained no

provisions for release or discharge of ineligible claims. PXC. Rather, the Invitation

explicitly and , purposefully contemplated a release only of all eligible claims that

went through the reconciliation process, whether or not the claims were eventually

reconciled with the Iraqi records, and whether nor not claims identified as

unreconciled were pursued in arbitration.

39

As is established in the following subsection, the claims in this case were not IDRO eligible claims, never went through the reconciliation process, were never treated as either reconciled or unreconciled, and cannot be construed to be "Unasserted Claims" within the meaning of the IDRO documents themselves, and in particular the release language of those documents.

### 2.    Plaintiff's IDRO Submissions, Tender and Results

In written and oral exchanges between Plaintiff and IDRO, IDRO insisted that the claims now asserted in this case were not Specified Debt, because the obligations did not arise from the type of debt described in paragraph (iii) of the definition of Specified Debt, PXB at 11, and because the obligation arose out of a debt denominated in dinars. The claims asserted herein were, therefore, deemed ineligible, Complaint, at ¶¶ 23-27, and were never submitted by IDRO for reconciliation.

On February 22, 2006, IDRO issued to Plaintiff a Schedule I Statement of Reconciled Eligible Claims, PXD, and a Schedule II Statement of Unreconciled Claims. PXE. Schedule I stated: "The Reconciliation Agent was unable to reconcile any of the claims registered by the Holder." PXE. Schedule II listed the claimed principal as $7,505,203.20, and stated that "The Reconciliation Agent is unable to confirm: existence." PXE.

On March 9, 2006, Plaintiff delivered to IDRO its Tender. PXF. That Tender provided, *inter alia*, that:

> The above-named Holder ... hereby offers each ...Reconciled Claim for purchase by Iraq and simultaneous cancellation on the terms, and subject to the conditions, set out in the Invitation....
>
> The Holder is the holder of the Unreconciled Claims specified in the Schedule II attached hereto and irrevocably agrees that if the Chairperson

40

for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim pursuant to the Arbitration Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any Unreconciled Claim not covered by such an election will be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 of the Invitation. …

…Holder represents and warrants … as follows:… (viii)   the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI…

PXF. Nothing in the Tender contained a discharge or release of ineligible claims, or of claims that did not meet the definition of Specified Debt. To the contrary, the discharge and release was explicitly limited to the Unreconciled Claims set out in Schedule II.

Plaintiff submitted to arbitration the Unreconciled Claim of $7,505,203.20 in its entirety. PXG. On June 28, 2006, Plaintiff prevailed in full in the arbitration. PXH.

### C.   The IDRO Documents Did Not Provide For  Discharge or Release of the Claims in This Case

Applying New York law, as is required by Section 17 of the Invitation, "(a) release is a contract that, unless its language is ambiguous, must be interpreted to give effect to the intent of parties as indicated by the language they utilized." (*J & A Bayly Construction Company, Inc. v. Village of Castleton-on-Hudson,* 248 A.D.2d 766, 767. In the event that the contract language is ambiguous, the ambiguity must be resolved against Defendant as the drafter of the contract. *Burgos v. Metro-North Commuter R.R.* - --- N.Y.S.2d ----, 2007 WL 1412548 *1 (N.Y.A.D. 1 Dept., 2007).

The release language upon which Defendant relies is limited, rather than general, *see Record v. Royal Globe Ins. Co.*83 A.D.2d 154, 443 N.Y.S.2d 755 (N.Y.A.D.,1981), and that language explicitly and clearly limited the scope of any discharge or release to eligible claims that completed the reconciliation process.

41

The claims in this case were not treated as eligible. IDRO's own Schedules establish beyond any challenge that the only claims that were submitted by IDRO to its Reconciliation Agent were certain of the contract claims in the amount of $7,505,203.20. PXD, PXE, PXG.

The claims in this case cannot be construed to have been "Unreconciled Claims," PXC at 8, 9, 11, PXB at 2, 11, and they were not characterized as such. Because they were treated as neither "eligible" nor "unreconciled," they fall outside the definition of "unasserted claims," PXC, at 8, 10-11, PXF at 1. Other than the sale and the transfer of the Reconciled Claims, and the discharge and release of the "unasserted claims," there are no other provisions in any of the IDRO documents which can be construed to effect any kind of release or discharge of the claims in this case.

Iraq negotiated for and received a surrender and release of that portion of any eligible reconciled claim or arbitration award which was not paid as a consequence of the acceptance of the 10.25% offer, PXC at 3, and it received a discharge and release of eligible claims which were not reconciled and either were not pursued in arbitration or which were unsuccessful in arbitration. It never sought, and it never received, a release of claims which were ineligible for IDRO processing and which never were reconciled in the IDRO process.

Clearly, Defendant has failed to establish beyond doubt that the plaintiff can prove no state of facts to overcome the affirmative defense of release.

### D. Reliance On the Exhibits Appended to Defendant's Motion Would Require Conversion to Summary Judgment

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the

motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*See Marshall County Health Care Authority v. Shalala* 988 F.2d 1221, 1226 (D.C. Cir. 1993). "...(T)he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'" *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2nd Cir. 2006).

Conversion is not required where the trial court considers material which is "integral" to the complaint or "an appropriate subject for judicial notice." *Id*. Defendant's contention that its exhibits fall within that exception to the conversion requirement is, however, incorrect. As the court in *Global Network Communications, Inc., supra,* made clear: "...(W)ith respect to whether the materials considered were integral to Global's complaint, a necessary prerequisite for that exception is that the 'plaintiff *rely* on the terms and effect of the document in drafting the complaint;" mere notice or possession is not enough (internal brackets and ellipses omitted, emphasis in original)." At 156.  The *Global* court rejected the contention that the complaint's reference to guilty pleas opened the door to the content of the testimony proffered in exchange for the pleas. At 156.

Emphasizing that the complaint neither "mentioned nor relied upon" the testimony, and citing with approval a prior decision requiring that the complaint "relies *heavily* upon its terms and effect (emphasis in original),"*id.*, the court noted that "(i)n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls...." At 157.  There is no reference in the Complaint to any of Defendant's

43

proffered exhibits, nor is any of those exhibits relied upon in the Complaint.
Accordingly, the court may only consider those exhibits if it follows the conversion
procedure described in Rule 12(b)(6).

In the event that the court determines that it will consider the exhibits appended to
Defendant's motion, the court must provide Plaintiff with notice and an opportunity to
conduct discovery on the issues raised by the exhibits. "When a district court converts a
Rule 12(b)(6) motion to one for summary judgment, it must allow all parties both a
'reasonable opportunity to present all material made pertinent to such a motion by Rule
56' and a chance 'to pursue reasonable discovery.'" *Taylor v F.D.I.C.*, 132 F.3d 753, 765
(D.C. Cir. 1997).

## CONCLUSION

For the reasons set forth herein, the instant motion should be denied.

44

Respectfully submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

45

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD      :
            :
    Plaintiff,     :   Case No. 1:07-cv-00165 (RBW)
            :
            :
  vs.         :
            :
THE REPUBLIC OF IRAQ    :
    Defendant.    :

### PLAINTIFF'S EXHIBITS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

**A-1**  U.S. State Department Travel Warning (August 28, 2006)

**A-2**  Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues, GAO-04-902R (June 28, 2004)

**A-3**  Judicial Reform Index for Iraq (July 2006)

**B**  Ernst & Young Reconciliation Methodology Memorandum (July 6, 2005)

**C**  Invitation to Tender Claims (February 9, 2006)

**D**  Schedule I:  Statement of Reconciled Eligible Claims (February 22, 2006)

**E**  Schedule II:  Statement of Unreconciled Claims (February 22, 2006)

**F**  Tender (March 9, 2006)

**G**  Statement of Claims Submitted to Arbitration (July 6, 2006)

**H**  Notice of Award (June 28, 2006)

Respectfully submitted,

*SJR b*

Sylvia J. Rolinski, Esq. # 430573
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*: (240) 632-0906
*Email*:  srolinski@rolinski.com

Philip M. Musolino, Esq. #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

# EXHIBIT A

Department of Consular Affairs
Washington, DC 20520

This information is current as of today, Mon Jun 04 14:04:00 2007.

## IRAQ

**August 28, 2006**

International Travel Home

New Requirements for U.S. Citizens

International Travel Information

Tips for Traveling Abroad

Document Requirements

Living Abroad Tips

Additional Resources

About Overseas Citizens' Services

This Travel Warning updates the current security situation and reiterates the dangers of the use of civilian aircraft and road travel within Iraq. This supersedes the Travel Warning of December 29, 2005 and the Public Announcement dated March 24, 2006.

The Department of State continues to strongly warn U.S. citizens against travel to Iraq, which remains very dangerous. Remnants of the former Ba'ath regime, transnational terrorists, criminal elements and numerous insurgent groups remain active. Attacks against military and civilian targets throughout Iraq continue, including in the International (or "Green") Zone. Targets include convoys en-route to venues, hotels, restaurants, police stations, checkpoints, foreign diplomatic missions, international organizations and other locations with expatriate personnel. These attacks have resulted in deaths and injuries of American citizens, including those doing humanitarian work. In addition, there have been planned and random killings, as well as extortions and kidnappings. U.S. citizens have been kidnapped and several were subsequently murdered by terrorists in Iraq. U.S. citizens and other foreigners continue to be targeted by insurgent groups and opportunistic criminals for kidnapping and murder. Military operations continue. There are daily attacks against Multinational Forces - Iraq (MNF-I), Iraqi Security Forces and Iraqi Police throughout the country.

There is credible information that terrorists are targeting civil aviation. Civilian and military aircraft arriving at and departing from Baghdad International Airport for other major cities in Iraq have been subjected to small arms and missiles. Civilian aircraft do not generally possess systems, such as those found on military aircraft, capable of defeating man-portable, surface-to-air missiles (MANPADS). Anyone choosing to utilize civilian aircraft to enter or depart or travel within Iraq should be aware of this potential threat, as well as the extremely high risk to road transportation described below. As a result of a recent security incident at the Baghdad International Airport (BIAP), the U.S. Embassy is prohibiting all U.S. government employees from departing BIAP on commercial airlines until further notice.

All vehicular travel in Iraq is extremely dangerous. There have been numerous attacks on civilian vehicles, as well as military convoys. Attacks occur throughout the day, but travel at night is exceptionally dangerous. Travel in or through Ramadi and Fallujah; in and between al-Hillah, al-Basrah, Kirkuk, and Baghdad; between the International Zone and Baghdad International Airport; and from Baghdad to Mosul is particularly dangerous.

Occasionally, U.S. Government personnel are prohibited from traveling to certain areas depending on prevailing security conditions. There continues to be heavy use of Improvised Explosive Devices (IEDs), (especially new-type Explosively Formed Penetrators (EFP), and/or mines on roads, concealed in plastic bags, boxes, soda cans, dead animals, and in other ways to blend with the road. Grenades and explosives have been thrown into vehicles from overpasses, particularly in crowded areas. Overland travel should be undertaken only when absolutely necessary and with the appropriate security.

The U.S. Embassy is located in the International Zone. The Embassy can provide only limited emergency services to U.S. citizens in Iraq. At present, travel to and from the International Zone is extremely limited. The U.S. Embassy does not provide visa services to the general public. American citizens who choose to visit or reside in Iraq despite this Travel Warning are urged to pay close attention to their personal security, avoid crowds, especially rallies or demonstrations, and to inform the U.S. Embassy of their presence in Iraq. All Americans in Baghdad are strongly encouraged to register with the Embassy at the following website: https://travelregistration.state.gov/ibrs/home.asp.

American citizens may obtain the latest security information or other information about Iraq by calling the U.S. Embassy, located in the International Zone, via landline at: 1-240-553-0584 x5340 or x5346, via Iraqna cellular phones at 07901-732-134 or 07901-168-383, via e-mail to usconsulbaghdad@state.gov, or via the U.S. Embassy's website at http://iraq.usembassy.gov. The after-hours number in case of extreme emergency is 1-914-822-5493.

Updated information on travel and security in Iraq may be obtained from the Department of State by calling 1-888-407-4747 within the United States, or, from overseas, 1-202-501-4444. For further information, please consult the Consular Information Sheet for Iraq, the current Worldwide Caution and the Middle East and North Africa Public Announcements, all of which are available on the Bureau of Consular Affairs Internet website at http://travel.state.gov.



EXHIBIT

A-1

6/4/2007



Keyword or Report #    ...........................................  Go

Home    |    About GAO    |    Contact GAO    |    Site Map    |    Help

# Abstract

Rebuilding Iraq: Resource, Security, Governance, Essential
Services, and Oversight Issues, GAO-04-902R, June 28, 2004
PDF    Accessible Text

Rebuilding Iraq is a U.S. national security and foreign policy
priority. According to the President, the United States intends to
help Iraq achieve democracy and freedom and has a vital national
interest in the success of free institutions in Iraq. As of April 30,
2004, billions of dollars in grants, loans, assets, and revenues from
various sources have been made available or pledged to the
reconstruction of Iraq. The United States, along with its coalition
partners and various international organizations and donors, has
embarked on a significant effort to rebuild Iraq following multiple
wars and decades of neglect by the former regime. The Coalition
Provisional Authority (CPA), established in May 2003, was the U.N.-
recognized coalition authority led by the United States and the
United Kingdom that was responsible for the temporary governance
of Iraq. Specifically, the CPA was responsible for overseeing,
directing, and coordinating the reconstruction effort. On June 28,
2004, the CPA transferred power to a sovereign Iraqi interim
government, and the CPA officially dissolved. To pave the way for
this transfer, the CPA helped the Iraq Governing Council develop
the Law of Administration of Iraq for the Transitional
Period in March 2004. The transitional law provides a framework
for governance of Iraq while a permanent government is formed.
In June 2004, U.N. Security Council Resolution 1546 provided
international support to advance this process, stating that, by June
30, CPA will cease to exist and Iraq will reassert full sovereignty.
Resolution 1546 also endorsed the formation of a fully sovereign
Iraqi interim government; endorsed a timetable for elections and
the drafting of an Iraqi constitution; and decided that the United
Nations, at the Iraq government's request, would play a leading
role in establishing a permanent government. Resolution 1546
further noted the presence of the multinational force in Iraq and
authorized it to take all necessary measures to contribute to
security and stability in Iraq, in accordance with letters annexed to
the resolution. Such letters provide, in part, that the multinational
force and the Iraqi government will work in partnership to reach
agreement on security and olicy issues, including policy on
sensitive offensive operations. Resolution 1546 stated that the
Security Council will review the mandate of the multinational force
in 12 months or earlier if requested by the government of Iraq and
that it will terminate the mandate if requested by the government
of Iraq. As part of our broad effort to monitor Iraq reconstruction,
which we undertook at the request of Congress, this report
provides information on the status of the issues we have been
monitoring, as well as key questions that will assist Congres in its
oversight responsibilities. Specifically, this report focuses on issues

## Browse by

**Date**

**Topic**

**Agency**

**Reports and Testimony**

**Legal Products**

**Topic Collections**

**From the Comptroller
General**

**Careers at GAO**

**Subscribe to Updates**

**FraudNET (Report
Fraud, Waste and
Abuse)**

http://www.gao.gov/docsearch/abstract.php?rptno=GAO-04-902R



EXHIBIT
A-2

associated with (1) resources, (2) security, (3) governance, and
(4) essential services. For the essential services issue, we focused
on the Army Corps of Engineers' Restore Iraqi Electricity project, a
major component of the U.S. assistance effort to rebuild the power
sector.

