# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**AGROCOMPLECT, AD,**                    )
                                         )
                    Plaintiff,           )
                                         )          Case No. 1:07CV00165 (RBW)
          v.                             )
                                         )
**THE REPUBLIC OF IRAQ**                 )
                                         )
                    Defendant.           )
                                         )
_____)

## REPLY MEMORANDUM IN FURTHER SUPPORT
## OF THE DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Matthew D. Slater
D.C. Bar No. 386986
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
Tel.:  202 974-1500
Fax:  202 974-1999

Jonathan I. Blackman
Lisa Coyle
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel:  212-225-2000
Fax:  212-225-3999

Attorneys for Defendant The Republic of Iraq

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    THIS COURT LACKS JURISDICTION UNDER THE
      FOREIGN SOVEREIGN IMMUNITIES ACT........................................................ 2

      A.    Plaintiff Relies On Irrelevant Legal Standards Governing
            Motions To Dismiss ..................................................................................... 2

      B.    The Facts Alleged By Plaintiff Are Insufficient To Meet
            The Direct Effect Test Under § 1605(a)(2) Of The FSIA ............................. 4

            1. Plaintiff's Alleged Payments To Third Parties Through United
               States Bank Accounts Do Not Meet The Direct Effect Test ..................... 5

            2. Plaintiff's Alleged Use Of American Goods And Services Does
               Not Meet The Direct Effect Test ............................................................ 10

            3. The Alleged Destruction of Construction Projects By The United
               States Military Does Not Satisfy The Direct Effects Test ....................... 12

      C.    The Arbitration Clause In The Contract Did Not Constitute
            A Waiver Of Iraq's Sovereign Immunity In The United States
            Under § 1605(a)(1) Of The FSIA .................................................................. 12

      D.    The Arbitration Clause Does Not Satisfy The Requirements
            Of § 1605(a)(6) Of The FSIA........................................................................ 15

            1. The Contract Required That Arbitration Take Place In Iraq ..................... 15

            2. Even If § 1605(a)(6) Were Applicable It Would Only Permit The
               Court To Compel Arbitration.................................................................... 17

II.   AGROCOMPLECT'S COMPLAINT IS TIME-BARRED .................................. 18

      A.    The Complaint Is Time-Barred On Its Face .................................................. 18

      B.    Agrocomplect Fails To Allege Facts That If True Would
            Demonstrate That The Statute of Limitations Was Tolled............................. 20

III.   AGROCOMPLECT'S CLAIMS HAVE BEEN RELEASED ............................... 23

   A.   This Court May Consider The Release Documents Without
        Converting The Motion To Dismiss Into A Motion For
        Summary Judgment ......................................................................... 23

   B.   Agrocomplect Released All Claims Arising Under the Contract .................... 24

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

28 U.S.C. § 1605(a)(2) ............................................................................................ 4

28 U.S.C. § 1605(a)(6) ............................................................................................ 17

D.C. Code § 12-301(7) (2006) ................................................................................ 19


**Cases**

Aktieselskabet AF 21 v. Fame Jeans, Inc.,
No. 06-585, 2007 WL 1655877 (D.D.C. June 7, 2007) ...................................... 4

*Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank,
251 F. Supp. 2d 126 (D.D.C. 2003) .................................................................... 6, 14

Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio,
446 U.S. 478 (1980) ............................................................................................. 21

Bell Atlantic Corp. v. Twombly,
127 S.Ct. 1955 (2007) .......................................................................................... 3-4

Berry v. Chrysler Corp.,
150 F.2d 1002 (6th Cir. 1945) ............................................................................. 18

Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.,
691 A.2d 1153 (D.C. 1997) ................................................................................. 18-19

C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.,
532 U.S. 411 (2001) ............................................................................................. 13

Cargill Int'l S.A. v. M/T Pavel Dybenko,
991 F.2d 1012 (2d Cir. 1993) .............................................................................. 16

Commercial Bank of Kuwait v. Rafidain Bank,
15 F.3d 238 (2d Cir. 1994) .................................................................................. 11

Conley v. Gibson,
355 U.S. 41 (1957) ............................................................................................... 3

*Creighton Ltd. v. Gov't of State of Qatar,
181 F.3d 118 (D.C. Cir. 1999) ............................................................................. 12, 14

\*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,
212 F. Supp. 2d 30 (D.D.C. 2002) ...................................................................... 6, 9, 10

East v. Graphic Arts Indus. Joint Pension Trust,
718 A.2d 153 (D.C. 1998) ................................................................................... 21

Forti v. Suarez-Mason,
672 F. Supp. 1531 (N.D.Cal. 1987) ..................................................................... 21

Goodman Holdings v. Rafidain Bank,
26 F.3d 1143 (D.C. Cir. 1994) (Wald, J. concurring) .......................................... 6, 7

Gupta v. Northrop Grumman Corp.,
462 F. Supp. 2d 56 (D.D.C. 2006) ....................................................................... 21

Hicks v. Ass'n of Am. Med. Colls.,
No. 07-00123, 2007 WL 1577841 (D.D.C. May 31, 2007) .................................. 4

Honduras Aircraft Registry, Ltd. v. Gov't of Honduras,
129 F.3d 543 (11th Cir. 1997) ............................................................................ 11

Huntley v. Bortolussi,
667 A.2d 1362 (D.C. 1995) ................................................................................ 19

\*IDAS Res. N.V. v. Empresa Nacional de Diamentes de Angola E.P.,
No. 06-00570, 2006 WL 3060017 (D.D.C. Oct. 26, 2006) ................................. 6, 9, 10

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,
115 F.3d 1020 (D.C. Cir. 1997) .......................................................................... 3

Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,
523 U.S. 751 (1998) ............................................................................................ 13

Lempert v. Republic of Kazakhstan,
62 Fed. Appx. 355 (D.C. Cir. 2003) .................................................................... 9

Libyan Am. Oil Co. v. Socialist People's Libyan Arab Jamahirya,
482 F. Supp. 1175 (D.D.C. 1980) ....................................................................... 15

Maritime Int'l Nominees Establishment v. Republic of Guinea,
693 F.2d 1094 (D.C. Cir. 1983) .......................................................................... 11

Mavrovich v. Vanderpool,
427 F. Supp. 2d 1084 (D.Kan. 2006) ................................................................... 23

Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.,
287 F.3d 568 (6th Cir. 2002) .............................................................................. 3

iv

Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,
995 F. Supp. 14 (D.D.C. 1998) ..................................................................... 11

Munno v. Town of Orangetown,
391 F. Supp. 2d 263 (S.D.N.Y. 2005).......................................................... 23

Native Vill. of Eyak v. GC Contractors,
658 P.2d 756 (Alaska 1983)........................................................................ 13

Nyhus v. Travel Mgmt. Corp,
466 F.2d 440 (D.C. Cir. 1972)..................................................................... 20

Panhandle E. Pipe Line Co. v. Parish,
168 F.2d 238 (10th Cir. 1948) ..................................................................... 18

Peterson v. Royal Kingdom of Saudi Arabia,
416 F.3d 83 (D.C. Cir. 2005) ........................................................................ 2

*Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992)................................................................................. 5, 6

Rosebud Sioux Tribe v. Val-U Constr. Co.,
50 F.3d 560 (8th Cir. 1995) ........................................................................ 13

Saltz v. Lehman,
672 F.2d 207 (D.C. Cir. 1982) ................................................................ 20-21

*Saudi Arabia v. Nelson,
507 U.S. 349 (1993)............................................................................. 5-6, 8

Sokaogon Gaming Enter. Corp. v. Tushi-Montgomery Assocs., Inc.,
86 F.3d 656 (7th Cir. 1996) ........................................................................ 13

*Strategic Techs. PTE, Ltd. v. Republic of China (Taiwan),
No. 05-2311, 2007 WL 1378492 (D.D.C. May 10, 2007)................................. 3, 9, 13

Taylor v. Houston,
211 F.2d 427 (D.C. Cir. 1954) ..................................................................... 18

*Termorio S.A. E.S.P. v. Electrificadora del Atlantico S.A. E.S.P.,
421 F. Supp. 2d 87 (D.D.C. 2006) ............................................................... 11

Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,
204 F.3d 384 (2d Cir. 2000)........................................................................... 9

United World Trade Inc. v. Mangyshlakneft Oil Prod. Ass'n.,
33 F.3d 1232 (10th Cir. 1994) ................................................................... 2, 11

Val/Del, Inc. v. Super. Ct.,
703 P.2d 502 (Ariz. Ct. App. 1985) ................................................................. 13


**Other Authorities**

51 Am. Jur. 2d Limitation of Actions § 162 (2006) ............................................. 20

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
art. I.1, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 .................................... 12

George Chamberlin, Cause of Action to Enforce Right to Arbitration
Pursuant to Contract Clause Requiring Arbitration,
29 Causes of Action 231 (2006) ......................................................................... 9-10

H.R. Rep. No 94-1487 (1976),
reprinted in 1976 U.S.C.C.A.N 6604 ................................................................. 5

Mahir Jalili, International Arbitration in Iraq,
4 J. Int'l Arb. 109 (1987) ................................................................................. 17

Restatement (Second) of Contracts § 202 ............................................................ 16

U.N. Compensation Commission Governing Council, Report and
Recommendations Made by the Panel of Commisioners Concerning the Second
Installment of "E3" Claims,
U.N. Doc. S/AC.26/1999/5 (Mar. 19, 1999) .................................................... 19, 20, 24

vi

Defendant The Republic of Iraq ("Iraq" or the "Republic") submits this reply memorandum in further support of its motion to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

The issues here are straightforward: this Court lacks subject matter jurisdiction to hear Agrocomplect's claims because the Complaint fails to allege facts sufficient to demonstrate that any exception to Iraq's sovereign immunity applies under the Foreign Sovereign Immunities Act (the "FSIA"). The plaintiff's claims are not based upon any act that occurred outside the United States in connection with Iraq's commercial activity and that caused a direct effect in the United States, as the statute requires. Nor has the plaintiff demonstrated that Iraq waived its sovereign immunity or that the arbitration clause in the parties' Contract is capable of enforcement in a United States court. Moreover, even if this Court had subject matter jurisdiction over plaintiff's claims, which it does not, it would be separately bound to dismiss them for failure to state a claim upon which relief can be granted, because such claims are time-barred and have already been released.

Agrocomplect's longwinded attempt to avoid these conclusions is meritless. While it discusses at length irrelevant or inapplicable case law, it ignores the binding precedent that defeats its claims. That precedent, on both the facts pleaded by Agrocomplect and the terms of its Contract with the Republic, which is properly before the Court on this motion to dismiss for lack of subject matter jurisdiction under the FSIA, requires dismissal of its Complaint as a matter of law.

---

[1]    All capitalized terms not defined herein have the same meaning set forth in the Statement of Points and Authorities in Support of the Defendant's Motion to Dismiss the Complaint, dated May 21, 2007 ("Opening Br.").

## ARGUMENT

**I.    THIS COURT LACKS JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT**

As the Court of Appeals has observed, "there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one – the FSIA." Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C. Cir. 2005). Contrary to Agrocomplect's arguments, "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n., 33 F.3d 1232, 1238 (10th Cir. 1994). Rather, a foreign state is immune from the jurisdiction of United States courts unless one of the exceptions to immunity in the FSIA applies. Here, none of the three exceptions Agrcomplect seeks to invoke – the "direct effect" prong of the commercial activities exception of § 1605(a)(2), the implied waiver of immunity exception of § 1605(a)(1) or the arbitration exception of § 1605(a)(6) – defeats the Republic's immunity, because the facts alleged by Agrocomplect and shown by the Contract are insufficient to demonstrate subject matter jurisdiction under any of these provisions.

**A.    Plaintiff Relies On Irrelevant Legal Standards Governing Motions To Dismiss**

Agrocomplect spends much of the beginning of its brief belaboring the difference between facial and factual attacks on a complaint in a motion to dismiss. This distinction is simply irrelevant to the present case. First, as Agrocomplect concedes, see Opp'n Br. at 7-8, where a motion to dismiss is made for lack of subject matter jurisdiction under Rule 12(b)(1), and particularly where it involves a challenge to subject matter jurisdiction by a foreign sovereign under the FSIA, courts are not limited to the face of the complaint in determining whether subject matter jurisdiction exists. To the contrary, "[w]here the motion to dismiss is

2

based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability… the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case." Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997) (internal quotation marks omitted); see also Strategic Techs. PTE, Ltd. v. Republic of China (Taiwan), No. 05-2311, 2007 WL 1378492, at *2 (D.D.C. May 10, 2007) ("the court is not limited to the allegations contained in the complaint[;] … to determine whether it has jurisdiction over the claim, [it] may consider materials outside the pleadings").  The Court must therefore look beyond the Complaint itself to adjudicate this motion under Rule 12(b)(1), although the result would be the same even if only the Complaint were considered:  either way, the plaintiff has not alleged sufficient facts to establish that subject matter jurisdiction exists as a matter of law.

Indeed, even as to the Republic's alternative motion to dismiss for failure to state a claim under Rule 12(b)(6) (which the Court need not and cannot reach if it finds that it has no subject matter jurisdiction under the FSIA), Agrocomplect's arguments are meritless.  Its assertion that the Court may not dismiss the Complaint unless "it appears beyond doubt that plaintiff *can prove no set of facts* in support of its claim which would entitle it to relief," see Opp'n Br. at 9 (emphasis supplied) (internal quotation marks omitted), ignores the recent Supreme Court decision specifically overruling this language.  See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1969 (2007). [2]

As the Supreme Court held in Twombly, the "no set of facts" language "has earned its retirement" and "is best forgotten as an incomplete, negative gloss on an accepted pleading

_____

[2]       The "no set of facts" language on which plaintiff relies originated in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which involved a motion to dismiss under Rule12(b)(6), but has also on occasion been applied to motions to dismiss under Rule 12(b)(1).  See, e.g., Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc., 287 F.3d 568, 572-73 (6th Cir. 2002).  It was never properly applied in the latter context and has now been overruled even in the Rule 12(b)(6) context.

standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. After Twombly, in order to survive a facial challenge under Rule 12(b)(6), a complaint must "plead enough facts to state a claim to relief that is *plausible on its face*," and "*above the speculative level*." See Hicks v. Ass'n of Am. Med. Colls., No. 07-00123, 2007 WL 1577841, at *2 (D.D.C. May 31, 2007) (emphasis supplied) (internal quotation marks omitted)). This standard requires that plaintiff meet "a substantive threshold not achieved by conclusory assertions." See Aktieselskabet AF 21 v. Fame Jeans, Inc., No. 06-585, 2007 WL 1655877, at *2 (D.D.C. June 7, 2007). Agrocomplect cannot satisfy this standard because its Complaint on its face shows that its claims are time-barred, it has not alleged and cannot allege any facts to overcome that conclusion, and the IDRO documents that it relied on in the Complaint and that are therefore properly before the Court on a Rule 12(b)(6) motion show that its claims have been released as well.

### B. The Facts Alleged By Plaintiff Are Insufficient To Meet The Direct Effect Test Under § 1605(a)(2) Of The FSIA

The third prong of § 1605(a)(2) of the FSIA grants United States courts jurisdiction over actions against foreign sovereigns that are "based upon…an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere…that…causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).[3] Agrocomplect claims that the "act" for purposes of § 1605(a)(2) need not be the alleged breach by the defendant – in this case, Iraq's alleged nonpayment of sums due to Agrocomplect under the Contract – or indeed an act by the defendant at all. See Opp'n Br. at 12, 18, 19. But this assertion, which is unsupported by any legal authority that Agrocomplect cites, ignores the statutory text: the "act" must be what the plaintiff's claim is "based upon," and must therefore be

---

[3]     Agrocomplect does not attempt to found jurisdiction on the first two prongs of § 1605(a)(2).

4

the act of the defendant; a claim cannot be "based upon" the plaintiff's own conduct, or that of a

third party. Indeed, the entire purpose of this statutory requirement, as is true of § 1605(a)(2)

generally, is to ensure a meaningful nexus between the foreign state's conduct and the United

States. See H.R. Rep. No 94-1487, at 18-19 (1976), reprinted in 1976 U.S.C.C.A.N 6604, 6617-

18. Plaintiff has identified no "act" by Iraq that caused a "direct effect" in the United States

within the meaning of well-established FSIA jurisprudence, and its attempt to found jurisdiction

under the direct effect test of §1605(a)(2) must therefore be rejected.

### 1.    Plaintiff's Alleged Payments To Third Parties Through United States Bank Accounts Do Not Meet The Direct Effect Test

Plaintiff first mistakenly argues that payments *it* allegedly made "to contractors and

suppliers *through* banks in the United States for performance of the contract constitute 'acts'

connected to Iraq's 'commercial activity'" that caused a direct effect in the United States. Opp'n

Br. at 16 (emphasis supplied).[4] Such alleged "acts" do not satisfy the direct effect test for several

reasons.

First, Agrocomplect's contention that under Saudi Arabia v. Nelson, 507 U.S. 349

(1993), the "act" for purposes of the third prong of § 1605(a)(2) need not be that of the

defendant, and can instead be a unilateral act of the plaintiff, see Opp'n Br. at 12, has no legal

basis. Plaintiff does not, and indeed cannot, provide a citation for this assertion because it is

neither stated nor implied by Nelson, which did not address the requirements of an "act" for

---

[4]       Plaintiff thus tacitly concedes that *Iraq* did not make any payments to Agrocomplect or anyone else "through" United States banks.
         Plaintiff also insists it "does not allege that the direct effect test is met by the possibility that payments may have, in the course of banking operations, been routed through American banks without any involvement of the parties," see Opp'n Br. at 15, yet fails to specify what else could be meant by its allegation that payments were made "through" – rather than into or from – United States banks. If plaintiff could allege that payments were to be made "into" a United States bank account, it would undoubtedly have done so. It did not, and its claim of payment "through" United States banks – which is how all dollar payments in the world are made – is far more tangential and fleeting than the deposits *into* United States bank accounts as the place of contractual performance by the foreign state defendant that have typically been found to meet the direct effect test. See, e.g., Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992).

purposes of the third prong of § 1605(a)(2) of the FSIA.  See Nelson, 507 U.S. at 356.  Nor could

Nelson have possibly contained any such statement, since it is well-settled that the direct effect

under the FSIA must "follow[] as an immediate consequence of the ***defendant's***…activity."  See

Weltover, 504 U.S. at 618 (emphasis supplied) (internal quotation marks omitted); see also IDAS

Res. N.V. v. Empresa Nacional de Diamentes de Angola E.P., No. 06-00570, 2006 WL 3060017,

at *7 (D.D.C. Oct. 26, 2006) ("A direct effect must follow as an immediate consequence of the

defendant's ***not the plaintiff's***…activity." (citing Weltover, 504 U.S. at 618) (emphasis supplied)

(internal quotation marks omitted)).

   "[A]n effect is direct if it 'has ***no intervening element***, but rather, flows in a straight line

without deviation or interruption.'" Croesus EMTR Master Fund L.P. v. Federative Republic of

Brazil, 212 F. Supp. 2d 30, 35-36 (D.D.C. 2002) (quoting Princz v. Federal Republic of

Germany, 26 F.3d 1166, 1172 (D.C. Cir. 1994)) (emphasis supplied).  Because an act of the

plaintiff necessarily constitutes an intervening element between the defendant's alleged activity

and the alleged effect in the United States, an effect caused by the plaintiff's act necessarily fails

to meet the immediacy standard set forth in Weltover.

   Agrocomplect's contention that an obligation of performance in the United States is

unnecessary under the direct effect test is also wrong.  Courts that have considered the direct

effect test have "interpreted [it] to require a clause in a contract ***mandating the fulfillment of

contractual obligations in the United States***." Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank,

251 F. Supp. 2d 126, 134 (D.D.C. 2003) (emphasis supplied in part).  While plaintiff asserts that

Atl. Tele-Network "simply overstates the direct effects requirements," on the basis of then-Chief

Judge Wald's concurring opinion in Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C.

Cir. 1994) (Wald, J. concurring), see Opp'n Br. at 17, Agrocomplect fails to meet even the more lenient standard suggested by Judge Wald in that concurrence.

Thus, while it is true that this Circuit has theoretically "left open the possibility that a court could find a 'direct effect' based upon a **non-express agreement** to pay in the United States…'[a]s a factual matter… in almost every case, in this circuit and others, involving the direct effect exception, the existence or absence of an expressly designated place of payment has been decisive.'" IDAS, 2006 WL 3060017 at *9 (emphasis supplied). In the absence of an express contractual obligation to make a payment in the United States, "the **only possible** way of establishing a direct effect by nonpayment that courts of this circuit have **even considered** is a consistent history of payment in the United States." Id. (internal quotation marks omitted) (emphasis supplied); see also Goodman Holdings, 26 F.3d at 1147 (Wald, J. concurring) ("if the **longstanding consistent customary practice** between [the parties] had been for [the defendant] to pay [the plaintiff] from its New York accounts, the breach…**might** well have had a direct and immediate consequence in the United States." (emphasis supplied)). Here, Agrocomplect has alleged no such "longstanding consistent customary practice" between itself and the Republic that payments be made "through" United States bank accounts, nor could it do so. Nor has it alleged any other agreement – express **or** implied – that payments be made in such a way. The alleged payments "through United States banks" – by plaintiff, not the Republic, and not pursuant to any contract or practice between plaintiff and the Republic – cannot, therefore, constitute direct effects under § 1605(a)(2) of the FSIA.[5]

---

[5]    The three additional cases on which plaintiff relies for the proposition that there is no requirement of an express or implied agreement that payment be made in the United States by the defendant are equally unpersuasive because the **foreign state** in each of these cases **was** under an obligation to make payments **into** a United States bank account under a contract that allowed the plaintiff to designate the place of payment. See Opp'n Br. at 13-16 (discussing I.T. Consultants, Inc. v. Islamic Republic of Pakistan, 351 F.3d 1184, 1187 (D.C. Cir. 2003) (although place of payment was not specified in original contract documents, plaintiff sent defendant letter specifying that place of payment should be Virginia and defendant agreed); Hanil Bank v. PT. Bank Negara Indonesia, (Persero),

Finally, even if alleged payments made by plaintiff to third parties through United States bank accounts could constitute acts that caused a direct effect in the United States under § 1605(a)(2), which they cannot, the direct effect test would still not be met because plaintiff's claims are not "based upon" these acts.  The phrase "based upon" means "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  Nelson, 507 U.S. at 357.  Because Nelson involved only the first prong of  § 1605(a)(2), plaintiff boldly asserts that it "establishes that the element of a cause of action test is applicable only to the first clause."  See Opp'n Br. at 12.  But plaintiff tellingly provides no citation for this assertion, and in fact, Nelson neither states nor implies such a conclusion.

Nelson did in fact address a distinction between the first and third prongs of § 1605(a)(2); however, the Court drew this distinction between the "thing" upon which the plaintiff's claim must be based under each prong, and did not remotely suggest that the phrase "based upon," which applies to each prong, somehow has different meaning from one to the other.  To the contrary, the Court pointed out that the first prong applies where "*the action is based upon* a commercial activity carried on in the United States by the foreign state" while the third prong applies where "*an action is based…upon* an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere."  See Nelson, 507 U.S. at 356, 357 (emphasis supplied) (internal quotation marks omitted).  Far from demonstrating that a different definition of the phrase "based upon" should apply to the first and third prongs, the Court's discussion confirms that the phrase applies equally to both prongs.

---

148 F.3d 127, 132 (2d Cir. 1988) (letter of credit specifically stated plaintiff could choose place of payment and plaintiff chose New York); and Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 236, 239 (2d Cir. 2002) (court finds no direct effect, but notes that direct effect will be found where "performance *could have been required* in the United States *and then was requested there*." (emphasis supplied))).

Subsequent case law confirms that the plaintiff's claim must be "based upon" the act that allegedly caused the direct effect in the United States.  As the Second Circuit has held, the third prong of § 1605(a)(2) "contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States and (2) *the plaintiff's suit must be based upon that act*."  Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 388 (2d Cir. 2000) (emphasis supplied).   The court went on to state "[w]e know from Nelson that 'based upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements."  Id. at 390; see also Strategic Techs., 2007 WL 1378492 at *4 ("The nexus requirement mandates that the foreign state's commercial acts be tied to the United States and that such commercial acts form the basis of the plaintiff's cause of action."); Croesus, 212 F. Supp. 2d at 34, 35 (holding that act alleged by plaintiffs did not satisfy third prong of § 1605(a)(2) because plaintiffs' action was not "based upon" such act under standard set forth in Nelson).  Thus, Agrocomplect's contention that claims "under the third clause [are] subjected to a less stringent nexus test than actions [proceeding] under the first clause," is simply unfounded. See Opp'n Br. at 12.

The elements of Agrocomplect's breach of contract claim, as with any contract claim, are the formation of the contract and its breach.  See Lempert v. Republic of Kazakhstan, 62 Fed. Appx. 355, 355-56 (D.C. Cir. 2003).  The elements of its claim to compel arbitration are that an agreement to arbitrate with the defendant exists and that the dispute falls within the scope of such agreement.  See George Chamberlin, Cause of Action to Enforce Right to Arbitration Pursuant to Contract Clause Requiring Arbitration, 29 Causes of Action 231 § 3 (2006) (citing Cont'l U.K.

Ltd. v. Anagel Confidence Compania Naviera, S.A., 658 F. Supp. 809 (S.D.N.Y. 1987);

Dougherty v. Mieczkowski, 661 F. Supp 267 (D.Del. 1987)).  The "act" alleged by plaintiff

(which it also erroneously conflates with the "direct effect" required by the FSIA) – that *it* made

payments to United States subcontractors and suppliers through United States bank accounts – is

not an element of either claim, and is therefore insufficient to meet the direct effect test of §

1605(a)(2) of the FSIA.[6]

2.    **Plaintiff's Alleged Use Of American Goods And Services Does Not Meet The Direct Effect Test**

Plaintiff next argues "an immediate effect of the ratification of the contract was the

contractual retention of, and performance by, various contractors and suppliers in the United

States."  Opp'n Br. at 17.  However, this Circuit has interpreted Weltover's immediacy

requirement to mean "an effect is direct if it 'has *no intervening element*, but rather, flows in a

straight line without deviation or interruption.'"  See Croesus, 212 F. Supp. 2d at 35-36 (emphasis

supplied) (quoting Princz, 26 F.3d at 1172).  Even if true, plaintiff's alleged contractual retention

of United States subcontractors and suppliers, and their subsequent performance, fails to meet

the immediacy requirement because the plaintiff's act of hiring these entities constitutes an

"intervening element" occurring between the "act" of the Republic – ratifying the Contract – and

the effect in the United States – the hiring by Agrocomplect, and subsequent performance, of

United States entities.  See id.

Moreover, Agrocomplect fails to cite a single case in this Circuit holding that an effect on

an entity other than the plaintiff is sufficient to constitute a direct effect under § 1605(a)(2) of the

---

[6]    Plaintiff does not allege that it was required under the Contract to make payments to subcontractors and suppliers through United States bank accounts, see Compl., and indeed the Contract contained no such requirement. See Contract between The Republic of Iraq and Agrocomplect, attached hereto as Exhibit C.  Following the filing of the Republic's motion to dismiss, we received the Contract from IDRO, to which Agrocomplect had submitted it as part of the Republic's debt reconciliation process, and had it translated.  Agrocomplect has not explained its own failure to provide the Contract to the Court.

FSIA.  See Opp'n Br. at 11-19.  Indeed, it simply ignores precedent from this Court stating precisely the opposite.  See Termorio S.A. E.S.P. v. Electrificadora del Atlantico S.A. E.S.P., 421 F. Supp. 2d 87, 95 (D.D.C. 2006) (holding that effects on non-plaintiff entity lacking standing to sue are irrelevant for purposes of direct effect test); see also Millicom Int'l Cellular, S.A. v. Republic of Costa Rica, 995 F. Supp. 14, 22 (D.D.C. 1998) (holding plaintiff "cannot rely on any repercussion felt by [its]…creditors to establish 'direct effects' under [the third prong of § 1605(a)(2) of the FSIA] because any derivative harm would be too indirect to qualify as an 'immediate consequence' of the defendant['s] conduct").

Ironically, the cases Agrocomplect cites in ostensible support its argument are mostly decisions in which effects on non-parties were not held to meet the direct effect test.  See United World Trade, 33 F.3d 1232; IDAS, 2006 WL 3060017; Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094 (D.C. Cir. 1983) (declining to decide whether FSIA could ever confer subject matter jurisdiction based on alleged losses to nonparties, but finding alleged losses to nonparties in instant case were not direct effects).  Nor does Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238 (2d Cir. 1994) help plaintiff:  in contrast with Termorio, the alleged effect in Commercial was on an agent of the plaintiff who also would have had standing to bring the action against the foreign state instrumentality defendant.  See Commercial, 15 F.3d at 241, 242.[7]  In sum, there is simply no legal support in this Circuit for Agrocomplect's contention that its own alleged breach of its unilateral subcontracts with United States suppliers, even if true, are "direct effects" of its Contract with Iraq, which did not require or refer to any such subcontracts.

---

[7]     The only case cited by plaintiff in which effects on non-parties were found to be direct is an Eleventh Circuit decision that is distinguishable on its facts because the contract **required** the performance in the United States of the activities that  were held to constitute direct effects.  See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543, 545-46 (11th Cir. 1997).

### 3. The Alleged Destruction Of Construction Projects By The United States Military Does Not Satisfy The Direct Effect Test

Finally, Plaintiff does not seriously dispute that the alleged destruction of construction sites related to the Contract by the United States military does not constitute a direct effect in the United States. See Opp'n Br. at 19. Nor could it seriously do so, since there is no conceivable connection between the Contract, or Iraq's alleged breach thereof, and the alleged destruction of Agrocomplect's work sites in Iraq by the United States military in the first Gulf War. Moreover, plaintiff utterly fails to explain how the destruction of construction sites *in Iraq* could possibly constitute a direct effect *in the United States*. See id.

### C. The Arbitration Clause In The Contract Did Not Constitute A Waiver Of Iraq's Sovereign Immunity In The United States Under § 1605(a)(1) Of The FSIA

It is settled in this Circuit that an agreement by a foreign sovereign to arbitrate under its own law does not constitute an implicit waiver of sovereign immunity in the courts of the United States under § 1605(a)(1) of the FSIA where the foreign sovereign is not a signatory to a treaty for the recognition and enforcement of foreign arbitral awards to which the United States is also a signatory. See Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 123 (D.C. Cir. 1999). Because the Arbitration Clause requires arbitration to take place under the laws of Iraq, see Compl. ¶ 6, and Iraq is not a signatory to the New York Convention,[8] or any other treaty with the United States providing for enforcement of agreements to arbitrate or arbitral awards, the Arbitration Clause cannot constitute a waiver of Iraq's sovereign immunity. See Creighton, 181 F.3d at 123. Unable to cite any FSIA cases holding otherwise, plaintiff instead embarks on a lengthy discussion of Native American tribal immunity jurisprudence. But plaintiff's

---

[8] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. I.1, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (historical and statutory note).

imaginative reliance on these cases is misplaced; they are neither relevant to an analysis of foreign sovereign immunity under the FSIA, nor supportive of plaintiff's contentions.

Plaintiff's *ipse dixit* claim that the Supreme Court's decision in C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411 (2001), affected the validity of the holding in Creighton ignores the fact that tribal and foreign sovereign immunity are governed by wholly different statutes and caselaw.  See Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 759 (1998) (explaining the different legal histories of foreign and tribal sovereign immunity in both courts and legislation).  Indeed, not one of the tribal immunity cases cited by plaintiff refers to the FSIA.  See Opp'n Br. at 20-23; C&L, 532 U.S. 411; Native Vill. of Eyak v. GC Contractors, 658 P.2d 756 (Alaska 1983); Rosebud Sioux Tribe v. Val-U Constr. Co., 50 F.3d 560 (8th Cir. 1995); Sokaogon Gaming Enter. Corp. v. Tushi-Montgomery Assocs., Inc., 86 F.3d 656 (7th Cir. 1996); Val/Del, Inc. v. Super. Ct., 703 P.2d 502 (Ariz. Ct. App. 1985)).  These tribal cases did not, and could not, modify Creighton, which was cited favorably by this Court as recently as last month.  See, e.g., Strategic Techs., 2007 WL 1378492, at *3 (holding, under Creighton, that arbitration clause did not constitute waiver of immunity under § 1605(a)(1) of the FSIA and stating, "[c]ritically, the Contract between [plaintiff and defendant] did not provide for the waiver of [the foreign state's] sovereign immunity, did not provide for arbitration or entry of judgment in the United States, and did not provide for the application of U.S. law").[9]

In any event, plaintiff concedes that for an arbitration agreement to constitute a waiver of sovereign immunity under § 1605(a)(1) of the FSIA, it must at the very least contemplate a role

---

[9]      Moreover, even if these cases were applicable, they would not support plaintiff's argument that a foreign sovereign's agreement to arbitrate, in itself, constitutes a waiver of sovereign immunity for FSIA purposes.  In each case, unlike in the Arbitration Clause here, the tribe agreed – either explicitly or by agreeing to a particular set of arbitration rules – that any arbitral award resulting from the arbitration clause would be enforceable in state or federal courts *in the United States*.  See C&L, 532 U.S. at 415, 419; Native Vill., 658 P.2d at 758; Rosebud, 50 F.3d at 562; Sokaogon, 86 F.3d at 659; Val/Del, 703 P.2d at 508.

for United States courts.  See Opp'n Br. at 22.  Because the Contract here explicitly **rejected** any possible role for the courts of the United States, see Compl. ¶ 6 ("Iraqi courts shall have **exclusive jurisdiction** to hear and determine **all actions and proceedings** arising out of the Contract" (emphasis supplied)); see also Ex. C at 220, the Arbitration Clause cannot constitute a waiver of Iraq's immunity under § 1605(a)(1) of the FSIA.  Cf. Atl. Tele-Network, 251 F. Supp. 2d at 135-36 (clause explicitly waiving foreign state's sovereign immunity did not apply in United States courts where such clause was preceded by choice of law clause specifying law of foreign state, and followed by mandatory forum selection clause granting exclusive jurisdiction to courts of foreign state).

Plaintiff also concedes that under Creighton, "an agreement to arbitrate in a New York Convention signatory state [is] of itself insufficient – 'without more' – to demonstrate the requisite intent to waive [the foreign state's sovereign] immunity," but asserts that the alleged "American role in contract performance" supports a finding of waiver in the instant case.  See Opp'n Br. at 23.  This argument is meritless.  The agreement to arbitrate in Creighton contemplated that the arbitration would be held in a New York Convention signatory state. See Creighton, 181 F.3d 120 (parties agreed to arbitrate under rules of Paris-based International Chamber of Commerce).  Here, by contrast, the Arbitration Clause, when read in the context of the Contract's other clauses, required arbitration in Iraq.  See infra at 15-17.  Moreover, plaintiff has failed to allege any facts that would support its conclusory claim of an "American role in contract performance;" to the contrary, the Contract is devoid of any provision for performance in the United States by Iraq, Agrocomplect, or anyone else.  See supra at 5-12.

**D.** **The Arbitration Clause Does Not Satisfy The Requirements Of § 1605(a)(6)
Of The FSIA**

**1.** **The Contract Required That Arbitration Take Place In Iraq**

Plaintiff argues that § 1605(a)(6) of the FSIA is applicable because the Arbitration Clause does not explicitly state that arbitration was required to take place in Iraq, and therefore such Clause "may be" governed by the New York Convention within the meaning of § 1605(a)(6)(B). This argument misreads the statute, the caselaw and the Arbitration Clause itself.

First, plaintiff claims the provision in the Arbitration Clause granting each party the right to choose *an arbitrator* to serve on the arbitration committee necessarily implies that the parties had the right to choose *the location* of the arbitration. See Opp'n Br. at 24-25. But plaintiff cites no provision of the Arbitration Clause indicating that the parties – or their chosen arbitrators – had the right to choose the location of the arbitration, and indeed, no such provision existed. See Compl. ¶ 6; see also Ex. C at 218-219. Plaintiff's reliance in this connection on Libyan Am. Oil Co. v. Socialist People's Libyan Arab Jamahirya, 482 F. Supp. 1175 (D.D.C. 1980) – a case that did not involve § 1605(a)(6) and was subsequently vacated – is therefore entirely misplaced. Contrary to the Arbitration Clause in the present case, the contract in Libyan stated that the "arbitration should take place *either where the parties agreed, or where the arbitrators might agree*." Libyan, 482 F. Supp. at 1178 (emphasis supplied). Here, the Arbitration Clause contains no such provision.

Plaintiff further argues the requirement in § 1605(a)(6)(B) that the agreement to arbitrate "is or may be governed" by the New York Convention "naturally encompasses those [agreements to arbitrate] under which the arbitral forum is to be selected after the controversy develops." See Opp'n Br. at 25 (emphasis omitted). Plaintiff cites no authority from this Circuit or any other in support of this proposition, and indeed, such an expansive reading of the statute is

unfounded.[10]  Moreover, even if plaintiff's expansive reading of § 1605(a)(6) were correct, the

exception would still not apply to the instant case, because there is no indication that under the

Arbitration Clause, the arbitral forum was to be selected after the controversy developed.  To the

contrary, the Arbitration Clause, when read in conjunction with the Contract's other clauses,

requires this Court to conclude that the parties intended any necessary arbitration to take place in

Iraq.

      As plaintiff concedes, the Contract contained a Forum Selection Clause granting Iraqi

courts *exclusive jurisdiction* over any suits arising from the Contract.  See Compl. ¶ 6; see also

Ex. C at 220.[11]  The Arbitration Clause also provides that the arbitration must be conducted not

only under Iraqi substantive law but, critically, under Iraqi arbitral law and rules.  See Ex. C at

219.  These provisions would make no sense unless the parties intended that Iraq be the situs of

their arbitration.  See Restatement (Second) of Contracts § 202 ("Wherever reasonable, the

manifestations of intention of the parties to a promise or agreement are interpreted as consistent

with each other").

      Such an interpretation of the Arbitration Clause is supported by literature discussing the

standard arbitration clause used by Iraq in construction contracts during the period in which the

Contract was signed, which is essentially identical to the Arbitration Clause between

---

[10]    Plaintiff's reliance on Creighton for its assertion that subject matter jurisdiction exists in the instant case under § 1605(a)(6) is entirely misplaced.  The plaintiff in Creighton sought to enforce in the United States an arbitral award rendered in France, a signatory to the New York Convention.  See Creighton, 181 F.3d at 120-21.  Similarly, the plaintiff in Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1014 (2d Cir. 1993), on which Agrocomplect also mistakenly relies, see Opp'n Br. at 24-25, sought to enforce an agreement to arbitrate in England, also a signatory to the New York Convention.  Agrocomplect seeks neither to enforce an arbitral award rendered in nor an agreement to arbitrate in a signatory state, but rather to enforce an agreement to arbitrate that implicitly required arbitration in Iraq, a foreign state that is *not* a signatory to the New York Convention.

[11]    Plaintiff's argument that the Forum Selection Clause may not be enforced because of the current state of hostilities in Iraq, see Opp'n Br. at 25-28, is entirely misplaced.  The Republic does not argue that this Court should enforce the Forum Selection Clause.  Rather, the Forum Selection Clause shows the absence of United States jurisdiction and demonstrates that by agreeing to the Contract, the parties agreed that any arbitration arising thereunder would occur in Iraq.

Agrocomplect and the Republic.  Compare Mahir Jalili, International Arbitration in Iraq, 4 J.

Int'l Arb. 109, 114-15 (1987) (attached hereto) with Compl. ¶ 6.  Jalili discusses the appropriate

interpretation of this arbitration clause in light of the other standard contract clauses, including

the forum selection clause and choice of law clause, used by Iraq at the time, which are identical

to the respective clauses in the instant Contract, see Jalili at 113-16; Compl. ¶6, and concludes

that the arbitration clause and forum selection clause complement one another because the

"arbitration clause provides the mechanism for the arbitration proceeding, whereas the

jurisdiction clause empowers the [Iraqi] courts to enforce the [Iraqi] Civil Procedure Code under

which the arbitration proceeding is conducted."  Jalili at 116.  In fact, the mandatory judicial

confirmation of the arbitral award by an Iraqi court required under the Iraqi Civil Procedure

Code "has the effect of reducing the [arbitral] award to the level of a 'proposed judgment' and

rendering the arbitration proceeding an intermediate step toward a final judgment."  Id. at 115.

Given the integral role Iraqi courts are required to play throughout the arbitration process under

the Arbitration Clause, that Clause must be interpreted to require arbitration in Iraq.[12]

### 2. Even If § 1605(a)(6) Were Applicable It Would Only Permit The Court To Compel Arbitration

Finally, even if the Arbitration Clause satisfied the requirement that the agreement to

arbitrate "is or may be" governed by the New York Convention, § 1605(a)(6) of the FSIA would

provide an exception to sovereign immunity under the present circumstances only where "***the***

***action is brought…to enforce an agreement [to arbitrate]***."  28 U.S.C. § 1605(a)(6) (emphasis

supplied).  Therefore, even if this Court found that subject matter jurisdiction exists pursuant to

---

[12]    The article points out that the Arbitration Clause is for these reasons highly unfavorable to foreign contractors, and suggests ways foreign contractors can attempt to mitigate its effects by negotiating certain variations in the clause before entering into a contract.  See Jalili at 116-20. Agrocomplect did not do this, and it must be held to the bargain that it in fact made.  That bargain does not contemplate the involvement of United States courts in the enforcement of the agreement to arbitrate or the enforcement of any resulting award under the New York Convention and therefore cannot be the basis for United States jurisdiction under § 1605(a)(6) or otherwise.

§ 1605(a)(6)(B) of the FSIA, such jurisdiction would only permit the Court to compel the parties to arbitrate, and not to hear plaintiff's underlying breach of contract claim.

## II.    AGROCOMPLECT'S COMPLAINT IS TIME-BARRED

Plaintiff argues that the Complaint is not time-barred because: (i) a twelve-year, rather than a three-year statute of limitations should apply to the Contract; (ii) the Republic has not sufficiently identified the date of accrual of the plaintiff's claims; and (iii) plaintiff has alleged facts sufficient to demonstrate a possibility that the claims may have been tolled, or that the doctrines of waiver or estoppel may apply. See Opp'n Br. at 30, 31, 33. None of these arguments has merit.

### A.    The Complaint Is Time-Barred On Its Face

It is well established, in this Circuit and elsewhere, that a complaint can be dismissed under Rule 12(b)(6) based on the expiration of the statute of limitations when it is clear from the face of the complaint that the claims asserted therein are time-barred. See Taylor v. Houston, 211 F.2d 427, 427-28 (D.C. Cir. 1954); Berry v. Chrysler Corp., 150 F.2d 1002, 1003 (6th Cir. 1945); Panhandle E. Pipe Line Co. v. Parish, 168 F.2d 238, 240 (10th Cir. 1948). Under the most liberal reading of the facts alleged in the Complaint, the claims alleged are time-barred, and the Court must therefore dismiss the Complaint.

Plaintiff first argues that the 12-year statute of limitations applicable to contracts "under seal," should be applied here. See Opp'n Br. at 30. However, the Complaint does not even allege that the Contract was "under seal," and the cases plaintiff cites in support of its argument demonstrate that the Contract possesses *none* of the attributes required of a contract under seal. "[C]ourts have been reluctant to declare a document to be sealed in the absence of evidence that the parties intended it to be under seal." Burgess v. Square 3324 Hampshire Gardens

Apartments, Inc., 691 A.2d 1153, 1155 (D.C. 1997); see also Huntley v. Bortolussi, 667 A.2d 1362, 1365 (D.C. 1995). As evidence that the parties intended the contract to be "under seal," courts require "something more than a corporate seal, such as, for example, a recitation that the document is 'signed and sealed.'" Burgess, 691 A.2d at 1156. The Contract does not contain such a recitation of intent for it to be "under seal." Accordingly, the statute of limitations for simple contracts, which requires that a claim be brought within three years from the date of accrual, applies here. D.C. Code § 12-301(7) (2006).

Plaintiff further argues that the Republic's failure to specify the exact date the plaintiff's claims allegedly accrued prevents this Court from finding that such claims are time-barred as a matter of law. Its attempt to rely on the deliberate vagueness of the Complaint in this regard is fruitless, because the expiry of the statute of limitations can be ascertained by a reasonable reading of the Complaint and the applicable law, notwithstanding the absence of precise dates.

Plaintiff alleges that "[its] machinery, production base, and camp facilities were destroyed" "[o]n or about January 1991." Compl. ¶ 15. Plaintiff does not allege that any work under the Contract resumed after this occurrence, nor could it, since Iraq was subject to international sanctions because of the Saddam regime's invasion of Kuwait from 1991 until the overthrow of that regime in April 2003.[13] Plaintiff's claims therefore clearly accrued at the latest in 1991.

---

[13]     Indeed, according to the Report and Recommendations Made by the Panel of Commissioners Concerning the Second Installment of "E3" Claims (the "UNCC Panel Report"), to which Agrocomplect refers in its Complaint, see Compl. ¶ 22, "Agrocomplect formally notified the Iraqi administration that, as a result of the imposed economic blockade and the ensuing circumstances, [it] was not in a position to proceed with its work on the project," on January 13, 1991. See U.N. Compensation Commission [UNCC] Governing Council, Report and Recommendations Made by the Panel of Commisioners Concerning the Second Installment of "E3" Claims, ¶ 37, U.N. Doc. S/AC.26/1999/5 (Mar. 19, 1999) [hereinafter UNCC Panel Report], available at: http://www2.unog.ch/uncc/reports/r99-05.pdf.

Nor is the fact that plaintiff does not allege precisely when it demanded payment by the Republic of the amounts allegedly due under the Contract, or when it demanded arbitration under the Arbitration Clause, see Compl. ¶¶ 37, 45, sufficient to avoid the bar of the statute of limitations.  Where "a demand is necessary before suit in order to perfect a contractual right of action, one cannot indefinitely and unnecessarily extend the bringing of the suit by deferring the demand, but must make it within a reasonable time."  51 Am. Jur. 2d Limitation of Actions § 162 (2006); see also Nyhus v. Travel Mgmt. Corp, 466 F.2d 440, 452-53 (D.C. Cir. 1972) ("a party is not at liberty to stave off operation of the statute inordinately by failing to make demand").  "If the time for demand is not indicated in the contract, the time specified in the [applicable statute of] limitations…is to be taken as the demand period," and "demand is to be presumed to have been made as of the end of [such] period…at [which] time…the statute is regarded as commencing to run."  51 Am. Jur. 2d Limitation of Actions § 162 (2006).  Since all performance of the Contract ceased by January 1991 at the latest, a reasonable period to demand payment under the District of Columbia's three year statute of limitations would have expired by January 1994, making Agrocomplect's claims time-barred by January 1997, three years after that date.[14]

**B.      Agrocomplect Fails To Allege Facts That If True Would Demonstrate That The Statute Of Limitations Was Tolled**

Plaintiff argues "the record is inadequate to enable the court to assess whether principles of waiver, estoppel or equitable tolling limit or preclude the application of the statute of limitations to the claims in this case."  See Opp'n Br. at 33.  Because the Republic demonstrated that the Complaint is time-barred on its face, it is plaintiff that has the burden of alleging facts demonstrating that an exception to the statute of limitations applies. See Saltz v. Lehman, 672

---

[14]      Indeed, the UNCC Panel Report states that Agrocomplect claims to have made demands for payment during the period between August 1991 and February 1992.  See UNCC Panel Report ¶¶ 39, 45.

F.2d 207, 209 (D.C. Cir. 1982); Gupta v. Northrop Grumman Corp., 462 F. Supp. 2d 56, 59

(D.D.C. 2006).  Plaintiff has failed to allege such facts.

Agrocomplect asserts that the implementation of the UNCC and the IDRO, the

imposition of an international embargo, and the state of hostilities previously and presently

extant in Iraq may have tolled the statute of limitations.[15]  This argument is meritless.  Under the

law of the District of Columbia,[16] equitable tolling is generally not available as a defense to the

expiration of the statute of limitations.  See East v. Graphic Arts Indus. Joint Pension Trust, 718

A.2d 153, 156 (D.C. 1998) (noting that District of Columbia is one of a minority of jurisdictions

that has not adopted a general equitable "saving" statute to toll statutes of limitations and holding

that "courts would exceed their prescribed role by providing a remedy where the legislature has

determined that none should lie").[17]

Moreover, even if the facts alleged by plaintiff could toll the statute of limitations, the

Complaint would still be time-barred.  Plaintiff claims that hostilities in Iraq may have

constituted a basis for the tolling of the statute of limitations.  The dates of such hostilities,

however, do not comport with plaintiff's argument.  The first Gulf War occurred between August

---

[15]    It is unclear how any of these facts could support a claim that Iraq waived, or is estopped from asserting, a statute of limitations defense.  The Republic therefore addresses the relevance of these facts to a claim that the statute of limitations was tolled.

[16]    The law of the District of Columbia must be applied to determine the availability of the defense of equitable tolling where, as here, such law is applied to determine the applicable statute of limitations.  See Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio, 446 U.S. 478, 487 (1980) (state tolling law should be applied where not inconsistent with the Constitution or federal law). The underlying claim for breach of contract is not one that has been federally created. Therefore, the cases plaintiff cites in which a court has applied a federal standard regarding equitable tolling are inapplicable. See, e.g., Forti v. Suarez-Mason, 672 F. Supp. 1531 (N.D.Cal. 1987).

[17]    Nor is Agrocomplect helped by any of the limited exceptions to this rule recognized in the District of Columbia.  See East, 718 A.2d at 156-57 (stating tolling has been permitted where "it appears the defendant has done [something] that would tend to lull the plaintiff into inaction;" or "the *fact* of an injury is not readily apparent" to the plaintiff as a result of some wrongdoing on the part of the defendant; or plaintiff brought claim in one court and "could not have been expected to anticipate subsequent unrelated case suggesting that review [of her claim] was proper in [a different court].").  Agrocomplect does not allege a single fact that would support any of these exceptions.

2, 1990 – the date on which Kuwait was invaded – and March 10, 1991 – the date on which coalition forces began to withdraw from Iraq. The second Gulf War began on March 20, 2003 – the day the American-led coalition invaded Iraq – and continues to the present day. As plaintiff concedes, "[w]here extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled ***until the barrier caused by these events is removed.***" Opp'n Br. at 34 (emphasis supplied) (internal quotation marks omitted). Even if the first Gulf War had tolled the statute of limitations on plaintiff's claims, plaintiff would still have been required to assert such claims within three years of the end of the war, or by no later than March 10, 1994. Because the statute of limitations expired before the second Gulf War, the present hostilities in Iraq could not have further tolled the statute.

The imposition of an international trade embargo against Iraq is similarly unhelpful to plaintiff's argument. While such embargo likely prevented plaintiff from initiating new business in the country, or further performing the Contract if any performance remained to be rendered by January 1991, it did not prevent Agrocomplect from seeking to collect a debt allegedly owed by the Republic. See Opp'n Br. at 33 (discussing United Nations Security Council Resolution 661, S.C. Res. 661, S/RES/0661 (Aug. 6, 1990), which precluded states from providing any funds or economic resources to Iraq, but not from asserting claims against it).

Nor does the implementation of the UNCC or the IDRO help plaintiff. Plaintiff alleges its claims were rejected by the UNCC on March 19, 1999, see Compl. ¶ 22. Therefore, even if the UNCC proceedings tolled the statute of limitations, plaintiff would still have been required to assert any claims within three years after their rejection by the UNCC, or by no later than March 19, 2002. And because the statute of limitations expired before the implementation of the IDRO debt reconciliation process, such implementation could not have further tolled the statute.

## III.    AGROCOMPLECT'S CLAIMS HAVE BEEN RELEASED

### A.    This Court May Consider The Release Documents Without Converting The Motion To Dismiss Into A Motion For Summary Judgment

Agrocomplect argues this Court may not consider the operative documents governing the IDRO process without converting the defendant's motion to dismiss into a motion for summary judgment.  See Opp'n Br. at 42-44.  Although it concedes that "[c]onversion is not required where the trial court considers material which is 'integral' to the complaint," it argues that because it did not rely on the document in drafting the Complaint, the exception has not been met.  See Opp'n Br. at 43.[18]  This argument is unpersuasive.  First, where a plaintiff refers in its complaint to previous cases in which it litigated the controversy at issue, a court may consider the documents and orders pertaining to the previous litigations on a Rule 12(b)(6) motion in order to determine whether plaintiff's claims were barred by res judicata.  See Mavrovich v. Vanderpool, 427 F. Supp. 2d 1084, 1090 (D.Kan. 2006).  Here, Agrocomplect referred in its Complaint to the fora in which it previously sought relief for its claims, including the IDRO debt reconciliation process.  See Compl. ¶ 21-26.  Therefore, it is entirely reasonable for this Court to consider the documents relating to such process in determining whether plaintiff's claims have been released.  See Mavrovich, 427 F. Supp. 2d at 1090.

Moreover, plaintiff overstates the requirement that it rely on the documents in drafting the complaint.  Where plaintiff has actual notice of all information in the movant's papers, it is only necessary that plaintiff relied upon the documents "in framing the complaint" in order for the court to consider them without converting the motion.  See Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005).  Plaintiff specifically refers to the IDRO debt

---

[18]    Plaintiff concedes that the exception to this rule encompasses a contract on which the plaintiff's complaint is based.  See Opp'n Br. at 43 (discussing Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006)).  Therefore, regardless of this Court's decision on whether to consider the exhibits attached to the Republic's Opening Brief, it may consider the Contract itself, which is quoted in the Complaint.

23

reconciliation process, the purposes thereof and the requirements for participation therein in its

Complaint.  See Compl. ¶¶ 23-26.  It necessarily had actual notice of the operative documents

governing that process and relied upon them in "framing" its complaint.

### B.     Agrocomplect Released All Claims Arising Under The Contract

Agrocomplect argues the release does not apply to claims that were ineligible for

submission to IDRO.  This argument misses the point.  The Invitation to Tender provides that the

release covers "any and all claims by [Agrocomplect]…*arising under* [the] Reconciled Eligible

Claims *or any contract…evidencing such Reconciled Eligible Claims*."  Opening Br. Ex. A

§ 8(ii) (emphasis supplied); see also Opp'n Br. Ex. C § 8(ii).[19]  Agrocomplect does not, and

cannot, argue that the claims it now asserts arose under any contract other than the one it

submitted to IDRO as evidence of the Reconciled Eligible Claim it tendered.

Plaintiff's claims are based on amounts allegedly due under, and the arbitration clause

contained in, a contract requiring plaintiff to perform work on the "Hilla-Diwaniya 4 Land

Reclamation Project."  See Compl. ¶¶ 4, 5, 6, 45.  As evidence of the claim it tendered, plaintiff

submitted Contract No. 65, for the Hilla-Diwaniya 4 Land Reclamation Project.  See Ex. C at

240-62; see also Opp'n Br. Ex. E.[20]  It has not remotely suggested or alleged that it had any other

contract with the Republic.  Therefore, even if plaintiff now seeks to assert claims other than the

Reconciled Eligible Claim purchased by Iraq, such claims are barred by the release agreement,

---

[19]     By submitting its Tender, Agrocomplect agreed that it would submit its claim, which was not able to be
reconciled with available Iraqi records, to the IDRO arbitration mechanism for reconciliation.  Upon being granted
an award in such arbitration, such claim was deemed a "Reconciled Eligible Claim" tendered by Agrocomplect
pursuant to its Tender, and was thereafter treated for all purposes as a Reconciled Eligible Claim pursuant to the
Invitation.  See Opening Br. Ex. A § 15, Opening Br. Ex. B at 2.

[20]     The UNCC Panel Report further demonstrates that the claims Agrocomplect now asserts, see Compl. ¶ 17,
arose under the same Contract it submitted to IDRO as evidence of the claim it tendered.  See UNCC Panel Report ¶
33; id. at 16 T.1 (listing claims with the same description and approximate amounts as those listed in the Complaint
and stating that the claims "relate to work performed on the Hilla-Diwaniya 4 Land Reclamation Project ("*Contract
No. 65*")" (emphasis supplied)).

which covered not only plaintiff's Reconciled Eligible Claim, but also all claims *arising under the contract evidencing such Reconciled Eligible Claim*.  <u>See</u> Opening Br. Ex. A § 8(ii); <u>see also</u> Opp'n Br. Ex. C § 8(ii).  Plaintiff is therefore bound by the release agreement for all claims arising under the Hilla-Diwaniya 4 Contract, including those it now asserts.

## <u>CONCLUSION</u>

For all the foregoing reasons and those stated previously, the Republic of Iraq respectfully requests that this Court dismiss the Complaint.

Dated: June 19, 2007

Respectfully submitted,

/s/ Matthew D. Slater_____
Matthew D. Slater (D.C. Bar # 386986)
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
Telephone:  (202) 974-1500
Facsimile:   (202) 974-1999

Jonathan I. Blackman
Lisa M. Coyle
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:   (212) 225-3999

Attorneys for Defendant The Republic of Iraq

CERTIFICATE OF SERVICE

I, Emily C. Capehart, assistant managing clerk at Cleary Gottlieb Steen & Hamilton LLP, hereby certify that:

On June 19, 2007, a copy of the foregoing Reply Memorandum in Further Support of the Defendant's Motion to Dismiss the Complaint and accompanying papers, was served by electronic transmission through the Court's CM/ECF System on the following parties:

> Sylvia J. Rolinski
> Danielle M. Espinet
> Rolinski & Suarez, LLC
> 14915 River Road
> Potomac, Maryland 20854
> srolinski@rolinski.com
> Attorney for Agrocomplect, AD
>
> Philip M. Musolino
> Musolino & Dessel
> 1615 L Street, N.W., Suite 440
> Washington, D.C. 20036
> pmusolino@musolinoanddessel.com
> Attorney for Agrocomplect, AD

Dated: June 19, 2007                    /s/ Emily C. Capehart_____
                                            Emily C. Capehart

Supplement

# International Arbitration in Iraq

Mahir Jalili*

## A. INTRODUCTION

Iraq is a civil law country governed by codes, the most important of which is the Civil Code of 1951.[1] The Iraqi Civil Code is based on the Egyptian Civil Code, which is in turn influenced by the French Civil Code.[2] *Sharia* law is not the ultimate law of the land, although it is an important source thereof.[3]

There is no independent arbitration law in Iraq. The rules of arbitration are set forth in Articles 251 through 276 of the Civil Procedure Code of 1969.[4] The writer's English translation thereof can be found at the end of this article.

It was expected that the arbitration rules would be amended following the enactment of the Legal System Reform Act of 1977,[5] which incorporated a Working Paper on the reform of the legal system in Iraq. The Working Paper refers to the amendment of the Civil Procedure Code, *inter alia*, to "promote and expand the principles of arbitration and conciliation" and to "establish a special procedure for the settlement of disputes . . . not bound by the rules of procedure in ordinary courts." However, no amendment has yet been made.

---

\* Partner in the London office of Whitman & Ransom, an international law firm based in New York

[1] Law No. 40 of 1951

[2] The Iraqi Civil Code was drafted by a committee headed by Professor Sanhouri who had earlier drafted the Egyptian Civil Code. Professor Sanhouri was educated in France and influenced by the French Civil Code

[3] According to Article 1(2) of the Iraqi Civil Code, the courts are required to apply the law in the following descending order of priority statutory law, customary law, Sharia law, and equity. The Arabic word "Sharia" means traditional Islamic law

[4] Law No. 83 of 1969

[5] Law No. 35 of 1977

110    JOURNAL OF INTERNATIONAL ARBITRATION

## B.  MAIN FEATURES OF IRAQI ARBITRATION

### (i)  ARBITRATION AGREEMENT

The parties may agree to arbitrate a specific dispute or all disputes arising from a specific contract.[6] The arbitration agreement must be in writing.[7] The agreement can be made during the judicial hearing.[8]

### (ii)  STAY OF JUDICIAL ACTION

The legislators debated two schools of thought. The first stated that the court has no jurisdiction to resolve disputes arising between parties who have entered into an arbitration agreement; the second advocated that the arbitration agreement does not divest the court of its jurisdiction, since the court has original jurisdiction to resolve all disputes.[9] A middle course was adopted, *viz*, the defendant in a judicial action must apply for a stay at the first hearing.[10] If he does, the action will be stayed until the arbitration proceeding is exhausted; if he does not, the action will proceed and the arbitration agreement will be deemed null and void.[11]

### (iii)  APPOINTMENT OF ARBITRATORS

The parties are free to appoint their arbitrators unless the latter are considered to have an incapacity to act.[12] A judge cannot be appointed as an arbitrator without the consent of the Judicial Council.[13] If a party fails to appoint an arbitrator or if the appointed arbitrator declines to act, the vacancy will be filled by the court whose decision is final with respect to any appointment.[14]

The number of arbitrators in commercial arbitration must be uneven.[15]

The rules are silent with respect to the mechanism for appointing the chairman of a three-man arbitral tribunal. The standard arbitration clause in

[6] Article 251 of Civil Procedure Code.
[7] Article 252 of Civil Procedure Code.
[8] *Id.*
[9] Explanatory notes to Civil Procedure Code.
[10] Articles 253 of Civil Procedure Code.
[11] *Id*
[12] Article 255 of Civil Procedure Code.
[13] *Id.*
[14] Article 256 of Civil Procedure Code.
[15] Article 257 of Civil Procedure Code.

INTERNATIONAL ARBITRATION IN IRAQ    111

construction contracts (discussed below) provides for the appointment of the chairman by the two party-appointed arbitrators.

An arbitrator cannot resign without cause and cannot be dismissed except by agreement of both parties.[16]

### (iv)  CHALLENGE OF ARBITRATORS

An arbitrator may be challenged for the same reasons for which a judge can be challenged.[17] These grounds include the existence of an attorney-client relationship with one of the parties.[18] A challenge must relate to matters which become known after the appointment of the arbitrator,[19] since the parties may originally appoint, say, an attorney of one of the parties who is trusted by the other party.[20]

### (v)  TIME FOR MAKING THE AWARD

If no time limit has been specified by the parties, the award must be made within six months after the date on which the arbitrators accept their nomination.[21] If the award is not issued within this period, any party may petition the court to extend the period, or to settle the dispute itself, or to appoint new arbitrators.[22]

### (vi)  APPLICABLE LAW OF ARBITRATION

The arbitrators must apply the substantive law of the contract and the procedural rules of arbitration, as set forth in the Civil Procedure Code, unless the arbitration agreement provides exemption from the said procedural rules, or requires the application of different procedural rules.[23] It would appear therefore that the parties can agree to the application of other procedural rules

---

[16] Article 260 of Civil Procedure Code.
[17] Article 261 of Civil Procedure Code.
[18] Articles 91 and 93 of Civil Procedure Code.
[19] Article 261 of Civil Procedure Code
[20] Explanatory notes to Civil Procedure Code
[21] Article 262 of Civil Procedure Code.
[22] Article 263 of Civil Procedure Code
[23] Article 265(1) of Civil Procedure Code.

such as those of the ICC[24] or UNCITRAL.[25] The arbitrators, however, are always required to apply the substantive law.[26]

The situation differs for arbitrators who are authorised to conciliate. They are exempt from applying the substantive law or the procedural rules, and may decide according to equity.[27]

### (vii)  MAKING THE DECISION

The arbitrators must make the award by a unanimous or majority vote, provided that they have all participated in the deliberations.[28] The award must be in writing,[29] and the arbitrators are required to state the reason for their decision.[30]

### (viii)  JUDICIAL CONFIRMATION OF AWARD

The most important (and undesirable) feature of Iraqi arbitration is that all awards are subject to the mandatory confirmation of Iraqi courts prior to any enforcement thereof. According to Article 272(1) of the Civil Procedure Code:

> "The arbitral award shall not be enforced by the executory departments, whether appointed by court or by agreement, unless it is confirmed by the court of original jurisdiction pursuant to a request made by one of the parties and following the payment of the prescribed fee "

The Iraqi court's review is directed to the merits of the award.[31] This practice contrasts with that in most other Arab countries, where the awards are subject only to a speedy and simplified external control by the courts.[32]

---

[24] The International Chamber of Commerce ("ICC") adopted its first set of arbitration rules in 1922 The rules are known as "Rules for the ICC Court of Arbitration". The ICC "Court of Arbitration" is an administrative body rather than a judicial court. For more information, see Craig, Park & Paulsson, *International Chamber of Commerce Arbitration* (1985).

[25] The United Nations Commission on International Trade Law ("UNCITRAL") adopted the UNCITRAL Arbitration Rules on April 28, 1976 The rules were then adopted by the General Assembly of the United Nations on December 15, 1976 with a recommendation that they should have the widest possible application. See generally P Sanders, *Commentary on UNCITRAL Arbitration Rules*, II Yearbook of Commercial Arbitration 172 (1977).

[26] Explanatory notes to Civil Procedure Code.

[27] Article 265(2) of Civil Procedure Code and explanatory note thereof.

[28] Article 270(1) of Civil Procedure Code.

[29] *Id*

[30] Article 270(2) of Civil Procedure Code.

[31] S. Saleh, *Commercial Arbitration in the Arab Middle East* (1984), at p. 192

[32] *Id*

### (IX)  CHALLENGE OF AWARD

In addition to mandatory judicial control, any party may apply to set aside the arbitral award when it has been submitted to court for confirmation, or the court itself may set it aside. According to Article 273 of the Civil Procedure Code, the award may be set aside in any of the following circumstances:

(a) If the award is made without written evidence, or is based on an invalid arbitration agreement, or if it exceeds the scope of the agreement.

(b) If the award violates a rule of public policy or morals, or any of the arbitration rules of the Civil Procedure Code.

(c) If any of the grounds for retrial exists.

(d) If there is a material error in the award or in the arbitration proceeding, which affects the validity of the award.

The above grounds are vague and could lead to endless judicial hearings.[33]

This state of affairs is apparently caused by a general hostility to arbitration by both the judiciary and public-sector employers in Iraq.[34] The private sector, which could be more inclined to settle disputes by arbitration, has not been an important body in Iraq for the past 30 years.[35]

This brief summary of Iraqi arbitration should explain why it is not widely practiced in Iraq. It should also be stated that Iraqi arbitration is not merely of academic interest, since many contracts continue to provide for the settlement of disputes by arbitration.

## C.  INTERNATIONAL APPLICATION

Iraqi arbitration is likely to be encountered by foreign contractors in two main areas; the execution of major contracts such as construction contracts, and the supply of arms and related materials. This article will concentrate on construction contracts.

### (I)  IRAQI ARBITRATION CLAUSE

The Iraqi Ministry of Planning has published the "General Conditions

---

[33] *Id*

[34] H. Mukhtar, *Arbitration in Iraq,* 50 Arbitration 171 (1984).

[35] Iraq has been ruled by successive socialist regimes since 1958 The Legal System Reform Law of 1977, *supra* note 5, refers to arbitration in the context of the settlement of disputes arising "among the ministries or state organizations or the public sector and cooperative sector "

for Contracts of Civil Engineering Works" which are based on the FIDIC form of contract.[36]

The FIDIC form is, of course, based on the English ICE form.[37]

The difficulties entailed by using a peculiarly English form (which is obscure and difficult even to English lawyers) in a civil law country has been widely commented upon[38] and is outside the scope of this article.

Clause 69 of the Ministry of Planning form (1972 Edition) reads in full as follows:

> "Clause 69—Settlement of Disputes—Arbitration:
>
> If any dispute or difference of any kind whatsoever shall arise between the Employer and the Contractor in connection with or arising out of the Contract or the carrying out of the Works (whether during the progress of the Works or after their completion and whether before or after the termination abandonment or breach of the Contract) it shall in the first place be referred to and settled by the Engineer who shall give notice of his decision to the Employer and the Contractor. Such decision in respect of every matter so referred shall be final and binding upon the Employer and the Contractor until the completion of the Works and shall forthwith be given effect to by the Contractor who shall proceed with the Works with all due diligence whether notice of dissatisfaction is given by him or by the Employer as hereinafter provided or not. If the Employer or the Contractor be dissatisfied with any such decision then and in any such case either the Employer or the Contractor may within 30 days after receiving notice of such decision require that the matter be referred to a Committee of Arbitration to be formed in the following manner·
>
> The Employer and the Contractor shall each appoint one member to the committee and the two members thus appointed shall agree upon a third member to act as a Chairman of the Committee. If agreement on the appointment of a Chairman cannot be reached within 14 days from the last date of their appointments then the Employer or the Contractor shall each have the right to ask a competent court to appoint the third member · in accordance with proceedings provided in the Civil Procedure Code.
>
> The reference to arbitration shall not enter until after the completion or alleged completion of the Works unless with the written consent of the Employer and the Contractor. Provided always that postponing the determination of the dispute shall not cause damage to

[36] See the Conditions of Contract (International) for Works of Civil Engineering Construction, prepared by the *Fédération Internationale des Ingénieurs—Conseils* ("FIDIC"), the current edition of which is the Third (1977). The Iraqi conditions of contract, however, are based on the Second Edition (1969).

[37] See the Conditions of Contract, sponsored by the Institute of Civil Engineers ("ICE"), the Association of Consulting Engineers, and the Federation of Civil Engineering Contractors, the current edition of which is the Fifth (1973). The Fourth Edition (1955) of the ICE form was used as the basis for the Second (1969) upon which the Iraqi conditions were modelled

[38] See, e g , I. Duncan Wallace, *The International Civil Engineering Contract* (1974).

INTERNATIONAL ARBITRATION IN IRAQ    115

> any of the parties or obstruct the progress of the work. All fees and other costs shall be paid to arbitrators by the party requiring arbitration provided that such fees and costs shall be payable by the party against whom the award has been pronounced."

The above Iraqi arbitration clause has the familiar "two-tier" structure, adopted from Clause 67 of the FIDIC form, for reference of disputes in the first place to the engineer, and later to an arbitrator. However, the Iraqi clause is different from the FIDIC clause in the following main aspects:

(a) The second-tier referral to an arbitrator must take place within 30 days as compared with 90 days in the FIDIC clause.

(b) The arbitral rules are those of the Civil Procedure Code, as compared with the ICC rules in the FIDIC clause.

(c) Interim arbitration is justified in the Iraqi clause only if the postponment thereof until the completion, or alleged completion, of the work would cause damage to any of the parties or obstruct the progress of the work, whereas the FIDIC clause (Second Edition) has the following two provisos:

> —the reference may be opened before such completion or alleged completion in respect of, *inter alia*, the withholding by the engineer of any certificate or the withholding of any portion of the retention money to which the contractor claims to be entitled.
> —the giving of a certificate of completion shall not be a condition precedent to the opening of any such reference.[39]

These departures from the FIDIC arbitration clause make the Iraqi arbitration clause considerably less desirable. For example, the mandatory judicial confirmation of the arbitral award under the Civil Procedure Code, has the effect of reducing the award to the level of a "proposed judgment" and rendering the arbitration proceeding an intermediate step toward a final judgment.

## (ii) Governing Law Clause

Before commenting further on the Iraqi arbitration clause, we wish to draw attention to Clause 71 of the Ministry of Planning form (1972 Edition) which states:

> "Clause 71—Law Applicable to the Contract:
>
> The Contract shall be subject to and construed according to the

---

[39] It should be noted that the arbitration clause in the Third Edition (1977) of FIDIC differs from the Second (1969) in that there is now no inhibition on an interim arbitration being commenced before the completion of the work

116    JOURNAL OF INTERNATIONAL ARBITRATION

> Iraqi laws regulations and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract."

The above jurisdiction clause appears *prima facie* to be inconsistent with the arbitration clause to the extent that the former provides that "Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract."

However, under Iraqi practice these clauses are not inconsistent since the arbitration clause provides the mechanism for the arbitration proceeding, whereas the jurisdiction clause empowers the courts to enforce the Civil Procedure Code under which the arbitration proceeding is conducted.

The Iraqi courts will generally enforce the arbitration clause and stay judicial action when the defendant attempts to litigate rather than arbitrate.[40] However, the plaintiff must apply for a stay of the action at the first hearing, otherwise the arbitration agreement is deemed null and void.[41]

### (iii)    Problems Faced by Foreign Contractors

Reverting to the arbitration clause, the main disadvantage to a foreign contractor is that the arbitration is conducted under Iraqi arbitration rules rather than the ICC rules.

As we have seen above, arbitration under the Iraqi Civil Procedure Code is unsatisfactory.

Furthermore, the mere referral of a dispute to arbitration by a contractor is usually deemed to be a hostile act by the government employer. A contractor, especially a foreign contractor, may not be able to find an Iraqi lawyer willing to act for him as counsel or even to serve as an arbitrator.

What should the contractor do to solve these problems? There are basically three alternatives, *viz*, arbitrating under the auspices of the Iraqi court, internationalising the arbitration clause by adopting the UNCITRAL rules, or insisting on a FIDIC-style ICC arbitration clause.

### (iv)    Judicial Arbitration

The first alternative is for the contractor to arrange for the arbitration to be conducted under the auspices of the court. A possible scenario is as follows.

The contractor commences a legal action in the court of original

---

[40] See, e.g., the decision of the Baghdad Court of First Instance in Case no 976/1134 of 1978
[41] Article 253(2) of the Civil Procedure Code.

INTERNATIONAL ARBITRATION IN IRAQ        117

jurisdiction.[42] At the first hearing, the employer-defendant moves for a stay of the action under Article 253 of the Civil Procedure Code. The court grants the stay and orders the parties to resolve their dispute by arbitration under its auspices and direction. The arbitral award would then be confirmed by the court as a routine matter. The arbitration proceeding under these circumstances, would be akin to a judicial proceeding, and Iraqi practitioners, whether counsel or arbitrators, would not be embarrassed or compromised if they participate therein.

Of course, the employer-defendant may not move for a stay, and the court itself may then settle the dispute, but such an outcome is not necessarily undesirable in view of the impracticality of Iraqi arbitration.

### (v) Internationalising the Arbitration Clause

The second alternative is for the contractor to attempt internationalising Iraqi arbitration (a) by appointing a foreign co-arbitrator and (b) by proposing the application of international arbitration rules.

(a) Foreign Arbitrators. There is nothing in Iraqi law which prohibits the appointment of foreign arbitrators.[43] The Egyptian Court of Cassation has confirmed that foreign arbitrators can be appointed,[44] and this decision is likely to be followed by the Iraqi courts.[45]

(b) International Arbitration Rules. Since Iraq belongs to the United Nations and other international committees, Iraqi employers, if pressed, may accept the application of the UNCITRAL Arbitration Rules instead of the Iraqi ones.[46] The Civil Procedure Code expressly provides for the possible application of non-Iraqi rules in the arbitration.[47]

The application of the UNCITRAL rules, and the appointment of an international co-arbitrator who has experience of them, would be a major improvement, even if the arbitration is conducted in Iraq. For example, the

---

[42] A court of first instance or an administrative court. The latter was established by Law No. 140 of 1977 and its jurisdiction was originally confined to the resolution of disputes between public-sector entities In 1980 this jurisdiction was expanded to include the resolution of disputes involving at least one public-sector entity.

[43] A Yamulki, *Iraq National Report*, IV Yearbook of Commercial Arbitration 104 (1979), at p. 106.

[44] N Tabakchali, unpublished lecture given at the IBA Arab Regional Conference in Cairo, on February 15, 1987

[45] Article 1(3) of the Iraqi Civil Code states that the courts shall be guided by judicial precedents in Iraq and other countries with similar legal systems. The Civil Codes of Egypt, Iraq and several other Arab countries were drafted by the same scholar, Professor Sanhouri

[46] Yamulki, *supra* note 43, at pp. 104, 113

[47] Article 265(1) of the Civil Procedure Code.

award is final and binding under the UNCITRAL rules, and must be carried out by the parties without delay.[48]

Although it is not yet clear how an Iraqi court would resolve a conflict between Iraqi and UNCITRAL rules, the contractor would at least be able to argue that the UNCITRAL rules, if adopted, supersede any conflicting provision in the Iraqi rules. The Jordanian Court of Cassation has recently resolved a conflict between the Jordanian Arbitration Law and the ICC rules, in connection with the appointment of arbitrators, in favour of the ICC rules since the contract in question had an ICC arbitration clause.[49] Again, this decision is likely to be followed by the Iraqi courts if a conflict arises between the Iraqi arbitration rules and those adopted by the parties.[50]

### (vi)    ICC Arbitration

The third alternative, achieved by several contractors with strong bargaining power, is to replace the *ad hoc* Iraqi arbitration clause by an ICC one. The availability of the ICC arbitration clause, as an alternative, is not advertised.[51]

The ICC arbitration clause currently in use in Iraq, either specifies a place of arbitration outside Iraq[52] or remains silent about the place of arbitration.

Where the clause is silent as to the place of arbitration, it is determined by the ICC Court of Arbitration in the absence of any agreement by the parties.[53] Although Iraq is the natural choice, since it is the place where the contract is signed and the works are executed, it is by no means certain that the ICC Court will always designate Iraq as the place of arbitration.

The choice of the ICC Court will be influenced, *inter alia*, by the attitude of the local courts. Where these tend to intervene in the arbitration process and offer a party not acting in good faith an opportunity to obstruct the arbitration, the ICC Court is likely to go elsewhere.[54]

The negotiation of an ICC arbitration clause does not necessarily mean that the contractor can obtain final resolution of the dispute by an ICC arbitral tribunal. When the contractor commences arbitration proceedings at the ICC

---

[48] Article 32(2) of the UNCITRAL Arbitration Rules.
[49] I Dallal, *Appointment of an Arbitrator under the ICC Rules in Jordan*, 2 Int. Cons. L. Rev 177 (January 1985)
[50] Article 1(3) of the Iraqi Civil Code, *supra* note 45
[51] H Mukhtar, *supra* note 34, at p. 179.
[52] *Id*
[53] Article 12 of the ICC Arbitration Rules.
[54] S. Jarvin, *Construction Disputes Under the ICC Court of Arbitration Rules*, 2 Int. Cons. L. Rev 139 (January 1985), at p. 148

Court of Arbitration, he may well find that the employer-defendant will not participate therein, particularly if the place of arbitration is outside Iraq.[55]

The failure of the employer-defendant to take part in the arbitration does not prevent it from proceeding or an award from being made.[56]

However, an ICC arbitral award is not automatically enforceable against the employer-defendant, and the whole exercise may have to be repeated before an Iraqi court.

(vii)  LOCAL ENFORCEMENT OF FOREIGN AWARD

Iraq is a party to the Geneva Protocol on Arbitration Clauses of 1923,[57] but this Protocol deals mainly with the recognition of international arbitration agreements.

Iraq has not signed or acceded to any of the international conventions on the recognition and enforcement of foreign arbitral awards, such as the Geneva Convention of 1927,[58] the New York Convention of 1958,[59] or the Washington Convention of 1965.[60]

The only convention acceded to by Iraq is the Arab League Convention of 1952 which deals with the enforcement of judgments and arbitral awards rendered in certain Arab countries.[61]

There is no domestic law dealing with the recognition or enforcement of foreign arbitral awards.

Iraq has enacted an Enforcement of Foreign Judgments Act of 1928,[62] but this Act does not contain any provisions in respect of arbitral awards. Only an arbitral award embodied in a foreign judgment may be enforceable thereunder.

[55] See text relating to note 89 *infra*.

[56] Articles 8.2 and 15.2 of the ICC Arbitration Rules.

[57] Law No. 34 of 1928.

[58] Convention on the Execution of Foreign Arbitral Awards, done at Geneva, on September 26, 1927, 92 L.N.T.S. 302 (1929–1930). The United States has not adhered to the Geneva Convention.

[59] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, on June 10, 1958, 330 U.N.T.S. 38 (codified in the United States at 9 U.S.C. 201–208 (1982)) and given effect in England by the 1975 Arbitration Act. The New York Convention has replaced both the Geneva Protocol and the Geneva Convention (Article VII 2 of the New York Convention) See generally Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049 (1961).

[60] Convention on the Settlement of Investment Disputes between States and Nationals of Other States, done at Washington, on March 18, 1965, 575 U.N.T.S. 159 (given effect in the United States by 22 U.S.C. 1650a (1982)). Also known as the ICSID Convention. See generally G. Delaume, *ICSID Arbitration: Practical Considerations*, 1 J. Int. Arb. 101 (July 1984).

[61] The Arab League Convention of 1952 has been ratified by Saudi Arabia (1954), Egypt (1954), Jordan (1954), Syria (1956), Libya (1957), Iraq (1957), and Kuwait (1962). The Lebanon and the Yemen signed the convention in 1955 but have not ratified it. See generally, Saleh, *supra* note 31, at p. 418.

[62] Law No. 30 of 1928.

This means that it is practically impossible for awards issued by the ICC Court of Arbitration, or another non-judicial institution, to qualify for enforcement under the 1928 Act since these awards cannot be judicially confirmed.[63]

One commentator[64] has suggested that an Iraqi court may recognise and enforce an ICC arbitral award based on the recent decision by the Jordanian Court of Cassation,[65] but that is doubtful. To begin with, Jordan acceded to the New York Convention in 1979, whereas Iraq has not even signed it. Furthermore, the Jordanian law for the enforcement of foreign judgments specifically applies to arbitral awards,[66] whereas the corresponding Iraqi law does not. Finally, the Jordanian precedent deals only with the appointment of arbitrators.

## D.  PROPOSALS FOR REFORM

Although international arbitration is not the best alternative to domestic litigation,[67] it is nevertheless an important alternative since most international contractors are reluctant to submit their disputes to the national courts of developing countries.

The writer is in favour of the formation of a permanent court for the resolution of disputes between foreign contractors and public-sector employers.[68] It should be manned by experienced international arbitrators including retired judges from specialised courts, such as the United States Claims Court[69] and the Official Referees Court in England.[70]

---

[63] Saleh, *supra* note 31, at p. 193

[64] S. Mukhtar, *An Introduction to Construction Contracts in Iraq*, 3 Int. Cons. L. Rev. 35 (October 1985), at p. 41.

[65] Dallal, *supra* note 49.

[66] Saleh, *supra* note 31, at p. 171.

[67] For an extreme example of the pitfalls of international arbitration, see Kerr, *Arbitration v. Litigation, the Macao Sardine Case*, 14 Int. Bus. Lawyer 152 (1987).

[68] One of the main problems of arbitration between public-sector employers and private contractors is that these employers will almost always appoint their own nationals as arbitrators, and expect them to act as advocates. The establishment of a permanent court with a standing body of skilled full-time arbitrators would solve this problem, since the parties cannot select their own arbitrators. Thus, a court can be established by treaty or by existing institutions such as the ICC or ICSID, and be based in a country which has ratified the New York Convention so that its awards can be enforced under that Convention. The proposed permanent court should not be confused with the Permanent Court of Arbitration at The Hague, which is suitable mainly for the resolution of disputes between states.

[69] The United States Claims Court has jurisdiction to settle claims and disputes arising in connection with Federal contracts. See 28 U.S.C. 1491 (1984)

[70] The Official Referees courts are part of the High Court and specialise in the resolution of construction disputes. See Note, *The Official Referees Courts*, 83 The Law Society's Gazette 1294 (1986).

Until such an ideal solution is achieved, the domestic arbitration law and practice should be reformed. For Iraq, the writer would propose the following remedies.

### (i)  ADOPTING NEW ARBITRATION LAW

The current arbitration law is clearly undesirable, particularly in view of the requirement that all awards be subject to the mandatory confirmation of Iraqi courts.

This and other unsatisfactory features should be removed when the Civil Procedure Code is re-enacted.

One possibility is to adopt legislation based on the Model Law on International Commercial Arbitration, as approved by the United Nations Commission on International Trade Law ("UNCITRAL") on June 21, 1985.[71]

The Model Law was developed by UNCITRAL in response to a request by the Asian-African Legal Consultative Committee ("AALCC") in 1977 for the amendment of the New York Convention.[72] The AALCC was concerned about the lack of harmonisation of national arbitration laws which often frustrated the expectations of parties expressed in their arbitration agreement. This concern led the AALCC to request legislative clarification to ensure that

> "where the parties have adopted rules for the conduct of arbitration between them, whether the rules are for *ad hoc* arbitration or for institutional arbitration, the arbitration proceedings should be conducted pursuant to those rules notwithstanding provisions to the contrary in municipal laws, and the award rendered should be recognised and enforced."[73]

The proposals of the AALCC led to a report by UNCITRAL which concluded that the AALCC objectives would be achieved more effectively by developing a Model Law to be adopted by various countries around the world, rather than by amending the New York Convention.[74]

The Model Law is particularly suitable for adoption by countries which have no arbitration law or where it is outdated.[75] Iraq is certainly in the latter category.

---

[71] See generally G Herrmann, *UNCITRAL adopts Model Law on International Commercial Arbitration*, 2 Arbitration International 2 (January 1986)

[72] See generally, G Herrmann, *The UNCITRAL Model Law—its Backgrounds, Salient Features and Purposes*, 1 Arbitration International 6 (April 1985)

[73] *Id*, at p 7.

[74] *Id*, at p 7

[75] *Id*, at p 28

It should be noted that Iraq is a member of the AALCC[76] whose 1977 session was held in Baghdad.[77]

Another possibility is to make Iraqi arbitration law conform to the modern laws of other Arab countries such as Egypt.[78]

### (ii)    Acceding to the New York Convention

The New York Convention provides for the recognition and enforcement of arbitral awards in convention states other than the states in which the awards were made, as long as the awards satisfy the basic conditions set forth in the Convention.

The Convention is neutral in its operation and can be used by both the public-sector employer and the foreign contractor. For example, an arbitral award rendered in Geneva in respect of a dispute between an Egyptian employer and a British contractor can be enforced by the winner through the Egyptian courts or the British courts, since Egypt, Britain, and Switzerland are all parties to the Convention.

At the last count, some 71 countries have acceded to the Convention, including six Arab states.[79] There is no reason why Iraq should not do so.

### (iii)    Acceding to the ICSID Convention

As an alternative, or in addition, to accession to the New York Convention, Iraq should join the Washington Convention,[80] which was formulated by the World Bank in 1965. One of the achievements of the Washington Convention was the establishment of an International Centre for the Settlement of Investment Disputes ("ICSID"). For this reason, the Washington Convention is also known as the ICSID Convention.

A special set of arbitration rules, known as the ICSID Arbitration Rules, were developed by the ICSID to govern the settlement of disputes between states and nationals of other states, when such parties agree to submit their disputes to the jurisdiction of the ICSID.

One of the major advantages of ICSID arbitration is that the ICSID

---

[76] Yamulki, *supra* note 43, at p. 104
[77] M. Aboul Enein, *Arbitration Under the Auspices of the Cairo Regional Centre for Commercial Arbitration (an AALCC Centre)*, 2 J. Int. Arb. 23 (December 1985), at p. 30.
[78] For a summary of Egyptian law and practice, see Saleh, *supra* note 31, at p. 191.
[79] The New York Convention of 1958 has been ratified by Egypt (1959), Syria (1959), Morocco (1959), Tunisia (1967), Kuwait (1978), and Jordan (1979)
[80] See *supra* note 60.

Convention provides its own mechanism for appealing and enforcing the award.[81] In addition, each contracting state is obligated to recognise and enforce an ICSID award as if it were a final judgement of its own courts.[82]

Arbitration under the ICSID Convention has two limitations. First, the dispute must arise directly out of an "investment". Second, one of the parties to the arbitration must be a contracting state (or a sub-division or agency thereof), and the other party must be a national of another contracting state.

However, these are not major limitations since ICSID arbitration is applicable to many disputes which may arise out of a construction project,[83] and since the disputes under consideration will normally arise between an agency of the Iraqi government[84] and nationals of other states.[85]

It is also interesting to note that 89 states have ratified the ICSID Convention, whereas only 71 have ratified the New York Convention. The ICSID contracting states include eight Arab countries.[86]

### (iv) Promoting Regional Centres for Arbitration

Regional arbitration centres should be promoted to create a more favourable environment for international arbitration in Iraq. For example, the Cairo Regional Centre for Arbitration was established in 1978 on the recommendation of AALCC.[87] As stated above, Iraq is a member of the AALCC whose 1977 session was held in Baghdad. The objectives and functions of the Cairo Regional Centre include, *inter alia*, the promotion of international commercial arbitration in the Arab states, the provision of assistance in the conduct of *ad hoc* arbitrations under the UNCITRAL

---

[81] See G. Delaume, *The ICSID and the Banker*, Int. Fin. L. Rev. 9 (October 1983)

[82] Article 54(1) of the ICSID Convention

[83] For example, the construction of hotels in the context of developing tourism, the construction of housing as part of urban development, the construction of a maternity ward, and the construction of a chemical plant on a turnkey basis, coupled with a management contract which provided technical assistance for the operation of the plant. See Yahiel & Cranston, *Arbitration and Dispute Resolution in the International Construction Industry*, 2 Int. Cons. L. Rev. 231 (April 1985), at p. 231

[84] The Iraqi public-sector employer will either be a ministry or a state organisation belonging thereto.

[85] The expression "national of another contracting state" includes any person with legal personality which has the nationality of the other contracting state. See Article 25(2)(b) of the ICSID Convention. This "person" can be a corporation. For purposes of the ICSID Convention, the nationality of a corporation is determined on the basis of its *siège social* or place of incorporation. Consequently, a business association, incorporated in Contracting State A and investing in Contracting State B, is eligible to be a party to an ICSID clause and to avail itself of ICSID facilities if the need arises. See Delaume, *supra* note 60, at pp. 111–112

[86] The ICSID Convention of 1965 has been ratified by Tunisia (1966), Morocco (1967), Egypt (1972), Jordan (1972), Sudan (1973), Kuwait (1979), Saudi Arabia (1980), and the United Arab Emirates (1982)

[87] Aboul Enein, *supra* note 77

Arbitration Rules, and the conduct of arbitration under the auspices and Rules of the Centre, which are based on the UNCITRAL Arbitration Rules.[88]

The Iraqi government should encourage its public-sector employers to use the facilities of the Cairo Regional Centre.

## D.   CONCLUSION

The above proposals for reform would certainly make Iraq a more acceptable place for doing business.

The current international verdict on Iraqi arbitration is rather damning. In the opinion of one commentator:

> "Arbitration doesn't work here—that's the consensus among Western commercial attachés. The Iraqi side invariably takes great umbrage to attempts to invoke arbitration. When one large EEC contractor invoked a Geneva arbitration provision in his contract, his client simply didn't show up for the proceedings. Contractors fare little better in the more common local arbitration procedures. In one case the Iraqi side took two years to name an arbiter. When it finally did, and only after considerable diplomatic pressure, the Iraqi expert representing the Western firm resigned without explanation. The wholesale failure of arbitration is causing mounting concern among Iraq's trading partners, as do the provisions in Iraqi law which accord no legal significance to the results of private arbitration."[89]

This is an unfortunate reputation, particularly for a country where arbitration was established 5,000 years ago.[90]

## IRAQI CIVIL PROCEDURE CODE
### LAW NO. 83 OF 1969

#### CHAPTER II
#### ARBITRATION

*Article 251*

The parties may agree to arbitrate a specific dispute, and may also agree to arbitrate all disputes arising from the execution of a specific contract.

[88] *Id.*
[89] Note, *Let the Seller Beware*, 5 Middle East Executive Reports 12 (March 1982)
[90] Arbitration was known 5,000 years ago in the Sumerian states of Legush and Omma in Southern Iraq. See Tabakchali, *supra* note 44.

*Article 252*

The arbitration agreement cannot be proved unless it is in writing. The parties may agree to arbitration during the judicial hearing. If the court is satisfied of the existence of the arbitration agreement or if it approves an arbitration agreement made by the parties during the judicial hearing, it shall stay the action until the arbitral award is made.

*Article 253*

(1) If the parties agree to arbitrate a certain dispute, no action may be brought before the court until the arbitration proceedings are exhausted.

(2) Nevertheless, if an action is brought by one party despite the arbitration clause, and no objection is made by the other party at the first hearing, the action may proceed and the arbitration clause shall be deemed null and void.

(3) However, if an objection is made by the other party, the court shall stay the action until the arbitral award is made.

*Article 254*

Arbitration shall not be permitted unless it relates to matters capable of conciliation and unless the parties are capable of the disposal of their rights. Arbitration shall be permitted between husband and wife in accordance with the Personal Status Code and the principles of Islamic *Sharia*.

*Article 255*

An arbitrator may not be appointed from the members of the judiciary without the consent of the Judicial Council. An arbitrator may not be a minor, or in quarantine, or stripped of his civil rights, or bankrupt.

*Article 256*

(1) If a dispute occurs and the parties fail to appoint the arbitrators, or if one or more of the appointed arbitrators is unwilling or unable or is unauthorised to act as an arbitrator, or has been removed as an arbitrator, and the parties have not agreed to appoint an alternative, then any of the parties may petition the court of original jurisdiction to appoint an arbitrator or arbitrators after notifying the other parties and considering their points of view.

(2) If the court appoints an arbitrator or arbitrators, its decision shall be final and not subject to any appeal. However, if the court rejects the petition to appoint the arbitrators, its decision shall be subject to appeal in accordance with the provisions of Article 216 of this Code.

### Article 257

If more than one arbitrator is appointed, the total number of arbitrators shall be uneven, except in arbitration between spouses.

### Article 258

If the parties instruct the arbitrators to conciliate, the conciliation shall be deemed to be their own.

### Article 259

The arbitrator's acceptance of his nomination shall be in writing, unless he is appointed by the court. The acceptance may be proved by the arbitrator's signature on the arbitration agreement. The arbitration shall not end if one of the parties dies.

### Article 260

After accepting the appointment, an arbitrator may not decline to act without a just cause, and he may not be dismissed except by agreement of the parties.

### Article 261

(1) An arbitrator may be challenged for the same reasons for which a judge may be challenged, but no challenge is permitted unless it relates to matters appearing after the arbitrator's appointment.

(2) The challenge notice shall be sent to the court of original jurisdiction whose decision in this respect shall be subject to appeal in accordance with the provisions of Article 216 of this Code.

### Article 262

(1) If the arbitration is subject to a time limit, then it shall end upon the

expiry of this limit, unless the parties agree to extend it.

(2) If the issue of the arbitral award is not subject to any time limit, then the arbitrators shall issue their award within six months after the date on which they accept their nomination.

(3) If one of the parties dies, or if an arbitrator is removed, or if a challenge is made to the appointment of an arbitrator, then the time limit for issuing the arbitral award shall be extended by the period required for such preventive factor to disappear.

### Article 263

If the arbitrators do not settle the dispute during the period specified in their agreement or in this Code, or if the arbitrators are unable to issue their award due to a coercive reason, any party may then petition the court of original jurisdiction to extend the period or to settle the dispute or to appoint alternative arbitrators, as deemed necessary under the circumstances.

### Article 264

If a petition is made to the court of original jurisdiction to appoint arbitrators, such a petition shall not in itself be deemed to be a request to approve the decision of the arbitrators or to rule in accordance with such decision, and the court shall then appoint the arbitrators and stay the action until the issue of the arbitral award.

### Article 265

(1) The arbitrators shall comply wih the substantive law and the procedural rules set forth in this Code, unless the arbitration agreement or a subsequent agreement provides an express exemption from said procedural rules or specifies certain procedural rules to be followed by the arbitrators.

(2) If the arbitrators are authorised to conciliate, they shall not be bound to comply with the procedural or substantive laws except those pertaining to public policy.

### Article 266

The arbitrators shall settle the dispute based upon the arbitration clause and the documents and pleadings submitted by the parties. The arbitrators shall specify a timetable for the submission of documents and pleadings, and

may settle the dispute in accordance with the documents and pleadings submitted by one party only if the other party fails to submit its defence during the specified period.

### Article 267

The arbitrators shall jointly carry out the inquisitorial proceedings, and shall individually sign the minutes thereof, unless they appoint one of them to carry out certain proceedings and confirm this in the minutes.

### Article 268

If a preliminary matter arises in the course of arbitration which is outside the jurisdiction of the arbitrators, or an objection is made in respect of the forgery of a paper, or if criminal proceedings are commenced in connection with such forgery or in connection with any other penal action, the arbitrator shall stay the arbitration and direct the parties to submit their requests to the court of original jurisdiction. In such an event, the running of the time period shall stop until a final decision is issued in respect of such matter.

### Article 269

The arbitrators shall state a case for the decision of the court of original jurisdiction if a judicial reference is necessary for the resolution of the dispute, or if it is necessary to apply sanctions as a result of the failure of witnesses to appear or answer questions.

### Article 270

(1) The arbitrators shall make their award unanimously or by a majority vote following a joint deliberation and in accordance with the provisions of this Code. The award shall be written in the manner that a court judgement is written.

(2) The award shall specifically include a summary of the arbitration agreement, the pleadings of the parties, the documents submitted by the parties, the reasons for the award, the ruling, the place of the award, the date of the award, and the signatures of the arbitrators.

### Article 271

After the issue of the award as set forth above, the arbitrators shall

provide a copy thereof to each party and submit the award, together with the original arbitration agreement, to the court of original jurisdiction within three days after the issue thereof, and shall obtain a receipt from the clerk of the court.

*Article 272*

(1) The arbitral award shall not be enforced by the executory departments, whether appointed by court or by agreement, unless it is confirmed by the court of original jurisdiction pursuant to a request made by one of the parties and following the payment of the prescribed fee.

(2) The arbitral award shall not be enforced except insofar as it affects the rights of the parties thereto and the subject matter of the arbitration.

*Article 273*

When the arbitral award is presented to the court of original jurisdiction for confirmation, a party may seek to set aside the award or the court itself may set it aside in the following circumstances:

(1) If the award is made without written evidence or is based on an invalid agreement or if it exceeds the scope of the agreement.

(2) If the award violates a rule of public policy or morals or any specific arbitration rule laid down in this Code.

(3) If any of the grounds for retrial exists.

(4) If there is a material error in the award or in the proceeding which affects the validity of the award.

*Article 274*

The court may either confirm the award or set it aside wholly or partially, and if it sets aside the award wholly or partially it may refer the matter back to the arbitrators to remedy any deficiency in the arbitral award, or it may itself resolve the dispute if the matter is suitable for resolution.

*Article 275*

The judgement of the court pursuant to the preceding article is not subject to objection but is subject to appeal in accordance with the provisions of this Code.

130    JOURNAL OF INTERNATIONAL ARBITRATION

*Article 276*

The arbitrators' fees shall be determined by an agreement of the parties in the arbitration agreement or a subsequent agreement. Otherwise, the fees shall be determined by the court of original jurisdiction in its judgement or in an independent decision subject to appeal in accordance with the provisions of Articles 153 and 216 of this Code.

EXHIBIT C  (Part 1 of 5)



STATE ORGANIZATION FOR LAND RECLAMATION

GENERAL ESTABLISHMENT OF DESIGNS & RESEARCH

GENERAL CONDITIONS & TECHNICAL SPECIFICATIONS

# FOR LAND RECLAMATION PROJECTS

7 NISSAN AMERIAH

MARCH 1982

00001

REPUBLIC OF IRAQ

STATE ORGANIZATION FOR LAND RECLAMATION

GENERAL ESTABLISHMENT OF DESIGNS AND RESEARCH.

GENERAL CONDITIONS AND TECHNICAL SPECIFICATIONS

FOR LAND RECLAMATION PROJECTS

*N = 65 - Хиза Добавитель 4*

*12. IX 1984 г.*

*дата на изпълнение*
*12. III. 1985 год.*

*Срок на изпълнение*
*38 месец. по 30 фин. 1140фин.*
*Срок за пропратане*
*до 12 месец = 1500фин — 12 V 1989 год.*

AGROC...
Econom...
61, Vitos... ...ofia
tel: 8........, 14. 22021
Bulgaria

Y NISSAN, AMERIAH

MARCH, 1982

G. S. CHUMAN.

00002

(i)

## SECTION I

### Tables of Content

General Conditions for contracts of Civil
Engineer works Part I & II (Prepared by
special committee and approved by the
Planning Board).



## SECTION II

### Tables of Contents

### Part I Land Reclamation Projects

|  |  | Page |
|---|---|---|
| General Conditions for Land reclamation Project |  | 1 |
| | Definitions ........................... | 1 |
| 1.2 | Job description ....................... | 3 |
| 1.3 | The site ............................. | 3 |
| 1.4 | Transport, roads and water ways ...... | 3 |
| 2 | Technical Specifications for Land Reclamation works | |
| 2.1 | Terms of reference ................... | 3 |
| 2.2 | General description of the Project.... | 4 |
| 2.3 | Land levelling and grading ........... | 4 |
| 2.3.a. | Sub soiling ....................... | 8 |
| 2.4 | Earthwork for drains and canals ...... | 10 |
| 2.4.1 | Clearance of site ................. | 10 |
| 2.4.2 | Notice to be given before starting earth work ......... | 11 |
| 2.4.3 | Earthwork to lines and levels ..... | 11 |
| 2.4.4 | Spoil dumps ....................... | 11 |
| 2.4.5 | Borrow areas ...................... | 11 |
| 2.4.6 | Access Tracks ..................... | 12 |
| 2.4.7 | Excavation and disposal ........... | .. |
| 2.4.8 | Measurement and rates of excavation. | 13 |
| 2.4.9 | Definition of depth .............. | 14 |
| 2.4.10 | Tolerances of earthwork .......... | 14 |
| 2.4.11 | Embankments ...................... | 14 |
| 2.4.12 | Compaction ....................... | 15 |
| 2.4.13 | Gaps in embankments ............ | 16 |
| 2.4.14 | Remodelling of existing drains and canals... | 16 |

2.4.16    Transitions . . . . . . . . . . . . .    17
2.4.17    Extent of Excavation . . . . . . . . . . . . .    17
2.4.18    Excavation of unsound Material . . . . .    17
2.4.19    Allowance for settlement . . . . . . . .    18
2.4.20    Scarifying ground surface . . . . . . . .    18
2.5       Field drains . . . . . . . . . . . . .    19

3    Materials for land reclamation Projects . . . . . .    22
3.1       Clay pipes . . . . . . . . . . . . .    22
3.2       Plastic pipes . . . . . . . . . . . . .    23
3.2.a.    Works Inspection . . . . . . . .    24
3.2.b.    Pipes laying . . . . . . . . . . . .    24
3.3.      Concrete pipes . . . . . . . . . .    26
3.4.      Filter materials . . . . . . . . .    27
3.5.      Pipe collector Drains . . . . . . . . . .    28
3.6.      Manholes . . . . . . . . . . . .    30
3.7       Collectors outlets . . . . . . . . . . .    30
          PART II-STRUCTURES . . . . . . . . .    31
I1   General Specification for Structures . . . . . .    32
1.1       Quality of materials . . . . . . . . . . .    32
1.2       Standards and codes of Practices . . . . .    32
1.3       Standards to be on site . . . . . . . . . . .    32
I2   Technical Specification for structures . . . . . .    33
2.1       Preparation of site and setting . . . . . . .    33
          out structures.
2.2       Structural steel work . . . . . . . . . . . .    33
2.3       Hydraulic equipment . . . . . . . . . . . .    33
2.4       Excavation for structure Foundations . . .    34
2.5       Concrete mix . . . . . . . . . . . .    35
2.6       Mixing and testing . . . . . . . . . . .    37
2.7       Sulphate resisting concrete . . . . . . . . .    38
2.8       Proportions of materials . . . . . . . . . .    39
2.9       Trial mixes and preliminary cube tests . . .    39
2.10      Plain concrete . . . . . . . . . . . .    42
2.11      Reinforced concrete . . . . . . . . . . .    43
2.12      Shuttering . . . . . . . . . . . . . . . .    46
2.13      Curing of concrete . . . . . . . . . . . . .    47
2.14      Proportions  of ingredients in cement mortar...    47
2.15      Brick work with cement mortar . . . . . . . . .    49
2.16      Pointing with cement mortar . . . . . . . . . .    50

00004

- iii -

| | | Page |
|---|---|---|
| 2.17 | Dry stone pitching .................... | 50 |
| 2.18 | Stone pitching in cement mortar .................. | 51 |
| 2.19 | Brick pitching in cement mortar................. | 51 |
| 2.10 | Gates . . . . . . . . . . . . . . . . . . . | 52 |
| | | |
| II.3 Materials for Structures . . . . . . . . . . . . . . | 53 |
| 3.1 | Cement . . . . . . . . . . . . . . . . . . . | 53 |
| 3.2 | Fine and coarse aggregates . . . . . . . . . . . | 54 |
| 3.3 | Water . . . . . . . . . . . . . . . . . . . | 5? |
| 3.4 | Clay bricks . . . . . . . . . . . . . . . . . | 56 |
| 3.5 | Materials for Shuttering . . . . . . . . . . . | 57 |
| | Reinforcing steel . . . . . . . . . . . . . . | ?? |
| 3.7 | Lime stone . . . . . . . . . . . . . . . . . | 58 |
| 3.8 | Gypsum . . . . . . . . . . . . . . . . . . . | 58 |
| 3.9 | Structural Steel . . . . . . . . . . . . . . | 58 |
| 3.10 | Testing of materials . . . . . . . . . . . . . | 59 |
| | | |
| II.4 Canal lining . . . . . . . . . . . . . . . . . . . | 60-70 |
| II.5 Water Control equipment . . . . . . . . . . . . . . | 71 |
| 5.1 | General . . . . . . . . . . . . . . . . . . . | 71 |
| 5.2 | Designs, calculations and drawings . . . . . . . . | |
| 5.3 | Alternative designs . . . . . . . . . . . . . | 71 |
| 5.4 | Data to be submitted with tender . . . . . . . . | 72 |
| 5.5 | Design to suit climatic conditions . . . . . . | 72 |
| 5.6 | Recesses in concrete work . . . . . . . . . . . | 73 |
| 5.7 | Materials, stresses and workmanship . . . . . . . | 73 |
| 5.8 | Minimum thickness . . . . . . . . . . . . . . . | 73 |
| 5.9 | Lifting ropes chains etc. . . . . . . . . . . . | 74 |
| 5.10 | Gate seals . . . . . . . . . . . . . . . . . | 74 |
| 5.11 | Advance delivery of Anchor members etc . . . . . . | 75 |
| 5.12 | Standard installation & maintenance . . . . . . . | 75 |
| 5.13 | Spareparts, special tools etc. . . . . . . . . . | 76 |

– iv –

|  |  | Page |
|---|---|---|
| 5.14 | Works erection . . . . . . . . . . . . . . . . . . | 76 |
| 5.15 | Packing and marking . . . . . . . . . . . . . . . | 76 |
| 5.16 | Cleaning, preparation & Painting . . . . . . . . | 77 |
| 5.17 | Site erection, operation & maintenance . . . – | 77 |
| 5.18 | Supervision of erection . . . . . . . . . . | 78 |

**Movable weirs**

| 5.19 | General . . . . . . . . . . . . . . . . . | 78 |
| 5.20 | Embedded parts . . . . . . . . . . . . . . . | 80 |
| 5.21 | Gate . . . . . . . . . . . . . . . . . . . | 81 |
| 5.22 | Operating gear . . . . . . . . . . . . . . . | 81 |
| 5.23 | Gauge . . . . . . . . . . . . . . . . . . . | 82 |
| 5.24 | Flow measurement . . . . . . . . . . . . . . | 82 |

**Radial Gates**

| 5.25 | General . . . . . . . . . . . . . . . | 83 |
| 5.26 | Embedded parts . . . . . . . . . . . . | 83 |
| 5.27 | Pivot Beams & Anchorages . . . . . . . | 84 |
| 5.28 | Gate and Pivots . . . . . . . . . . . | 86 |
| 5.29 | Operating Gear . . . . . . . . . . . . | 88 |
| 5.30 | Gear Bearers, plating & Hand Railing . . . . | 89 |
| 5.31 | Vertical Slide Gates . . . . . . . . . | 91 |

**Stop logs & stop log handling gear**

| 5.32 | General . . . . . . . . . . . . . . . . | 92 |
| 5.33 | Grooves and sills . . . . . . . . . . . | 92 |
| 5.34 | Stop log . . . . . . . . . . . . . . . . | 92 |
| 5.35 | Handling gear . . . . . . . . . . . . . | 92 |

AGROC . . . 'LECT
61, . . . . . .
tel.: 87-09-0.., lx. 22021
Bulgaria

- V -

|  |  | Page |
|---|---|---|
| II-6 PAINTING | | 96 |
| 6.1 | General | 96 |
| 6.2 | Materials | 96 |
| 6.3 | Cleaning and preparation of steel work | 97 |
| 6.4 | Painting of steel work | 98 |
| 6.5 | Painting schemes for structural steel work, water control equipment etc. | 99 |
| 6.6 | Preparation and storing of bolts | 100 |
| 6.7 | Paint for plant & Machinery | 100 |
| 6.8 | Printing wood work | 100 |
| 6.9 | Final coat of paint at end of maintenance period | 101 |
| 6.10 | Payment | 101 |
| II_7 QUANTITIES OF CEMENT USED IN LINING CONCRETE | | 102 |

LIMITS OF SULPHATES & GYPSUM, TESTS FOR SITE

INVESTIGATION

| 7.1 | Quantities of cement used in lining | 102 |
| 7.2 | Expansion and dummy Joints | 102 |
| 7.3 | Limits of sulphates percentages expressed. as $SO_3$ | 102 |
| 7.4 | Limits of gypsum percentages in soil | 103 |
| 7.5 | Sampling method for fixing sulphates. or gypsum in canals | 104 |
| 7.6 | Taking samples for Irrigation structures | 105 |
| | SPECIAL SERVICES AND FACILITIES | 106 |
| 1. | Office and Laboratory for the Engineer | 106 |
| 2. | Housing for the Engineers representatives and his staff | 109 |
| 3. | Other services | |
| 4. | Surveying instruments and equipment | |

AGROCOMPLECT
Economic a Li . erig1
Org. , at en
61, Vitosha Cl d. ofia
tel.: 87-09-62, tlx. 2203
Bulgaria

— vi —

|  |  | Page |
|---|---|---|
| 1 | BILL OF QUANTITIES (Preamble) . . . . . . . . . | 112 |
| 1. | Bill No. 1 Works . . . . . . . . . . . . . | 113 |
| 2. | Bill No.2 Special services & Facilities. . . . . | 114 |
|  | ANNEXURE TO BILL NO.2 . . . . . . . . . . . . | 116 |
| 2.1 | List of furniture, fixtures & equipment for the Engineer's office and laboratory. . . . . . . . . | 116 |
| 2.2 | List of Testing equipment for the Engineer's Laboratory . . . . . . . . . . . . . . . | 119 |
| 2.3 | List of furniture, fixtures and equipment for the Engineer's staff House Type AA . . . . . . . | 12? |
| 2.4 | List of furniture, fixtures and equipment for the Engineer's staff House Type A. . . . . . . . . | 125 |
| 2.5 | List of furniture, fixture and equipment for the Engineer's staff House Type B. . . . . . . . . | 128 |
| 2.6 | List of furniture, fixture and equipment for the Engineer's staff House Type C. . . . . . . . . | 131 |
| 2.7 | List of surveying instruments and equipment. . . . | 134 |
|  | APPENDICES. . . . . . . . . . . . . . . . | 136 |
|  | Appendix — 1 List of relevant Iraqi standards and codes of practice. . . . . . . . . . . . . . . . | 136 |
|  | Appendix — II List of relevant British Standards and codes of Practice. . . . . . . . . . . . . . | 139 |
|  | Appendix — III | 145 |
|  | List of Drawings. . . . . . . . . . . . . . | 145 |
|  | Form of Contract Agreement. . . . . . . . . . . | 146 |

PART I: LAND RECLAMATION PROJECT

1.  GENERAL CONDITIONS FOR LAND RECLAMATION PROJECT FOR FIELD

IRRIGATION AND DRAINAGE

1.1  DEFINITIONS:

The following definitions are used in the Specifications and in the bill of quantities:-

- Main canal: Is the channel taking off directly from the river and serving a number of branch canals.

- Branch canal: (usually called a branch or secondary canal): A canal with smaller discharge off taking from a main canal and having outlet structures to several distributaries.

- Distributary: A canal off taking from a branch canal or main canal and feeding water courses.

- Water course (Tertiary canal): A smallest discharge capacity channel off taking from distributary, irrigation one irrigation unit or as specified.

- Field ditch (farm channel): A smallest discharge channel which takes off from the water course and irrigating fields directly within the irrigation unit.

- Main drain: An open drain into which a number of drainage outlets discharge.

- Branch drain (or secondary drain): An open drain into which a number of collector drains discharge.

- Open collector drain: An open drain into which a number of field drains discharge.

- Covered collector drain: A pipeline under the ground surface, into which a number of field drains discharge and having an outlet to an open drain.

- Field drain (Relief drain): A covered or open drain designed to control the ground water level and which discharges to a collector drain. It refers here to a covered pipe drain unless it is stated as an open field drain.

Intercepter drain: An open or covered drain designed to intercept and ground water flow or seepage water.

Irrigation unit: An area bounded by two collector drains, a distributary canal and a branch drain and served by a water course.

GENERAL:

### 1.2  Job Description:

This Contract includes the construction of an irrigation and drainage system, and the supply of materials, erection, and execution of all works of land reclamation, mentioned hereinafter and handing it over to the Employer according to the Drawing and Specifications.

### DRAWINGS:

The drawings are considered as a part of the contract and the works have to be executed accordingly. Drawings have to be considered the main reference for execution in case the technical specifications lack some items. The contractors can look at the Drawings at the Office which is mentioned when issuing the tender. Any part which is not clear or appears to be contradictory with the tender document could be clarified by the Employer before bidding in writing. A copy of such clarification will be endorsed to the other tenderers.

Contractors can obtain the tender document including the Drawings from the state Organization for Land Reclamation, at a cost of I.D. ........................... However, the Contractor.

.... extra copies needed for execution at a cost of I.D. ...................... . The Contractor is deemed to be aware of all the Contract conditions and the Drawings, by the time he submits his offer. Also no bids will be accepted unless the Contractor has acquired the document officially.

1.3  The Site:

In compliance with Clause No. 11 of Part I, hereof, the Cor
should be aware of the soils' texture, ground water table, t p
phy, etc., and he is held responsible for his investigation:.
Consequently, any claim of this type will be discarded. How
if a rocky part (rocky soil is the stony soil which cannot be
cavated by ordinary means such as draglines, excavators, suct
dredgers..; etc., it cannot be excavated except by using ex;t.
ons, compressors or hydraulic drills..,.; etc.) or demolishin;
masonry works could not be avoided during execution of part o
the Work, reasonable compensation will be considered in ac-
with Clause No. 12, of part I of the General Conditions.

1.4  TRANSPORT, ROADS AND WATER WAYS (CANAL, DRAINS ETC.):

Further to Clauses No. 11, 30 and 31 of Part I a rac;, ...
Employer does not bear any responsibility to provide any s·rt
transport and have no obligations to assist in this domain. O. ·he
contrary the Contractor should investigate and take necess ·
measures to insure his transport and estimate its cost befor
submitting his offer.

On the other hand; if the work interferes with a road or water
way which can not be avoided, the Contractor should provide the
necessary diversion to insure non-interrupted function of the
inter-sected one. The offered price shall be inclusive of su:
works and also of the works necessary to hand it over again i.
its original condition upon completion of the work.

It is the responsibility of the contractor to execute any n·
diversions to insure non-interrupted function of irrig·t.
inside his area, or outside his area, but water co···;·;, ..·;·
through his area.

2.  TECHNICAL SPECIFICATIONS FOR LAND RECLAMATION WORKS:

2.1  TERMS OF REFERENCE:

This Contract comprises construction of a new irrigation and ar.·
networks, land clearing, land levelling, remodelling of existing
irrigation and drainage networks, execution of covered field dr·

........... .. ..... ........, ........... with other rel....
of irrigation and drainage system, execution of canals (!
or unlined), structures for irrigation and drainage syste ,
and ponding of the reclaimed irrigation units and plots whi
are going to be handed over to the Employer or leaching these
units or plots with related soil management, it specified.
Also, includes flushing and maintenance of the system through-
out the contract period and/or issuance of the Maintenance
Certificate (Part I - Clause 64).

2.2   GENERAL DESCRIPTION OF THE PROJECT:

This project aims at the reclamation of saline and water-l...
lands and amelioration of field conditions by the provision
adequate water management system including the following:-

a. Land levelling of irrigation units to ensure that t'
   commanded by the water levels in the watercourses or non'
   and execution of field ditches to ensure proper supply and
   distrubution of water duties for all parts of the served a
   due time.

b. Execution of covered field drains and necessary related work ..
   ammend the collectors and branch drains in order to provide ..
   drainage of the excessive irrigation water and the saline w t
   used for leaching.

c. Execution of irrigation and drainage networks and related
   structures or any other works specified.

d. Flushing the covered drains and clearing the executed water
   channels as deemed necessary to clean them from the silt and
   vegetation. Also maintain all the works during the maintens .
   period.

2.3. LAND LEVELLING AND GRADING:

a. A detailed level survey for land levelling and land planin
   be carried out by the Contractor on irrigation unit area. ...
   med by the Engineer during the course of construction. I' t
   levelled as a single plane or as a number of planes as def,
   the Engineer.



The Contractor shall temporarily mark the boundaries of each irrigation unit with stakes and shall maintain them until the land planing has been completed and approved by the Engineer and the farm channels excavated. The Contractor shall also erect and maintain a permanent concrete reference bench mark for each irrigation unit at a location indicated by the Engineer. The detailed level survey of each irrigation unit shall be carried out and plotted by the Contractor on a grid of 25 ms or such closer distances the Engineer may direct or approve. The contractor shall calculate the plane of best fit and compute the volumes of cut and fill for each irrigation unit and submit, them successively to the engineer for approval.

If specified that the Engineer has to calculate the best fit plane, the contractor has to submit to him the spot levels (25 x 25 metres, or each irrigation unit) plotted as specified, in a form to be supplied by the Engineer, together with the location and value of the reference benchmarks and the contractor shall allow a period not less than two weeks between submitting the completed form and receiving the calculated plane of best fit.

In determining the plane of best fit and for measurement purposes it shall be assumed that there is no bulking or shrinkage of the excavated material so that one cubic meter of excavation provides one cubic meter of fill placed. The contractor shall, if necessary, make allowance for any bulking or shrinkage which may occur in practice. Any adjustment shall raise or lower the plane of best fit without changing the design slopes, and shall be approved by the Engineer. After completing land levelling operations, the Contractor may deposit any excess material along the irrigation unit boundaries, or collector drain embankment, in a uniform shape and distribution.

Proposed soil haulage diagram for the above mentioned area shall be also submitted by the contractor to the Engineer showing the field levelling planes and its slopes, in the direction of irrigation, which is usually between 0.04% and 0.15 %, and cross slope not more than 0.05% in the field plots or as specified by the Engineer, to suit the irrigation method best fit for the area, and also the places of soil deposit if requested.

- 6 -

The contractor shall take in consideration  the extra amount
of earth work for the construction of farm channels,
ditches, leaching plots dikes and roads to be made available
from the land levelling earth.  The contractor shall level
the surface to the required plane to a tolerance of + 0.025m
for excavation (Cut) and between 0-0.04m for fill, subject
to the summation of the positive and negative deviations
balancing.  Areas where the ground level is more than 0.3??
below the level of the required plane shall be filled in
layers not exceeding 0.15 m in depth.

c. Upon written approval of the Engineer, the contractor shall ..
   the basic levelling by scrapers and bulldozer , ..?
   the excavated soil from high plots to the depressions as ag?
   upon, taking into consideration the ratio of cut/fill volum.
   which is subject to revision eventually.

d. Subsequently, land shall be ploughed harrowed, and then ?? ?
   ened by a land plane three times (twice diagonally and fin ?
   parallel to the irrigation direction according to the dest?.?
   slope).

e. The Engineer has the right to stop the work with heavy machines
   or any kind of work if in his opinion the soil conditions ar?
   too wet and further work would damage the soil structure or h?
   may direct the work to another area until this abandoned l?
   ready for work without hazard of soil structure disturb?n??
   Such normal maneuvers should be considered in the prepar?..
   the work plan and the cost of any delays shall be deemed t? ??
   included in the rates.

f. Cloddy surface should be avoided as far as possible.  Th? ?
   the Engineer will decide, according to the soil condit?n??
   whether chiseling may or may not precede scraping.  Howev??, ?
   it would be the case, cloddy soils should be spread in thin
   layers not exceeding 10 cm, to avoid excessive settlement.



r. the haulage programme selection of suitable excava... .
for the embankments of compacted fill will be taken i... .
ation. Such soil shall be spread in the embankments in la/
maximum 25 cm.

t.  The unit Price for land levelling shall also include the constr...
tion of farm channels and dikes for leaching plots and field cor...
ers or basins, if specified.

:.  In accordance with Clause 49 (Certificate of Completion of the
'orks., the completed unit shall be examined by ponding of 10 cm.
depth of water. Maximum tolerance accepted is ± 4 cm within each spot
of the plot. This examination may be done in selected sample plots
or in the whole area at the discretion of the Engineer. Th...
this examination and the maintenance of dikes through ... it.
shall be included in the price.

'.  If tested areas show discrepancies in respect of desired le-
vel/or gradients, before or after ponding, the contractor shall
carry out again on his own expenses the necessary work of level
...ading, or smoothing to comply with the design, before calling
another examination.

The contractor should submit to the Engineer, all drawings .
detailed surveying work for the grid spots, land levelling
calculations and the final level of the planes at least two cop...
with-out any extra cost.

i.  The contractor shall inform the Engineer about his program of ...
levelling operations and field drainage execution in the select
...es or sectors for the next seasons.

Engineer will arrange for the suspension of cropping
... ... in these selected areas in order that the works
... without interference from farming operations. After ...
levelling has been accepted by the Engineer, the Contract
start scarification of the surface, and smoothing and plan...
th. levelled lands. This scarification shall include plow...
harrowing or rotovating as approved by the Engineer. The
shall use heavy land planes which are not less than 60 feet...
planing and he has also to insure that the surface is broken...
that no clods of earth appears on the ground surface bigger t...
! cm in diameter...

- 8 -

## Sub soiling:

a. Sub soiling is an operation which is performed by a suitable unit with its mounted ripper or sub-soiler in the sub soil of a minimum depth of 60 cm in order to improve the physical and agricultural qualities in the effective soil depth or root zone depth.

b. After performing all the operations as mentioned in items a,b,c of clause 2.3 above, the land shall be smoothened by a land plane three times (twice diagonally and finally parallel to the irrigation direction according to designed slope). If the soil is too hard to work with the land plane, the land can be ploughed and horrowed after getting the approval of the engineer.

c. Subsequently, after getting the written approval from the engineer the contractor can start sub-soiling of minimum depth of 60 cm with two to three ripper or sub soiler with various pitch of less of 100 cm of the ripper or sub soiler. Any closer pitch of these shall be adjusted in order to avoid big clods (as directed by the engineer and under his approval. The Dozer with its mounted ripper or subsoiler should move parallel to the direction of irrigation starting from one corner and of the levelled plane and subsequently turn back from the other end in parallel direction with a distance of half the pitch of the shanks. Repeat the operation to subsoil the whole levelled plane. The diameter of the clods should not be bigger than 5 cm otherwise harrowing or/and chiselling should be done.

d. Most soils would be damaged if sub soiling is done when the soil is wet. The Engineer has the right to stop the work with heavy machinery or any kind of work in such circumstances, and direct the work to another area until this abandoned land is ready for work without hazard of soil structure disturbance. Such normal manner should be considered in the preparation of this job, etc.

e. In the haulage programme selection of suitable excavated materials for the embankments of compacted fill will be taken into consideration. Such soil shall be spread in the embankments in layers of maximum 25 cm.

- 9 -

f.   The Unit price for sub soiling shall include the construction
of field ditches, and dikes for leaching and field borders also.

g.   In accordance with Clause 49 (Certificate of completion of the
after item b
works), The completed unit /shall be examined by ponding water a
direction of engineer to his satisfaction. This examination may
be done in selected sample plots or in the whole area at the de
ration of Engineer.  The cost of this examination and the maint
ance of dikes throughout the test shall be included in the pric

h.   If tested areas show discrepancies in respect of designed level
and/or gradients, before or after ponding the Contractor shall
carry out again on his own expenses the necessary work of (cut)
grading, or smoothing to comply with the design, before asking
another examination.


MEASUREMENT OF LAND LEVELLING:-

Land levelling work shall include excavation (cut), haulage
and placing of fill within irrigation unit to form the required
plane or planes to the tolerance specified.  The amount of cutting,
shall be based on the detailed survey ground levels and the plane
or planes of best fit as determined by the contractor and approved
by the Engineer.

The rate shall include for topographical survey, cutting,
haulage, placing of fill to form the required plane or planes as
specified and for the disposal of any surplus material along ...
.... of the irrigation unit or collector drains with the ....
trimming.

- 10 -

The measurement of land levelling including all items
mentioned above shall be made on area basis (per donum)
unless otherwise specified in the bill of quantities.

The rate for land levelling shall be quoted separately
for areas without subsoiling work and for areas with sub-
soiling work as specified in the bill of quantities.

The item of land levelling shall include the
clearance of the old water channels and ditches within these land
levelling units and no separate payment shall be made for
this work.

2.4 . EARTHWORK FOR DRAINS AND CANALS:

2.4.1 CLEARANCE OF THE AREA:

The contractor shall clear the area indicated by the
Engineer and the sites of channels and structures of all
vegetation including trees up to 0.5 m girth measured 1.0 m
above ground level and all superficial obstacles including
old water channels and ditches, orchard and area wall of mud brick.
The cost for this work including the grubbing out of tree
roots and refilling the voids with compacted fill and the
removal from site of all material arising from the clearance
shall be included in the related earth work rate.

When ordered by the Engineer, in writing, the Contractor
shall so clear trees over 0.5 girth measured 1. the
ground level, and demolish buildings. This includes grubbing
out of roots, refilling the voids with compacted fill and
the removal from site of all materials arising from the
clearance.

for these works shall be made under a separate ...
quantity and at the rates agreed upon between the contractor
the Employer, and as set out in the order of the Engineer.

## NOTICE TO BE GIVEN BEFORE STARTING EARTHWORK:

The Contractor shall give in advance the Engineer, at least 15 days,
written notice of his intention to start earthwork, so as to enable
the Engineer to acquire all data required for the purpose of meas-
urements. The earthworks shall not be commenced until written
approval has been received by the Contractor from the Engineer.
When site clearance is accomplished, the period of notice shall
start from the completion of such clearance.

## EARTHWORK TO LINES AND LEVELS:

The work for the several parts of the works shall be c...
out to the dimensions and levels shown on the Drawings, or as may
be ordered by the Engineer. Dimensions, which are based on, or
related to ground levels or chainages, shall be referred to the
Engineer, for his confirmation before earthwork is commenced  For
the purpose of the specifications term ground level shall refer to
the ground surface before the start of the earthwork operations.

## SPOIL DUMPS:

If required, the Contractor shall form spoil dumps in uniform
shape and distribution in at locations designated by the Engineer.
The cost of forming and trimming these dumps to the dimensions and
shapes ordered, shall be included in the excavation rate.

## BORROW AREAS:

Where specified or ordered by the Engineer, earth fill shall be
obtain d from borrow areas, after the completion of the tests, t...
confirm the suitability of the material. Before excavation starts,
dimensions and depths of borrow areas shall be approved by the
Engineer. The depth of borrow areas shall not exceed 1.0 m. On
completion of excavation the Contractor shall trim, grade the area,
and leave it in a tidy condition according to the Engineer's requi-
rements, and if ordered, shall carry out without charge any further
earthwork necessary to prevent accumulation of water or damage or

AGRO ENGINEERING
Ex...    of Engineering
61, Vitosha Blvd , Sofia
tel : 87-59-5.., tlx, 22021
Bulgaria

...... .. the ..... .... .. in the barrow areas.  All
The rates shall also include for stripping top soil or unsuitab..
material from the surface of the ground, excavating, loading,
hauling, up to the distance if specified and unloading together
with forming and trimming the material to the dimensions shown
on the drawings including any compaction that may be required or
specified by the Engineer.

### 1...6 ACCESS TRACKS:

To facilitate access for setting out and construction of the d...
and canals, the Contractor shall form continuous access tracks,
cluding temporary diversions and bridges, on alignments appro-
the Engineer.  The tracks shall be of a size and condition to
easy passage of motor transport and shall be maintained in a...
condition, until such time as the Engineer deems them to be super
fluous.  After removal of the tracks, the ground should be kept.
at least to its original condition.  The rates shall include all
works specified above.

### 1...7 EXCAVATION AND DISPOSAL:

Earth excavated from drains and canals shall be placed alongside
in the embankments.  If excess spoil is available it shall, unles
otherwise specified, be placed in other embankments requiring add
tional fill.  Embankments for drains and canals shall be formed w
earth excavated from them if available.  Where material for emba
ents additional to that available from excavation of the drain.
and land levelling, is required, it shall be obtained from borrow
areas.  Where earth excavated from the drain or canal or any
source must necessarily be transported between excavation and
filling, the cost of transport of earth for a ten...
300 meters shall be included in the related excavation rate...
for cost of transport for distance greater than 300 met.. ...
made under the appropriate items in the Bill of Quantities.

The length of haul shall be measured as a straight line from ...
center of gravity of the area of excavation to the centre of gr...
of the area of deposition.

61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

- 15 -

## 2.4.6 MEASUREMENT AND RATES OF EXCAVATION:

a.  The quantity of excavation for drains and canals, shall be on cross-sections and ground levels taken at intervals of 5.0 meters, as located at the chainage points on the centre line. the purpose of calculating volumes, the cross-sections shall taken to apply for a distance up to the midpoint between th. related cross-sections on each side along the centre-line.

The Engineer may, at his discretion, order measurement of sections at any intermediate distance in addition to, or in of measuring at the specified intervals. It shall be that there is no bulking or shrinkage of the excavation that cubic meter of excavation in drains and canals or areas provides one cubic meter of fill compaction. ces shall be included, in the tendered rates for any bulki and shrinkage which may occur in practice. The rates for ex tion shall include cutting in any material, and to any depth on the Drawings, trimming the side slopes and bed, hauling th excavated spoil and its placing on the embankments to the dim ions shown on the Drawings, or to such other dimensions as th Engineer may order. Excavation in borrow areas will be measur as fill provided in embankments.

The rates for excavation shall include the cost of excavating either in wet or dry soil or under water and the cost of any dewatering, which may be necessary.

b.  The limits of channel excavation at structures other than aqueducts underpasses and siphons passing under the channel cerned shall be a vertical surface erected along the upst limits of pitching related to the structure. At aqueduct cts etc. the channel concerned shall be deemed to be excav. its normal cross-section through the site before excavation structure is started.

The rates of excavation shall cover the risks of meeting and excavation through any material and shall include for excavat to any depth, trimming the side slopes and bed, hauling the vated spoil and disposing in embankments, forming and trimmir embankments to the dimensions shown on the drawings or such d dimensions as the Engineer may order compacting embankments

any part of the excavation which is required to deepen or under the bed/flotation of the section of the drain or canal and which is ordered by the Engineer before the excavation to the cross-section is completed will unless otherwise specified be measured and paid for under the channel excavation items. The rates inserted against the excavation items shall be deemed to include, where necessary for re-excavation, hauling to a new position, reforming compacting and trimming the embankments already placed so as to maintain the berm widths shown on the drawings or ordered be the Engineer.

## 2.4.9 DEFINITION OF DEPTH:

Where separate items are provided in the Bill of Quantities for excavation for drains or canals between given depth intervals, the depth shall be defined as the average depth from ground level to bed level of channel on the centre line between one kilometer chainage point and the next, as determined from cross-sections taken as specified in Clause 2.4.8.

## 2.4.10 TOLERANCE OF EARTHWORK:

Tolerances of 0.10m on levels and dimensions within the local spot will be permitted, provided the cross sectional area of channels, bed width, bank top width and bank top level, shall not be less than those shown on the Drawings, or ordered by the Engineer, and in any case negative slope in the bed level shall not be allowed. Centre-lines of channels, embankments, and roads shall be accurately located, and shall not be affected by tolerances on levels and dimensions. All surfaces shall be finished off neatly and evenly.

## 2.4.11 EMBANKMENTS:

Embankments for drains, canals, water channels and roads shall unless otherwise specified be formed with spoil excavated from the drains and canals if available. Where materials for embankments additional to that available from excavation of the drains and canals is required or where otherwise specified it shall be obtained from borrow areas in accordance with Clause 2.4.5.

PROJECT
East
61, Vitosha Blvd, Sofia
tel.: 87-59-02, tlx. 22021
Bulgaria

The top width, the berm width and the height of the embankments, measured from the ground level shall not be less than those shown on the Drawings. They shall be so aligned and graded on the top surface, as to permit safe and easy passage of the vehicles at a speed of forty kilometers per hour, and shall be maintained in this condition till the end of the maintenance period. Embankments, formed by heavy machinery will not normally require to be compacted. The embankments shall be formed as subsequently described or in such other manner as may be approved by the Engineer. The fill shall be spread in approximately levelled layers of 25 cm. thickness by adequate earthmoving equipment, weighing, not less than 15 tonnes, so that each layer receives at least one pass of the tracked vehicle.

COMPACTION OF FILL:

If ordered by the Engineer, the material proposed for the compacted fill, shall be tested on site in accordance with B.S. 1377 or any other similar or Iraqi standards to determine its characteristics and suitability.

Compacted fill shall consist of approved material spread and compacted in layers, approximately horizontal and of uniform thickness with a slight outward slope and of compacted depth not exceeding 0.15 metres. The moisture content of the soil shall be carefully controlled by natural drying or wetting with a fine spray. Compaction shall be carried out by mechanical rollers, rammers, vibrators or approved plants, so as to produce the minimum dry density specified or ordered by the Engineer in writing, expressed as a percentage of the maximum dry density determined in accordance with B.S. 1377. Test. 10 or any other similar or Iraqi standards. Payment for compaction of fill shall be made according to the dimensions shown on the Drawings or ordered by the Engineer and no payment will be made for any additional fill required for consolidation and settlement allowances. The rates for compaction shall include expenses for selection of suitable material, scarifying the surface of ground and for carrying out of dry density and moisture content determinations in accordance with the approved standards as often as required by the Engineer during the course of the work.

— 16 —

## 2.4.13 GAPS IN EMBANKMENTS.

Where necessary at the site of structures, and where ordered by the Engineer, the Contractor shall leave gaps in the embankments. The cost of all additional work involved in forming these gaps and establishment of the embankments on completion, if necessary, including the formation of ramps for temporary or permanent access, shall be included in the rates for the excavation.

## 2.4.14 REMODELLING OF EXISTING DRAINS AND CANALS

Where existing canals and drains are to be remodelled, the earthwork which is required to be done, unless otherwise specified, shall be paid for under a separate item of the Bill of Quantities. The rates for earthwork of remodelling, shall include the deepening and widening of the canals or drains, and or filling                 .1 . with compaction to the designed section, hauling and placing the earth to a new position on the embankments and trimming, so as to maintain the berm width shown on the Drawings or as ordered by the Engineer. The rate should also cover the required scarifying in accordance with  the clause 2.4.20. The earthwork of remodelling shall be measured in accordance with the Clause 2.4.8. When the earthwork for remodelling is to be carried out under water, the rates shall include all necessary dewatering works. The Contractor shall be responsible to maintain other parts of existing irrigation or drainage system, which may be affected by his operation, in a condition, not less satisfactory than they where prior to the commencement of works, and shall maintain the normal flow therein at all times, except when written permission to vary the flows has been obtained from the Engineer. The cost of these temporary works shall be included in the rate of the earthwork for remodelling.

## 2.4.15 OVER EXCAVATION.

Should any drain or canal be excavated or any embankment or berm formed, in excess of the specified dimensions, the Contractor shall establish at his own cost the specified, or such other section as the Engineer may order without additional payment to him. In any case, the Contractor shall not be paid for any work in excess of the specified cross-section.

- 17 -

### 4.16  TRANSITIONS:

At all changes of cross sections, transitions shall be formed in
the bed and the side slopes of the channel and berms, such that
the horizontal or vertical change in direction shall not be less
than a deviation of 1 in 10. All additional work involved in
these transitions, shall be included in rates.

### 4.17  EXTENT OF EXCAVATION:

The extent of excavations shall be the minimum practicable in the
opinion of the Engineer for the construction of the works. The
construction of open channels and pipelines shall at any one
time be limited to length previously approved by the Engineer in
writing. Except with the written approval of the Engineer, work
on each approval length shall be completed to the satisfaction of
the Engineer before work on any new length is commenced.

### 4.18  EXCAVATION OF UNSOUND MATERIAL:

If any unsound material occurs in foundation, the Contractor shall
remove it and dispose it of to the satisfaction of the Engineer.
Unless otherwise specified or ordered by the Engineer, the Contra-
ctor shall fill the voids in the foundations so formed with conc-
rete Class D for structures, with embankment fill material for
embankments and with approved granular material for roads, pipe-
lines and embankment pitching. If the Contractor encounters any
material which in his opinion may be unsound he shall immediately
inform the Engineer who will instruct the Contractor in writing
as to whether or not the said material shall be treated as unsound.
The cost of dealing with the unsound material shall be born by the
Contractor if in the opinion of the Engineer the unsoundness is
due to failure of the Contractor to comply with the specification
including keeping the excavation free from water.

صلاح الاراضي
خوري قطيفي

Bulgaria

The Contractor shall make due allowance for consolidation and settlement of embankments whether compaction is specified or not, such that the levels, widths and dimensions of the finished surface at the end of the period of Maintenance shall not be less than the levels and dimensions shown on the Drawings. The cost of all such allowances shall be included in the rates.

## 4.20 SCARIFYING GROUND SURFACE:

Where fill in embankments is to be compacted the surface of the ground under the embankment shall be scarified to a depth of 0.15 meter or a depth free from the plant roots so as to provide a satisfactory bond between the ground and the fill. The moisture content of the scarified surface shall be carefully, controlled either by natural drying or by wetting with a fine spray.  If for any reason, progress in compacting the fill is interrupted for unreasonable time, the surface of the fill shall be scarified before compaction continues.  All costs in connection with this work shall be included in the rates.

- 17 -

## FIELD DRAINS (LATERALS):

The field drains to be constructed under this contract shall consist of covered pipes (clay, cement or plastic) with a filter material. The ground water passes to the pipes through joints or perforations. Field drains discharge their water to open or closed conduits which consists normally of collector drains, branch drains, and main drains.

The price of this item shall include the supply of materials and execution of field covered drains which comprises the alignment and excavation of trenches, taking into consideration the eventual need for dewatering and shuttering, laying the pipes and filter material, backfilling, making ridges flushing and maintenance of the system, and the outlet structure according to the Drawings, Specifications, and as assigned by the Engineer.

The pipes shall be laid in a trench of at least 30 cm width when laid mechanically and 50 cm if manually. The Contractor shall be responsible for the correct alignment of the laterals according to the Drawings, where the spacing between laterals is designated for each collector. Unless otherwise described, laterals shall be straight and perpendicular to their respective serving collectors.

c.   The type and number of trenchers, intended to be used, shall be mentioned in the offer along with all the relevant features of the machine, viz, alignment and depth control implement, engine power, type of transmission, maximum possible depth of trench, ground pressure, and width of trench.

The trench shall be cut to the designed depth shown in the Drawings and as assigned by the Engineer in special cases, starting from the collector's connection point and rising with a slope of at least 0.15% to the higher end which shall be at minimum depth of 1.8 m / Maximum alignment tolerance is 2 cm, from the ground, if not specified. at any point provided that negative slope is not created. In case the designated depth is exceeded, a layer of fine gravel shall be provided to bring the bottom of the trench to the required level. Spoil shall not be used for this purpose. The bottom of the trench shall be firm, and clean from slurry or any loose soil. Pipes shall be securely positioned to avoid displacement before

and during backfilling of the trench. A ... ... ... ... ... ... ... ... ... ... to provide the required bedding for the pipe . If labourers have to work in the trench, they shall not ... ... ... to puddle its bed with their feet, especially in the case of h- wet soils.

e. The allowable departure from grade shall not exceed 3 cm . When departures occur, the rate of return to the established grade shall not exceed 2 percent of the pipe diameter per joint of pipe. The allowable departure from alignment shall not exceed 20 percent of the inside diameter of the drain pipe with a rate of return to the established line not to exceed 5 percent per joint of pipe.

f. It shall not be allowed to work in recently irrigated land or during high water tables as the efficiency of drains is badly affected when the work is carried out while soil is wet. The plan of ... ... shall be flexible to be adaptable to such conditions so that the work can be shifted to places where favourable conditions prevail.

g. Clay and cement pipes shall be laid with minimum gap width, not more than 3 mms. Pipes of approved quality shall be laid under precise control to provide the required tight fit. In case the Contractor intends to use plastic pipes, the size of perforation and their distribution shall be mentioned in the Tender and approved by the Employer.

h. Gravel filter of approved graded fine clean quality shall be laid around the pipes by a hopper on the machine during the laying of pipes. On the other hand, it shall not be allowed to cover the pipes with filter material before the line has been checked by the Engineer and approved by him. In such case, covering with gravel shall be carried out by a separate operation taking into consideration the safeguard against breakage or displacement of pipes. The thickness of gravel filter shall not be less than 10 cms and according to the draw.

i. Trenches shall be backfilled, over the filter cover, with the excavated spoil up to the ground level. No backfilling shall be allowed in a ditch under water or with too wet soil, especiall in heavy soils. Wet clods of soil shall not be used for back- filling. The fill shall be compacted firmly but not to such an

extent as to render it impervious.  The surplus spoil shall be
left crowned over the centreline of the trench to form ridges
with dimensions not less than 50cm x 50cm for backfill soil
and trench protection.  The Contractor shall also form two ci
ridges, (on both sides of the ridge over the field drain trch
each with a height not less than 35 cm, immediately after the
first operation to be used as leaching borders.

The Contractor shall maintain these ridges throughout the main
enance period, in order to hinder surface water from flowing
directly into the pipes, through the unstabilized backfill soil.
At the end of the maintenance period, and after consolidation of
the fill has taken place, these ridges over the laterals shall
remain as irrigation strips' borders or field plots.

j.  Testing drain lines - A light or sun reflector shall be place
    at the open end of each straight run of drain after `` `
    is in place in the reach under test.  If a clear view of the
    light cannot be seen when viewed from the other end, or a r
    rubber ball or other approved object, having a diameter 7.5
    less than the inside diameter of the drain pipe, shall be flo
    through the drain pipe line.  The Engineer has the right to r
    defective material and work manship or require its correction
    without any extra charge.

k.  The Contract Price shall include the cost of maintenance of th
    executed drains during the maintenance period until the Contrac
    obtains the Maintenance Certificate (Clause 64- Part I).  The
    maintenance work comprises cleaning and flushing of drain pip
    changing defective parts, and the maintenance of ridges so
    to remain always above the ground level to safeguard the
    against surface water flow.

l.  In accordance with Clause 49 - Part I, concerning the
    of works, the Engineer shall test the performance of the
    network executed by the Contractor with respect to its a
    for the purpose it was constructed for.  This implies that
    priate discharge of clear water shall flow out of the pip
    that the water shall not be standing over the pipes in ai
    of it, which indicates a blockage in the lines, or break
    some pipes.

AGRCCC"PLECT
Economic & I      ting
    Organhat n
Gl, Vitosha Blvd., Sofia
ul: 87-59-02, tl     21
    Bulga

- 22 -

If the lateral is more than 250m.s long, there shall be a manhole which is located according to the Drawings. Size of manhole shall be specified in the Drawing.

In case the field drain laid by the contractor has been rejected by the Engineer because of any reason, whatso ever it may be, and a new field drain has to be established, then the old field drain trench shall be properly compacted by, the contractor, to the satisfaction of the Engineer, so as to avoid any settlement afterwards.

**1.3    MATERIALS FOR LAND RECLAMATION PROJECTS (FIELD DRAINS AND PIPE COLLECTORS):**

**1.3.1    CLAY PIPES: (For Field drains)**

a.    The clay pipes shall have an inside diameter of not less than 10 cm.

b.    The length of the pipes shall be 30 cm.

c.    The wall thickness of the pipes shall be between 12 mm and 15 mm.

d.    Minimum crushing strength of the pipe shall be 1190 kg/lineal meter for average of five pipes and 1010 kg/lineal meter for one pipe. The crushing strength of the pipes shall be tested by three points loading, in accordance with the ASTM C-4-59-T Standard Specification.

e.    The pipes shall be manufactured from a well prepared, and well and uniformly thoroughly baked clay.

f.    The pipes shall not have cracks, bubbles or burns.

g.    The dry pipes shall give a clear sound.

h.    The pipes shall be sufficiently round and maximum allowed variation in diameter shall be 3 mm.

i.    The pipes shall be sufficiently straight and the highest allowed curvature measured as a gauge shall be limited to 3 cm.

j.    The water absorption of the pipes, after their remaining in water for 5 hours, shall be at the most 5% of their weight.





- 23 -

## 1.3.2  PLASTIC PIPES:

Field drainage pipes shall conform to the Internatational Organi-
zation for Standardization document Din 1187 (or specified
as approved by the Employer. ) Draft Specification for plastic
pipes and fittings for use in Sub-Soil Drainage, dated July
1973.

Pipes for field drainage shall be perforated and may be either
smooth (rigid) or corrugated. The following pipe diameters shall
be used (or as specified) :-

| Type of Pipe | Nominal External Dia. (mm) |
|---|---|
| Smooth | 75 |
| " | 90 |
| " | 110 |
| Corrugated | 80 |
| " | 100 |
| " | 125 |

or such other diameters as may be approved by the Engineer.
Perforations to admit water shall be provided in accordance
with the standard specifications. The width of perforations
shall be within the Type 1 range (or 0.9-1.2 mm). Unperforated
pipes shall be laid as shown on the Drawings or where ordered
the Engineer.

Field drain outfall / structure shall be / constructed at the outfall of each
field drain into the open collector, main collector or main
drain as shown on the Drawings. Any fill above the pipe
properly compacted in layers not exceeding 0.1 m thick for
length shown in the drawings, to avoid any damage     to
the structure              An alternative arrangement
drain outfall may be submitted to the Engineer for approval.

Joints between perforated pipes of the same or different dia.
shall comply with the Standard Specification. Joints between
of different diameter shall be of a type that presents no ob-
tion to drain cleaning equipment that employs a self intrud-
high pressure pumping working from the outfall.

- 2/ -

if specified

End caps shall be provided at the upper end of each field drain
and vermin excluders if required as per drawings shall be fitted
at each outfall. The vermin excluder shall be securely fastened
but capable of removal for cleaning purposes. The total area of
apertures shall not be less than 90% of the internal cross
section of the end pipe and the maximum dimensions of any
individual apertures shall not be greater than 20 rm.

outfall
The / pipes, mechanical joints, and caps and vermin excluders
shall be constructed of non-corrodible and nondegradeable
materials and shall be approved by the Engineer.

### WORKS INSPECTION:

The contractor shall afford the Engineer or his Representative
full access to inspect the manufacture and testing of all pipes
and shall give the Engineer in writing a minimum fourteen days
notice prior to when the pipes will be ready for inspection and
testing at the manufactures work-shop. The cost of carrying
out the tests shall be included in the rates.

All materials which are likely to deteriorate or be damaged by
exposure to the elements shall be stored in a weatherproof
building and shall not be exposed to direct sunlight. Consign-
ments of each material shall be stored separately and shall be
used in the order in which they are delivered.

The perforated pipe shall be laid within a gravel filter of the
cross section shown on the Drawings. The contractor shall sat-
isfy the Engineer that the method of construction used shall provide
sufficient alternative also so over the winter
that the thickness of filter around the pipe is not less that
0.075 m or as per drawings. The filter material to be used
be of approved gradation.

### 1.3.2 (b)  PIPES LAYING:

Pipes for field drains shall at all stages be handled, loaded,
transported, unloaded and stored on site so that they are care-
protected, shaded from direct sunlight and not damaged. The
equipment used shall be maintained in good repair and the meth-
of drainlaying employed shall be approved by the Engineer.

00032

- 25 -

The Contractor shall obtain from the manufacturer all special
information regarding the handling and laying of their pipes.
The Contractor shall provide the Engineer with three copies
for his use.

Generally field drains will be aligned perpendicular to collec-
tor drains according to Drawings. As the pipes are laid in tren-
ches the fill shall be carefully compacted so that piping of
surface water down through the fill material into the drainage
pipe is prevented. The fill shall also be placed so as to make
due allowance for settlement and be to the satisfaction of the
Engineer. Any subsequent settlement below the level of the
surrounding ground shall be made good by the Contractor upto
the end of the Period of Maintenance and the cost of making good
shall be included in the rates.

Where a field drain passes under a watercourse, an unperforated
pipe of sufficient length is used and the fill of the trench shall
be compacted in layers not exceeding 0.3 m thick for the full
width of the watercourse as shown on the drawings.
At the outfall end of each field drain, any fill shall be compacted
in layers not exceeding 0.3 m thick for a length of  10 meters or as
specified form the end of the pipe.

The backfill shall not be placed until one day after the laying
of the pipe to allow for inspection by the Engineer.

Field drains will be measured by length for each diameter and the
rates entered in the Bill of Quantities shall include for excava-
tion, for supply, jointing and laying of pipes whether perforated
or unperforated, for supply and laying of gravel filter and poly-
thelene sheet where specified, for backfilling, compacting and
leaving the ground surface to the required profile and for dispo-
sal of surplus spoil and for making ridges. The rates shall also
be deemed to include additional excavations and reinstatement of
complete watercourse and drain embankments on the line of the field
drain and for inspection pits. The rates shall include also the
supply and fixing of end caps and vermin excluders, If specified





CONCRETE PIPES:

a. All precast concrete pipes shall be manufactured by an approved process designed to provide a pipe of a dense and homogeneous concrete, possessing a perfectly smooth internal surface.

b. Precast concrete pipes shall be manufactured from sulphate resisting cement of approved quality, and shall be in general conformity with the B.S. 556. The concrete mix used for the manufacture of the pipes shall not be weaker than concrete Class A.S.

c. Pipes up to and including 37.5 cm. diameter shall not be reinforced and shall incorporate spigot and socket type joints.

Pipe above 37.5 cm shall be reinforced, as specified on the drawings and shall have spigot and socket type joints. reinforcement shall be placed midway between the inner and the outer surfaces of the concrete. In socketed pipes the reinforcement shall be extended continuously from the pipe barrel into the socket, the longitudinal bars being cranked as necessary.

d. The pipes shall have thicknesses of not less than that specified in the table hereof. The Contractor may at his own expense provide pipes with greater wall thickness.

| Nominal diameter in cm. | 30 | 40 | 45 | 52.5 | 60 | 70 | 75 | 82.5 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|
| Minimum wall thickness in cm. | 5.5 | 6.0 | 6.5 | 7.0 | 7.5 | 8.0 | 8.5 | 9.0 | 10.0 | 10.0 |

e. The pipes shall be free of cracks, cavities and air bubbles.

f. The water absorption of the pipes, after remaining in water for six hours, shall not exceed 8% by weight.

g. The Contractor shall state, when submitting his offer, the name of the pipe manufacturers together with details of manufacturing process.

h. Unless otherwise specified, and shown on the Drawings, the length of the concrete pipes shall be 1.0 m.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Bld., Sofia
tel. 87-09-62, tlx 22021
Bulgaria

- 27. -

3.4. FILTER MATERIAL

a. The perforated pipe shall be laid within a sand and gravel graded
filter of the cross section, shown on the drawings.
The contractor shall satisfy the engineer that the method of
construction used, i.e. trench or any other method, shall provi
sufficient allowance over the minimum size of trench or bore t.
the thickness of filter around the pipes is in no case less than
0.075 m. or as specified in the drawing.

b. The particle size analysis curve of the filter material shall b
smooth curve and fall within the maximum and minimum limits of th
lowing s gradation, according to the ASTM Specifications for th
gradation for the sand and gravel graded filter shall be as
approved gradation as may be ordered by the Engineer)

| ASTM Seive size or No. | Percentage passing by weight |
|---|---|
| 3/4" (19.1mm) | 100 |
| 3/8" (9.52mm) | 75-100 |
| No.4 (4.76mm) | 30-60 |
| No.10(2.0mm) | 10-45 |
| No.20(0.844mm) | 5 -30 |
| No.40(0.42mm) | 0 - 5 |
| No. 200 (0.074mm) | not more than 1 |

However, the contractor should take in consideration that the
sand-gravel gradation may be slightly changed, if further detailed
soil and filter analysis are done. The graded filter material shou/
be clean washed and should be free from soil and deteriorates. (i.
clay, plants, salts gypsum and any other foreign matters),and no:
containing gravels of flaky shape and with natural gradatio..

c. Before any graded gravel is placed and as often as required by t
Engineer, a particle size distribution analysis shall be made of
representative samples of the filter material and of the related
layer to be protected to ensure that it complies with the requir
of (b) above. The cost of these tests shall be included in the
rates offered by the tenderes.

- 28 -

## PIPE COLLECTOR DRAINS:

The pipe collector drains are constructed to carry the water removed by field drains (laterals) into the open drain. The pipes shall be laid in a trench of specified width and according to the designed depth.

The price of this item shall include the supply of materials and the execution which comprises alignment and excavation of trenches, taking into consideration the eventual need for dewatering and shuttering, laying pipes, backfilling, flushing and maintenance of the system and its outlet structure according to the design, drawings, specifications and as assigned by the Engineer.

The trench shall be cut to the designed depth shown in the drawing and as assigned by the Engineer in special cases, starting from the collector outlet and rising with the designed slope. Maximum alignment tolerance is $\pm$ 1/2 cm. at any point. In case the designed depth is exceeded, a layer of gravel shall be provided to bring the bottom of the trench to the required level. Spoil shall not be used for this purpose. The bottom of the trench shall be firm and clean from any loose soil. No negative slope in the trench shall be created

Laying and bedding of the Pipes: the pipes shall be laid according to the designed slope. The material to be used for the bedding of the pipes shall be approved by the Engineer and shall be as specified in the drawings.

The pipes shall be laid in lengths of 1.0 meter or more according to the factory design and as approved by the Engineer. The pipes shall be laid in a secure position to avoid displacement. The junctions between pipes shall be provided as per approved standard specifications or as directed by Engineer may be used with cement concrete cement pipes according to the factory design.

Reinforced concrete pipes shall be used when the collector diameter increases to more than 37.5 cm. The reinforced concrete pipes shall be of approved quality by the Engineer and according to the contract.

AGRO COMPLECT
Enor    at i    arng
...in
Cl,    a Fld., Sofia
tel: t    ...2, tlx. 22021
Bulgaria

- 29 -

g.  Concrete pipes or p.v.c. or plastic pipes of approved quality shall be laid under precise control to provide the required slope. In case the tenderers intend to use p.v.c. or plastic pipes it should be approved by the Employer.

h.  Trenches shall be backfilled over the pipes with the excavated spoil upto the ground level. The backfilling shall be done in successive layers. The first layer shall almost cover the collector pipe with a depth of about 15 cm. Then backfilling shall continue in layers. The fill shall be compacted firmly. The fill spoil shall be left crowned over the collector line to form ridges to be used as leaching borders. The contractor shall maintain these ridges thoroughly during the maintenance period. At the end of the contract period and after consolidation of fill has taken place, these ridges over the collector shall remain as irrigation borders.

i.  In case the collector pipes pass underneath an irrigation ditch, junctions should be completely water tight and shall be provided as per approved standard specification or as directed by the Engineer.

j.  In case the collector pipes pass underneath paved or unpaved road where agriculture tractors may be used, and in general if the width is more than 2 meters, then reinforced concrete pipes with the same diameter of the collector shall be used and shall be laid under concrete base and according to the designed drawings and specifications and as instructed by the Engineer.

k.  All necessary diversion works required to pass water from canals and drains over the pipe collector shall be included in the price of collector pipe construction without any extra cost. The diversion works shall be removed after the collector pipe construction and the Contractor shall insure the crossings, whether a canal or a drain or a road to its original position before construction.

- 3. -

The contract price shall include the cost of maintenance of the executed collector pipes during the contract period until the contractor obtains the maintenance certificate. The maintenance works comprise cleaning and flushing of collector pipe, changing defective parts, and maintenance of ridges.

The contract price of collector pipe construction shall be on the actual length of collector pipe in the field from the centr- line of manholes and upto its end according to the layout in the field.

3.6    MANHOLES:

Manholes are constructed along the lines of collector pipes as according to the Drawings and as specified. The manhol .. shall be covered with reinforced concrete cover as specified in the Drawings. Provision for opening in the manholes connected to field drains & collector pipes shall be made after which the openings shall be closed tightly with cement mortar mix of ratio 500 kg. cement to one cubic meter of sand. The connection of field drains and collector pipes to the manholes shall be constructed according to the Drawings. The cover of the manhole shall be provided with steel handle of size specified in the drawing.    A marble sign of dimension 20 x 15 x 3 cm. written on it the collector No. and the area shall be sticked over the cover.  The sign shall be put at first inlet and last outlet of the manhole.

3.7    COLLECTORS OUTLETS:

All collectors outlets to the open drains shall be construc- according to the design, Drawings and as instructed by the Eng- neer.

GEOCOMPLECT
....  ....  ....ering
61, .... .... ....., Sofia
tel: 87-99-63, tlx. 22021
Bulgaria

Kamal/12.9.80

- 32 -

PART II — STRUCT



IN STRUCTURE 5

II. QUALITY OF MATERIALS AND STRUCTURES

## QUALITY OF MATERIALS:

All materials, fixtures, fittings and supplies shall be new and unused, of standard first grade quality, and of the best workmanship and finish. All work of assembly and construction shall be done in a neat, first class and work-manlike manner.

Before procurement, the Contractor shall furnish to the Engineer, for his approval, the names of the manufacturers of all equipment and materials, which he intends to use on the works. Samples of materials shall be submitted to the Engineer, for his approval, as required. Equipment, materials, supplies and articles, installed or used on the works, without the approval of the Engineer, shall be liable to subsequent rejection.

## STANDARDS AND CODES OF PRACTICES:

Except where materials and workmanship are not covered by the relevant Iraqi Standard Specifications, and except when otherwise specified, all materials and workmanship shall conform to the requirements of the latest revision or edition (at the time of delivery of tenders) of the relevant British Codes of Practice. Other international equivalent standard Specifications may be substituted for the British Standards or British Standard Codes of Practice, Provided approval for this, is accorded by the Engineer, in writing.

## STANDARDS TO BE AT SITE:

The contractor shall obtain and keep at site at least one copy each of Iraqi Standard Specification, and B.S.C.P.





EXHIBIT C (Part 2 of 5)

- 33 -

other agreement therewith. The standards, shall
at all times, be available for inspection and use by the Engineer.

Representative lists of Iraqi Standard Specifications
and British Standards and Codes of Practice are enclosed vide
Appendix I and Appendix II, to the Specifications.

II.2 TECHNICAL SPECIFICATIONS FOR STRUCTURES

2.1 PREPARATION OF SITE AND SETTING OUT STRUCTURES

a. The Contractor shall be completely and entirely
responsible for the horizontal and vertical setting
out, the levels, and correctness of all the dimensions
of permanent works. The Contractor shall mend all faults
and imperfections which occur during the execution of
the works at his own expense, as soon as notified in
writing to do so, by the Engineer.

b. No payment shall be made to the Contractor for works
mentioned in the afore-said paragraph (a) of this
Clause, and their cost shall be included in the
Contractor's tendered rates.

2.2 STRUCTURAL STEEL WORK

The steel work shall be fabricated accurately to the
sections and dimensions and shapes indicated on the
Drawings.

They shall receive adequate coatings of a paint
appropriate to their conditions of final location and
utilisation.

2.3 HYDRAULIC EQUIPMENT

a. All hydraulic equipment be installed with the greatest care to the exact levels shown on the



00041

particular attention to the satisfactory preparation of waterized joints, at the points of contact of the gates and the masonry.

b. Hydraulic equipment shall be tested under the direction and in accordance with the instructions of the Engineer. If any equipment fails to give satisfactory results, the Contractor shall immediately carry out at his own cost, any work which may be necessary to rectify the defects, such as rebuilding masonry, resetting and grouting the equipment, repairing watertight joints etc. Until satisfactory test results are obtained.

c. Inspection.

Any equipment which is shop manufactured by a manufacturer shall be delivered to site fully painted. After installation the Contractor shall touch up paint work, as necessary, and if required, shall apply a new coat of paint, in accordance with the Engineer's instructions, all at the expense of the Contractor.

d. Unless otherwise permitted by the Engineer, all hydraulic equipment shall be erected completed and set to work at the site, by or under the technical assistance of a specialist or specialists from the manufacturer.

2.4 EXCAVATION FOR STRUCTURE FOUNDATIONS

a. The contractor shall excavate the foundations for structures and also excavate trenches in any type and composition of soil in accordance with the dimensions and levels shown on the relevant Drawings, and as directed by the Engineer.

b. The Contractor shall take necessary measures for dewatering foundations from ground water which might be encountered during excavations such that the surface on which the concrete is to be laid is rendered perfectly dry. The Employer is not responsible to stop the flow of water in canals, unless it is agreed upon in the work plan.

c. Excavation shall be levelled, cleaned and dried. The contractor shall take necessary precautions against the slips and fall of any materials in the excavations. The Contractor shall fill the Engineer, when excavations are completed, to enable him inspect and check the same, before placing of the concrete laying of filter layer.

d. The Engineer is not responsible for any excess excavations carried out by the Contractor, over and above those required and those shown on the relevant drawings, and the Contractor shall fill such excess excavations by the same concrete and filters as specified for use in the foundations and trenches at his own expense. In no case shall it be permitted to fill the excess excavation with soil.

e. After completion of construction, the Contractor shall fill the spaces behind the structures and buildings with selected materials, free of any vegetation or foreign matter, and such back fill shall be laid in layers not exceeding 25 cm. in thickness, and each layer shall be properly compacted with spraying of water, to render it perfectly cohesive. The excavated material may be used in backfilling if it is clean and approved by the Engineer.



f. The rate offered by the contractor for earth work (excavation and backfilling) shall include other related work such as controlling quick-sand, dewatering, protection of sides from slips and falls, trimming of side slopes and various other works which are required and shown on the Drawings.

2.5   CONCRETE MIX:

a. The proportions of materials to be used for the various mixes of concrete are given in Table 1, appended herewith.

b. Mixing of the concrete shall be well controlled by the Engineer, and the proportions of various ingredients. and the water-cement ratio specified vide Table (I) appended, shall be adopted for the various mixes of concrete, but these can be modified by the Engineer, if warranted by site conditions, to such a degree that guarantees obtaining a properly dense concrete.

c. Mechanical mixers shall be used for the concrete work and the dry mix shall be thoroughly mixed inside the mixer for an appropriate time to ensure uniform distribution of the materials before adding water to complete the mixing perfectly.

d. Various concrete mixes shall be used, to conform with those specified in the Bill of Quantities, and Drawings, and the proportions of ingredients and water cement ratio in the various mixes shall be as specified vide paragraph (a) above.

COMPLECT

Sofia

22021

Bulgaria

- 37 -

Gauging of materials shall be carried out in weighin[...]
supplied by the Contractor having dimensions approv[...]
by the Engineer.

## 2.6  MIXING AND TESTING

The classes of concrete to be used in the concrete work[...]
and the limitations on the constituent materials for e[...]
class shall be, as per the following table.

| Class | Type of Cement | Nominal Size of graded aggregate (in.) | Minimum weight of cement per cu.m. of concrete (Kg) | Maximum weight of water per kg of cement (by) | |
|-------|----------------|------------|------------|------------|-----|
| A | Ordinary Portland Cement | ¾–3/16 | 370 | 0.5? | Wea[...] con[...] |
| B | " | 1½ – 3/16 | 330 | 0.5? | " |
| C | " | 1½ – 3/16 | 290 | 0.5? | [...] |
| D | " | 1½ – 3/16 | 200 | – | Bli[...] Gr[...] |
| As | Sulphate Resisting Cement | ¾ – 3/16 | 300 | 0.50 | Nu[...] Wa[...] Conc[...] |
| Bs | Sulphate Resisting cement | 1½ – 3/16" | 370 | 0.47 | " |



TABLE (12)

SHOWING PROPORTIONS OF MATERIALS

TO BE USED FOR VARIOUS KINDS OF CONCRETE

| Concrete mix | Quantity of materials contained in one cubic meter of concrete | | | Water | | Quantity of material contained in concrete per bag of cement | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Gravel m³ | Sand m³ | Cement Kg | Water cement Ratio | Quantity of water in liters | Gravel m³ | Sand m³ | Cement Kg | Water liters |
| 1: :8 | 0.80 | 0.40 | 150. | 0.70-0.80 | 110-120 | 0.27 | 0.13 | 50 | 37-40 |
| 1: :6 | 0.80 | 0.40 | 200. | 0.60-0.70 | 120-140 | 0.20 | 0.10 | 50 | 30-35 |
| 1:2:4 | 0.80 | 0.40 | 300 | 0.50-0.57 | 150-170 | 0.13 | 0.07 | 50 | 26-28 |

AGROCOMPLECT
Economic & Engineering
Corporation
Sofia, Bulgaria
Bulgaria

00046

- 39 -

## 2.7 SULPHATE RESISTING CEMENT

Concrete below ground may be subject to attack from sulphates, and where shown on the Drawings, or ordered by the Engineer, such concrete made from sulphate resisting cement shall be used. The designations of the concrete mixes to be used in such cases are classes AS and BS as specified in clause 2.6

## 2.8 PROPORTIONS OF MATERIALS

The proportion of cement, fine and coarse aggregates and water, proposed to be used in the works, for each class of concrete, shall be approved by the Engineer, as result of satisfactory preliminary tests made in accordance with clause 2.9.

## 2.9 TRIAL MIXES AND PRELIMINARY CUBE TRIALS

The Contractor shall prepare trial mixes having workability, strength and surface finish as criteria, to satisfy the the Engineer regarding these qualities. The trial mixes shall be made and compacted in the presence of the Engineer, using the same type of plant and equipment as will be used for the works.

Trial mixes shall be made for concrete classes A, B, C, AS and BS, and from each trial mix preliminary 6 in. test cubes shall be made in sets of six, three for test at 7 days and three for test at 28 days. The preliminary cube shall be made, cured and tested in accordance with B.S. 1881, "Methods of Testing Concrete". They shall be tested in a nominated laboratory and the certified copies of all the shall be submitted to the Engineer.

The appropriate strength requirement shall be satisfied if none of the 20 days strengths of three preliminary test cubes is below the cube strength specified below or if the average strength is not less than the specified cube strength and the difference between the greatest and least strengths is not more than 20 per cent of the average.

| Concrete Class | 20 days cube strength KG/sq.cm. |
|---|---|
| A | 350 |
| B | 350 |
| C | 350 |
| AS | 380 |
| BS | 400 |

A trial mix shall be acceptable with respect to strength when three sets of three preliminary test cubes (tested at 20 days) made from different trial batches of concrete satisfy the requirements of this clause. From the same mix as that from which the preliminaly test cubes are made, the consistency of the concrete shall be determined by the compacting factor test in accordance with B.S. 1881 or other method approved by the Engineer. When the compacting factor test is used, the compacting factor for all classes of concrete shall not exceed 0.95. The remainder of the mix shall be cast in a wooden mould and compacted. After 6 hours, the sides of the mould shall struck and the surface examined in order to satisfy the Engineer that an acceptable surface can be obtained with the mix.

When a proposed mix has been approved, no variation shall be made in the mix proportions or in the type, size, grading, zone or source of any of the constituents, without the consent of the Engineer, who may require further trial mixes to be made. Until the mix design has been approved by the Engineer, no concrete of the relevant class shall be placed in the works. Where the Contractor intends to purchase factory made precast concrete unit, trial mixes may be dispensed with, provided that evidence is furnished to the satisfaction of the Engineer, that the factory regularly produces concrete which complies with the specifications. The evidence shall include details of mix proportions, water cement ratio, workability and strengths obtained at 28 days.

### WORKS CUBE TESTS

During the course of execution of the works, and at such time as the Engineer may direct, 6-inch works test cubes of concrete class A/B/C, AS and BS shall be made at site and tested at the nominated laboratory in accordance with B.S.C. P 114.

The works test cubes shall attain minimum compressive strengths at 28 days as follows :

| Concrete | Compressive strength Kg/Sq. cm |
|----------|-------------------------------|
| A        | 230                           |
| B        | 230                           |
| C        | 230                           |
| AS       | 250                           |
| BS       | 270                           |

AGROCOMPLECT
...
... Sofia
tel: ... tlx. 22021
Bulgaria

- 42 -

If the cubes fail to attain the minimum compressive strength specified when the concrete which they represent shall be cut out, removed and replaced with concrete complying with the specifications to the satisfaction of the Engineer. No extra payment shall be made to the contractor on this account. The cost of sampling, making and curing works, test cubes, together with the provision of cube moulds, all other necessary equipment and apparatus and the packing and transport to a nominated laboratory shall be included in the tendered rates.

## PLAIN CONCRETE WORK:

a. Place of works shall be dry. The place where concrete is to be cast shall be dry and the contractor shall pump the water if present in such place. It is not permitted to cast concrete in mud, flowing or stagnant water. All concreting shall be as per directions of the Engineer.

b. After mixing, the concrete shall be transported to work site, and deposited in place in accordance with the instructions of the Engineer, in order to produce a water-tight concrete of maximum density and strength free of any cracks or honey combing. At the end of each day's work, the concrete surface shall be finished, stepped roughened, and shall be well chipped and cleaned using stiff wire brush, before its connection with the next day's casting.

c. Concrete shall not be thrown or dropped from a height exceeding one and a half meters and it shall be ensured that no air bubbles are contained inside the concrete.

GROCOMPLECT

61, ........ Sofia
tel.: 6........, tlx, 22021
Bulgaria

- 43 -

d. The Contractor shall take necessary precautions to
protect the new cast concrete, so as not to disturb or
damage it during its setting.

REINFORCED CONCRETE WORK:

a. Concrete used in reinforced concrete shall be of
Class - A -.

b. Reinforced concrete shall be mixed in accordance with
the requirements stated for plain concrete. The Contractor
shall supply, bend and fix the reinforcement, at
requisite places as indicated in the Drawings.

c. Reinforcement steel shall be clean, free from paint
and loose rust, and to achieve this, it shall be cleaned
with a stiff wire brush. Reinforcement steel shall be
bent cold to the shapes and dimensions shown on the
Drawings.

d. Lapped bar or steel reinforcement shall be in one piece
and cut pieces shall be avoided, as much as possible,
No welding shall be permitted and if lapping is required
the length of lap joints shall be (30) times the dia-
meter of the lapped bar, measured from the straight
sections. The ends shall be hooked and tied together
firmly with steel wire, If the reinforcement is mesh
then the lapped length between the two pieces shall
not be less than 15 cm.

e. Concreting shall not be allowed to start, unless the
Engineer has checked the reinforcement, scaffolding,
centering and shuttering, and unless the Engineer
accords his permission in writing. Concrete shall be
placed immediately after mixing, and all concrete which
starts setting before its placement shall be rejected.

GROCONPLECT
Economic & ... ...ing
Cra ...
61, VI... ...ofia
tel.: 87-59-62, ... 22021
Bulgaria

f. Concrete shall be placed as directed by the Engineer, and shall be well compacted by mechanical vibrator and as directed by the Engineer, until all corners are filled perfectly. Concrete shall be free of holes, air bubbles, and it shall be laid as per direction of the Engineer.

g. All precautions shall be taken to prevent changing the location of lapped bars or wire mesh used in reinforcement, during vibrating or compacting the concrete.

As far as possible, concrete shall be placed in one casting, and if this is not possible, the Engineer shall decide the location of construction joints. While placing new concrete at a construction joint, one previously placed and hardened concrete, the surface of hardened concrete shall be roughened and covered with a suitable layer of cement mortar, before placing of new concrete.

Concrete shall be protected from rain and sun until it has set and shall be kept wet for a period of not less than seven days from the casting date, until it attains its strength.

h. Concreting will not be permitted during heavy rain or dust storms or when the air temperature falls below 2 $^{0}$C, or rises above 43 $^{0}$C, when the air temperature in the shade exceeds 30 $^{0}$C, concreting will only be permitted if approved by the

- 45 -

Engineer and other special precautions have been taken to
prevent early setting of the concrete, such as keeping
the aggregates and shutters continuously sprayed with
water, and erection of temporary sun shades over the
working area.  This shall apply to casting of plain
concrete, as well.

i.   The contractor shall supply, bend and fix the reinforcement
bars in the required places after cleaning in accordance
with the dimensions shown on the related drawings.

j.   Longitudinal and cross bars shall be firmly tied together
with steel wire in such a manner and at such intervals
as to support the bars adequately.

k.   If the Engineer finds, after removal of shutters, that
cracks and holes are present in the finished concrete,
then  he  shall request the contractor to cut out the
defective parts and recast them, in an approved manner
without extra charges.

l.   The rates of reinforced concrete shall include all
reinforceing steel bars of shapes, sizes, and lengths
as shown on Drawings, together with steel tying wire,
shutters and other requirements.





a. The contractor shall supply the shutters for all works in which ... of concrete (such as casting plain and reinforced concrete, and jack arching with brick and cement mortar, and other works).

b. The Contractor shall supply shutters of steel or timber of firm construction, such that their dimensions conform with the contract Drawings of related works. The shutters shall be of sound construction free from cracks or holes, and the joints in shuttering shall be so made, as to prevent leakage of material from the concrete. The inside faces of shutters shall be fine, clean and free from dirt.

c. Shutters shall be supported on suitable struts and bearings. The struts and bearings shall not be removed unless approved by the Engineer in writing, and the removal of shuttering shall be only under skilled supervision and in such manner as will not damage the concrete or building.

d. The cost of shutters shall be included in the rates offered by the contractor for works which require shutters for its construction.

e. The contractor shall submit to the Employer the design and details of shuttering, including the struts and bearings, for approval. Shuttering shall not be erected, until the drawings have been approved by the Engineer, but such approval shall not relieve the contractor from his responsibility of carrying out the work properly.

AGROCOMPLECT
Engineering
...
..., Sofia
..., 2021
Bulgaria

- 47 -

## CURING OF CONCRETE:

All concrete surfaces which are exposed to the air either immediately after casting, or after removal of shutters shall be completely covered by a damp thick hessian sheet, wet sand, straw, or similar approved material, as soon as the surface is finished or the shutters removed. There after curing shall be effected by a continuous even spray of water applied to the hessian covering such that the concrete casting is kept fully saturated.

Curing shall continue until a minimum period of 7 days after casting of the concrete has elapsed.

The specification for curing of concrete mentioned above apply to concrete blocks, masonary work with brick in cement and sand mortar, jack arching and pointing with cement and sand mortar.

## PROPORTIONS OF INGREDIENTS IN CEMENT MORTAR:

a. The proportions of materials to be used for the various mixes of cement mortar with sand are tabulated below:

| Cement Mortar Mix. | Quantity of materials in various mixes of mortar | | |
|---|---|---|---|
| | Cement (Kg) | Sand (cu.m) | Water (Litres) |
| 1: 2 | 8 | 0.01 | 2.3 |
| 1: 3 | 5 | 0.01 | 2.3 |
| 1: 4 | 4 | 0.01 | 2.3 |

00055

• 45 •

Sand shall be gauged in special boxes having a volume of 0.01 m³, with internal dimensions of 20 x 20 x 25 cm.

The gauging boxes shall be supplied by the Contractor, at his own expense

Mixing of cement mortar shall be carried out on new galvanised steel sheets or in chambers built with brick and cement, with cement rendering of 1: 10 mix. Before mixing commences, the chambers shall be cleaned and saturated with water. It is preferable to use a mixer.

d. Sand and cement shall be mixed thoroughly and turned over at least 3 times before water is added, and three times after addition of water (For manual mixing)

e. If the Engineer finds that the amount of water needed for the cement mortar is more or less than required, then he is entitled to change this amount to such an extent, in order to obtain a good mortar.

f. Unless other wise specified by the Engineer, it is not permitted to use mortar, after a lapse of more than half an hour since the time, addition of water to the mix was started.

g. When the air temperature in the shade exceeds 30°C, mixing of cement mortar shall be carried out in temporary shades erected over the mixing platform, as directed by Engineer.

## BRICK - WORK WITH CEMENT MORTAR:

a. Brickwork in cement mortar shall be carried out in accordance with the proportions specified in the Drawings related to the work.

b. Unless otherwise specified, brickwork shall be laid in English Bond.

c. It shall not be permitted to use broken brickwork unless agreed by the Engineer, in special necessary cases for closure, and to prevent formation of heading joints.

d. All courses of brickwork both in longitudinal and transverse directions, shall be perfectly horizontal and level, unless otherwise specified in the drawings.

e. All bricks before use in brickwork, shall be soaked in clear water for at least three hours, and the contractor shall provide suitable tanks for this purpose.

f. If any portion of wall is to be made in round edges, then the contractor shall work on the bricks and shape them up to fit in to the curves and dimensions of this part of brick-work and to suit curvature shown on the drawings and in accordance with the dimensions shown therein.

g. The joints shall not generally be more than 0.6 cm. in the beds and 1.0cm. at the ends, or such other dimensions as may be agreed by the Engineer, and the whole joint shall be completely fitted with mortar.

AGROCOMPLECT
Economic & Engineering
Corporation
1, Vitosha Blvd., Sofia
W: 6..... .lx. 22021
Bulgaria

- 51 -

shown on the drawings, and not less than 20 cm.
In length or width, ... the un le small be laid to
a true and even surface, on a bed of gravel of the
thickness specified. After the pitching is completed,
the external face shall be pointed with cement mortar of
1: 2 mix, unless otherwise specified by the Engineer.

## STONE PITCHING IN CEMENT MORTAR:

The work shall be carried out as described for dry
pitching (vide 1.2.7.17) except that the stone shall be
bedded and jointed in cement mortar of 1: 3 mix, unless
otherwise specified by the Engineer. The Joints in cement
mortar shall be so made that no voids remain in the comp-
leted pitching, and the external faces of the pitching
shall be levelled, such that they become level as shown
on the Drawings. After the pitching is completed, the
external faces shall be pointed in cement and sand mortar
of 1: 2 mix unless other wise specified by the Engineer.

## BRICK PITCHING IN CEMENT MORTAR:

The work shall be carried out in accordance with the
dimensions shown on the Drawings. Before use, the bricks
shall be washed and soaked for at least three hours.
Unless otherwise specified by the Engineer, the cement
sand mortar shall be of 1: 3 mix. The exposed faces of
pitching shall be levelled during construction, such that
they are level, as shown on the Drawings. After the
pitching is completed, the external faces shall be pointed
in cement - sand mortar of 1: 2 mix, unless otherwise
specified by the Engineer.

AGROCOMPLECT
Economic ... ... ering
C ... n
Cl. Vito ... ... Sofia
tel: 6 ... Tx. 22021
Bulgaria

- 52 -

7.20    GATES:

The work to be carried out under this item shall cover fabrication, supply and delivery to site of steel gates. complete as per design, including accessories, control equipment, staunching arrangements, nuts and bolts etc. and painting protective coating as per approval of the Engineer, including the application of last coat of paint to the parts not embedded in concrete after assembly and concreting.

The contractor shall supply steel gates and transport them to site of works, and install them lete with grouting and final stage concreting installation of gates shall be carried out while carrying out brick-work or concrete work opening shall be permitted in masonry or conc later stage, for this purpose.

The contractor shall bear all costs including scaffolding, if necessary any supply, equipment and shop coats (including electricity water, welding and man power), adjusting and testing, and all contingencies in connection with complete installation of the gates and placing them in operating order.

53

**11.)    MATERIALS FOR STRUCTURES:**

The Contractor shall use the building materials in accordance with the following specifications in all construction work included in this contract.

**3.1    CEMENT:**

Ordinary Portland cement shall comply in all respects with the requirements of B.S. 12.

Sulphate resisting cement shall comply in all respects with the requirements of B.S. 4027.

The contractor shall submit to the Engineer without charge test certificates relating to each consignment of cement. Each certificate shall show that a sample of the consignment has been tested by the manufacturer or by an approved laboratory and that it complies in all respects with the requirements of the Specifications. Cement shall be delivered to the site in properly marked, sound and sealed bags, or other approved container unless written approval from the Employer is obtained for handling of cement in bulk.

Cement shall be delivered in quantities sufficient to ensure the proper progress of works, and the quantity to be stored at site shall be as per requirements of the Engineer. All cement shall be stored in a weather proof and reasonably airtight building provided for that purpose. The floors of the building shall be raised above the ground level to prevent the absorption of moisture. Cement from partly filled or unsealed bags shall not be used.

- 54 -

Notwithstanding the receipt of the test certificate, the Engineer may reject any cement as a result of further tests. The Engineer may also reject cement which has deteriorated, owing to in-adequate protection. The contractor shall remove all rejected cement from the site without delay.

3.2     FINE AND COARSE AGGREGATES:

Fine and coarse aggregates for concrete shall be obtained from sources approved by the Engineer, and shall comply with the requirements of B.S. 882.

Fine aggregate shall consist of natural sand, unless otherwise specified.

Aggregates shall contain no impurities in excess of the limits laid down in B.S. 882 nor shall they contain any salts or other chemicals, or impurities to a degree which may effect the setting time, strength, durability, quality or appearance of concrete, or the strength or durability of embedded steel reinforcement.

In case, the aggregates fail to comply with the specified purity requirements, in the opinion of the Engineer, he will order all aggregates to be washed before incorporation in the works. When washing of aggregates is done, it shall be done by using water of the Specification laid down vide clauses 3.3 of the specification, and by using methods and plant approved in advance by the Engineer and all costs arising there-from shall be borne by the Contractor.

When tested, the grading of fine aggregates shall be within the limits given by Zone I, Zone II or Zone III of Table 2 of B.S. 882. Fine aggregates within the limits of grading Zone 4 shall not be incorporated in the work.

- 55 -

For achieving the gradings specified above, it may be necessary to combine two or more fine aggregates, or remove some fraction by hydraulic classification.

The grading of coarse aggregates shall be within the limits given in Table I of D.S. 002, and the contractor shall, if directed by the Engineer, obtain the specified grading by combining single sized aggregates, in such proportions as to give the specified grading.

Each size of fine and coarse aggregates shall be stored separately and covered with a hard and clean surface, which shall be self draining and protected from contamination by earth or other deleterious matter.

The contractor shall submit to the Engineer samples of fine and coarse aggregate proposed for use on the works.  Sampling shall be carried out in accordance with the methods described in D.S. 812 and the samples shall be tested as set out in D.S. 812 or as the Engineer may direct, by the contractor in presence of the Engineer.

..   After the Engineer has accorded approval for any aggregate a sample of such approved aggregate, weighing  at least 50 kg. shall be retained by the Engineer, as a standard, for the purpose of comparison with all future samples.

During the coarse of execution; the aggregates, both fine and coarse shall be tested at site as often as required by the Engineer, and as per his directions.   Tests shall be carried out in respect of particle size, silt content by field testing test, moisture content, organic impurities content, soluble sulphate provisions in accordance with the relevant /of D.S. 812-51 and D.S. 1377-d

Limitations on the nominal sizes of graded aggregates (in for each class of concrete shall be as given in the Table vide clause 2.6 of the specifications.

~ 50 ~

The sand shall pass through sieve having 25 opening per square cm.

**3.3    WATER:**

The water used for all purposes throughout the works shall be free from objectionable quantities of silt, organic matter, alkali, salt or other impurities.

The water used for mixing concrete and mortar shall be from an approved source and shall contain no deleterious matter which significantly affects the setting time or strength or durability of the concrete or which has any effect on the appearance of the hardened concrete by discoloration or efflorescence.

The contractor shall deliver to the Engineer without charge samples of the water proposed for use on the works for the Engineer to carry out such tests, as he may require to confirm its suitability. Samples will be delivered sufficiently in advance of the work for completion of the tests before the water is required for use and at such other times during the course of the contract as the Engineer may direct.

If required by the Engineer, the contractor shall without extra charge treat the water taken from rivers, canals or from any other source to such a degree, as may be necessary in order to render it suitable for mixing concrete and mortar.

**3.4    CLAY BRICKS:**

All bricks shall be new and of best quality of mechanically produced clay bricks having approximately dimensions of (23 x 11 x 7 cm). All bricks shall be of homogeneous size for each work. The colour of bricks shall be brown or yellow.

AGROCOMPLECT
... Engineering
... Sofia
... 1, 22021
Bulgaria

- 57 -

All bricks shall be obtained from manufacturers approved by by Engineer. Bricks shall have sharp edges and shall be well burnt and free of any cracks and shall give a clear ringing sound. Bricks shall be free of any gypsum and salts; unburnt bricks, shall never be permitted to be used on works. Samples of bricks shall be submitted to the Engineer for his approval and any consignment delivered to the works shall confirm to the quality of samples approved by the Engineer. Bricks delivered to the works shall be unloaded by hand, and not tipped.

## MATERIALS FOR SHUTTERING:

Shuttering shall be made from good quality timber free from loose knots, shakes and warped surfaces. Timber for shuttering shall not be less than 3 cm. in thickness, and the board faces in contact with concrete and edges shall be planed smooth, and joints shall be tongued and grooved.

Alternatively, with the approval of the Engineer, shuttering may be made from either (a) metal with accurately aligned and close fitting joints, or (b) plywood or hardboard 0.5 cm in thickness, supported by 1.5 cm close bordered timber or (c) plywood not less than 1.75 cm in thickness. The plywood or hardboard used shall be resistant to deterioration by water, and shall be fixed and jointed in such a manner, as to give a perfectly smooth and even finish to the concrete.

## REINFORCING STEEL:

Steel reinforcement for concrete shall consist of mild steel bars or wire mesh except where otherwise shown. Mild steel bars shall consist of plain round steel bars as specified in B.S. 785, and all bar steel shall have a minimum tensile strength of 28-33 tons per. Sq. in (44-52 Kg. Per sq. mm). Wire mesh for concrete reinforcement shall be in accordance with the requirements of B.S. 1221 part 4.

GROCOMPLECT

58

## LIMESTONE:

Limestones shall be obtained from sources approved
by the Engineer and from quarries designated by him. The
stone shall be of calcium composition, hard, harmonenus
in colour and shall not dissolve in water, shall be free
from cracks and spaces and sand, and shall not crush easily
in water. Its weight shall range from 15 to 60 Kilograms;
any of its dimensions shall not be less than 25 cm. It
shall conform in all respects with the sample present d by
the Contractor and approved by the Engineer.

## GYPSUM:

The Juss used shall be factory product and shall be
of the ordinary type, hot and well burnt. The juss shall
be clean, free of any foreign matter, and the contractor
shall take necessary measure to protect the juss during
transportation and storage, from rains humidity and other
factors which are likely to cause damage to it. If it is
found that the supplied juss or part of it is exposed or
damaged by these factors, and has become cold and inferior,
then such juss shall not be used in the work, and the
Cotractor shall remove it from the site, at his own expenses.

## STEEL:

Steel bars, plates and sections shall be ordered of
sufficient length to enable the Engineer to select samples
from any bar, plate, or section for testing.

The workmanship, details of construction and erection
of the steel and other metal work shall generally comply
with B.S. 153, Parts, 1, 2, and 4 and B.S.4449, parts 4, 5
and 6, except where they are inconsistent with the terms
of this specification. AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd, Sofia
22021

00065

- 59 -

**3.10    TESTING OF METERIALS:**

The Engineer may take one or more samples from
each type of the construction materials before using
in the works, for analysis in any of the official
laboratories. If it is found that all the construc-
tional material or some of it does not conform with the
requirments and Specifications, then the contractor
shall remove it from the site of the works, and replace
it by other approved material, according to the directions
of the Engineer, and in this case the contractor shall
have no right to claim from the Employer any expense
caused by such action, to him. The material requiring
painting shall not be allowed to be painted, until
the Engineer has inspected the same and approved it.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd. Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

Particular Specifications for Concrete Lining Canals
(Machine made Lining)

EARTHWORK:

Embankments for unreinforced concrete lined canals shall be
formed as shown on the drawing or ordered by the Engineer and
in accordance with the specifications of Earthwork at Clause
2.4

The formation to the concrete lining shall be scarified and
sprayed with water if necessary and compacted to bring the
material to a depth of 0.15 m. below formation to a dry density
notless than 95% of the maximum as specified in clause 2.4.12.
Unsuitable material shall be cut out and replaced with selected
material and compacted as specified above.

3. Immediately prior to placing the unreinforced concrete canal
lining, the formation to the concrete lining shall be formed to
the required profile by careful excavation, trimming and
compaction.

4. Earthworks for unreinforced concrete canals will be measured as
stipulated in Bill of Quantities or drawings and in accordance
with clause 2.4 of the specification. Comapction of the formation
to a depth of 0.15 m and compaction of the required embankment
will be measured under related item of the Bill of Quantities and
drawings.

5. PREPARATION OF SUB-GRADE IN PRE-DOMINANTLY SANDY REACHES:

    When canal is in cutting in perdominantly sandy reaches,
compaction of sub-grade shall be done as follows:
    i) Consolidation of the bed shall be done by over-saturating
       the bed by flooding it with water before lining is laid.
    ii) Consolidation of sides shall be done by over cutting
        sub grade by (15) cm and refilling it with granular material
        stabilised with not less than 5% cement (measured by volume)
        and compacted by vibro-compaction.

6. PREPARATION OF SUBGRADE IN REACHES WITH EXPANSIVE SOILS:

    When dry bulk density of natural soil is less than 1.89 $kg/cm^3$
or the soil is of expansive nature any of the practices detailed
below shall be adopted (depending on swelling properties of the
soil encountered).

- 61 -

If the expansive clay is in a thin layer or is in small pockets in an otherwise suitable subgrade, it shall be over-excavated and replaced with a selected granular material, properly compacted to a depth of 40 cm. If swelling of the clay encountered can be controlled by loading the surface with a non-expansive soil or gravel, the expansive clay bed shall be over excavated to dept. about 40 cm and filled to the grade of underside of the lining with good draining material leading away the seepage water from the canal, to be released into the canal again, through suitable pressure relief valves. The excavated surface of expansive clay shall be covered by polythene sheeting to prevent the entry of water into the clay.

PREPARATION OF THE SUB-GRADE IN REACHES WITH HIGH GYPSUM CONTENT:

Gypsum (CaSO4. 2H₂O) if it is in high percentage in the soil and comes in contact with water it dissolves, causing cavity in the soil and damage to the structure, by differ ential settlements.

Effective protective measures shall be taken to prevent gypsum coming in contact with water making the concrete lining water proof, either by plastering the surface or placing a compacted layer of selected clay material under the lining or provide a flexible type membrane of Butyl or P.V.C. etc. Efficient drainage system may also be required to rapidly remove water that gets under the lining. The work shall be carried out as per the drawings and direction to the Resident Engineer.

CONCRETE LINING, GENERAL:

The contractor shall use a construction train for laying the concrete canal lining which shall consist of mechanical trimmer, diploma paver and platforms for lining construction, for cutting and filling contraction joints and for applying curing compound. All lining machinery shall have been built by a reputable manufacturer and evidence of satisfactory operation of similar equipment under similar conditions shall be provided.

While trimmers and slip form pavers are used, a qualified and experienced forman provided by the manufacturer, shall be in attendance. The engineer will not permit construction of lining unless he is satisfied that there is a sufficiency of basic materials (e.g. concrete dump trucks) for the lining to progress without significant interruption.

- 62 -

It shall also be ensured that all the operators and mechanics are trained and experienced in such cements.

Sample lengths of canal lining shall be constructed in advance so that the Engineer may consider and approve the method of working which the contractor proposes to employ and the quality of lining to be obtained.

The previously compacted ground and embankments shall be trimmed within the following tolerances from given alignment

± 20 mm on straight sections.

± 50 mm on tangents and partial curves

± 100 mm on 90° curves.

± 20 mm from established grade.

After trimming, the subgrade shall be kept moist by intermittent fine spraying with water, prior to the lining operation. The period between trimming and lining shall not exceed 72 hours.

10. CONCRETE

The lining shall be with such class of concrete as a to give a work cube strength of 211 Kg/cm$^2$ at 28 days; Typical water cement Ratio and minimum cement contents are given below:

Water cement Ratio          0.48 to 0.50

Minimum compressive
strength of air entrained.

Concrete 28 days            211 Kg/cm$^2$

Minimum cement
content kg/m$^3$               320

Max. Aggregate size (mm) 19 mm for concrete thickness up to

80 mm

39 mm for conc. thickness 10% +

Air percent by volume 5 to 7%

The details of the mix shall be approved by the Resident Engineer as per the above guidelines.

11. LINING TOLERANCES AND GUIDE WIRES

The tolerances for line and level of the concrete lining shall be as specified for trimming. The contractor shall provide portable equipment and out inspection

Cores (50) cm. dia from sides and bed of canal lining, if directed by the Engineer; No extra payment shall be made for costs of cutting, labelling cores, and filling holes with 1:2 cement/sand mortar.

The means of support and adjustment of guide wire shall be to the approval of the Engineer. Guide wire supports shall be set up 24 hours in advance of concreting and maintained at their correct heights until 24 hours after the concrete has been finished. The wire shall be erected and tensioned on the supports at any section for at least two hours before concreting that section. The concrete shall be compacted and finished with a smooth surface by slipform paver.

12. CURING :

a. The concrete lining shall be cured by a white [illegible] concrete curing compound sprayed at a coverage of 1 litre [illegible] square metre as soon as the moisture film has disappeared [illegible] concrete, but while the surface is still damp. The [illegible] shall be obtained from an approved manufacturer [illegible] in accordance with instructions in a single coat sprayed from a pressure type tank with provision for continual agitation to the contents during application.

b. In lieu of applying a curing compound, water curing for a minimum of 10 days may be accepted at the discretion of the Resident Engineer.

13. UNDER DRAINAGE

Under drainage shall be provided as shown in the drawings at locations where the canal bed level is below the ground water level and when the lining may be subjected to back water pressure at draw-down conditions. This shall generally consist of open joint [illegible] placed in trenches and surrounded by filter materials [illegible] filter blanket below the lining, and the drainage in released the [illegible] drain system or pressure relief valves or flap valves as indicated in the drawings.

AGROCOMPLECT
Economic & Engineering
Orga[illegible]
61, Vitosha [illegible], Sofia
tel : [illegible]
Bulgaria

JOINTS

(a) Contraction joints as detailed on the drawings shall be formed in the surface of the concrete in such a way as to ensure to the Engineer's satisfaction that a surface finish corresponding to the joint is obtainable within the appropriate tolerances permitted in Clause (31). Transverse contraction joints shall be provided in the canal lining at intervals shown in the drawings, by cutting grooves in the top of the slab while the concrete is still plastic. The grooves shall be cut out either by hand, or by mechanical knife, or otherwise impressed and vibrated in to the concrete, where necessary, the grooves shall be reshaped to specified dimensions after the concrete has stiffened sufficiently to retain its shape. Details of the grooves shall be as shown in the drawings. Longitudinal contraction joints indicated in the drawings shall be cut by stationary or revolving cutters attached to the rear of the slip form and shaped as shown in the drawing.

(b) Expansion joints shall be provided as shown on the drawings and Bill of Quantities.

15. JOINT FILLER

The grooves shall be clean and free from foreign material when the joint filler is applied. The grooves shall not be filled while it is raining or when there is free water in the grooves. The grooves shall be filled as soon as concrete has become sufficiently stiff to prevent distortion of grooves shape or damage to concrete.

The grooves shall be filled by a ready mixed mastic joint filler of approved make, by means of caulking guns or other suitable equipment. Detailed specifications, test reports and other technical literature regarding the joint filler shall be furnished by the contractor to the Engineer for his approval. However, accord of approval by the Engineer, will in no way relieve the contractor of the responsibility for preparing the compound, meeting requirements of the specifications.

The filling shall be done from the bottom up so as not entrap of air bubbles. The grooves shall be uniformly and completely filled and the sealer shall hump up slightly above the surrounding area to compensate for subsequent shrinkage and subsidence.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021.
Bulgaria

CONCRETING AT LOW AIR TEMPERATURES

Concreting will not be permitted during low temperatures that is when the air has a temperature below [illegible] the aggregation or mixer or special care is taken to ensure it to be [illegible] coated with ice. When the air temperature in the shade is [illegible] concreting will only be permitted after special precautions agreed with the Engineer, have been taken to prevent early setting of the concrete such as lowering the temperature of the water to be used in the mix, keeping the aggregate and shutters continuously sprayed with water erection of temporary enclosures over the working area.

CONCRETE LINING NOT BY MECHANICAL SLIP PAVER

The requirements of earthwork and concrete lining in paragraphs [illegible] 6 above shall also apply at the locations where concrete lining without using mechanical slip form paver, is permitted by the Resident Engineer. In such cases the concrete shall be compacted and finished to a [illegible] surface to that obtainable by effective use of a long handled steel trowel or as directed by the Resident Engineer. The lining shall be completed in panels not exceeding 3 m length each and the joints [illegible] butt type joints 1 cm thick filled with bitumen sealer as described.

LADDERS

Ladders as shown in Drawings, shall be constructed in [illegible] as directed by the Engineer.

MEASUREMENT

The unreinforced concrete lining will be measured on the superficial area and the rate entered in the Bill of Quantities shall be for lining complete including trimming the earth formation, local filling and [illegible] ation where required (excluding backfill specifically included as a separate item in Bill of Quantities) supplying, placing, compacting concrete and surface finishing, and necessary formwork such as for the construction, expansion and construction joints and sealing with bitumen sealer, cutting inspection cores & filling them with cement mortar.

- 66 -

SPECIFICATIONS OF FLEXIBLE MEMBRANE (LINER) TO BE USED IN CANAL FLOW AND RELATED STRUCTURES.

**General Requirements**

The work covered by these specification consists of supplying and installing a flexible liner for canal lining.  This will also include the work required to attach the flexible linner to existing and /or new canal structures.  All the work to be carried out in strict accordance with the drawings and /or as directed by the Engineer and according to these specification and subjected to the  conditions of contract.

**MATERIALS.**

2.1    The flexible membrane (Liner) shall be of BUTYL polymer/EPDM or similar approved material of specified thickness.  The liner shall have multiply and laminated to protective layer of a Woven Polyester Fiber to the full cross section of canal and with a one piece length of liner not less than 50 meters.

The material of liner and protective layer shall be of first quality products designed and manufactured, specifically  for the canal lining and related works.

The materials should be suitable and durable under severe climatic condition of the project area.

2.2    The flexible membrane (Liner) shall conform to the following specification.



AGROCOMPLECT
Econo...  Engineering
...Sofia
...
...Bulgaria

- 67. -

| Item | Test Method | Unit | Specification Required |
|------|-------------|------|------------------------|
| 1. Specific gravity | NFT 54-101 | | 1.20-1.30 |
| 2. Dimensional Stability | NFT 54-105 | % | Maximum 0.50 |
| 3. Tensile strength | as per relevant International Standards | kg/cm$^2$ | Minimum 95 |
| 4. Modulus 300% | NFT 46002 cutter Ref. H1 | kg/cm$^2$ | Minimum 45 |
| 5. Elongation @ break | | % | Minimum 350 |
| 6. Tear | ASTM D1004 | N/mm | Minimum 30 |
| 7. Hardness | NFT 51-109 | | 50-70 |
| 8. OZONE | | | |
| 7 days/50- pphm/20%/40°C | NFT 46019 | % | 80% Tensile 80% E & B. |
| 9. Heat ageing 7 days @ 125°C | NFT D573 | | |
| Tensile Ret. | | % | Minimum 70 |
| Elongation Ret. | | % | Minimum 70 |

The material of protective layer shall be non woven polyester fabric which will be laminated to flexible liner (mentioned in 2.1) and (2.2) shall conform to the following specification.



AGROCOMPLECT

Sofia

Bulgaria

- 68 -

ARISTICS

| | | Unit | Specification Required |
|---|---|---|---|
| er unit surface | | $Kg/m^2$ | 0.27 |
| ess under | 0.005 bar | mm | 2.3 |
| | 2 bar | mm | 1.05 |
| sity under | 0.005 bar | $Kg/m^3$ | 117 |
| | 2 bar | $Kg/m^3$ | 250 |
| ty under | 0.005 bar | % | 91 |
| | 2 bar | % | 61 |
| ic surface | Superficial | $m^2/m^2$ | 25.0 |
| | in the mass | $m^2/kg$ | 102.2 |

BILITY

| | | | |
|---|---|---|---|
| | 0.020 bar | m/s | $3\ 10^{-3}$ |
| bility | 2 bar | m/s | $7\ 10^{-4}$ |
| bility Under | 0.020 bar | m/s | $6\ 10^{-4}$ |
| | 2 bar | m/s | $4\ 10^{-5}$ |
| tical atory | 0.005 bar | $\mu$ m | 90/56 |
| tion of fines) | 2 bar | $\mu$ m | 32/29 |

ICAL

| | | | | |
|---|---|---|---|---|
| directional on | Resistance | kgf/5 cm. | 70 | |
| | | N/m | $1.4\ 10^4$ | |
| | Stretch | % | 50/70 | |
| directional on | Resistance | N/m | $21\ 10^4$ | |
| | Stretch | % | 27/30 | |
| | Dry and wet modulus | N/m | $5.5\ 10^4$ | |
| ursting strength (indicative) | | $N/m^2$ | $2.5\ 10^6$ | |
| tued tearing strength | | N | $1.7\ 10^3$ | |
| ic flow under | | | Under 20% of breaking load, stability attainded after 1 hour | |
| mensional tension | | | Under 40% of breaking load, stability attained after 6 hours. | |

AGROCOMPLECT
Economic & ......ng
Organi.a...
61, Vitosha Blvd. Sofia
tel: 87-00-64, tlx. ..2021
Bulgaria

t. The contractor shall submit the test result (test to be done as per test method mentioned on clause 2.2 and 2.3 or as per all relevant standards) of the liner to be used to the Resident Engineer for his approval.

## Preparation of Supporting Surfaces

### Spraying of Weed Killer Chemical

Before placing the lining; sniprko Diuren the total weed killer or similar approved material to be sprayed over the entire subgrade.

### Preparation of Earth Subgrade.

The surface of the subgrade shall be prepared by excavating and trimming with to elevations and section as shown on the drawings. The prepared shall be free from loose earth-work, cobbles, rubbish. The compacted subgrade shall be smooth, uniform and free from ...

### ADDITIONAL EXCAVATION AND BACKFILL .

As directed by the Engineer, in the lining area where gravelly ... using large cobbles or boulders exist, these materials shall be ... depth of a minimum of 75 mm and the areas backfilled and ... calcotos and approved materials.

### PREPARATION OF SUBGRADE :

Before final rolling and compaction, the entire subgrade shall be freed rocks, rock, cobbles, boulders, debris and other foreign materials and be approved by the Engineer for installation of the lining.

### Maintenance of Subgrade :

The earth subgrade shall be maintained in a smooth, uniform and compacted during installation of the lining.

### Placing of Lining

The lining shall be placed in a relaxed state over the prepared ... to be lined in such a manner as to assure minimum ... shall be sealed to all concrete structures and other openings the ... lining in accordance with details shown on drawings and / or its approval by the Engineer. The lining shall be closely fitted and sealed ... inlets, outlets, and other projections through the lining. Any portion of lining damaged during installation by any cause shall be removed or repaired by using an additional piece of lining as specified hereinafter.



- 70 -

### Roof Joints and Site Fabrication

Lap joints shall be used, to weld factory fabricated pieces together in the field. Lap joints shall be formed by lapping the edges of pieces a minimum of 50 mm. The contact surfaces of the pieces shall be wiped clean to remove all dirt, dust, moisture, or other foreign materials and to be hot or cold bonded by using appropriate binding material tape etc. of approved quality for liner. The joints shall be wrinkle free and smooth. All joints should have similar strength properties as the original sheet, complete test results for joints strength should be submitted with the offer.

### Joints to Structures

All curing compounds and coatings shall be completely ............... joint area. Jointing of liners to concrete shall be ............... by the approved standard method. Unless otherwise shown on the drawings, the minimum width of concrete shelf provided for the cemented joint shall ............... to 100 mm.

### Repairs to Liners

Any necessary repairs to the liner shall be patched with lining material itself and hot cold bonded by the approved standard method; Any wrinkles shall be smoothed out.

### Quality of Workmanship

All joints, on completion of the work, shall be tightly bonded. Any liner surfaces, showing injury due to scuffing, penetration by foreign objects, or distress from rough ............... grade shall, as directed by the Engineer, be replaced or covered and sealed with an additional layer of the proper size.

### Sheltered Storage

It shall be the contractor's responsibility to arrange for approved sheltered storage of liner material until required for lining of canals.

### Measurement

The flexible membrane (liner) will be measured on superficial area of liner actually used in canal section and in an overage as shown in drawings or /or as ordered by resident Engineer and the rate for such item, given in Bill of quantities shall cover all the cost, obligations and liabilities in respect of supplying and installing the liner as per .............../ ordered by resident engineer and according to these spe...............

00077

# WATER CONTROL EQUIPMENT

## GENERAL.

This section contains the specification for the design, supply, delivery and installation of water control Equipment which generally comprises the following:-

i)    Movable Weirs
ii)   Radial Gate
iii)  Vertical Slide Gates
iv)   Stop-logs and stop-log handling gear.

## DESIGNS, CALCULATIONS AND DRAWINGS:-

The drawings indicate generally the types of equipment required.  The Contractor shall design the gates, hoists and other equipment to be supplied under the Contract and submit with his tender, drawings, calculations, with stresses, assumed coefficients of friction, factors and specifications in sufficient detail clearly to indicate materials, equipment etc., which he proposes to offer.

After acceptance of his tender the Contractor shall further submit to the Engineer fully detailed calculations and shop drawings of all equipment to be supplied under the Contract for approval before manufacture commences.  Three prints of Drawing shall be provided in first instance and any modifications or changes which the Engineer may require or consider desirable shall be made and the work executed accordingly without extra payment.  As many copies of approved drawings as may be required by the Engineer shall be supplied without extra charge.

## ALTERNATIVE DESIGNS:

The Contract must be for equipment in accordance with the general designs shown on the Drawings and described in the Specification, but in addition, separate offers for alternative equipment, which experience in this class of work may indicate as being desirable, will be given full consideration provided that the alternative designs will give factors of safety and other working conditions not inferior to those resulting from the Engineer's general designs.  Any such alternative quotation shall be made out in a complete schedule as nearly as possible indentical with                of Bill of Quantities and shall be accompanied by drawings, calculations, design data, stresses,

AGROCOMPLECT
Economic & Engineering
Organization
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

- 72 -

ctors of safety and specification in sufficient detail to
im adequate descriptions o. the alternative offered.

## TA TO BE SUBMITTED WITH TENDER:

he Contractor shall submit with the tender the followir

i)   Complete dimensioned arrangement drawings of the equipmen.
     offered with sufficient enlarged details to adequately
     illustrate design features.

ii)  Details of proposed methods of erection with drawings
     showing positions and types of field connections.

iii) Tabulated maximum stresses in the principal members
     each gate, stop-log, gear bearer, etc.

iv)  Calculations showing the computation of the maxim. lead
     on gate lifting members.

v)   Complete descriptive specifications supplemen in the
     drawings giving details of the materials proposed.

vi)  Speeds of operation by hand power of all equipment offerd

vii) Full details of the discharge characteristics of the
     movable weirs over the full range of thier operatin:
     levels and other data requested in Clause (5.74)

viii) Other information requested in various sect'a a the
      specifications.

## DESIGN TO SUIT CLIMATIC CONDITIONS:

All equipment to be supplied under the Contract shall
designed with due regard to the climatic conditions preva
in Iraq particular care being taken to accommodate expans
contraction due to temperature changes.  Equipment shall be
suitable for operation in ambient air temperature
but metal work exposed to the sun reach higher temperatures.

- 73 -

## RECESSES IN CONCRETE WORK:

As soon as possible after acceptance of tende   the    r shall submit to the Engineer for approval drawings showing the dimensions and positions of the recesses and bolt holes required to be left in the concrete work to receive the Water Control Equipment.

The Concrete work shall be prepared by the contractor to suit the drawings and all costs in connection with forming th necessary recesses for the reception of Water Control Equipment shall be included in the rates for installation of Water Cont . quipment entered in the bill of Quantities.

## MATERIALS, STRESSES AND WORKMANSHIP:

The water control equipment shall be designed and constru in accordance with the requirements of BS 153 or any other appr ved standard, except where inconsistent with the terms of this Specification.  The deflection of gates and operating platforms shall be restricted to 1/600th of their span.

## MINIMUM THICKNESS:

An allowance of 1/8 in.  shall be added to the thickness of gate skinplates over and above the calculated thickness required to meet the design stresses, but in no case shall the actual skimp-late thickness is less than ½ in. unless otherwise specified. Other plates,         steel angle                            construction of gates shall have a minimum thickness of 5/8 in. the webs of rolled steel beams and channel sections shall have a minimum thickness of 5/16 in. Rectangular hollow sections and tubes used in the construction of gates shall have a minimum wall thickness of ½ in. provided that their ends are fully sealed.

.2021

Bulgaria

EXHIBIT C (Part 3 of 5)

- 74 -

In the case of gates and weirs of 2.00 m span and less, plates of ½ in. thickness will be considered provided that they are of corrosion resisting material or are steel plates suitably protected by metallic or non-metallic coatings other than paint. Details of the contractor's proposals in this connection shall be submitted with the tender.

Steel work which will be permanently submerged, such as that used for embedded gate guides, frames etc., shall have a minimum thickness of ½ in., with the exception of rolled steel beam, channel and hollow sections, which shall have a minimum thickness of 3/8 in.

LIFTING ROPES CHAINS ETC.:

Steel lifting ropes and steel lifting chains shall have factors of safety of not less than six and five respectively when operating the gates against the maximum loading conditions specified. Maker's test certificates for ropes and chains shall be submitted to the Engineer.

GATE SEALS:

The drawings and Specification refer to the use of rubber and other materials in the seals for the various gates. Contractor shall put forward proposals for using materials which experience indicates as being the most suitable for the purpose, having regard to its effectiveness as a seal, durability in the climatic conditions prevailing in Iraq and continual immersion in water and subsequent exposure to sunlight. The use of synthetic rubbers or plastics will be considered. The arrangements for fixing the seals to the gates shall be such that the seals may be simply adjusted or replaced and their fixing bolts shall be of corrosion-resisting material.

AGROCOMPLECT

Bulgaria

#### 6.7.1. DELIVERY OF ANCHOR PARTS (Cont.)

As a general principle embedded parts, guides, etc. for gates shall be fixed to primary concrete-work and not to secondary concrete used for final concreting-in.

Accordingly anchor members, seating plates, etc. for building into primary concrete work to facilitate alignment and fixing of embedded parts, together with all anchorage components and ducts, shall be arranged by the contractor in advance of the remainder of the equipment in accordance with a programme arranged with the Engineer.

#### 6.7.2. INSTALLATIONS & MAINTENANCE

Wherever possible, corresponding parts shall be finished with sufficient accuracy to ensure that they are interchangeable and where required by the Engineer, interchangeability shall be proved by actually changing the various parts.

The designs shall be such that all parts of the installation are accessible for adequate inspection and maintenance and for use where continuity of operation is a first consideration. Drainage holes shall be provided in members which are likely to collect or retain water.

Self-lubricating bearing materials shall be used wherever possible for bearings, particularly those which may be submerged. Bearings and moving parts for use above water may be of the grease lubricated type, in which case provision shall be made for sufficient lubrication by the provision of nipples for grease-gun lubricators. The contractor's detailed proposals for the various bearings shall be submitted to the Engineer for approval before being incorporated in the Works.

Spare parts as recommended by the manufacturer, together with any special tools, grease-guns etc. required for maintaining the gates, shall be provided and delivered into store at Site. The spare parts shall generally consist of one complete set of gate wheels, and bushes, a set of all small gate fittings, seals etc., sufficient to fit up one gate of each size and type, together with recommended spares such as springs etc.

The contractor shall prepare a priced list of recommended spare parts and tools etc. and submit it with his Tender. The cost less of the parts and tools shall be entered against the appropriate item in the Bill of Quantities.

### WORKS ERECTION:

Each gate and operating gear shall be fully assembled at the place of manufacture for inspection by the Engineer and if considered necessary, testing, before despatch. The contractor shall give the Engineer, in writing, a minimum of fourteen days notice prior to the date when the assemblies will be ready for inspection. No parts shall be despatched from the manufacturer's works until they have been marked to ensure correct reassembly. The cost of works erection and testing shall be included in the rates and prices entered in the Bill of Quantities.

### PACKING AND MARKING:

The contractor shall pack, mark and, as necessary, all equipment for transit to and storage on Site.

Attention shall be given to the protection of parts which are liable to deterioration in the climatic conditions prevailing in Iraq, and the form of packaging shall be such that no damage to the equipment shall result from normal handling or prolonged storage in the open.

- 77 -

Small parts shall be boxed and suitably marked on th
side. Larger cases should be protected as necessary
will be suitably marked and listed.

Lists of contents of crates, boxes and bundles in it
...lied and shall be handed over on delivery of each cons

Attention shall be given to the method of marking sub-a
...ies and other components to assist in identifying them at 2
...method of marking employed shall enable any particular
...nt or sub-assembly to be easily identified from the Cont.
...awings and also from the Shipping Specification.

...NING PREPARATION AND PAINTING:

Except where an alternative treatment is agreed with ...
Engineer as specified in Clause 8 the water Control l
...all be treated in accordance with the specification of
...tails of the paint schemes proposed by the Contractor shall be
...ubmitted with the tender.

The cost of the supply of paint and of all cleaning a...
...ainting, specified to be carried out before despatch fr
...anufacturer's Works, shall be included in the ...
the tenderer in              the Bill of Quantities.

The cost of all cleaning and painting specified to ...
...arried out after despatch from the manufacturer's works, s...
...e included in the rates for installation of the water Cont
...uipment entered in the Bill of Quantities.

SITE ERECTION, OPERATION AND MAINTENANCE:

Four sets of Instructions detailing the method of
...rection of each type of gate shall be furnished by th...
...r and handed over to the Engineer. The instructions sh ll ...
...n/English and shall refer to identification marks on c
...Arabic and
...components. Instructions in both Arabic and

- 78 -

...ing and maintaining   the various items of Water Cont...
...ment shall be provided by the C ntractor.   ...
...l prepare a draft of the instructions for the approval of
...Engineer and thereafter shall supply fourteen sc... ... ...
... structions, together with any relevant reduced-scale drawing...
...logues, parts lists etc. on stout paper bound into durabl...
...ers for use at the various sites.  The cost of providing
...tion, Operation and Maintenance Instructions shall be
...luded in the rates entered in  ·          the Bill of
...ntities.

   The Contractor shall erect the water Control Equip...
...rdance with the specifications, and the rates for in...
...x entered in the Bill of Quantities shall include all
...nnection with handling, storing on site, adjusting level...
...ting, grouting and concreting-in, site painting and testing th...
...uipment to the Engineer's satisfaction and for the prov...
...ry erection equipment or special tools that may be required

PROVISION    OF ERECTION:

   The Contractor shall provide the services of a skilled
...ecting engineer to supervise Site erection of some of t...
...f water Control Equipment.

MOVABLE WEIRS:
GENERAL:

            Hand operated movable weirs shall be supplied
...nstalled in the Regulator structures as shown on the Draw...
...nd shall comprise as detailed in the bill of Quantities

Each weir shall consist of embedded parts, movable gate ...
...perating gear with supporting members and a gauge.

- 79 -

Each weir shall be designed to maintain maximum design
upstream head of water equal to the depth of the fully raised
gate with the downstream side dry, and to withstand the water
loading resulting from flow over its crest, when it is in any
condition, under all upstream water levels up to the maximum
design water level and with the downstream water at any corres-
ponding lower levels.

The gate shall be capable of adjustment by the operating
gear to any position within its range of travel, to regulate
flow over its crest. The depth of water passing over the gate
crest (from which the quantity may be deduced) shall be read on
a gauge, with the gate in any position under any of the up-
stream and downstream water levels defined above.

The gate shall be shaped to form a rounded crest of high
discharge efficiency and shall in-corporate a sloping apron on
which a standing wave shall form under some operating conditions
while under other conditions the discharge will fall freely
downstream water levels below the lower edge of the apron. The
gate shall permit stream-lined flows over its crest with a high
drowning ratio so that a small difference in upstream and down-
stream water levels does not prevent accurate single gauging flow
measurement.

The discharge over the movable weirs shall not be less than
that calculated from the following formula:

$$Q = 2.30 \ wh^{1.6} \quad \text{(Types B,C,Cx)} \quad Q = 2.18 \ wh^{1.6} \quad \text{(Types ...)}$$

where h = gauged depth of water over weir crest, in metres.

    w = width of weir, in metres, and

    Q = discharge in cumecs

Contractor shall submit with the tender full details of
the discharge characteristics of the weirs offered by him and a
guarantee of the degree of accuracy of flow measurement possible.

...di operating conditions. Details of the minimum res-
...ge required in order to obtain accurate flow measurer
...g single gauging, expressed as a percentage of the total
...over the weir, shall also be submitted with the tender.

...After acceptance of his tender the Contractor will be
...ired to carry out laboratory tests at his own expense to
...strate to the satisfaction of the Engineer that the flow
...cteristics of movable weirs comply with the require-
...s of the Specification.

...leakage at the sides and bottom of the gates shall be
...ed to a minimum by employing suitable sealing devices and
...ils of the proposed sealing devices shall be submitted
...the tender together with an estimate of the likely error in
...y measurement attributable to leakage. The leakage shall be
...ensated on the flow measurement charts mentioned in Clause
...4.

## EMBEDDED PARTS:

...The embedded parts shall consist of side groove members,
...sealing member built in to the concrete sill immediately up-
...ream of the weir and cross beams built into recesses in the
...crete side walls.

...The groove work shall be of steel or cast iron members
...ending upwards to the top of the side walls to support and
...de the gate throughout its entire travel. The grooves shall
...itted with machined non-ferrous faces upon which the gate
...ll slide and seal. The sealing member and cross beams shall
...ecurely fixed to the groove members.

...The sealing member shall be of steel, housing an inser-
...er or other approved material arranged to seal against the
...ream face of the gate.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitos a Blvd, Sofia
Tel.: 87-09-02, tlx. 22021
Bulgaria

- 81 -

The cross beams shall be of steel and designed to r the loads resulting from operation of the gate.

Means for identifying the type and size of Movable .ie shall be clearly inscribed in English and Arabic on tl beams above each weir.

GATE:-

The gate shall consist of a steel skinplate shaped to form a round-crested weir of high discharge efficiency and a sloping apron on which a standing wave shall form under some of conditions. The skinplate shall be stiffened on the down side by rolled steel sections and braced to support of stream sloping apron. The bracings shall be of adequate length to resist vibration of the apron under all flow conditions.

The gate shall be attached to two vertical side members extending upwards within the grooves to a position above the side walls where they shall be securely fixed to the operating gear support beams to form a rigid frame. The whole of gate and frame shall be capable being raised and lowered in the grooves by the operating gear.

The vertical side members shall be fitted with non-ferrous sliding and sealing faces to match those in the grooves and shall be arranged to sufficiently fill the side grooves as to provide a smooth surface for the passage of water over the crest.

The operating gear support beams shall be designed to support the lifting gear and the loads resulting in of the gate.

OPERATING GEAR:

Each weir shall be provided with its own hand operated gear.

AGROCOMPLECT
Economic & Engineering
Organization
61, Vitosa Blvd, Sofia
tel: 87-59-02, tlx. 22021
Bulgaria

00088

- 82 -

The gear shall consist of a self sustaining gear unit capable of positively holding the gate in any position when the hand-wheel is released.

The gearing shall be capable of operating the gate the maximum water loading conditions by exerting [...] the embedded cross beams and the operating gear support beams attached to the gate.

The gearing shall be machine cut and enclosed in suitable casings designed as far as possible to exclude wind blown dust. A locking device shall be provided with each unit to prevent unauthorised operation.

## GAUGE:-

The depth of water passing over the crest of the gate shall be measured by a gauge fixed to the gate on the upstream side of the weir and shall be positioned so that it may easily read by the weir operator. The gauge shall be graduated in increments of 0.01 m and shall be capable of adjustment after erection to ensure that its zero corresponds exactly with the crest of the weir. The gauge shall be made from approved corrosion resisting material and shall be tapered at [...] edge so as to present minimum interference to [...] facilitate accurate reading of the gauge.

## FLOW MEASUREMENT:

The Contractor shall provide 50 No. copies of approved flow measurement charts in the form of durable pocket books for use in the field, showing the flow related to the [...] reading of all the various types and sizes of weirs over full range of their operating levels.

The cost of providing the booklets shall [...] the rates entered in the Bill of Quantities.

AGROCOMPLECT
[...] Engineering
[...] Sofia
61, V[...] 2021
tel; 87[...]
Bulgaria

00089

– 84 –

The sill member shall be of steel having a machined upper surface on which the lower sealing member of the gate shall bear. The sill member shall be fitted with levelling screws to permit accurate alignment within a recess formed in the concrete floor. The ends of the sill member shall be drilled for securing to the curved side sealing members.

5.27    – Pivot Beams and Anchorages

Unless otherwise specified or shown on Tender Drawings the fabricated pivot beams secured to the piers and abutments by pre-stressed high stress, th anchor-bars shall be provided for each Radial Gate as shown on the Drawings.

The pivot beam and anchorages shall be designed to resist the whole of the pivot loading without movement and shall be capable of transmitting the loading to the piers and abutments. The pivot beams and anchorages at the piers shall also be designed to resist the unsymmetrical loading due to one gate operating under its full water loading condition with an adjacent gate completely dewatered, or fully open.

The pivot beams shall consist of universal rolled steel column sections carrying fabricated steel pivot bearing brackets. The pivot brackets shall house stainless steel pivot pins fitted with locking arrangements to prevent their rotation. The pivot brackets shall have machined bases suitable for bolting to machined seatings provided on the pivot beams.

- 35 -

The ends of the pivot beam shall be stiffened locally in the vicinity of the pivot bracket settings and also at the anchor-bar positions. The stiffening shall be arranged to completely enclose the anchor-bars where the bars pass through the pivot beam.

Bearing plates welded to the pivot beams shall carry adjusting bolts capable of adjusting the position of the pivot beam relative to seating of the end into the primary concrete work and which in conjunction with the anchor-bar nuts to securely hold the bars in position. Whilst mortar is placed underneath the bearing plates. The seating plates complete with their anchors shall be provided by the gate manufacturer.

The high tensile steel anchor-bars shall be 20 mm dia, having a minimum breaking load of 325 KN, The bars shall be enclosed in 40 mm internal diameter ducts cast into the primary concrete work of the piers and abutments. Each pair of bars shall be fitted with an end plate arranged to be accommodated within a recess formed in the sides of the piers and abutments.

Grouting flanges shall be fitted to the end plates and helical reinforcement provided around the bars at the end plates.

The ducts shall be arranged to seal to the grouting flanges and also to the seating plates. Rubber sealing rings shall be provided round the bars between the seating and bearing plates.

– 86 –

All anchorage components other than the basic steel roinforcement to the piers and abutments shall be supplied by the gate manufacturer.

The high tensile steel anchor bars shall be post tensioned to the piers and abutments by the Contractor using approved jack. The jack shall be provided by the gate manufacturer and shall be complete with all accessories necessary for completing the work of stressing the anchorage beams to the piers and abutments. Final grouting-in of the anchor bars after stressing shall be carried out by the Contractor.

A standard design of anchorage shall be adopted for all gates irrespective of their size.

All anchorage components required for casting into primary concretework together with the anchor bars themselves shall be supplied and delivered by the gate manufacturer in advance of the remainder of the gate components in accordance with Clause 5.11.

Should a tenderer intend to vary the detailed arrangement of anchorage shown on the Drawings, full details of his proposals shall be submitted with the tender.

3.28 – Gate and Pivots

Unless otherwise specified or shown on Tender Drawings the gate structure, radial arms and pivots shall be designed to permit ease of erection and subsequent maintenance.

- 87 -

The gate shall consist of a minimum number of individual sub-assemblies bolted together to form a robust and substantial structure. The use of minor bracings shall be avoided.

The gate structure shall consist of a curved steel skinplate supported on the downstream vertical curved stiffening members and horizontal girders. The horizontal girders shall be connected by bolts to the radial arms. The radial arms shall be in the form of "A" frames constructed from steel rectangular hollow sections with bearings fitted to their apices.

The bearings shall be of cast iron or steel and shall be fitted with self-lubricating bushes of Lubrite as manufactured by Merriman Inc., (Division of Litton Industries), 100 Industrial Park Road, Hingham, Massachusetts, Mass. 02043.

The gates shall be arranged to seal at the sides and bottom against water pressure acting from the upstream side.

The side seals shall consist of strips of section rubber, or other approved material, secured to the gate by adjustable bolted clamping bars, arranged to seal against the surface of the embedded side members. Bronze guide shoes (four per gate) shall be incorporated into the side seal assemblies and arranged so that the complete seal and guide assembly is capable of adjustment and easy removal when required. The bottom seals shall consist of strips of rubber, or other approved material, of plain section, secured to the gate by bolted clamping bars.

'A'

Bulgaria

00093

- 88 -

The gate shall be lifted by steel wire ropes attached to lifting lugs fixed to the upstream side of the skinplate near to the lowest horizontal gate girder.

5.29   - Operating Gear

Unless otherwise specified or shown on Tender Drawings the following specifications shall be followed:

Each gate shall be provided with its own hand operated lifting gear.

The lifting gear shall consist of a self sustaining gear unit, capable of holding the gate suspended in any position when the crank handle is released, driving two rope winding drums positioned on the platform vertically above the gate lifting lugs.

The gearing shall be capable of operating the gates against the specified maximum water loading conditions, and the speed of operation and corresponding handle effort when lifting the gate against these conditions shall be stated in the sub-tender.

The hand operated gear unit shall consist of a machine cut worm and spur gearing. The worm gearing shall operate in an oil bath and the whole unit shall be enclosed in suitable casings designed as far as possible to exclude wind blown dust.

E....
C....
61, Vite.... l lvd, So'ia
tel: 87-09-62, tlx. 22021
Bulgaria

- 89 -

The winding drums shall be grooved to receive the lifting ropes and connected to the gear unit by a horizontal steel cross shaft supported on bearings fitted with gun-metal bushes. A removable steel plate cover shall be provided over each winding drum.

The cross shaft shall incorporate an adjustable coupling to allow a fine adjustment in the angular position of one winding drum relative to the other.

A gate position indicator graduated in 0.05m intervals shall be incorporated with the gearing showing the level of the lower edge of the gate relative to the sill level.

Grease nipples shall be provided where necessary for lubricating the various bearings etc. and a grease gun shall be provided.

5.30   - Gear Bearers, Plating and Handrailing

Unless otherwise specified or shown on Tender Drawings the following specifications shall be followed:

A steel operating platform shall be provided with each gate, designed to support the operating gearing and the loads resulting from gate operation.

The platform shall be complete with bearing plates and holding down bolts etc. and arranged to accommodate expansion and contraction due to temperature changes.

AGRO CONPLECT
Econo      n
61.               Sofia
tel.: 87-90-02, tlx. 22021
Bulgaria

- 90 -

The platform shall be fitted with galvanised handrailing and standards, and those portions of the decking not covered by gear-boxes and bearings etc. shall be fitted with galvanised open steel flooring.

The handrailing and standards shall be of tubular construction, the standards being of the double rail type suitable for carrying two tubular handrails each weighing approximately 3.1 kg/metre.

The open mesh flooring shall be "Safetread" steel flooring as supplied by Allan Kennedy & Co. Ltd., Stockton-on-Tees, England. The flooring shall be not less than 30 mm in depth and it shall weigh not less than N kg/m. The deflection of the flooring shall not exceed 1/1 000 of the clear span between supports under a superimposed loading of 2.7 KN/m.

AGRC ... ... T
Econ...
61, ... ... Ind., Sofia
tel: 8... ... tlx. 22021
Bulgaria

- 91 -

VERTICAL SLIDE GATES:

The work covered by this clause consists of providing all plants, labour, materials and equipment required and completing the design to fabricate, furnish, deliver, install test, paint and perform all items of works to complete the installation of vertical gates.

The slide gates complete with frames, stems, stem guides, anchor bolts and lifting devices and painting protective coating as per Specification and approval of the Engineer, shall be furnished by the Contractor.

The gates shall be of standard manufacture and suitable for operation under various hydrostatic heads. For vertical slide gates, all steel construction shall be of rectangular shape with ball bearing, hand wheel lift (minimum diameter of hand wheel to be thirty contimetors), raising gate stem and seating by face pressure against the structural steel, anchor frames and rubber seal on steel plates and other required components.

Details shown on the drawings are to be considered as suggestion only.

The contractor shall calibrate the gate in relation to the gate opening Vs discharge and supply 50 copies of approved flow measurement charts showing the flow related to the gauge reading of all various sizes of gates over the full range of their operating levels.

The number and size of the gates are detailed in the Bill of Quantities.

AGROCOMPLECT
Economic & Engineering
Company in
61, Vitosha Blvd, Sofia
tel.: 87-65-52, tlx. 22021
Bulgaria

- 92 -

## LOGS & STOP LOG HANDLING GEAR.

### GENERAL:

Stop logs and stop log handling gear shall be provided for use at the various sites as shown on the Drawing and shall comprise as detailed in          the Bill of Quantities.

### GROOVES AND SILLS:

Certain regulating structures with opening greater than 2.00 m clear span shall be provided with steel grooves and /or sills to receive stop-logs. The grooves shall be formed from steel rectangular hollow section cut to the dimensions shown on the drawings or fabricated individually as required. The grooves shall be fitted with anchor bars as shown on the Drawings.

The sills shall consist of rolled steel tee-sections fitted with levelling screws, to permit accurate levelling within a recess formed in the concrete floor, and shall be fastened to the groove members at each end.

### STOP-LOG:

The stop-logs shall be constructed from steel rectangular hollow section to the dimensions and sizes shown on the Drawings. Stop-logs for opening greater than 2.00 m clear span shall be fitted with end plates and tongue plates having machined edges whereas stop-logs for smaller spans shall be fitted with end plates and bearing plates as shown on the Drawing. All stop logs shall be fitted with suitable lifting lugs.

### HANDLING GEAR:

Stop-logs for openings of 2.00 m clear span and less shall be provided with pairs of lifting hooks for handling purposes as shown on the Drawings.

AGROCOMPLECT
Engineering & Marketing
Consultation
61. Vitosha Blvd., Sofia

00098

- 93 -

Stop-logs for openings greater than 2.00 m clear span
shall be provided with transportable manually operated stop
handling gear, which shall consist of the following:-

a) Portable steel trestles located on steel dowel
   into the concrete piers and abutments of each
   structure.

b) Runway beams.

c) Operating gear with lifting beams.

The handling gear shall be arranged so that it may be
dismantled, transported and re-erected at any of the regular
structures. It shall be capable of lifting and lowering
logs in any sluice bay in structures having sluice
and shall also be capable of transporting stop-logs and deposit
them on the abutments when required.

To facilitate transport between sites and erection of the
handling gear at the various regulating structures it shall
preferably be of light weight construction. Where necess
shall be capable of being broken down into easily assemble   s
of a size and weight which can be lifted and handled by two
without the use of an independent lifting appliance.        at
independent lifting appliance is required in assembling the  -
ling gear, the appliance shall be supplied as an integral part of
the handling gear at no additional cost.

The portable trestles shall be of light weight tubular
construction arranged to fit overlocating dowels set into the
concrete work at each structure. Proposals for suitable
devices at the trestle bases shall be submitted with the
The trestle shall be fitted with quick-release clamp
which the runway beams may be fastened.

Suitable template shall be provided to accurately posi-
tion the locating dowels set in the various structures.

AGROCOMPLECT
Equipment & Engineering
Corporation
61, Vitosha Blvd, Sofia
tel.: 87-5-02, tlx. 22021

00099

- 94 -

... ... ... stop-log span
be provided and, to facilitate ease of handling, they shall
structed from lightweight material such as aluminium alloy.

The stop-log operating shall consist of a hand-operated
lifting gear unit comprising twin, travelling, worm geared
ting blocks each of approximately 500 kg capacity, coupled
ther by cross shafting and arranged to provide a synchron-
two-point lift onto the lifting beams. The lifting gear
ll be self-sustaining and operated by two hand chains, each
in passing over a chain wheel situated at each end of the unit.

The lifting-beams shall be suspended from the gear by
fting chains and the gear unit shall incorporate chain boxes
ranged to collect the surplus chain as the lifting-beam is
isted.

The operating gear shall be capable of lifting the up-
ermost stop-log against a pressure head equal to its depth,
us enabling the remaining stop-logs to be lifted under bal-
anced hydraulic conditions after the water pressure has been
equalised. Stop-logs will always be lowered into still water.

The gear unit shall be provided with travelling gear,
operated by means of a hand chain, capable of moving the
complete unit with the lifting-beam and stop-log suspended
from the hoisting gear. The travelling gear shall be arranged
to operate travelling wheels bearing on the lower flanges of
the runway beam.

A device shall be provided which will ensure that the
operating gear unit is positioned over each sluice opening
that the lifting beam is accurately located in its lift
position over the groove guide members.

GROCOMPLECT
Eng... ... ... ...ering
... ...isation
61, ... ...a Tlvd , Sofia
tel.: 87-59-62, tlx. 22021
Bulgaria

- 95 -

The operating gear unit shall be arranged so that it
a readily be dismantled and removed from the runway beam when n
a ired. The runway beams shall be designed to support the
w.s resulting from operation of the stop logs and also the
..a.s produced when the gear unit complete with lifting-beam
..r stop-log is travelling from one sluice opening to another.

All stop-log operating gear shall be properly enclosed
..thin suitable covers to protect it from the weather and as
r as possible to exclude wind blown dust. Where necessary
.. .able cov.es shall be fitted to permit access for ins-
..ction and maintenance of the various gear parts.

The operating gear unit shall be so arranged that it
..n be used with lifting-beams and stop-logs for spans of
3.00 to 4.00 m.

Lifting-beams to suit each span of stop-log shall be
provided. The lifting-beams shall be fitted with automatic
latching and unla taching hooks arranged so that each stop-
log may be lowered and unhooked underwater, or, hooked under-
water and lifted clear of the grooves. The lifting-beams
shall be fitted with guides at each end to engage with the
groove work, and the hook positions shall correspond with the
positions of the lifting bars on the stop-logs.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vinosta Ltd , Sofia
tel.: 87-55-62, tlx. 22021
Bulgaria

- 96 -

## II-6  PAINTING

Surfaces to be painted are to be throughly dry and properly prepared, and each coat of paint, when properly cleaned and prepared before the application of succeeding coats, Ample time is to be allowed for drying and hardening before the application of the next coat and no exterior painting is to be done in wet, foggy or frosty weather. exterior work carried out during the winter months bi ication only must be employed.

Immediately before paint is applied the whole of the surface to be painted shall be throughly cleaned of all dust, loose paint or dirt, if necessary by washing down with fresh clean water and by brushing with bristle brush. The first coat of priming paint shall be applied by brush.

The ideal temperature for painting lies within the range 13° to 32°C with the ambient relative humidity below 90 percent. So far as is practicable all painting should be done when the ambient conditions are favourable and to continue so throughout the drying time

## MATERIALS:

Materials shall comply with the following British Standards; or any other approved standard:-

B.S. 2521 & 2523        : 1966 Lead-based priming.

B.S. 2524               : 1966 Red oxide linseed oil priming paint.

B.S. 2525-32            : 1954 Ready mixed oil undercoating and finishing paints (exterior quality).

- 97 -

B.S. 242, 243, 259     : 1936 Linseed oil for paints.
B.S. 244 & 290         : 1962 Turpentine for paints.
B.S. 245               : 1956 White Spirit.

All materials shall be obtained from a manufacturer approved
the Engineer and samples of all paints and associated materials
used for use shall be submitted to the Engineer for his approval.
rials shall be delivered to Site in tins or drums with the
r's seal unbroken.

So paint shall be used after the date of expiry
the 'shelf life' marked on its container and on such expiry the
shall be immediately removed from the site.

Paints shall be thoroughly mixed under the supervision of a
etent foreman in a manner approved by the Engineer and shall not
passed to the painters until both it and the surfaces to be
ted have been properly prepared.

The whole of the work shall be finished in such tints and
des as the Engineer may direct and if required, the Contractor
ll vary the shade of each separate coat of paint.

## CLEANING AND PREPARATION OF STEEL WORK:

Except where otherwise specified steelwork surfaces to be
inted shall be shot or grit blasted and the maximum surface rough-
ss of blasted steel shall not exceed an amplitude of 0.004 inches.
second quality surface finish is required in accordance with B.S.
or any other approved standard.

The blasting material shall be in accordance with B.S. 2451 or
y other approved standard and the following abrasives properly
ed can produce the required surface roughness:-

    Steel and malleable iron   :  S 340 shot or G39 grit
    Chilled iron               :  S 340 shot or G39 grit

- 98 -

last cleaned surfaces shall receive their first coat of paint under warm, dry, dust free conditions within four of cleaning. Contact surfaces of joints made with friction bolts shall be left unpainted as specified in B.S. 1294 Part 5a. Any paint that has been previously applied shall be by blast-cleaning.

**PAINTING OF STEELWORK:**

A. **Before Assembly:** at the manufacturer's works all surfaces steelwork which will be in permanent contact or conc alment after bly at the works, except surfaces which are to be welded, shall cleaned and painted with one coat of primer.

B. **Before Despatch:** from the manufacturer's works, surfaces shall be cleaned and treated or painted as follows:-

a) Machined - one coat of a mixture of white lead and oil or with approved varnish or plastic paints.

b) In contact with other steelwork when site erected unless otherwise specified
- two coats of primer, (surfaces connected by high strength bolts to be cleaned and left unpainted).

c) In contact ultimately with concrete; asphalt, tarmacadam or bituminous waterproofing-no treatment or painting.

d) In contact with brickwork - one coat of primer.

e) All other surfaces - unless otherwise specified-one coat of primer after inspection at the manufacturer's works by the Engineer.

C. **Before Erection:** Surfaces described in B (b) above, shall cleaned and coated with one coat of primer immediately prior to ing up.(Surfaces connected by high strength bolts to be cleaned left unpainted).



AGROCOMPLECT
Economic & Eng... ... ng
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-69-6.., tlx. 22021
**Bulgaria**

AFTER ERECTION AT THE SITE, Surface shall be cleaned to satisfaction of the Engineer and then treated as follows:-

In contact with concrete - cleaned by scraping and wire-brushing immediately before being covered.

In contact with asphalt, tarmacadam or bituminous water-proofing - cleaned and coated with hot bitumen.

In contact with brickwork, or, cased in less than a minimum thickness of 40 mm of concrete - one coat of bituminous paint.

In contact with timber - cleaned and painted with two coats of primer and two coats of bituminous compound, the final coat to be applied immediately before the timber is placed in position.

Those surfaces specified in B (a) above which have previously been primed in the manufacturer's works and which are damaged by handling and erection shall be made good by thoroughly cleaning the affected parts to the approval of the Engineer, if necessary to the bare metal, bevelling the edges of the undamaged paint with sandpaper and recoating the prepared surfaces with one coat of priming paint. Each patch coat shall overlap the original undamaged priming paint by at least 1 mm. Unless otherwise specified all the primed surfaces shall then receive a further coat of primer and two finishing coats of paint.

PAINTING SCHEMES FOR STRUCTURAL STEELWORK, PLANT,
EQUIPMENT, ETC.:

Except where otherwise specified, all structural steelwork, other control equipment etc. shall be prepared and painted with clauses 6.3 and 6.4 and the painting scheme shall be as follows:-

1.  Exposed to normal atmospheric conditions whether under cover or not.

      a) Blast clean (wire brushing for handrails)
      b) Two coats red lead primer
      c) Two coats of Micaceous Iron oxide or two coats of Alluminium paint.

exposed to be dry conditions or to be immersed in water
   a) Blast clean

b) Two coats of primer suitable for use under the coating
   selected in (c)

c) Two coats of High Build bituminous paint or two coats
   of Epoxy Resin paint or two coats of Chlorinated Rubber
   Paint or two coats coal Tar Epoxide paint.

Cast iron sluice gates, penstocks, valves etc., shall be
painted with/coats of bituminous paint or similar as directed by
the Engineer.

6.6. PREPARATION AND STORING OF BOLTS:

Before being despatched to the Site, all black bolts, except
zinc bolts, lewis bolts and galvanised bolts shall be dipped, into
hot "Ensis" fluid 256 or similar approved fluid. Care shall be
taken in storing bolts at Site to ensure that the threads do not
become damaged and are kept perfectly clean.

6.7. PAINT FOR PLANT AND MACHINERY:

Except where otherwise specified, pumping plant machinery and
equipment shall be prepared and painted in accordance with clauses
6.3 and 6.4 above, and the painting scheme shall be as follows:-
   a) Blast clean, wire brush or clean by other approved methods
   b) Two coats red lead primer
   c) Two coats Micaceous Iron oxide or two coats Aluminium paint
      or two coats long oil alkyd paint or two coats lime oil
      based paint to B.S. 2525-32.

6.8. PAINTING WOODWORK:

Unless oterwise specified all work shall be carried out in
accordance with British Standard Code of practice 231 (1966)
"Painting"  andgenerally in accordance with Clause 6.4.

E   me & Engineering
   Organisation
61,  ....  Blvd., Sofia,
tel.: 87-65-6-, ...  22021
   Bulgaria

Unless otherwise specified all new wood shall receive a four coat paint system.

The first coat shall be a water repellant treatment followed by a primer, undercoat and finishing coat.

Stopping and filling with approved materials shall follow the priming coat and if the priming coat gives incomplete coverage and is in the opinion of the Engineer too thin a further coat or primer shall be applied at no extra cost before the application of the undercoat.

4.5.   FINAL COAT OF PAINT AT END OF MAINTENANCE PERIOD:

At the end of the period of maintenance a further coat of finishing paint in addition to those specified above shall be applied to all painted surfaces other than those which are built in or similarly    inaccessible.

4.10.   PAYMENT:

Unless otherwise specified no direct payment will be made for cleaning or preparing surfaces for painting or for supplying and applying the paint or other protective coating and the entire cost of the work as specified shall be included in the rates inserted in the Bill of Quantities.

AGROCOMPLECT
Eng     g Engineering
          ration
61, V     a Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

00107

• 167 •

7.] Specifications Related to Quantities of cement used in lining
Concrete and limits of sulphates & gypsum & some tests for
site investigations.

### 7.1. Quantities of Cement used for lining:

The quantity of cement will be at least 300 kg/m$^3$ of
concrete to obtain a compressive strength not less than
211 kg/cm$^2$ at laboratory after 28 days for the samples
taken from the field.  The water cement ratio ranges
between (0.5-0.55) with recommendation for doing laborate
and field tests to obtain the optimum quantity of cement
to be sure of the figure above and to follow what
mentioned in item (7.3) below.

### 7.2. Expansion and Dummy Joints:

Only dummy joints will be used in lining by concrete
while expansion joints will be used only at the junction
of structure with the lining or at construction joint in
the junction of old lining with new parts.

### 7.3. Limits of Sulphates Percentages expressed as SO3:-

The types of cements listed at the table below will
be used which are similar to B.S. (cp 2004:1972) and
British Research Station Standards (BRS).



At
E
Corporation
Gl. Yauna Chek, Sofia
tel.: 87-09-62, tlx. 22021
**Bulgaria**

00108

In no case, shall walking on the walls by labourers
be allowed, and the contractor shall make foot paths
along the walls for that purpose. Scaffolding shall be
erected along the walls, from inside and outside for
the high parts.

## POINTING WITH CEMENT MORTAR:

a. All joints in brick-work shall be pointed after raking
the joints between bricks with a suitable instrument to
a depth not less than two centimeters, such that no
damage occurs to brick edges as a result of raking. The
faces of brick-work shall be properly cleaned, washed
and sprayed with water immediately before commencing
pointing.

b. All horizontal and vertical joints of brick-work,
whether hidden or exposed, shall be pointed with
cement mortar.

c. All pointing mentioned in paragraphs (a) and (b) above
shall be carried out with cement and mortar of 1: 3 mix,
unless other-wise specified by the Engineer.

d. The cost of pointing shall be deemed to be included in
the rates tendered by the contractor for brickwork in
cement mortar, or pitching with stone or brick in cement
mortar, and no extra payment shall be made for this.

## DRY STONE PITCHING:

When dry pitching is specified the stones may be of
random size, and shall be roughly hammer dressed, so that
they fit closely together. The stone shall generally not
be less than 25 kg. in weight, and shall be to the depth

AGROCOMPLECT
Economic & Engineering
Organisation
Gl, Vitos ... ofia
tel.: 87-09-24, tlx. 22021
Bulgaria

| Total percentage of sulphates in the soil expressed as SO3 | Total percentage of sulphates in ground water ppm | Type of cement | Quantity of cement kg/m³ |  |
|---|---|---|---|---|
|  |  |  | Thick-ness 5-7.5 cm | Thick-ness 6-15 cm |
| Less than 0.2 | Less than 300 | Ordinery Portland | 300 | 300 |
| 0.2-0.5 | 300-1200 | Ditto | 340 | 300 |
| 0.5-1.00 | 1200-2500 | Sulphate resistance | 330 | 300 |
| 1.00-2.00 | 2500-5000 | Ditto | 370 | 330 |
| More than 2.00 | More than 5000 | Sulphate resistance cement with a layer of nylon below lining | 410 | 330 |

**Limits of gypsum percentages in soil (CaSO4, 2H2O):**

The gypsum percentages are modified to what suites with the field and laboratory results available in some areas in Iraq, till we get more general results, on condition that the natural properties of soil and discharges in canals should be taken in consideration to decide the type of lining as follows:-

| Discharge in Canal m³/sec. | Depth of Water in canal (m) | Dry density as perstandard proctor test ( g/c³ ) | Liquid limit L.L.% | Plastic Limit P.L.% | Gyps. Perc. as allow |
|---|---|---|---|---|---|
| Less than 3.00 | Less than 1.00 | 1.65 | 30-50 | 15-25 | 7 |
| 3.00-15.00 | 1-2.50 | 1.65 | 30-50 | 15-25 | 5 |
| More than 15.00 | more than 2.5 | 1.70 | 30-50 | 15-25 | 3 |

To ... AGROCOMPLECT tables the following points are to be taken into consideration.

AGROCOMPLECT
Economic & Engineering Corp.
61, Moskva Flat., Sofia
tel; 87-09-6., dx, 22024
Bulgaria

The sub grade of canal soil whether the canal is in cut or fill, should be compacted to apercentage not less than 95% from max. dry density obtained from standard proctor test.

The liquid limit for canal soil should be less than 50 and in the limits mentioned above.

The percentages of gypsum in the original soil over which the canal is constructed, should be equal or less than the limits shown in the table above. Incase the canal section is in fill, the soil used in filling should have percentages of gypsum less than the limits shown above, but this soil should be tested in its borrow area before it is used in the canal construction.

Sampling method for fixing sulphates or gypsum in canals:

The samples taken for testing in laboratory, should represent the actual condition of the canal such that the horizontal distance between one sample and another should not exceed 250 meters. As for the depth required for taking these samples to fix the gypsum percentages it is proposed to be below the bed level of the canal to a depth not less than twice the depth of the canal incase the discharge of canal is less than 15m$^3$/Sec. and the depth should be at least (10) meters if the discharge of canal is more than 15 m$^3$/Sec. For fixing sulphates percentage in soil, the samples for boring will be limited to depth of greater that is, on shallow depths.

HYDROCOMPLECT
Scientific & Engineering
Organization
65, Vitosha Blvd., Sofia
tel: 84-65-52, tlx. 22021
Bulgaria

## ...king samples for Irrigation Structures:

The samples which will be taken to the laboratory give the natural mechanical characteristics o... from these samples tests will be done for soil classificat... changes which depends on them the soil strength, subs... structure, soil permeability, sulphates quantity, org... materials, and soluble salts.

If the soil is clay, undisturbed samples should be ta... at the level of foundation and below of it for each (3:... taking disturbed samples for each one meter below the structu... at each boring hole. In case the soil is sandy, standa... ration test should be taken each 2 meters below the struct... The level of ground water should be fixed after drilling di... tly (24 hours after drilling).

The no. of borings should be five bores at least, fo... corners and one in center. The minimum depth of drilli... simple structures equals twice the width of foundation of that structure below of it. In case the structure is a pumping stati... for example, the testing depth of drilling should range betw... 20-30m. and the same thing incase of big regulators and bridge...

AGR... ...HITECT
Engin... ...eering
...tion
61, V... ...bd, Sofia
tel: 87-0.. ...lx, 23021
**Bulgaria**

.../20..3.82

00112

– 106 –

III SPECIAL SERVICES & FACILITIES:

OFFICE AND LABORATORY FOR THE ENGINEER:

(i) The contractor shall provide and maintain, until the end of period of maintenance an office accommodation and a laboratory accommodation, including garages, roads paths and boundary walls, as per works, complete with furniture, fixtures and equipment.

The office and laboratory, together with all furniture, fixtures, equipment, services, garages, etc. shall be provided by the contractor, within 90 days from the date of the order. If the contractor fails to provide the accommodation, complete by the specified date, he shall provide alternative temporary accommodation to the satisfaction of the Engineer on the site, and in addition shall pay to the Employer, a sum of ID. 50/- Iraqi dinars fifty only, as liquidated damages, for each day after the stipulated date, until the complete accommodation is made available to the Employer. The office and laboratory shall be located at the site, designated by the Employer.

On expiry of the period of maintenance, the office and laboratory will be redecorated, and handed over in good condition, and the building together with furniture, fixture, equipment, services, garages, roads paths etc. shall become the property of the Employer.

The material used and the workmanship employed in the construction of the office and laboratory, shall be in accordance with the requirements of specifications and shall be of such kind, as that used in the classwork.

An efficient electrical installation shall be provided, including wiring, electrical fixtures, fuse boxes, light, bulbs, shades etc. complete with connection to an approved source of supply.

AGROCOMPLECT

61, Vit... ...tol., Sofia

tel: 87-0... ...tx. 22021

Bulgaria

- 107 -

... and laboratory shall be equipped with air ... a total capacity of 10,005 cubic feet per minute, complete with all supports, ducts, louvres, and electrical and plumbing work.

Prior to occupation, the interior and exterior of the buildings shall be painted. The exterior brickwork shall receive two coats of cement based paint, and the internally plastered walls and ceilings shall receive two coats of emulsion paint. All wood work shall receive one coat of primer, one undercoat and one top coat. All colours of paint shall be per approval of the Engineer. At the end of the maintenace period, redecoration shall include one coat of top paint to all the above mentioned painted surfaces.

The area measured under the related item in the Bill of quantities for the construction of Office and laboratory shall be the plain area of the office and laboratory at floor level including formulion but excluding the area of garages, roads, paths, boundary walls, etc.

The rates tendered for this item shall also include cost of provision of water supply, electricity supply and sewage disposal systems, and the cost of garages, roads paths, boundary walls etc.

All furniture, fixtures and equipment for the office and laboratory shall be new and shall be approved by the Engineer before being installed. The standard of furniture, fixtures and equipment shall be of the best quality available in Iraq.

The rates tendered in the Bill of Quantities for the supply of furniture, fixtures and equipment, listed in the appendix to the Bill of Quantities, shall include cost of supply, delivery, installation, and replacement in the event of damage or loss, and maintenance, until the end of the period of maintenance.

AGROCOMPLECT
Economic & Engineering
Corporation
61, Vitosha Blvd, Sofia
tel.: 87-09-62, tlx. 23021
Bulgaria

- 108 -

The Contractor shall also maintain the office and laboratory, including all services, garages, roads, paths, boundary walls, etc., and the rates tendered in the Bill of Quantities shall include cost of supply of electricity, water, fuel, regular daily cleaning, watchmen, messengers, and other matters necessary for the efficient working of the staff during the period of contract.

The Contractor, if ordered by the Employer, shall arrange with the competent Post and Telegraphs Authority to connect the Engineer's office to an outside telephone line, and to provide and maintain one telephone in the office and one in the laboratory. The Contractor shall pay all the charges in connection there with, including charges for all calls, and the actual running charges of the Posts and Telegraphs Authority will be reimbursed to him in addition to the Item Sum in the Bill of Quantities.

(ii) If ordered by the Employer, the Contractor shall provide the required number of portable offices, fully equipped as specified below, for the sole use of the Engineer's staff, at locations designated by the Engineer, and shall remove them from the site on completion of the works or earlier as directed by the Engineer. During the course of execution of the Contract, the Contractor, when ordered shall dismantle the offices, transport them to and re-erect them on new locations as directed by the Engineer. Each office shall be of substantive timber construction and shall have a floor area of not less than 10 sq. metres.

Each office shall be provided with a door fitted with a suitable lock, a fly mesh door, and windows fitted with fly mesh and steel shutters to lock as the inside. The equipment shall consist of a table with a drawer suitable for storing drawings, a stool, four chairs, two shelves, jug and basin, the rates tendered in the Bill of Quantities for this item shall include cost of heating, lighting,

AGROCOMPLECT
Economic & Engineering
Corporation
61, Vitosha Blvd., Sofia
tel.: 87-69-62, tlx. 22021
Bulgaria

- 108 -

The Contractor shall also maintain the offices and laboratory, including all services, grounds, roads, paths, boundary walls, etc., and the rates tendered in the Bill of Quantities; shall include cost of supply of electricity, water, full, regular daily cleaning, watchmen, messengers, and other matters necessary for the efficient working of the staff during the period of contract.

The Contractor, if ordered by the Employer, shall arrange with the competent post and Telegraphs Authority to connect the Engineer's office to an outside telephone line, and to provide and maintain one telephone in the office and one in the laboratory. The Contractor shall pay all the charges in connection there with, including charges for all calls, and the actual running charges of the Posts and Telegraphs Authority, will be reimbursed to him in addition to the Item Sum in the Bill of Quantities.

(ii) If ordered by the Employer, the Contractor shall provide the required number of [portable offices, fully equipped as specified below, for the sole use of the Engineer's staff, at locations designated by the Engineer, and shall remove them from the site on completion of the Works or earlier as directed by the Engineer. During the course of execution of the Contract, the Contractor, when ordered shall dismantle the offices, transport them to and re-erect them on new locations as directed by the Engineer. Each office shall be of substantive timber construction and shall have a floor area of not less than 30 Sq. meters.

Each office shall be provided with a door fitted with a suitable lock, a fly mesh door, and windows fitted with ... gauze and hinged shutters to lock on the inside ... equipment shall consist of a table with a drawer suitable for storing drawings, a stool, four chairs, two shelves, jug and basin, the rates tendered in the Bill of Quantities for this item shall include cost of heating, lighting,

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

- 109 -

regular cleaning of offices, and for supply of clean water

## VISIT OF QUARTERS REQUIREMENTS FOR THE STAFF

The Contractor, shall if ordered by the Employer, provide, furnish and maintain for the duration of the Contract, and to the satisfaction of, the Engineer, suitable houses for the Engineer and his staff. The houses shall be located as designated by the Employer. For each house, the accommodation shall consist of bed rooms, living room, dining room, hall, store room, kitchen, bathroom, w.c. garage, servant's quarters, and compound.

The minimum floor area of the accommodation, excluding area of the garage, servant's quarters and compound shall be as follows, for the respective types of houses:

| Type | Floor area sq. meter | No of bed rooms |
|------|---------------------|-----------------|
| AA   | 240                 | 4               |
| A    | 190                 | 3               |
| B    | 160                 | 3               |
| C    | 140                 | 2               |

The "C" type houses shall have a combined living and dining room, but garage and servant's quarters are not required.

Each house shall be equipped with proper sanitary and cooking facilities, purified water supply suitable for drinking, electricity supply for light and power, and ample fly-proof doors and windows. The kitchen shall be fitted with all necessary facilities, and provided with crockery, as listed in appendix to the Bill of Quantities, as directed by the Engineer. The electrical installation shall have ample wiring for power supply, sufficient lighting points and switch-socket outlets, all

GR  COMPLECT
Issue  & Engineering
Corporation
61, Vishov Blvd., Sofia
tel.: 87-65-62, tlx. 22021
Bulgaria

00117

- 118 -

in the approval of the Engineer. The hot and cold water system and storage tanks shall also be subject to the approval of the Engineer and shall also incorporate enamelled cast iron bath tub, connected to the water heater, listed in Appendix to the Bill of Quantities.

Internal walls and ceilings shall be repainted throughout with two coats of emulsion paint, wood and metal surfaces shall be painted with 2 coats of gloss paint. The walls, ceiling, wood and metal surfaces shall be re-painted once again, every two years, during the Contract period. paint quality and colours shall be to the Engineer's approval.

The furniture, fittings and equipment, for each house, listed in Appendix to the Bill of Quantities, shall be provided new and in accordance with specifications. Each item shall be approved by the Engineer, before being installed in the house. The rate to stated for the item in the Bill of Quantities shall include cost of delivery, installation, replacement in the event of damage, loss, and maintenance up to the end of the Works.

On completion of the Contract, all furniture, fittings and equipment provided, shall become the property of the Employer. The Contractor shall pay all charges in connection with the supply of electricity, water and services provided by the municipality, and all these charges shall be included in the rates tendered by the contractor, and nothing extra shall be paid to him, on this account.

Each house, together with furniture, fittings and equipment shall be provided, complete, within three months of the order, should the contractor fail to provide the houses including furniture, fittings and equipments.

AGROCOMPLECT
Economy & Technical
Organization
61, Vitosha Blvd, Sofia
tel.: 87-69-62, tlx. 22021
Bulgaria

~ 121 ~

as specified above, within the scheduled time, he shall pay to
the Employer a sum of 10 Dayn-Ireqi Denars Two only, per each
day per each house, as damages for the delay, after the expiry
of the scheduled date of supply, until such time, as the
complete house is made available to the Engineer.

## 3. OTHER SERVICES

The contractor shall render assistance and supply labour,
and technicians, as may be required by the Engineer, in connection
with the Contract such as messengers, chainmen, watchmen etc,
whether required continuously or from time to time by the Engine..
No extra payment will be made to the contractor for these servi..
and the cost there-of shall be included in the rates tendered
by him, in the Bill of Quantities.

## 4. SURVEYING INSTRUMENTS AND EQUIPMENT

The contractor shall supply for the sole use of Engineer,
surveying and other instruments and equipment as per specificat...,
and the number listed in Annexure 2.7 of the Bill of Quantities.
All instruments and equipment shall be new, and shall be replaced
in the event of damage, when required by the Engineer.

On completion of the contract, ownership of the instruments
and equipment shall be returned to the Contractor.



Definitions

The Bill of Quantities comprises this Preamble, the Bill with
their Appendices and the Summary.

Quantities:

The quantities set out in the Bill of Quantities are the estimated
quantities of the work and they are not to be taken as the actual
and correct quantities of the works to be executed by the Contrac-
tor in fulfilment of his obligations under the Contract.

Except where specifically and expressly stated in the Specification
or Bill of Quantities, the Permanent works only shall be measured.
The works shall be measured net to the dimensions shown on the
drawings or ordered by the Engineer, except, where otherwise spec-
ifically described or prescribed in the Contract.  Such measurements
shall be made notwithstanding any general or local custom
contrary.

Rates and Prices:

The rates entered against the several items in the following Bill
of Quantities.  Rates and Prices shall cover the execution, comp-
letion and maintenance of the several items of work finished comp-
letely in every respect as shown on and described in the Contract
Documents.

The rates shall include but not by way of limitation, labour,
transport and materials, the provision, maintenance, use and repair
of all plant, equipment and appliances of every kind, the Constru-
ction and maintenance of all temporary works of every description
and the performance of all services that may be required for the
proper execution, completion and maintenance of the works in full
and complete accordance with the provisions of the Contract
Documents, and the undertaking of all obligations and responsibi-
lities therein defined.

The Contractor shall be deemed to have fully considered all the
conditions, obligations and requirements of the Contract Documents
in establishing the respective rates against the general items.

Provisional Quantities:

Items in the Bill of Quantities marked 'Provisional Quantity' are
provisional items and shall only be executed if they are the subject
of a written Instruction from the Engineer.  The rates and prices
for such items shall be used for the valuation of works so ordered
by the Engineer in writing whether the quantities shown are used
wholly or in part and the Contract Price shall be varied by deduc-
tion of the amount of each such item and by addition of the value
of the work performed (if any) as ordered by the Engineer.

AGROCOMPLECT
Corporation
61, Vitosha Blvd, Sofia
tel.: 87-69-62, tlx. 22021
Bulgaria

EXHIBIT C (Part 4 of 5)



– 113 –

## BILL OF QUANTITIES

Bill No. 1 ( WORKS)

| Description | Unit | Qty | Rate | | Amount | |
|---|---|---|---|---|---|---|
| | | | ID | FILS | ID | FILS |

ACRRC IMPLECT
in oring
Gl. ... ' I Id , Sofia
tel.: br.55-62, tlx. 22021
**Bulgaria**

-114-

BILL NO. 2

SPECIAL SERVICES & FACILITIES

| Description | Unit | Qty. | Rate | | Amount | |
|---|---|---|---|---|---|---|
| | | | ID. | FILS | ID. | FILS. |
| OFFICE & LABORATORY: | | | | | | |
| supply, erection and maintenance for the entire duration of the Contract, of an office & laboratory, complete for the Engineer and his staff, as per Drawings and Specifications. | sq. m | | | | | |
| Provision and maintenance of furniture, fixtures and equipment, for the entire duration of the contract, for office and laboratory, as specified in annexure 2.1(sum. B/F from Annexure 2.1 ) | Sum. | | | | | |
| Supply & maintenance for the entire duration of the Contract, of testing equipment for the Engineer's laboratory, as specified in Annexure 2.2, sum B/F from Annexure 2.2 | Sum. | | | | | |
| Provision erection & maintenance for the entire duration of the contract complete for the Engineer and his staff protable office accommodation, as specified and approved by the Engineer. | No. | | | | | |

AGROCOMPLECT
Economic & Engineering
Corporation
Cl. Narod12 Ficd, Sofia
tel : 8x-25-62, tlx. 22021
Bulgaria

| Description | Unit | Quant | Rate | |
|---|---|---|---|---|

Provision and maintenance for the
entire duration of the contract
housing for the Engineer and his
staff, as per Drawings and Speci-
fications.

| i) Type AA | No. |
|---|---|
| ii) Type A | No. |
| iii) Type B | No. |
| iv) Type C | No. |

Provision and maintenance of
furniture, fixtures and equip-
ment for the entire duration of
the Contract, for the Engineer's
staff house Type AA, as specified
in Annexure No. 2.3.
Sum. B/F from Annexure 2.3.          Sum

Provision and maintenance of
furniture, fixtures and equip-
ment for the entire duration of the
contract, for the Engineer's staff
houst Type A, as specified in
Annexure 2.4.
Sum. B/F from Annexure 2.4.          Sum

Provision and maintenance of
furniture, fixtures and equip-
ment for the entire duration of
the contract, for the Engineer's
staff house Type B, as specified
in Annexure No. 2.5.

Sum. B/F from Annexure 2.5.          Sum.

Provision and maintenance of
furniture, fixtures and equipment
for the entire duration of the
Contract, for the Engineer's
staff house type C, as specified
in Annexure 2.6

Sum. B/F from Annexure 2.6.          Sum.

Supply and maintenance for the
entire duration of the contract
of surveying instruments and
equipment as specified in Annex-
ure No. 2.7.

Sum. B/F form Annexure 2.7          Sum.

AGROCOMPLECT
Economic & Engineering
Corporation
61, V. levski Blvd., Sofia
tel.: 87-..-02, tlx, 22021
Bulgaria

ANNEXURE 2-D

t of Furniture, Fixtures and Equipment for the Engineer's Office
and Laboratory

| Description | Unit | Quan-tity | Rate | Amount ID File |
|---|---|---|---|---|
| Supply and install the following items of furniture, fixtures and equipment in the Engineer's Office and laboratory | | | | |
| Metal desk with 6 drawers fitted with locks (1.50 m x 0.8 m) | No. | 4 | | |
| Typist desk metal 3 drawers with locks (1.0 m x 0.5 m) | No. | 1 | | |
| Metal table with 2 drawers (1.5 m x 0.8 m) | No. | 3 | | |
| Chair, wooden without arms | No. | 12 | | |
| Chair, typist | No. | 1 | | |
| Filing cabinet, metal, 3 drawers with suspended filing system. | No. | 1 | | |
| Filing cabinet, metal 4 drawers | No. | 1 | | |
| Cupboard, metal with 4 No. shelves (0.9 x 0.45 x 1.0 m) | No. | 2 | | |
| Laboratory Bench, with soild teak top (1.0 m x 3.0) having fitted laboratory sink. | No. | 1 | | |
| Balance bench | No. | 1 | | |
| Plan chest, antiquarian size, 8 drawers in two sections. | No. | 1 | | |
| Drawing board, antiquarian size, adjustable stand, with tee square. | No. | 1 | | |
| Stool, drawing office type | No. | 4 | | |
| Draughtsman's lamp adjustable | No. | | | |
| Drawing instruments, including protractors, setsquares and french curves. | Set | 1 | | |

AGROCOMPLECT
Economic & Engineering
Corporation
Cl. Vitosha Blvd., Sofia
tel. 87-59-62, tlx. 22021
Bulgaria

- 117 -

ANNEXURE 7.1

| Description | Unit | Quan- tity | Rate | Amount TD Fill |
|---|---|---|---|---|
| Map measurer. | No. | 1 | | |
| Planimeter. | No. | 1 | | |
| Scales, triangular, various. | No. | 6 | | |
| Drawing pens. | Set | 2 | | |
| Magnifying glass | No. | 1 | | |
| Waste paper basket | No. | 6 | | |
| Letter tray. | No. | 10 | | |
| Typewriter (Arabic) olivetti 82 with 3"wide carriage or similar approved. | No. | 1 | | |
| Typewriter (English) Olivetti 82 with 13"wide carriage and spare 18" wide carriage, or similar approved. | No. | 1 | | |
| Calculating machines Facit cm 2-16 or similar approved | No. | 1 | | |
| Sundry office items, paper, punches, stapling machines, sharpeners etc. | Sum. | | | |
| Office safe 1½ cu.ft; capacity | No. | 1 | | |
| Gas heater with 2 bottles | No. | 4 | | |
| Electric heater, 2 kw capacity | No. | 2 | | |
| Air coolers as specified | Sum. | | | |
| Curtains, as required by the Engineer | Sum. | | | |
| Carpets | No. | 3 | | |
| Gas Cooker, 2 ring type | No. | 1 | | |
| Refrigerator 6 cu. ft. Capacity | No. | 1 | | |

ACROCOMPLECT
I. ... & Engineering
Corporation
..., ... Blvd., Sofia
d: 8...-62, tlx. 22021

- 118 -

ANNEXURE 2.1



| Ita No. | Description | Unit | Quani | Rate | Amount ID.  FILS. |
|---|---|---|---|---|---|
| 3 | Benchin, and shelving, as required | Sum. | | | |
| 5 | Fire extinguishers including refills. | No. | | | |
| | | | | ID. | |

Total Carried forward as amount
against item 2/2 of the Bill of
Quantities.

AGROCOMPLECT
Economic & Engineering
Organization
61, Vitosha Bvd., Sofia
tel: 87-xx-x2, tlx. 2202x
Bulgaria

ANNEXURE A-2

List of Testing Equipment for Engineer's Laboratory.

| Description | Unit | Quan-tity | Rate ID FIls | Amount |
|---|---|---|---|---|

Supply and install the following
items of equipement in the
laboratory.

1 No. set of sieves in accordance
with B.S. 410 of the following
apertures:

Fine mesh wire cloth:
200, 100, 72, 52, 36
25, 14, 7 (8" dia X 2"
deep inside).

| Medium mesh wire cloth: | Set | 1 | | |
|---|---|---|---|---|

1/8", 3/16", 1/4", 3/8",
1/2", (12 dia. x 3" deep
inside).

Perforated plates 3/4", 1",
1½", 2", 2½", 3" (10" dia
x 3½" deep inside).

| Fine mesh wire cloth size No. 200 and 100. | sq.m. | 1 | | |
|---|---|---|---|---|

| Long stem soil hydrometer 0.995 - 1.030 range cali- brated at 20°C. | No. | 2 | | |
|---|---|---|---|---|

| 10 kg. capacity semi-automatic balance (x 1 g) with set of weights. | No. | 1 | | |
|---|---|---|---|---|

| 200 g capacity beam balance (x 0.001 g) with set of weights | No. | 1 | | |
|---|---|---|---|---|

| Electric oven thermostatically controlled, approx. 0.05 m³ capacity. | No. | 1 | | |
|---|---|---|---|---|

| Anhydrous silica gel dissicator, 250 mm dia. | No. | 2 | | |
|---|---|---|---|---|

| Stainless steel laboratory tongs | No. | 2 | | |
|---|---|---|---|---|

| Tripod stand | No. | 4 | | |
|---|---|---|---|---|

AGROCOMPLECT

- 180 -

ANNEXURE 2.2

| Description | Unit | Qty. | Rate | Amount ID. Fils |
|---|---|---|---|---|
| Glass stirring rod 300 mm long 6 mm dia. | No. | 2 | | |
| Pipette 50 cc. capacity | No. | 1 | | |
| Pipette 25 cc. capacity | No. | 1 | | |
| Pipette 10 cc. capacity | No. | 1 | | |
| Graduated glass measuring cylinder 1000 ml. | No. | 16 | | |
| Graduated glass measuring cylinder 100 ml. | No. | 2 | | |
| Stop watch. | No. | 2 | | |
| Buchner funnel to take 150 mm. dia. filter paper. | No. | 12 | | |
| Thermometer 0°C - 200°C x 1°C. | No. | 1 | | |
| 100 mm long stainless steel flexible spatula. | No. | 6 | | |
| 150 mm dia. plastic funnel | No. | 1 | | |
| Beaker, cylindrical 500 ml. capacity. | No. | 2 | | |
| PH paper colour strips. | Book | 6 | | |
| Vacuum filter pump. | No. | 1 | | |
| Rubber tubing 12 mm o.d. | m. | 10 | | |
| Thick walled rubber tubing (Vacuum) 14 mm. o.d. | m. | 3 | | |
| 20 litre polythene container for distilled water with tap. | No. | 2 | | |

AGROCOMPLECT
Economic & Engineering
Corporation
61, Vitosha Blvd., Sofia
tel: 8 -9-62, tlx. 22271
Bulgaria

– 121 –

ANNEXURE 2.2

| Item | Description | Unit | Qty. | Rate | Amount KD Fils |
|---|---|---|---|---|---|
| 1. | 6 in. dia. earth augers | No. | 1 | | |
| 2. | Electrical conductivity meter for soil survey use (Wheatstone bridge type). | No. | 2 | | |
| 3. | Vibrating table 500 mm x 600 mm table top. | No. | 1 | | |
| 4. | Supply of polythene bags including sizes 750 mm x 500 mm, 400 mm x 150 mm and bags with cloth outer cover 200 mm x 100 mm. | Sum. | | | |
| 5. | Supply of: Distilled water apparatus sodium boxamet-phosphat. hydrochloric acid (S.G. 1.1.18) Litmus paper. | Sum. | | | |
| 6. | Grinding machine. | No. | 1 | | |
| 7. | Mixer for soil sample | No. | 1 | | |
| 8. | Size 1 litre/hour. | No. | 1 | | |

AGROCOMPLECT
Bulgaria

Total carried Forward to amount against item 2/3 the Bill of Quantities.

ANNEXURE 2-2

...t of Furniture, Fixtures and Equipment for one
Engineer's Staff House Type AA

| Item No. | Description | Unit | Quantity | Rate ID Fils | Amount ID Fils |
|---|---|---|---|---|---|
| 1. | Supply to staff house upholstered settee. | No. | 1 | | |
| 2. | Ditto upholstered easy chair | No. | 3 | | |
| 3. | Ditto coffee table | No. | 2 | | |
| 4. | Ditto side table. | No. | 4 | | |
| 5. | Ditto bookcase with 2 shelves and glass front | No. | 2 | | |
| 6. | Ditto writing desk with chair | No. | 1 | | |
| 7. | Ditto dining table | No. | 1 | | |
| 8. | Ditto dining chairs. | No. | 8 | | |
| 9. | Ditto sideboard. | No. | 1 | | |
| 10. | Ditto standard lamp | No. | 1 | | |
| 11. | Ditto single bedstead and headboards. | No. | 7 | | |
| 12. | Ditto mattress interior sprung | No. | 7 | | |
| 13. | Ditto pillow for ditto | No. | 14 | | |
| 14. | Ditto bedside table with drawer. | No. | 7 | | |
| 15 | Ditto bedside lamp | No. | 7 | | |
| 16. | Ditto dressing table with mirror and stool. | No. | 2 | | |
| 17. | Ditto wardrobe fitted with mirror | No. | 4 | | |



AGROCOMPLECT
Economic & Engineering
Organ ation
61, Vitosha Blvd., Sofia
tel: 87-..-62, tlx. 22021
Bulgaria

00130

- 173 -

| № | Description | Unit | Quan-tity | Rate | Amount Il Fils |
|---|---|---|---|---|---|

Brought forward

| | | | | |
|---|---|---|---|---|
| Supply to staff house chest of drawers with four drawers. | No. | 3 | | |
| Ditto chair, wooden. | No. | 6 | | |
| Ditto refrigerator with 10 cu.ft. freezer capacity. | No. | 1 | | |
| ... ... for ... gas, with 4 burners, grill and thermostat controlled oven. | No. | 1 | | |
| Ditto kitchen table with drawer and formica top. | No. | 1 | | |
| Supply and deliver to staff house ironing board. | No. | 1 | | |
| Ditto tubular metal garden table. | No. | 1 | | |
| Ditto garden chairs. | No. | 6 | | |
| Ditto waste paper basket | No. | 7 | | |
| Ditto dustbin. | No. | 1 | | |
| Ditto 30 m. length garden hose with tap connection. | No. | 1 | | |
| ditt. lampshades. | Set | 1 | | |
| Ditto curtains, complete with hooks and runners. | Set. | 1 | | |
| Ditto rugs and carpets | Set. | 1 | | |

Carried forwards

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

00131

- 124 -

ANNEXURE 2.3

| No. | Description | Unit | Quan-tity | Rate | Amount TD F |
|-----|-------------|------|-----------|------|-------------|

Brought forward

1. Supply to staff house child's cot wooden, drop sided with mattress. No. 1

2. Ditto kerosene heaters, Aladdin type with glass globe. No. 3

3. Ditto protable bottled gas type heater. No. 1

4. Ditto kitchen waste bin with pedal operated lid. No. 1

5. Ditto Kerosene 5 gallon container No. 1

6. Ditto water heater Fireking or similar approved, 40 gallon storage capacity. No. 1

7. Ditto air coolers complete including connections to water and electricity mains, provision of supports, ducting, and louvres, and of such capacity and number to deliver a volume of cooled air each minute equal to the gross volume of the house. Set 1

8. Ditto ceiling fans, rheostat controlled No. 6

Total

Total carried Forward as amount against item 2/6 the Bill of Quantities.

Notes:

The furniture shall generally be teakwood and teak wood veneer with top surfaces teak type Formica or similar approved. Kitchen furniture shall be white wood painted.

PHOTOCONNECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-99-62, tlx. 22021
Bulgaria

00132

... ... ...

... ... ... Fixtures and Equipment for one Engineer's ... Staff House - Type ...

| Description | Unit | Quant-ity | Rate ID Fils | Amount |
|---|---|---|---|---|
| Supply to staff house upholstered settee. | No. | 1 | | |
| Ditto upholsterers' easy chair. | No. | 3 | | |
| Ditto coffee table. | No. | 2 | | |
| Ditto side table. | No. | 4 | | |
| Ditto bookcase with 2 shelves and glass front. | No. | 2 | | |
| Ditto writing desk with chair. | No. | 1 | | |
| Ditto dining table. | No. | 1 | | |
| Ditto dining chairs. | No. | 6 | | |
| Ditto sideboard. | No. | 1 | | |
| Ditto standard lamp. | No. | 1 | | |
| Ditto single bedstead and headboards. | No. | 5 | | |
| Ditto mattress interior sprung. | No. | 3 | | |
| Ditto pillow for ditto. | No. | 10 | | |
| Ditto bedside table with drawer | No. | 5 | | |
| Ditto bedside lamp. | No. | 5 | | |
| Supply to staff house dressing table with mirror and stool | No. | 1 | | |
| Ditto wardrobe fitted with mirror | No. | 3 | | |

Carried forward:

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-9-62, tlx. 22021
Bulgaria

| Description | Unit | Quantity | Rate | Amount In Fils |
|---|---|---|---|---|
| Brought forward: | | | | |
| Ditto chest of drawers with four drawers. | No. | 2 | | |
| Ditto chairs, wooden. | No. | 6 | | |
| Ditto refrigerator with 10 cu. ft. cold capacity and 4 cu. ft. freezer capacity. | No. | 1 | | |
| Ditto cooking stove, gas, with 4 burners, grill and thermostat controlled oven. | No. | 1 | | |
| Ditto kitchen table with drawer and Formica top. | No. | 1 | | |
| Ditto ironing board. | No. | 1 | | |
| Ditto tubular metal garden table. | No. | 1 | | |
| Ditto garden chairs. | No. | 6 | | |
| Ditto waste paper basket. | No. | 6 | | |
| Ditto dustbin. | No. | 1 | | |
| Ditto 30 m. length garden hose with tap connection. | No. | 1 | | |
| Ditto lampshades | Set | 1 | | |
| Supply to staff house curtains, complete with hooks and runners. | Set | 1 | | |
| Ditto rugs and carpet. | Set | 1 | | |
| Ditto child's cot wooden, drop sided with mattress | No. | 1 | | |

carried forward:

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-69-62, tlx. 22021
Bulgaria

00134

| Item | Description | Unit | Quantity | Rate ID Fils | Amount ID Fils |
|------|-------------|------|----------|------|--------|
| 1. | Ditto Kerosene heaters, Aladdin type with glass globe. | No. | 3 | | |
| 2. | Ditto portable bottled gas type heater. | No. | 1 | | |
| 3. | Ditto Kitchen waste tin with pedal operated lid. | No. | 1 | | |
| 4. | Ditto kerosene 5 gallon container. | No. | 1 | | |
| 5. | Ditto water heater "Fireking" or similar approved, 40 gallon storage capacity. | No. | 1 | | |
| 6. | Supply and deliver to staff house air cooler complete including connections to water and electricity mains, provision of supports, ducting, and louvers of such capacity and number, to deliver a volume of cooled air each minute equal to the gross volume of the house. | Set | 1 | | |
| 7. | Ditto ceiling fans, rheostat controlled. | No. | 5 | | |

Total Carried Forward as amount against item 2/7 the Bill of Quantities.

Notes

The furniture shall generally be teak wood and teak wood veneer with top surfaces teak type Formica or similar approved. Kitchen furniture shall be white wood painted.

AGROCOMPLECT
Economic & Industrial Corporation
61, Vitosa Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

00135

- 196 -

ANNEXURE 3.5

List of Furniture, Fixtures and Equipment for one Engineer's staff
House - Type E

| Item No. | Description | Unit | Quantity | Rate ID Fils | Amount |
|----------|-------------|------|----------|--------------|--------|
| 1. | Supply to staff house uphol-stered settee | No. | 1 | | |
| 2. | Ditto upholstered easy chair | No. | 2 | | |
| 3. | Ditto coffee table | No. | 1 | | |
| 4. | Ditto side table | No. | 4 | | |
| 5. | Ditto bookcase with 2 shelves and glass front | No. | 1 | | |
| 6. | Ditto writing desk with chair. | No. | 1 | | |
| 7. | Ditto dining table | No. | 1 | | |
| 8. | Ditto dining chairs. | No. | 6 | | |
| 9. | Ditto sideboard | No. | 1 | | |
| 10. | Ditto standard lamp. | No. | 1 | | |
| 11. | Ditto single bedstead and headboards. | No. | 5 | | |
| 12. | Ditto mattress interior sprung | No. | 5 | | |
| 13. | Ditto pillow for ditto | No. | 10 | | |
| 14. | Ditto bedside table with drawer | No. | 5 | | |
| 15. | Ditto bedside lamp. | No. | 5 | | |
| 16. | Ditto dressing table with mirror and stool | No. | 1 | | |
| 17. | Ditto wardrobe fitted with mirror. | No. | 3 | | |

Carried forward:

AGROCOMPLECT
Economic & Engineering
Organisation
Gl. Vitosha Blvd., Sofia
tel: 8?-?3-62, tlx. 22021
Bulgaria

00136

ANNEXURE 7.5

| | Description | Unit | Quan- tity | Rate ID Fils | Amount ID Fils |
|---|---|---|---|---|---|
| | **Brought forward:** | | | | |
| | Supply to staff house chest of drawers with four drawers. | No. | 3 | | |
| | Ditto chairs, wooden. | No. | 6 | | |
| | Ditto refrigerator with 10 cu. ft. cold capacity and 4 cu. ft. freezer capacity. | No. | 1 | | |
| | Ditto, cooking stove, gas, with 4 burners, grill and thermostat controlled oven. | No. | 1 | | |
| | Ditto kitchen table with drawer and Formica top. | No. | 1 | | |
| | Ditto kitchen chairs | No. | 2 | | |
| | Ditto tubular metal garden table. | No. | 1 | | |
| | Ditto ironing board. | No. | 1 | | |
| | Ditto garden chairs. | No. | 4 | | |
| | Ditto waste paper basket | No. | 6 | | |
| | Ditto dustbin. | No. | 1 | | |
| | Ditto 30 m. length garden hose with tap connection. | No. | 1 | | |
| | Ditto lampshades. | Set. | 1 | | |
| | Ditto curtains, complete with hooks and runners. | Set. | 1 | | |
| | Ditto rugs and carpets. | Set. | 1 | | |
| | Supply to staff house child's cot wooden, drop sided with mattress. | No. | 1 | | |

Carried forward:



AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx. 22021
Bulgaria

- 130 -

ANNEXURE 2.3

| Description | Unit | Quan-tity | Rate | Amount ID Mils. |
|---|---|---|---|---|

brought forward:

Ditto Kerosine heaters, Aladdin type
with glass globe.                     No.    3

Ditto portable bottled gas type
heater.                               No.    1

Ditto kitchen waste bin with pedal
operated lid.                         No.    1

Ditto kerosene 5 gallon container.    No.    1

Supply and deliver water heater
'Picking or similar approved.         No.    1

Ditto air coolers complete including
connection to water and electricity
mains, provision of supports, ducting
and louvers and such capacity and
number to deliver a volume of cooled
air each minute equal to the gross
volume of the house.                  Set.   1

Ditto ceiling fans, rheostat
controlled.                           No.    4
                                      ------------------------------
                                      ID.
                                      ------------------------------

Total Carried forward as amount
against item 2/8 the Bill of
Quentities.

Notes:
------

     The furniture shall generally
be teak wood and teak wood veneer
with top surfaces teak type formica
or similar approved.  Kitchen
furniture shall be white wood
painted.

AGROCOMPLECT
Economic & Engineering
Organization
61, Vitosha Blvd., Sofia
tel.: 87-09-62, tlx: 22021
Bulgaria

- 131 -

SCHEDULE 3.7

Furniture, Fixtures and Equipments of the Engineer's

Staff House - Type C

| Description | Unit | Quantity | Rate | Amount ID Fils |
|---|---|---|---|---|
| ...ply to staff house | | | | |
| upholstered settee | No. | 1 | | |
| ditto upholstered easy chair | No. | 2 | | |
| ...to side table | No. | 2 | | |
| ...to dining table. | No. | 1 | | |
| ...to dining chairs | No. | 6 | | |
| ditto sideboard | No. | 1 | | |
| ditto single bedstead. | No. | 4 | | |
| ditto mattress. | No. | 4 | | |
| ditto pillow for ditto | No. | 8 | | |
| Ditto bedside table with drawer. | No. | 2 | | |
| Ditto bedside lamp. | No. | 2 | | |
| Ditto wardrobe fitted with mirror | No. | 2 | | |
| Ditto chest of drawers with four drawers. | No. | 2 | | |
| Ditto chairs, wooden | No. | 4 | | |
| ditto refrigerator with 6 cu. ft. Capacity. | No. | 1 | | |
| Ditto cooking stove, gas with 3 burners and thermostat. | No. | 1 | | |
| | | TD. | | |

Carried forward:

TECHNOCOMPLECT
Engineering & Purchasing
Organisation
61, Vitosha Blvd., Sofia
tel.: 6, 30-62, tlx. 22021
Bulgaria

- 132 -

ANNEXURE E.1

| Item No. | Description | Unit | Quantity | Rate |
|---|---|---|---|---|
| | Brought forward: | | | |
| 17. | Supply to staff house kitchen storage cabinet | No. | 1 | |
| 18. | Supply and deliver to staff house ironing board | No. | 1 | |
| 19. | Ditto dustbin. | No. | 1 | |
| 20. | Ditto lampshades | Set. | 1 | |
| 21. | Ditto curtains, complete with hooks and runners | Set. | 1 | |
| 22. | Ditto rugs and carpets. | Set. | 1 | |
| 23. | Ditto Kerosene heater Aladdin type | No. | 3 | |
| 24. | Ditto Kerosene 5 gallon container | No. | 1 | |
| 25. | Ditto water heater "Fireking" or similar approved, 20 gallon storage capacity. | No. | 1 | |
| 26. | Ditto air cooler complete including connections to water and electricity mains provision of supports, ducting and louvres, and of such capacity and number to deliver a volume of cooled air each minute equal to the gross volume of the house | Set. | 1 | |
| | | ID. | | |

Carried forward:

AGROCOMPLECT
Technical Engineering
Organisation
61, Vitosha Bvd., Sofia
tel.: 87-09-03, tlx. 22021
Bulgaria

00140

~ 131 ~

ANNEXURE 2.6

| No | Description | Unit | Quan-tity | Rate | Amount ID. ... |
|----|-------------|------|-----------|------|----------------|

Brought forward:

Supply to staff house
ceiling fans, rheostat
Controlled.                              No.    3

                                                ID.

Total Carried forward as amount
against item 2/4, the Bill of
Quantities.

Notes:

The furniture shall generally be
mahogany type wood and veneer
with top surfaces mahogany type
Formica or similar approved.
Kitchen furniture shall be white
wood painted.



AGROCOMPLECT
Economic & Engineering
Corporation
Gl. Vitosha i b.J., Sofia
tel.: 87-66-33 ilk, 22021
Bulgaria

~ 131 ~

ANNEXURE 2.6

| Item | Description | Unit | Quan-tity | Rate IL. Fil | Amount IL. Fil |
|------|-------------|------|-----------|--------------|-----------------|

Brought forward:

Supply to staff house ceiling fans, rheostat Controlled.          No.    3

ID.

Total Carried forward as amount against item 2/9, the Bill of Quantities.

Notes:

The furniture shall generally be mahagony type wood and veneer with top surfaces mahagony type Formica or similar approved. Kitchen furniture shall be white wood painted.

AGROCOMPLECT
Command & Engineering
Co-operation
Gl. Vitosha i B.J., Sofia
tel.: 87-65-54, tlx. 22021
Bulgaria

00142

Schedule....

list of surveying instruments and Equipments

| Description | Unit | Quan-tity | Rate | Amount to File |
|---|---|---|---|---|

Supply the following items of surveying instruments and equipment.

| Description | Unit | Quantity |
|---|---|---|
| Theodolite (of approved make), complete with tripod, carrying case and all accessories. | No. | 1 |
| Level (of approved make) complete with tripod, carrying case and all accessories | No. | 2 |
| Levelling stave (of approved make), engine divided 4 m long folding. | No. | 12 |
| Levelling stave, engine divided 3 m long extending | No. | 3 |
| Staff levelling plate | No. | 15 |
| Land chain. | No. | 6 |
| Steel tape, 25 m length. | No. | 2 |
| Steel tape, 50 length | No. | 2 |
| Steel tape repair kit. | No. | 1 |
| Ranging rod, 3 m length. | No. | 50 |
| Arrow, 40 cm length. | No. | 50 |
| Conical plummet, 200 gr. weight | No. | 5 |
| Fixed straight edge, 1 m. length | No. | 2 |
| Spirit level, 1 m. length | No. | 2 |
| Flexible steel rule, 2 m. length | No. | 6 |
| Mason string line, 50 m length | No. | 10 |
| Thermometer, maximum and minimum graduated in °C and °F. | No. | 2 |

Carried forward:

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel : 87-59-61, tlx. 22021
Bulgaria

00143

ANNEXURE 2.7

| Item No. | Description | Unit | Quantity | Rate ID Fils | Amount ... |
|---|---|---|---|---|---|

Brought forward:

| 18. | "Speedy" moisture tester or similar approved. | No. | 2 | | |
| 19. | Hand auger set, four inch diameter, 15 m long, including jarring link and 1½" diameter soil sampling tubes | No. | 1 | | |
| 20. | Prismatic compass | No. | 2 | | |
| 21. | Optical square | No. | 6 | | |
| 22. | hammer 3 kg weight | No. | 4 | | |
| 23. | Shovel | No. | 6 | | |
| 24. | "Thermos" flask 4 litre capacity or similar approved | No. | 3 | | |
| 25. | Water bottle plastic,/ litre capacity. | No. | 12 | | |
| 26. | Water bag. | No. | 6 | | |
| 27. | 8" low pressure portable flow meter (of approved make) with light weight galvanized steel tube with flanged ends, direct reading totalizer connecting pipes flood extension unit and carrying box. | No. | 1 | | |
| 28. | Stop watch, reading to 1/5th second. | No. | 4 | | |
| 29. | Groundwater observation pipes consisting of 1½" diameter galvanised M.S. pipe with graded gavel packing, etc, as shows on the drawings. | No. | 24 | | |
| | | ID. | | | |

Total carried forward as amount
against item 2/10 the Bill of
Quantities.

AGROCOMPLECT
Econo... ...eering
61, Vitosha ... Sofia
tel.: 87-69-62, tlx. 22021
Bulgaria

00144

# APPENDIX I

## LIST OF IRAQI STANDARD SPECIFICATIONS AND CODES OF PRACTICE

| Code | Title |
|------|-------|
| Sp. | |
| 1/67 | Bitumen roofing felts for damp proofing |
| 5/67 | Ordinary and rapid hardening portland Cement |
| 2/63 | Sulphate resisting portland cement. |
| 3/58 | Standard methods of chemical analysis of portland cement. |
| 5/60 | Standard methods for physical tests of portland cement. |
| 13/69 | Standard test sieves. |
| 24/69 | Standard methods for physical and chemical tests, and sampling procedures for building bricks. |
| 25/69 | Clay building bricks. |
| 26/69 | Chemical analysis of gypsum and gypsum products. |
| 27/69 | Building gypsum. |
| 29/69 | Methods for sampling fine & coarse aggregates, lumps, solid rocks and filters used in construction. |
| 30/69 | Determination of particle size and shape of aggregate. |
| 31/69 | Determination of relative density (specific gravity), water absorption, Density voids and bulking for aggregates. |
| 32/69 | Determination of moisture in fine and coarse aggregates. |
| 33/69 | Standard methods for testing deleterious materials in aggregates. |

AGROCOMPLECT
Econom... ... ...ineering
Orga ... ... ...n
61, Vitosha : 1 ...Sofia
tel: 8..-5-5... 1 ...22021
Bulrai...

- 137 -

APPENDIX I

Code                    Title

.:/70    Determination of crushing value of aggregates
         and crushing strength of rocks.

.:/70    Alkali potential reactivity of coarse and fine
         aggregates used in concrete (Chemical method).

../70    Determination of soundness of the fine and co
         aggregates used in concrete.

:/70     Aggregates from natural sources for concrete.

.:/70    Determination of impact value of aggregates.

/70      Determination of ten per cent fines value.

/70      Methods of sampling fresh concrete and
         determination of workability of concrete.

.:/70    Test of compressive strength of concrete.

'/70     Preparation of specimens and testing flexural
         strength of concrete in the laboratory.

'./70    Determination of initial and final moisture content
         of concrete.

'5/70    Preparation and testing concrete core samples.

'J./70   Methods for tensile testing of metals.

'4/70    Methods of sampling of paints, varnish and
         related materials.

5/70     Paints and varnishes-preparation of test panels
         before coating.

'/70     Paints and varnishes surface drying time
         (Billotine Method).

'J70     Paints and varnishes-determination and
         volatile matters.

AGROCOMPLECT
Economic & Engineering
Corporation
8, Vitosha Blvd., Sofia
tel.: 87- -52, tlx. 22021
Bulgaria

00146

- 138 -

APPENDIX 1

| Iraqi Code No. | Title |
|---|---|
| 70/71 | Paints and varnishes - Bend test. |
| 71/71 | Building and sanitary pipes in asbestos cement. |
| 72/71 | Asbestos cement pipes, joints and fittings for sewage and drainage. |
| 74/71 | Asbestos cement fitting for building and sanitary purposes. |
| 79/71 | Asbestos-cement corrugated sheets for roofing and cladding. |
| 82/71 | Asbestos cement slates for roofing and cladding. |
| 83/71 | Asbestos cement flat sheets. |
| 127/72 | Brinel hardness tests of steel. |
| 193/73 | Water for analytical and laboratory uses. |
| 262/72 | General technical delivery requirements of steel. |

AGROCOMPLECT
E..... ....ering
C.. ....on
.... Bivd., Sofia
.. B.....52, tlx. 22021
Bulgaria

APPENDIX AI

BRITISH STANDARDS AND CODES OF PRACTICE

| B.S. Number | STANDARDS |
|---|---|
| 7 | Rubber insulated cables and flexible cords for electric power and lighting. |
| 10 | Tables of pipe flanges. |
| 12 | Portland cement (ordinary and rapid hardening. |
| 63 | Single-sized roadstone and chippings. |
| 65 & 540 | Salt - glazed ware pipes. |
| 76 | Tars for road purposes. |
| 78 | Cast iron pipes (vertically cast) for water gas and sewage. |
| 144 | Coal tar creosote for the preservation timber. |
| 146 | Portland - blastfurnace cement. |
| 153 | Steel girder bridges. |
| 171 | Power transformers. |
| 242, 243, & 259 | Linseed oil for paints. |
| 244 & 290 | Turpentine for paints. |
| 275 | Dimensions of rivets (½ in. to 1½ " in.). |
| 340 | Precast concrete kerbs, channels, edgings and quadrants. |
| 368 | Precast concrete flags. |
| 410 | Test sieves. |
| 416 | Cast iron spigot and socket soil, waste and ventilating pipes. |
| 417 | Galvanized mild steel cisterns, tanks and cylinders. |
| 437 | Cast iron spigot and socket drain pipes. |

AGROCOMPLECT
Economic & Engineering
Corporation
GL. Rakovski Blvd., Sofia
tel. 82, lk. 22021
Bulgaria

APPENDIX II

| B.S. Number | Standards |
|---|---|
| 449 (CP 113) | The use of structural steel in building. |
| 460 & 1205 | Cast iron rainwater goods. |
| 486 | Asbestos cement pressure pipes. |
| 497 | Cast manhole covers, road gully gratings &c. |
| 534 | Steel spigot and socket pipes and special water, gas and sewage. |
| 539 | Dimensions of drains fittings. Salt ule and glass (vitreous) enamelled cast., |
| 544 | Linseed oil putty for use in wooden frames. |
| 556 | Concrete cylindrical pipes and fittings. |
| 569 | Asbestos cement rainwater pipes, gutters and fittings. |
| 582 | Asbestos cement soil, waste and ventilating pipes and fittings. |
| 594 | Rolled asphalt (hot process). |
| 599 | Pump tests. |
| 602 | Lead pipes for other than chemical purposes. |
| 639 | Covered electrodes for the metal arc welding of mild steel. |
| 659 | Light gauge copper tubes. |
| 709 | Methods of testing fusion welds, welded joints and weld metal. |
| 729 | Zinc coating on iron and steel articles parts 1 and 2. |
| 743 | Materials for damp proof courses. |
| 747 | Roofing felts (bitumen and fluxed pitch). |
| 785 | Rolled steel bars and hard drawn steel wire for concrete reinforcement. |
| 802 | Tarmacadam with crushed rock or slag aggregate. |
| 812 | Methods for sampling and testing of mineral aggregates, sands and fillers. |
| 816 | Requirements for electrical accessories. |

AGROCOMPLECT
...ganisation
6., ...a Blvd., Sofia
tel. ... 62, tlx. 22621
Bulgaria

00149

APPENDIX IX.

| Item Number | Standards |
|---|---|
| 864 | Capillary and compression fittings of copper |
| 882-1201 | Concrete aggregates from natural sources. |
| 890 | Building limes. |
| 892 | Glossary of highway engineering terms. |
| 913 | Pressure creosoting of timber. |
| 915 | High alumina cement. |
| 952 | Glass for glazing. |
| 968 | High tensile (fusion welding quality) structural steel for bridges, etc. and general building construction. |
| 990 | Metal casement windows and casement doors for domestic buildings. |
| 1010 | Draw off taps and stop valves for water services (Screw-down pattern). |
| 1053 | Water paints and distempers. |
| 1070 | Black paint (tar base). |
| 1125 | W.C. Flushing cisterns (including flush pipes). |
| 1130 | Schedule of cast iron drain fittings, spigot and socket type. |
| 1144 | Cold twisted steel bars for concrete reinforcement. |
| 1162, 1410 & 1418 | Mastic asphalt for roofing. |
| 1184 | Copper and copper alloy traps. |
| 1186 | Quality of timber and workmanship in joinery. |
| 1188 | Ceramic lavatory basins (dimensions and workmanship only). |
| 1191 | Gypsum building plasters. |
| 1194 | Concrete porous pipes for under-drainage. |

AGROCOMPLECT
Engineering
Consultation
Blvd., Sofia
-0-02, IIx, 22021
Bulgaria

- 212 -

APPENDIX IV

| B.S. Number | Standards |
|---|---|
| 1196 | Clayware field drain pipes. |
| 1198-1200 | Building sands from natural sources. |
| 1211 | Centrifugally cast (spun) iron pressure |
| 1213 | Ceramic washdown W.C. pans (dimensions workmanship). |
| 1221 | Steel fabric for concrete reinforcement. |
| 1242 | Tarmacadam tarpaving. |
| 1243 | Metal wall ties. |
| 1255 | Brackets and supports for lavatory basins and sinks. |
| 1286 | Clay tiles for flooring (dimensions and workmanship). |
| 1377 | Methods of testing soils for civil engineers' purposes. |
| 1387 | Steel tubes and tubulars suitable for screwing to B.S. 21 pipe threads. |
| 1455 | British made plywood for general purposes. |
| 1478 | Bending dimensions of bars for concrete reinforcement. |
| 1521 | Waterproof building papers. |
| 1621 | Bitumen macadam with crushed rock or slag aggregate. |
| 1690 | Fine cold asphalt. |
| 1722 | Fencing. |
| 1775 | Steel tubes for mechanical, structural and general engineering purposes. |
| 1788 | Street lighting lanterns. |
| 1853 | Tubular fluorescent lamps for general lighting service. |

AGROCOMPLECT
Export ... Engineering
... ...ation
... ...od ... Clvd., Sofia
... ... .52, ttx, 22021
Bulgaria

● 213 ●

APPENDIX 13

| Number | Standards |
|---|---|
| 1856 | General requirements for metal-arc welding of mild steel . |
| 1660 | Structural timber, Measurement of characteristics effecting strength. |
| 1881 | Methods of testing concrete. |
| 2033 | Cast iron flanged pipes and flanged fitt- |
| 2451 | Chilled iron shot and grit |
| 2521 to 2524 | Ready-mixed oil-based priming paints. |
| 2525 to 2523 | Ready mixed oil-based undercoating and finishing paints. |
| 2542 | Recommendations for the use of bitumen emulsion for roads. |
| 2642 | General requirements for the metal-arc welding of medium tensile weldable structural steels to B.S. 968 type B. |
| 3139 | High strength friction grip bolts for structural engineering. |
| 3294 | The use of high strength friction grip bolts in structural steelwork. |
| 3436 | Ingot zinc. |
| 3921 | Bricks and blocks of fired brickearth, clay or shale. |
| 3978 | Water for laboratory use. |
| 3981 | Iron oxide pigments for paints. |
| 4027 | Sulphate Resisting cement. |

AGROCOMPLECT
E nomic & Engin er'ng
Organization
...lion's Blvd, Sofia
...a Bulg...2, tlx. ....1
Bulgaria

-213-

## APPENDIX II

| B.S. Number | Standards |
|---|---|
| 425 | Two part polysulphide-based sealing compound for the building industry. |
| 4360 | Weldable structural steels. |
| 4246 | Low heat portland · blastfurnace cement. |
| 4248 | Supersulphated cement. |

| C.P. Number | Codes of Practice |
|---|---|
| 112 | The structural use of timber in buildings. |
| 113 | The structural use of steel in building (see B.S. 449). |
| 114 | The structural use of reinforced concrete in buildings. |
| 144, 101 | Bitumen felt roof coverings. |
| 144, 201 | Mastic asphalt roofing. |
| 152 | Glazing and fixing of glass for buildings. |
| 231 | Painting. |
| 305 | Sanitary appliances. |
| 310 | Water supply. |
| 321 | Electrical installations – general. |
| 321, 101 | Electric wiring systems in building. |
| 2001 | Site investigations. |
| 2005 | Sewerage |
| 2006 | Traffic bearing structures, Pavings. |
| 2008 | Protection of iron and steel structures from corroding. |

AGROCOMPLECT
Economic & Engineering
Organization
1, "Rue"a Blvd. Sofia
with . . . 21, th. 2...1
Bulgaria



- 143 -
APPENDIX TEN
List of Drawings

| Serial | T i t l e of Drawing | No. |
|--------|----------------------|-----|
| | | |

AGROCOMPLECT
Export of Engineering
...ation
...Vtoria Ltd., Sofia
tel: 0...9-62, tlx. 22021
Bulgaria

- 215 -

... ........ made this day ... ..................... ... ....
of the month of ........................ of the year one thousand
nine hundred and , ......... .......... between Mr. ...................
on behalf of the State Organisation for Land Reclamation,
Government of Iraq, herein-after called the " Employer " of the
one part and ................................................................
herein-after called the "Contractor" of the other part.

Agreement is reached between the Employer and the "Contractor"
that the " Contractor " shall undertake the construction, execution,
completion and maintenance of the work pertaining to the Contract..
.......................................................................
(name of the Contract shall be mentioned) in accordance with ...
Contract's Documents and stipulations against the sum of .........
.......................................... within a period of ...
.......................................... days.

On the other part, the employer agrees to pay the amounts
due to the contractor according to the prices, conditions and
dates stated in the Contract. Each of the following documents shal.
be deemed complimentary to the other, and all of which shall form
Contract Documents in accordance with the Contents of which ......
of works shall be carried out or in a revised or modified form in
accordance with the permits provided in the same document:

      a.  Instructions to Tenderers.
      b.  Tender Form.
      c.  Contract agreement.
      d.  General conditions.- Section 1.

AGROCOMPLECT
................
................
................ 22021
Bulgaria

- 147 -

Part I - General Conditions.

Part II - Condition of Particular application

General condition section II.

Part I          - General Conditions & technical specifications
                  for Land Reclamation Projects.

Part II   -      General conditions & technical specifications
                 for structures, lining.

Part III -       Special services & facilities.

     d.   Bill of Quantities and Prices.

     f.   Drawings.

     g.   Letter of Intent

     In compliance there with this contract is signed by
the above mentioned two contracting parties.

Contrator:                        Employer:

Name: ...........................    Name: ...............

dress: ..........................    Address: ............

AGROCOMPLECT
... & Engineering
... ration
... Blvd., Sofia
62, fl., 22021
... garia

mcl/26.8.80

[logo: Republic of Iraq]

Republic of Iraq

Ministry of Irrigation

Project _____

Contract Number ( 65 )   Hila- Diwaniya Project
                          Contract Number / 4

(General Conditions)

[logo: Republic of Iraq]

Republic of Iraq

Ministry of Irrigation

Project _____

Contract Number (   ) _____

(General Conditions)

[illegible signature] [illegible stamp]

# Contents
## General Conditions
## For Civil Engineering Contract Work
## General Conditions
### -Section One-

| Article | No. | Topic | Page |
|---------|-----|-------|------|
| | | Instructions to bidders | 11-14 |
| | | Bidding Form | 15-16 |
| Article One | 1 | Definitions | 17 |
| | | a. Employer | 17 |
| | | b. Contractor | 17 |
| | | c. Engineer | 17 |
| | | d. Resident Engineer | 17 |
| | | e. Works | 17 |
| | | f. Temporary Works | 17 |
| | | g. Contract | 18 |
| | | h. Contract Sum | 18 |
| | | i. Construction Equipment | 18 |
| | | j. Quantities Table | 18 |
| | | k. Maps | 18 |
| | | l. Specifications | 18 |
| | | m. Site | 18-19 |
| | | n. Authentication | 19 |
| | 2 | Singular and plural | 19 |
| | 3 | Titles and comments | 19 |
| Article Two | | Duties and Responsibilities of the Resident Engineer | 19-20 |
| Article Three | - | Concession | 20 |
| Article Four | - | Subcontracting (secondary contracts) | 20 |
| Article Five | - | Scope of contract | 20-21 |
| Article Six | - | Language and interpretation | 21 |
| Article Seven | - | Keeping maps | 21-22 |
| Article Eight | 1 | Additional maps and instructions | 22 |
| | 2 | Photographs | 22 |
| Article Nine | - | Contract formula | 22 |
| Article Ten | - | Guarantee of implementation | 22 |
| Article Eleven | - | Testing the site | 22-23 |
| Article Twelve | - | Exceptional natural conditions of the "Site" and unnatural conditions | 23 |
| Article Thirteen | - | Engineer's satisfaction with the works | 23-24 |
| Article Fourteen | - | Submitting the work program | 24 |
| Article Fifteen | - | Contractor's management of work | 24 |
| Article Sixteen | - | Contractor's employees | 25 |
| Article Seventeen | - | Planning work at the site | 25-25 |

3
[illegible signature] [illegible stamp]

| Article | No. | Topic | Page |
|---|---|---|---|
| Article Eighteen | - | Test holes and investigative drilling | 26 |
| Article Nineteen | - | Guarding and lighting | 26 |
| Article Twenty | 1 | Caring for works | 26-27 |
| | 2 | Exceptional hazards | 27 |
| Article Twenty One | - | Insurance of works and others | 27-28 |
| Article Twenty Two | - | Damages to people and money | 28-29 |
| Article Twenty Three | 1 | Insurance against other (third person) liability | 29 |
| | 2 | Minimum insurance sum against other (third person liability) | 29 |
| Article Twenty Four | - | Accidents and workers' injuries | 29-30 |
| Article Twenty Five | - | Failure of contractor to insure | 30 |
| Article Twenty Six | - | Settling of taxes and fees | 30-31 |
| Article Twenty Seven | - | Complying with provisions of laws and regulations | 31 |
| Article Twenty Eight | - | Fossils and others | 31 |
| Article Twenty Nine | - | Patent rights and preferential returns | 32 |
| Article Thirty | - | Interfering with traffic and neighboring property | 32 |
| Article Thirty One | 1 | Transport | 32-33 |
| | 2 | Special loads | 33 |
| | 3 | Settlement of compensation claims for transport | 33-34 |
| | 4 | Marine transport | 34 |
| Article Thirty Two | - | Facilities to other contractors | 34 |
| Article Thirty Three | - | Preparing equipment, material, and laborers | 34 |
| Article Thirty Four | - | Cleaning the site upon completion of works | 35 |
| Article Thirty Five | - | Laborers | 35-36 |
| | 1 | The use of local workers | 35 |
| | 2 | Providing water | 35 |
| | 3 | Alcoholic beverages and narcotics | 35 |
| | 4 | Weapons and ammunition | 35 |
| | 5 | Festivals and religious traditions | 35 |
| | 6 | Epidemics | 36 |
| | 7 | Disturbing conduct | 36 |
| | 8 | Abidance of secondary contractors to the provisions of laws and regulations | 36 |
| Article Thirty Six | - | Statistical information | 36 |
| Article Thirty Seven | - | Texts and examinations | 36 |
| | 1 | The type of materials, working skills and tests | 36-37 |
| | 2 | Cost of prototypes | 37 |
| | 3 | Cost of investigations | 37 |
| | 4 | Cost of unlisted and other investigations | 37 |
| Article Thirty Eight | - | Entry into work site and material sources | 37-38 |
| Article Thirty Nine | - | Examining and revealing works | 38 |
| | 1 | Examining works prior to covering them | 38 |
| | 2 | Revealing works and making openings | 38 |

00160

| Article | No. | Topic | Page |
|---------|-----|-------|------|
| Article Forty | 1 | Removing faulty work and unsuitable material | 39 |
| | 2 | Non compliance by the contractor to the order to remove faulty work and unsuitable material | 39 |
| Article Forty One | 1 | Temporary cessation of work | 39-40 |
| | 2 | Cessation that lasts for more than (90) days | 40 |
| Article Forty Two | - | Conducting works | 40-41 |
| Article Forty Three | 1 | Handing over the site | 41 |
| | 2 | Right of passage and other costs | 41 |
| Article Forty Four | - | Work completion period | 41-42 |
| Article Forty Five | - | Extending work completion period | 42 |
| Article Forty Six | - | Illegality of working at night or on Fridays | 42-43 |
| Article Forty Seven | - | Progress of work | 43 |
| Article Forty Eight | 1 | Delay Penalties | 43-44 |
| | 2 | Reducing delay penalties | 44 |
| Article Forty Nine | - | Completion of work certificate | 44 |
| Article Fifty | 1 | Maintenance | 44-45 |
| | 2 | Carrying out maintenance work | 45 |
| | 3 | Contractor's inability to implement maintenance work | 45-46 |
| Article Fifty One | - | Contractor's Investigations | 46 |
| Article Fifty Two | 1 | Alterations | 46 |
| | 2 | Alteration orders are written | 46-47 |
| Article Fifty Three | 1 | Calculating alterations value | 47 |
| | 2 | Alterations that exceed the percentage specified in Section Two of these general conditions | 47-48 |
| | 3 | Daily work | 48-49 |
| | 4 | Compensations claims | 49 |
| Article Fifty Four | 1 | The need to limit the use of materials and others to the works | 49 |
| | 2 | Removing equipment and others | 49-50 |
| | 3 | Employer non liability for harm affecting equipments and others | 50 |
| | 4 | Customs clearance | 50 |
| | 5 | Re-exporting equipment | 50 |
| Article Fifty Five | - | Authenticating materials and others is not implicit | 50 |
| Article Fifty Six | - | Quantities | 50 |
| Article Fifty Seven | - | Need Specifications of work | 50-51 |
| Article Fifty Eight | - | Method of specification | 51 |

[illegible signature] [illegible stamp]

| Article | No. | Topic | Page |
|---|---|---|---|
| Article Fifty Nine | 1 | Reserve Funds | 51-52 |
| | 2 | Primary Cost Paragraphs | 52 |
| | 3 | Using paragraphs on reserve and emergency funds | 52 |
| | 4 | Issuing documents and others | 53 |
| Article Sixty | 1 | (Named) Secondary Contractor | 53-54 |
| | 2 | Payment to (Named) Secondary Contractor | 54 |
| Article Sixty One | - | Transferring the obligations of (Named) Secondary Contractor | 54-55 |
| Article Sixty Two | 1 | Cash payment and loan certificates | 55 |
| | 2 | Loans against construction equipment and materials | 55 |
| | 3 | Payments in foreign currencies | 55 |
| Article Sixty Three | - | Authentication | 55 |
| Article Sixty Four | 1 | Maintenance certificate | 56 |
| | 2 | Employer non liability | 56 |
| | 3 | Unfulfilled obligations | 56 |
| Article Sixty Five | 1 | Withdrawing work | 57-58 |
| | 2 | Calculating the value at the date of withdrawing work | 58-59 |
| | 3 | Settlement of contractor account after withdrawing work | 59 |
| Article Sixty Six | - | Urgent Repairs | 59-60 |
| Article Sixty Seven | - | Special hazards | 60-63 |
| Article Sixty Eight | - | Payment of sums in the event of non implementation | 63 |
| Article Sixty Nine | - | Settlement of disputes (Arbitration) | 63-64 |
| Article Seventy | 1 | Sending notifications to contractor | 64 |
| | 2 | Sending notifications to employer | 65 |
| Article Seventy One | - | Government debt collection law | 65 |
| Article Seventy Two | - | Applicable law on contracts and the authority of Iraqi courts | 65 |

**- Section Two -**

| | |
|---|---|
| 1- Definitions | 69 |
| 2- Final Insurance | 69 |
| 3- Penalty of Delay | 69 |
| 4- Minimum work done and available materials monthly | 69 |
| 5- Minimum insurance against others and third person liability | 69 |
| 6- [illegible] | 69 |
| 7- Needed foreign currency | 70 |
| 8- Percentage of administrative expenses upon withdrawing work from contractor | 70 |
| 9- [illegible] | 70 |
| 10- Lending against finished work | 70-71 |
| 11- Rule of payment and lending against machines, materials, equipment, and methods of repayment | 71-74 |

6

12- Illegality of the contractor's use of Ministry of Irrigation engineers and affiliates    74
13- Preparing tanks for cement storage    74
14- Determining the number of engineers and technical assistants    74
15- Transporting imported cargo and materials    74
16- Transporting experts and technicians    74
17- Registering the company branch with the Ministry of Trade    75
18- Workers' Actions    75
19- The Comprehensive National Annihilation of Illiteracy Campaign Law    75
20- The Discovery of a third party in the contract    75
21- Marine insurance    75
22- Providing residence for foreigners    75
23- Providing technicians to foreign companies    75
- Contracting Formula    78-79
- General Comments    80
- Copy of the Revolutionary Command Council Resolution Number 376 on 03/28/1977    81
- Copy of the Revolutionary Command Council Resolution Number 377 on 03/28/1977    83
- Copy of the Planning Council Resolution Number 5 on 05/28/74    85-86
- Table of maps and figures    87
                        **- Section Three -**    89
1. Special Conditions
2. Technical Specifications
3. Quantities and Prices Tables
4. Appendices
5. Maps

[illegible signature] [illegible stamp]

*i*

## Introduction

The Council of Planning has authenticated in its Decision Number (2) adopted at its Fifth Session held on 06/12/1972 these conditions and it was decided to distribute it to ministries and public entities to apply upon announcing contracts, and to comply by implementing them in all civil engineering contracts, taking into account accuracy in the implementation of Section Two of these conditions in a way befitting the size and nature of each contract. They were amended in accordance with the provisions of the Implementation and Follow-up Instructions for the National Development Plans Projects and Works, which was authenticated by the Council of Planning Decision Number (14) on 01/19/1975, and its subsequent decisions.

[illegible signature] [illegible stamp]

## General Conditions
## Of Civil Engineering Contacts

**Instructions to Bidders:**
**1- Name of Contract:**
Bids are requested for the works whose details are stated under the description of work in the name of ……………………………………………………………………..

**2- Acquiring Copies of Contract Documents:**
You may acquire the contract documents from "…………………." In two copies for the sum of (            ) Dinar, nonrefundable.

**3- Submitting Bids:**
    a. Bids are submitted to …………………………………… signed by the bidders, in sealed envelopes with the contract name an number as mentioned in the documents written clearly on the envelope.
    b. Prices of bids will be written in ink in numerals and then written out. The unit price per type will be as is listed in the quantities table in quantity, weight, or size, without any change or alteration in the unit. The price table should be signed by the bidder.
    c. The bidder may not cross out any of the items or technical specifications, and may not amend them in any way. He is also not allowed to scratch or erase anything in the quantities table. If the bidder wished to include conditions or reservations, this should be documented in a letter attached to the bid, provided that that letter is indicated in the bid itself. Any amendment to the prices or any other amendment should be rewritten by the bidder in numerals and written out and signed against.
    d. The bidder should indicate his address for correspondence, and if the bid is submitted by his agent, he should provide an official power of attorney as per the legal requirements.

**4- Certificates and Documents Attached to the Bid:**
The following general conditions of the contract, specifications, quantities tables, maps, and certificates should be attached to the bid:

11
[illegible signature] [illegible stamp]

    a.  A certificate of his affiliation to the Chamber of Commerce if the bidder was a resident of a province that has a Chamber of Commerce.

    b.  A list including the details of the contracts under the bidder at the time of bidding, showing the dates of work and expected completion.

    c.  A renewed certificate of registration at the Income Tax Authority.

    d.  An identification card of the Contractors' Register.

    e.  Preliminary insurance mentioned in Paragraph (8) below.

## 5- Information on Bidders:

Bids submitted by companies should include the documents related to the formation of the company, the authority and responsibility of its officials, with an authenticated copy of the company or partnership contract, with details on the contracts they are committed to at the time of bidding, and the statement of times of work and expected completion of each of them.

## 6- Work Program:

Bidders should construct a general method and program for the progress of work, and the types of machines and equipment they plan to use in the implementation of work.

## 7- Time Needed for Completion of Work:

Bidders should mention in their bids the time needed to complete the work. The bidder whose bid is accepted will be committed to complete the work within that period.

## 8- Preliminary Insurance:

Bidders, "Other than specialized cooperative sector agencies" should pay to the accountant of "………………………………" preliminary insurance in cash to the sum of (     ) Dinar, a substitute to that may be a letter of guarantee issued by one of the government banks in Iraq or loan bonds issued by the Iraqi government equivalent to the insurance sum, or in the form of authenticated records issued by a bank in Iraq.

The insurance will be retained throughout the implementation period of the bids as stated in Paragraph (9) below. The bidder may request a refund of these insurances at the end on the mentioned period or the final completion of the contract, whichever is sooner.

12
[illegible signature]

**9- Bidding Expiry Date:**
The bids remain valid and binding to the bidders for "............................" months from the closing date.

**10- The Necessity to Provide Bidders with Needed Information:**
Bidders, prior to submitting their bids, and despite the information that may be included in the contract documents, should conduct their own investigations on the nature or work and surrounding conditions, and should in general, gather information on all matters that may in one way or the other affect the financial balance of the contract of the contractor's obligations as per the contract agreement, or because the hazards that may face the work. Any negligence, delay, or failure on the part of the bidder in acquiring dependable information on what was previously mentioned, or any other matters, does not exempt the contractor (whose bid is accepted) from the hazards, commitments, or the responsibility of completing the works within the specified period and at the prices listed in the bid.

**11- The Work in General:**
Bids for the works in general are accepted, bids for specific parts of the work will not be accepted, unless otherwise specified in the contract.

**12- Deadline for Bidding:**
Bids will be submitted by the Bidding Form at or before twelve noon of the day ................. corresponding to    /    /19   , and the bidders should take into consideration sending their bids while allowing time for registered mail to arrive with sufficient time to spare before the deadline. No bid made after the deadline will be accepted, regardless of the reason for its delay, nor any amendment, whatever its type, or decrease in prices will be accepted if submitted after the deadline for bidding.

**13- Executing the Contract:**
The contractor "other than specialized cooperative sector agencies" whose bid is accepted, should be present within (            ) days of the date of notification of the decision.


13
[illegible signature] [illegible stamp]

To sign the contract organizing this purpose and provide the final insurance of (   ) Dinar to guarantee the good implementation of the contract, and if the contractor refrained from committing to what was mentioned in his bid, the employer has the right to retain the preliminary insurance and complete the work at the cost of the contractor as per the provisions of the contract without the need for further notification or legal action.

**14- Name of Contractor and Project:**
The contractor should provide the "Engineer" with signs in the shape and size specified by the "Engineer" bearing the name of the project to be placed in areas designated by the "Engineer." The signs should include the names of the project and contractor, the implementing authority, and consultant engineers (if present).

**15- Correspondence:**
Correspondence will be sent to the "Engineer" or who represents him at the address stated in the "Contract." In the event of directing correspondence to the "Employer," the contractor should send a copy of it to the "Engineer" or who represents him.

**16- Accepting Bids:**
The "Employer" has the right, at his discretion, to accept or reject any bid, or to cancel the contract without the bidder having any rights for compensation.

14

[illegible signature]

## Bidding Form

Mr. ................................................................................... Esteemed
We ...................................................................…......... whose office is located
At ...........................................................

After visiting the work site and receiving all the necessary information, we have carefully studied the instructions to bidders, contracting formula, maps, and quantities tables of the construction and implementation of works as described in the "Contract."

We hereby wish to present our offer for the construction, implementation, completion, and maintenance of "Works," as well as providing all equipment, machines, tools, and other matters for carrying out the work. We pledge to undertake all the necessary work, and supply all needed materials as per the general conditions, maps, specifications, and quantities tables, and in the way stated in them and in the aforementioned contract in accordance with the requests and instructions of the "Engineer," for the sum of (                ) Iraqi Dinar to be paid in accordance with the provisions of this contract.

Also, we hereby state and admit that the quantities stated in the quantities tables are approximate and are liable to increase or decrease, and that we are willing to undertake all "Works," regardless or the increase, decrease, or deletion from the quantities table.

We undertake to begin work within (        ) days from the date of receiving an order from you authorizing us to begin work, and we also commit to completing and handing over the complete works within (                ) from the date of actual start or the final day of the period specified in the contract, whichever is sooner. We also pledge, in the event of accepting our bid, to attend to sign the contract in accordance with the contracting formula attached to this contract, which may be added to or amended as needed.

We also agree to pay the stamp duty necessary for the aforementioned contract agreement and all other funds required in accordance with the provisions of the contract with the exception of the construction license fees.

15
[illegible signature] [illegible stamp]

We also state that the insurance sum paid by us in accordance with this contract in the amount of (          ) Iraqi Dinar will remain in your possession as a guarantee of our good will. Also in the event of our absence to sign the contract after (     ) days following the acceptance of our bid, or in the event we signed the contract but did not begin work within (          ) days of our notification to begin work, then you will have the right to keep the mentioned insurance and finish the work at our own expenses as per the provisions stated in the contract, without the need for further notification or legal action.

Signature: Contractor

Name of Contractor:

Address:

Work Telephone:

Residence Telephone:

16
[illegible signature]

00170

**(Section One)**
**General Conditions of Contract**

**Article One – Definitions:**

1. The following words and expressions will have the meanings given to them for the purposes of this contract unless otherwise stated:

   a. The "Employer": Is the entity that calls for "Bids" and contracts the "Contractor" or who legally stands for it, and which is mentioned in Section Two of these General Conditions.

   b. The "Contractor": Is the person, persons, establishment, or company whose bid the "Employer" accepted and includes the "Contractor's" authorized representatives, those who legally substitute him, and those the "Employer" allows a concession to.

   c. The "Engineer": Is the natural or legal entity or office whose name is mentioned in Section Two of these General Conditions, or any "Engineer" the "Employer" appoints from time to time to exercise the authorities of the "Engineer" as mentioned in the "Contract." The "Contractor" should be notified of his name in writing.

   d. The "Resident Engineer": Is any supervisor appointed by the "Engineer" from time to time to carry out the duties stated in Article Two of these General Conditions and of whose authorities the "Engineer" should inform the "Contractor" in writing.

   e. The "Works": Means all the works that should be carried out in accordance with the provisions of the "Contract," including the design, construction, preparation, erection, operation, and maintenance as is needed.

   f. "Temporary Works": Means all temporary works of any type needed to implement, complete, operate, or maintain the "Works."

17
[illegible signature] [illegible stamp]

g.  The "Contract": Means the general conditions of the contract, the specifications, maps, priced quantities table, table of prices, sums "if present," the bid, the contracting formula, the transfer letter and the instructions to the bidders and any amendments agreed upon, and are all considered as parts completing each other and form in total the contract documents.

h.  "Contract Sum": Means the sum mentioned in the bid accepted by the "Employer" and which is liable to increase or decrease according to the provisions mentioned in the "Contract."

i.  "Construction Equipment": Means all the tools, equipments, and things, regardless of their nature, that are required for the implementation, completion, or maintenance of the "Works" or "Temporary Works" and does not include the materials and other things that constitute the "Works" or is a part of them.

j.  "Quantities Table": Means the table or tables that describe the works in brief and specify the quantities approximately to allow the bidders to put prices for the parts of the "Works" required in the "Contract."

k.  "Maps": Means the maps indicated in the "Contract" documents, and any amendments to them should be approved in writing by the "Engineer," and any other maps the "Engineer" prepares or authenticates in writing from time to time.

l.  "Specifications": Means the technical specifications according to which the "Works" should be implemented, and that are attached to or indicated in the "Contract" documents or any other specifications agreed upon.

m.  The "Site": Means the lands and places where the "Works" are carried out, on, under, or through, or any other lands or places designated by the "Employer" for the purposes of the "Contract" or those [sic]

18
[illegible signature]

that were specifically specified in the "Contract" as part of the "site."

    n.    "Authentication": Means what is approved in writing, including the written confirmation following a prior verbal approval.

    2.    Singular and Plural: Singular words only include also plural and vice versa as is needed for the context of the text.

    3.    Titles or Notes: Titles or notes are not considered as part of these General Conditions and are not taken into consideration upon its interpretation or the interpretation of the "Contract" and the effects of that interpretation on them.

**Article Two – The Duties and Responsibilities of the "Resident Engineer":**

    1.    The duties of the "Resident Engineer" are the monitoring and supervision of "Works," the testing and examining of any materials or skills to be used in the "Works." The "Resident Engineer" does not have, other than what is explicitly stated in these General Conditions, the authority to relieve the "Contractor" of his duties or commitments in accordance with the "Contract," and may not order what may result in a delay in the completion of "Works" or what may lead to an increase in the "Contract Sum" or the "Contract" or to make any changes of or to the "Works."

    2.    The "engineer" may authorize the "Resident Engineer" in writing from time to time to undertake any of his authorities and responsibilities, and the "Engineer" in this case should provide the "Contractor" of a copy of all written authorizations.

    3.    Any written instructions or authentication given by the "Resident Engineer" to the "Contractor" within the limitations of authorization mentioned in Paragraph (2) of this Article is binding to the "Contractor" and the "Employer" as if it was granted by the "Engineer." Provided it should always be taken into consideration that:

        a.    The failure of the "Resident Engineer" to refuse any complete work or prepare materials in violation of the conditions of the "Contract" will not later affect the authority [sic]

19

[illegible signature] [illegible stamp]

00173

the "engineer" in refusing that work or those materials and thereby order their demolition, removal, or breakage.

b. If the "Contractor" was not convinced of any of the "Resident Engineer's" decisions, he has the right to refer the matter to the "Engineer" who should upon that either support, refute, or amend the decision.

**Article Three – Concession:**

The "Contractor" does not have the right without prior written consent from the "employer" to concede the "Contract" or any part of it, or any benefit or interest for him by it (except for the entailed commitments to the banks the "Contractor" deals with of any sums payable or that will be payable in accordance with this "Contract").

**Article Four – Subcontracting (Secondary Contracts):**

The "Contractor" does not have the right to subcontract the entire "Works." Other than with respect to the conditions otherwise stated in the "Contract," the "Contractor" does not have the right to "Subcontract" any part of the "Works" without prior written consent from the engineer (which should not be withheld without reasonable cause). Once such permission is granted, it does not exempt the "Contractor" from any responsibility or commitment by the "Contract," and the "Contractor" remains responsible for any action or refusal to do any act or shortcomings from any subcontractor, "Secondary Contractor," or his agents, employees, or workers, as if that work, or the refusal to do work or the shortcomings are those of the "Contractor" himself , his agents, employees, or workers.

**Article Five: Scope of Contract:**

The "Contract" includes all "Works" except what is otherwise clearly stated; it also includes providing all workers, materials, "Construction Equipment," "Temporary Works," and everything else, whether of temporary or permanent nature, that is required by or for the "Works."

The "Quantities Table" is considered comprehensive of all expenses, costs, and hazards [sic]

20

[illegible signature]

regardless of their type and which are needed for the "Contractor" to carry out, complete, hand over, and maintain the "Works." It is assumed that the "Contractor" had included within the "Quantities Table" all that is necessary to cover the cost of all "Works" considered reasonable and necessary to carry out the "Contract."

**Article Six – Language and Interpretation:**
1. Arabic is the language used in interpreting and arranging the effects of the "Contract," with the exception of all that is related to technical specification, for which in the event of a disagreement, the English language will be applied.
2. The provisions of the General Conditions will be applied, and Special Regulations when in conflict with the provisions of another document; it forms a part of the "Contract" unless otherwise stated.
3. If the "Maps" contradicted the "Specifications" or "Quantities Tables" or any of them together, the matter will be presented to the "Engineer" for his opinion on the matter. His decision will be binding as per the conditions of the "Contract." Yet, if the implementation of the "Engineer's" decision entailed additional costs an experienced contractor could not have expected, the "Employer" should compensate the "Contractor" reasonably for these expenses.

**Article Seven – Keeping "Maps":**
1. Maps will remain in the custody of the "Engineer," provided that two copies be prepared for the "Contractor" free of charge. The "Contractor" should get and make additional copies if needed at his own expense. Upon the completion of the "Contract," the "Contractor" should return to the "Engineer" all "Maps" prepared in accordance with the "Contract."
2. The "Contractor" should submit to the "Engineer" or "Resident Engineer" a written notification of any additional "Maps" or "Specifications" that may be needed for the implementation of "Works" or otherwise in accordance with the "Contract."
3. The "Contractor" should keep at the "Site" one copy of the "Maps" prepared for him according to what was mentioned; these "Maps" should be ready for review [sic]

21
[illegible signature] [illegible stamp]

# EXHIBIT C (Part 5 of 5)

and use at all appropriate times by the "Engineer" or "Resident Engineer" or any other person authorized in writing by the "Engineer."

**Article Eight –**
**1- Additional (Maps) and Instructions:**
The "Engineer" has full authority and power to provide the "Contractor" from time to time during the course of work with any additional "Maps" and instructions, in the quantity seen necessary for the correct and comprehensive implementation of the "Works," and the "Contractor" should implement such "Maps" and instructions and abide by them.

**2- Photographs:**
The "Engineer" may ask the "Contractor" to provide him with photographs of the desired number and size, showing the course and progress of work, provided that those photographs are taken from the points and places the "Engineer" selects.

**Article Nine – Contracting Formula:**
The "Contractor" after being notified in writing of the acceptance of his bid, to sign a "Contracting Formula" in accordance with the form attached to this contract with the necessary amendments if present.

**Article Ten – Guaranteeing Implementation:**
1. The "Contractor" "other than the cooperative sector" is committed to providing a guarantee in the form of a letter of guarantee issued by a bank in Iraq of the sum shown in Section Two of these General Conditions; the letter of guarantee may be substituted by bearer bonds issued by the Iraqi Government in order to secure the satisfactory implementation of the "Contract."
2. The letter of guarantee remains in effect and is not released prior to the end of the maintenance period and the issuance of the final acceptance certificate. It may not be held for a reason other than the one it was issued for.

**Article Eleven – Checking the Site:**
It is assumed that the bid was based on the data concerning the marine, weather, and natural conditions, which the "Employer" explains in the prepared documents for the "Contractor" for the purposes of the "Bidding," yet, the "Contractor" should, prior to submitting his bid, check and investigate the "Site" and become convinced of the condition and nature of the "Site" and what surrounds [sic]

22
[illegible signature]

the "Contractor" to receive instructions and orders from the "Engineer" only or (taking into considerations the limitations mentioned in Article Two of these General Conditions) from the "Resident Engineer."

**Article Fourteen – Presenting the Work Program :**
The "Contractor" should present to the "Engineer" whenever possible after the acceptance of his bid – a program showing the successive phases and the method intended to be used in the implementation of "Works" for the "Engineer" to approve. The "Contractor" should, upon the request of the "Engineer" or "Resident Engineer," present written details for their review of the measures taken to implement the "Works," as well as details on the "Construction Equipment" and "Temporary Works" the contractor intends to prepare, use, or construct as per case. The presenting such program to the "Engineer" and his approval of it, or presenting those details does not exempt the "Contractor" from any of his duties or responsibilities according to the "Contract."

**Article Fifteen – The Contractor's Management of the Works:**
The "Contractor" should prepare and provide the full needed management of all aspects at the time of the implementation of "Works" and for the duration of the following period seen necessary by the "Engineer" to fulfill the contractor's commitments satisfactorily in accordance with the "Contract." The "Contractor" or his authorized agent, whose agency the "Engineer" approves in writing (an approval that may be withdrawn at any time), should at the "Works" site, constantly and continuously, dedicate his full time for the management of the "Works," and if the approval of the agency was withdrawn by the "Engineer," the "Contractor," upon receipt of the written notification of withdrawing approval, should exclude the agent from the "Site" as soon as possible, and he should not use him again at the "Site," in any capacity, and in this case the "Contractor" appoints another agency to be approved by the "Engineer." The authorized agent should receive on behalf of the "Contractor" the orders and instructions from the "Engineer" or "Resident Engineer," taking into consideration the limitations mentioned in Article Two of these General Conditions.

24
[illegible signature]

**Article Sixteen – "Contractor's" Employees:**

1. With the exception of what is otherwise agreed upon, the "Contractor" should use the following at the "Site" for the purpose of the design, construction, preparation, installation, operation, and maintenance of "Works":

   a. Skilled engineers and technical assistance with experience in the work they were hired for, as well as efficient supervisors, work managers to properly supervise the "Works" assigned to them.

   b. Skilled, semi skilled, and unskilled workers as necessary to implement and maintain the "Works" at specific times satisfactorily.

2. The "Engineer" may object to the use of any person and ask the "Contractor" to remove them from the "Works" without delay if he sees that such a person misbehaves or is inefficient or negligent in properly carrying out his duties. This person may not be used once again for the "Works" without the written permission of the "Engineer," and the "Contractor" should substitute him with another of the same skill as soon as possible.

**Article Seventeen – Planning Works at the Site:**

The "Contractor" is responsible for the planning of "Works" at the "Site" in a proper and satisfactory way in accordance with the original approved dots, lines, and levels the "Engineer" provides in writing. The "Contractor" is also responsible (taking into consideration what was mentioned above) the proper position, ratios, dimensions, and straightness of all sections of "Works" and to prepare all the necessary equipment, tools, and workers for that effect. If it became evident or developed at any time during the course of "Works" any error in the position, ratios, dimensions, or straightness of any section of the "Works," the "Contractor" must ask the "Engineer" or "Resident Engineer" to rectify this error at his own personal expense in a way satisfactory to the "Engineer" or "Resident Engineer," unless that error resulted from erroneous data prepared in writing by the "Engineer" or "Resident Engineer," and as such the cost of repair will be born by the "employer."

The "Engineer" or "Resident Engineer" should revise any plans for the "Works" [sic]

25

[illegible signature] [illegible stamp]

at the "Site" or any line or level that does not exempt the "Contractor" in any way of his responsibility for the accuracy of that, and the "Contractor" should carefully protect all settlement numbers, "Site" lines, pegs, and other things used in planning the "Works" at the "Site."

### Article Eighteen – Test Holes and Investigative Drilling:

If the "Engineer" asks the "Contractor" at any time during the implementation of the "Works" to carry out test holes or investigative drilling, such request will be submitted in writing and is not considered an additional work to conduct in accordance with the provisions of Article Fifty One of these General Conditions.

The cost of test holes and investigative drilling indicated in this article will be at the expense of the "Employer" unless otherwise stated in the "Contract."

### Article Nineteen – Guarding and Lighting:

The "Contractor" should prepare and maintain at his own expense all means of lighting, observation, fencing, and guarding related to the "Works" when and where necessary. The "Engineer" or "Resident Engineer" or any legally authorized authority may request guarding to protect the "Works" or the safety or the public or others, or to secure their necessary needs.

### Article Twenty –
### 1- Caring for Work:

The "Contractor" is fully responsible as of the beginning of "Works" and till their completion for the care of the "Works" and all "Temporary Works," and if any damage, loss, or delay happened to the "Works" or any part of them, or to any of the "Temporary Works" for any reason (other than the exceptional hazards stated in Paragraph (2) of this article), the "Contractor" should repair that at his own expense, so that the "Works" would be, upon completion, in good condition suitable with the requirements of the "Contract" and "Engineer's" instructions. In case this damage, loss, or delay resulted from any of the exceptional hazards, the "Contractor" should comply with the provisions of Article Sixty Seven of these General Conditions.

26
[illegible signature]

to, at the expense of the "Employer" if the "Engineer" asks him and within the limitations of that request to amend that and make it suitable in the way previously mentioned. The "Contractor" is responsible also for the damage caused to the "Works" during the performance of any of the operations for the purpose of fulfilling his commitments as per Article Fifty of these General Conditions.

**2- Exceptional Risks:**
Exceptional risks are limited to the damage, loss, or delay as a result of the following:
- a. Acts of war (whether war was declared or not), acts of invasion by a foreign enemy, rebellion, revolution, mutiny, civil war, or coup d'etat.
- b. Acts of riot, unrest, or disturbances except what happens among the employees of the "Contractor" himself.
- c. The use or occupation by the "Employer" to any part of the "Works" for which a completion certificate was issued.
- d. Only of the "Engineer's" design of the works.
- e. Atomic Energy and Nuclear Radiation hazards.

**Article Twenty One – Insurance on Works and Others:**
The "Contractor" should, without lessening his commitments and responsibilities in accordance with Article Twenty of these General Conditions, insure all the mentioned below in the name of the "Employer" and "Contractor" together against all losses or harms, regardless of the reason for them (with the exception of the exceptional hazards) and for which he is responsible in accordance with the text of the "Contract" which guarantees the right of the "Employer" and the "Contractor" during the duration of the "Works," and to insure against any loss or damage during the maintenance period that is the result of [illegible] "Maintenance Period" as well as any loss or damage caused by the "Contractor" during the localities he conducts for the purpose of fulfilling his commitments in accordance to Article Fifty of these General Conditions:

27
[illegible signature] [illegible stamp]

00180

1. "Works" and "Temporary Works" in the full value of these implemented works from time to time.
2. Materials, "Construction Equipment," and other things that the "Conductor" should bring to the "Site" in full value.
   This insurance should be done at the National Insurance Company and the "Contractor" should, as required, provide the "Engineer" or "Resident Engineer" with the insurance document or documents and insurance installation settlement receipts.

## Article Twenty Two – Harm Affecting People and Money:

With the exception of and in the extent specifications states to the contrary, the "Contractor" is committed to compensate the "Employer" for all the losses, compensation claims, legal fees for damages, expenses, fines, and expenditure regardless of their type that result from damage or harm to any person or money whatever they were and that may arise from or as a result of the construction and maintenance of "Works," with the exception of the damages to the face of earth or other damages to lands or crops at the "Site," which may be suffered by the lessees or occupiers. Provided it is not in this article what makes the "Contractor" responsible for compensating the "Employer" for any compensations or damages resulting from the following:

1. The use or occupancy of the land permanently by the "Works" or any part of them, or the damages to the face of earth or others as previously mentioned (with the exception of what is otherwise stated later).
2. The right of the "Employer" to construct "Works" or any part of them on any land or above it, under it, in it, or through it.
3. Temporary or permanent interference with any of the rights to light, ventilation, passage, water, or any other rights that would be a definite result of the construction of the "Works" as per the "Contract."
4. Harm or damage to people or money as a result of any work, or negligence befalling or committed during the implementation of the "Contract" by the "Employer" or his agents [sic]

28
[illegible signature]

00181

or his employees or other contractors (other than the ones used by the "Contractor") or any claims for compensation, legal fees, compensation sums for damages, and expenses, fines, and expenditure related to that.

The site for the purposes of this article means the area specified in the specifications, shown on the map, and that is affected or its lands and crops are harmed as a certain result of the "Works."

The "Employer" should compensate the "Contractor" for the realized compensation claims, legal fees, compensation sums for damages, and expenses with respect to the matters indicated in Paragraphs (1, 2, 3, 4) of this article.

### Article Twenty Three –
### 1- Insurance against Other Liability (Third Party):
The "Contractor" prior to beginning the "Works" (and without any less commitment and responsibilities as per Article Twenty Two of these General Conditions) should insure against any damage, loss, or harm that may affect any moneys (including that belonging to the "Employer") or any person (including "Employer" employees) as a result or due to the implementation of "Works" or "Temporary Works" or the conducting of the "Contract" with the exception of the matters that may arise as mentioned in Paragraphs (1, 2, 3, 4) of Article Twenty Two of these General Conditions.

### 2- Minimum Insurance Sum against Other Liability (Third Person):
Such insurance should be done at the National Insurance Company for a sum not less than that stated in Section Two of these General Conditions, and the "Contractor" should, as required, provide the "Engineer" or "Resident Engineer" with the insurance document or documents and insurance installation settlement receipts.

### Article Twenty Four – Accidents and Workers' Injuries:
The "Employer" will not be responsible for any damages or compensations legally payable regarding any accident or injury to any worker or any other person hired by the "Contractor" or "Secondary Contractor," with the except of the accidents and injuries that [sic]

29
[illegible signature] [illegible stamp]

00182

resulting from any work or abstention from a work issued by the "Employer" or his agents or employees.

The "Contractor" should guarantee the "Employer" from all these harms and compensations (with the exception of the aforementioned) and from all claims of compensation, legal costs, fines and related expenses regardless of their type, all that without violating the commitments stated in the labor and social security laws applied from time to time.

**Article Twenty Five – Contractor's Failure to Insure:**

1. If the "Contractor" fails to insure or continue to insure in accordance with Articles (21, 23, and 24) of these General Conditions, or if he fails to make any other insurance he may be required to do in accordance with the provisions of the "Contract," then the "Employer" in that case should apply that insurance, maintain it, and pay the insurance installment or installments required for that purpose. The "Employer" may deduct the sum paid in the abovementioned fashion from any sums payable or will be payable to the "Contractor," or to collect that sum as a debt on the "Contractor."

2. If the "Contractor" was unable to provide the full insurance cover against the risks that should be insured against as per the provisions of the previous articles, he should make the effort to adhere to providing the best insurance coverage possible, in the event of finding a wider insurance cover than the one available at the National Insurance Company, he should despite that carry out that insurance, after the approval of the "Employer," through the National Insurance Company itself or by it.

3. The "Contractor's" implementation of the insurance condition or the insurance's not being inclusive of all the hazards or all buildings does not except the "Contractor" from his responsibilities and commitments in accordance with these General Conditions.

**Article Twenty Six – Payment of Taxes and Fees:**

1. The "Contractor" should pay all taxes and fees, including stamp duties, engineers' retirement fund stamp duty, and other fees related to the implementation [sic].

30
[illegible signature]

[same as previous page]

The "Contract" that should be paid by any of the applied laws, regulations, decrees, or orders, the costs of the "Contract" are inclusive of all taxes and fees (other than those of the construction permit).

2. If, after the date of submitting the offer and during the period of the contract, any increase or decrease in the taxes and fees mentioned in Paragraph (1) of this article arise, then the "Contractor" will have the right to demand the difference in the increase, and the "Employer" will have the right to demand or deduct the difference in the decrease.

3. Taxes and fees for the purposes of this article mean all that is imposed by the state on people or moneys in accordance with a law, regulation, or statement issued upon a law, whether it was a fee, duty, or tax, or other. The aforementioned provisions will apply to ay change in the wages and guarantees to the workers that are decided by a law, regulation, or statement issued based on a law.

### Article Twenty Seven – Compliance with the Provisions of Laws, Regulations,…etc.

The "Contractor" should comply from all aspects to the provisions of laws, regulations, statements, or orders, in addition to instructions, announcements, or decrees issued by local administrations or other legally authorized authorities.

The "Contractor" guarantees the "Employer" in the face of all compensations and responsibilities regardless of their type resulting from the violation of any or these laws, regulations, decrees, orders, or any other of the aforementioned.

### Article Twenty Eight – Fossils and Others:

Taking into consideration the provision stated in the related laws, all fossils, parchments, valuable or historic substances, installations, or other remains, or things of geological or archaeological importance discovered at "Work Sites" the sole property of the "Employer" and the "Contractor" should take all necessary precautions to prevent his workers or any other people from removing of damaging any of those materials or things, and should the discovery and prior to removal of them immediately inform the "Resident Engineer" of the find and to carry out the orders of the "Resident Engineer" at the expense of the "Employer" regarding the necessary arrangements for them.

31
[illegible signature] [illegible stamp]

**Article Twenty Nine – Patent Rights and Preferential Returns:**
The "Contractor" should protect and compensate the "Employer" for all legal claims and procedures regarding or as a result of any violation on any patent, prototype, logo, or name rights or any other rights protected by the law with respect to any of the "Construction Equipment," machines, work, or the materials used in or in relation to the "Works" or "Temporary Works" or any of them. The "Contractor" should also protect and compensate the "Employer" for all claims for compensations, legal costs, and compensation sums for damages, expenses, fines, and expenditure, regardless of their type that arise from or are related to them. The "Contractor," with the exception of what is otherwise stated, should pay all transport fees, other preferential returns, rent substitutes, and other payments or compensate (if available) for receiving the rocks, sand, pebbles, clay or other materials needed for the "Works" or "Temporary Works" or any of them.

**Article Thirty – Interfering with Traffic and Neighboring Property:**
All operations necessary for the implementation of "Works" or for the construction of any of the "Temporary Works" should be conducted to the extent required by the implementation requirements of the "Contract" and to the extent that does nor interfere in any unnecessary or improper way to the comfort of the public or would prevent access to the use and occupation of public and private roads and passages for the purpose of reaching property, whether they were in the possession of the "Employer" or others, and the "Contractor" should protect and compensate the "Employer" with respect to all claims for compensation, legal costs, and compensation sums for damages, expenses, fines, and expenditure, resulting from or related to any of these matters and to the extent to which the "Contractor" is responsible.

**Article Thirty One –**
**1. Shipping**
The "Contractor" should take all reasonable precautions to prevent the damage or harm to any of the roads leading to the "Site" or the bridges on the passages leading to it from the passage of means of transport owned by him or any of [sic]

32

[illegible signature]

.

his secondary contractors, and the "Contractor" should in particular select the passages and use means of transport and determine and divide cargoes so that transport of equipment and materials from and to the (Site) would be determined as much as possible to avoid unnecessary damage or harm to it on those roads and bridges.

**2- Special Cargoes:**
If it was found necessary for the "Contractor" to transport one or more loads of "Construction Equipment" or machines or pre-manufactured units or parts of work units through a road or bridge and that it is possible for harm to fall on the transport in either the road or bridge way unless special protection or fortification is provided, then the "Contractor" should, prior to beginning the transport of the cargo through that road or bridge to give notice to the "Engineer" or "Resident Engineer" of the weight and other details of the load intended for transporting with his suggestions for the protection or fortification of that road or bridge. If the "engineer" did not explain within fourteen days from the date of receiving such notice that such protection or fortification is unnecessary, then the "Contractor" will carry out these suggestions or any amendments to them that the "Engineer" might request, and if the "Quantities Table" or the "Contract Documents" are void of a paragraph or paragraphs to state the cost of work related to the aforementioned protection or reinforcement, then the costs and expenses resulting from that should be paid by the "Employer" to the "Contractor."

**3- Settlement of Compensation Claims for Transport:**
If the "Contractor" received during conducting "Works" or at any later time any claims for compensation arising from the implementation of "Work" with respect to damage or harm that affected roads or bridges, he should inform the "Engineer" of it without delay, and the "Employer" should negotiate for a settlement and pay all due sums related to these compensation claims. He should also compensate the "Contractor" for his damages as a result of that and for all the compensation sums, legal costs, damages, expenses, fines, and expenses related to them always and in the amount where these compensation claims or any part of [sic]

33

[illegible signature] [illegible stamp]

[same as previous page]

of them as per the opinion of the "Engineer" results from the shortcoming of the "Contractor" in his consideration and fulfillment of his obligations as per Paragraphs (1 and 2) of this Article, the "Contractor" pays to the "Employer" the sums the "Engineer" supports result from such shortcoming.

**4- Marine Transport:**
If the nature of the "Works" requires the "Contractor" to use means of marine transport, them the previously mentioned provisions in this article should have their legal effects arranged in a way that the expression (highway) would include waterway locks, port docks, marine wall, or other installations related to the waterway, and for the expression (means of transport) to include the ship, ferry, or others.

**Article Thirty Two – Facilities for Other Contractors:**
The "Contractor" should provide the suitable facilities requested by the "Engineer" for any other contractors used by the "Employer" to conduct "work," as well as their workers and the "Employer's" workers and those of any other authority legally authorized by those who may use in or close to the "Site" to carry out any work that was not included in the "Contract" or any other contract signed by the "Employer" with respect to the "Work" or its attachments. But if the "Contractor" place upon the written request from the "Engineer" or "Resident Engineer" in the hands of any of those other contractors or "Employers" or this authority any roads or passages, the "Contractor" would be responsible for sustaining them, or if he allows the use of any of the "Contractor's" cranes or other equipment at the "Site," or provided any other service to them regardless of its nature, then the "Employer" should pay the "Contractor" for such use or service, the sum "Engineer" finds appropriate.

**Article Thirty Three – Preparing Equipment, Materials, and Laborers:**
With the exception of what is otherwise stated, the "Contractor" should, at his own expense, provide and maintain all "Construction Equipment," "Temporary Works," materials, machines, tools for permanent and temporary work, laborers, and transport from and to the "Site" and well as transport in "Works" and around them, as well as other things whatever their kind that are needed for the construction, completion, and maintenance of "Works."

34
[illegible signature]

**Article Thirty Four – Cleaning the Site upon Completion of Works:**

The "Contractor" upon the completion of "Works" should remove and clear the "Site" of all the "Construction Equipment," surplus materials, dirt, and "Temporary Works" or any type, and leave all "Site" and "Works" clean and in a suitable state satisfactory to the "Engineer."

**Article Thirty Five – Laborers:**

The provisions of the Labor Law and Social Security are taken into consideration in all that is related to the laborers, also the following is especially taken into account:

1. The use of local workers: The "Contractor" should take all his arrangements to use all local or other laborers needed for the implementation of the "Works."

2. Preparing Water: The "Contractor" should prepare at the "Site" as much as is practically reasonable, after taking into account the local circumstances and in a way satisfactory to the "Resident Engineer" sufficient source of potable and other water to be used by the employees and workers of the "Contractor."

3. Alcoholic Beverages and Narcotics: The "Contractor," with the exception of what corresponds to the provisions of the executed laws, regulations and instructions, or the applied orders at the time, should not import, sell, give, trade, or deal in any way in alcoholic beverages or narcotics, or to overlook any such import, selling, giving, trading, or dealing in that by his secondary contractors, agents, or employees.

4. Weapons and Ammunition: Taking into account the provisions of the laws applied, the "Contractor" may not give, trade, or deal in any way in weapons and ammunition regardless of their type to any person or persons, or allow it, or overlook it in the previously mentioned way.

5. Festivals and Religious Traditions: The "Contractor" should take into consideration all accepted festivals, holidays, and religious traditions in all his relations with his workers and employees.

35

[illegible signature] [illegible stamp]

6. Epidemics: The "Contractor" in the event of the spread of any disease of an epidemic nature, to implement and carry out any regulations, orders, or requirements that may imposed by the government or the medical, health, or local authorities for the purpose of correcting and combating such diseases.

7. Order violating conduct, the "Contractor" should take all appropriate precautions to prevent any unlawful, disruptive, or disorderly conduct by or between any of his employees in order to maintain order and protect people and moneys in the area close to the "Works."

8. Adherence by secondary contractors to the provisions of laws and regulations: The "Contractor" is responsible for the abiding of his secondary contractors to the abovementioned provisions.

**Article Thirty Six – Statistical Information:**
1- The "Contractor" should provide the "Resident Engineer" with the following:
   a. A detailed table of the shape and paragraphs determined by the "Engineer" explaining the number of "Work" supervisors and the number and type of various workers and employees of the "Contractor" from time to time.
   b. The information related to the "Construction Equipment" in the way requested by the "Resident Engineer."

2- The "Contractor" should provide the Central Agency for Statistics with the statistical information necessary as per the Statistics Law Number (21) for 1973 or any substitute law.

**Article Thirty Seven – Investigations and Tests:**
**1- The Type of Materials, Skill of Labor, and Tests:**
All materials and labor skills should be of the types specified and described in the "Contract" according to the instructions of the "Engineer" and should be subject from time to time to the tests ordered by the "Engineer" at the place of manufacture or installation or at the "Site" or in any or all of those places.

The "Contractor" should provide the assistance, tools, machines, workers, and materials whenever needed to carry out a test and measure and examine any work and quality or weight or [sic]


36
[illegible signature]

the quantity of any substance used and he should prepare samples of the materials prior to their use in the "Works" for the purpose of being examined in the way chosen and requested by the "Engineer."

**2- The Cost of Prototypes:**
The "Contractor" should prepare all samples at his own expense if the "Contract Documents" stated that explicitly, otherwise the cost is born by the "Employer."

**3- The Cost of Tests:**
The "Contractor" should bear the cost of any tests if the "Contract Documents" stated that explicitly, he should also bear the cost of tests "only in the cases of testing below the load or the test that aims for confirming the suitability of the design of any complete work in whole or in part for the purposes it was designed for" if the "Contract Documents" had explained that in enough details to enable the "Contractor" to price it or take it into consideration in his offer.

**4- The Cost of Tests Not Stated and Others:**
The "Contractor" will bear the cost of tests if the results of the tests showed that the skill of the work or the quality of the substance was not suitable to the provisions of the "Contract" or the instructions of the "Engineer" in the two following cases:
   a. If the test was not explicitly stated in the "Contract Documents" or not given sufficient details as indicated above.
   b. If the test was explicitly stated in the "Contract Documents" yet the "Engineer" ordered it to an independent person at any place other than the "Site" or a manufacturing place, or the construction of the tested materials.
      The "Employer" bears the cost of those tests if it became clear from their results that the skill of the labor or the quality of the material conforms with the "Contract" or the instructions of the "Engineer."

**Article Thirty Eight – Entry to Work "Site" and Material Sources:**
The "Engineer" and any person he authorizes the right to enter at any time to the "Works" and the "Site" and all repair labs and the places where the work preparation is carried out or [sic]

37
[illegible signature] [illegible stamp]

00192

from which materials, manufactured materials, or machines can be found for work, and the "Contactor" should provide assistance and acquire the special approvals needed for that.

**Article Thirty Nine – Examining and Revealing "Work":**
**1- Examining Negligence before Covering It:**
No work should be covered or hidden from view without the approval of the "Engineer" or "Resident Engineer," the "contractor" should give sufficient opportunity for the "Engineer" or "resident Engineer" to examine and measure any work about to be covered and hidden from view, and to examine the foundations prior to setting permanent work on them.

The "Contractor" should give the necessary notice to the "Resident Engineer" when any such work or foundation is ready or about to be ready for examination, and the "Resident Engineer" should, without unreasonable delay conduct the examination and check on that work or those foundations, unless the "Resident Engineer" finds such examination unnecessary and informs the "Contractor" of that.

**2- Revealing Works and Making Openings:**
The "Contractor" should reveal to people any part or parts of the "Works" or make openings in them or through them in the way ordered by the "Engineer" from time to time. The contractor should repeat and make that part or those parts suitable in a way satisfactory to the "Engineer," and if it became clear that that section or those sections that were covered and hidden from view after complying with the requests of Paragraph (1) of this article have been carried out in accordance with the "Contract," the expenses of exposing to the public and making openings in or through the "Work" and returning them to what they were and make them suitable will be born by the "employer," otherwise, all these expenses will be born by the "Contractor" and the "Employer" will collect it from him or deduct it from any sums payable or will be payable to the "Contractor."

38
[illegible signature]

**Article Forty:**
**1- Removing Defective Work and Unsuitable Materials:**
The "Engineer," during the course of "Work," has the authority to issue written orders from time to time with respect to:

   a. The removal of any materials from the "Site" that the "Engineer" finds that they do not conform with the provisions of the "Contract" within the period or periods stated in the "Engineer's" Order and to substitute them with proper and suitable materials.

   b. Removing any work whose materials and the skill of its work as per the "Engineer's" opinion does not conform with the "Contract" and to redo it in an appropriate way (regardless of any previous examination conducted on it or any payment installment for it).

**2- Non Compliance of The Contractor to the Request to Remove Defective Work and Unsuitable Materials:**
If the "Contractor" did not comply with the order to remove defective "Work" and unsuitable materials, the "Employer" would have the right to use others at the expense of the "Contractor" to implement that order and would recollect all the expenses resulting from that from any sums payable to the "Contractor" or asking him for them as a debt in accordance with the situation.

**Article Forty One –**
**1. Temporary Cessation of Work:**
The "Contractor," upon a written order from the "Engineer," known in this Article as a "Cessation Order" should temporarily halt the course of "Works" or any part of it for the period or periods and in the way considered necessary by the "Engineer." The "Contractor" during that cessation should maintain and protect the work in an appropriate way and to the extent the "Engineer" finds necessary.

Additional cost including all current expenses that should be paid at the "Site," such as wages, [illegible], maintenance, "Site" expenses, and general fixed expenses of the "Contract" that are paid by the "Contractor" as a result of the implementation of the "Cessation Order" in accordance with the provisions of this article should be born and paid by the "Employer," unless such temporary cessation was:

39

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

    a.  Stated in the "Contract."

    b.  Necessary to implement the work correctly or because of the weather conditions that affect the safety and quality of the "Works" or resulting from a failure on the part of the "Contractor."

It is conditional to redeem any of these additional expenses for the "Contractor" to submit a written notice of his intention to request compensation to the "Engineer" within (30) days of the date of the "Cessation Order," and the "Engineer" should indicate and determine the value of the additional funds that should be paid to the "Contractor" regarding this claim as the "Engineer" considers it fair and reasonable.

**2- Stopping That Extends for More Than (90) Days:**

    a.  If the course of "Work" or any part of it was halted (by a Cessation Order) for a period or successive periods of (90) days in total whether regarding the "Work" in full or part of it, the "Contractor" may at the end of that period send a written notification to the "Engineer" requesting permission to resume "Work" or any part of it that was stopped within (30) days of the date of the "Engineer's" receipt of the mentioned notice, and if that permission was not granted during that period, the "Contractor" may submit another written notification in which he considers the cessation that affects a section of the "Work" only as a deletion in accordance with Article Fifty Two of these General Conditions, or to consider the cessation that affects the "Work" in total as the "Employer" abandoning the "Contract."

    b.  The provisions of the previous paragraph do not apply if the cessation of work was the result of a reason beyond the control of the "Employer," and in this case the two parties agree to manage the situation provided that the "Contractor" is not responsible for any additional expenses incurred during that halt.

**Article Forty Two – Conducting Work:**

The "Contractor" should conduct "Work" at the "Site" within the period specified in Section Two of these General Conditions, and that after receiving a written order to that [sic]

40
[illegible signature]

respect from the "Engineer" and he should proceed with the "Works" in the needed speed and without delay other than the delay that is approved or requested by the "Engineer" explicitly or the delay resulting from reasons beyond the control of the "Contractor."

**Article Forty Three –**
**1- Handing Over the Site:**
The "Employer" (with the exception of what is otherwise stated in the "Contract") should put under the disposal of the "Contractor" once the "Engineer" issues his written order to begin the "Works" that part of the "Site" that is required to allow the "Contractor" to begin and conduct the "Work" in accordance with the course indicated in Article Fourteen of these General Conditions (if present); otherwise according to the appropriate suggestions given by the "Contractor" upon a written notification to the "Engineer"; and the "Employer" should from time to time according to progress of "Work" put at the disposal of the "Contractor" the other sections of the "Site" in the way required to enable the "Contractor" to conduct the "Work" at the speed necessary in accordance with the mentioned course or suggestion (as is the case). If the "Contractor" suffered delay or expenses as a result of a failure on the part of the "Employer" to allow him to receive the "Site" in accordance with the provisions of this article, the "Engineer" should grant an extension of the period to complete the "Works" and to estimate the sums he considers fair to cover the expenses requested by the "Employer" and that should be paid to him by the "Employer."

**2- Right of Passage and Other Expenses:**
The "Contractor" should bear all the expenses and fees needed for the right of passage to reach the "Site" and the "Contractor" should also provide at his own expenses any additional means of comfort needed for the "Work" outside the "Site."

**Article Forty Four – Period for Completion of Work:**
The "Contractor" should complete the entire "Works" during the contracting period provided that this period is calculated from the date of the actual implementation or from the day following the end of the period [sic]

41

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

defined in Section Two of these General Conditions through which the "Works" should be conducted, whichever is first, or the extended period in the allowed manner in accordance with Article Forty Five of these General Conditions, provided taking into considerations any specification requirements regarding the completion of any part of the "Works" prior to its full completion.

**Article Forty Five – Extending the Work Completion Period:**

1.  The "Contractor" may request an extension of the completion period of the contracted "Works" in the following cases:
    a.  If any increase of change occurred in the "Works" in quantity or quality and could affect the course of "Works" so that they may not be completed in the contracted period.
    b.  If the delay in the completion of "Works" was for reasons or procedures related to the "Employer" or to any legally authorized authority or for reasons related to other contractors used by the "Employer."
    c.  If after the contract, unforeseen circumstances that are not the responsibility of the "Contractor" arose, and which could not have been expected or avoided and resulted in a delay in the completion of the "Works" within the contracted period.

2.  It is conditional for the implementation of the provisions of Paragraph (1) of this article that the "Contractor" should submit a request to the "Resident Engineer" within (30) days of the date of the reason for which he requests and extension arises and whenever possible later explaining the full and specific details for any request to extend the period according to what the "Contractor" deems his right so that it is possible to investigate the reasons for that request at the time.

**Article Forty Six – Inability to Work at Night or on Fridays:**

Taking into considerations the provisions of the applied labor laws, [illegible] work is not allowed at night or on Fridays without the written permission of the "Resident Engineer"; the exception from this is the cases in which the work cannot be avoided or is necessary to save life, protect money, or achieve the wellness of the "Works" and in [sic]

42
[illegible signature]

In this case the "Contractor" should inform the "Resident Engineer" of that immediately. This Article is not applied in the event if conducting any work is done usually in two shifts.

**Article Forty Seven – Progress of Works:**

All materials, equipment, and laborers that should be provided by the "Contractor" in accordance with [illegible] and speed in the implementation and maintenance of "Works" should be of the type and method suitable for the course of work and in a way satisfactory to the "Engineer." If the "Engineer" sees at any time that the progress of "Works" or any section of them is slow in a way that does not guarantee the completion of "Works" in the designated time for them or at the extended time, the "Engineer" should inform the "Contractor" of that in writing, and the "Contractor" based on that should take the steps he deems necessary after its authentication by the "Engineer" to speed up the progress of "Works" in the way for it to be completed at the designated time or the extended time. If work is conducted during the day only and the "Contractor" requested a license to work during the night in addition to working during the day, then if the "Engineer" grants that permission to the "Contractor" no additional sums will be payable for that, but if he refuses to grant such license and there was no possible substitute way to speed up the progress of "Works," then the period of completion of work should be extended for the period that would compensate for that rejection only. Night work should be conducted without unnecessary noise or disturbance.

**Article Forty Eight:**
**1- Penalties on Delays:**

If the "Contractor" was unable to complete the "Works" during the period specified in Article Forty Four of this [illegible] sums payable or may become payable to the "Contractor." If he paid or was able to [sic]

43

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

from his obligations and responsibilities in accordance with the "Contract."

**2- Reducing Penalties on Delay:**
If the "engineer" supports (confirms) that any part of the "Works" has been completed in accordance with Article Forty Nine of these General Conditions" in total, and the "Employer" occupied or used that section, penalties on delay for any periods of delay after the issuance of that support should be reduced calculated as a percentage of the value of that section whose completion was supported to the percentage of the value of the "Works" in full.

**3- Penalties on Delay are Deducted in an Ascending Order in the Following Percentages:**
    a.  The same penalty stated in the contract is deducted in the event the contractor is late for a period that does not exceed 20% of the contracting period including the additional periods given to him with the exception of the periods granted as a result of adding new paragraphs to work or for dire reasons.
    b.  Penalties on delay will be doubled one and a half times more that the one mentioned in the contract in case the period of delay is more than 20% and less than 50% of the original contracting period including the additional periods given to him with the exception of the periods granted as a result of adding new paragraphs to work or for dire reasons.
    c.  Penalties on delay will be double the ones mentioned in the contract in case the period of delay is more than 50% of the original contracting period including the additional periods given to him with the exception of the periods granted as a result of adding new paragraphs to work or for dire reasons.

**Article Forty Nine – Negligence Completion Certificate:**
When it is the opinion of the "Engineer" that the "Works" have been completed in essence (meaning that they were completed to the extent with which they could be benefited from for the purpose they were built for) and that they have passed satisfactorily any final examination stated in the "Contract," the "engineer" upon receipt of written pledge from the "contractor" of completion of any pending work during the "Maintenance Period" and in the form decided by the "Engineer," he would issue a certificate of completion of the "Works" and the "Maintenance Period" for the "Works" will begin as of the date of that certificate. Provided that the "Engineer" may grant the certificate regarding any part of the "Works" and prior to the completion of the entire "Works," the "Engineer," upon a written request from the "Contractor" should grant this certificate regarding any principal part of the "Works" that were previously completed in a way satisfactory to the "Engineer" and was occupied or used by the "Employer." Upon granting this certificate regarding part of the "Works" then this section is considered done, and the "Maintenance Period" for it begins from the date of that certificate.
The "Completion Certificate" granted in accordance to the previously mentioned provisions for any section of the "Works" that were occupied or used as was previously mentioned may not be considered in support of the completion of any works related to the site work or external appearances which should be returned to their former situation unless explicitly stated in that certificate.

44
[illegible signature]

**Article Fifty –**
**1- Maintenance:**
The expression "Maintenance Period" mentioned in these General Conditions means the twelve months following the date of completion of "Works" that is supported by a certificate from the "Engineer" and issued as per Article Forty Nine of these General Conditions. In the event the "Engineer" issues more than one certificate as per the mentioned article, then the "Maintenance Period" is calculated from the dates mentioned in those certificates, and the expression "Works" in the event of multiple certificates applies to the part meant by that certificate.

**2- Implemented Maintenance Works:**
    a.  In order to hand over the "Works" to the "Employer" at the end of the "Maintenance Period" or as soon as possible after that in good condition, and complete, incurring the satisfaction of the "Engineer" (with the exception of reasonable loss) the "Contractor" should, based upon a statement prepared by the "Engineer" or who represents him prior to the end of the maintenance period, to conduct all repairs, amendments, reconstruction, [illegible], and repair of omission, defects, cracks, or any other defects that the "Engineer" may request repaired in writing from the "Contractor" within the "Maintenance Period" or within fourteen days from its completion.

    b.  The "Contractor" should conduct all maintenance works stated in Paragraph (2-a) of this Article at his own expense if the "Engineer" sees that these works were the result of using materials or working skills that are not consistent with the provisions of the "Contract" or the result of the "Contractor's" negligence or inability to fulfill any obligations explicitly or implicitly stated in the "Contract." If the "Engineer" decides that these works resulted from any other reasons, then their cost should be paid on the bases of additional works after verification.

**3- The "Contractor's" Inability to Carry Out Maintenance Works:**
If the "Contractor" did not do any of the works requested by the "Engineer" as is shown in previous paragraphs of this article, the "Employer" has the right, without the need to resort to court for a special permit, to carry out these works in person or by other contractors, and if such works were the type the "Contractor" should have conducted at his own expense, the "Employer" has the right to demand [sic]

45

[illegible signature] [illegible stamp]

the "Contractor" of the cost of those works or to deduct its sums from any payable sums to the "Contractor" or those that will be payable to him.

**Article Fifty One – The Contractor Conducting Investigations:**
The "Contractor," upon a written request from the "Engineer" and as per his directions, should investigate the reasons for any defects, shortage, or error; if that defect, shortage, or error was not the responsibility of the "Contractor" as per the provisions of the "Contract," the "Employer" bears the cost of the investigations conducted by the "Contractor," but if such a defect, shortage, or error was the responsibility of the "Contractor," he should bear the cost of the investigation work and to repair and mend that defect, shortage, or error at his own expense based upon the provisions of Article Fifty of these General Conditions.

**Article Fifty Two – Alterations:**
1.  The "Engineer" may carry out any change in the form, quality, and quantity of "Works" or in any part of it if he deems it necessary of desired, and he has the right to order the "Contractor" to carry out any of the following works, and the "Contractor" should implement them:
    a.  Increase or decrease the quantity of any work included in the "Contract."
    b.  The deletion of any part of the work.
    c.  The substitution of the description, quality, or type of any of the works.
    d.  The substitution of percentages, verticals, positions, and dimensions of any part of the "Works."
    e.  The implementation of any type of additional work that is necessary to complete the "Works," such change is not in any way considered a impediment to the implementation of the "Contract" or [illegible], but the cost of all these changes (if present) should be taken into consideration in determining the value of the "Contract Sum" and its duration.
2.  Alteration Orders are in Writing:
The "Contractor" should not make any changes without a written order from the "Engineer" and there is no need to issue such written order to increase or decrease [sic]

46
[illegible signature]

00201

the quantities of any work actually implemented as per the maps and designs if this increase or that decrease was a result of implementing those maps and designs, yet if the "Engineer" sees for any reason that what is needed is to issue that order verbally, then the "Contractor" should abide by that order, and any written confirmation of that verbal order by the "Engineer," whether before or after the carrying out of the order should be considered as a written order issued as is understood from this article.

Also if the "Contractor" supported in writing to the "Engineer" any verbal order made by the "Engineer" and the latter did not object to that support in writing within fourteen days, it should then be considered as a written order from the "Engineer."

### Article Fifty Three –
### 1- Calculating the Value of Changes (Alternations):

The "Engineer" will determine the sum (if applicable) he sees as necessary to be added or deducted from the sum shown in the "Contract" regarding any increase of addition to works implemented or others deleted by order of the "Engineer"; the value of these works should be calculated as per the prices listed in the "Contract." If the "Contract" did not include any prices that can be applied on the increase or addition to works, then appropriate prices should be agreed upon between the "Engineer" and "Contractor," and in the event of not reaching an agreement, the "engineer" should determine such prices in a way he sees reasonable and appropriate.

The "Contractor" should carry out the "Works" at the prices specified by the "Engineer" and the "Contractor," and in the event of not agreeing on those prices, has the right to record his objection in a written notice to the "Engineer" in which he explains his intention to ask for an increase in prices, provided this does not affect the course of work.

### 2- Changes that Exceed the Percentage Specified in Section Two of the General Conditions:

If, at the completion of all "Works," it was found out that the net result of all changes (other than those resulting from any case related to changes in the prices of materials / [sic]

47
[illegible signature] [illegible stamp]

or work) has led to the reducing or adding more than the percentage specified in the "Contract" from the sum listed in the bid, then the "Contract" sum should be adjusted to the sum agreed upon between the "Engineer" and the "Contractor," and in the event of not reaching an agreement, the "Engineer" should specify the sum he deems reasonable and appropriate taking into consideration all the financial and related factors, including the "Contractor's" indirect expenses and fixed general expenses.

## 3- Daily Work:

The "Engineer" may demand in writing the carrying out of any additional or alternative work to the daily work if he believes it is necessary or beneficial. In this case, he should pay the "Contractor" for such work as per the conditions listed in the daily work table included in the "Quantities Table" and as per the prices and sums shown in the "Contract," and the "Contractor" should provide the "Engineer" or the receipt and documents as per the case to support the paid sums, he should also provide the "Engineer" with the prices of materials prior to purchase for authentication.

The "Contractor" should, in all that is related to the carried out works on the bases of the daily work and for the duration of that work, hand daily to the "Resident Engineer" a specific list of two signed copies including the names, professions, work duration, and wages of the workers used for that work; he also has to submit a statement of two signed copies showing the description and quantity of all materials and equipment used in or for that work (except for the equipment included in the added percentage as per the previously mentioned table). The "Resident Engineer" should sign them and return a copy of each list and statement to the "Contractor" if it was correct or if approved.

The "Contractor" should submit to the "Resident Engineer" at the end of every month a statement with the cost of laborers, materials, and equipment used (except for the previously mentioned). The "Contractor" is not payable any sums unless those lists and data have been submitted regularly and in full. It is conditional to constantly take into consideration

48

[illegible signature] [illegible stamp]

that if the "Engineer" sees for any reason whatsoever that the "Contractor" sending such lists or data as per the provisions previously mention is not possible practically, the "Engineer" has the right despite that to grant permission to pay for such work, either on the bases of daily work (after being convinced about the time this work requires and the equipment and materials used in it), or on the bases of a similar value in the way he deems fair and appropriate.

### 4- Requests for Compensation:

The "Contractor" should send to the "Resident Engineer" once every (30) days a statement (as comprehensive and with as many details as possible) showing the details of all compensation claims for any additional expenses the "Contractor" believes himself entitled to, and for all the increases or additions to "Works" ordered by the "Engineer" and were implemented during the previous month. Any claims for payment for these works will not be taken into consideration if not accompanied by those details.

If the "Contractor" failed to submit the said statement on time, the "Engineer" has the right to allow payment for those works when the "Contractor" submits the requested statement, provided that the "Contractor" had informed the "Engineer" in the first possible opportunity that he intends to request compensation.

### Article Fifty Four –
### 1- The Need to Limit the Use of Equipment and Others to the Works:

All "Construction Equipment," "Temporary Works" and materials prepared by the "Contractor" should be considered, upon arrival at the "Site," as exclusively designated to the construction and completion of "Works," and the "Contractor" should not remove them or any part of them (other than to move them from one section to another in the "Site"), without the written consent of the "Engineer," which should not be withheld without reasonable cause.

### 2- Removing Equipments and Others:

The "Contractor," upon the completion of "Works" should remove from the "Site" all "Construction Equipment" and "Temporary Works" that are still on "Site" and that [sic]

49
[illegible signature] [illegible stamp] [illegible]

the conditions of the contract did not state its return to the "Employer" and that he would remove any excess or rejected materials prepared by the "Contractor."

**3- Employer No Liability for Damage of Equipment and Others:**
The "Employer" is not held responsible at any time for the loss or damage of any of the "Construction Equipment" or "Temporary Works" or otherwise materials shown in Articles Twenty and Sixty Seven of these General Conditions.

**4- Customs Clearance:**
The "Employer" should assist the "Contractor" upon request in acquiring customs permits to clear the "Construction Equipment," materials, and other matters needed for the "Works" from customs.

**5- Re-Exporting Equipment:**
With respect to any of the "Construction Equipment" the "Contractor" imported for the purpose of "Works," the "Employer" should assist the "Contractor" upon request to acquire any needed government approvals for the "Contractor" to re-export the "Construction Equipment" upon their removal as previously mentioned.

**Article Fifty Five – Authenticating Materials and Others Are Not Inclusive:**
The Implementation of the provisions of Article Fifty Four of these General Regulation does not include that the "Engineer" had tacitly agreed on the materials or other matters mentioned in the mentioned article, and the "Engineer" has the right to reject any of these materials or others at any time.

**Article Fifty Six – Quantities:**
Quantities listed in the "Quantities Table" are considered estimated quantities for the work and are not the actual and correct quantities for the works to be carried out by the "Contractor" for the purpose of fulfilling his obligations as per the "Contract."

**Article Fifty Seven – The Need to Estimate (Measure) Work:**
The "Engineer" should (except when otherwise stated) indicate and determine the value of the work implemented in the "Contract" in an estimation method and in the form mentioned in the "Contract," and when the "Engineer" requests the estimation of any section or sections of the "Works," he should give notification to the agent or representative of the authorized "Contractor" who should attend without delay or send [sic]

50

[illegible signature]

00205

A qualified agent to assist the "Engineer" or "Resident Engineer" in conducting that estimate with the need to prepare all that is needed for the estimate. If the "Contractor" was absent or was careless or reluctant to send that agent, then the estimate prepared by the "Engineer" or that is authenticated by him is considered the correct estimate for the work, and for the purpose of measuring the permanent work which measuring needs to resort to records and maps, the "Resident Engineer" should prepare the records and maps for that work month by month, and the "Contractor in this case when called in writing to do that, should be present within (fourteen days) to examine these records and maps and agree on them with the "Resident Engineer," and he should sign them in the event of an agreement. If the "Contractor" did not show up as requested to examine any of those records and maps and reach an agreement on them, they are considered correct; if the "Contractor" did not approve those records and maps after examining them or did not sign them as per the agreed form, they are in that case considered correct unless the "Contractor" sent to the "resident Engineer" within (14) days of the examination date a written notification that includes the ways in which those records and maps are inauthentic, requesting a decision from the "Engineer" concerning them.

### Article Fifty Eight – Method of Specifications (instrument):

The "Work" specification is conducted on the bases of the net dimensions shown in the maps regardless of any special or local custom, other than what is otherwise stated.

### Article Fifty Nine:
### 1- Reserve Funds:

Every reserve fund (other than the Primary Cost as per Paragraph (2) of the Article) stated in the "Quantities Table" in that capacity (whether for a work that should be done by the "Contractor" and which was not defined in details when approving the contract or the work that should be carried out by a named secondary contractor as is later here defined) with expenses and profits (if any) that were added by the "Contractor" to that sum should be deducted from the "Contract Cost" and instead the following will be added to the "Contract Cost":

   a. The value of the work to which the reserve money is related and that was ordered by the "Engineer" and carried out;

51

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

"Contractor" accountable based on Article Fifty Three of these General Conditions.

    b. The sum or sums already paid by the "Contractor" to the named secondary contractor (as he is later identified here) upon the directions of the "Engineer," when the work related to the reserve sum has been ordered by the "Engineer" and implemented by that named secondary contractor, and another sum that is appropriate to the already paid sum with the same primarily added percentage to the mentioned reserve fund for expenses and profit if the "Contractor" had added to the reserve sum related to work any other amounts of money related to expenses and profits.

**2- Primary Cost Paragraphs:**

Each sum of money allocated in the "[illegible] Table" (in full or in part) as the primary cost of goods or materials that should be prepared and introduced to the "Work" should be changed to the actual price paid by the "Contractor" for the goods and materials upon directions from the "Engineer," and the "Contract Sum" should be increased or decreased (as per the case) according to the amount that exceeded or decreased from the sum entered in the "Quantities Table" as a result of that change. No change should be made to or regarding any sum that has been added to the primary cost for labor as a result of the actual mentioned cost being higher or lower than the primary cost. With respect to other expenses and profits, here add or subtract (as per case) a sum representing an percentage similar to that stated in the (Quantities Table) regarding the paragraph on the concerned primary cost, and if it was not stated, the to the amount the "Contractor" listed in the offer as a percentage to amend the primary cost sum.

**3- Use of Paragraphs on Reserve or Emergency Money:**

All sums stated in the "Quantities Table" stated as being reserve or emergency, should only be used upon the directions of the "Engineer" and his estimation, and if they were not used in full or in part, then the unused sum should be deducted from the "Contract Cost."

52

[illegible signature]

**4- Submitting Documents and Others:**

The "Contractor" should, upon the request of the "Engineer," submit all offers, lists, documents, accounts, and receipts related to the expenses of the paragraphs on reserve funds and preliminary cost referred to in this Article.

**Article Sixty –**

**1- (Named) Secondary Contractor:**

All specialists, merchants, craftsmen and others, as well as those carrying out any work or preparing any goods, for which reserve funds or preliminary cost funds have been allocated in the "Quantities Table," who were nominated, or are nominated, selected, or accepted by the "Employer" or the "Engineer" and all those the "Contractor" should assign any work to through subcontracting as per the "Contracting Documents." All those should be considered in the implementation of these "Works" or the preparation of those goods as secondary contractors and employers for the "Contractor" and are referred to as the "Named Secondary Contractor." The "Employer" or the "Engineer" may not commit the "Contractor" to use a named secondary contractor who refuses to commit through subcontracting to a secondary contract with the "Contractor" that includes the following:

a.  The named secondary contractor's commits with respect to work or the goods subject to the "Contract" through subcontracting to the "Contractor" to the same commitments and responsibilities of the "Contractor" to the "Employer" in accordance with the provisions of the "Contract" and to protect and compensate the "Contractor" for those commitments and responsibilities and for all compensation claims, requests, legal expenses, damages, costs, fines, and expenses regardless of their type resulting from that and related to it and for the failure to implement those commitments or uphold those responsibilities.

b.  The named secondary contractor will protect and compensate the "Contractor" for any negligence on the part of the "Named Secondary Contractor," his agents, workers, and employers, and for any misuse by him or them of any of the "Construction Equipment."

53

[illegible signature] [illegible stamp]

or "Temporary Work" prepared by the "Contractor" for the purposes of the "Contract" and for all compensation demands as was mentioned in the previous paragraph.

## 2- Payment of Sums to Named Secondary Contractor

Prior to issuing any payment certificate as per Article Sixty Two of these General Conditions that includes the payment of any sum related to the completed work or the cargo prepared by a "Named Secondary Contractor," the "Engineer" has the right to ask the "Contractor" of sufficient proof that all sums (minus retentions) included in the previous payment certificates with respect to the work or cargo of that named secondary contractor have been paid or settled by the "Contractor." In case they were not paid or settled, the "Employer" has the right to pay to the "Named Secondary Contractor" directly upon the "Engineer's" certificate all the sums (minus retention) that the "Contractor" did not pay to the named secondary contractor, and to deduct the paid sum from any sums payable or that will be payable to the "Contractor." All this as long as the "Contractor" did not inform the "Engineer" in writing that he has reasonable reasons for withholding or refusing to pay these sums. The "Engineer" will provide sufficient proof that he had informed the "Named Secondary Contractor" of that in writing.

Yet if the "Engineer" supported that and the "Employer" paid the "Named Second Contractor" directly as was previously mentioned, the "Engineer" upon issuing any latter certificate in favor of the "Contractor" should deduct from its sum the total paid directly, and has no right in this case to halt or delay the issuing of the same certificate when it is due for issuance as per the conditions of the contract.

## Article Sixty One – Transferring the Commitments of the Named Secondary Contractor:

In the event of the commitment of the "Named Secondary Contractor" in accordance to the provisions of Article Sixty of these General Conditions, toward the "Contractor" with respect to the carried out work, cargo, or materials prepared by the "Named Secondary Contractor" is an ongoing commitment for a period exceeding the maintenance period stated in the "Contract." The "Contractor" should convey to the "Employer" [sic].

54
[illegible signature]

Work" at any time after the completion of the "Maintenance Period" upon the request and at the expense of the "employer." The benefits of that commitment for the remaining period.

**Article Sixty Two –**
**1- Cash Payment and Loan Certificates:**
With the exception of what states otherwise, cash loans should be paid and payment certificates are issued monthly as per the conditions stated in Section Two of these General Conditions, excluded from this are the contracting works of cost not exceeding five thousand dinar, as the employer can pay more than one commodity in a single month.

**2- Loans against Construction Equipment and Material:**
Granting and repaying cash loans against "Construction Equipment" and material is done according to the conditions listed in Section Two of these General Conditions.

**3- Payments in Foreign Currency:**
If carrying out "Work" required importing material, machines, or equipment from abroad, or if the carrying out of the "Work" or any part of it required the use of foreign workers, then in these cases, a percentage of the payments that must be made with respect to the "Contract" must be made in certain foreign currencies. The mentioned percentage, the exchange rate applied, and the conditions that should be applied are as mentioned in Section Two of these General Conditions.

**Article Sixty Three – Authentication:**
No certificate other than the "Maintenance Certificate" mentioned in Article Sixty Four of these General Conditions is considered an authentication to any work or any other issue, or an admittance of the required fulfillment in the "Contract" or any part of it, or the authenticity of any claim or request made by the "Contractor" or for any additional work or change ordered by the "Engineer," and no other certificate may end or touch any of the authorities of the "Engineer."

55

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

**Article Sixty Four:**
**1- Maintenance Certificate:**
The "Contractor" should notify the "Engineer" of the end of the "Maintenance Period" and that he had completed all that was missing and the "Works" were maintained as required by the "Contract." The "Contractor" is not considered to have fulfilled his obligations till after the "Engineer" signs the "Maintenance Certificate" and hand it to the "Employer" explaining that the "Work" has completed and maintained to his satisfaction. The "Engineer" grants the "Maintenance Certificate" (30) days after the completion of the "Maintenance Period" (if various maintenance periods were applied to various sections of "Work" then after the end of the last of those periods) or when any of the works ordered by the "Engineer" during the "Maintenance Period" in accordance to Article Fifty of these General Conditions seem complete to his satisfaction. This Article is applied regardless of whether the "Employer" received "Work" or its maintenance or operation or use in total or in part or not.

**2- Employer Non Liability:**
The "Employer" is not held liable to the "Contractor" for any case or matter resulting from the "Contract" or related to it or to the implementation of "Work," and unless the "Contractor" has demanded in writing a compensation for any matter or case prior to the issuance of a "Maintenance Certificate" as per this article, he is considered to have exonerated the "Employer" in full and completely from any right or claim related to the "Contract."

**3- Unfulfilled Obligations:**
Despite the issuance of a "Maintenance Certificate," a letter of guarantee and settling the final account, each of the "Contractor" (taking into consideration Paragraph (2) of this Article) and the "Employer" will remain responsible for the fulfillment of any obligations resulting from the provisions of the "Contract" prior to the issuance of the "Maintenance Certificate" and remained unfulfilled after the issuance of this certificate, and for the purposes of determining the nature and scope of any of those obligations. The "Contract" is considered in force between the two parties in that respect.

56

[illegible signature]

**Article Sixty Five:**

**1. Withdrawing Business:**
The "Employer" has the right, (14) days after giving the "contractor" a written notice to seize the "Site" and "Work" and evict the "Contractor" from them in any of the following cases without resorting to court:

1. If the "Contractor" is bankrupt.
2. If the "Contractor" applies to declare bankruptcy.
3. If the qualified court issued a ruling to put the "Contractor's" money with the bankruptcy Holder [illegible].
4. If the "Contractor" reconciled in a way to avoid bankruptcy or abdicated his rights in favor of his debtors.
5. If the "Contractor" agrees to carry out the "Contract" under the supervision of a supervising authority comprised of his debtors.
6. If the "Contractor" has a company that has announced its liquidation other than voluntary liquidation for purposes of mergers or reformation.
7. If the "Contractor" abdicated the "Contract" without prior written consent from the "Employer."
8. If a qualified court seized the funds of the "Contractor" and that seizure would result in the inability of the "Contractor" to fulfill his obligations.
9. If the "Engineer" supported to the "Employer" in writing that he was of the opinion that:
   a. The "Contractor" had abandoned the "Contract" or that he had refused to sign the format of its contract.
   b. The "Contractor" had failed, without legitimate excuse, to conduct the work, or that he has stopped the progress of work for (30) days after receiving written notification from the "Engineer" of the necessity to carry out work.

57

[illegible signature] [illegible stamp]

    c.  The "Contractor" had failed in removing the materials from the "Site" or in demolishing the "Work" and replacing it within (30) days after receiving a written notification from the "Engineer" that it has been decided to reject the materials or the mentioned work for not conforming to the provisions of the "Contract."

    d.  The "Contractor" is not implementing the "Work" as per the "Contract" or has been deliberately negligent and careless in carrying out his obligations as per the "Contract."

    e.  The "Contractor" made sub-contracts regarding any part of the "Contract" in a way that would harm the quality of work or violate the instructions of the "Engineer."

The "Employer's" seizure of the "Site" or "Work" and evicting the "Contractor" from them is not considered in developed cases an annulment of the "Contract" or excusing the "Contractor" from any of his obligations or responsibilities with respect to the "Contract" or a violation of the rights or authorities of the "Employer" or "Engineer" as per the "Contract." The "Employer" may complete the "Work" in person or use another contractor to complete the "Work," and he or the other contractor has the right to use for this completion sufficient "Construction Equipment" and "Temporary Work" and the materials that were considered as completely allocated to the construction and completion of the "Work" in accordance with the provisions of the "Contract" and in the way seen appropriate by the "Employer" or other contractors. The "Employer" has the right at any time to sell any of these "Construct Equipment" or "Temporary Work" and excess materials and to put the exchange from the sale in or for the fulfillment of any sums payable or may become payable to the "Employer" by the "contractor" [illegible] the "Contract."

## 2- Calculating the Value at the Date of Withdrawing Business:

The "Engineer," whenever possible after the "Employer" seizes the "Work" and evicting the "Contractor" in the previously mentioned way, and prior to beginning

58

[illegible signature]

to complete the works and after conducting the appropriate investigations and questioning to determine and appoint through the concerned parties or after referring to them, or from his side in the event of their absence despite notifying them the amount of what the "Contractor" reasonable deserves upon seizures and ousting from the "Site" in exchange of the actually complete "Work" by him in addition to the value of any of the unused or used materials, any "Construction Equipment" and any "Temporary Work" and that to take into consideration upon settling the account of the "Contractor" as was mentioned in Paragraph (3) of this Article.

3- Settling the "Contractor" account after withdrawing work:
If the "Employer" seized the "Site" and "Works" and ousted the "Contractor" by this Article, the "Contractor" is not paid any sums of money on account of the "Contract" prior to the end of the "Maintenance Period," and the "Engineer" would determine the sums paid to the "Contractor" before withdrawing the work and the cost of completing the "Work," maintenance, and delayed penalties (if any) and all the other expenses suffered by the "Employer" including (when the "Employer" finished the work himself) the administrative expenses stated in Section Two of these General Conditions. Their percentage are determined according to the nature, cost, and period of completion of each contract and individually, provided that this percentage does not exceed 20% (twenty percent) as a maximum of the cost of work that is completed at the cost of the contractor, once this is done, the paid sums to the "Contractor" and those spent on his account are deducted as was previously mentioned from the sums the "Engineer" concurs are payable to the "Contractor" in the event of his completing the "Works" fundamentally. If it was found that the "Contractor" account was in credit, he will be paid the difference between the two sums, yet if it was found that the sums paid to the "Contractor" and those spent on his account are more that what should have been paid to him in the event of the fundamental completion of the "Works," the "Contractor" should pay the "Employer" upon request this increase which is considered a payable debt by the "Contractor" and should be accordingly [illegible].

**Article Sixty Six – Urgent Repairs:**
If the "Engineer" or "Resident Engineer" found it important to do whatever necessary quickly to secure safety and correct what may result from any accident, negligence, or any other incident

59

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

caused [sic] harm to "Work" or what is related to it or any part of it whether during the implementation of "Work" or during the "Maintenance Period" and the "Contractor" was either incapable or not willing to do that work or repair immediately, then the "Employer" may, in person or through others, carry out that work or repair in the way the "Engineer" or "Resident Engineer" deems necessary. If the work or repair carried out by the "Employer" in this way was work according to the "Engineer" that is asked from the "Contractor" to do at his own cost by virtue of the "Contract," then all costs and expenses fundamentally carried out by the "Employer" for the purpose of doing that, should be paid by the "Contractor" to the "Employer" upon request, or the "Employer" may deduct them from any sums payable to the "Contractor" or that will be payable to him. It should always be taken into consideration that the "Engineer" or "Resident Engineer" should, whenever possible and reasonable, inform the "Contractor" in writing with the procedures taken as per the aforementioned.

**Article Sixty Seven – Special Hazards:**
The following provisions will be implemented regardless of what was mentioned in the "Contract":
1. The "Contractor" will not be held responsible in any way for the destruction and harm to which the "Work," "Temporary Work," or "Refunded Money" to the "Employer" or third person, or the harm or loss of life resulting directly or indirectly from war activities (whether war was declared or not), or invasion by a foreign enemy, or rebellion, revolution, mutiny, civil war, coup d'etat, riots, disturbances, or system overthrow (except those taking place among the workers of the "Contractor" himself).
   These matters and actions collectively mentioned will be referred to as "Special Hazards."
   The "Employer" should compensate the "Contractor" and protect him against [illegible] "Special Hazards" and against all claims, requests, and expenses of any kind, and should compensate the "Contractor" for any loss or harm resulting directly or indirectly from "Special Hazards" to the funds of the "Contractor" used or intended to be used for the purposes of "Work" (including the funds

60

[illegible stamp]
[illegible signature]

that are on their way to the "Site"). The aforementioned does not apply to the rejected "Works" as per Article Forty of these General Conditions prior to the occurrence of any of the "Special Hazards."

2.  If the "Works" or "Temporary Works" of any materials (whether for "Works" or "Temporary Works") present at the "Site" or close to it or on their way to it suffered any damage or destruction as a result of any of the "Special Hazards," the "Contractor" in spite of that is due the sums for any of the damaged or destroyed works and material in this way, as well as the cost of mending any of this damage or destruction whether to works or "Temporary Works" and the cost of substituting or repairing these materials to the extent that may be requested by the "Engineer" or as is necessary to complete the "Works" on the bases of the Primary Cost in addition to the profit, whose reasonability is approved by the "Engineer."

3.  The destruction, damage, harm, or loss of life resulting from the explosion or its effects, when and if it occurs, as a result of any landmine, bomb, grenade, missile or any war ammunition or explosives, should be considered within the results of "special hazards." The provisions of this Article do not apply to what results from the use of the "Contractor" of the mentioned substances for the purposes of carrying out the "Contract."

4.  The "Employer" should compensate the "Contractor" for any increase in the cost of carrying out "Works" or what branches from it, which are referred in any form to "special hazards" or where resulting from or related to them. The "Contractor" should inform the "Engineer" in writing and without delay upon his knowledge of this increase, while taking into consideration the provisions of Paragraph (5) of this Article. The provisions of this Paragraph do not apply on the increase in the cost of constructing the rejected work in accordance with the provisions of Article Forty of these General Regulation prior to the happening of any of the special hazards.

5.  If a war broke out during the course of the "Contract" (whether war was or was not declared in any part of the world that would affect the carrying out of the "Work" whether financially or in any other substantial way), the "Contractor" should, till

61

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

the end of the "Contraction" by virtue of the provisions stated in this Article, exert his utmost effort to complete the execution of these "Works," and the "Employer" has the right at any time after the outbreak of this war to end the "Contraction" by notifying the "Contractor" of that in writing. Upon such notification, this "Contracting" will end without sacrificing (jeopardizing) the rights of either party with respect to any previous violation of ending the "Contracting" and the ending of the "Contraction" in this case will have no effect on the rights of either party as per this Article and Article Sixty Nine of these General Conditions.

6. If the "Contracting" was ended as per the provisions of paragraph (5) of this Article, the "Contractor" should remove from the "Site" as soon as possible all "Construction Equipment" and should provide to his sub contractors similar facilities to achieve that.

7. If the "Contracting" was ended as per the provisions of paragraph (5) of this Article, the "Employer" should pay the "Contractor" the costs of all "carried out work prior to the termination date which the "Employer" had not previously paid to the "Contractor" as per the prices and sums listed in the "Contracting" in addition to:

   a. Sums payable with respect to any preparatory paragraphs and as per the amount of work and service they included and was carried out and implemented and a reasonable percentage as supported by the "Engineer" for any of those paragraphs included in the work or service and were partially carried out or implemented.

   b. All requested (ordered) materials or commodities in a reasonable amount for the "Works" or "Temporary Works" that will be handed over to the "Contractor" or for which the "Contractor" will be legally responsible for accepting its receipt (such materials or commodities become the property of the "Employer" upon payment of their cost).

   c. The sum the "Engineer" agrees equivalent to any reasonable expenses born by the "Contractor" in the hope of completing the "Works" in total, as long as those expenses were not included in the sums paid in accordance to the previously mentioned provisions of this paragraph.

62
[illegible signature]

D. Any additional payable sums in accordance to the provisions of paragraphs (1, 2, 4) of this Article.

E. The reasonable cost for removing equipment as per paragraph (6) of this Article and the cost of returning it if the "Contractor" requested that to his main storages in the country in which he is registered or to any other entity at a higher cost.

F. The reasonable cost of returning all employees and workers of the "Contractor" assigned to the "Works" or to anything related to it to their countries at the time of that completion of "Works," and the "Employer" has the right to settle any remaining balances with the "Contractor" related to the loans against the equipment and materials, and any other sums he had previously paid to the "Contractor" for the execution of "Works" from any sums payable by the "Employer" to the "Contractor."

**Article Sixty Eight – Payment of Sums in Case of Execution Difficulties:**

If the execution of the "Contracting" becomes impossible as a result of war or for any other reason beyond the will of the "Contractor," the sum payable by the "Employer" to the "Contractor" for the completed word will be as per the sum payable in accordance with Article Sixty Seven of these General Conditions, and that as if the "Contracting" was completed as per the mentioned Article Sixty Seven.

**Article Sixty Nine – Settlement of Disputes – Arbitration:**

If any dispute or difference of any kind whatsoever shall arise between the "Employer" and the "Contractor" in connection with or arising out of the "Contract" or the carrying out of the "Works" (whether during the progress of the Works or after their completion, and whether before or after the termination, abandonment, or breach of the "Contract") it shall in the first place be referred to and settled by the "Engineer" who shall give notice of his decision to the "Employer" and the "Contractor". Such decision in respect of every matter so referred shall be final and binding upon the "Employer" and the "Contractor" until the completion of the "Works," and shall forthwith be given effect to by the "Contractor" who shall proceed with the "Works" with all due diligence, whether notice of dissatisfaction is given by him or by the "Employer" as hereinafter provided or not.

63

[illegible signature] [illegible stamp]

00218

If the "Employer" or the "Contractor" be dissatisfied with any such decision, then in any such case the "Employer" or the "Contractor" may within (30) days after receiving notice of such decision require that the matter be referred to a "Committee of Arbitration" to be formed in the following manner:

The "Employer" and the "Contractor" shall each appoint one member to the committee and the two members thus appointed shall agree upon a third member to act as Chairman of the Committee. If agreement cannot be reached within (14) days from the last date of their appointments, then the "Employer" or the "Contractor" shall each have the right to ask a competent court to appoint the third member in accordance with proceedings provided in the Civil Procedure Code or in accordance with any procedures stated in an arbitration affairs law.

The "Committee of Arbitration" shall have complete authority to review (reconsider), revise, and amend any decision, opinion, order, certificate, or [illegible] issued by the "Engineer." The ruling issued by the "Arbitration Committee" shall be binding to both parties unless one adheres to its annulment in accordance with the provisions stated in the Civil Procedure Code.

The reference to arbitration shall not enter until after the completion or alleged completion of the "Works" unless with the written consent of the "Employer" and the "Contractor." Provided always that postponing the determination of the dispute shall not cause damage to any of the parties or obstruct the progress of the work. All fees and other costs shall be paid to the arbitrators by the party requiring arbitration, provided that such fees and costs shall be payable by the party against whom the award has been pronounced.

**Article Seventy -**

**1- Sending Notices to Contractor:**
Notices and Warnings addressed to "The Contractor" are correct according to "Contracting" conditions if they are sent to him by registered return mail or were deposited (handed) at his place of work, yet if the "Contractor" was a non-Iraqi company, they are sent to his registered office in Iraq or to headquarters.

64

[illegible signature]

2- Sending Notices to Employer:
Notices and Warnings addressed to "The Employer" are correct according to "Contracting" conditions if they are sent to him by registered return mail or were deposited (handed) in his department (directorate).

**Article Seventy One – The Collection of Governmental Debt Law:**
Debt payable to the employer by the contractor resulting from his violation of the provisions of this contract in accordance with the Law on the Collection of Governmental Debt Number 56 for 1977 or any other law to substitute it.

**Article Seventy Two – The Law Applicable to Contracting and the Jurisdiction of Iraqi Courts:**
"The Contract" shall be subject to and construed according to the Iraqi laws, regulations, and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of "The Contract."

65

[illegible stamp]
[illegible signature]

00220

## Section Two

It shall be taken into consideration in the organization of Section Two the requirements of each contracting individually (separately), provided all this is conducted in precision and care and in a way harmonious with the provisions of Section One of the General Conditions whenever possible, provided it is always taken into account the necessity of honestly stating the deletion, addition, or amendment of any of the provisions of Section One of the General Conditions.

[illegible signature] [illegible stamp]

**Section Two**
**General Conditions for Civil Engineering Contracting Works**

**1- Definitions:**
    A- Name of business owner: General Establishment for Land Reclamation
    B- Name of engineer: Public Company for Executing Land Reclamation Contracts
    C- Any other definitions to be added: /

**2- Final Insurances:**
Final insurances are renewed for better implementation of the contracting in accordance with the provisions of Article Ten of Section One of these General Conditions and as per the following percentages of the transferred money including lump sums and reserves:
8% for half the first million.
6% for the second half.
5% for the second million.
4% for the third million and above.

3- Penalty on Delay - / 250 Dinars [handwritten: Two hundred and fifty dinar] for each day as per the provisions of Article Forty Eight of Section One of the General Conditions, provided the imposed penalties do not exceed the rate of (15%) fifteen percent of the total cost of contracting. The employer may, before reaching that limit, take procedures to speed up the implementation of the project, including the formation of a committee in which the contractor is represented to pay for the remaining work.

4- The minimum for the value of the achieved work and provided materials monthly for the purpose of lending is                    Dinar.

5- The minimum for insurance against responsibility for others and third person in accordance with the provisions of Article Twenty Three of Section One (           Dinar).

- Percentage for changes by deletion or addition is (twenty) 20% of the transfer cost guaranteed by the reserve in accordance with the provisions of Article Fifty Two of Section One.

69
[illegible signature] [illegible stamp]

By a report signed by it with the types of machines, their numbers and values at the time of lending while noting their suitability for work.

    d.  The total amount of borrowing on machines and equipment should not exceed 30% (thirty percent) of the transferred sum, including the sum allocated for reserve.

    e.  It is not allowed to lend on machines and equipment after two thirds of the contracting period.

    f.  It is not allowed to lend money on backup equipment and temporary installations used for the purposes of the project, such as the dwellings of the contractor, resident engineer, workers' dwellings and others.

2. Lending is conducted on production vehicles in accordance with the payment and lending regulations on machinery, materials and equipment as per paragraph (11-1) above, provided they are allocated for the contracted work, and by its nature does not include vehicles designed for transporting people (sedans, buses).

3. Lending on those machines, equipment, and production vehicles is conducted as per the following percentages and conditions.

    a.  Machines, equipment, and production vehicles available at the work site, lending on them will be at 50% of their value at the time of lending in exchange for a letter of guarantee or a possession mortgage by an authenticated contract at the notary general after they are insured.

    b.  Lending on machines, equipment, and production vehicles that are not available at the work site and which are imported from abroad will be according to the following standards after providing a letter of guarantee with the borrowed sums.

        10% of their value upon opening credit.

        25% of their value upon arrival to Iraq and handing over of shipment papers.

        15% of their value upon arrival at work site.

            The letter of guarantee may be launched in exchanged of their possession mortgage by an authenticated contract at the notary general after they are insured.

4. Refund of granted loans is conducted as per paragraphs 1 and 2 above in equal installments of the sums payable to the contractor as per the monthly payments and that from [sic]

72

[illegible signature]

Date of second premium following the credit line award date. If the amount deducted is greater than the amounts due to the contractor under the monthly premium in a given month, the remaining amounts shall then be deducted in the following month and so forth until the loan amounts are collected during or prior to the expiration of the contract duration.

5. Credit line shall be granted for the material, machinery and equipment used for the contract work under the following conditions:

A- The volume of these material, machinery and equipment must be necessary for the completion of work and certified by the resident engineer.

B- The quality and description of the material, machinery and equipment must reflect the specifications in the contract certified by the resident engineer.

C- The value of the material, machinery and equipment must reflect the supplier list description in addition to payment of customs fees and other expenses, not to exceed the contract prices.

D- The contractor must submit a letter of guarantee in the amount equivalent to the credit line and shall authorize its release upon the arrival of the material, machinery and equipment to the work site and with the certification of the resident engineer.

6- The credit line shall be awarded for the material, machinery and equipment existing in the work site at 75% of their value at the time of the loan approval and without submittal of a letter of guarantee.

7- The loan shall be granted for the directly imported material, machinery and equipment at 75% of their value that shall be paid according to the following schedule:
15% of the value upon extension of the credit line
30% of the value upon their arrival to Iraq and with delivery of bills of lading
25% of the value upon arrival at the work site.

8- The contractor shall be granted, with the endorsement of the resident engineer, a credit line in the amounts and rates requested by the affiliated organizations initiating the import on behalf of the contractor provided the credit amounts paid under any circumstances, do not exceed 75% of the value of the material, machinery and equipment.

73

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

According to the prepared lists approved by the institution that imports or as per the price of the contract, whichever less.

9.  The specialized equipment of the cooperative sector are exempted from the condition of submitting a letter of guarantee related to lending.

12. The contractor may not use the engineers and affiliates of the Ministry of Irrigation and the public authorities affiliated with or without its permission.

13. The contractor should prepare tankers to store unbagged cement at the work site of contracting work whose cost exceeds one and a half million dinar and level of need (500) tons, five hundred tons of cement monthly. If the contractor was unable to do that, he will not be provided with cement and will be liable for the delay.

14. The number of engineers and technical assistants needed at the work site by the contractor will be determined in accordance with the provisions of Paragraph (1/a) of Article Sixteen of Part One of the General Conditions at (9) engineers and (30) technical assistants. In the event of not being ready, the contractor is committed to compensate [illegible] work a monthly sum equivalent to    dinar for the engineer and    dinar    for the technical assistant, and is deducted from his account.

15. The contractor is committed to transfer goods and materials imported from abroad that [illegible] the contracting work by the Iraqi railway or the land transport company from Basra to the work site.

16. The contractor is committed to transport experts and technicians who work with him in contracting works, as well as the materials needed for work and are shipped by air, to be with the planes of the Iraqi Airlines or by them.

74

[illegible signature]

17. Foreign contractors should adhere to refer to the Ministry of Trade for the purpose of registering their company in Iraq, based on the amended Trade Law Number 31 for 1957.

18. a- Foreign companies bear in accordance with this contract the responsibility for the conduct of workers whom are brought with it from abroad and all that might result from their strike within the company.

b- The embassy of the country of the contracted foreign company participates in handling the phenomenon mentioned in (a) above.

c- Contracted foreign companies will be responsible for the implementation of work to the employer for all the repercussions of delay in the fulfillment of their commitments as a result of the conduct of its workers and for whatever reasons.

19. The foreign contractor who uses illiterate people should adhere to Paragraph (4) of Article (14) of the amended Comprehensive National Campaign for the Compulsory Annihilation of Illiteracy Law Number (92) by signing them up in illiteracy centers, otherwise legal actions will be taken against them.

20. The employer has the right to cancel the contract unilaterally in the event of discovering the presence of a third party in the contract that is benefiting from it in the form of [illegible] or bonus or in any other form. The employer also has the right to redeem the sums paid to the contracted company adding a percentage interest on those sums of not less than 10%.

21. Foreign companies that implement the projects of the development plan in Iraq should have marine insurance on their imports to Iraq with the Iraqi National Insurance Company, otherwise they would be responsible for all repercussions.

22. The foreign contractor should adhere to what was stated in the Revolutionary Council Resolution Number 376 on 03/28/1977 regarding the housing resolution for foreigners working for him.

23. The foreign contractor should adhere to what was stated in the Revolutionary Council Resolution Number 376 on 03/28/1977 regarding providing sufficient number of specialized non-Iraqi technicians to carry out the work of the contract.

24. The contracting company should conduct all works of diverting telephone networks, if present, at the work sites, and in coordination with the Post, Cable and Telephone Public Authority.

Follows Paragraph (18)

d- The contracting company will be responsible for all matters affecting the safety and security of the state by the foreign workers it contracts and its workers and the results of their conduct.

Article (24) was added [illegible] Number [5/2/1/18523 on 11/02/1980].

[stamp:] The General Corporation of Land
Reclamation, Division of Legal Affairs
[illegible signature]

# Contracting Format

[illegible]

[illegible stamp]
[illegible signature]

# Contracting Format

The present contract was concluded on this [handwritten: twelfth day of the month of July in the year nineteen eighty four between the General Company of Corporation of Land Reclamation] in addition to his occupation referred to in the contract as "Employer" and [handwritten: AGROCOMPLECT of Bulgaria] referred to in this agreement as "Contractor"

Agreement is hereby concluded between the Employer and Contractor upon the request of the Contractor regarding the construction, implementation and maintenance of works specified under agreement number 65 [handwritten: Contract number 4, Project Hila-Diwaniya] according to contract the documents and terms therein, for the amount of 29,853.00 [handwritten: twenty nine million, eight hundred fifty three dinars excluding the security deposit] during [handwritten: 48 forty eight months, 09/12/82].

Further, the Employer agrees to pay the due amounts to the Contractor according to the prices, conditions and deadlines stipulated in the contract.

The following documents complement each other and shall be treated as "Contract documents" according to which the project works shall be implemented or in an edited or amended format under terms of the contract documents.

    A- Directives to bidders
    B- Bidding form

78

[illegible signature]

C- General Conditions (Part One and Two).
**D- Copy of the decision by the Supreme Revolution Command Council number 376 of 3/28/1977**
**E- Copy of the decision by the Supreme Revolution Command Council number 377 of 3/28/1977**
F- Copy of the decision by the Planning Council number 5 of 5/28/1974
G- Submittal Record number 7548 of 9/2/1984
H- Contracting Format
I- Special conditions
G- Technical specifications
K- Volume and pricing schedule
L- Appendix
M- Maps

By virtue of the above, the aforementioned contracting parties have signed this contract on................. below.

| Contractor | Employer |
|---|---|
| [illegible signature] | [illegible signature] |
| Mr. Tzano Tzanov | Mr. Abdelwahab Mahmoud |
| AGROCOMPLECT, Economic and | Irrigation Minister |
| Engineering Organization, 61, Vitosha Blvd, | PO Box: 6061 |
| Sofia Tel: 87-09-62 T/x. 22021 Bulgaria" | Telex: 212117 |

79

[stamp:] "Republic of Iraq, Printing office, 100 Fils"
[illegible signature]

[illegible stamp]
[illegible signature]

## General Observations

[handwritten:]
The Company submitted insurance record number 3/8861 of 9/4/1984 by the National Insurance Company, Engineering Insurance Division establishing the contract insurance application is being processed.

(*) This page must be filled by the competent officer upon signature of the contract.

80

[illegible stamp]
[illegible signature]

Number 376

Pursuant to provisions of Paragraph A, of Article Forty Two of the Provisional Constitution, the Supreme Revolution Command Council, in its session held on 3/28/1977, decides the following:

1- For the purpose related to the implementation of these projects, foreign companies, entities and contractors operating in Iraq, shall take the necessary steps to provide housing accommodation for their foreign employees according to the requirements of each work type and by agreement with the Ministry or the Iraqi implementing agency. They must particularly ascertain the following:

A- Number, specification and site of the floors and apartments intended to host foreigners.

B- Floors and apartments needed must be ready to be habitable and furnished or made of pre - manufactured components.

C- The cost of the floors and apartment provision must be entered under a separate section under the project special pricing schedule.

D- In calculating the cost referred to in C above, deciding whether ownership of these floors and apartments will be possessed by the Iraqi or foreign party or the contractor must be determined, provided the implementing agency is given the option.

2- The competent Minister shall be vested with the right to grant to those covered by this decision, authorizations to import floor and apartment components or parts thereof provide the relevant authorities are provided with the information and data related to the said authorizations.

3- Floors, apartments or parts thereof or material used in their construction shall be exempt from customs fees, importation support fees as well as franchise fees, if any, according to the directives issued by the Ministry of Finance in cooperation with the relevant agencies.

4- Parties covered by this decision shall observe the following:

A- Abstention from re-exporting, selling, leasing or using in any way whatsoever the imported floor and apartment components prior to receiving the approval of the Ministry or the implementing agency.

B- Providing care and maintenance to the floor and apartment components and deliver them in a good condition to the implementing agency upon issuance of the work completion certificate if agreement is reached on the transfer of ownership of floors and apartments to the implementing agency otherwise they will be removed from the work site upon issuance of the job completion certificate should the implementing agency decide otherwise.

5- Establishing a business relationship with a foreign company, entity or contractor proved to have violated provisions of this decision, shall be prohibited with violators' names being placed on the black list.

6- No other legal text inconsistent with provisions and objectives of this decision shall be valid.

7- The Planning Minister shall issue the necessary directives to facilitate implementation of this decision.

8- The present decision shall be published in the Official Publication, and Ministers shall be tasked with the implementation of its provisions.

9- The present decision shall be implemented as of 4/1/1977 and all its provisions shall govern any contracts signed subsequent to its effective date.

<div align="center">

Ahmed Hassan Elbikr
President of the Supreme Revolution Command Council

[illegible stamp]
[illegible signature]

</div>

Number 377

Pursuant to provisions of Paragraph 3 of Article Forty Two of the Provisional Constitution, the Supreme Revolution Command Council, in its session held on 3/28/1977, decides the following:

First-   Foreign companies, entities and contractors operating in Iraq, shall take the necessary steps to provide the sufficient number of non Iraqi technicians and specialists in order to implement the tasks assigned to them after an agreement with the Iraqi implementing agency on the type, number and category of workers and the employment duration in Iraq.

Second- Foreign companies, entities and contractors operating in Iraq shall provide the Ministry of Planning at the end of each calendar year, with detailed lists of their Iraqi and foreign nationals working in Iraq. Further they shall provide other relevant official departments with the required information under the applicable laws and regulations and effective directives. The list must include the following:
   1-   Name
   2-   Nationality
   3-   Date and place of birth
   4-   Type of work and occupation
   5-   Educational qualifications and professional proven expertise
   6-   Gross income in Iraq. For Iraqi employees, the gross income shall include an indication of the base salary or nominal pay and a separate amount of bonuses.
Third:  Under this decision, the Ministry of Planning shall protect the privacy of the information collected.
Fourth: The competent Minister shall decide on the steps to facilitate supplying of the sufficient number of technicians and specialists of all required fields to be employed by the foreign companies and entities tasked with the implementation of developmental projects according to the applicable salary standards and to the directives issued by the Ministry of Planning.
Fifth:  Iraqi nationals shall be appointed to technical and managerial positions in foreign companies and entities operating in Iraq as well as with foreign contractors in Iraq according to ` directives issued by the Ministry of Planning.
Sixth:  Establishing a business relationship with foreign companies, entities or contractors violating provisions of this decision, shall be prohibited. Violators' names shall be placed on the back list.
Seventh: No other legal text inconsistent with provisions and objectives of this decision shall be valid.
Eight:  The present decision shall be published in the Official Publication, and Ministers shall be tasked with the implementation of its provisions.
Ninth:  The present decision shall be implemented as of 4/1/1977 and all its provisions shall govern any contracts signed subsequent to its effective date.

                                    Ahmed Hassan Albikr
                                    President of the Supreme Revolution
                                    Command Council

                                       [illegible stamp]
                                       [illegible signature]

**Copy of decision number 5 by the Planning Council dated 5/28/1974, made in session 5.**

Having considered the matter and conducted the due deliberations, the Council decides the following:

First: For purposes of this decision, terms specified hereunder shall bear the meaning assigned to them:

1- Price: the official price confirmed on the day the bid was submitted.
2- Contract duration: the effective duration contracted plus any extensions that may be granted to the contractor.
3- Compensation: the difference between the official confirmed price on the day the proposal was submitted and the price confirmed on the purchase date within the contract duration.

Second: Under this decision, the compensation principle shall be exclusively applicable to the construction material listed below:

1- Iron including:
    A- T-shaped bars
    B- Round thin and square bars
    C- Sheets and plates
    D- Window frames
    E- Twisted iron bars
    F- Corner iron parts
    G- Fountain iron bars
    H- Door iron parts
    I- Steel poles
    J- Iron support poles

2- Cement including:
    A- Ordinary Portland cement
    B- Sulphate Resisting cement
    C- White Portland cement

[illegible stamp]
[illegible signature]

3- Brick bocks including:

      A- Oiled brick blocks of all types.
      B- Cement brick blocks not to include manufactured concrete blocks of all types
      C- Asphalt brick blocks

Third: The beneficiary shall compensate its contracting business partner for any increase in prices of construction material indicated in part two above provided:

1- The intended construction material is purchased in domestic markets.
2- The purchase of the construction material and the increased prices occurred while the contract duration is valid.
3- The resident engineer certifies the volume of the construction material actually supplied to the work site.

Fourth: The compensation amount shall be included in the project allocation or contracted work account.

Firth: The contractor may not dispose of the construction material covered by this contract even if it exceeds the needs of the project after completion unless authorized by the Iraqi implementing agency.

Sixth: The contractor's name shall be placed on the black list if there is evidence proving that contractor fraudulently used and tampered with the quality of the contraction material. Further, the contractor shall be subject to additional penalties under the applicable laws and regulations.

Seventh: In the event of a decrease in the prices of construction material under this decision within the contract duration, the project prices shall be adjusted accordingly.

.

[illegible stamp]
[illegible signature]

## Maps and Diagrams Schedule

A- The work diagrams are comprised of (          ) map (s) explaining the nature and type of work as follows: -

| Serial number | Map address | Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  | . |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Part Three**

**Special Conditions**

**Technical Specifications**

**Volume and Pricing Schedule**

**Appendix**

**Maps**

[illegible seal]
[illegible signature]

00236

Appendix Number (1)
To the General Conditions
Contractors should Abide by the Articles of Resolution Number 583 Adopted
At the Session Held on 05/03/1982 for the
Revolutionary Command Council as follows

"Resolution (583)"

Based on the provisions of Paragraph (A) of Article Forty Two of the Temporary Constitution: The Revolutionary Command Council decided in its Meeting held on 05/02/1982 the following:

First: Foreign and Iraqi companies, contractors, and the cooperative and mixed sectors authorities will be forbidden from carrying out excavations on street sidewalks and roads for the purpose of conducting the work assigned to them to any authority without the approval of the Capital Secretariat and the Public Postal, Cable, and Telephone Authority.

Second: The entities shown in Paragraph (First) of this resolution should contact the Capital Secretariat and the Public Postal, Cable, and Telephone Authority to provide the necessary maps for the implementation of the works for the purpose of placing cables within a period of no longer than (10) ten days from the date of presenting the request.

Third: The abovementioned authorities will conduct a survey of the area for excavation to determines the services that contradict with the path of excavations using modern equipment and machines to reveal cables, and conduct appropriate test points along the path of the area for excavation prior to the actual work.

Fourth: Manual digging in the areas close to cable paths must be observed within the city and on outer roads.

Fifth: At [illegible] the designs of projects that cut streets and roads, the entity is committed to refer to the Capital Secretariat and the Public Postal, Cable, and Telephone Authority for the purpose of getting the paths of cables to include them in the designs for the purpose of avoiding those paths, otherwise, it is agreed with the concerned authorities to reroute the cables within a time frame, provided that the implementing authority bears the costs.

Sixth: The procedures stated below will be followed against those violating the provisions of Paragraphs (First, Second, Third, Fourth, and Fifth) of this resolution.

"To be continued"

[illegible signature] [illegible stamp]

"2"

1. The cost of amendments will be settled as per fundamental lists prepared by the Postal, Cable, and Telephone Public Authority.
2. Cash compensations will be settled as determined by the Postal, Cable, and Telephone Public Authority to the minimum value of ten thousand dinar and a maximum of one hundred thousand dinar according to the type and size of the cut cable and the decrease in the value of cables, and prices of lost telephone calls and telexes.

Seventh: You may appeal the decision of the Board of Directors of the Postal, Cable, and Telephone Public Authority mentioned in Item (2) of Paragraph (Sixth) of this decision to the concerned authorities within ten days of the date of notification of the decision.

Eighth: In the event of the repeated cut of the same cable, or any damage to it by the same entity mentioned in Paragraph (First) of this resolution, the compensation amount will be doubled.

Ninth: Any legal text contradicting the provisions of this resolution will not be put to force.

Tenth: This resolution will be published in the Official Gazette, and ministries and other executive authorities will implement it.

Coordination between the Ministry of Transport and the authorities carrying out the excavation work in the abovementioned resolution will be as follows:
1. For excavation within the city of Baghdad, referral and coordination will be conducted with the Baghdad Cable and Telephone Services Directorate, near Al-Khayyam Cinema 8884477.
2. For excavations on the sides of outer roads, referral and coordination will be with the Public Wired and Wireless Communication Authority, Al-Kholafaa Street, near Shourja, Telephone 8888110.
3. For excavations within the provinces, referral and coordination will be with the Public Cable and Telephone Services Authority, 52 Street, near Technical Investigations, Telephone 7769969.

Zahra /9/3/1984

[illegible signature] [illegible stamp]

Printed in the Public Survey Authority / 1980G

00239

 

**BULGARIA**

**ENGINEERING ECONOMIC ORGANIZATION**
FOR AGRARIAN AND INDUSTRIAL DEVELOPMENT

**IRAQ BRANCH**

Baghdad - Hay Al-Wahda, 904 District,
22/1, 14th Street
P. C. Box 6084
Te.: 7194840.  Telex : 2604

ال ........................
رقم ........................ 198 ........................  198 ........................

# L I S T
## of
### the staff for execution of "HILLA-DIWANIYA
### Contract No.4 Project

---

## S P E C I A L I T Y

### BULGARIAN STAFF

1. Site Manager
2. Employees by the administration of the Project
3. Chief Engineer
4. Engineers
5. Technicians
6. Machine operators
7. Drivers
8. Mechanics
9. Civil workmen - masters

### LOCAL STAFF

1. Employees by the administration of the Project
2. Machine operators
3. Drivers
4. Civil workmen

**AGROCOMPLECT**
Economic & Engineering
Organization
61, Vitosha Blvd., Sofia
tel.: 87-59-42, tlx. 22521
Bulgaria

**A G R O C O M P L E C T  E.**
**BULGARIA**

| No. | DESIGNATION | Units/i.. |
|-----|-------------|-----------|
| 20. | Flushing machines | 8 |
| 21. | Laser equipment for construction machines | 40 |
| 22. | Prefabricated houses | 180 |
| 23. | Air-conditioners | 350 |
| 24. | Kitchen equipment | 1 |
| 25. | Medical equipment | 1 |
| 26. | Workshop equipment | 1 |
| 27. | Laboratory equipment | 1 |
| 28. | Dump trucks | 70 |
| 29. | Trucks | 15 |
| 30. | Concrete-mixer trucks | .. |
| 31. | Tanker trucks | 35 |
| 32. | Cement-carrier trucks | 6 |
| 33. | Trailors | 4 |
| 34. | Workshop trucks | 5 |
| 35. | Greaser trucks | 3 |
| 36. | Pick-ups | 25 |
| 37. | Personal cars | 5 |
| 38. | Minibuses | 35 |
| 39. | Buses | 6 |
| 40. | Jeeps | 20 |
| 41. | Auto-cranes | 8 |

Remark

The above mentioned machines and equipment
... are subject to the approval
of the project manager according
to the programme of execution of
the work.

AGROCOMPLECT
Economic & Engineering
Organisation
61, Vitosha Blvd., Sofia
tel.: 87-86-02, tlx. 22621

AGROCOMPLECT E.E.O.
BULGARIA



BULGARIA

...RING ECONOMIC ORGANIZATION
...ARIAN AND INDUSTRIAL DEVELOPMENT

...NCH

... Hay Al-Wahda, 904 District,
55/1, 14th Street
... 3031
1240, Telex : 2604

المؤسسة البلغارية للهندسة والاقتصاد الزراعي

الفرع العراق

بغداد ـ حي الوحدة ـ محلة ٩٠٤ زقاق ١٤ رقم العقار ١/٥٥

صندوق بريد ٣٠٣١

تلفون : ٧١٩٤٤٥٠ تلكس : ٢٦٠٤

L  I  S  T
of

the construction machines, equipment, vehicles, houses
and other camp accessories for the execution of "HILLA
DIWANIYA Contract No.4" Project

| No. | D E S I G N A T I O N | Units/Ass. |
|---|---|---|
| 1. | Scrapers | 44 |
| 2. | Graders | 33 |
| 3. | Bulldozers | 37 |
| 4. | Excavators | 38 |
| 5. | Loaders | 23 |
| 6. | Additional equipment for construction machines | 120 |
| 7. | Tractors | 54 |
| 8. | Rollers | 10 |
| 9. | Drainage-laying machines | 6 |
| 10. | RAHCO Trimmer I | 7 |
| 11. | RAHCO Lining machine I | 1 |
| 12. | RAHCO Trimmer II | 1 |
| 13. | RAHCO Lining machine II | 1 |
| 14. | RAHCO Trimmer III | 1 |
| 15. | RAHCO Lining machine III | 3 |
| 16. | Additional equipment for RAHCO machines | 40 |
| 17. | Concrete plants | 4 |
| 18. | Generators | 10 |
| 19. | Aggregate plants | 2 |

00242

5.

No construction shall be performed in any sector whatsoever, prior to granting an approval over design of said sector.

Designing of HILLA-DIWANIYA Land Reclamation Project, Contract No.4, being an integral part of the construction thereof, shall be covered by Law 157.

This Memorandum shall be an integral part of the Contract for construction of HILLA-DIWANIYA Land Reclamation Project, Contract No.4.

A g r o c o m p l e c t -  E E O,
B U L G A R I A

AGROCOMPLECT
Economic & Engineering
Organization
61, Vitosha Blvd., Sofia
tel.: 87-60-62, tlx. 22621
Bulgaria

Memo. Note (E.N. 168)

# M E M O R A N D U M

on design for HILLA-DIWANIYA Land Reclamation
Project, Contract No. 4

Hereby this Memorandum Bulgarian AGROCOMPLECT State Engineering Orga-
nisation responds to Iraqi SOLR's request to prepare a complete des
for the construction of HILLA-DIWANIYA Land Reclamation Project, Con-
tract No.4, which AGROCOMPLECT shall construct under this Contract,
with the following provisions and prices:

1. AGROCOMPLECT shall design the area of HILLA-DIWANIYA Land Reclam.
   project, Contract No.4, covering the raeas adjacent to and supplie'
   with water from THRAIMA Canal, from its head downstream to T-14 Ca'
   included, gross approximately 102,327 (one hundred and two thousan'
   three hundred and twenty-seven) donums and net approximately 85,61'
   donums (eighty-ffve thousand, six hundred and nineteen), as has bee
   put down in the Minutes signed between the Establishment for Agri-
   culture & Development of Plant-Growing in the town of Diwaniya, the
   SOLR and AGROCOMPLECT, on August 2, 1983.

2. Design shall be prepared by AGROCOMPLECT on the basis of available
   design data of NEDECO and taking into consideration the  manual of
   design adopted by SOLR, of on-spot inspections and of capacities
   specified in Paragraph 1 hereabove.

3. AGROCOMPLECT shall utilise in the Project design suitable materil&
   available in SOLR or with NEDECO, after careful examination.

4. AGROCOMPLECT shall not conduct any additional geological, hydroge-
   gical and soil studies. It shall only perform those tests needed fo
   verifying the quality of embankments executed under the exisiting
   irrigation canals within the specified area, as well as those respe-
   tive topographic activities in their surveying, in new aligning and
   in setting up of an additional grand survey grid for control during
   construction.

5. AGROCOMPLECT shall accept without alterations the hydrological, agr
   economic and hydroeconomic substahtiated grounds out of NEDECO's de
   sign, complete with all ameliorations introduced by SOLR. This data
   to be used should result in b complete and suitable design to meet
   the Project requirements.                    AGROCOMPLE

network.

- study and check-up on the already constructed open-drain network
  and determining its suitability to the new design requirements in
  alignment, draining and hydraulic aspects.
- designing of new additional open drainage canals conforming with
  the construction of a covered drainage network.
- structures securing the off-flow of accumulated water into the open
  drainage network and structures securing traffic communications
  within the Project area as a whole.

All design workouts shall be executed under the standards, specifica-
tions and regulations now in effect in Iraq, while the design solution
shall be agreed upon in the course of work, with SOLR's headquarters
in Baghdad. All designs shall be complete with an OPERATIONS & MAIN-
TENANCE MANUAL on the area irrigated by THRAIMA Canal.

Design approval shall be granted by SOLR's headquarters, in portions
which might be completed independent reaches of THRAIMA Main Irrigation
Canal, or be distributory canals with their adjacent areas, set apart
as sectors. Approval shall be granted in accordance with the agreed
Designing Programme, to enable AGROCOMPLECT to perform construction
without awaiting the completion of design over the entire Project area

Design costs under this Memorandum have not been included in the cost
of the Project construction over an area of net approximately 58,534
(fifty-eight thousand, five hundred thirty-four) donums.

SOLR shall pay AGROCOMPLECT for drawing-up of design under this Memo-
randum a total amount of I.D. 300/000/000 (say: Iraqi Dinars three hun-
dred thousand only). AGROCOMPLECT shall hand over the design for
approval in portions set apart for the adjacent areas to a particular
distributory canal, which portion shall be paid for at a percentage
rate out of the total amount equal to the proportional ratio of the
portions of designed areas to the total Project area.

Payments shall be subject to the provisions of the Arrangement between
the Central Bank of Iraq and the Bulgarian Foreign Trade Bank, signed
on March 22, 1983, in Sofia. A portion, at a rate of 30 (thirty) per
cent of each payment, shall be in Local Currency (Iraqi Dinars), and
a portion, at a rate of 70 (seventy) per cent, shall be in freely
convertible currency, under the provisions of the Arrangement between
the two banks.

AGROCOMPLECT
Econor        ng

coming into effect and against a bank guarantee, a down-payment at a rate of 10 (ten) per cent of the total design costs specified in Paragraph 10 hereabove, in Iraqi Dinars.

3. For the needs of the designing activities that AGROCOMPLECT shall perform in Iraq, it will be entitled to a duty-free temporary import of the following equipment and vehicles:

| | |
|---|---|
| - a minicomputer, complete with a plotter | - 1 unit |
| - a photocopier | - 3 units |
| - a heliograph | - 3 units |
| - a distomat | - 1 unit |
| - a theodolite | - 5 units |
| - a level | - 15 units |
| - a survey hub | - 30 pcs |
| - a surveying rod | - 150 pcs |
| - a minibus | - 3 units |
| - a jeep | - 4 units |

4. AGROCOMPLECT shall enlist, together with its experts in designing and construction, those experts proposed by SOLR, but not more than 8 (eight) specialists of the latter, for the entire term of design and construction activities. SOLR shall pay, at its own expense, the monthly salaries directly to its specialists. All accommodation, meals and transportation shall be provided freely by AGROCOMPLECT.

5. The period for the design works shall start on the day following the signing of the Contract and shall last 38 (thirty-eight) months.

The general design of the total Contract area shall be elaborated within 90 (ninety) days following the signing of the Contract.

Approval of the general design shall be granted by SOLR within 20 (twenty) days following the day of submittal of design.

The detailed design of the first portion to be executed shall be elaborated by AGROCOMPLECT within 45 (forty-five) days following day of approval of the general design as above and shall be approved further by SOLR within 20 (twenty) days following the day of submittal of the design.

The detailed designs of the remaining portions of the Project are shall be done in accordance with a Programme to be agreed upon wherein the approval of the designs for each portion shall be given within 20 (twenty) days following the day of submittal of designs.

AGROCOMPLECT
Economic...

6. The design for said specified gross approximately 102,327 donums a: net approximately 85,619 donums, as areas within HILLA-DIWANIYA La: Reclamation Project, Contract No. 4, shall cover the following:

**A. IRRIGATION SECTION –**

– research on and optimizing of the alignments of THRAIMA Main Irr: gation canal and outturning branch & distributory canal, downstr: to T-9 included.

– hydraulic off-measuring of hereabove mentioned canals under the : ditiondsof a concrete lining along their entire reaches and cros: sections.

– finding out the quality of the executed-already embankments for : reaches that shal} be retained along the canal alignments.

– design for reconstruction of retained embankments, as well as fo the reaches that shall be executes as newly aligned.

– lining design for the Main Irrigation Canal, for branch and dist tory canals, conformed with their hydraulics and with the geolog and soil conditions in the designed embankments

– hydraulic & engineering study on the executed water-regulating : water-distributing and other structures to be retained, determin their suitablity to the new design requirements, as well as desi additional structuires in conformity with the alterations in the scheme for distributory canals alignment.

– locating the alignments and the number of watercourses under the conditions of thoroughly land-leveléd areas, construction of co field drains and a reassessed open-drain network.

– watercourse designing in hydraulic & engineering respects, with lining and structures needed for water-regulation & water-distr:

– AGROCOMPLCCT shall submit with the design two alternative oppier regarding the watercourses – one,as flumed canals,and the other, lined canals.

– hereabove outlined design shall cover all required design activi in order to ensure a most suitable and economical solution to co and control water distribution down to the farm units (ready to used by the farmers).

**B. DRAINAGE SECTION –**

– study on the alignment, depth of laying and hydraulic off-measu of the covered field drains and on the effect of desalinisation draining.

  

AGROCOMPL
Econo

Let

11. A. The Contractor shall receive in local currency (Iraqi D.
a down-payment at a rate of 8 (eight) per cent of the total c
struction contract price. The down-payment shall be paid-off
3 (three) portions against a respective bank guarantee, as
follows:

    - First portion at a rate 30 (thirty) per cent of the down-pa
ment within a month after signing this Contract.

    - Second portion at a rate of 35 (thirty-five) per cent of th
down-payment, at the beginning of the second year of executio
of this Contract.

    - Third portion at a rate of 35 (thirty-five) per cent of the
down-payment, at the beginning of the third year of the execu
ion of this Contract.

    B. The re-payment of the down-payment shall be done through
equal installments deducted from the Iraqi Dinar portion of
the monthly certificates, beginning from the first month afte
the down-payment, and shall be fully repaid 3 (three) months
before the end of the Contract period.

12. The penalty for delay shall be at a rate of ID 250/000 (say Ir
Dinars two hundred and fifty only) per day for the Contract, but
not exceeding 15 (fifteen) per cent of the total Contract value, foll
ing the Contract's expiry date. AGROCOMPLECT shall not be entitle
to work on a third sector, provided he had not already handed ove
one and not started work on the second sector.

13. The provisions of the Iterbank Agreement between the Central
of Iraq and the Bulgarian Foreign Trade Bank, signed on March 22,
in Sofia, Bulgaria, shall be valid for this Contract, provided t
Agreement is approved by the respective authorities of both con.

14. The Contractor shall be entitled to use the local currency po
ion (in Iraqi Dinars) at a rate of 45% (fourty-five per cent only
of the total Contract value, solely in Iraq, and with no right to
transfer to another country or currency, whatsoever.

15. The Contractor shall have the right to transfer abroad 55% (f
five per cent only) of the total Contract value, in free US Dolla
including payments for the personnel engaged in the Project's exe
ion, in accordance with the minutes of the Extraordinary Session
Iraqi-Bulgarian Joint Committee for Economic, Scientific and Tech.
Cooperation, signed on January 13, 1983 in Baghdad, Republic of I
The exchange rate declared by the Central Bank of Iraq on the da

The exchange rate declared by the Central Bank of Iraq on the date
of the actual transaction, shall be valid

... the conditions of the deferred payment shall be as follows:

A. Simple annual interest at a rate of 5 (five) per cent in accordance with the Protocol of November 10, 1983 signed at the XV Session of the Bulgarian-Iraqi Joint Committee, held in S... Bulgaria shall be charged on the balance of the amount in for... currency for work actually executed within the Project.

B. – The utilised credit principle amount shall be repaid in 4 (four) equal yearly installments.

– The accumulated interest amount on utilised credit princip amount shall be paid in free US Dollars, within 3 (three) mont... following its charging.

– The first installment for repayment of the credit princip... amount shall fall due on the date of handing over the whole Pro... ject for operation through a certificate of substantial complet... ion.

C. In case of an overdue payment of the first installment, only the interest rate, stipulated in said Agreement, shall be appli... for a period of up to 20 (twenty) days. After said 20 (twenty) days an additional interest of 1 (one) per cent shall be appli... up to the date of repayment.

D. No additional cost of any nature whatsoever, shall be paid to the Iraqi side.

17. Construction which AGROCOMPLECT shall execute under this Contra... shall cover gross approximately 69.845 (say sixty-nine thousand eig... hundred and fourty-five) donuma and net approximately 58.534 (say fifty-eight thousand five hundred and thirty-four) donums, that sha... be restricted within the area limited by the canals:

A. "Thraina" canal – from its head and up to T-9 distributary canal with the ajacent areas, irrigated by direct water off-tu... for the ajacent watercourses.

B. T-1, T-2, T-2.1, T-3, T-4, T-5, T-6, T-7, T-8 and T-9 distri- butary canals with their ajacent areas irrigated by watercours... out of them.

18. The "Sub-soiling" section, Item 2.3 (A) of the Technical Specifi... cation has not been included for the land-levelling and only ploug... shall be performed.

19. Both Parties have agreed that SOLR shall, for an exchange of ... acquaintance with Bulgarian achievements in the fiel... ...d reclamation. delegate at AGROCOMPLECT's expenses 3 (three)

......, for an exchange of experience and acquaintance with the Bulgarian achievements in the fiel...

of their experts to Bulgaria. The periods for the visits shall
agreed mutually.

20. The technical conditions of "Hilla-Diwaniya 1" Project shall
be valid for "Hilla-Diwaniya 4" Project.

21. This Memorandum shall be an integral part of the Contract f
the construction of "Hilla-Diwaniya 4" Land Reclamation Project

AGROCOMPLECT

61, 

A G R O C O M P L E C T   E.E.C.
Bulgaria
BULGARIA

## ADDENDUM NO.1

The new compaction zones in the embankment mentioned in item 26 of the bill of quantities shall include the remodelling of the existing section of the embankment of canals to the design dimension . Measurement will be for the compacted quantities only. Payment will be accordingly.

First Party                        Second Party
Eng.Kanaan Abdul Jabbar            Mr.Tzano  Tzanov
    Jawad                          Agrocomplect
President of SOLR

AGROCOMPLECT
Engineering

Bulgaria

## HILLA-DIWANIYA 4" Land Reclamation Project

| DESCRIPTION | Unit | Quantity | Rate I.D./Fils | Amo I.D./F |
|---|---|---|---|---|
| 2 | 3 | 4 | 5   6 | 7 |
| Excavation for new collector drain and extension of existing collector drains, as per specifications. | m³ | 3.600.000 | 0/580 | 2088000/ |
| Excavation for deepening and widening of existing: | | | | |
| a) collector drains | m³ | 71.150 | 0/900 | 64035/ |
| b) main drains | m³ | 100.000 | 1/500 | 150000/ |
| Excavation for supply of materials and construction of outfall structures of open collector drains at junction with parent drains as per specifications, complete in all respect. It shall include backfilling to ground surface, construction of road embankments and access ramps. Total number of structures | No. | 240 | 3150/000 | 756000; |
| Dismantling and removal of existing outfall structures of open collector drains. All reusable parts are property of SOLR and shall be stored as per instruction of Resident Engineer | No. | 3 | 2340/440 | 7021. |
| Supply of materials and construction of new outfall structures of collector drains instead of dismantled structures, as per specifications complete in all respects. Item shall include construction of road | | | | |

AGROCOMPLECT

00253

| | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|

Excavation for and supply of
materials and construction of
drops on collector drains as
per specifications complete
in all respects          No.          12       1500/000   18000/-

Excavation for covered field
drains, supplying and laying
corrugated PVC pipes of 100 mm
nominal diametre and longitu-
dinal slope not less than 15cm
per 100 m together with supply
ing and placing filter mater-
ial of graded coarse sand and
gravel in accordance with spe-
cifications with thickness 10cm
around the pipes backfilling to
the ground level with making
two protection dykes along the
length of the drain to a height
of 50 cm and width not less than
50 cm. It shall also include
all clearance and levelling re-
quired at the position of the
drains in accordance with draw-
ings and specifications. The
upper end of the field drains
shall be closed with concrete
block of sulphate resistant ce-
ment                      L.M.       1.700.000              3/100 5270000/-



Excavation for and supply of
materials and construction of
field drain outlet structures
to connect covered drains with
open collector drains and back-
filling to be compacted in layers
of exceeding 0.30 m for the
length of outlet pipe, as per
specifications complete in all
respects. It shall also include
supply and fitting of vermin



ARCH... ...OJECT

| | 2 | 3 | 4. | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| | fications. It shall include su;ply of sulphate-resistant cement and other materials required. | | | | | |
| | - thickness of concrete 6 cm | m$^2$ | 485.000 | | 4/100 | 1988500/- |
| | - thickness of concrete 8 cm | m$^2$ | 211.000 | | 5/500 | 1160500/- |
| | - thickness of concrete 10cm | m$^2$ | 311.000 | | 6/750 | 2099250/- |
| | Excavation for and supply of materials and construction of foot bridges accross existing irrigation canals asper specifications complete in all respects | No. | 35 | | 800/000 | 28000/- |
| | Excavation for and supply of materials and construction of structures connecting surface drains from irrigation canal escapes with collector drains as per specifications complete in all respects. It shall include earth work for costruction of surface drains. (Provisional) | No. | 16 | | 1800/000 | 28800/- |
| | Excavation for and supply of materials and construction of the watercourse headgate structure as per specifications complete in all respects | No. | 148 | | 987/980 | 146221/040 |
| | Dismantling and removal of existing watercourses headgate structures. All disassembled parts are the property of SOLR and shall be stored as ordered by Residen Engineer | No. | 3 | | 1793/550 | 5380/650 |
| | Excavation for and supply of materials and construction of drop-behind headgate structures in watercourses as per specifications complete in respects. | No. | 10 | | 320/000 | 3200/- |

المؤسسة العامة واستصلاح الأراضي
قسم للشؤون القانونية

(18)

Earthwork for the construction
of watercourses of local soil
materials up to bank top le-
vel, with compaction in layers
not more than 15 cm thick after
compaction at specified moisture
content to achieve dry density
not less than 95% according to
Proctor test and cutting the sect.
.on of watercourses as per speci-
fications and instructions of
the Engineer. The rate includes
setting out, surveying, scari-
fication and transporting of
fill materials, trimming of the
watercourse cross-section, dis-
posal of earth on the banks/
slopes and proper compaction
to the satisfaction of the En-
gineer.
The measurements shall be done
on the basis of completed
cross-section of compacted fill
above the ground level.

| | | | | |
|---|---|---|---|---|
| a) haul not exceeding 300 m | m³ | 1.419.000 | 1/200 | 170280C |
| b) haul exceeding 300 m but less than 1000 m (provis ional quantity) | m³ | 284.000 | 1/450 | 41180C |

(19)
Supply of materials for and li-
ning of watercourses with sul-
phate resistant concrete
class "AS", 5 cm thick, with
execution of joints as per spe-
cifications | m² | 781.200 | 3/800 | 296856C

Excavation for and supply of
materials and construction of
m outlet structures, as per
specifications complete in all



| | | | | |
|---|---|---|---|---|
| AC No. | 0.495 | 385/040 | 575534 |
| L No. | 0.492 | 422/000 | 629524 |

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| (21) 1. | Excavation for and supply of materials and construction of cross-regulators on watercourses as per specifications complete in all respects | No. | 857 | 200/000 | | 171400/ |
| (22) 2. | Excavation for and supply of materials and construction of pipe cross-regulators on watercourses as per specifications complete in all respects. | No. | 171 | 945/000 | | 161595. |
| (23) 3. | Excavation, supply of materials and construction of pipe culverts of watercourses as per specifications complete in all respects. | No. | 12 | 772/000 | | 9264/- |
| (24) 4. | Land ploughing up to 35 cm, grading and levelling (cut and fill) within irrigation units with earth work and construction of irrigation field ditches and dividing the area between field drains by earth dykes into a convenient number of levelling plots according to drawings, specifications and construction. | Donums | 58.534 | | 45/500 | 2663297/- |
| 25. | Weeds-clearing between preliminary and final handing over. (Provisional): | | | | | |
|  | a) for collector drains | m' | 170.000 | | 0/500 | 85000/- |
|  | b) for all other drains | m' | 130.000 | | 1/000 | 130000/- |
| (26) 26. | Execution of compacted embankments for main and branch irrigation canals, and shall include new compaction zones in the embankment as per specifications and as shown in the drawings: (Provisional) | | | | | |
|  | ... not more than 300 m² | m³ | 84.000 | | 1/200 | 100800/- |

AGROCOMPLECT

| | | | | |
|---|---|---|---|---|
| 2 | 3 | 4 | | |

| | | | | |
|---|---|---|---|---|
| b) with haulage of material at not less than 300 m' and not more than 1000 m' | m³ | 84.000 | 1/450 | 121800/- |
| c) with haulage of material at not less than 1000 m' and not more than 2000 m' | m³ | 42.000 | 2/000 | 84000/- |

T O T A L:                                        I.D.   29553271/

29,553 271/550

(Say: Iraqi Dinars twenty-nine million five hundred fifty-three thousand two hundred seventy-one and Iraqi Fils 550 only)

AGROCOMPLEGT
61. Vit...................., Sofia
tel: ...... 7, tlx. 2..021
Bulgaria

The First party
ABDUL WAHAB
MAHMOOD
Minister of

The Second party
Akr. TZANOTZANOV

00258

[handwritten:]

Copy to Contractor
Contract Number (65)
Hila – Diwaniya Project
Contract Number (4)

In the Name of God the Merciful the Compassionate
Republic of Iraq

Ministry of Irrigation                                    Number 5/1/26/8457
The Public Authority for Land Reclamation                Date 09/02/1984
Legal Section / Contracts

To/ Bulgarian Company Agrocomplect
Baghdad / Al-Watheq Street 23/1
P.O. Box 6034
Telephone 94840
Subject/ Transfer of Contract Number (4) Hila-Diwaniya Project

In reference to the approval of the Ministry of Irrigation in its letter number S/13/9/1/4774 on 09/01/1984, this establishment has decided to transfer the contract works above to your company at a sum of 29,853,000 (twenty nine million and eight hundred fifty three thousand) dinar, excluding the reserve fund, inclusive of all executive work as per the quantities tables and the cost of design work.

And as per the following conditions:

1. 55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between the Central Bank of Iraq and the Bulgarian Foreign Trade Bank, signed by a protocol on 03/22/1983, and the delayed payment conditions mentioned in Paragraph Third/D of the meeting minutes of the Joint Iraqi Bulgarian Committee for Economic, Technical, and Scientific Cooperation in its fifteenth session held in Sofia in the period from 5-10 November /3, and to pay 45% in Iraqi currency.

2. Pay an advance loan to the contractor in Iraqi dinar at 8% of the value of the contract on three installments to be covered by a letter of guarantee for each installment as follows:

   30% within one month of signing the contract.

   35% at the beginning of the second year of implementation.

   35% at the beginning of the third year of implementation.

3. The contract is covered by amended Law Number 157 for 1973, the Major Development Projects Implementation Law Number 157 for 1973 (Paragraphs (a, b, c, and d) of Article [sic]

-to be continued –

[illegible signature]

[stamp· The General Corporation of Land Reclamation; Division of Legal Affairs]

**00260**

(2)
[illegible signature]
[illegible] 38 [9/12 8] [illegible]

Sixth of the mentioned law.

4. The duration of the implementation of the contract work (including preparing designs) is (48) [crossed and corrected to 38 on 09/12/82, illegible signature] months after the six months preparation period from the date of contract signature.

5. The penalty for delay is 250 two hundred and fifty dinars for each day of delay for the duration of the contract.

6. The percentage of payment in foreign currency equal to 55% includes salaries of foreign employees at the company, and no part of the second percentage (in local currency) 45% should be transferred abroad in any way.

7. This letter and the documents and conditions of the contract are considered an inseparable part of the contract.
   Thus, this letter is considered an official notification of accepting your bid in accordance to the abovementioned, and transferring the contract to you, hoping that a representative from your side, with the authority to sign the contract by an official authorization, will attend to the headquarters of this establishment/legal department within ten days for notifying you for the purpose of signing the contract, bringing along the letter of guarantee from one of the Iraqi banks of the sum of 1,317,758 one million, three hundred and seventeen thousand seven hundred and fifty eight dinar as insurance for the proper implementation of the contract work as per the required conditions and specifications, and to provide us with the necessary receipt. Also contact the Central Statistics Agency in Baghdad to provide it with the required statistical information, and bring with you two stamps valued at 250 and 100 fils respectively.
   We would also like you to provide us, after signing the contract, with a document to cover the contract work with the requested insurance as per the general conditions of civil engineering works, or what proves that the document is being studied by the insurance company.

[illegible signature]
Director of Establishment
Engineer Kannan Abdel Jabbar Jawad

- to be continued -

[illegible signature] [illegible stamp]

copy to/
Ministry of Irrigation /          Reference to your abovementioned letter with regards
Ministry of Planning / Agricultural Department
Ministry of Trade / Financial Auditing Department
Central Bank of Iraq
The Public Authority for Trade in Productive Commodities
The Public Authority for Trade in Machines and Equipment
The Public Tax Authority
The National Insurance Company / to cover the contract works above with the needed insurance according to the contract agreement and as was mentioned in the civil engineering works conditions.
The Directorate of Registering and Monitoring Companies
Central Statistics Agency
Public Establishment for Designs and Research
Public Establishment for the Implementation of Land Reclamation Contracts /2/ Supervision / Legal
Department for the Management of the Hila-Diwaniya Lands
Financial Auditing and Monitoring Department
Legal Department / with attachments


[illegible signature] [illegible stamp]




[illegible signature]



**TRANSPERFECT**
T R A N S L A T I O N S

City of New York, State of New York, County of New York

I, Rika Honda, hereby certify that the following document is to the best of my

knowledge and belief, a true and accurate translation of the Arabic Portions of

Contract between Agrocomplect and the Republic of Iraq from Arabic into English.

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
DENVER
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
STOCKHOLM
TOKYO
WASHINGTON, DC

_____

Rika Hinda
Signature

Sworn to before me this
June 18, 2007


Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3, 2011

Stamp, Notary Public