## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD    :
           :
    Plaintiff,   :   Case No. 1:07-cv-00165 (RBW)
           :
           :
  vs.       :
           :
THE REPUBLIC OF IRAQ  :
    Defendant.  :

### PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY ON MOTION TO DISMISS COMPLAINT

    Plaintiff, by and through undersigned counsel, moves this Honorable Court for leave to

conduct limited discovery on three issues raised in Defendants' Motion to Dismiss the Complaint,

and, in support therefor, respectfully refers this Honorable Court to the annexed memorandum of

points and authorities and exhibits.

    WHEREFORE, by all these presents, counsel for plaintiff prays that the instant motion be

granted.

### CERTIFICATE OF COUNSEL

    I, Philip M. Musolino, certify that I sought consent to the instant motion on July 10,

2007. Counsel for Defendant advised undersigned that defendant will oppose the motion.

          Respectfully submitted,

          Philip M. Musolino #294652
          *Musolino & Dessel*
          1615 L Street, N.W., Suite 440
          Washington, D.C. 20036
          (202) 466-3883
          *Voice*: (202) 466-3883
          *Fax*:  (202) 775-7477
          *Email*: pmusolino@musolinoanddessel.com

_____

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*:   srolinski@rolinski.com

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AGROCOMPLECT, AD            :

          :

      Plaintiff,           :      Case No. 1:07-cv-00165 (RBW)

          :

          :

   vs.              :

          :

THE REPUBLIC OF IRAQ       :

      Defendant.       :

## ORDER

     This matter having come before this Court on Plaintiff's Motion for Leave to Conduct

Limited Discovery on Motion to Dismiss, and opposition thereto, it is, for good cause shown this

_____ day of _____, 2007,

     ORDERED, that the instant motion be and is hereby GRANTED, and it is

     FURTHER ORDERED, that the parties are granted leave to conduct discovery in

the form of twenty interrogatories and twenty requests for production of documents on the

following three subjects: "direct effects" under the Foreign Sovereign Immunities Act; the statute

of limitations; and release, and it is

     FURTHER ORDERED, that discovery requests under this Order must be served within

fourteen (14) days of the date of this Order, and it is

     FURTHER ORDERED, that any supplemental authority with respect to the Motion to

Dismiss the Complaint and which arises out of the discovery shall be filed within sixty (60) days

of the date of this Order.

                      SO ORDERED.

                      _____

                      Reggie B. Walton, Judge
                      United States District Court for the
                      District of Columbia

Philip M. Musolino, Esq.
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski, Esq.
Danielle M. Espinet, Esq.
*Rolinski, Terenzio & Suarez, LLP*
14915 River Road
Potomac, Maryland 20854

Matthew D. Slater, Esq.
*Cleary Gottlieb Steen & Hamilton, LLP*
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006

Jonathan I. Blackman, Esq.
Lisa M. Coyle, Esq.
*Cleary, Gottlieb, Steen & Hamilton, LLP*
One Liberty Plaza
New York, NY 10006

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AGROCOMPLECT, AD | : | |
| | : | |
| Plaintiff, | : | Case No. 1:07-cv-00165 (RBW) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| THE REPUBLIC OF IRAQ | : | |
| Defendant. | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY ON MOTION TO DISMISS COMPLAINT

Plaintiff Agrocomplect, A.D. ("Agrocomplect" or "Plaintiff") seeks limited discovery [1] on three issues upon which Defendant Republic of Iraq ("Iraq" or "Defendant"); the application of the "direct effects" test under the Foreign Sovereign Immunities Act ("FSIA"); the statute of limitations; and, release.

For the reasons set forth below, the instant motion should be granted.

## I.  STATEMENT OF PROCEEDINGS

This action commenced with the filing of a Complaint ("Compl.") on January 23, 2007, Defendant filed a Motion to Dismiss the Complaint ("Def.Mot.") on May 21, 2007. The Motion sought dismissal pursuant to Fed.R.Civ.P. 12(b) (1) and 12(b)(2) because, Defendant alleged: the court lacks subject matter jurisdiction and therefore personal jurisdiction  under the direct effects requirement of the FSIA;  defendant did not waive sovereign immunity; [2] and, the court lacks subject matter jurisdiction to compel arbitration. [3]

Defendant's motion also sought dismissal under Fed.R.Civ.P. 12(b)(6) because, Defendant alleged: the claim is barred as a matter of law by Plaintiff's release; and, the claim is time-barred. Two exhibits were appended to the motion:  an Invitation to Tender Claims for Cash

---

[1] In the proposed order, discovery is limited to twenty interrogatories and  twenty requests for production of documents.

[2] Waiver is not the subject of this motion.

[3] Jurisdiction to compel arbitration is not the subject of this motion.

Purchase and Cancellation , issued by the issued by Iraq through its ministry of Finance and the Iraq debt Reconciliation Office ("IDRO"), and, Plaintiff's Tender to IDRO. Defendant contended that those two exhibits supported its defense of release.

Plaintiff filed its Opposition (the "Opposition") on June 5, 2007. The Opposition asserted *inter alia*, that: the allegations of the complaint satisfied the direct effects test; defendant failed o meet its burden on the affirmative defense of the statute of limitation; defendant failed to meet its burden on the affirmative defense of release; and, defendant's improperly relied on exhibits to support a motion under 12(b)(6). Appended to the Opposition were three exhibits directed at the availability of Iraq as a forum for resolution of plaintiff's claims, see Plaintiff's Exhibits ("PX") A-1, A-2, A-3, appended to Plaintiff's Exhibits In Opposition to Defendant's Motion to Dismiss Complaint, and seven exhibits directed at the IDRO process, PX B, C, D, E, F, G and H.

On June 19, defendant filed its Reply to the Opposition.  The Reply was accompanied by a supplement containing an Article from the Journal of International Arbitration, and by documents collected in Exhibit C ("DX C") defendant apparently contends constitute the contractual agreement of the parties. Included in DX C was Memorandum No.2, at Document 14-7, pages 74-77, Bates No. 248-251, and a letter dated 09/02/84 ( the  "1984 Letter"), at Document 14-7, pages 86-88, Bates No. 260-262.

## II.  STANDARDS APPLICABLE TO THE INSTANT MOTION

Plaintiff is not at this stage entitled to seek discovery absent leave of court. Fed.R.Civ.P.26(d).  "The district court has broad discretion in its handling of discovery, and its decision to allow or deny discovery is reviewable only for abuse of discretion." *Islamic American Relief Agency v. Gonzales,* 477 F.3d 728, 737 (D.C.Cir., 2007). That discretion is applicable with respect both to 12(b)(1) and 12(b)(2) jurisdictional defenses under the FSIA, and defenses nominally brought under 12(b)(6).

2

## A. Jurisdictional Discovery

As Plaintiff noted in its opposition, with respect to claims by defendants that they are immune pursuant to the FSIA, the allegations of the complaint should be examined more carefully than under the standard conventionally applicable to motions to dismiss. *See, e.g. Burnett v. Al Baraka Inv. and Development Corp.,* 274 F.Supp.2d 86 (D.D.C. 2003)( plaintiffs, in a case arising out of the September 11, 2001 attacks, allege that defendants have funded and supported al Qaeda).

As the *Burnett* court observed:

"Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." However, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." The district court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."

*Burnett v. Al Baraka Inv. and Development Corp.,* 292 F.Supp.2d 9, 14 (D.D.C. 2003)(citations omitted).

