UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AGROCOMPLECT, AD<br>A Bulgarian Corporation<br>54 Dondukov Blvd<br>Sofia 1000, Bulgaria<br><br>      Plaintiff,<br><br>vs.<br><br>THE REPUBLIC OF IRAQ<br>A Foreign State<br>1801 P Street, NW<br>Washington, DC 20036<br><br>      Defendant. | Case No. 1:07-cv-00165 (RBW) |

### FIRST AMENDED COMPLAINT

COMES NOW plaintiff, AGROCOMPLECT AD (hereinafter, including any predecessor in interest, referred to as "Agrocomplect" or "Plaintiff"), by and through undersigned counsel, and, pursuant to F.R. Civ. Proc. 7, and F.R.Civ.P. 15(a), and *Confederate Memorial Ass'n, Inc. v. Hines* 995 F.2d 295, 299 *reh and reh en banc den* (D.C.Cir. 1993) and for a demand states and avers as follows:

### JURISDICTION AND VENUE

1. Jurisdiction is founded on 28 USC §§ 1330 and 1605(a)(2), (6). Venue is proper pursuant to 28 USC § 1391(d) and (f)(4).

### NATURE OF THE CLAIM

**The Parties**

2. Plaintiff Agrocomplect is a corporation organized under the laws of the Republic of Bulgaria.

3. Defendant the Republic of Iraq (hereinafter "Iraq") is a foreign state.

**The Contract**

4. Defendant entered into a certain written contract (the "Contract") with Plaintiff for the provision of engineering and construction services to be performed by Plaintiff in Iraq.

5. The Contract required Plaintiff to perform work, *inter alia*, on the Hilla-Diwaniya 4 Land Reclamation Project for the State Organization for Land Reclamation, operating under the authority of Iraq's Ministry of Agriculture and Irrigation of the Republic of Iraq.

6. The Contract provided, *inter alia*, that:

> If any dispute or difference of any kind whatsoever shall arise between the Employer and the Contractor in connection with or arising out of the contract or the carrying out of the Works (whether during the progress of the Works or after their completion and whether before or after the termination abandonment or breach of the contract) it shall in the first place be referred to and settled by the Engineer who shall give notice of his decision to the Employer and the Contractor... If the Employer or the Contractor be dissatisfied then with any such decision and in any such case either the Employer or the Contractor may within 30 days after receiving notice of such decision require that the matter be referred to a Committee of Arbitration to be formed in the following manner:
>
> The Employer and the Contractor shall each appoint one member to the Committee and the two members thus appointed shall agree upon a third member to act as a Chairman of the Committee. If agreement on the appointment of Chairman cannot be reached within 14 days from the last date of their appointment then the Employer or the Contractor shall each have the right to ask a competent court to appoint the third member in accordance with any proceedings provided in a special law of arbitration.

> ... All fees and other costs shall be paid to arbitrators by the party requiring arbitration provided that such fees and costs shall be payable by the party against whom the award has been pronounced.
>
> The Contract shall be subject to and construed according to the Iraqi Laws regulations and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract.

(the "Contract Arbitration Clause").

7. Plaintiff performed pursuant to the terms of the Contract.

8. In order to perform under the terms of the Contract, Plaintiff was required to and did in fact enter into agreements with suppliers and others in the United States.

9. The contract time for drafting of design and completion of construction was 44 calendar months.

10. The gross area was approximately 102,000 donum, one donum equal to 1338 square meters, divided initially into 8 zones. Subsequently, the contract was amended adding a ninth zone.

11. The project commenced on March 12, 1985, and the execution and handover was effectuated zone by zone.

12. By August 2, 1990, eight zones were completed and handed over.

13. Iraq invaded Kuwait on August 2, 1990.

14. An international embargo was enacted effective August 6, 1990, and remained in effect through April 3, 1991, and was thereafter extended through 2003.

15. On or about January 1991, Plaintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the Iraqi invasion and occupation of Kuwait.

16.  The assault by, *inter alia*, American military on the machinery, production base, and camp facilities was foreseeable by Defendant.

17.  As a result of breach of the Contract by Defendant, Plaintiff sustained actual, foreseeable and consequential damages in the approximate amount of US$56,000,000, including: contract losses of approximately US$17,000,000; loss of tangible property of approximately US$38,000,000; payment of third party expenses of approximately US$188,000; and, loss of business reputation of approximately US$483,000.00 in interest.