As of the end of April 2004, about $58 billion in grants, loans,
assets, and revenues from various sources had been made
available or pledged to the relief and reconstruction of Iraq.
Resource needs are expected to continue after the transfer of
power to a sovereign Iraqi interim government. Of the funds
available, the United States obligated about $8 billion of the
available $24 billion in U.S. funds. The CPA obligated about $15.5
billion of the nearly $21 billion in available Iraqi funds. The
international community pledged nearly $14 billion. In December
2003, the CPA put into effect an Iraqi-led process to coordinate
reconstruction efforts. An October 2003 U.N./World Bank
assessment noted that Iraq's ability to absorb resources as the
country gains sovereignty and decision-making authority will be
one of the most significant challenges to reconstruction. The
security situation in Iraq has deteriorated since June 2003, with
significant increases in attacks against the coalition and coalition
partners. The increase in attacks has had a negative impact on
military operations and the work of international civilian
organizations in Iraq. As part of the effort to provide stability, the
coalition plans to transfer security responsibilities from the
multinational force to Iraqi security forces and to dissolve Iraqi
militias operating outside the central government's control. During
the escalation of violence that occurred during April 2004, these
security forces collapsed in several locations. However, key
elements of the CPA's transition and reintegration process remain
to be finalized. With U.S. and others' assistance, Iraqis have taken
control of government institutions at the national and subnational
levels. National ministries are providing some services to citizens
as their facilities are being rebuilt, reforms are being introduced,
and their staffs trained. According to the head of the now-dissolved
CPA, all ministries were under Iraqi authority as of the transfer of
power on June 28, 2004. However, the security situation hinders
the ability of the ministries to provide needed services and
maintain daily operations. To reform the rule of law, ongoing
efforts have begun to establish a functioning independent judiciary,
although courts are not at their pre-war capacity. However, efforts
to rebuild Iraq's judicial system and restore the rule of law face
multiple challenges. U.S. officials said that rehabilitating and
reforming Iraq's judicial system will likely take years. The Coalition
considers reconstruction of the power sector critical to reviving
Iraq's economy, supporting essential infrastructure, improving daily
well-being, and gaining local support for the coalition presence in
Iraq. The CPA set a goal of 6,000 megawatts of generating capacity
by June 30, 2004, in anticipation of the higher demand for power
during the summer months. As part of the overall effort to achieve
this goal, the U.S. Army Corps of Engineers (Corps) has
undertaken $1.4 billion in work under the Restore Iraqi Electricity
(RIE) program. As of late May, the Corps anticipated that 59 of the
66 RIE projects expected to help meet the goal would be
completed by June 30. However, electrical service in the country as

a whole has not shown a marked improvement over the immediate postwar levels of May 2003 and has worsened in some governorates. RIE contractors report numerous instances of project delays due to difficulties in getting employees and materials safely to project sites. Further, the security environment continues to affect the cost of rebuilding the power sector.

### Subject Terms

Electric power generation
Employee training
Federal aid to foreign countries
Foreign governments
International cooperation
International organizations
International relations
Judicial reform
Physical security
Iraq War and reconstruction
Army Corps of Engineers Restore Iraqi Electricity Project
Iraq

Home    |    About GAO    |    Contact GAO    |    Privacy & Other Site Policies    |    Site Map    |    Help

*A c c o u n t a b i l i t y      I n t e g r i t y      R e l i a b i l i t y*



# JUDICIAL REFORM INDEX

## FOR

# IRAQ

*July 2006*

© American Bar Association



The statements and analysis contained in this report are the work of the American Bar Association's Iraq Legal Development Project (ABA/ILDP), which is solely responsible for its content. The Board of Governors of the American Bar Association has neither reviewed nor sanctioned its contents. Accordingly, the views expressed herein should not be construed as representing the policy of the ABA. Furthermore, nothing contained in this report is to be considered rendering legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This publication was made possible through support provided by the U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs (INL) and the U.S. Department of Justice (DOJ). The opinions expressed herein are those of the author(s) and do not necessarily reflect the view of either the INL or the DOJ.

ISBN:  978-1-59031-813-3

Printed in the United States of America

Copyright © 2006 by the American Bar Association
740 15th Street NW, Washington, DC  20005

# TABLE OF CONTENTS

Introduction ........................................................................................................................... i

Executive Summary ............................................................................................................. 1

Iraq Background .................................................................................................................. 5
  Legal Context ..................................................................................................................... 5
  History of the Judiciary ..................................................................................................... 6
  Structure of the Courts ..................................................................................................... 7
  Conditions of Judicial Service ........................................................................................ 10
    *Qualifications* ................................................................................................................ 10
    *Appointment and Tenure* ............................................................................................ 10
    *Training* ......................................................................................................................... 11

**Iraq JRI 2006 Analysis**

Table of Factor Correlations ........................................................................................... 13

I.      **Quality, Education, and Diversity** ................................................................... 14
1.      Judicial Qualification and Preparation ........................................................... 14
2.      Selection/Appointment Process ....................................................................... 15
3.      Continuing Legal Education .............................................................................. 16
4.      Minority and Gender Representation .............................................................. 17

II.     **Judicial Powers** .................................................................................................. 18
5.      Judicial Review of Legislation .......................................................................... 18
6.      Judicial Oversight of Administrative Practice ............................................... 20
7.      Judicial Jurisdiction over Civil Liberties ........................................................ 21
8.      System of Appellate Review ............................................................................. 22
9.      Contempt/Subpoena/Enforcement .................................................................. 24

III.    **Financial Resources** .......................................................................................... 25
10.     Budgetary Input ................................................................................................... 25
11.     Adequacy of Judicial Salaries .......................................................................... 26
12.     Judicial Buildings ................................................................................................ 27
13.     Judicial Security ................................................................................................... 28

IV.     **Structural Safeguards** ....................................................................................... 29
14.     Guaranteed Tenure ............................................................................................. 29
15.     Objective Judicial Advancement Criteria ....................................................... 30
16.     Judicial Immunity for Official Actions ............................................................. 31
17.     Removal and Discipline of Judges .................................................................. 32
18.     Case Assignment ................................................................................................ 33
19.     Judicial Associations .......................................................................................... 34

**V.     Accountability and Transparency** ...................................................................34
20.     Judicial Decisions and Improper Influence ........................................................34
21.     Code of Ethics ...................................................................................................36
22.     Judicial Conduct Complaint Process .................................................................37
23.     Public and Media Access to Proceedings .........................................................38
24.     Publication of Judicial Decisions ......................................................................39
25.     Maintenance of Trial Records............................................................................40

**VI.    Efficiency** ...........................................................................................................40
26.     Court Support Staff............................................................................................40
27.     Judicial Positions ..............................................................................................41
28.     Case Filing and Tracking Systems....................................................................42
29.     Computers and Office Equipment .....................................................................43
30.     Distribution and Indexing of Current Law ..........................................................44

**List of Acronyms** ............................................................................................................45



## Introduction

The Judicial Reform Index (JRI) is an assessment tool implemented by the American Bar Association's (ABA) Rule of Law Initiative through the Iraq Legal Development Project (ILDP). It was developed by the American Bar Association's Central and East European Law Initiative (ABA/CEELI), with the purpose to assess a cross-section of factors important to judicial reform in emerging democracies. In an era when legal and judicial reform efforts are receiving more attention than in the past, the JRI is an appropriate and important assessment mechanism. The JRI will enable the ABA, its funders, and the emerging democracies themselves, to better target judicial reform programs and monitor progress towards establishing accountable, effective, independent judiciaries.

The ABA embarked on this project with the understanding that there is not uniform agreement on all the particulars that are involved in judicial reform. In particular, the ABA acknowledges that there are differences in legal cultures that may make certain issues more or less relevant in a particular context. However, after a decade of working in the field on this issue, the ABA has concluded that each of the thirty factors examined herein may have a significant impact on the judicial reform process. Thus, an examination of these factors creates a basis upon which to structure technical assistance programming and assess important elements of the reform process.

The technical nature of the JRI distinguishes this type of assessment tool from other independent assessments of a similar nature, such as the U.S. State Department's *Human Rights Report* and Freedom House's *Nations in Transit*. This assessment will *not* provide narrative commentary on the overall status of the judiciary in a country. Rather, the assessment will identify specific conditions, legal provisions, and mechanisms that are present in a country's judicial system and assess how well these correlate to specific reform criteria at the time of the assessment. In addition, this analytic process will not be a scientific statistical survey. The JRI is first and foremost a legal inquiry that draws upon a diverse pool of information that describes a country's legal system.

## Assessing Reform Efforts

Assessing a country's progress towards judicial reform is fraught with challenges. No single criteria may serve as a talisman, and many commonly considered factors are difficult to quantify. For example, the key concept of an independent judiciary inherently tends towards the qualitative and cannot be measured simply by counting the number of judges or courtrooms in a country. It is difficult to find and interpret "evidence of impartiality, insularity, and the scope of a judiciary's authority as an institution." Larkins, *Judicial Independence and Democratization: A Theoretical and Conceptual Analysis*, 44 AM. J. COMP. L. 611 (1996). Larkins cites the following faults in prior efforts to measure judicial independence:

> (1) the reliance on formal indicators of judicial independence which do not match reality, (2) the dearth of appropriate information on the courts which is common to comparative judicial studies, (3) the difficulties inherent in interpreting the significance of judicial outcomes, or (4) the arbitrary nature of assigning a numerical score to some attributes of judicial independence.

*Id.* at 615.

Larkins goes on to specifically criticize a 1975 study by David S. Clark, which sought to numerically measure the autonomy of Latin American Supreme Courts. In developing his "judicial effectiveness score," Clark included such indicators as tenure guarantees, method of removal, method of appointment, and salary guarantees. Clark, *Judicial Protection of the Constitution in Latin America*, 2 HASTINGS CONST. L. Q. 405 – 442 (1975).

i



The problem, though, is that these formal indicators of judicial independence often did not conform to reality. For example, although Argentine justices had tenure guarantees, the Supreme Court had already been purged at least five times since the 1940s. By including these factors, Clark overstated . . . the independence of some countries' courts, placing such dependent courts as Brazil's ahead of Costa Rica's, the country that is almost universally seen as having the most independent judicial branch in Latin America.

Larkins, *supra*, at 615.

Reliance on subjective rather than objective criteria may be equally susceptible to criticism. *E.g.*, Larkins, *supra*, at 618 (critiquing methodology which consisted of polling 84 social scientists regarding Latin American courts as little more than hearsay). Moreover, one cannot necessarily obtain reliable information by interviewing judges: "[j]udges are not likely to admit that they came to a certain conclusion because they were pressured by a certain actor; instead, they are apt to hide their lack of autonomy." Larkins, *supra*, at 616.

## Methodology

The ABA sought to address these issues and criticisms by including both subjective and objective criteria and by basing the criteria examined on some fundamental international norms, such as those set out in the *United Nations Basic Principles on the Independence of the Judiciary; Council of Europe Recommendation R(94)12 "On the Independence, Efficiency, and Role of Judges"; Council of Europe's European Charter on the Statute for Judges;* as well as the 1999 *Beirut Declaration* and the 2003 *Cairo Declaration on Judicial Independence.* Reference was also made to a Concept Paper on Judicial Independence prepared by ABA/CEELI and criteria used by the International Association of Judges in evaluating membership applications. The ABA has continually integrated new standards and guidelines into its JRI process, such as the *Bangalore Principles on Judicial Conduct.*

Drawing on these norms, the ABA compiled a series of 30 statements setting forth factors that facilitate the development of an accountable, effective, independent judiciary. To assist assessors in their evaluation of these factors, the ABA developed corresponding commentary citing the basis for the statement and discussing its importance. A particular effort was made to avoid giving higher regard to American, as opposed to European or other regional concepts, of judicial structure and function. Thus, certain factors are included that an American or a European judge may find somewhat unfamiliar, and it should be understood that the intention was to capture the best that leading judicial cultures have to offer. Furthermore, the ABA reviewed each factor in light of its decade of experience and concluded that each factor may be influential in the judicial reform process. Consequently, even if some factors are not universally accepted as basic elements, the ABA determined their evaluation to be programmatically useful and justified. The categories incorporated address the quality, education, and diversity of judges; jurisdiction and judicial powers; financial and structural safeguards; accountability and transparency; and issues affecting the efficiency of the judiciary.

The question of whether to employ a "scoring" mechanism was one of the most difficult and controversial aspects of this project, and the ABA debated internally whether it should include one at all. During the 1999-2001 time period, the ABA tested various scoring mechanisms. Following a spirited discussion with members of the ABA/CEELI's Executive and Advisory Boards, as well as outside experts, the ABA decided to forego any attempt to provide an overall scoring of a country's reform progress to make absolutely clear that the JRI is not intended to be a complete assessment of a judicial system.

Despite this general conclusion, the ABA did conclude that qualitative evaluations could be made as to specific factors. Accordingly, each factor, or statement, is allocated one of three values: *positive, neutral, or negative.* These values only reflect the relationship of that statement to that

ii



country's judicial system. Where the statement strongly corresponds to the reality in a given country, the country is to be given a score of "positive" for that statement. However, if the statement is not at all representative of the conditions in that country, it is given a "negative." If the conditions within the country correspond in some ways but not in others, it will be given a "neutral." *Cf.* Cohen, *The Chinese Communist Party and 'Judicial Independence': 1949-59*, 82 HARV. L. REV. 972 (1969), (suggesting that the degree of judicial independence exists on a continuum from "a completely unfettered judiciary to one that is completely subservient"). Again, as noted above, the ABA has decided not to provide a cumulative or overall score because, consistent with Larkin's criticisms, the ABA determined that such an attempt at overall scoring would be counterproductive.

Instead, the results of the 30 separate evaluations are collected in a standardized format in each JRI country assessment. Following each factor, there is the assessed correlation and a description of the basis for this conclusion. In addition, a more in-depth analysis is included, detailing the various issues involved. Cataloguing the data in this way facilitates its incorporation into a database, and it permits end users to easily compare and contrast performance of different countries in specific areas and – as JRIs are updated – within a given country over time.

Social scientists could argue that some of the criteria would best be ascertained through public opinion polls or through more extensive interviews of lawyers and court personnel. Sensitive to the potentially prohibitive cost and time constraints involved, the ABA decided to structure these issues so that they could be effectively answered by limited questioning of a cross-section of judges, lawyers, journalists, and outside observers with detailed knowledge of the judicial system. Overall, the JRI is intended to be rapidly implemented by one or more legal specialists who are generally familiar with the country and region and who gather the objective information and conduct the interviews necessary to reach an assessment of each of the factors.

One of the purposes of the assessment is to help the ABA – and its funders and collegial organizations – determine the efficacy of their judicial reform programs and help target future assistance. Many of the issues raised (such as judicial salaries and improper outside influences), of course, cannot necessarily be directly and effectively addressed by outside providers of technical assistance. The ABA also recognizes that those areas of judicial reform that can be addressed by outsiders, such as judicial training, may not be the most important. Having the most exquisitely educated cadre of judges in the world is no guarantee of an accountable, effective, or independent judiciary; and yet, every judiciary does need to be well-trained. Moreover, the nexus between outside assistance and the country's judiciary may be tenuous at best: building a truly competent judiciary requires real political will and dedication on the part of the reforming country. Nevertheless, it is important to examine focal areas with criteria that tend toward the quantifiable, so that progressive elements may better focus reform efforts. The ABA offers this product as a constructive step in this direction and welcomes constructive feedback.