"The district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction (internal quotation marks omitted)." *Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C. 2000). With respect to factual challenges under the FSIA, the court in *Phoenix* observed that the district court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction."…. In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited…. (internal citations, brackets and quotation marks omitted)." At 149.

Defendant's Reply, and the attachments, converts a facial challenge into a factual challenge. Specifically, and as is more fully set forth below, the documents attached to the Reply

refer to and in part incorporate documents which clearly suggest that the parties agreed to contract payments in New York

### B. Non-Jurisdictional Discovery

As Plaintiff noted in its Opposition:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*See Marshall County Health Care Authority v. Shalala* 988 F.2d 1221, 1226 (D.C. Cir. 1993).

"…(T)he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'" *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2nd Cir. 2006).

"When a district court converts a Rule 12(b)(6) motion to one for summary judgment, it must allow all parties both a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56' and a chance 'to pursue reasonable discovery.'" *Taylor v. FDIC,* 132 F.3d 753, 765 (D.C. Cir. 1997).

Defendant's reliance in its Motion to Dismiss on two IDRO exhibits, if accepted by the court, constitutes a conversion triggering plaintiff's right to discovery on the release defense. Defendant's reliance in its Reply on Reports from the United Nations Compensation Commission, *see* Reply notes 13, 14, and on exhibits which include provisions related to payment, *see* DX C, if considered by the court, constitute a conversion triggering plaintiff's right to discovery on the statute of limitations defense.

### III.    PLAINTIFF HAS DISCOVERED EVIDENCE WHICH ESTABLISHES THE PROPRIETY OF  LIMITED DISCOVERY [4]

The front page of the Contract, DX C,  reflects a date of March 1982. Memorandum

No.2, DX C, does not appear to be dated, but it refers specifically to various other agreements,

including an Iterbank Agreement between the Central Bank of Iraq ("CBI") and the Bulgarian

Foreign Trade Bank ("Bulbank"). Those Agreements, and related documents show that payments

under the contract were to be made in New York.   Memorandum No. 2, provided in part that:

> 1.   The Contract for the construction of  "Hilla-Diwaniya 4" Land Reclamation Project shall be covered by the provisions of Par.6, Item 1 of Law 157 of 1973 that grants privileges to major development projects in Iraq....

> 13.   The provisions pf the Iterbank Agreement between the Central Bank of Iraq and the Bulgarian Foreign Trade Bank, signed on March 22,  ___, [5]in Sofia, Bulgaria, shall be valid for this Contract, provided the Agreement is approved by the respective authorities of both _____....

> 15.    The Contractor shall have the right to transfer abroad 55% (fifty-five percent only) of the total Contract value, in free US Dollars, including payment for the personnel engaged in the Project's execution, in accordance with the minutes of the Extraordinary Session of the Iraqi-Bulgarian Joint Committee for Economic, Scientific and Technical Cooperation, signed on January 13, 1983, in Baghdad ....

> A.   Simple annual interest at a rate of 5 (five) percent in accordance with the Protocol of November 10, 1983 signed at the XV Session of the Bulgarian-Iraqi Joint Committee hold (sic) in Sofia Bulgaria shall be charged on the balance of the amount....

> B.   The utilized credit principle (sic) amount shall be paid in 4 (four) equal yearly installments ... The first installment for repayment shall fall due on the date of handing over the whole Project for operation through a certificate of substantial completion....

> 21.   This Memorandum shall be an integral part of the Contract for the construction of "Hillya-Diwaniya 4" Land Reclamation project.

In the 1984 Letter, **DX C,** Iraq identifies the following "conditions:"

> 55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between (CBI) and (Bulbank), signed by a protocol on 03/22/1983, and the delayed payment conditions mentioned in Paragraph Third/D of the meeting minutes of the Joint

---

[4] Plaintiff reserves the right to proceed under Fed.R.Civ.P. 15(a).

[5] Portions of the Memorandum are cut off, and therefore not legible.

Iraqi Bulgarian Committee for Economic, Technical and Scientific Cooperation in its fifteenth session held in Sofia in the period from 5-10 November /3, and to pay 45% in Iraqi currency.

In the Agreed Minutes (the "Minutes") of the Fifteenth Regular Session (the "15th Session") of the Bulgarian-Iraqi Joint Committee for Economic, Scientific and Technical Cooperation ( the "Joint Committee"):

Both sides agreed that the amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between the parties in the present Agreed Minutes. Amounts due in 1983 will be settled in accordance with the contract conditions not later than 31 December 1983. **PX I.** [6]

The Minutes of the 15th Session of the Joint Committee noted that the agreed minutes of the working groups were attached.

The Bulgarian Foreign Trade Bank ("Bulbank") and the Central Bank of Iraq ("CBI") entered into apparently undated Banking Arrangement No. (1) to undertake "implementation of the Agreed Minutes on Trade and (F)inancial Cooperation of the 17th Session of the (Joint Committee) on 13th February 1986 in Baghdad...." **PX L-1**. Banking Arrangement No. (1) provided, in part as follows:

In conformity with item I (page 6) of the (Agreed minutes) the Bulgarian prty shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments. Banking Arrangement No.1 also provided that:

(Bulbank) shall send to (CBI)  debit advises accompanied by interest tables for each interest calculation...The (CBI) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.

*The latest by crediting the account of the Bul Bank (w)ith Credit lyonnais, New york (sic), under telex advice to the Bul Bank.*

Bul Bank shall send to (CBI) credit advices for each payment of interest.  The calculation of interest shall stop on the day of final repayment of the utilized amounts under the credit.

---

[6] Plaintiff commences with Exhibit I to avoid any confusion with **Exhibits A through H** appended to the Opposition.

The utilized credit under each project shall be repaid in eight equal subsequent semi-annual installments, the first of which shall fall due One year after the date of the final completion of the project, evidenced by the date of FAC....

Bul Bank shall prepare and send to (CBI) epayment (sic) schedules for each project, (CBI) shall confirm or advice its remarks, if any, with in (sic) 60 days after receipt. *On the respective maturity date (CBI) shall credit the account of the Bul Bank with Credit Lyonaisse, New york (sic) in convertible US. Dollars with the amount of principal, under telex advices to Bul Bank.* The latter shall send the credit advices to (CBI) for the respective payments.

(CBI) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective (Credit Account) as well as, the interest accrued under these amounts entered in the respective (Interest Account) mentioned in Article (1) above.(emphasis added).

Banking Arrangement No. 1 appears to have been signed on "1.07.1986."

Banking Arrangement No. 3, **PX L-2,** between Bulbank and CBI, also apparently signed

on "1.07.1986," was designed to implement the "trade and Financial Co. Operation" of the 17th

Session of the Joint Committee, and it provided in part as follows:

In confirmity [sic] with item 4 page 8 of the agreed Minutes, the Bulgarian Party responsed [sic] to the request of the Iraqi Party that all payments due or which will fall due to the Bulgarian side in Convartible [sic] Currency during 1986 under all existing Civilian and special Banking Arrangments [sic] and commercial Contracts shall be settled as follows:

A. 50% shall be paid in 1986 in accordance with relevant Contracts and Banking Arrangements.

B. 50% shall be paid one year from the dates of maturity in accordance with relevant contracts and Banking Arrangements.

C. Deferred payments bear simple interest rate of 5 (Five) percent annum....

On the respective maturity dates, *"CBI" shall credit the Accounts of "BulBank" with Credit Lyonnais, New - York, in convertible US. Dollars with amounts of due payments mentioned in article 1 above plus their interest,* advising Simultansusly [sic] the "BulBank" by telexes....