18.  Notwithstanding repeated notice and demand, Iraq has failed and refused to pay to Plaintiff the sums due and owing under the Contract.

19.  Notwithstanding notice and demand, Iraq has failed and refused to comply with the Contract Arbitration Clause.

**Administrative Debt Recovery Procedures**

20.  Plaintiff has exhausted administrative remedies.

21.  Plaintiff timely submitted its claims under the Contract to the United Nations Compensation Commission (the "UNCC Claims").

22.  On March 19, 1999, the Governing Council of the UNCC, adopting the Report and Recommendations made by the Panel of Commissioners, rejected on jurisdictional grounds the UNCC Claims other than US$150,790 for the cost of air evacuation of 368 company employees and 56 family members.

23.  The Interim Iraqi Government formed the Iraqi Debt Reconciliation Office (hereinafter "IDRO") for the expressed purpose of resolving certain debts on certain pre-established terms, including discounts and structured payment schedules.

24.     Plaintiff timely submitted its claims to IDRO.

25.     IDRO rejected certain of Plaintiff's Claims as outside of its jurisdiction, including claims where payments were required to be made in local currency.

26.     IDRO agreed to pay $US 7,505,203.20 on certain of Plaintiff's claims, plus accrued interest at the IDRO rate, reduced to 10.25% of the total amount of the claim plus interest. The net payment received by Plaintiff from and through IDRO was $1,761,875.12.

27.     Defendant remains indebted on the Contract to Plaintiff in the amount of $US 48,500,000, plus accrued interest at the annual rate of no less than the IDRO rate.

**Sovereign Immunity**

28.     The Contract, and performance thereunder, was a commercial activity.

29.     The obligations set out in the Contract had a direct effect in the United States, in that goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States.

30.     The obligations set out in the Contract had a direct effect in the United States, in that payment was to be made at least in part by and through and into banking institutions in the United States.

31.     A document titled Memorandum No. 2, between the Bulgarian Foreign Trade Bank ("Bulbank") and the Central Bank of Iraq ("CBI") provided in part that:

> 1. The Contract for the construction of "Hilla-Diwaniya 4" Land Reclamation Project shall be covered by the provisions of Par.6, Item 1 of Law 157 of 1973 that grants privileges to major development projects in Iraq....
>
> 13. The provisions pf the Iterbank Agreement between the Central Bank of Iraq and the Bulgarian Foreign Trade Bank, signed on March 22, ___, [1]in Sofia, Bulgaria, shall be valid for this Contract, provided the Agreement is approved by the respective authorities of both _____....

---

[1] Portions of the Memorandum are cut off, and therefore not legible.

> 15. The Contractor shall have the right to transfer abroad 55% (fifty-five percent only) of the total Contract value, in free US Dollars, including payment for the personnel engaged in the Project's execution, in accordance with the minutes of the Extraordinary Session of the Iraqi-Bulgarian Joint Committee for Economic, Scientific and Technical Cooperation, signed on January 13, 1983, in Baghdad ....
>
> A. Simple annual interest at a rate of 5 (five) percent in accordance with the Protocol of November 10, 1983 signed at the XV Session of the Bulgarian-Iraqi Joint Committee hold (sic) in Sofia Bulgaria shall be charged on the balance of the amount....
>
> B. The utilized credit principle (sic) amount shall be paid in 4 (four) equal yearly installments ... The first installment for repayment shall fall due on the date of handing over the whole Project for operation through a certificate of substantial completion....
>
> 21. This Memorandum shall be an integral part of the Contract for the construction of "Hillya-Diwaniya 4" Land Reclamation project.
>
> In a 1984 Letter, Iraq identified the following "conditions:"
>
> 55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between (CBI) and (Bulbank), signed by a protocol on 03/22/1983, and the delayed payment conditions mentioned in Paragraph Third/D of the meeting minutes of the Joint Iraqi Bulgarian Committee for Economic, Technical and Scientific Cooperation in its fifteenth session held in Sofia in the period from 5-10 November /3, and to pay 45% in Iraqi currency.