## Acknowledgements

Lisa Dickieson, Director, Judicial Reform Programs, the American Bar Association's Central and East European Law Initiative (ABA/CEELI) (1995 to 2000), and Mark Dietrich, Member, New York State Bar and Advisor to ABA/CEELI developed the original concept and design of the JRI. Scott Carlson, Director, Judicial Reform Programs at ABA/CEELI (2000-2003), directed the finalization of the JRI. Assistance in research and compilation of the JRI was provided by Jenner Bryce Edelman, Program Associate at ABA/CEELI, and James McConkie, Student Intern, ABA/CEELI.

During the course of developing the JRI, the ABA benefited substantially from two expert advisory groups. The ABA would like to thank the members of ABA/CEELI's First Judicial Advisory Board, including Tony Fisser, Marcel Lemonde, Ernst Markel, Joseph Nadeau, Mary Noel Pepys, and Larry Stone, who reviewed earlier versions of this index. Additionally, the ABA would like to thank the members of the Second Judicial Advisory Board, including Luke Bierman, Macarena Calabrese, Elizabeth Dahl, Elizabeth Lacy, Paul Magnuson, Nicholas Mansfield, Aimee Skrzekut-



Torres, Roy T. Stuckey, Robert Utter, and Russell Wheeler, who stewarded its completion. Finally, the ABA also expresses its appreciation to the experts who contributed to the ABA/CEELI Concept Paper on Judicial Independence: James Apple, Dorothy Beasley, Nicholas Georgakopolous, George Katrougalos, Giovanni Longo, Kenneth Lysyk, Roy Schotland, Terry Shupe, Patricia Wald, and Markus Zimmer.

## Assessment Team

The Iraq JRI 2006 analysis assessment was conducted by Dr. Sami Shubber and Dr. Aziz Al-Okaily. The team received strong support from the ABA and ILDP staff in Iraq, Jordan, and Washington, including Iraq Country Director Alexander A. Kravetz, Attorneys Jaleel Al Saidi, Riyadh Adnan, and Sarab Hassan, Middle East Programs Director Angela Conway, Research and Program Development Deputy Director Simon R. Conté, Middle East Program Managers Clara Mathieu and Jenna Mace, Deputy Regional Director for Gender Programs Aline Matta, and Regional Judicial Advisor Frank McLoughlin. Thomas F. Cope served as editor, and Olga Ruda, the ABA Rule of Law Initiative's Judicial Reform Focal Area Co-Coordinator, provided guidance throughout the assessment process, edited the report and prepared it for publication. The conclusions and analysis are based on interviews with 34 stakeholders in the Iraqi judiciary conducted in Iraq and Jordan during May and June, 2006, and relevant documents that were reviewed at that time. Records of relevant authorities and individuals interviewed (whose names are kept confidential) are on file in the Washington, DC office of the ABA. A supplemental report that focuses on the Kurdish judiciary in Iraq will be produced in the fall of 2006.

The interviews conducted in Iraq took place under extremely difficult security conditions. In some instances, the assessment team could only travel to courthouses in cars belonging to the High Judicial Council. At least one interview could not be conducted on site in Baghdad because of the deteriorating security situation in that part of the city. This security situation may have affected the interviewees' provision of information. We are extremely grateful for the time and assistance rendered by those who agreed to be interviewed for this project.



## Executive Summary

### Brief Overview of the Results

The 2006 Judicial Reform Index (JRI) for Iraq[1] was conducted in May and June, 2006 during a period of extreme turmoil and violence. The security situation has greatly hindered the operation of the courts. Despite all, since the fall of the Baath regime, the judiciary has made some significant advances, particularly in the areas of enhancement of the judiciary's role in managing its own affairs and in the expansion of its role in oversight of civil rights and liberties and government actions. Overall, Iraq received a positive correlation on 7 out of 30 JRI factors, a negative correlation on 12 factors, and a neutral correlation on the remaining 11 factors. The results reveal an important dichotomy. There are positive correlations on many factors related to the legal reform of the judiciary's role and structure, but primarily negative correlations for many of the factors related to how the courts operate day-to-day. In many instances, neutral correlations indicate that, as a matter of law, the Iraqi judiciary has made great strides, but that it is too soon to determine whether these legal advances will be put into practice. The legacy of Saddam Hussein's rule is a major factor in many of the negative correlations identified in this JRI. It will take many more years and a concerted long-term effort by Iraq's current and future judicial leadership to address the lack of balanced gender, ethnic, and religious representation in the courts and the inadequacy of court buildings, to name but two prominent issues. Much will depend on whether Iraq becomes stable again in the near future and, if it does, whether the Iraqi government that emerges will respect the principle of judicial independence set forth in the 2005 Constitution of Iraq and will accept a judiciary that is empowered to act independently of the government.

### Significant Reforms and Improvements Identified in the 2006 Iraq JRI

A number of key reforms in the Iraqi judiciary, such as greater structural judicial independence, occurred during the period in which Iraq was governed by the Coalition Provisional Authority (CPA). These include the creation of the High Judicial Council (HJC), composed exclusively of judges, that operates the judiciary with substantial independence from the Ministry of Justice (MOJ) and the government. Other reforms, such as the development of broader judicial oversight, came about as a result of the ratification of the new Constitution in 2005.

Examples of specific strengths and achievements include:

- The judiciary as a unit has achieved **substantial structural independence from the MOJ and from the executive branch** of government in general. The **newly formed HJC** has been empowered to manage court employees and to develop an annual budget independently of the MOJ. Interviews with both judges and other legal system stakeholders indicate widespread support for judicial independence within the legal community. A **serious concern remains, however, about the independence of individual judges** from political, religious, and personal influences.

- **Judicial salaries have been increased significantly** since the fall of the Baath regime. It appears that this has been a factor in attracting many well-qualified applicants for judicial positions. Concerns remain, however, about how evenly non-monetary benefits, such as the use of government vehicles, are distributed among judges.

---

[1] The 2006 Iraq JRI does not include an analysis of the Kurdistan Region of Iraq. A supplement to this JRI covering the Kurdistan Region will be completed by the end of November 2006.

ABA
ILDP
Iraq Legal Development Project
المشروع القانوني التنموي العراقي

- The formation in June 2006 of an *independent, non-political, voluntary Judicial Association*, which would include both judges and prosecutors, potentially will enable the judges to address issues of concern to the judiciary as a whole.

- The 2005 Constitution greatly *enhanced the role of the judiciary in overseeing civil rights and liberties, as well as government administrative practices*. The courts now have extensive authority over the review of laws and governmental actions and the power to nullify or overturn decisions that violate the Constitution or relevant laws. Early cases involving the newly created Federal Supreme Court appear to *indicate that the Iraqi Government will accept adverse rulings*, perhaps signifying a broader acceptance of the principle of judicial review of executive actions. It remains to be seen, however, whether acceptance of this exercise of authority by the courts will become the norm.

## Major Concerns Identified in the 2006 Iraq JRI

- *Safety and security remains the fundamental issue* for Iraqi judges and their families. Indeed, the most serious issue facing Iraqi judges today is survival. The growing insurgency has made *judges and courthouses a centerpiece of attack*. Several judges and their family members have been assassinated since 2003, and many more have been threatened and have gone into hiding when not at the courthouse. Although judges are provided with bodyguards and other security measures, they remain at serious risk. Until security is restored to Iraq, judicial improvements of any sort will be difficult or impossible to implement.

- Despite advances related to structural independence of the judiciary, the *independence of individual judges, remains a concern. Judges face intense pressure from external forces and individuals*, often for reasons related to strong family, tribal, ethnic, and religious loyalties. *Wasta*, the *practice of doing favors for persons with whom you have a family or other personal connection*, remains widespread. Although judges frequently rebuff these improper advances, it is impossible to measure how frequently *wasta* affects judicial actions. Given the polarization currently occurring in Iraqi society, it is likely that *pressure from religious and political leaders of various sects and factions* on judges who belong to the same sect or faction has grown. Furthermore, threats against judges and their families from individuals or groups connected to violent factions in Iraqi society have clearly increased.

- A number of problems in the Iraqi judiciary relate to an ongoing *lack of respect for the courts' authority by other parts of government*. For instance, there have been reports that the Ministry of Interior has *detained individuals in non-exigent circumstances without court authorization*, despite legal requirements to the contrary. Furthermore, there is frequently a *lack of enforcement of judicial decisions* by the police, who are charged with enforcing court judgments. Weak enforcement is due to a lack of coordination between the courts and the police, as well as the security situation and a lack of resources.

## Concerns Related to Lack of Accountability, Transparency, and Efficiency of the Judiciary

- Unless they are parties to the case at issue, Iraqi citizens have *little ability to hold judges accountable* or *to access information on the activities of the courts*. For instance, ordinary citizens have *no right to file a complaint against a judge* for misconduct, unless they are also a party to the case at issue. The invasion of Iraq in 2003 resulted in extensive damage to court files. Members of the public are *unable to examine court records* without special permission of the court, nor is there a public method for them to obtain judicial decisions of Iraqi courts. The poor condition of court

2



buildings, which results in some judges conducting civil trials in their offices, means that the public and the media often have *inadequate access to courtroom proceedings*.

- There is *no continuing legal education system* for Iraqi judges, which hinders judges from keeping up with developments in the law. Attempts by foreign governments and international NGOs to train Iraqi judges on cutting-edge issues have occurred, but it is impossible to gauge the sustainability of these efforts. Many of these courses involve flying Iraqi judges out of the country for short periods of time, with little or no follow-up.

- A related concern is that Iraqi judges are *unable to access information easily*. Judges and court employees have *no formal means of learning about court decisions* promulgated elsewhere in Iraq. *Law libraries have been devastated* in many parts of the country by post-invasion looting. Secondary source legal materials are difficult to find. Most judges and court employees *are unable to access the Internet for legal information*, due either to lack of adequate computer equipment, lack of training on how to use this equipment, or lack of steady electricity supply in some instances.

## Concerns Related to Gender, Ethnic, and Religious Imbalance in the Courts

- Despite some progress in achieving gender balance within Iraqi courts, *women still represent less than two percent of the judiciary* (13 women out of 738 sitting judges). The main reason for this disparity is the legacy of the Baath regime, when women were banned from the bench for nearly 20 years during 1984-2003. The current *judicial leadership is making strides in addressing this imbalance*. For instance, more than 10% of students presently enrolled at the Judicial Institute are women. However, a greater effort will need to be made to address this imbalance, particularly given the rise of religious parties and factions in Iraq that are opposed to women serving in the judiciary.

- Similarly, it appears that *full representation for all ethnic and religious groups in the judiciary has not yet been attained*, due mainly to decades of Baath domination of the courts, which favored Sunni Arabs over other minorities. Although the present ethnic composition of the courts is harder to measure, there are judges of various ethnic and religious backgrounds, including the current Chief Justice, who is a Shi'a Muslim. However, there are no formal programs aimed at stimulating the training, placement, and advancement of ethnic and religious minorities in the Iraqi judiciary.

3

# EXHIBIT B

**⧓ ERNST & YOUNG**

**EY Iraq Debt Reconciliation Office**
Ernst & Young
5th. Circle
7 Kindi Street
Off Mecca Street
P.O. Box 5552                        Phone: +962 6 550 9001
Amman 11183
Jordan                              Fax:    +962 6 551 0552

Website                            www.eyidro.com
E-Mail                             idro@ammrsiesd.com


<u>Reconciliation Methodology</u>

This memorandum describes the steps that Ernst & Young, in its capacity as the Republic of Iraq's debt reconciliation agent (the "Reconciliation Agent"), have been instructed by the Iraqi authorities to follow in reconciling claims submitted for reconciliation pursuant to the Request For Information ("RFI") dated 9 December 2004 and posted on the Reconciliation Agent's website (www.eyidro.com).[1]

Capitalized terms used but not otherwise defined in the body of this memorandum are listed in the Index of Defined Terms in the attached Exhibit A.

1.    <u>Confirmation of Eligibility</u>

Only those claims that meet the criteria of Specified Debt will be reconciled and deemed eligible for the next step in this process.  In brief (the attached Index of Defined Terms should be consulted for a complete definition), such claims are defined as outstanding contractual claims:

  (i)     against certain Iraqi governmental obligors or guarantors, as well as Rafidain Bank and Rasheed Bank;

  (ii)    that arose prior to 6 August 1990 (the date of United Nations Security Council Resolution 661 imposing sanctions prior to the first Gulf War);

  (iii)   that are now held by non-governmental creditors not resident in Iraq; and

  (iv)    that have not otherwise been nor will be submitted as part of a claim by a governmental creditor.

---

[1] Also posted on the www.eyidro.com website is the presentation made at the Dubai forum on 4 May 2005.  That presentation outlined potential approaches to parts of this methodology (for example, with respect to interest calculation).  In addition, comments made by claimants during and after the forum informed this methodology.

**EXHIBIT**

B

PENGAD 800-631-6989

**≡ய ERNST & YOUNG**

Such claims include any Items of Specified Debt that have been reduced to court judgments or arbitral awards. These will be reconciled as if the underlying claims had not been reduced to a judgment or award.

All claims that were or are eligible for consideration by the United Nations Compensation Commission (UNCC) will not be considered in this reconciliation process.

A Holder will be informed by the Reconciliation Agent if a claim is not eligible for reconciliation under these procedures.

In addition, Iraq reserves the right, in its sole discretion, to exclude from the reconciliation process any claims submitted by Holders that are located in jurisdictions subject to applicable sanctions or are otherwise deemed by Iraq or its advisers not to be eligible to participate in this process.

2.      Matching of Records

In the RFI, the Reconciliation Agent has asked Holders to provide certain information in respect of each Item of Specified Debt, including the name of the Holder, the name of the borrower and (where applicable) the guarantor, the caption of the governing instrument or contract (the "Instrument"), the date of the Instrument, the total original principal amount and currency of the claim, the outstanding principal amount of the claim and any details respecting the purpose of the Instrument or underlying transaction.

Upon receipt of sufficient information from the Holder concerning claims that are eligible for reconciliation, the Reconciliation Agent will proceed to compare the information provided in respect of each submitted Item against the corresponding Iraqi records. If the Holder has not submitted adequate information to begin this process, the Reconciliation Agent will contact the Holder requesting supplemental or clarifying information, including, where appropriate, supporting documentation.

The Reconciliation Agent will classify each Item as either reconciled or not reconciled. An Item will be classified as reconciled when it is matched to Iraqi records. An Item will be classified as not reconciled if, in light of the Reconciliation Agent's review of both the available Iraqi records and all of the information submitted by the Holder, the Reconciliation Agent is unable to confirm one or more of:

(1)      the claim's existence;

(2)      the outstanding principal amount claimed; or

(3)      the maturity date claimed.

The Reconciliation Agent will deliver to the Holder: (i) a notice of reconciled eligible claims, and (ii) a notice of claims not reconciled identifying

2

**ΞͰ ERNST & YOUNG**

Items that cannot be reconciled because of one or more of the reasons set forth above (see Section 8, "Reconciliation Statements", below). However, throughout the reconciliation process, the Reconciliation Agent will continue to communicate with Holders who have submitted claims in order to facilitate the proper submission and rapid reconciliation of Items of Specified Debt.