Interest shall be calculated from the date of deferring the amounts till [sic] the date of the acctual [sic] payment and shall be paid together with each respective principal.

7

> CBI Guarntees [sic] with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 1 abovePlus [sic] its interest according to the Banking Arrangement dates 15th 5. 1985 and 13th October 1985.

> The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment [sic] of all obligations, esusing [sic] thereform [sic].(emphasis added).

At least three working groups issued protocols following the Joint Committee's 17th

Session: the Workgroup on Economic Partnership; the Working Group on Trade and Financial

Cooperation; and, the Working Group for Scientific and Technical Cooperation. **PX J-1, J-2, J-**

**3.**

> The Protocol of the Workgroup on Economic Partnership stated:

> The Bulgarian party expressed their desire to participate in the irrigation activities in Iraq.

> The Iraqi party declared their positive attitude towards the participation of the Bulgarian party in said field. The Bulgarian party took all necessary steps in the period between the Seventeenth and the Eighteenth Sessions of the Bulgarian - Iraqi (Joint Committee) enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hal-Davana-4'. These efforts would be continued and the Bulgarian aprty [sic] would intensify its work, in order to secure the successful completion of the project without any damages to the Iraqi party, in accordance with the agreements signed. ...

> Outstanding payments of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity....

> *(Bulbank) and (CBI) shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.* (emphasis added). **PX J-3.**

> The 18th Session of the Joint Committee was held in Sofia, Bulgaria in March 1987.

Along with the Joint Committee, three working groups issued protocols. **PX K.**

On March 1, 2000, Iraq and Bulgaria agreed, in the form of Agreed Minutes, during discussions

on "Iraqi debt obligations owed to Bulgaria...," that:

> ...crude oil shall be utilized for payment of the existing debts together with those becoming due until 31st December 1994....

8

> *To implement these Agreed Minutes, Banking Arrangements between (CBI) and*
> *(Bulbank) shall be concluded as soon as possible (*emphasis added). **PX M**.

On February 16, 2002, CBI wrote to Bulbank, in part, as follows:

> With reference to your Statements dated 1/1/2002 and 24/1/2002.
> We would like to inform you that due to the continued unjustified sanctions
> imposed on our country, which makes hindrances on our banking procedures, we
> inform you that the matter will be subject to reconsideration when the current
> situation cease to exist, and the sanctions imposed on Iraq are lifted taking into
> consideration that the figures of the principal debt and interest will not be
> considered as final figures unless all pending matters will be settled. **PX N**.

These documents clearly evince a payment arrangement under the agreement between the

parties that included payments from CBI into Bulbank in New York. *See* Reply at 5, n.4, and

accompanying text (discussing the ostensible dispositive difference between the assertion that

payments were to be made "'through' rather than into or from United States banks"). Though

**DX C** included both Memorandum No. 2 and the 1984 Letter, defendant did not include either the

specific documents to which Memorandum No. 2 or the 1984 Letter referred, nor the applicable

minutes, protocols, or banking arrangements themselves. Banking Arrangements 1 and 3, **PX L-**

**1, PX L-3**, explicitly require payment by CBI in New York, and, as late as 2002, CBI relied on

the "unjustified sanctions" as an excuse to delay payment under the agreement in issue. *See*

Opposition, at 33, n.15 and accompanying text, and *see* Reply, at 22 (discussing the embargo).

Thus, there is sufficient reason to permit limited additional discovery to enable the court

to "ferret out" the pertinent facts on jurisdiction ,[7] and to effectively assess whether defendant

has met its burden of proof on its two affirmative defenses. [8]

Accordingly, the instant motion should be granted.

---

[7] On March 10, 2007, plaintiff proposed an informal exchange of documents on the jurisdictional issue, but
defendant declined that proposal.

[8] On the release defense, the construction of the IDRO documents would be aided by discovery on whether
Iraq has litigated claims arising out of its boilerplate release language, *see, e.g., Novak v. World Bank* 703
F.3d 1305, 1309 (D.C. 1983)(discussing defensive and offensive collateral estoppel), and whether Iraq
itself treated the claims in this case as released. *See* **PX O** (IDRO press release describing in dollars and in
numbers the commercial claims which were "settled"), and *see Tillery v. District of Columbia Appeals
Board* 912 A.2d 1169, 1176 (D.C. 2006) (conduct of parties under a contract  can be extrinsic evidence of
meaning of contract.)

9

Respectfully submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AGROCOMPLECT, AD                           :
                                           :
        Plaintiff,                         :        Case No. 1:07-cv-00165 (RBW)
                                           :
                                           :
    vs.                                    :
                                           :
THE REPUBLIC OF IRAQ                       :
        Defendant.                         :
                                           :

## EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY ON MOTION TO DISMISS COMPLAINT

**I**     Agreed Minutes of the Fifteenth Regular Session of the Bulgarian-Iraqi Joint Committee

**J-1**   Protocol of the Working Group on Trade and Financial Cooperation

**J-2**   Protocol of the Working Group for Scientific and Technical Cooperation

**J-3**   Protocol of the Workgroup on Economic Partnership

**K**     Protocol of the Eighteenth Regular Session of the Bulgarian-Iraqi Combined Committee

**L-1**   Banking Arrangement No. 1

**L-2**   Banking Arrangement No. 3

**M**     Agreed Minutes (March 1, 1990)

**N**     Letter Central Bank of Iraq to Bulgarian Foreign Trade Bank (February 16, 2002)

**O**     Press Release (July 18, 2006)

Respectfully submitted,

_____
Philip M. Musolino, Esq. #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:   (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski, Esq. # 430573
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*:  srolinski@rolinski.com

AGREED MINUTES

of the Fifteenth Regular Session of the Bulgarian-
Iraqi Joint Committee for Economic, Scientific and
Technical Cooperation

On the occasion of the visit of H.E. Ta
Yassin Ramadhan, First Deputy Prime Minister of the
Republic of Iraq, in response to the invitation of H.
Grisha Philipov, Prime Minister of the People's Repub
of Bulgaria, and in order to follow up and assess the
implementation of the Agreed Minutes of the talks hel
on further expansion of trade, economic, scientific and
technical cooperation between the People's Republic c
Bulgaria and the Republic of Iraq, signed in Baghdad
January 13, 1983, as well as to review and follow up f
implementation of the Agreed Minutes of the Extraordi
Session of the Joint Committee, signed in Baghdad on
January 13, 1983, the Bulgarian-Iraqi Joint Committee
Economic, Scientific and Technical Cooperation held it
Fifteenth Session in Sofia during the period from 5th
10th November, 1983.

The Bulgarian delegation was headed by
H.E. Hristo Hristov, Minister of Foreign Trade.

The Iraqi delegation was headed by H.E.S
Abdul Latif Younis, Minister of Agriculture and
Agrarian Reform.

PENGAD 800-631-6989

EXHIBIT

I

2.

His Excellency Todor Zhivkov - General Secretary of the
Central Committee of the Bulgarian Communist Party and
President of the State Council of the People's Republic of
Bulgaria and His Excellency Saddam Hussein, President of the
Revolutionary Command Council , President of the Republic
of Iraq.