32. In the Agreed Minutes (the "Minutes") of the Fifteenth Regular Session (the "15th Session") of the Bulgarian-Iraqi Joint Committee for Economic, Scientific and Technical Cooperation ( the "Joint Committee"):

> Both sides agreed that the amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between the parties in the present Agreed Minutes. Amounts due in 1983 will be settled in accordance with the contract conditions not later than 31 December 1983.

**Plaintiff's Exhibit I**, appended to Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss Complaint ( hereinafter "**PX __**").

33. The Minutes of the 15th Session of the Joint Committee noted that the agreed minutes of the working groups were attached.

34. The Bulgarian Foreign Trade Bank ("Bulbank") and the Central Bank of Iraq ("CBI") entered into apparently undated Banking Arrangement No. (1) to undertake "implementation of the Agreed Minutes on Trade and (F)inancial Cooperation of the 17th Session of the (Joint Committee) on 13th February 1986 in Baghdad...." **PX L-1**. Banking Arrangement No. (1) provided, in part as follows:

> In conformity with item I (page 6) of the (Agreed minutes) the Bulgarian prty shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments. Banking Arrangement No.1 also provided that:
>
> (Bulbank) shall send to (CBI) debit advises accompanied by interest tables for each interest calculation...The (CBI) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.
>
> *The latest by crediting the account of the Bul Bank (w)ith Credit lyonnais, New york (sic), under telex advice to the Bul Bank.*
>
> Bul Bank shall send to (CBI) credit advices for each payment of interest. The calculation of interest shall stop on the day of final repayment of the utilized amounts under the credit.
>
> The utilized credit under each project shall be repaid in eight equal subsequent semi-annual installments, the first of which shall fall due One year after the date of the final completion of the project, evidenced by the date of FAC....
>
> Bul Bank shall prepare and send to (CBI) epayment (sic) schedules for each project, (CBI) shall confirm or advice its remarks, if any, with in (sic) 60 days after receipt. *On the respective maturity date (CBI) shall credit the account of the Bul Bank with Credit Lyonaisse, New york (sic) in convertible US. Dollars with the amount of principal, under telex advices to Bul Bank.* The latter shall send the credit advices to (CBI) for the respective payments.
>
> (CBI) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective (Credit Account) as well as, the interest accrued under these amounts entered in the respective (Interest Account) mentioned in Article (1) above.(emphasis added).

35. Banking Arrangement No. 1 appears to have been signed on "1.07.1986."

36. Banking Arrangement No. 3, **PX L-2**, between Bulbank and CBI, also apparently signed on "1.07.1986," was designed to implement the "trade and Financial Co. Operation" of the 17th Session of the Joint Committee, and it provided in part as follows:

> In confirmity [sic] with item 4 page 8 of the agreed Minutes, the Bulgarian Party responsed [sic] to the request of the Iraqi Party that all payments due or which will fall due to the Bulgarian side in Convartible [sic] Currency during 1986 under all existing Civilian and special Banking Arrangments [sic] and commercial Contracts shall be settled as follows:
>
>> A. 50% shall be paid in 1986 in accordance with relevant Contracts and Banking Arrangements.
>>
>> B. 50% shall be paid one year from the dates of maturity in accordance with relevant contracts and Banking Arrangements.
>>
>> C. Deferred payments bear simple interest rate of 5 (Five) percent annum....
>
> On the respective maturity dates, *"CBI" shall credit the Accounts of "BulBank" with Credit Lyonnais, New - York, in convertible US. Dollars with amounts of due payments mentioned in article 1 above plus their interest,* advising Simultansusly [sic] the "BulBank" by telexes....
>
> Interest shall be calculated from the date of deferring the amounts till [sic] the date of the acctual [sic] payment and shall be paid together with each respective principal.
>
> CBI Guarntees [sic] with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 1 abovePlus [sic] its interest according to the Banking Arrangement dates 15th 5. 1985 and 13th October 1985.
>
> The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment [sic] of all obligations, esusing [sic] thereform [sic].(emphasis added).