3.     <u>Reconciliation of Principal</u>

       The total unpaid principal of an Item of Specified Debt as of 1 December 2004 will be reconciled. Claims consisting solely of late interest will not be taken into account and will not be reconciled. However, to the extent that partial payments have been made in respect of claims including both principal and interest (late or otherwise) components, such payments will, for purposes of this reconciliation process, be applied to interest before principal.

4.     <u>Calculation of Interest</u>

      (a)     <u>Interest Accrual Date</u>

       Interest (whether unpaid contractual interest or late interest) on the total reconciled unpaid principal of an Item of Specified Debt will not be reconciled according to the contractual provisions of the Instrument but will instead be calculated in the manner described below from the earliest of:

          (i)     the principal maturity date of that Item (where that Item has been rescheduled, the most recent rescheduled maturity date);

          (ii)     for interest-bearing Instruments, the last date on which a payment of interest was due for that Item and paid in full, regardless of actual date of payment (except where <u>no</u> interest payments were made, in which case the date from which interest began to accrue under the Instrument); and

          (iii)     6 August 1990

(the "<u>Interest Accrual Date</u>"). Any Item for which no date corresponding to (i) or (ii) above is specified in its Instrument will be deemed to have an Interest Accrual Date of 6 August 1990.

       Partial payments will be assumed to have occurred as of the Interest Accrual Date unless the Holder establishes otherwise, in which case the calculation of interest will be adjusted accordingly, consistent with this methodology.

       For Instruments that provide only for a lump sum payment due at maturity (and which do not specify a contractual rate of interest), the unpaid

principal amount of the relevant Item as of the Interest Accrual Date will be assumed to include all accreted interest.

For the avoidance of doubt, this methodology for calculating interest accruals on Items of Specified Debt will supercede, for purposes of this reconciliation, any provisions for calculating unpaid contractual and late interest in the relevant Instrument. If an Instrument does not expressly contemplate the accrual of late interest on an Item after its scheduled principal maturity date, that Item will nonetheless be deemed for purposes of this reconciliation to have accrued late interest according to this methodology.

(b)    Interest Prior to 6 August 1990 -- Original Currency

Where the Interest Accrual Date for an Item occurs before 6 August 1990, interest will be deemed to have accrued on that Item from and including the Interest Accrual Date to but excluding 6 August 1990 at the Uniform Accrual Rates (defined in paragraph (d) below) corresponding to the original currency under the Instrument.[2] The Uniform Accrual Rate prevailing on each February 6, May 6, August 6 and November 6 (each, an "Interest Reset Date") will apply during the period from and including that date until it is reset as of the next Interest Reset Date.

If the Interest Accrual Date is not itself an Interest Reset Date, interest will be deemed to accrue for the period between the Interest Accrual Date and the immediately succeeding Interest Reset Date at the simple average of the Uniform Accrual Rates prevailing on (i) the Interest Reset Date immediately preceding the Interest Accrual Date and (ii) the Interest Reset Date immediately succeeding the Interest Accrual Date. For example, if the Interest Accrual Date is 1 November 1987, interest under this paragraph (b) will accrue from and including 1 November 1987 to but excluding 6 November 1987 at the average of two Uniform Accrual Rates, i.e., that prevailing on 6 August 1987 and that prevailing on 6 November 1987. From and including 6 November 1987 to but excluding 6 February 1988, interest will accrue at the Uniform Accrual Rate prevailing on 6 November 1987, and so forth.

All accrued but unpaid interest calculated pursuant to this Section 4 will be treated for these purposes as capitalized and compounded on each Interest Reset Date. The sum, in each currency, of the reconciled unpaid principal due as of the Interest Accrual Date plus the capitalized interest accrued pursuant to this paragraph (b) (together, the "Original Currency

---

[2] For certain currencies (for example, Austrian Shillings, Belgian Francs and Indian Rupees), published interbank rates are not available for some or all of the period preceding 6 August 1990. In such circumstances, the reconciled unpaid principal due as of the Interest Accrual Date will be converted as of that date into the applicable standard currency (as set forth in Section 4(c) below), and interest will be deemed to have accrued from the Interest Accrual Date to but excluding 6 August 1990 at the Uniform Accrual Rates corresponding to that standard currency.

**≡Ϊ ERNST & YOUNG**

Sum") will be converted to a standard currency and bear interest as provided below.

(c)    Interest After 6 August 1990 -- Standard Currencies

As of 6 August 1990, the Original Currency Sum will be converted (where necessary) to:

(i)     Deutsche Marks ("DEM"), for Instruments denominated in the currency of any member of the European Economic Area and Switzerland; or

(ii)    United States Dollars ("USD"), for Instruments denominated in all other currencies,

except that all amounts under Instruments denominated in Japanese Yen ("JPY") will remain in JPY.  Conversion will occur into either DEM or USD at the exchange rate prevailing for the respective original currencies as of 6 August 1990 as set forth in Exhibit B attached to this memorandum.

For each Item, interest will be deemed to accrue on each converted Original Currency Sum from and including 6 August 1990 to but excluding the date of the closing for that Item under any future restructuring proposal that Iraq may elect to make, at the Uniform Accrual Rates corresponding to DEM, USD or JPY, as the case may be.  As of 6 February 1999, each Original Currency Sum that had been converted to DEM plus all interest accrued thereon pursuant to this paragraph (c) will be converted to Euros ("EUR") at the exchange rate of EUR 1: DEM 1.955830, and interest will then continue to accrue on the resulting converted sum from and including 6 February 1999 at the Uniform Accrual Rates applicable to EUR.

(d)    Uniform Accrual Rates

Interest deemed to accrue under paragraphs (b) and (c) above will be calculated for purposes of this reconciliation using the applicable Uniform Accrual Rates set out in Exhibit C attached to this memorandum.

The Uniform Accrual Rates reflect the 3-month currency interbank rate (London Interbank Offer Rate or comparable) prevailing as of each Interest Reset Date (adjusted as necessary to reflect a 30/360 day-count convention where the applicable currency's interbank rate follows an actual/360 (or other) money market convention), plus a margin of 0.75% p.a. (For purposes of illustration only, between 6 August 1990 and 30 June 2005, the Uniform Accrual Rates for USD indicate an interest factor of 2.17.)

**≡‖ ERNST & YOUNG**

EY Iraq Debt Reconciliation Office

(e)     Illustrative Example

By way of illustration, assume 100,000 French Francs ("FRF") in unpaid principal due on 1 May 1988, together with FRF 3,000 of unpaid accrued interest (claimed as pursuant to the contractual rate specified in the relevant Instrument for the period 1 November 1987 through 1 May 1988), the last interest payment having been made on 1 November 1987.

Applying the reconciliation methodology set out in this memorandum:

(i)     the Interest Accrual Date is 1 November 1987, which is the last date of an interest payment (and earlier than the maturity date);

(ii)    interest will be calculated and deemed to accrue as follows:

(a)     from and including 1 November 1987 to but excluding 6 November 1987, at 9.5325%, which is the simple average of the Uniform Accrual Rates for FRF, as set out in the attachment, prevailing on 6 August 1987 (9.0569%) and 6 November 1987 (10.0081%), resulting in FRF 132.40 accrued and capitalized interest for those five days; and

(b)     from and including 6 November 1987 to but excluding 6 August 1990 (capitalized and compounded quarterly), at the Uniform Accrual Rates for FRF reset at each Interest Reset Date, resulting in further interest of FRF 30,625.69;

(iii)   the resulting Original Currency Sum of FRF130,758.09, representing outstanding principal plus interest accrued until 6 August 1990, will be converted on that date to DEM 38,960.16 at the exchange rate set out in the attachment;

(iv)    interest will be deemed to accrue (capitalized and compounded quarterly) on the converted Original Currency Sum from and including 6 August 1990 to but excluding 6 February 1999, at the Uniform Accrual Rates for DEM reset at each Interest Reset Date, and the resulting total of DEM 68,853.35 will on the latter date be converted to EUR 35,204.16 at the exchange rate set forth above; and

6

**EY** ERNST & YOUNG

      (v)     interest will thereafter be deemed to accrue (capitalized and compounded quarterly) from and including 6 February 1999, to but excluding the date on which that Item is restructured, at the Uniform Accrual Rates for EUR reset at each Interest Reset Date.

5.     <u>Fees, Liquidated Damages, etc.</u>

      For purposes of this reconciliation, any amounts (such as fees, indemnities, liquidated damages and so forth) due in respect of an Item of Specified Debt other than principal or interest (reconciled as described in Section 3, "Reconciliation of Principal" and Section 4, "Calculation of Interest", above) will not be taken into account and will not be reconciled.

6.     <u>Treatment of Set-Offs</u>

      The RFI asks Holders to identify whether they have exercised any set-off or other debit against the amount of an Item of Specified Debt (each, a "<u>Set-Off</u>"). In addition, if Iraqi records indicate an otherwise unexplained disposition of any Iraqi assets that were or are held by a Holder, the Reconciliation Agent will presume that a Set-Off has been effected in the absence of evidence to the contrary produced by the Holder.

      If a Holder, or any predecessor in title of a Holder, has effected a Set-Off, the amount of that Set-Off will be treated for purposes of this reconciliation (without making a determination as to the validity of the Set-Off) as follows:

      (a)     <u>Contractual Set-Offs</u>

      A Set-Off or foreclosure against collateral security effected pursuant to provisions in the Instrument (or any related collateral security agreement) will be treated as having reduced the outstanding principal amount of the Item to the extent of the Set-Off or foreclosure, effective as of the Interest Accrual Date unless the Holder provides the date of its constructive receipt of the funds. Interest accruals will be adjusted accordingly to reflect that reduction.

      (b)     <u>Set-Offs Against<br>Property of the Specified Obligor</u>

      A Set-Off in respect of an Item that was effected pursuant to provisions of statutory or common law against property owned, as of the date of the Set-Off, by the Specified Obligor (including any guarantor) for that Item, will be treated for purposes of this reconciliation as having reduced the outstanding amount of the Item to the extent of the Set-Off, effective as of the Interest Accrual Date unless the Holder provides the date of its constructive receipt of the funds. Interest accruals will be adjusted accordingly to reflect that reduction.

(c)    Set-Offs Against
Property of Third Parties

A Set-Off in respect of an Item that was effected against property owned, as of the date of the Set-Off, by any person or entity <u>other than</u> the Specified Obligor (including any guarantor) for that Item will be treated as a constructive receipt by the Holder of all or a portion of the consideration payable to that Holder pursuant to any future restructuring proposal that Iraq may elect to make.

For purposes of illustration, if a Holder (or its predecessor in title) had applied $1,000 held in a bank account in the name of the Republic of Iraq against an Item of Specified Debt for which Rafidain Bank was the sole Specified Obligor, that $1,000 will be debited from the aggregate value of the consideration payable to that Holder in connection with any future restructuring proposal that Iraq may elect to make.

7.    Assignments

A claim otherwise meeting the criteria of Specified Debt will not be excluded from reconciliation merely because the Specified Obligor (including any guarantor) for that claim did not respond to a request for consent to a prior assignment of the claim.

For the sake of efficiency, however, the reconciliation process will proceed only with the Holder of an Item of Specified Debt as registered with the Reconciliation Agent pursuant to a Submission as of April 15, 2005 (the previously announced deadline for receipt of Submissions). Registered Holders (as of April 15, 2005) that have subsequently assigned legal title to any of their reconciled claims will, at or prior to the time of receiving any future restructuring proposal that Iraq may elect to make in respect of those claims, be asked to identify the assignee(s) of those claims. Each such assignee, assuming it meets the eligibility criteria referred to in Section 1 above ("Confirmation of Eligibility"), will separately receive any such restructuring proposal for the assigned reconciled claims.

8.    Reconciliation Statements

Following the reconciliation of a substantial amount (to be determined in Iraq's discretion upon consultation with the Holder) of the Items of Specified Debt submitted by a Holder for reconciliation pursuant to the methodology described in this memorandum, the Reconciliation Agent will send back to that Holder a Statement of Reconciled Eligible Claims substantially in the form attached as Exhibit D to this memorandum. The statement will list all of the Holder's reconciled Items.

If the Reconciliation Agent is unable to reconcile some or all of the claims submitted by a Holder for reconciliation, the Reconciliation Agent will send back to that Holder a Statement of Unreconciled Claims substantially in the form attached as Exhibit E to this memorandum. The statement will list all such

8



unreconciled claims and identify one or more of the reasons listed in Section 2, "Matching of Records", above for each unreconciled claim.

9.    Supplements and Clarifications

Any supplements to, or clarifications of, the reconciliation methodology described in this memorandum will be posted on this website (www.eyidro.com).

10.    Preservation of Defenses

Some or all of the claims submitted for reconciliation by a Holder may not be enforceable against the obligor or any guarantor thereof as a result of the operation of a statute of limitations, or the obligor or guarantor thereunder may have available other defenses to the legal enforcement of such claim. Nothing in this memorandum, or in any communication from the Reconciliation Agent or Iraq relating to this memorandum or the reconciliation process described herein, constitutes an admission of any such claim, an acknowledgment that any such claim has been revived or reinstated, or an express or implied promise to pay any such claim (or part thereof). All defenses available to Iraq or an obligor or guarantor of such a claim relating to any applicable statute of limitations or otherwise are expressly preserved.

This memorandum may not be relied upon as evidence of the willingness or ability of Iraq or any such obligor or guarantor to pay any such claim.

\*    \*    \*    \*    \*

By participating in this reconciliation process, each Holder agrees that the Reconciliation Agent shall be indemnified and held harmless for any and all claims, liabilities, suits, proceedings, judgments, costs and expenses to which the Holder or any related party may become subject arising from or in connection with any item of Specified Debt submitted for reconciliation in response to the Government of Iraq's RFI.

July 6, 2005        Ernst & Young,
                        as Reconciliation Agent for the Republic of Iraq

| Exhibit A | Index of Defined Terms |
|---|---|
| Exhibit B | Tables of Exchange Rates |
| Exhibit C | Tables of Uniform Accrual Rates |
| Exhibit D | Form of Statement of Reconciled Eligible Claims |
| Exhibit E | Form of Statement of Unreconciled Claims |

9

EXHIBIT A

<u>Index of Defined Terms</u>

For purposes of this reconciliation:

"<u>DEM</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>EUR</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>FRF</u>" has the meaning set forth in Section 4(e) on page 6 of the Reconciliation Methodology.

"<u>Holder</u>" (page 2) has the meaning set forth in the RFI and means a corporation, partnership, business trust, joint stock company, trust, unincorporated association, joint venture or other legal entity, other than:

        (i)      any of the foregoing resident in, or having its principal place of business in, the Republic of Iraq (as of 1 December 2004);

        (ii)     a multilateral financial institution (such as the IMF and the World Bank); and

        (iii)    a foreign government (including a foreign export credit agency).

"<u>Instrument</u>" has the meaning set forth in Section 2 on page 2 of the Reconciliation Methodology.

"<u>Interest Accrual Date</u>" has the meaning set forth in Section 4(a) on page 3 of the Reconciliation Methodology.

"<u>Interest Reset Date</u>" has the meaning set forth in Section 4(b) on page 4 of the Reconciliation Methodology.