It was stated that inspite of the attained
success, the vast potentialities for further expansion of
trade   exchanges, economic,scientific and technical
cooperation had not been materialized to full extent.

A positive estimation was given to the
implemented   projects by the Bulgarian organisations in the
Republic of Iraq.

The Agreed Minutes of the working groups are
attached hereto as an integral part (Annexes No.No.1,2 and 3

The discussions of the Fifteenth Session of the
Joint Committee were held in a friendly and constructive
spirit in accordance with the relations of friendship and
cooperation that exist between the two countries and reflec
ted their common determination and desire to strengthen
and develop their cooperation in  various fields for their
mutual interest.

Both sides agreed that the amounts due in 1984
for   development project contracts under execution will
be covered by the deferred payment arrangements agreed upon
between the two parties in the present Agreed Minutes.
Amounts due in 1983 will be settled in accordance with the
contract conditions not later than 31 December 1983.

PROTOCOL

OF THE WORKING GROUP ON TRADE AND FINANCIAL COOPERATION

I.    TRADE

The representatives of the two countries made a review of the commodity exchange between the above countries over the period following the Seventeenth Session of the Combined Committee and were pleased to note the substantial progress made. Both parties believed, however, that further opportunities for the development and expansion of the range of commodity exchange were available, and the relevant organizations involved should put more efforts in order to take advantage of these opportunities. The two countries adopted a mutually beneficial trade plan for 1987, as follows:

1. The Bulgarian party stated their readiness to take all necessary measures allowing export of commodities and materials, as specified in Lists A1 and A2, attached herein, to Iraq, for the state-owned, the combined and the private sector, as well as any other kinds of goods and materials that might be subject of agreement in 1987, on the basis of facilitated rescheduling plan as agreed and set out in the Minutes of February 13th 1986.

2. Seeking mutual benefit the Iraqi party expressed their readiness to export for the Republic of Bulgaria the commodities and the materials, listed in List B, attached hereto.

The Bulgarian party expressed their unwavering intention and willingness to take all necessary measures for the expansion of the Bulgarian import of commodities and materials from Iraq.

3. Lists A and B would not limit the exchange of any other commodities, materials or quantities of the latter as might be negotiated between the relevant organizations in each country.

4. The Bulgarian party expressed their willingness to increase the delivery of electric trucks, engine-driven trucks, electric hoists, as well as agricultural machinery and facilities, other machine-engineering products and spare parts.

PENGAD 800-631-6989

EXHIBIT

J-1

5. The Bulgarian party confirmed their readiness to increase the delivery of various Bulgarian products, including chemicals, cigarettes, industrial goods, foods and others. Both parties agreed to pay special attention to the delivery of the required quantities of tomato paste, eggs for breeding purposes and other goods as per List A1.

6. The Bulgarian Party undertook to place their orders for the available positions as included in the Lists within two weeks. These Lists showing the inquiry for medications for both humane and veterinary purposes, raw materials for the pharmaceutical industry, medical instruments and others as the per the attached lists under No.6, were prepared by the Iraqi party.

7. Both parties undertook to encourage their respective competent authorities to accelerate the signing of the relevant agreements, which would enforce this annual trade plan and would also encourage the signing of any long-term contracts, whenever possible.

8. Both parties agreed to meet again, whenever the need to do this might arise, in order to review the implementation of the trade plan and exchange information for any problem or obstacles that might prevent or hinder the process of commodity exchange between the two countries, and eventually rectify or remove these.

9. Both parties gave high praise of their participation in international fairs, organized by them and agreed to encourage the participation of a larger number of organizations in such events.

10. Both parties expressed their willingness to enter into a long-term Agreement for delivery of fertilized eggs.

The Iraqi party requested an increase in the quantities of fertilized eggs up to 150 million pieces during 1988.

The Bulgarian party undertook to reply within 45 days.


II.    FINANCIAL COOPERATION

1. Both parties confirmed that the rescheduling payment provisions set forth in the Protocol of February 13th 1986 would apply for all contracts, which had been signed or would be signed in 1987, in compliance with Paragraph 3 of the Section

on Financial Cooperation. The relevant maturity dates would be revised according to paragraph 2.5. of the said Protocol.

2.1. Payments arising from the site contracts would be regulated by Bank Agreement No. 1 of 1 July 1986, dealing with contracts signed in 1987.

2.2. Payments arising from the commodity agreements, which had been signed by the parties within the period of January 1st – 31st December 1987, would be regulated by the provisions of the Protocol of the seventeenth Session of the Combined Committee dated 13th February 1986 (as mentioned in Paragraph 3 therein). An Annex to Bank Agreement No.2 of July 1st 1986, made by and between the Bulgarian Foreign Trade Bank and the Central Bank of Iraq, would be signed.

3. With regard to the request made by the Iraqi party all payments (principal amounts and interest), payable in convertible currency to the Bulgarian party for 1987, related to both civil and the military sector, would be settled in the following manner:

3.1. All interest shall be paid on maturity throughout 1987;

3.2. Principal amounts due for civil deliveries (Lists A1 and A2) shall be paid on maturity throughout 1987;

3.3. Principal amounts due for site contracts shall be paid on maturity throughout 1987;

3.4. Outstanding payment of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2. of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity.

3.5. Outstanding payment of principal amounts, related to military agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity and in 12 or 24 months respectively, as follows:

- 25% in 1987;

- 35% in 1988;

- 40% in 1989.

4. Principal amounts subject to rescheduled payment, as indicated in paragraph 3.5 above, shall accrue simple interest of 5% per annum, starting from the date the said rescheduling has come into effect. Interest shall be paid together with each relevant new principal amount.

5. The Bulgarian Foreign Trade Bank and the Central Bank of Iraq shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.

## PROTOCOL

### Of the working group for scientific and technical cooperation

Both sides made a review of the progress in the area of scientific and technical cooperation between the two countries in the period following the 17th session and discussed their means and methods for consolidating and expanding their cooperation, as well as matters related to specialized training.

The Iraqi party announced their needs for the training of specialists, of which the Bulgarian side was notifies during the previous session of the committee. The Bulgarian party promised to consider the matter once again and to reply to these inquiries during the second three months of 1987.

Both sides discussed the possibility of establishing bilateral cooperation between the relevant Iraqi and Bulgarian organizations, specialized in the following areas:

1. Conduction of joint scientific research in the breeding of sheep, cows and poultry.

2. Conduction of joint scientific research in the area of plant tissue cultures.

3. Exchange of specialists and visits (one scientific researcher, for two weeks) in the following areas:

A/ fodder processing

B/ protective cultivation

C/ live-stock breeding

D/ production of oil-bearing seeds and plant tissue cultures

E/ orchard growing technology, production and storage of fruit

F/ fruit growing

G/ food industry

4. The Iraqi side demonstrated their readiness to receive Bulgarian specialists in the above mentioned areas for a two week period with any specialization training. The Bulgarian party undertook to consider the matter and to notify the Iraqi party accordingly.

Both sides discussed the possibility of training the Iraqi specialists in the following areas:

EXHIBIT

J-2

PENGAD 800-631-6989

A/ fodder processing, one researcher for one month

B/ protective cultivation, two researchers for one month

C/ production of oil-bearing seeds and plant tissue cultures, two researchers for one month each

Both sides agreed to participate in scientific conferences, which would be held in one of the countries as well as to exchange of periodical scientific publications.