37. At least three working groups issued protocols following the Joint Committee's 17th Session: the Workgroup on Economic Partnership; the Working Group on Trade and Financial Cooperation; and, the Working Group for Scientific and Technical Cooperation. **PX J-1, J-2, J-3.**

38. The Protocol of the Workgroup on Economic Partnership stated:

> The Bulgarian party expressed their desire to participate in the irrigation activities in Iraq.
>
> The Iraqi party declared their positive attitude towards the participation of the Bulgarian party in said field. The Bulgarian party took all necessary steps in the

> period between the Seventeenth and the Eighteenth Sessions of the Bulgarian - Iraqi (Joint Committee) enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hal-Davana-4'. These efforts would be continued and the Bulgarian aprty would intensify its work, in order to secure the successful completion of the project without any damages to the Iraqi party, in accordance with the agreements signed. ...
>
> Outstanding payments of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity....
>
> *(Bulbank) and (CBI) shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.* (emphasis added). **PX J-3.**

39. The 18th Session of the Joint Committee was held in Sofia, Bulgaria in March 1987. Along with the Joint Committee, three working groups issued protocols. **PX K**. On March 1, 2000, Iraq and Bulgaria agreed, in the form of Agreed Minutes, during discussions on "Iraqi debt obligations owed to Bulgaria...," that:

> ...crude oil shall be utilized for payment of the existing debts together with those becoming due until 31st December 1994....
>
> *To implement these Agreed Minutes, Banking Arrangements between (CBI) and (Bulbank) shall be concluded as soon as possible* (emphasis added). **PX M**.

40. On February 16, 2002, CBI wrote to Bulbank, in part, as follows:

> With reference to your Statements dated 1/1/2002 and 24/1/2002.
> We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist, and the sanctions imposed on Iraq are lifted taking into consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled. **PX N**.

41. Performance of the contract had a direct effect in the United States, in that the construction projects became foreseeable targets of opportunity and necessity for the United States military.

42. Defendant is not entitled to sovereign immunity because the conduct in issue was a commercial activity with a direct effect in the United States.

43. The Contract Arbitration Clause constituted a waiver of sovereign immunity.

## COUNT ONE
### (Enforcement Of Contract Arbitration Clause)

44. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 43 of the Complaint.

45. Plaintiff and Defendant agreed in the Contract to submit "any dispute or difference of any kind whatsoever" arising out of the Contract to an arbitration process defined in the Contract.

46. Defendant has failed and refused to participate in the arbitration process set out in the Contract.

47. The Contract Arbitration Clause was a material provision of the Contract.

48. Plaintiff has satisfied all of the conditions applicable to implementation of the Contract Arbitration Clause.

49. Defendant's failure and refusal to participate in the arbitration process set out in the Contract is a material breach of the Contract.

50. Defendant's failure and refusal to participate in the arbitration process set out in the Contract has caused, and continues to cause damage and injury to Plaintiff.

## COUNT TWO
### (Breach of Contract)

51. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 50 of the Complaint.

52. The losses sustained by Plaintiff were the result and the consequence of "special risks," as that term is defined in Section 67 of the Contract.

53. Unpaid contract amounts are due to be paid to Plaintiff by Defendant pursuant to the provisions of Sections 67 and 68 of the Contract.

54. Section 67 is and was a material provision of the Contract.

55. Section 68 is and was a material provision of the contract.

56. Despite repeated notice and demand, defendant has failed and refused to pay to Defendant the sums required to be paid by the Contract.

57. That failure is a material breach of the Contract.

58. As a direct, foreseeable and consequential result of that breach, Plaintiff has sustained injury and damage.

WHEREFORE, by all these presents, counsel for plaintiff demands:

1. Judgment in the amount of US$ 47,500,000 in favor of Plaintiff and against Defendant, plus an award of attorneys fees, interest and costs;

2. Entry of an order, judgment and decree directing the parties to proceed to arbitration pursuant to the terms of the Agreement between the parties;

3. Entry of an order, judgment and decree directing the parties to nominate one member; and

4. Such other relief as may be just and proper.

Respectfully submitted,

_____
Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

_____
Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

## CERTIFICATE OF SERVICE

I certify that a true copy of this First Amended Complaint was sent by electronic mail on July 16, 2007 to:

Matthew D. Slater, Esq.
*Cleary Gottlieb Steen & Hamilton, LLP*
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006

Jonathan I. Blackman, Esq.
Lisa M. Coyle, Esq.
*Cleary, Gottlieb, Steen & Hamilton, LLP*
One Liberty Plaza
New York, NY 10006

_____
Philip M. Musolino