"<u>Item</u>" has the meaning set forth under the definition of "<u>Specified Debt</u>" below.

"<u>JPY</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>Original Currency Sum</u>" has the meaning set forth in Section 4(b) on pages 4 and 5 of the Reconciliation Methodology.

10

"Reconciliation Agent" has the meaning set forth on page 1 of the Reconciliation Methodology.

"RFI" has the meaning set forth on page 1 of the Reconciliation Methodology.

"Set-Off" has the meaning set forth in Section 6 on page 7 of the Reconciliation Methodology.

"Specified Debt" (page 1) has the meaning set forth in the RFI and means each outstanding contractual claim (each, an "Item") against a Specified Obligor (as defined below), in its capacity as obligor, issuer, guarantor, surety or, in the case of non-financial claims, as a contractual counterparty, that represents a claim:

      (i)    evidenced by a written agreement or financial instrument;

      (ii)    incurred or contracted for prior to 6 August 1990;

      (iii)    for borrowed money, the advance of credit, the deferred purchase price of goods or services, balances due under letters of credit or financial guarantees, a conditional sale or a transfer with recourse or with an obligation to repurchase, interbank lines or placements, unpaid amounts due under commercial contracts with a Specified Obligor, and the uninsured portion of debts guaranteed by a foreign export credit agency if the claimant holds that portion in its own name and not through the foreign export credit agency;

      (iv)    denominated, or at the option of the Holder payable, in a currency other than Iraqi Dinars; and

      (v)    shown on the records of the Holder as being outstanding and owing as of 1 December 2004;

including any court judgments or arbitral awards rendered in respect of any Item of Specified Debt.

"Specified Obligor" (page 8) has the meaning set forth in the RFI and means:

      (i)    the Republic of Iraq;

      (ii)    the Central Bank of Iraq;

11

    (iii)    other agencies or instrumentalities of the Republic of Iraq;

    (iv)    legal entities more than 50% of whose capital stock (or equivalent ownership interest) is owned (as of 1 December 2004) by the Republic of Iraq or any of its agencies and instrumentalities;

    (v)    Rafidain Bank, including branches and departments thereof; and

    (vi)    Rasheed Bank, including branches and departments thereof.

Claims against private sector Iraqi obligors do not constitute Specified Debt.

"Submission" (page 8) has the meaning set forth in the RFI and means a properly completed Cover Sheet, Summary of Claim Forms, Claim Forms (as applicable, Trade Finance Claim Forms) and, if necessary, a Claim Adjustment Form.

"Uniform Accrual Rate" has the meaning set forth in Section 4(d) on page 5 of the Reconciliation Methodology, and each applicable Uniform Accrual Rate is set forth in Exhibit C to the Reconciliation Methodology.

"USD" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

The Republic of Iraq reserves the right to revise any of the above definitions as additional information becomes available.

# EXHIBIT C





# THE REPUBLIC OF IRAQ

## INVITATION TO TENDER CLAIMS FOR CASH PURCHASE AND CANCELLATION

**February 9, 2006**

Citigroup Global Markets Inc.
J.P. Morgan Securities Inc.,
as Global Coordinators



EXHIBIT

C

You are reminded that this Invitation has been delivered to you on the basis that you are a person into whose possession this Invitation may lawfully be delivered in accordance with the laws of the jurisdiction in which you are located, and you may not, nor are you authorized to, deliver this Invitation to any other person if doing so would result in a violation of the applicable laws of such jurisdiction. This Invitation does not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law.

# THE REPUBLIC OF IRAQ

## INVITATION TO TENDER CLAIMS
## FOR CASH PURCHASE AND CANCELLATION

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 1. | Invitation to Tender | 1 |
| 2. | Settlement Agent | 1 |
| 3. | Reconciliation; Interest Calculation | 2 |
| 4. | Currencies | 2 |
| 5. | Purchase Price | 3 |
| 6. | Tender Procedures and Acceptance by Iraq of a Tender | 4 |
| 7. | Holder Representations and Warranties | 4 |
| 8. | Effect of the Tender | 6 |
| 9. | Indemnity for Failure to Deliver Negotiable Instruments | 8 |
| 10. | Closing | 8 |
| 11. | Regulatory, Accounting and Tax Consequences | 9 |
| 12. | Preservation of Defenses | 9 |
| 13. | Litigated Claims | 10 |
| 14. | Unasserted Claims | 10 |
| 15. | Unreconciled Claims; Arbitration Mechanism | 11 |
| 16. | More Information | 12 |
| 17. | Governing Law; Submission to Jurisdiction; Waiver of Immunity | 12 |

EXHIBIT A:       ARBITRATION PROCEDURES
EXHIBIT B:       FORM OF TENDER
EXHIBIT C:       FORM OF ACCEPTANCE OF TENDER
SCHEDULE I:      STATEMENT OF RECONCILED ELIGIBLE CLAIMS
SCHEDULE II:     STATEMENT OF UNRECONCILED CLAIMS

## Guide to Defined Terms

Defined terms used in this Invitation are first defined in the Section of the Invitation identified below.

| **Term** | **Defined in Section** |
| --- | --- |
| Acceptance Date | 6 |
| Arbitrated Claims Closing Date | 10 |
| Arbitration Mechanism | 8(x) |
| Closing Date | 10 |
| Dollars | 4 |
| Invitation | 1 |
| Iraq | 1 |
| Judgment | 13 |
| Pending Litigation | 13 |
| Purchase Price | 5 |
| Purchased Claims | 10 |
| Reconciled Eligible Claims | 1 |
| Reconciliation Agent | 3 |
| Reconciliation Methodology | 3 |
| RFI | 3 |
| Settlement Agent | 2 |
| Settlement Currency | 4 |
| Syndicate Agent | 8(iii) |
| Tender | 1 |
| Tender Due Date | 6 |
| Unasserted Claims | 1 |
| UNCC | 7(xiv) |
| Unreconciled Claims | 3 |
| Website | 3 |
| Yen | 4 |

The following defined terms used in this Invitation are defined in the paragraph of the document captioned "Reconciliation Methodology" available at www.eyidro.com:

**Term**

Holder

Interest Accrual Date

Set-Off

Specified Obligor

**THE REPUBLIC OF IRAQ**

**INVITATION TO TENDER CLAIMS**
**FOR CASH PURCHASE AND CANCELLATION**

1.    <u>Invitation to Tender</u>

On the terms and subject to the conditions set forth in this invitation (the "<u>Invitation</u>"), the Republic of Iraq, acting through its Ministry of Finance ("<u>Iraq</u>"), hereby invites the entity identified as the Holder in Schedule I attached to this Invitation to tender for cash all of the Reconciled Eligible Claims listed in Schedule I (the "<u>Reconciled Eligible Claims</u>") for purchase by Iraq and simultaneous cancellation, at the Purchase Price described below (the "<u>Tender</u>").

This is the final Invitation you will receive in respect of your claims. No further work will be undertaken on the reconciliation of any claims of a Holder that elects to decline this Invitation, or does not tender its claims by the Tender Due Date (as defined below). No further offers to settle any such claims on different terms will be made or will be entertained. Pursuant to Section 12 below, all legal defenses (including statute of limitations defenses) that may be available to Iraq or any other obligor have been expressly reserved and will be vigorously asserted in any attempt to enforce any such claim at law.

2.    <u>Settlement Agent</u>

Iraq has engaged Citibank, N.A. to act as the Settlement Agent (the "<u>Settlement Agent</u>") for the purposes of this Invitation. The Settlement Agent will perform the functions ascribed to it in this Invitation. The Settlement Agent will perform its functions in connection with this Invitation principally through its office located at the following address:

Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
Citibank N.A. Agency and Trust
21st Floor
Citigroup Centre
33 Canada Square
London
E14 5LB
United Kingdom
Tel: +44 20 7508 3867
Fax: +44 20 7508 3866
Email: exchange.gats@citigroup.com

Citibank, N.A., in acting as the Settlement Agent, is acting solely as the agent of Iraq and does not assume any relationship of agency or trust with any Holder in connection with this transaction or assume any obligations to any Holder. The Settlement Agent shall not be liable for any recital or statement contained herein or in any other communication from Iraq regarding the Invitation.

3.    Reconciliation; Interest Calculation

This Invitation has been preceded by a debt reconciliation process performed by Ernst & Young, Iraq's debt reconciliation agent (the "Reconciliation Agent"). This process involved the solicitation by the Reconciliation Agent (on behalf of Iraq) of information concerning certain categories of claims against Iraq, other Iraqi public sector obligors and certain other parties as described in the Request for Information posted on the Ernst & Young website (www.eyidro.com) (the "Website") on December 9, 2004 (the "RFI"). The Reconciled Eligible Claims set out in Schedule I to this Invitation reflect claims meeting the eligibility criteria described in the RFI that were submitted by the Holder and successfully reconciled by the Reconciliation Agent (including any applicable adjustment for set-offs against the claims).

If any claims meeting the eligibility criteria of the RFI were submitted by the Holder in response to the RFI but could not be reconciled by the Reconciliation Agent by the date of this Invitation, these are listed on Schedule II to this Invitation ("Unreconciled Claims").

If any of the claims listed on either Schedule I or Schedule II to this Invitation seem inappropriately included, please contact the Settlement Agent at the address or telephone number set forth in Section 2 above.

Iraq will only recognize as interest for purposes of this Invitation the amounts shown opposite each Reconciled Eligible Claim in Schedule I to this Invitation. This calculation of interest has been carried out according to the methodology described in the document captioned "Reconciliation Methodology," dated July 6, 2005 (the "Reconciliation Methodology"), available on the Website. Such amounts may differ from amounts resulting from the formula for calculating contractual and late interest contained in the underlying contract, instrument or judgment evidencing the Reconciled Eligible Claim, if any.

4.    Currencies

For purposes of purchasing any Reconciled Eligible Claims that are tendered and accepted in connection with this Invitation, Iraq will make payments of the Purchase Price only in United States Dollars ("Dollars"), Euros or Japanese Yen ("Yen"), as applicable. Accordingly, Reconciled Eligible Claims submitted to the

2

debt Reconciliation Agent in a currency other than Dollars, Euros or Yen were translated from their original currencies into Euros or Dollars in accordance with the procedures set forth in the Reconciliation Methodology. The Purchase Price for claims tendered and accepted for purchase hereunder that are denominated in Dollars, Euros or Yen will be paid in their original currency. The currency you will receive is referred to herein as the "Settlement Currency".

5.      Purchase Price

        The Purchase Price (the "Purchase Price") for all Reconciled Eligible Claims tendered and accepted in connection with this Invitation is an amount in the Settlement Currency equal to 10.25% of the aggregate amount of such Reconciled Eligible Claims (principal plus calculated interest accrued from and including the Interest Accrual Date to and excluding the Closing Date applicable to those Reconciled Eligible Claims) specified in Schedule I (rounded to the nearest single currency unit). The Holder should note that although the Purchase Price is expressed as a fixed percentage of the reconciled principal and calculated interest amount of Reconciled Eligible Claims, payment of the Purchase Price by Iraq to the Holder will effect the unconditional and irrevocable purchase and cancellation of all amounts (including principal, contractual interest, late or penalty interest, fees, indemnities and any other amounts of whatever description) payable in respect of such Reconciled Eligible Claims and will release Iraq, any other obligors and any guarantors from any obligations on the Reconciled Eligible Claims.

        As set forth in the Reconciliation Methodology, any Set-Off exercised by the Holder (or a predecessor in title) against the property of a party other than the Specified Obligor that reduced the amount of a Reconciled Eligible Claim prior to the purchase and simultaneous cancellation by Iraq of that claim, will reduce the Purchase Price payable to the Holder for that claim by an amount proportional to the amount of such Set-Off.

        The Purchase Price for Reconciled Eligible Claims accepted for purchase in connection with this Invitation will be paid on the Closing Date in the Settlement Currency. The aggregate Purchase Price for all of the Holder's accepted Reconciled Eligible Claims denominated in each Settlement Currency shall be paid by a single wire transfer for each Settlement Currency in same-day funds to such bank account(s) as the Holder shall specify to the Settlement Agent in the Holder's Administrative Information accompanying the Holder's Tender or, at the Settlement Agent's option in the case of a payment of less than US$500,000 (or its equivalent in other currencies), by check mailed to such Holder at its address shown on the Holder's Administrative Information.

3

6.    Tender Procedures and Acceptance by Iraq of a Tender

If the Holder wishes to respond to this Invitation, it must do so by 5:00 P.M. (London time) on March 13, 2006 (the "Tender Due Date") by sending or delivering to the Settlement Agent a Tender in the form of Exhibit B hereto covering all, but not less than all, of the Reconciled Eligible Claims of such Holder listed on Schedule I together with all documentation required by Section 8(vii) and Section 13 below.

**If the Holder does not submit a Tender by the 5:00 P.M. (London time) on the Tender Due Date, Iraq shall deem this Invitation to have been rejected by the Holder in its entirety and no further Invitation or settlement offer will be sent to such a Holder.  There is no option to defer this offer.**

Tenders that comply with the requirements of this Invitation will be accepted by Iraq.  If the Tender does not strictly conform to those requirements it may be rejected by Iraq in its sole discretion.  If any Tender is rejected, any negotiable instruments evidencing the Reconciled Eligible Claims that were delivered to the Settlement Agent pursuant to Section 8(vii) below will be promptly returned to the Holder.

The Settlement Agent shall confirm to the Holder the acceptance of the Tender by Iraq not later than March 27, 2006 (the "Acceptance Date") by sending a notice of acceptance in the form of Exhibit C.  If the Holder submits the Tender but does not receive notice of receipt and acceptance from the Settlement Agent within fifteen calendar days after submission, the Holder should promptly contact the Settlement Agent.

Upon acceptance by Iraq of the Tender, such Tender will, together with the terms of this Invitation, constitute a binding contract between Iraq and the Holder for the sale, purchase and cancellation of the Reconciled Eligible Claims, enforceable in accordance with the terms hereof.