The Iraqi side requested that the Bulgarian side to provide the opportunities for training of Iraqi specialists in the area production and transfer of electric power, as follows:

1. Possibilities for training programs in facilities and security systems maintenance in electric power substations.

2. Teachings in residential area power network design, especially in the country, electric power substation maintenance and power network operation.

3. Training in electric power consumer data, user accounts data, management of electric power distribution and power plant spare parts storage control system.

4. Training in steam-boilers, steam, gas and water turbines, their accessory, and computer and control systems.

The Iraqi side informed the Bulgarian side of the request for technical support by the Ministry of Agriculture and Agrarian Reform, which would be given by the Bulgarian side on condition that the latter would cover the costs for training in the following areas:

1. One specialist in honey bee diseases, for the establishment of a special laboratory for honey bee diseases in Iraq

Apart from the above four further training opportunities would be available in the area of queen bee breeding, honey bee-hive maintenance, honey production, honey bee disease control.

2. Possibilities to provide for the training or make arrangements for a Bulgarian specialist to visit and train Iraqi personnel in the following areas:

- Cutting and packaging of fresh and frozen meat;(two people for one month)

- inspecting of meat that has been frozen by use of chemicals (two persons for a month each)

The Bulgarian side confirmed their readiness to provide assistance to the Iraqi Ministry of agriculture and Agrarian Reform in the abovementioned areas under the condition that the technical assistance and training costs would be at the expense of the Iraqi side.

Both sides agreed to proceed with the negotiations until an acceptable solution, which would take the Bulgarian viewpoint into consideration, was reached.

During the talks the Iraqi side submitted to the Bulgarian side a list of additional applications for training of specialist in 1987 and 1988 (Attachment 8).

The Iraqi side requested Bulgarian assistance in disabled people rehabilitation by commissioning Bulgarian experts to Iraq or by training of Iraqi specialists in Bulgaria. The Bulgarian side would revert with their opinion on this type of cooperation after the Iraqi side had provided additional details on the subject.

Apart from the above mentioned arrangements both parties agreed to expand the means and methods of their cooperation in the areas of agriculture, irrigation, construction, designing and further economic sectors, as well.

Both parties agreed to encourage the implementation of the Agreement for economic, scientific and technical cooperation signed by and between the government of the People's Republic of Bulgaria and the government of the Republic of Iraq, in compliance with Clauses 9 and 12 of the said Agreement, as well as create conditions for the implementation of the arrangements made in the area of scientific and technical cooperation as set out in the previous Protocol.

**PROTOCOL**
OF THE WORKGROUP ON ECONOMIC PARTNERSHIP

The workgroup reviewed the execution of the Protocol of the Seventeenth Session of the Combined Bulgarian-Iraqi Committee. There was an exchange of information pertinent to the progress of all projects in the period between the two sessions, and the two parties gave a favorable estimate of the progress achieved so far.

The two parties declared their will to promote the cooperation between the corresponding organizations in the sectors reviewed.

INDUSTRY
1. The Iraqi party invited the Bulgarian party to participate in the auction for the reconstruction of the Factory for liquid sugar in Hindya.

The Bulgarian party agreed to take part in this reconstruction and is ready to provide, within two weeks' time, a team of experts in order to analyze the prospects of its participation, and conduct negotiations on the terms of the execution of the current project.

The Iraqi party asked the Bulgarian party to participate in the following projects:

a) a line for the production of date syrup in Karbala, with annual capacity of 15 thousand tons, for the replacement of the old production line.

b) A line for the production of tomato purée in Duhok, with a daily capacity of 300 tons.

c) Two bottling lines, one for 'Seven Up', and the other one for 'Pepsi'. The specifications for these bottling lines will be the same as for the 'Pepsi' line in Bani Haylan.

d) Enlargement of the factory for the production of mineral water Bani Haylan.

The Bulgarian party agreed to participate in these projects and is ready to provide, within one month, a team of experts in order to conduct negotiations on the terms of the execution of these projects.

The two parties declared their will to finish the construction of the tomato purée project – the two production lines in Bakuba and Al-Hindya.

The Bulgarian party promised to reconsider the offer it has received from the corresponding Iraqi institution and to provide its representatives to continue the negotiations of said offer.

2. The two parties discussed their cooperative work on the tobacco fermentation factory in Suleimania. The Iraqi party asked the Bulgarian party to send their specialists back to work within two weeks. The two parties shall undertake all necessary measures in order to facilitate their work.

3. The two parties noted their mutual interest in the continuation of their cooperation in the field of tobacco production.

The Iraqi party asked the Bulgarian party to reconsider their own offer for the production of "Baghdad" cigarettes from 5 thousand tons of Iraqi tobacco.

The Bulgarian party agreed to reconsider their own offer and to conclude an agreement, based on a 15% advance payment and 85% in payments on terms, in accordance with the Protocol from 13 February 1986. The Bulgarian party also agreed to send their representatives to Baghdad within 10 days from

EXHIBIT

J-3

PENGAD 800-631-6989

the signing of the current Protocol for the negotiation and execution of the present agreement.

Enlargement of the factory for the production of starch and dextrin, the two parties expressed their satisfaction with the cooperation on said project. By the end of March 1987 the Bulgarian party shall deliver a preliminary offer for the enlargement, which shall be followed by negotiations and the presentation of a technical economic study on said matter.

5. A factor for the extraction of lead from used batteries

The Bulgarian party informed the Iraqi party of the offer it had already presented, concerning the above mentioned project. The Iraqi party shall examine the opportunities and shall answer accordingly.

6. New projects for cooperation.

The Bulgarian party expressed its will to continue the cooperation with the Iraqi party in the field of building materials.

The Iraqi party welcomes the Bulgarian participation and shall inform the Bulgarian party about future opportunities.

7. Electrification.
        a) the two parties expressed their satisfaction with the cooperation in the field of electrification and noted the opportunities for the expansion of their cooperation in this area. On the basis of the revised offer for the transmission line 400 KW packet #3, which shall be delivered to Electroimpex by 15 March 1987. The final negotiations shall have to be conducted not later than the end of March 1987.

The Iraqi party confirmed its will to continue the cooperation with the corresponding Bulgarian organization in the field of electrification, and especially on the following projects:

        - a transmission line Diala Taameem 400 KW,
        - a transmission line 132 KW,
        - substations 132 KW
        The Bulgarian party  expressed their willingness to participate in the above mentioned auctions.

AGRICULTURE AND IRRIGATION

The two parties reviewed their cooperation and the progress of their mutual activities, executed by the Bulgarian party in the field of agriculture and irrigation in Iraq. They expressed their satisfacton and hope that this progress would continue to the benefit of the cooperation between the People's Republic of Bulgaria and the Republic of Iraq.

AGRICULTURE

The two parties agreed  that their cooperation in the field of green house utilization would continue.

To this effect the Bulgarian party shall provide an expert to help with the preparation of a list of the spare parts, needed for the 'Reshammiya' green house, with the corresponding offer and delivery deadlines. In addition, the two parties would examine the opportunities for cooperation in the reconstruction of 'Reshammiya' green house.

IRRIGATIONS

The Bulgarian party expressed their desire to participate in the irrigation activities in Iraq.