In the event any of the Reconciled Eligible Claims listed on Schedule I have been, or subsequently are, asserted against a Specified Obligor by a bilateral (governmental) creditor, by its acceptance of the Purchase Price on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

7.    Holder Representations and Warranties

By submitting the Tender, the Holder represents and warrants to each of Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of the Tender and as of the Closing Date, as follows:

4

(i)    it is the record holder of the Reconciled Eligible Claims identified in Schedule I (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)    it has the power and authority to submit the Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by the Tender;

(iii)    in submitting the Tender it will not, to its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal having jurisdiction over the Holder or any Reconciled Eligible Claim;

(iv)    it has taken all necessary action to authorize the execution and delivery of the Tender, and the performance of its obligations under the Tender and this Invitation;

(v)    the Tender, if accepted by Iraq in the manner described in Section 6 above, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of the Tender and this Invitation;

(vi)    any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under the Tender and this Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)    on the Closing Date, the Reconciled Eligible Claims covered by the Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)    the claims that are tendered meet the criteria for eligibility set forth in the RFI;

(ix)    it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)    the statements set forth in the Holder's response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

5

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claim;

(xii)    other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien, any other security interest or any other legal constraint) any Specified Obligor;

(xiii)    it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

(xiv)    none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the United Nations Compensation Commission (the "UNCC") established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

8.    Effect of the Tender

By submitting the Tender, the Holder irrevocably agrees to the terms and conditions of this Invitation.  As part thereof, the Holder:

(i)    agrees that it will continue to be the record holder of such Reconciled Eligible Claims (subject, where applicable, to the clarification in the parenthetical text in Section 7(i) above) from the date of the Tender to and including the Closing Date.  The Holder agrees that any purported transfer of any tendered Reconciled Eligible Claim in violation of the foregoing covenant will be void and of no effect;

(ii)    agrees to receive the applicable Purchase Price on the Closing Date as the full consideration for the sale to Iraq and cancellation of the Reconciled Eligible Claims listed in the Tender and in full discharge, release and satisfaction of all claims (including claims previously reduced to a Judgment (as defined in Section 13 below)) for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due in respect of the Reconciled Eligible Claims tendered by such Holder (regardless of whether any adjustment has been made to a claim or to the Purchase Price to account for a set-off effected by the Holder or a predecessor in title), and agrees to release and indemnify Iraq and any other obligor or guarantor in respect thereof from any and all claims by the Holder (or any other person claiming through the Holder) arising under such Reconciled Eligible Claims or any contract or Judgment evidencing such Reconciled Eligible Claims;

6

(iii)    agrees and authorizes the Settlement Agent to instruct the relevant syndicate agent (if any) under each syndicated contract relating to such Reconciled Eligible Claims (each a "Syndicate Agent") to mark its records to reflect the cancellation of the Reconciled Eligible Claims upon payment of the Purchase Price to the Holder on the Closing Date and agrees that the Settlement Agent in such capacity and the Syndicate Agent shall be fully indemnified by the Holder and held harmless for acting upon such instruction;

(iv)    agrees to provide the Settlement Agent with all relevant information (including addresses and fax numbers) pertaining to the Syndicate Agents so that the Settlement Agent may send notices to such Syndicate Agents confirming the instructions provided by the Holder in the above covenant (Section 8(iii));

(v)    agrees that Iraq and any other obligor or guarantor in respect of Reconciled Eligible Claims tendered hereunder, the Settlement Agent, the Global Coordinators and the Reconciliation Agent shall not, in any way, be liable to the Holder for any loss, liability, payment or expense incurred by such Holder as a result of any claim that may be brought against such Holder by any third party claiming to have an interest in such Reconciled Eligible Claims or the proceeds of the Purchase Price paid in respect thereof;

(vi)    confirms that in evaluating this Invitation and in making its decision whether to participate therein by submitting a Tender, the Holder has made an independent appraisal of the matters referred to herein and in any related communications from Iraq and is not relying on any statement, representation or warranty, express or implied, made to it by Iraq (other than as expressly set forth in this Invitation), the Settlement Agent, the Global Coordinators or the Reconciliation Agent, or by any of the partners, directors, officers, agents, employees or affiliates of any of them;

(vii)    warrants and agrees for each Reconciled Eligible Claim tendered that all negotiable instruments pertaining to such Reconciled Eligible Claim will have been delivered to the Settlement Agent prior to the Tender Due Date. If the Holder fails, for any reason, to deliver any such negotiable instrument to the Settlement Agent prior to the Tender Due Date, the Holder shall be deemed to have given the indemnity set forth in Section 9 below;

(viii)    warrants and agrees for each Reconciled Eligible Claim tendered and each Unreconciled Claim that if any such claims are (i) covered by or merged into a Judgment (as defined in Section 13 below) or (ii) the subject of any Pending Litigation (as defined in Section 13 below), all documents required by Section 13 will have been delivered to the Settlement Agent prior to the Tender Due Date;

7

(ix)    agrees (subject only to the resolution of any Unreconciled Claims in accordance with Section 15 below) that the receipt of the Purchase Price with respect to the Reconciled Eligible Claims that are the subject of the Tender on the Closing Date will fully discharge and satisfy any and all claims for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due, or thereafter falling due, in respect of any Unasserted Claims (as defined in Section 14 below) and will release Iraq or such obligor or guarantor of any Unasserted Claim from such obligation as provided in Section 14 below;

(x)    agrees that any claim that remains unreconciled and is shown as such on the Holder's Statement of Unreconciled Claims will, no later than the Tender Due Date, either be submitted by the Holder to the Arbitration Mechanism described in Exhibit A hereto (the "Arbitration Mechanism") pursuant to Section 15 below, or be withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release contained in Section 8(ix) above; and

(xi)    agrees that the Tender will be irrevocable.

9.    Indemnity for Failure to Deliver Negotiable Instruments

If the instrument evidencing any Reconciled Eligible Claim is in the form of a negotiable instrument that the Holder fails, for any reason, to deliver to the Settlement Agent prior to the Tender Due Date as provided in this Invitation, the Holder thereof shall automatically be deemed to have given the following indemnity in respect of that instrument:

The Holder, by its acceptance of the Purchase Price on the Closing Date, hereby covenants and agrees to indemnify each of Iraq, the Specified Obligor under such instrument and the Settlement Agent, and to hold each of the foregoing harmless against, any loss, liability or expense (including legal expense) incurred by any of them arising out of, or in connection with, any subsequent assertion of a claim (including any exercise of a right of set-off or counterclaim) by any person based on that instrument or the underlying Reconciled Eligible Claim.

10.    Closing

A Closing in respect of this Invitation is expected to occur on or about March 30, 2006 (the "Closing Date"). Iraq may, in its sole discretion, revise the Closing Date, as it deems appropriate.

A final closing date for the settlement of commercial claims, following completion of the arbitration process, is expected to occur on or about July 15, 2006 (the "Arbitrated Claims Closing Date").

8

Upon acceptance of the Tender by Iraq, the Reconciled Eligible Claims covered by that Tender will be purchased by Iraq and simultaneously cancelled on the Closing Date.

Payment of the Purchase Price for the Reconciled Eligible Claims tendered and accepted in connection with this Invitation (the "Purchased Claims") will be made by the Settlement Agent on the Closing Date to the Holder of Purchased Claims in the manner described in Section 5 above.  All such payments shall be made free and clear of any Iraqi taxes, including withholding taxes or similar levies.

At the time of the closing on the Closing Date, each tendering Holder (and any financial institution acting for the benefit of such Holder) shall be fully released and discharged by Iraq or any other Iraqi public sector obligor from any liability in connection with any performance bond, financial guarantee, counterguarantee or similar financial undertaking issued in respect of a project related to a Purchased Claim of that Holder.

11.     Regulatory, Accounting and Tax Consequences

The making of the Tender and the acceptance of payment for Purchased Claims may have accounting, tax and regulatory consequences to the Holder.  This Invitation does not, and does not purport to, address these consequences, which may vary in different jurisdictions, and the Holder should consult its own independent accounting, tax and legal advisors in the relevant jurisdiction(s) concerning these matters.

12.     Preservation of Defenses

Some or all of the Reconciled Eligible Claims listed on Schedule I or Unreconciled Claims listed on Schedule II may not be enforceable against the obligor or any guarantor thereof as a result of the operation of a statute of limitations, or the obligor/guarantor thereunder may have available other defenses to the legal enforcement of such claim.  Nothing in this Invitation, or in any communication from the Settlement Agent, the Reconciliation Agent or Iraq relating to this Invitation or the reconciliation process that preceded this Invitation, constitutes an admission of any such claim, an acknowledgment that any such claim has been revived or reinstated, or an express or implied promise to pay any such claim (or part thereof) other than, in the case of tendered and accepted Reconciled Eligible Claims, to pay the Purchase Price therefor in accordance with the terms of this Invitation.  All defenses available to Iraq or an obligor or guarantor of a Reconciled Eligible Claim or an Unreconciled Claim relating to any applicable statute of limitations or otherwise are expressly preserved until such claim is fully discharged and cancelled in connection with this Invitation.  This Invitation may not be relied upon as evidence of the willingness or ability of Iraq or any such obligor or

9

guarantor to pay Reconciled Eligible Claims or any other claims that are not tendered pursuant to this Invitation or are not accepted by Iraq for purchase hereunder.

13.    Litigated Claims

If any Reconciled Eligible Claims or Unreconciled Claims are (i) covered by or merged into a court judgment or arbitral award (other than a UNCC award) (a "Judgment") or (ii) the subject of any pending litigation or arbitral proceeding in any jurisdiction ("Pending Litigation"), the Holder shall deliver to the Settlement Agent, not later than the Tender Due Date, all appropriate documents or court filings that will be required to discharge and cancel in full the Judgment corresponding to that Reconciled Eligible Claim or Unreconciled Claim (or that portion of the Judgment in which the Holder has an interest), or to withdraw, dismiss and discontinue with prejudice (with each party to bear its own legal costs and expenses) any Pending Litigation in full and final settlement thereof (to the extent that the Holder is a party thereto), together with the Holder's written authorization for Iraq (or its legal counsel) to file such documents with any court or tribunal that issued or recognized a Judgment, or before which a Pending Litigation is pending, following the closing on the Closing Date.

The Holder agrees, promptly upon request of Iraq or the Settlement Agent, to take such other steps or give such other notifications as may be required to ensure that Iraq, or any Iraqi obligor or guarantor in respect of a Reconciled Eligible Claim or Unreconciled Claim, shall have no further liability to the Holder under a Judgment or in respect of a Pending Litigation.

14.    Unasserted Claims

The RFI to which the Holder responded asked the Holder to identify all claims owned by it that meet the eligibility criteria set out in the RFI. In processing responses to the RFI, Iraq and the Reconciliation Agent have assumed that the Holder complied with this request and that, to the extent any claims meeting the eligibility criteria of the RFI held by the Holder on the date of its response to the RFI (or any supplement thereto) were not identified in its response to the RFI, or were initially identified but were subsequently withdrawn from the Holder's submission to the Reconciliation Agent, the Holder has decided to waive its right to assert a claim for payment or settlement of those amounts. Such unasserted claims are referred to herein as "Unasserted Claims".

Accordingly, if a Holder's Tender of Reconciled Eligible Claims pursuant to this Invitation is accepted by Iraq and the Holder receives the Purchase Price corresponding to those Reconciled Eligible Claims on the Closing Date then, pursuant to Section 8(ix), the Holder (i) shall be deemed to have simultaneously cancelled and discharged in full all amounts (of whatever description) that may be

10

payable in respect of any Unasserted Claims, effective as of the Closing Date and (ii) shall have released Iraq and any obligor or guarantor of the Unasserted Claims from such obligation. The Holder further agrees not to attempt to sell, transfer or encumber any such Unasserted Claim following the date of Tender, or to take any action (including set-off and other similar self-help remedies) to enforce any such Unasserted Claim.

15.    Unreconciled Claims; Arbitration Mechanism

Schedule II to this Invitation lists any claims submitted for reconciliation by the Holder in response to the RFI that could not be successfully reconciled by the Reconciliation Agent by the date of this Invitation. Any claim that is identified on the Holder's Statement of Unreconciled Claims will, by the Tender Due Date, at the Holder's election, either be submitted to the Arbitration Mechanism or withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.

This election may be made separately for each Unreconciled Claim shown on Schedule II.

**If the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim by the Tender Due Date, the Holder agrees that any Unreconciled Claim not covered by such an election will automatically be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.**

The arbitral award for any Unreconciled Claim that the Holder elects to refer to the Arbitration Mechanism will finally determine the existence, principal amount and maturity of such Unreconciled Claim and will be binding on both Iraq and the Holder, and shall not be subject to appeal. If that arbitral award is in favor of the Holder, the claim (as so awarded) shall thereafter be treated (without any action being taken by the Holder) for all purposes as a Reconciled Eligible Claim (with interest accrued to the Arbitrated Claims Closing Date) tendered by the Holder in accordance with its original Tender that has been accepted by Iraq and will be placed in line for purchase by Iraq on the Arbitrated Claims Closing Date pursuant to the terms, conditions and procedures set out in this Invitation. If the award is in favor of Iraq, the disallowed claim (or any disallowed portion thereof) shall be treated as an Unasserted Claim covered by the discharge and release contained in Section 14 above.

16.    More Information

        Questions and requests for assistance may be directed to the Settlement Agent at its address and telephone number set forth in Section 2 of this Invitation. Additional copies of this Invitation and any related materials may be obtained from the Settlement Agent.

        Holders with general enquiries relating to the terms of the Invitation may contact the Global Coordinators using the following contact details:

        Citigroup Global Markets Inc.

        Tel: +44 207 986 8969
        Email: liabilitymanagement.europe@citigroup.com

        J.P. Morgan Securities Inc.

        Tel: +44 207 777 0600
        Email: iraq.com.claims@jpmorgan.com

17.    Governing Law; Submission to Jurisdiction; Waiver of Immunity

        This Invitation, the Tender, and any acceptance or rejection thereof by Iraq, shall be governed by and construed in accordance with the law of the State of New York.

        The Holder, by submitting a Tender in response to this Invitation, and Iraq, each irrevocably submits to the jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, the City of New York, in any suit, action or proceeding relating to this Invitation or that Tender (it being understood, however, that disputes concerning Unreconciled Claims shall be resolved exclusively pursuant to the Arbitration Mechanism described elsewhere in this Invitation).

        Iraq hereby waives irrevocably any immunity from jurisdiction (but not execution or attachment or process in the nature thereof) to which it might otherwise be entitled in any action arising out of or based on this Invitation that may be instituted by the Holder in any New York State or United States federal court sitting in the Borough of Manhattan, the City of New York. The submission to jurisdiction and waiver of immunity by Iraq contained herein is for the exclusive benefit of the Holder and shall not extend to any other person.

## ARBITRATION PROCEDURES

### Introduction

This Exhibit contains the procedures by which a determination as to the existence (including ownership), the principal amount and/or the maturity date (as the case may be) of one or more Unreconciled Claims may be submitted by a Holder (the "<u>Claimant</u>") for arbitration and final decision by an independent arbitrator. Capitalized terms used but not defined in this Exhibit have the meanings given to those terms in the Invitation.

Arbitration pursuant to these Arbitration Procedures is the sole remedy for a Claimant that wishes to pursue a claim in respect of one or more Unreconciled Claims. **If a Holder elects <u>not</u> to submit an Unreconciled Claim to arbitration pursuant to these Arbitration Procedures by the Tender Due Date, that Unreconciled Claim shall be deemed cancelled effective on the Closing Date as provided in Section 15 of the Invitation.**

It is anticipated by Iraq that arbitrations pursuant to these Arbitration Procedures will commence in approximately March, 2006.

### Arbitration Panel

Each arbitration pursuant to these Arbitration Procedures shall be conducted by a sole arbitrator chosen by the Chairperson from an Arbitration Panel of independent experts recommended by the Secretariat of the International Court of Arbitration of the International Chamber of Commerce (the "<u>Panel</u>"). The Chairperson shall be chosen by Iraq and shall not serve as an arbitrator.

Members of the Panel will be chosen for their experience and independence. At least two members of the Panel shall be fluent in Arabic. All members of the Panel shall be fluent in English. At the request of the Chairperson, the Secretariat of the International Court of Arbitration of the International Chamber of Commerce shall be asked to recommend additional members of the Panel, or to fill any vacancies on the Panel, with similarly qualified individuals.

These Arbitration Procedures shall govern all arbitrations conducted by members of the Panel. The Chairperson, in consultation with the Panel, shall have the discretion to supplement these Procedures if he or she feels this would be in the best interest of an efficient arbitration process by posting such supplements on the Website.