The Iraqi party declared their positive attitude towards the participation of the Bulgarian party in said field. The Bulgarian party took all necessary steps and in the period between the Seventeenth and the Eighteenth Sessions of the Bulgarian-Iraqi Committee for Economic, Scientific and Technical Cooperation, enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hala Davana-4'. These efforts would be continued and the Bulgarian party would intensify its work, in order to secure the successful completion of the project without any damages to the Iraqi party, in accordance with the agreements signed.

The two parties discussed the irrigation project 'Sadam', contract 21, and agreed that the project would be executed by the Bulgarian side. The Bulgarian party agreed to reduce the general cost of the agreement to 30 483 000 Iraqi Dinars and to finance the share of foreign currency in accordance with the conditions of the payments on terms, agreed upon in the Minutes from 13 February 1986. The competent authorities of the two parties would take all necessary steps, in order to conclude the agreement as soon as possible.

OIL

The Bulgarian party reiterated their desire to promote the cooperation with the Iraqi party in the following fields: oil drill installations, construction of oil and gas pipelines, pumping stations, river crossings.

The Bulgarian party also expressed their readiness to participate in the construction of gas installations in Balaji and Ranadi, as well as interior base communications in the Kut depot.

The Iraqi party took notice of the Bulgarian offer and undertook to inform the corresponding Iraqi organizations thereof.

CONSTRUCTION

The two parties reiterated their readiness to cooperate in the following fields:

> 1. The reconstruction of the railway line Baghdad - Abu Ghraib,
> 2. Construction of the Roula Bridge.

The two parties agreed upon the continuation of the negotiations pertinent to the first project. The Bulgarian party undertook to send their representatives to Baghdad in order to successfully conclude the negotiations and bring the matter to a conclusion.

As far as the second project was concerned, the Iraqi party declared their positive attitude towards the Bulgarian participation and is ready to supply all necessary information and documentation.

TRANSPORTATION

The two parties expressed their satisfaction with the development of their cooperation in the field of air transportation and agreed that their competent air transport organizations need to meet, discuss and conclude a business agreement, which would include all matters of mutual interest for the benefit of the two countries.

## PROTOCOL
### OF THE EIGHTEENTH REGULAR SESSION OF THE BULGARIAN-IRAQI COMBINED COMMITTEE FOR ECONOMIC, SCIENTIFIC AND TECHNICAL COOPERATION

The session of the Combined Bulgarian-Iraqi Committee for Economical, Scientific, and Technical Cooperation was held in Sofia within the period of March, 2nd-7th 1987, in connection with His Excellency Taha Iasin Ramadan's visit, First Vice Chairman of the Council of Ministers of the Republic of Iraq, in response to the invitation of His Excellency George Atanasov, Chairman of the Council of Ministers of the Republic of Bulgaria, for further development of the commercial, economical and technical cooperation between the two countries.

His Excellency Hristo Hristov, Trade Minister, led the Bulgarian Delegation

His Excellency Al-Nyman, Minister for Agriculture and Land Reform, led the Iraqi delegation.

Members of both delegations are listed in Appendixes №1 and 2.

The Combined Committee adopted the following agenda:
1. Review and analysis of the commodity exchange between the two countries on the basis of the Protocol of the 17th Regular Session of the Combined Committee, held in Bagdad; February 1986. Development of new commercial schedule for 1987.
2. Review and analysis of the current economical cooperation and opportunities.
3. Discussion on financial cooperation for 1987 and 1988.
4. Discussion on proposals for scientific and technical cooperation
5. Scheduling the time and the place for the 19th session of the Combined Committee.

The Combined Committee decided to create three working groups in the following areas:
- commercial and financial cooperation
- economic cooperation
- scientific and technical cooperation

Both parties made an elaborate review of the commodity exchange and an assessment of their economical, scientific and technical cooperation over the period following the 17th Session of the Combined Committee.

They expressed their satisfaction with the results achieved till that time and stated that wider opportunities existed for the development of their future cooperation. It was emphasized that the trade and economic relations between the two countries were progressing in the direction for cooperation given by His Excellency Todor Jivkov, chairman of the State Council of the Peoples Republic of Bulgaria and His Excellency Saddam Hussein, President of the Republic of Iraq.

Both parties analyzed and outlined the specific prospects for economic cooperation according to their own needs and abilities in 1987. With regard to this they discussed the methods and



**EXHIBIT**

K

means for overcoming the difficulties and the obstacles standing in the way of their future cooperation.

The protocols of the working groups are attached hereto and are an integral part of it.

Both sides were pleased to note that the talks proceeded in an amicable atmosphere and full understanding in compliance with the good relationship between both countries and their willingness to consolidate their cooperation in different areas.

The 19th session of the Combined Committee was agreed to take place in Bagdad, during the first three months of 1988, while the date would be specified through diplomatic channels.

This Protocol was drawn on March 7th 1987 in Sofia in two original copies in English, both of which were of equal force.


For the Bulgarian Delegation          For the Iraqi Delegation
Hristo Hristov                        Al Numan

BANKING ARRANGEMENT NO. ( 1 )

Between

The Bulgarian Foreign Trade Bank, Sofia here in after refrred to as ( Bul Bank ) and Central Bank of Iraq, Baghdad here in after referred for to as (C.B.I.) for implementation of the Agreed Minutes on t Trade and financial Cooperation of the seventeenth Regular Session of the Bulgarian-Iraqi Joint committee for Economic Scientific and Technical cooperation on 13th February, 1986 in Baghdad reperred to Agreed Minutes).

In conformity with item I (page 6 ) of the (Agreed minutes) the Bulgarian party Shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments. The credits which the Bulgarian party shall grant to the Iraqi party shall cover 100% value of the foreign exchangs currency portion of the contracts to be concluded between the competent Organizations of the two countries From 1st Jan. 1986 untill 31st. Dece. 1987.

The portion in Iraqi Dinars shall be effected in cash in conformity with the contracts concluded between the Buglarian and Iraqi Organizations.

The two sides may agree on the implementation of other development projects, on the same principles of deferred payments stipulated on the Agreed Minutes .

In implementation of the above mentioned agreed minutes, the " Bul Bank " and " C.B.I. " have agreed upon the following:

Cont.../

EXHIBIT

L-1

PENGAD 800-631-6989

ARTICLE ( 1 )
----------------

" Bul Bank " shall opend in its books the following accounts in US. Dollars in the name of the (C.B.I.):-

1- Interest-bearing account entitled (.C.B.I. credit Agreed Minutes 13.2.1986) for Accounting of 100% value of the foreign currency portion of all projects here in after refrred to as (Credit Account). Sub-account ∴ _ shall be opend for each project.

2- Anon interest bearing Account entitled (C.B.I'! Interest credit Agreed minutes 13.2.1986) for accounting of the interest accrued under the utilized credit, hereinafter refereed to us (( Interest Account )).

The (C.B.I.) shall opend corresponding Accounts in the name of the (Bul Bank). The Accounts shall be kept free of commissions and charges for both Banks.

The payments ι shall be effected by, means of irrevocable Documentary letters of credit opened by the (C.B.I.) or Rafidain Bank with the (Bul Bank) in favour of the bulgarian exporters, or by any other means of payment stipulated in the contracts.