<u>Notice of Arbitration</u>

A Claimant wishing to commence an arbitration for one or more Unreconciled Claims held by that Claimant must, by the Tender Due Date, submit a written notice (a "<u>Notice of Arbitration</u>") to the Chairperson and the Reconciliation Agent containing the following information:

(i)    the name and contact details of the Claimant;

(ii)   a list of all Unreconciled Claims for which arbitration is sought, identified by the caption of the debt instrument(s) and the identification number assigned by the Reconciliation Agent to each such claim;

(iii)  a copy of the related Statement of Unreconciled Claims, together with the Reconciliation Agent's indication of the reason for its inability to reconcile;

(iv)   a statement as to whether the Claimant wishes the arbitration to be conducted in English or in Arabic;

(v)    a statement that the Claimant understands and accepts that the Award rendered by the Arbitrator in respect of each Unreconciled Claim submitted for arbitration shall be final, non-appealable and binding; and

(vi)   a statement that the Claimant agrees to participate in an arbitration in accordance with these Arbitration Procedures.

The Settlement Agent will contact each Holder prior to the Tender Due Date regarding the form of Notice of Arbitration, the form of list of all Unreconciled Claims for which arbitration is sought and the addresses of the Chairperson and the Reconciliation Agent for submissions.

Prior to the commencement of the arbitration period, the Chairperson shall assign each arbitration to a member of the Panel (for that arbitration, the "<u>Arbitrator</u>") who has certified to the Chairperson that he/she is independent of each of the parties to the Arbitration and intends to remain so; and to the best of his/her knowledge, there are no facts or circumstances, past or present, that need be disclosed because they might be of such nature as to call into question his/her independence in the eyes of any of the parties to the Arbitration. The Arbitrator shall promptly identify himself/herself to the parties by telephone, electronic mail or in writing, and shall provide the parties with the address and contact details of the Arbitrator.

Parties

The only parties to an arbitration shall be Iraq and the Claimant. The Settlement Agent, the Global Coordinators, any Syndicate Agent and the Reconciliation Agent shall not be joined as parties or witnesses to any Arbitration.

Written Submissions

Within 15 calendar days of being assigned an arbitration, the Arbitrator shall notify the Claimant and Iraq in writing of the date on which written submissions by the Claimant and Iraq are due (which date shall be approximately 45 days following the date of the Arbitrator's notice) (the "Submission Date").

Written submissions by Claimants and other communications to or from Iraq, the Arbitrator or Claimants may be made in English or Arabic, as specified by the Claimant in the Notice of Arbitration. A written submission by the Claimant shall be comprised of a brief statement of the Claimant's position, copies of relevant documents (translated into English if the arbitration is to be conducted in English; or into English or Arabic if the arbitration is to be conducted in Arabic) and (at the option of the Claimant) one or more sworn statements by individuals having personal knowledge of the relevant facts that bear upon the validity, principal amount or maturity date of the Unreconciled Claim (as the case may be).

The Claimant shall also include in its written submissions, if available, the originals (or certified copies) of the instruments evidencing the Unreconciled Claim. If such original or certified copies are not available, the Claimant shall include the best evidence the Claimant possesses concerning the Unreconciled Claim.

Iraq may, but shall not be obligated to, submit a written submission of the kind referred to in the prior two paragraphs.

One copy of each written submission shall be delivered to the Arbitrator and to the other party.

Within 15 calendar days of the Submission Date, either party may submit a rebuttal to the written submission of the other party by delivering a copy of that rebuttal to the Arbitrator and to the other party. Thereafter, no further written submissions of any kind will be entertained unless specifically requested by the Arbitrator.

At the Arbitrator's sole discretion, the Arbitrator may request additional documentary evidence and one or more conference telephone calls among the parties to discuss issues related to the arbitration or any questions that the Arbitrator may have arising from the written submissions or rebuttals. Both parties shall be entitled to have legal counsel participate in any such calls.

A-3

No party shall have any right of documentary discovery, or any right to depose or cross-examine witnesses, in respect of the other party.

Neither party may communicate with the Arbitrator verbally unless they have given notice to the other party of that intended communication and the other party has been furnished an opportunity to participate in the communication.

Any document or writing sent by either party to the Arbitrator shall be simultaneously copied to the other party.

<u>Awards</u>

Approximately 45 calendar days following the Submission Date, the Arbitrator shall send his/her written award to the parties, with a copy to the Chairperson and the Reconciliation Agent (each an "<u>Award</u>"), covering each Unreconciled Claim for which arbitration was requested, the final value of which shall be calculated by the Reconciliation Agent in accordance with the Reconciliation Methodology, as described below. The Award shall state, for each such Unreconciled Claim, whether the Claim is recognized as valid and, if so, the total principal amount and maturity date of that Unreconciled Claim.

<u>Standard for Rendering Awards</u>

An Arbitrator, acting in his or her sole discretion, shall recognize as valid an Unreconciled Claim submitted for arbitration, or shall determine the principal amount or maturity date thereof (as the case may be), if the Arbitrator finds that the existence, principal amount or maturity date, as the case may be, of that Unreconciled Claim has been, to the reasonable satisfaction of the Arbitrator, corroborated by credible documentary evidence, which may include historical documentary evidence (such as financial statements, annual reports, or copies of prior billings sent to an Iraqi counterparty) of the existence, principal amount or maturity date of the Unreconciled Claim, as the case may be. Under these circumstances, the Arbitrator shall render an Award in respect of that Unreconciled Claim in favor of the Claimant, even if Iraq presents no written submission in the arbitration.

If the Arbitrator fails to find such credible documentary evidence, it shall render the Award for that Unreconciled Claim in favor of Iraq.

If the Award is rendered in favor of the Claimant, the Reconciliation Agent shall proceed to calculate contractual and late interest thereon in accordance with the Reconciliation Methodology referred to in Section 3 of the Invitation. The aggregate amount of the claim (principal plus calculated interest) shall then be purchased by Iraq and simultaneously cancelled on the Arbitrated Claims Closing Date, on the terms set out in the Invitation.

The Arbitrator shall not be required to give a statement of the rationale or reasons for the Award.

**All Awards shall be final, non-appealable and binding on both parties. Neither party shall have any recourse to appeal an Award to any court or tribunal.**

### Indemnity and Release

The Claimant (by submitting one or more Unreconciled Claims for arbitration under these Arbitration Procedures) and Iraq each irrevocably agrees to indemnify, release and hold harmless the Chairperson and each member of the Panel from any loss, claim or liability arising from these Arbitration Procedures or from the conduct of, or the Award in, an Arbitration.

### Notices

Any Notice of Arbitration, written submission, rebuttal or Award or other document delivered in accordance with these Arbitration Procedures shall be sent by registered mail or receipted courier, in each case to arrive, to the extent possible, with the intended recipient no later than the second day following dispatch.

### Governing Law

These Arbitration Procedures, and each Arbitration conducted hereunder, shall be subject to the law of the State of New York.

A-5

**SUMMARY TIME SCHEDULE OF ARBITRATION PROCEDURES**[*]

| <u>Event</u> | <u>Date</u> |
|---|---|
| Submission of Notice of Arbitration – Tender Due Date ............................................................... | March 13, 2006 |
| Assignment of Claims to Arbitrator by Chairperson ............................................................... | March 14, 2006 through March 21, 2006 |
| Notification by Arbitrator of Deadline for Written Submissions ............................................................... | Not later than 15 calendar days from Assignment of Arbitration to Arbitrator |
| Submission Date ............................................................... | Approximately 45 calendar days from Notification |
| Deadline for Rebuttal Submissions.................................... | Not later than 15 calendar days from Submission Date |
| Arbitral Awards Rendered ................................................ | Approximately 45 calendar days from Submission Date |
| Arbitrated Claims Closing Date......................................... | Not later than July 15, 2006 |

_____

[*] These dates may be altered by Iraq in its sole discretion. Any changes to this schedule shall be posted on the Website.

## FORM OF TENDER

**[Please complete by typing in the missing information and return this form together with its attachments, including your Statement of Reconciled Eligible Claims, to the Settlement Agent at the fax number shown below.]**

To:      Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
         Citibank N.A. Agency and Trust
         21st Floor
         Citigroup Centre
         33 Canada Square
         London
         E14 5LB
         United Kingdom
         Tel: +44 20 7508 3867
         Fax: +44 20 7508 3866
         Email: exchange.gats@citigroup.com

From:    _____
         (the "Holder")

Date:    _____

Re:      Iraq Invitation to Tender Claims for Cash Purchase and Cancellation
         dated February 9, 2006 (the "Invitation")


         We refer to the Invitation. Capitalized terms used herein have the meanings given to those terms in the Invitation.

         The above-named Holder is the holder of the Reconciled Eligible Claims specified in the schedule attached hereto (bearing the Holder Reference Number: _____) and hereby offers each such Reconciled Eligible Claim for purchase by Iraq and simultaneous cancellation on the terms, and subject to the conditions, set out in the Invitation. This Tender is irrevocable.

         The Holder is the holder of the Unreconciled Claims specified in the Schedule II attached hereto and hereby irrevocably agrees that if the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim pursuant to the Arbitration Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any Unreconciled Claim not covered by such an election will be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 of the Invitation.

By submitting this Tender, the Holder represents and warrants to Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of this Tender and the Closing Date, as follows:

(i)     it is the record holder of the Reconciled Eligible Claims identified in Schedule I to the Invitation (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)    it has the power and authority to submit this Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by this Tender;

(iii)   in submitting this Tender it will not, to the best of its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal of competent jurisdiction;

(iv)    it has taken all necessary action to authorize the execution and delivery of this Tender, and the performance of its obligations under this Tender and the Invitation;

(v)     this Tender, if accepted by Iraq in the manner described in Section 6 of the Invitation, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of this Tender and the Invitation;

(vi)    any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under this Tender and the Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)   on the Closing Date, the Reconciled Eligible Claims covered by this Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)  the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI;

(ix)    it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)     the statements set forth in the Holder's response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

B-2

Holder Reference Number: _____

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claims;

(xii)    other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien or any other security interest) any Specified Obligor;

(xiii)    it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

(xiv)    none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the UNCC established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

If any Reconciled Eligible Claims or Unreconciled Claims are covered by or merged into a Judgment (other than a UNCC award) or are the subject of any Pending Litigation in any jurisdiction (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), the Holder has delivered to the Settlement Agent the documentation required by Section 13 of the Invitation.

If any Reconciled Eligible Claims are evidenced by a negotiable instrument (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), those negotiable instruments have been delivered to the Settlement Agent, or the indemnity set forth in Section 9 of the Invitation is given.

Regards,

By:

_____

Name:

Title:

Name of Institution:

Attachments:  Holder's Administrative Information
              Statement of Reconciled Eligible Claims

B-3

Holder Reference Number: _____

## ATTACHMENT TO TENDER

<u>HOLDER'S ADMINISTRATIVE INFORMATION</u>

| HOLDER'S NAME: | |
|---|---|
| | |
| STREET ADDRESS: | |
| | |
| CONTACT PARTY: | |
| | |
| PHONE: | |
| | |
| FACSIMILE NUMBER: | |
| | |
| ELECTRONIC MAIL ADDRESS: | |

<u>SYNDICATE AGENT'S ADMINISTRATIVE INFORMATION (IF APPLICABLE)</u>

| SYNDICATE AGENT'S NAME: | |
|---|---|
| | |
| STREET ADDRESS: | |
| | |
| CONTACT PARTY: | |
| | |
| PHONE: | |
| | |
| FACSIMILE NUMBER: | |
| | |
| ELECTRONIC MAIL ADDRESS: | |

Holder Reference Number: _____

PAYMENT INSTRUCTIONS

| CURRENCY: | U.S. DOLLARS |
|---|---|
| BANK NAME: | |
| ABA/FEDWIRE OR SWIFT (OR USD CORRESPONDENT BANK DETAILS, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | EURO |
|---|---|
| BANK NAME: | |
| SWIFT OR SORT CODE (OR EURO CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | JAPANESE YEN |
|---|---|
| BANK NAME: | |
| SWIFT (OR JPY CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

EXHIBIT C

## FORM OF ACCEPTANCE OF TENDER

To:          [Holder]

Attn:        [Name]

From:        Citibank, N.A.

Date:        _____

Re:          Iraq Debt Purchase Tender


We refer to your Tender (the "Tender") dated _____ in response to the Republic of Iraq's ("Iraq") Invitation to Tender Claims for Cash Purchase and Cancellation dated February 9, 2006 (the "Invitation").

At the instruction of Iraq, we are writing to confirm Iraq's acceptance of the Tender on the terms and subject to the conditions of the Invitation.

Accordingly, Iraq has instructed us to inform you that the Reconciled Eligible Claims listed in the schedule to the Tender (Holder Reference Number_____) will be purchased by Iraq and cancelled on or about March 30, 2006 (the "Closing Date") at the Purchase Price calculated in the manner provided in Section 5 of the Invitation.


Regards,


By:  Citibank, N.A.,_____
         as Settlement Agent


Name:_____

C-1

EY Iraq Debt Reconciliation Office

Date of this Reconciliation Statement: 09-Feb-2006                  Tender Due Date : 13-Mar-2006

Date Interest Calculated To:        30-Mar-2006                     Closing Date :    30-Mar-2006

## Schedule I: Statement of Reconciled Eligible Claims

**Name of Holder: Example COMMERCIAL Company**

**Holder Address: 25 Main St, Anytown, Any Country**

**Holder Reference Number: CR999999**                  Holder Contact Person: Mr. Ralf Thomson

**Holder Telephone: +49 111 222 4567**                 Holder Fax: +49 111 222 9988

| | Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Principal in Original Currency | Standard Currency | Reconciled Outstanding Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 56021 0x0 | ABC 112233 | Letter of Credit SN-100166 | CENTRAL BANK OF IRAQ | FRF | 1,202,809.73 | EUR | 183,239.04 | 292,303.57 | 475,542.61 |
| 2 | 56023 0x0 | XYZ 987654 | Letter of Credit 1100167 | CENTRAL BANK OF IRAQ | FRF | 467,682.90 | EUR | 71,247.84 | 109,675.63 | 180,923.47 |
| 3 | 56025 0x0 | FYH 123456 | Letter of Credit 204935089 | CENTRAL BANK OF IRAQ | FRF | 472,152.32 | EUR | 71,928.86 | 109,016.37 | 180,945.33 |

Aggregate Amount of Reconciled Eligible Claims    EUR    837,411.31

Purchase Price of Reconciled Eligible Claims (apply 10.25%)    EUR    85,834.66

Notes - 1. Where the number in the column "Our Reference" of this statement is followed by a letter, please refer to the appropriate note for that Item as below:

(a) Contractual, statutory or common law Set-Offs effected against property of the Specified Obligor have been treated as having reduced the outstanding principal amount of the Item to the extent of the Set-Off. Holder must confirm and/or disclose full details of all set-offs exercised against Iraqi assets. Details to be disclosed include the type of set-off, the date set-off was exercised, the currency and amount.

(b) Indicates that the original negotiable instrument must be submitted pursuant to Section 8 of the Invitation.

(c) Indicates that all appropriate documents relating to Judgments and Pending Litigation must be submitted pursuant to Section 13 of the Invitation.

(d) Holder must confirm that claim was not eligible for consideration by the United Nations Compensation Commission (UNCC) pursuant to Section 7 of the Invitation. Indicates that official documents relating to compensation awards made by United Nations Compensation Commission (UNCC) must be submitted.