Upon presention of documents in order by the respective Bulg arian Organizations for deliveries and services under opened letters of credit, or any other means of payment stipulated in the contracts, the Bul Bank shall enter 100% of their value of the foreign currency portion to the debit of the ( Credit Account ) .
The date of the shipping documents, or the date of approval by Iraqi authority of the respective invoices for rendered sevices shall appear as value date. The Bul Bank shall send advices for each entry

Cont .../

to these accounts to the (C. B. I.) Upon receipt of the advices (CBl) shall credit the ( Credit Account )),

Opened in the name of the Bul Bank for the respective project,

The shipment conditions ( FOB or C and F, ect...) shall be in accordance with contracts concluded between the Bulganian and Iraqi orgnizations .

Transport costas of the exported goods shall be paid by Iraqi side in accordance with relevant conttact.

## ARTICE ( 2 )

On the utilized part of the credit under " Credit Account " as at 31 December each your the Bul Bank till 15th January each year shall calculate simple annual interest at the rate of the 5% p. a. on the basis of 360/360 days.

The interest shall be calcuated from the date of the shipping documents, or from the date of approval by Iraqi or certificate Organizations the respective invoice for rendered services. the accrued interest shall be entered to the debit of respective interest Account,

The Bulgarian Foreign Trade Bank shall send to the(C. B. I.) debit advices accompanied by interest tables for each interest calcuation. The latter shall advice its remarks, if any, with in 30 days after their receipt. The (C. B. I) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.

The latest by crediting the account of the Bul Bank With telex advice Credit lyonnats , New York, under to the Bul Bank.

Cont.../

Bul Bank shall send to (C. E. I.) credit advices for each payment of interest . The calcuation of interest shall stop on the day of final repayment of the utilized amounts under the credit.

## ARTICLE ( 3 )

The utilized credit under each project shall be repaid in eight egual subsequent semi-annual instalments , the first of which shall fall due One year after the adate of the final completion of the project, evidenced by the date of F A C. provided that the peried between the date of and FAC shall not exceed one year and in accordance with the provisions of the special contract related to such project.

Bul Bank shall prepare and send to (C. B. I.) epayment schedules for each project, (C. B. I.) shall confirm or advice its remarks, if any with in 60 days after receipt. On the respective maturity date (C. B. I.) shall credit the account of the Bul Bank with Credit Lyonnais, New york in convertible US. Dollars with the amount of principal, under telex advice to Bul Bank. The latter shall send the credit advices to (C. B. I.)/the for respective payments. ...

## ARTICLE ( 4 )

Omitted

Cont.../

ARTICLE (5 )
----------------

. . . . . C.B.I.) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective ( Credit Account ) as, well as, the interest accrued under these amounts entered in the respective ( Interest Account) Mentioned in article (1) above.

ARTICLE ( 6 )
----------------

All documents concerning the implementation of the present Arrangement. shall be expressed in US.Dollars and shall bear the stipulation " Credit Iraq 13.02.1986.♪

ARTICLE ( 7 )
----------------

Bul Bank shall send to (C.B.I.) daily statements ( upon each entry ) of the Accounts opened in conformity with Article (1) of the present Arrangement.

(C.B.I.) shall advice its remarks, if any, with in 30 days after their receipt.

ATRICLE ( 8 )
----------------

All Banking commissions and charges under the present Arrangement in Iraq shall be for the account of the Iraqi party and in Bulgaria shall be fo the account of the Bulgarian party.

ATRICLE ( 9 )
----------------

All payments concerning the repayment of the amount and the interests entered in the Accounts as per Article (1) shall be free of taxes and fees in Iraq, present, or which may be introduced in the future.

Cont. . . /

ARTICLE ( 10 )
----------------------

Any amendments to the present Arrangement may be done only by the mutual written consent of the two Banks.

ARTICLE ( 11 )
----------------------

The correspondence in implementation of the present Arrangement will be in the English language.

ARTICLE ( 12 )
----------------------

The present Arrangement enters in to force on the day of its signing and shall remain valid until the fianl settlement of all obigations, ensuing thereform.

Done and signed in Baghdad. 1.07. 1956......in two copies in the English language, both being equally authentic.

For                                                     For
Bulgarian Foreign Trade Bank                            Central Bank Of Iraq.

BANKING ARRANGEMENT NO. (3)

Between the Bulgarian Foreign Trade Bank, Sofia

here in after referred as to ( Bul Bank ) and the Central Bank

of Iraq Baghdad here in after referred to as ( CBI )  for

implementation of the Agreed Minutes on the trade and Financial

Co. Operation of the 17th regular session of the Bulgarian-Iraqi

joint committee for Economic, Scientific and  Technical Co-

operation of 13th February 1986/ Here inafter referred to as

the " Agreed Minutes "

In the Implementation of the above mentioned Agreed

Minutes the " Bul Bank " and the CBI have agreed upon the

following:

## ARTICLE (1)

In confirmity with item 4 page 8 of the agreed Minutes,

the Bulgarian Party responsed to the  request of the Iraqi Party

that all payments due or which will fall due to the Bulgarian

side in Convartible Currency during 1986 under all existing

Civilian and special Banking Arrangments and commercial Contracts

Cont../2



PENGAD 800-631-6989

EXHIBIT

L-2

shall be settled as follows:

A.       50% shall be paid in 1986 in accordance with relevant

Contracts and Banking Arrangements.

B.       50% shall be paid one year from the dates of maturity

in accordance with relevant contracts and Banking Arrangements.

C.       Deferred payments bear simple interest rate of 5 (Five)

percent annum.

## ARTICLE (2)

The "BulBank" shall open in its books the following

Accounts,  kept in US. Dollars in the name of the (CBI) as follows:

A.       The interest bearing account entitled " Account No. 1 -

CBI - re - deferred payments, Agreed Minutes of 13-2-86" for

accounting of 50% of the re- payment of all payments due including

the interest to Bulgarian side during 1986, concerning the civilian

sector on the respective intial maturity dates.

B.       A non interest bearing Account entitled "Account

No.2-CBI interest/redeferred payments" for accounting the interest

calculated on the amounts entered to the Account No.1 above.

Cont../3

C.       An interest bearing account entitled (Account No. 3 -
CBI redeferred payments, Agreed Minutes of 13-2-1986) for
accounting of 50% of the re-payment of all payments due including
the interest to Bulgarian side during 1986 under special Banking
Arrangements and contracts, on the respective intial maturity
dates.

.d.       A non interest bearing account entitled ( Account No.4-
CBI interest re-deferred payments) for accounting the interest
calculated on the amount, entered to the Account No. 3 above.

"CBI" shall open correspondent Accounts in the name of "BulBank".

## ARTICLE (3)

"BulBank" shall send to (CBI) monthly statements of the
deferred payments.

"CBI" shall confirm them or shall advise its remarks if any, within
30 days from their receipt.

On the respective maturity dates, "CBI" shall credit
the Accounts of "BulBank" with Credit Lyonnais, New - York, in
inconvertible US. Dollars with amounts of due payments mentioned

Cont../4



in article 1 above plus their interest, advising Simultaneously the "BulBank" by telexes.

### ARTICLE (4)

The "BulBank" shall calculate simple annual interest at the rate of 5% per annum on 360/360 days basis on each amount credited to the accounts mentioned in Article. 2 above. Interest shall be calculated from the date of deferring the amounts till the date of the acctual payment and shall be paid together with each respective principal.

### ARTICLE (5)

All payments concerning the repayment of the amounts and the interest entered in the accounts as per Article 2 above shall be free of taxes and fees in Iraq, present, or which may be introduced in the future.