(e) Indicates that the Item may be a duplicate of an official claim. Holder must confirm and / or disclose full details of such duplication.

(f) Holder must provide details of all accounts (deposit accounts etc.) belonging to Specified Obligors (including the Central Bank of Iraq, Rafidian Bank, Rasheed Bank, and the branches and offices of these banks) at the Holder institution. Details provided should include the name of the Specified Obligor(s), account number(s) and the current balance and currency for each account.

2. Set-Offs effected improperly against the property of third parties will be taken into account when calculating the consideration to which the tendering Holder is entitled.

3. Certain of the claims shown on this Statement may have been, or may subsequently be, asserted against a Specified Obligor by a bilateral (governmental) creditor. By its acceptance of the Consideration on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

EY Iraq Debt Reconciliation Office

Date of this Statement of Unreconciled Claims   09-Feb-2006

## Schedule II: Statement of Unreconciled Claims

**Name of Holder: Example COMMERCIAL Company**

**Holder Address: 35 Main St , Any City, Any Country**

**Holder Reference Number: CR999999**

**Holder Telephone: +49 111 222 4567**

**Holder Contact Person: Mr. Ralf Thomson**

**Holder Fax: +49 111 222 9988**

| | Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Unreconciled Claim | Specified Obligor | Currency | Amount of Principal claimed by Holder | The Reconciliation Agent is unable to confirm: |
|---|---|---|---|---|---|---|---|
| 1 | 57407 | XYZ.552/45489 | Letter of Credit 900003-497660 | RAFIDAIN BANK | FRF | 1,062,671.40 | Existence |
| 2 | 57410 | XYZ.552/45489/10 | Letter of Credit 900003-498303 | RAFIDAIN BANK | FRF | 302,835.90 | Existence |
| 3 | 57413 | XYZ.552/45480/11 | Letter of Credit 900003-497659 | RAFIDAIN BANK | FRF | 52,745.47 | Existence |
| 4 | 57416 | XYZ.552/45486 | Letter of Credit 900003-497661 | RAFIDAIN BANK | FRF | 900,194.75 | Existence |
| 5 | 57417 | XYZ.552/45487 | Letter of Credit 900003-497662 | RAFIDAIN BANK | FRF | 335,729.44 | Existence |
| 6 | 57419 | XYZ.552/45488 | Letter of Credit 900003-498303 | RAFIDAIN BANK | USD | 10,955.55 | Existence |

# EXHIBIT D

EY Iraq Debt Reconciliation Office

Date of this Reconciliation Statement : 22-Feb-2006

Date Interest Calculated To:    30-Mar-2006

Tender Due Date :    13-Mar-2006

Closing Date :    30-Mar-2006

## Schedule I: Statement of Reconciled Eligible Claims

Name of Holder: AGROCOMPLECT, EAD

Holder Address: 14915 River Road, Potomac, Maryland 20854, USA

Holder Reference Number: CR006097

Holder Contact Person: Attorney Sylvia J. Rolinski, Esquire

Holder Telephone: +1 240 632 0903

Holder Fax: +1 240 632 0906

| Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Principal in Original Currency | Standard Currency | Reconciled Outstanding Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

The Reconciliation Agent was unable to reconcile any of the claims registered by the Holder.

EXHIBIT
D

PENGAD 800-631-6989

# EXHIBIT E

EY Iraq Debt Reconciliation Office

Date of this Statement of Unreconciled Claim    22-Feb-2006

# Schedule II: Statement of Unreconciled Claims

**Name of Holder: AGROCOMPLECT, EAD**

**Holder Address: 14915 River Road,Potomac,Maryland 20854,USA**

**Holder Reference Number: CR006097**

**Holder Telephone: +1 240 632 0903**

**Holder Contact Person: Attorney Sylvia J. Rolinski, Esquire**

**Holder Fax: +1 240 632 0906**

| Our Reference | Your Booking Ref | Caption of, or description of, instrument relating to Unreconciled Claim | Specified Obligor | Currency | Amount of Principal claimed by Holder | The Reconciliation Agent is unable to confirm: |
|---|---|---|---|---|---|---|
| 57890 | CONTRACT NO 65 | Other Debt : CONTRACT NO 65 | RAFIDAIN BANK | USD | 7,590,203.20 | Existence |

PENGAD 800-631-6989

EXHIBIT
E

# EXHIBIT F

# TENDER

To:       Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
          Citibank N.A. Agency and Trust
          21st Floor
          Citigroup Centre
          33 Canada Square
          London
          E14 5LB
          United Kingdom
          Tel: +44 20 7508 3867
          Fax: +44 20 7508 3866
          Email: exchange.gats@citigroup.com

From:     Agrocomplect, EAD
          (the "Holder")

Date:     03/09/06

Re:       Iraq Invitation to Tender Claims for Cash Purchase and Cancellation
          dated February 9, 2006 (the "Invitation")

          We refer to the Invitation. Capitalized terms used herein have the meanings given to those terms in the Invitation.

          The above-named Holder is the holder of the Reconciled Eligible Claims specified in the schedule attached hereto (bearing the Holder Reference Number: - CR 006097     ) and hereby offers each such Reconciled Eligible Claim for purchase by Iraq and simultaneous cancellation on the terms, and subject to the conditions, set out in the Invitation. This Tender is irrevocable.

          The Holder is the holder of the Unreconciled Claims specified in the Schedule II attached hereto and hereby irrevocably agrees that if the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim pursuant to the Arbitration Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any Unreconciled Claim not covered by such an election will be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 of the Invitation.

          By submitting this Tender, the Holder represents and warrants to Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of this Tender and the Closing Date, as follows:



EXHIBIT

F

(i)    it is the record holder of the Reconciled Eligible Claims identified in Schedule I to the Invitation (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)    it has the power and authority to submit this Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by this Tender;

(iii)    in submitting this Tender it will not, to the best of its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal of competent jurisdiction;

(iv)    it has taken all necessary action to authorize the execution and delivery of this Tender, and the performance of its obligations under this Tender and the Invitation;

(v)    this Tender, if accepted by Iraq in the manner described in Section 6 of the Invitation, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of this Tender and the Invitation;

(vi)    any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under this Tender and the Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)    on the Closing Date, the Reconciled Eligible Claims covered by this Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)    the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI;

(ix)    it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)    the statements set forth in the Holder's response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claims;

2

Holder Reference Number: CR 006097

(xii)    other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien or any other security interest) any Specified Obligor;

(xiii)    it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

(xiv)    none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the UNCC established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

If any Reconciled Eligible Claims or Unreconciled Claims are covered by or merged into a Judgment (other than a UNCC award) or are the subject of any Pending Litigation in any jurisdiction (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), the Holder has delivered to the Settlement Agent the documentation required by Section 13 of the Invitation.

If any Reconciled Eligible Claims are evidenced by a negotiable instrument (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), those negotiable instruments have been delivered to the Settlement Agent, or the indemnity set forth in Section 9 of the Invitation is given.

Regards,

By:
Name: Sylvia J. Rolinski, Esq.
Title: Attorney
Name of Institution: Agrocomplect, EAD

Attachments:    Holder's Administrative Information
Statement of Reconciled Eligible Claims

3

Holder Reference Number: <u>CR 006097</u>

**ATTACHMENT TO TENDER**

<u>HOLDER'S ADMINISTRATIVE INFORMATION</u>

| HOLDER'S NAME: | Agrocomplect, EAD |
|---|---|
| | |
| STREET ADDRESS: | 61 Vitoshe Blvd. |
| | Sofia, Bulgaria 1000 |
| CONTACT PARTY: | Sylvia J. Rolinski, Esq. |
| | |
| PHONE: | 1-(240) 632-0903 |
| | |
| FACSIMILE NUMBER: | 1-(240) 632-0906 |
| | |
| ELECTRONIC MAIL ADDRESS: | SRolinski@Rolinski.com |

<u>SYNDICATE AGENT'S ADMINISTRATIVE INFORMATION (IF APPLICABLE)</u>

| SYNDICATE AGENT'S NAME: | |
|---|---|
| | |
| STREET ADDRESS: | |
| | |
| CONTACT PARTY: | |
| | |
| PHONE: | |
| | |
| FACSIMILE NUMBER: | |
| | |
| ELECTRONIC MAIL ADDRESS: | |

4

Holder Reference Number: CR  006097

## PAYMENT INSTRUCTIONS

| CURRENCY: | |
|---|---|
| BANK NAME: | |
| ABA/FEDWIRE OR SWIFT (OR USD CORRESPONDENT BANK DETAILS, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | EURO |
|---|---|
| BANK NAME: | |
| SWIFT OR SORT CODE (OR EURO CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | JSn |
|---|---|
| BANK NAME: | |
| SWIFT (OR JPY CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

5

# EXHIBIT G

EY Iraq Debt Reconciliation Office

Date of this Reconciliation Statement: 06-Jul-2006

Date Interest Calculated To:    13-Jul-2006

Arbitrated Claims Closing Date: 13-July-2006

## Statement of Claims Submitted to Arbitration

**Name of Holder: AGROCOMPLECT, EAD**

**Holder Address: 14915 River Road,Potomac,Maryland 20854,USA**

**Holder Reference Number: CR006097**

**Holder Contact Person: Attorney Sylvia J. Rolinski, Esquire**

**Holder Telephone: +1 240 632 0903**

**Holder Fax: +1 240 632 0906**

| Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Claimed Principal in Original Currency | Awarded Principal in Original Currency (4) | Standard Currency | Awarded Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Awarded Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 57390 (4) | CONTRACT NO. 65 | Other Debt:CONTRACT NO. 65 | RAFIDAIN BANK | USD | 7,505,203.20 | 7,505,203.20 | USD | 7,505,203.20 | 9,683,822.35 | 17,189,025.55 |
| | | | | | | **Aggregate Amount of Awarded Reconciled Eligible Claims** | USD | | | 17,189,025.55 |
| | | | | | | **Purchase Price of Reconciled Eligible Claims (apply 10.25%)** | USD | | | 1,761,875.12 |

Notes - 1. Where the number in the column "Our Reference" of this statement is followed by a letter, please refer to the appropriate note for that Item as below:

(a) Contractual, statutory or common law Set-Offs effected against property of the Specified Obligor have been treated as having reduced the outstanding principal amount of the Item to the extent of the Set-Off. Holder must confirm and/or disclose full details of all set-offs exercised against Iraqi assets. Details to be disclosed include the type of set-off, the date set-off was exercised, the currency and amount.

(b) Indicates that the original negotiable instrument must be submitted pursuant to Section 8 of the Invitation.

(c) Indicates that all appropriate documents relating to Judgments and Pending Litigation must be submitted pursuant to Section 13 of the Invitation.

(d) Holder must confirm that claim was not eligible for consideration by the United Nations Compensation Commission (UNCC) pursuant to Section 7 of the Invitation. Indicates that official documents relating to compensation awards made by United Nations Compensation Commission (UNCC) must be submitted.

(e) Indicates that the Item may be a duplicate of an official claim. Holder must confirm and / or disclose full details of such duplication.

(f) Holder must provide details of all accounts (deposit accounts etc.) belonging to Specified Obligors (including the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, and the branches and offices of these banks) at the Holder institution. Details provided should include the name of the Specified Obligor(s), account number(s) and the current balance and currency for each account.

2. Set-Offs effected improperly against the property of third parties will be taken into account when calculating the consideration to which the tendering Holder is entitled.

3. Certain of the claims shown on this Statement may have been, or may subsequently be, asserted against a Specified Obligor by a bilateral (governmental) creditor. By its acceptance of the Consideration on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

(4) Awarded Principal has been reduced by the amount of any contractual, statutory or common law Set-Offs effected against property of the Specified Obligor, in accordance with Sections 6(a) 6(b) of the Reconciliation Methodology

PRM040 800-581-6996

**EXHIBIT**

G

# EXHIBIT H

## Dr. GHALEB S. MAHMASSANI

**AVOCAT - LAW CONSULTANT**

Serhal – Massabki Building
Cairo St.- Hamra
Beirut - Lebanon
Tel : (961.1)  349777 - 349988
Fax : (961.1)  348712
E-mail: ghmahmasani@terra.net.lb

## By E-Mail and Courier

28 June, 2006

## NOTICE OF AWARD

To:        AGROCOMPLECT, EAD
            C/o Rolinski and Suarez LLC
            14915 River Road
            Potomac, Maryland 20854
            U.S.A.

            **Attention: Mrs. Sylvia Rolinski, Esq**

            **e-mail: SRolinski@Rolinski.com**

            **(the "Holder")**

To:        Iraq Debt Arbitration Desk
            c/o Ernst & Young
            7th Circle, 7 Kindi Street Off Mecca Street
            P.O. Box: 5552 Amman 11183 Jordan

            email: idebtarbitration@ammrsiesd.com

Cc:        Mr. E. Michael Hunter
            Chairperson
            Iraq Arbitration Office
            51 JFK Parkway
            First Floor West
            Short Hills, New Jersey 07078
            U.S.A.

            email: mhunter@comcast.net



EXHIBIT

H

PENGAD 800-631-6989

Cc:        Iraq Debt Reconciliation Office
                c/o Ernst & Young
                7th Circle, 7 Kindi Street Off Mecca Street
                P.O. Box: 5552 Amman 11183 Jordan

                email: idro@ammrsiesd.com

From:     Dr. Ghaleb S. Mahmassani
                Massabki-Serhal Bldg
                Cairo Street-Hamra
                Beirut Lebanon

                email: ghmahmasani@terra.net.lb

**Holder: AGROCOMPLECT, EAD**

**Holder Reference Number :   CR 006097**

As you are aware, I have been appointed to determine the Holder's Unreconciled Claims against Iraqi public sector obligors that were submitted to the Arbitration Procedures accompanying Iraq's Invitation to Tender Claims for Cash Purchase and Cancellation dated 9 February 2006 (the "Invitation").

In Schedule 1 attached hereto I hereby render the award in respect of the individual claim presented for determination by the Holder.

With respect to such claim, I find that the existence of the Claim listed on Schedule 1 has been corroborated by credible documentary evidence, for the maturity date and principal amount specified in Schedule 1. That claim (to the extent of the amounts awarded) shall be treated for all purposes as Reconciled Eligible Claim tendered by the Holder in accordance with the Holder's original Tender accepted by Iraq. It will be placed in line for purchase by Iraq on the Arbitrated Claims Closing Date pursuant to the terms of the Invitation.

In making my determinations in respect of the Holder's Claim, I have reviewed the submissions and documents delivered by the Holder pursuant to my Notice of Deadline dated 7 April 2006.

Iraq did not exercise its right to deliver submissions or documents within the time limit established by my Notice of Deadline.

I do not propose to enter into correspondence with the Parties in connection with this Award, other than in relation to any purely typographical or computation errors; and I remind the parties that the terms of the Invitation provide that all awards rendered pursuant to the Invitation shall be final and binding on the parties; and that neither party shall be entitled to an appeal or other form of recourse to any court or tribunal.

Yours truly

Ghaleb Mahmassani

Date:    28 June, 2006

3

**SCHEDULE 1**

**AGROCOMPLECT, EAD**

**Holder Reference Number :   CR 006097**

| E&Y Ref. | Currency | Principal | Maturity Date |
|----------|----------|-----------|---------------|
| 57890 | USD | 7,505,203.20 | 01 January 1991 |