### ARTICLE 6

CBI Guarntees with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 3abovePlus its interest according to the Banking Arrangement dated 15th 5.1985 and 13th October 1985.



## ARTICLE (7)

Any amendment to the present Banking Arrangement may be done by the mutual written consent of the two Banks.

## ARTICLE (8)

The Correspondence in the implementation of the present Banking Arrangment shall be in the English Language.

## ARTICLE (9)

The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment of all obligations, esusing thereform.

Done and signed in Baghdad on 1.07.1986 in two copies in the English Language, both being equally authentic.


For. the Bulgarian                    For. Central Bank
Foreign Trade Bank                       of Iraq.

AGREED MINUTES

the occasion of the visit of H.E. Christo Christov as a Speicil Envoy from H.E. Petar Mladenov President of the People Republic of Bulgaria to H.E. Saddam Hussien President of the Republic of Iraq during the period 28th February to 1st March 1990, The Iraqi debt obligations owed to Bulgaria as well as the promotion of future bilateral trade and economic cooperation between the two countries were discussed with H.E.Or. Mohammed Mehdi Saleh Minister of Trade, Acting Minister of Finance, Co-chairman of the Iraqi – Bulgarian Joint Committee .

Both Sides agreed on the following:-

1.  The Iraqi Side shall make available the quantity of 4.75 Million (four million seven hundred and fifty thousand)Metric Tons of crude oil in the course of the years 1990 – 1994 . This quantity of crude oil shall be utilised for payment of the existing debts together with those becoming due until 31st of December 1994 and to be delivered in accordance with the following programe:-

| Year | Quantity in tons |
|------|------------------|
| 1990 | 1 000 000 |
| 1991 | 750 000 |
| 1992 | 750 000 |
| 1993 | 750 000 |
| 1994 | 1 500 000 |

- 1 -

EXHIBIT
M

The settlement of the remaining balance shall be paid in cash or in oil in accordance with the outcome of the negociations to be initiated in the early part of 1995.

2.    Oil prices, delivery schedules and any other relevant details shall be agreed upon by the specilazed organizations tions of the two countries.

3.    To implement these Agreed Minutes, Banking Arrangements between the Central Bank of Iraq and the Bulgarian Foreign Trade Bank shall be concluded as soon as possible.

4.    With the aim of the further expanding and diversifying the Trade Exchange between the two countries, The Bulgarian Side expressed his rediness to make available to the Iraqi Side export credit facilities for financing Bulgaria's exported goods to Iraq . The relevant details including amounts, terms and conditions as well as coverage shall be discussed in the next Session of the Joint Committee.

- 2 -

These Agreed Minutes shall enter into force from the
date of exchanging Diplomatic Notes confirming its
approval by the relevant authorites of both Sides.

Done and signed in Baghdad on 1st, March, 1990 in two
originals in English language.

For the Government of the
Republic of Iraq

For the Government of the
People's Republic of Bulgaria

Dr.Mohammed M.Saleh
Minister of Trade
Acting Minister of Finance

Christo Christov
Presidential Special Envoy

- 3 -



**NTRAL BANK OF IRAQ**

Ref.NO.: 6/157     العدد :

Date: 16/2/2002     التاريخ :

Agreements & Loans

الى :

To: Bulgarian Foreign Trade Bank,
     7,sveta nedelya sq. sofia 1000, Bulgaria,.

Re.:Statements of the Accounts opened under
     the Banking Arrangements signed between
     our two Banks.

Dear sirs,
     With reference to your Statements dated 1/1/2002 and 24/1/2002.
     We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist , and the sanctions imposed on Iraq are lifted taking into your consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled .
     This reply should not be interpreted and /or considered as a confirmation to the contents of said Statements .
     Thank you for your co-operation.
     We remain,

                    Yours faithfully
                 For Central Bank of Iraq

                    AHMED S. MOHAMAD
                    D.G.

Alla

CENTER:RASHED ST. BAGHDAD - IRAQ
8884115 - 8845175 P. O.Box 64
X: 212203 - 212558 : 212256 CN BK IK
E: <ccbi@niadiraq.net>

مركز البنك : شارع الرشيد - بغداد العراق
هاتف : ٨٥٨٤١٧١ - ٨٨٥٦١١٥ـ
ص . ب : ٦٤ - تلكس : ٢١٢٢٥٦ - ٢١٢٥٥٨ - ٢١٢٢٠٣
البريد الالكتروني : ccbi@niadiraq.n - e-mail

EXHIBIT

N

PENGAD 800-631-6989

 

**REPUBLIC OF IRAQ**
MINISTRY OF FINANCE

**Press Release**                                    **For Immediate Release**

July 18, 2006

Iraq Announces Conclusion of Commercial Debt Settlement

**Baghdad, Iraq**:  The Republic of Iraq today announced the conclusion of its program to restructure Saddam-era commercial debt with payments that were made to holders of small claims against Iraq and Iraqi public sector entities.

Holders that received payments include those who tendered in response to a final round of cash buyback invitations, as well as those who previously tendered and received awards in the arbitration process that addressed their unreconciled claims.

A total of $19.7 billion of commercial claims against Iraq have been settled over the past eleven months as part of the Government of Iraq's program to address the huge debt stock accumulated by the Saddam regime.

As a result of the two rounds of Iraq's debt-for-debt exchange offer, the four rounds of its cash buyback offer and the arbitration process:

- 11,776 individual Saddam-era commercial claims have been cancelled, including 817 following the arbitration process;

- 491 commercial claimants participated in the program;

- The aggregate amount of commercial claims retired under this program exceeds $19.7 billion; and

- The holders of approximately 96% (by value) of the eligible claims that received invitations to settle their Saddam-era claims agreed to do so.

EXHIBIT

0

PENGAD 800-631-6989

"The success of Iraq's commercial debt restructuring program represents a crucial milestone in Iraq's return to normal relations with the international financial community," said Bayan Jabr, Iraq's Minister of Finance. "The pace and scale of this debt restructuring program is unprecedented in the history of sovereign finance."

Sinan Al-Shabibi, Governor of the Central Bank of Iraq, added, "The enormous and unsustainable debt stock accumulated by the Saddam regime has now been reduced to the point that it will not deter the new investment needed to finance Iraq's economic reconstruction. This was one of the major objectives that the Government of Iraq identified in June, 2004. It is an objective that has now been accomplished."

\*     \*     \*     \*     \*

This communication is not an offer of securities for sale in the United States. Securities may not be offered or sold in the United States absent registration or an exemption from registration under the Securities Act of 1933, as amended. Any public offering of securities to be made in the United States will be made by means of a prospectus that may be obtained from the issuer or selling security holder and that will contain detailed information about the Republic of Iraq. No public offering of securities in the United States is contemplated by the Republic of Iraq at this time.

Neither this release nor any of the documents referred to herein constitute an offer by the Republic of Iraq or by any other party to settle or exchange any outstanding claims, nor do they constitute an admission or acknowledgement of any such claim, or an acknowledgement that any such claim exists or has been revived or reinstated, or an express or implied promise to pay any such claim or any part thereof. This release and the documents referred to herein are expressly published without prejudice. All defenses available to the Republic of Iraq and any other party based upon any applicable statute of limitations or otherwise are expressly preserved. Neither this release nor the documents referred to herein may be relied upon as evidence of the existence of any claim or the willingness or ability of the Republic of Iraq or any party to pay any such claim.

2