# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD                          :
                                          :
      Plaintiff,                       :
                                          :
      v.                               :  Case No. 1:07-cv-00165 (RBW)
                                          :
THE REPUBLIC OF IRAQ                      :
                                          :
      Defendant.                       :

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**COMES NOW** Plaintiff Agrocomplect, AD (hereinafter "Plaintiff" or "Agrocomplect")

by and through undersigned counsel and, pursuant to Fed.R.Civ. P. 12 and LCvR 7(b), and

opposes Defendant's Motion to Dismiss the First Amended Complaint, and, in opposition thereto,

respectfully refers this Honorable Court to the annexed memorandum of points and authorities.

      WHEREFORE, by all these presents, counsel for Plaintiff prays that the instant motion

be denied.

                          Respectfully submitted,

                          _____

                          Sylvia J. Rolinski # 430573
                          Danielle M. Espinet # 478553
                          *Rolinsk & Suarez, LLC*
                          14915 River Road
                          Potomac, Maryland 20854
                          *Voice*: (240) 632-0903
                          *Fax*:   (240) 632-0906
                          *Email*: srolinski@rolinski.com

                          _____

                          Philip M. Musolino #294652
                          *Musolino & Dessel*
                          1615 L Street, N.W., Suite 440
                          Washington, D.C. 20036
                          (202) 466-3883
                          *Voice*:  (202) 466-3883
                          *Fax*:   (202) 775-7477
                          *Email*:  pmusolino@musolinoanddessel.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD          :
         :
     Plaintiff,            :
         :
    v.                  :  Case No. 1:07-cv-00165 (RBW)
         :
THE REPUBLIC OF IRAQ       :
         :
     Defendant.         :

## ORDER

This matter having come before this Court on Defendant's Motion to Dismiss the First

Amended Complaint, and opposition thereto, and after hearing, it is this _____ day of

_____, 2007, for cause shown,

ORDERED, that Defendant's Motion to Dismiss the First Amended Complaint shall be,

and hereby is DENIED, and it is

FURTHER ORDERED, that defendant shall file and serve an answer to the First

Amended Complaint within _____ days of the date of entry of this Order.

SO ORDERED.

_____
Reggie B. Walton, Judge
United States District Court for the
District of Columbia

Philip M. Musolino, Esq.
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski, Esq.
Danielle M. Espinet, Esq.
*Rolinski, Terenzio & Suarez, LLP*
14915 River Road
Potomac, Maryland 20854

Matthew D. Slater, Esq.
*Cleary Gottlieb Steen & Hamilton, LLP*
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006

Jonathan I. Blackman, Esq.
Lisa M. Coyle, Esq.
*Cleary, Gottlieb, Steen & Hamilton, LLP*
One Liberty Plaza
New York, NY 10006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AGROCOMPLECT, AD | : |
| Plaintiff, | : : |
| v. | : Case No. 1:07-cv-00165 (RBW) |
| THE REPUBLIC OF IRAQ | : : |
| Defendant. | : : |

**TABLE OF CONTENTS**

SECTION ONE:  BACKGROUND, PROCEDURE, STANDARDS
AND BURDENS OF PROOF..............................................................1

    A. Statement of the Case.............................................................................1

    B.  Summary of Argument..........................................................................4

    C. Applicable Standards and Burden of Proof....................................................5

        1.  Challenges to Subject Matter Jurisdiction
Under Fed.R.Civ.P. 12(b)(1).......................................................6

        2.  Assertions that the Complaint Fails to State A Claim
Under Fed.R.Civ.P. 12(b)(6).......................................................7

SECTION TWO:  THIS COURT HAS SUBJECT MATTER JURISDICTION...................10

    A. The Complaint Alleged Facts Sufficient Under Rule 12(b)(1)
to Preclude Dismissal Under the FSIA's Direct Effect Test.............................10

        1. Defendant's Agreement to Make Contract Payments Into a New York Bank
Account Satisfied the Direct Effect Test.........................................11

        2. That Goods and Services Required Under the Contract Were to be
Supplied In Part By  American Contractors Was A Direct Effect In the
United States........................................................................18

        3. Construction of Facilities Which Became American Military Targets Had a
Direct Effect in the United States.................................................20

    B.  The Arbitration Clause Is A Waiver of Sovereign Immunity............................20

SECTION THREE: DISPOSITION OF AFFIRMATIVE DEFENSES IN ARBITRATION....24

SECTION FOUR: THE COMPLAINT STATES A CLAIM........................................25

A.  Defendant Failed To Meet Its Burden On the Affirmative
    Defense of the Statute of Limitations...................................................25

    1.  Motions To Dismiss on Statute of Limitations Grounds are Disfavored......25

    2.  Defedant Failed to Meet Its Burden of Proof On the Commencement and the
        Running of A Statute of Limitations...............................................26

    3.  Principles of Equitable Tolling, Waiver, and Estoppel Preclude Dismissal...29

B.  Defendant Failed To Meet Its Burden On the Affirmative Defense of
    Release.........................................................................................32

    1.  Defendant Does Not Meet the Standard Applicable to Disposition on a Motion
        to Dismiss a Contractual Release Clause...........….……………………...32

    2.  The Invitation and the Tender Show That the Release Did Not Cover the
        Claims in This Case...............................................…..…….........34

    3.  IDRO's Procedures Show That the Release Did Not Dover the Claims in This
        Case.........................................................................................36

CONCLUSION   .......................................................................................41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD                          :
                                          :
                    Plaintiff,            :        Case No. 1:07-cv-00165 (RBW)
                                          :
        v.                                :
                                          :
THE REPUBLIC OF IRAQ                      :
                                          :
                    Defendant.            :

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendant the Republic of Iraq ("Defendant" or "Iraq") moves pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss the First Amended Complaint. As is more fully set forth below, that motion should be denied.

### SECTION ONE:  BACKGROUND, PROCEDURE, STANDARDS AND BURDENS OF PROOF

#### A. Statement of the Case

Plaintiff Agrocomplect A.D. ("Plaintiff" or "Agrocomplect") filed its two-count complaint against Defendant the Republic of Iraq ("Defendant" or "Iraq") on January 23, 2007. On May 21, 2007, Defendant filed a Motion to Dismiss the Complaint ("Defendant's First Motion to Dismiss"). Defendant's motion also sought dismissal under Fed.R.Civ.P. 12(b)(6) because, Defendant alleged: the claim is barred as a matter of law by Plaintiff's alleged release; and, the claim is time-barred. Two exhibits were appended to the motion: an Invitation to Tender Claims for Cash Purchase and Cancellation, issued by Iraq through its Ministry of Finance and the Iraq Debt Reconciliation Office ("IDRO"), and, Plaintiff's Tender to IDRO. Defendant contended that those two exhibits supported its defense of release.

Plaintiff filed its Opposition on June 5, 2007. The Opposition asserted *inter alia*, that: the allegations of the complaint satisfied the direct effect test; defendant failed to meet its burden on the affirmative defense of the statute of limitation; defendant failed to meet its burden on the

affirmative defense of release; and, defendant improperly relied on exhibits to support a motion

under 12(b)(6). Appended to the Opposition were three exhibits directed at the availability of

Iraq as a forum for resolution of plaintiff's claims, designated as Plaintiff's Exhibits ("**PX**") A-1,

A-2, A-3,[1] and seven exhibits directed at the IDRO process, designated as **PX B, C, D, E, F, G**

and **H**.[2]

On June 19, defendant filed its Reply to the Opposition. The Reply was accompanied by

a supplement containing an Article from the Journal of International Arbitration, and by

documents collected in designated Exhibit **C**, some or all of which defendant apparently

contended constituted the contractual agreement of the parties.[3] Included in Defendant's Exhibit

("**DX**") C was Memorandum No.2, and a letter dated 09/02/84 (the "1984 Letter"), at Document

14-7, pages 86-88, Bates No. 260-262.

On July 11, 2007, plaintiff filed a Motion for Limited Discovery. That motion was

accompanied by 10 exhibits.[4] Nine of those exhibits – **PX I, J-1, J-2, J-3, K, L, M** and **N**--

satisfied the "direct effect" test by establishing that contract payments were to be made in New

York.[5]

---

[1] Plaintiff appends hereto the same exhibits, and for convenience utilizes the same numbering and lettering.
[2] Also appended hereto, with the same numbering and lettering.
[3] Defendant complains that Plaintiff did not append the contract to the complaint. Defendant's Motion to Dismiss First Amended Complaint ("Second Motion to Dismiss"), at 29, n.16. But as Defendant's own Exhibit C compilation shows, there was cause for prudence in asserting that one or more documents constituted the full agreement between the parties. Defendant does not claim – nor can it – that Plaintiff's recitation of contract clauses in the complaint excluded significant provisions. To the contrary, defendant relies – incorrectly -- on forum selection clauses recited by Plaintiff in the complaint. Defendant, for its part, relied in its Reply on, among other things, a "Memorandum No. 2," at Document 14-7, pages 74-77, Bates No. 248-251, which explicitly applied to the contract "the provisions of the Iterbank Agreement, between the Central Bank of Iraq ("CBI") and the Bulgarian Foreign Trade Bank ("Bulbank"), *id.*, at page 75, Bates 249. But defendant did not produce that Agreement, notwithstanding its clear relevance, as is discussed below, to the New York payment provisions which satisfy the "direct effect" test.
[4] Also appended hereto, with the same numbering and lettering. Defendant surmises incorrectly that Plaintiff "possessed but had not presented" the documents in its opposition to Defendant's motion to dismiss. *Defendant's Second Motion to Dismiss*, at 1. Plaintiff uncovered the documents in its continuing efforts to unearth facts pertinent to this claim, and came into possession of the documents after the filing of its opposition.
Indeed, defendant rejected Plaintiff's March 10, 2007 proposal for an informal exchange of documents on the jurisdictional issue.
[5] An Iraq Press Release appended as **PX O** provided support for Plaintiff's request for limited discovery on Defendant's release argument.

2

On July 16, 2007, pursuant to Fed.R.Civ.P. 15(a), and *Confederate Memorial Ass'n, Inc.*

*v. Hines*, 995 F.2d 295, 299 *reh and reh en banc den* (D.C.Cir.1993), Plaintiff filed its First

Amended Complaint ("Compl." or the "Complaint"). Like the initial complaint, the First

Amended Complaint seeks relief in the nature of enforcement of a contract arbitration clause in

Count One, and damages for breach of contract in Count Two, and alleges, *inter alia*, that:

Defendant entered into a certain written contract (the "Contract") with Plaintiff for the provision
of engineering and construction services to be performed by Plaintiff in Iraq. Compl., at ¶ 4.

The Contract required Plaintiff to perform work, *inter alia*, on the Hilla- Diwaniya 4 Land
Reclamation Project for the State Organization for Land Reclamation, operating under the
authority of Iraq's Ministry of Agriculture and Irrigation of the Republic of Iraq. Compl., at ¶ 5.

The Contract provided, *inter alia*, that:

> If any dispute or difference of any kind whatsoever shall arise between the
> Employer and the Contractor in connection with or arising out of the contract or
> the carrying out of the Works (whether during the progress of the Works or after
> their completion and whether before or after the termination abandonment or
> breach of the contract) it shall in the first place be referred to and settled by the
> Engineer who shall give notice of his decision to the Employer and the
> Contractor... If the Employer or the Contractor be dissatisfied then with any such
> decision and in any such case either the Employer or the Contractor may within
> 30 days after receiving notice of such decision require that the matter be referred
> to a Committee of Arbitration to be formed in the following manner:
>
>> The Employer and the Contractor shall each appoint one
>> member to the Committee and the two members thus appointed
>> shall agree upon a third member to act as a Chairman of the
>> Committee. If agreement on the appointment of Chairman
>> cannot be reached within 14 days from the last date of their
>> appointment then the Employer or the Contractor shall each have
>> the right to ask a competent court to appoint the third member in
>> accordance with any proceedings provided in a special law of
>> arbitration....
>>
>> The Contract shall be subject to and construed according to
>> the Iraqi Laws regulations and instructions and the Iraqi courts
>> shall have exclusive jurisdiction to hear and determine all actions
>> and proceedings arising out of the Contract.

(the "Contract Arbitration Clause"). Compl., at ¶ 6.

On or about January 1991, Plaintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the Iraqi invasion and occupation of Kuwait. Compl., at ¶ 15.

The Complaint also described administrative debt recovery procedures before the United

Nations Compensation Commission (the "UNCC Claims"). Compl., at ¶¶ 21, 22, and IDRO, *id.*

at ¶¶ 22-27, and set out the three categories of direct effects in the United States which create

jurisdiction over the defendant under the Foreign Sovereign Immunities Act ("FSIA") *Id.*, at ¶¶

28-42.

On July 26, 2007, because of the filing of the First Amended Complaint, this court denied

as moot Defendant's motion to dismiss and Plaintiff's motion for leave to take limited discovery.

Defendant filed its Motion to Dismiss the First Amended Complaint ("Def. Motion") on

August 6, 2007.

### B. Summary of Argument

Defendant concedes, as it must, its contractual obligations to Plaintiff; and, Defendant

does not contest, at least for purposes of this motion, that it breached its contractual obligations to

Plaintiff. Nor does Defendant dispute that it is subject to an enforceable arbitration clause.

Indeed, Defendant insists that, "unless the Amended Complaint is dismissed for lack of

jurisdiction, the court **must** direct the parties to arbitration and either stay or dismiss the present

action pending the outcome of such arbitration. (Emphasis in original.)" Defendant's Second

Motion to Dismiss, at 23-24.

Thus, according to Defendant, the only impediment to the **grant** of Plaintiff's demand

under Count One of the First Amended Complaint[6] is a determination by this court that it lacks

jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), and, in particular, that there

was no "direct effect in the United States" within the meaning of 28 U.S.C. § 1605(2).[7]

---

[6] "…(P)laintiff demands … (e)ntry of an order, judgment and decree directing the parties to proceed to arbitration pursuant to the terms of the Agreement between the parties…." Compl., at *ad damnum* clause.
[7] *See* discussion in Section 3 below on the submission of affirmative defenses such as release and statutes of limitation to the arbitrators.

Defendant reiterates in its Second Motion to Dismiss its misplaced First Motion to Dismiss challenges to plaintiff's reliance on the use of American goods and services, and the nature of the construction projects as American military targets, as direct effects. But Defendant – confronted with recently-discovered documents establishing New York payment obligations – awkwardly abandons its previous position, drops without comment any reference to the District of Columbia Circuit's clearly controlling ruling in *I.T. Consultants Inc. v. The Islamic Republic of Pakistan*, 351 F.3d 1184 (D.C. Cir. 2003), and finds itself reduced to intolerably contorted constructions of those documents, coupled with groundless rumblings about "fraudulent" IDRO claims.[8]

Sovereign immunity is also unavailable to the Defendant because the contract's arbitration clause is a waiver of that immunity under 28 U.S.C. 1605 §§(a)(1) and (6).

Under 12(b)(6), Defendant has failed to meet its heavy burden with respect to the affirmative defense of the statute of limitations. Defendant has also failed to meet its equally-heavy burden with respect to the affirmative defense of release. In fact, the documents upon which Defendant purports to rely establish that the limited release into which the parties entered did not include, and was not intended to include, the claims in this case.

### C. Applicable Standards And Burdens Of Proof

Defendant contends under Fed.R.Civ.P. 12(b)(1) that the court lacks subject matter jurisdiction because Defendant is protected by sovereign immunity. Defendant moves to dismiss under Fed.R.Civ.P. 12(b)(6) because it contends that the claim is barred by a three-year statute of limitations and because plaintiff has released the claims.

---

[8] Plaintiff unhesitatingly stands by its IDRO claims. Defendant's cavalier "suggestions"— made without any investigation of any kind – of fraudulent conduct warrant even greater skepticism of defendant's repackaged challenge to jurisdiction.

### 1. Challenges to Subject Matter Jurisdiction Under Fed.R.Civ.P. 12(b)(1)

By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception, and how the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge.

If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff.

*Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40, 342 U.S.App.D.C. 145, 149

(D.C. Cir. 2000). Applying *Phoenix*, the District of Columbia Circuit in *Nemariam v. Federal*

*Democratic Republic of Ethiopia* --- F.3d ----, 2007 WL 1791098 (D.C.Cir. 2007) wrote that:

In their motion to dismiss, the CBE and Ethiopia did not dispute the appellants' factual allegations....Grounds for dismissal are based upon issues of law, and *underlying facts sufficient to support dismissal are not in dispute.* Accordingly, we must "take the appellants' factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the appellants (internal brackets, citations, quotation marks omitted, emphasis in original).

With respect to claims by Defendant that it is immune pursuant to the FSIA, the

allegations of the complaint should be more carefully examined. As the court in *Burnett v. Al*

*Baraka Inv. and Development Corp.,* 274 F.Supp.2d 86 (D.D.C. 2003) observed:

"Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." However, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." The district court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."

*Burnett v. Al Baraka Inv. and Development Corp.,* 292 F.Supp.2d 9, 14 (D.D.C. 2003)(citations

omitted).

It is beyond dispute that "... the foreign sovereign has the burden of proof." *El-Hadad v.*

*United Arab Emirates* --- F.3d ----, 2007 WL 2141943 *4 (D.C.,2007). And *see Princz v. F.R.G.,*

26 F.3d 1166, 1171 (D.C.Cir.1994), cited with approval in *El-Hadad, supra,* ("It is the burden of

the foreign sovereign in each case to establish its immunity by demonstrating that none of the

exceptions is applicable"); and *see Transamerican S.S. Corp. v. Somali Democratic Republic,* 767

F.2d 998, 247 U.S. App. D.C. 208 (1985), cited with approval in *Princz, supra* ("In accordance

with the restrictive view of sovereign immunity reflected in the FSIA, the burden of proof in

establishing the inapplicability of these exceptions is upon the party claiming immunity....").

"The district court retains considerable latitude in devising the procedures it will follow

to ferret out the facts pertinent to jurisdiction (internal quotation marks omitted)." *Phoenix,*

*supra,* at 40.

### 2. Assertions that the Complaint Fails to State a Claim Under Fed.R.Civ.P.12(b)(6)

> In general, against a motion to dismiss, once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint...construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged(internal citations, quotation marks, omitted).

*In re Sealed Case* --- F.3d ----, 2007 WL 2067029*4 (C.A.D.C.,2007).

In its motion, Defendant does not contend that the First Amended Complaint failed to

adequately plead a claim under either Count One ("Enforcement of Contract Arbitration Clause")

or Count Two ("Breach of Contract."). Rather, Defendant contends that the First Amended

Complaint should be dismissed because of the affirmative defenses of the statute of limitations

and release.[10] Defendant purports to support its statute of limitations defense with an extraneous

UNCC Report, and its release defense with an IDRO Invitation to Tender, **DX B**, at Document

19-8, and the Tender from Plaintiff. **DX C**, at Document 19-9.

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be

---

[10] Both "statute of limitations" and "release" are included among the affirmative defenses listed in Fed.R.Civ.P. 8(c).

> treated as one for summary judgment and disposed of as provided in Rule 56, and
> all parties shall be given reasonable opportunity to present all material made
> pertinent to such a motion by Rule 56.

*See Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

"…(T)he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56

when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'"

*Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2nd Cir. 2006).

Conversion is not required where the trial court considers material which is "integral" to

the complaint or "an appropriate subject for judicial notice." *Id*. As the court in *Global Network*

*Communications, Inc., supra*, made clear:

> "…(W)ith respect to whether the materials considered were integral to Global's
> complaint, a necessary prerequisite for that exception is that the 'plaintiff *rely* on
> the terms and effect of the document in drafting the complaint;" mere notice or
> possession is not enough (internal brackets and ellipses omitted, emphasis in
> original)."

At 156. The *Global* court rejected the contention that the complaint's reference to guilty pleas

opened the door to the content of the testimony proffered in exchange for the pleas. *Id*.

Emphasizing that the complaint neither "mentioned nor relied upon" the testimony, and

citing with approval a prior decision requiring that the complaint "relies *heavily* upon its terms

and effect (emphasis in original),"*id.*, the court noted that "(i)n most instances where this

exception is recognized, the incorporated material is a contract or other legal document

containing obligations upon which the plaintiff's complaint stands or falls…." At 157.

In *Fin. Sec. Assurance Inc. v. Stephens Inc.*, 450 F.3d 1257, 1264 (11th Cir. 2006), the

court tested whether a document was central to plaintiff's case by examining whether plaintiff

would have to offer the document to prove his case.

In the Complaint in this case, Plaintiff neither referred to nor relied on the invitation to

Tender or the Tender, or any alleged release language contained in either of those documents.

8

Neither document could conceivably be construed to be a requisite element of Plaintiff's case.

Thus, neither document can be considered integral to the claim.

Courts routinely reject attempts to assert the affirmative defense of release through a

12(b)(6) motion where the complaint did not itself rely on the document which contained the

alleged release. In *Levine v. Columbia Laboratories*, 2004 WL 1392372*1 (S.D.N.Y. 2004) the

court recognized that:

> The fundamental difficulty here is that the release is not referred to in the
> complaint. Columbia is seeking to invoke the release, an affirmative defense, in a
> motion to dismiss. While an affirmative defense properly may be raised by a
> motion to dismiss, that is so only where the defense appears on the face of the
> pleading and the documents incorporated therein. That is not the case here.
> Although the complaint contains a passing reference to the Separation and
> Consulting Agreement, it would be inappropriate to regard it as incorporating
> that document by reference.
>
> In the circumstances, the appropriate course is to deny the motion to dismiss,
> saving to defendant the ability to raise the release as a defense on a motion for
> summary judgment or at trial.

Similarly, in *Donahue v. Uno Restaurants L.L.C.*, 2006 WL 1373094*1 (N.D.N.Y. 2006),

the court concluded that a motion to dismiss could not be based on the affirmative defense of

release because the complaint made no reference to the release and the release did not form the

basis for the suit.

In *Perkins ex rel Estate of Perkins v. Ottershaw Investments Ltd.*, 2005 WL 3273747*3

(S.D.Fla. 2005) the court concluded that the release defense should be disposed of in a motion for

summary judgment, rather than a motion to dismiss. In comparison, in *Fitzpatrick v. Queen*, 2005

WL 11723776 *4, n.7 (E.D.Pa. 2005), the court emphasized that a motion to dismiss cannot

normally be based on a claimed release, but that, in the complaint before the court, the plaintiff

had "explicitly relied on" the agreement which contained the release language.

The First Amended Complaint neither referred to nor relied on either the Invitation to Tender or the Tender. Accordingly, the court may only consider those exhibits if it follows the conversion procedure described in Rule 12(b)(6).[11]

### SECTION TWO: THIS COURT HAS SUBJECT MATTER JURISDICTION

#### A. The Complaint Alleged Facts Sufficient Under Rule 12(b)(1) to Preclude Dismissal Under the FSIA's Direct Effect Test

The FSIA"…provides generally that a foreign state is immune from the jurisdiction of the United States courts unless one of the exceptions listed in 28 U.S.C. § 1605(a) applies." *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 235, 357 U.S.App.D.C. 107, 114 (D.C. Cir. 2003). "When one of these exceptions applies, the foreign sovereign is stripped of immunity and, pursuant to 28 U.S.C. § 1330(a), subject matter jurisdiction exists in the district court." *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 148 (2nd Cir. 1991), *aff'd Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394, 60 USLW 4510 (U.S.N.Y. Jun 12, 1992). As is set forth in the preceding section, defendant bears the burden of proof on the inapplicability of the exceptions.

Plaintiff proceeds in part under 28 U.S.C. §1605(a)(2), which provides that a sovereign state is not immune from suit in any case "in which the action is based … upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

Thus, the issues generally to be decided by the trial court "…are whether defendants engaged in 'commercial activity,' as opposed to sovereign activity, and whether such activity has caused a 'direct effect in the United States.'" [12] *Weltover, supra,* at p.149.

---

[11] In the event that the court determines that it will consider the exhibits appended to Defendant's motion, the court must provide Plaintiff with notice and an opportunity to conduct discovery on the issues raised by the exhibits. "When a district court converts a Rule 12(b)(6) motion to one for summary judgment, it must allow all parties both a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56' and a chance 'to pursue reasonable discovery.'" *Taylor v F.D.I.C.,* 132 F.3d 753, 765 (D.C. Cir. 1997).

The Complaint alleged three acts or activities which independently satisfy the direct effect requirement: payment was to be made at least in part by and through banking institutions in the United States; Compl., at ¶¶ 30-40; goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States; *id.*, at ¶ 29 and, the construction projects became foreseeable targets of opportunity and necessity for the United States military. *Id.*, at 41.

### 1. Defendant's Agreement to Make Contract Payments Into a New York Bank Account Satisfies the Direct Effect Test

Paragraph 30 of the First Amended Complaint alleges that: "(t)he obligations set out in the Contract had a direct effect in the United States, in that payment was to be made at least in part by and through *and into* [13] banking institutions in the United States(emphasis added). Compl., at ¶ 30. The Complaint then identifies ten documents which establish that payments required by the Contract were to be made to Credit Lyonnais Bank in New York. *Id.*, at 31-40.

Memorandum No. 2, **DX A**, Document 19-7, pp. 74-77, specifically identified the Contract in issue in this case, and provided that the "Iterbank Agreement" between Bulbank and CBI "shall be valid for this Contract...." Compl., at 31. It, further, permitted the "Contractor" to "transfer abroad 55%... of the total Contract value." The Memorandum added that "(t)his Memorandum shall be an integral part of the Contract...." In the 1984 Letter, **DX A**, Document 19-7, pp.86-88, defendant's Ministry of Irrigation wrote to plaintiff that: "... 55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between" CBI [14] and Bulbank[15]. The 1984 Letter added that "(t)his

---

[12] Defendant does not deny that the complaint alleges "commercial activity."

[13] Defendant appears to complain that plaintiff's initial complaint did not contain the "into" language. But plaintiff, which has unsuccessfully proposed an informal exchange of documents, prudently and appropriately deferred including that specific assertion until further investigation, including the discovery of documents now referenced in the Amended Complaint, were located.

[14] "State-owned central banks indisputably are included in the FSIA's definition of 'agency or instrumentality.' " *Em Ltd. v. Republic of Argentina* 473 F.3d 463, 472 (2d Cir.,2007). CBI, thus, acted as agent for defendant. Defendant describes CBI as a state-owned bank. Defendant's Second Motion to Dismiss, at 15.

letter and the documents and conditions of the contract are considered an inseparable part of the contract."

There can thus be no serious contention that the banking arrangements between CBI and Bulbank were somehow separate from and irrelevant to defendant's obligations to plaintiff. Nor can there be any legitimate claim that CBI and Bulbank were not acting as agents for their respective governments, and their respective government companies and ministries, for purposes of making payments required under the Contract.

In the Agreed Minutes (the "Minutes") of the Fifteenth Regular Session (the "15th Session") of the Bulgarian-Iraqi Joint Committee for Economic, Scientific and Technical Cooperation ( the "Joint Committee"):

> Both sides agreed that the amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between the parties in the present Agreed Minutes. Amounts due in 1983 will be settled in accordance with the contract conditions not later than 31 December 1983. **PX I.**

Bulbank and CBI entered into apparently undated Banking Arrangement No. (1) to undertake "implementation of the Agreed Minutes on Trade and (F)inancial Cooperation of the 17th Session of the (Joint Committee) on 13th February 1986 in Baghdad...." **PX L-1.** Banking Arrangement No. (1) provided, in part as follows:

> In conformity with item I (page 6) of the (Agreed minutes) the Bulgarian prty shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments. Banking Arrangement No.1 also provided that:
>
> (Bulbank) shall send to (CBI) debit advises accompanied by interest tables for each interest calculation...The (CBI) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.

---

[15] Defendant characterizes plaintiff in 1985 as "a Bulgarian company under a communist regime." Defendant's Second Motion to Dismiss, at 16, n.8, and refers to "various other state-owned enterprises." Id, at 15. Bulgaria has since democratized, and plaintiff has been privatized. Prior to democratization, Bulgaria followed the customary communist pattern of central planning and a single state-run bank performing all banking and investment functions. Bulbank was then a subsidiary of the Bulgarian National Bank, and is characterized by defendant as a state-owned bank." *Id.*, at 15.

The latest by crediting the account of the Bul Bank (w)ith Credit lyonnais, New york (sic), under telex advice to the Bul Bank....

On the respective maturity date (CBI) shall credit the account of the Bul Bank with Credit Lyonaisse, New york (sic) in convertible US. Dollars with the amount of principal, under telex advices to Bul Bank...
(CBI) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective (Credit Account) as well as, the interest accrued under these amounts entered in the respective (Interest Account) mentioned in Article (1) above.(emphasis added).

Banking Arrangement No. 1 appears to have been signed on "1.07.1986."

Banking Arrangement No. 3, **PX L-2,** between Bulbank and CBI, also apparently signed

on "1.07.1986," was designed to implement the "trade and Financial Co. Operation" of the 17th

Session of the Joint Committee, and it provided in part as follows:

In confirmity [sic] with item 4 page 8 of the agreed Minutes, the Bulgarian Party responsed [sic] to the request of the Iraqi Party that all payments due or which will fall due to the Bulgarian side in Convartible [sic] Currency during 1986 under all existing Civilian and special Banking Arrangments [sic] and commercial Contracts shall be settled as follows:

A. 50% shall be paid in 1986 in accordance with relevant Contracts and Banking Arrangements.

B. 50% shall be paid one year from the dates of maturity in accordance with relevant contracts and Banking Arrangements.

C. Deferred payments bear simple interest rate of 5 (Five) percent annum....

On the respective maturity dates, *"CBI" shall credit the Accounts of "BulBank" with Credit Lyonnais, New - York, in convertible US. Dollars with amounts of due payments mentioned in article 1 above plus their interest,* advising Simultansusly [sic] the "BulBank" by telexes....

CBI Guarntees [sic] with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 1 abovePlus [sic] its interest according to the Banking Arrangement dates 15th 5. 1985 and 13th October 1985.

The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment [sic] of all obligations, esusing [sic] thereform [sic].(emphasis added).

The Protocol of the 17th Session's Workgroup on Economic Partnership stated:

...The Bulgarian party took all necessary steps in the period between the Seventeenth and the Eighteenth Sessions of the Bulgarian -Iraqi (Joint Committee) enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hal-Davana-4'. ...

Outstanding payments of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity....

*(Bulbank) and (CBI) shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.* (emphasis added). **PX J-3.**

These documents show that Defendant's payments under the Contract would be made by

its agent CBI to an account at Credit Lyonnais in New York.[16]

In *Weltover,* an FSIA breach of contract action arising out of Argentina's unilateral

extension of time to pay bonds, the Supreme Court ruled:...(W)e reject the suggestion that

§1605(a)(2) contains an unexpressed requirement of 'substantiality' or 'foreseeability....' (A)n

effect is 'direct' if it follows as an immediate consequence of the defendant's activity (internal

ellipses omitted)". *Weltover,* at 618, 2168. As the Supreme Court further explained:

We ... have little difficulty concluding that Argentina's unilateral rescheduling of the maturity dates on the Bonds had a "direct effect" in the United States. Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming. We reject Argentina's suggestion that the "direct

---

[16] Defendant complains that paragraph 30 is phrased in the "passive voice," Defendant's Second Motion to Dismiss, at 14, and fails to allege that payments "**to Agrocomplect** were required to be paid **by the Republic in the United States pursuant to the Contract**...(emphasis in original)." *Id.,* at 11-12. This stunningly sophistic critique, among its many failings, simply ignores the remainder of the Complaint, in which plaintiff referred to payments as those obligations due from defendant to plaintiff under the contract. *See* Complaint, at ¶ 18 ("...Iraq has failed and refused to pay to Plaintiff the sums due and owing under the Contract;" ¶ 53("Unpaid contract amounts are due to be paid to Plaintiff by Defendant pursuant to the provisions of Sections 67 and 68 of the Contract." Though it is absolutely unnecessary, plaintiff is certainly prepared to amend the complaint so that paragraph 30 repeats and incorporates the averments of paragraphs 18 and 53, and avers that the payments to which paragraph 30 refers were payments due from defendant to plaintiff.

effect" requirement cannot be satisfied where the plaintiffs are all foreign
corporations with no other connections to the United States.

*Weltover*, at 618-619, 2168-2169.

In *Commercial Bank of Kuwait v. Rafidain Bank and Central Bank of Iraq*, 15 F.3d 238

(2d Cir. 1994), plaintiff sued the Iraqi banks because they suspended payments after the invasion

of Kuwait. The defendants contended that the direct effect test was not satisfied because "the

payments were to be made not directly to Commercial but to New York bank accounts held by

the lead banks of the various lending syndicates." At 241. They thus claimed that "because the

United States is not the place of performance of any contractual obligations owed to this plaintiff,

there is no 'direct effect." *Id.*

Relying on *Weltover*, the Second Circuit rejected that argument, and reiterated that the

exception applies to "commercial activities of foreign sovereigns that have an impact within the

United States." *Id. Commercial* thus establishes that the direct effect is not limited to effects on

the plaintiff. And *see United World Trade Inc. v. Mangyshlakneft Oil Prod. Assoc.*, 33 F.3d 1232,

1236-38 (10th Cir.1994), see also *IDAS Resources, N.V. v. Empresa National de Diamantes de

Angola E.P.*, 2006 WL 3060017*7 (D.D.C. 2006), and *see Maritime International Nominees

Establishment v. The Republic of Guinea*, 693 F.2d 1094, 1110, 1111 (D.C.Cir. 1983)(applies

pre-*Weltover* foreseeability test to reject immunity exception, but recognizes that injury to non-

party could constitute direct effect.)

The District of Columbia Circuit addressed *Weltover* in *I.T. Consultants Inc. v. The

Islamic Republic of Pakistan*, 351 F.3d 1184 (D.C. Cir. 2003). Discussing its earlier decision in

*Goodman Holdings v. Rafidain Bank* 26 F.3d 1143 (D.C.Cir. 1994), the Court ruled that:

> a foreign sovereign's failure to make a contractually required deposit in a bank in
> the United States meets the statute's definition of a "direct effect," without regard
> to whether the parties considered the place of payment "important," "critical," or
> "integral."

*I.T. Consultants* at 1186. The court then harmonized its ruling with *Weltover* and *Goodman

Holdings* by explaining that the bank account upon which plaintiffs based their argument in

15

*Goodman Holdings* was nothing more than an Iraqi account in the United States which had no connection to the activities in issue, but which had occasionally been used in the past to make payments to creditors.  At 1190.

In *Weltover*, by *I.T. Consultant's* dispositive contrast, "(s)everal bondholders balked at (Argentina's election to delay payment) and demanded full payment, naming New York as the place of payment...." At 1189.  The court then characterized it as a "quibble" Pakistan's dispute about the contractual requirements, and their distinction "from those in *Weltover*, where the payee's specification of payment was *also* not contemporaneous with the signing of the underlying agreement...(emphasis added)". At 1190.  *I.T. Consultants* did not, therefore, insist that the contract documents themselves contain an obligation for performance in the United States.

In her concurrence in *Goodman Holdings*, Judge Wald stressed that: "I write separately to emphasize that, for an act to have a 'direct effect' in the United States, there is no prerequisite that that the United States be contractually designated as the place of performance." *Goodman Holdings*, at 1147 (Wald, concurring). Judge Wald's concurrence comports with the opinion in *I.T. Consultants*.

As noted above, the Circuit emphasized in *I.T. Consultants* that the specification of payments in the United States was not contained in the contract. In *Hanil Bank v. Pt. Bank Negara Indonesia*, 148 F.3d 127 (2nd Cir. 1988), on which *I.T. Consultants* in part relied, at 1189, n.2, the Second Circuit wrote:

> Even assuming that Indonesia *is* the place of performance under letter of credit law, *Weltover* does not insist the "place of performance" be in the United States in order for a financial transaction to cause a direct effect in this country.  Rather, it only requires an effect in the United States that follows as an immediate consequence of the defendant's actions overseas.  At 133.

In *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 239 (2nd Cir. 2002), the Second Circuit wrote:

16

> Every circuit court of which we are aware that has addressed this issue has held-without reference to whether the plaintiff was a corporation, a non-corporate business entity, or a natural person-that an anticipatory contractual breach occurs "in the United States" for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there.

Nothing in *Weltover* contained the contract clause requirement now demanded by

defendant, and its reliance on *Peterson v. The Royal Kingdom of Saudi Arabia,* 416 F.3d 83

(D.C.Cir. 2005) is unavailing. As the *Peterson* court emphasized:

> These assertions evidence no agreement – implied or express – that Peterson was to be paid in the United States.  In fact, he was not paid in the United States....Peterson not only received his refund in Saudi Arabia, but deposited it in a Saudi bank as well – the entire transaction occurred outside the United States. At 91.

*Peterson's* recitation of the fact that there was no agreement was not, and under *Weltover*

could not have been, intended as a requirement designed to satisfy *Weltover's* "immediate

consequence" test. In all events, the averments of the Complaint set out a chain of facts, and

agreements, which together incorporate into the contract the New York banking arrangements

which provided for payment into a New York bank.

Tellingly, defendant is now absolutely silent on this Circuit's controlling decision in *I.T.*

*Consultants,* notwithstanding its reliance on that decision in its First Motion to Dismiss.[17]  In its

earlier formulation, elucidated by *I.T.Consultants*, defendant referred to "deposits ***into*** United

States bank accounts as the place of contractual performance by the foreign state defendant that

have typically been found to met the direct effect test." Defendant's Reply, at 5, n.4. That is, of

course, the essence of the First Amended Complaint's averments

---

[17] In its Reply, defendant sought to distinguish *I.T. Consultants*, along with *Hanil Bank, supra,* and *Virtual Countries, supra,* from its construction of the averments of the initial complaint by emphasizing that " the ***foreign state*** in each of those cases ***was*** under an obligation to make payments ***into*** a United States bank account under a contract that allowed plaintiff to designate the place of payment(emphasis in original)." At 7, n.5. That distinction cannot be applied to the Amended Complaint.

It is of absolutely no moment that some provisions of some of the banking arrangements may have some attributes of a "trade financing agreement,"[18] Defendant's Second Motion to Dismiss, at 12, 14, or "general trade cooperation agreements," *id.* at 13. The arrangements, taken together, provide for precisely the sort of payment – into a bank account in the United States – which constitutes a direct effect under both *Weltover* and *I.T. Consultants*. Those arrangements are, as the documents reflect, part of the contract; moreover, they can no more be construed to be an intervening event for purposes of identifying a direct effect in the United States, Defendant's Second Motion to Dismiss, at 15, than each bank's likely agreements in *Weltover* and *I.T.Consultants* to follow the instructions of its customer and to deliver to the customer payments directed to the customer's account.

Under *Weltover* and *I.T.Consultants,* the direct effect test is satisfied by the agreement to make payments under the contract into a New York bank account.

### 2. That Goods and Services Required Under the Contract Were to be Supplied In Part By American Contractors Was A Direct Effect In the United States

Defendant's challenges to the sufficiency of the Complaint's American goods and services allegations on three grounds: 1) the absence of a contractual obligation; 2) the absence of a direct and immediate effect as a consequence of defendant's actions and; 3) the failure to allege a requisite effect on the American supplier. Each contention fails.

First, and as is set forth above, neither this Circuit, nor the Supreme Court has ever imposed a requirement that there must be a contractual provision mandating performance in the United States. *Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank,* 251 F. Supp. 2d 126 (D.D.C. 2003), upon which defendant relies simply overstates the direct effects requirements and overlooks Judge Wald's concurring opinion in *Goodman Holdings.*

---

[18] See, in any event, *National Westminster Bank PLCc v. Grant Prideco, Inc.* 261 F.Supp.2d 265, 273 (S.D.N.Y.,2003) (discussing the third party beneficiary relationships which can flow from trade financing agreements).

Secondly, defendant's contention that plaintiff's election to retain American contractors or to use American supplies is an intervening element which interrupts the straight line to the effect in the United States simply proves too much. To the extent that the defendant's argument is not a repackaged version of its argument that any direct effect must be mandated by a contractual provision, it would mean that any effect in the United States which resulted in part from the exercise of any contractually-authorized discretion by plaintiff would be insufficient.

In *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534 (11th Cir.1993), . Vermeulen was driving a Renault in Georgia when she was injured in an accident. The car was designed and manufactured by a corporation which was wholly owned by the French government. *Id.* at 1537. The court applied the *Weltover* test and held: "The complaint in this case alleges that the injuries Vermeulen suffered in an automobile accident on the roads of Georgia were the result of RNUR's negligent design and manufacture of the LeCar passenger restraint system. We can hardly imagine a more immediate consequence of the defendant's activity." *Id.* at 1545.

Under defendant's intervening element test, Vermeulen would lose, because Vermeulen made the decisions to purchase the car, drive the car on the roads of Georgia.

Third, plaintiff does not allege loss by the American contractors and suppliers nor is it required to. As noted above, "(n)othing in the commercial activity exception expressly limits cognizable effects to those felt solely by plaintiff." Morris v. People's Republic of China 478 F.Supp. 2d 561, 568 (S.D.N.Y. 2007). The direct effect is comprised of the considerable undertakings in the United States by the suppliers and contractors in order to satisfy the requirements of defendant's commercial contract. *See, e.g., Honduras Aircraft Registry, Ltd. v. The Gov't of Honduras,* 129 F.3d 543, 559 (11th Cir. 1997) (looking to the offices and registry database that were to be established and maintained in Florida, and computers and other equipment that were to be purchased in the United States).

19

### 3. Construction of Facilities Which Became American Military Targets Had a Direct Effect in The United States

Defendant does not dispute, at least for purposes of this motion, that the construction projects undertaken pursuant to the Contract, including Plaintiff's machinery, production base, and camp facilities became American military targets, and that the American military expended resources to destroy those targets. Compl. at ¶¶ 15, 41. Nor does Defendant appear to contend that the "act" to which §1605(a)(2) refers excludes the entry into, and partial performance under, and supervision of performance, under the contract.

Rather, Defendant insists that:

"there is no conceivable connection between the Contract, or Iraq's breach thereof, and the alleged destruction of Agrocomplect's work sites in Iraq by the United States military...Moreover, there is no conceivable explanation for how the destruction of construction sites in Iraq could possibly constitute a direct effect in the United States"

Second Motion to Dismiss, at 16-17. Defendant is wrong.

First, the "connection" between the contract which resulted in the construction of military targets and the destruction of those targets, is apparent. In the absence of the Contract, there would have been no construction project, and thus, no military attack on the construction project. As is discussed above, *Weltover* rejected both "foreseeability" and "substantiality" tests. *Weltover*, at 618, 2168.

Whether or not the American military attacks were foreseeable, the fact remains that the American military attacks destroyed the Contract's sole product.

As to effect "in the United States," it is a particularly safe inference for purposes of their motion that the commitment of American military time, equipment, resources and, in particular, personnel, and the planning associated with the undertaking, had a direct effect in the United States.

### B. The Arbitration Clause Is A Waiver of Sovereign Immunity

---

[22] The application in this case of section 1605(a)(6)(C) is coterminous with 28 U.S.C. § 1605(a)(2), discussed in Section II above.

28 U.S.C. 1605(a)(6) rejects sovereign immunity in any case

> in which the action is brought, either to enforce an agreement ... to submit to arbitration all or any differences which have arisen or which may arise between the parties ... or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable....

Both 1605(a)(6)(B) and (C) [22] apply to this case, and preclude defendant's assertion of sovereign immunity.

Defendant concedes, as it must, that the *Convention on the Recognition and Enforcement of Foreign Arbitral Awards* 21 U.S.T. 2517, 9 U.S.C.§ 201 ( the "New York Convention") is a "treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C.§ 1605(a)(B). [23] Defendant's Second Motion to Dismiss, at 22.

In *Creighton Ltd. v. Gov't of the State of Qatar* 181 F.3d 118 (D.C. Cir. 1999), the District of Columbia Circuit wrote that:

> Qatar does not contest Creighton's assertion that because the New York Convention calls for enforcement of any arbitral award rendered within the jurisdiction of a signatory country, the quoted exception applies by its terms to this action. Indeed, it has been said with authority that the New York Convention "is exactly the sort of treaty Congress intended to include in the arbitration exception." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993); *see also Chromalloy Aeroservices v. Arab Republic of Egypt,* 939 F.Supp. 907, 909      (D.D.C.1996). At 123-124.

There thus appears to be no dispute that an arbitration proceeding conducted in a country which is a signatory to the New York Convention is "governed" by the New York Convention within the meaning of 1605(a)(6)(B). The arbitration clause itself, of course, does not specify a venue.

---

[23] Congress passed Article II of the Federal Arbitration Act ("FAA") in 1970. 9 U.S.C. § 201 *et.seq.* Article II implements the New York Convention.

The language of section1605(a) (6)(B) does not require that the arbitration clause contain

a venue clause specifying a jurisdiction which is a signatory to the New York Convention.  To the

contrary, section 1605(a) (6)(B) refers to an "agreement or award which is *or may be*

...(emphasis added)" governed by the New York Convention. As the Second Circuit stated in

*Cargill, supra*: "...

> ...(T)he Convention should be broadly interpreted to effectuate the goals of the
> legislation. Moreover, when the Convention is read together with the FSIA's
> arbitration exception, which gives jurisdiction if an arbitration agreement "is or
> *may be* governed" by a treaty, 28 U.S.C. § 1605(a)(6)(B) (emphasis added), it
> evinces a strong legislative intent to provide enforcement for such agreements
> (emphasis in original). At 1018.

Thus, unless the arbitration agreement itself requires that the arbitration proceeding take

place in a jurisdiction which is not a signatory to the New York Convention, section 1605(a)

(6)(B) will preclude the assertion of sovereign immunity.

In order to escape the clear dictates of (6)(B), defendant urges this court to conclude as a matter

of law  that "the parties intended any necessary arbitration to take place in Iraq." Defendant's

Second Motion to Dismiss, at 20.

The  UNCITRAL [24]Model Law On International Commercial Arbitration,  at article 20(1)

provides, "the parties are free to agree on the place of arbitration. Failing such agreement, the

place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances

of the case, including the convenience of the parties." [25] Those circumstances do not mandate Iraq

as  the sole available forum.

To the contrary, the Contract contemplated an Arbitration Committee comprised, after a

dispute has arisen which could not be resolved amicably, of three members —with each party

selecting one member.  There is no reason to conclude that a disgruntled party would elect a

distant forum convenient to its arbitration opponent, or that it would elect a panel member likely

---

[24]  The United Nations Commission on International Trade Law.

[25] The FAA authorizes a court to compel arbitration in its own judicial district. *See See Manny Pollak & Co., Inc. v. Shelgem, Ltd.*, 1990 WL 180171*2-3 (S.D.N.Y.,1990).

to insist on a forum in Iraq.. As the court in *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya*, 482 F.Supp. 1175, 1178 (D.D.C., 1980), vacated *Libyan American Oil Company v. Socialist People's Libyan Arab Jamahirya*, 684 F.2d 1032, 221 U.S.App.D.C. 510 (D.C.Cir. May 06, 1981) ruled:

> The 1955 agreement had provided that any eventual arbitration should take place in Libya's capitol, Tripoli. The clause that LIAMCO proposed in 1966, however, provided that arbitration should take place either where the parties agreed, or where the arbitrators might agree. Libya agreed to this provision. Although the United States was not named, consent to have a dispute arbitrated where the arbitrators might determine was certainly consent to have it arbitrated in the United States.

To support its contention that the parties somehow silently agreed to an arbitral forum in Iraq, defendant points to a forum selection court for judicial proceedings, [26] a choice of Iraqi law provision, and, "critically," the requirement that the arbitration be conducted "under Iraqi arbitral law and rules." Defendant's Second Motion to Dismiss, at 20. But each of those decisions simply cannot lead to the conclusion that plaintiff contractually agreed to arbitrate any disputes in Iraq.

First, to the extent that the court undertakes to construe the agreement in order to divine a mandated arbitral forum, the parties' decision to identify such a forum for judicial proceedings, but not for arbitration proceedings, weighs against the construction urged by defendant. Self-evidently, the parties showed themselves to be perfectly capable of identifying a forum when they wished to do so.

---

[26] Defendant, in a passing sentence, suggests that the court is "separately bound" by the forum selection clause "to dismiss the Complaint." Motion, at 18-19. A motion to dismiss based on a forum selection clause is brought, where no transfer is or can be sought under 28 U.S.C.§ 1404, under Rule 12(b)(3). *D/H Oil and Gas Co. v. Commerce and Industry Insurance Company*, __ F.Supp.2d,__ (N.D.Fla.,2005), 2005 WL 1153332*3.

12(b)(3) was not identified by Defendant as one of the bases for its motion, and, in its Reply to plaintiff's opposition to defendant's first motion to dismiss, defendant noted that " the Republic does not argue that the court should enforce the Forum Selection Clause," Reply, at 16, n.11. In any event, the standards applicable to enforcement of a forum selection clause would mandate denial of a forum selection clause motion under Fed.R.Civ.P. 12(b)(3) because, even if a forum selection clause is mandatory on its face, it will not be enforced if there is a "compelling and countervailing reason." *McDonnell Douglas Corp. v. Islamic Republic of Iran* 758 F.2d 341, 345 (8th Cir. 1985) (declining to enforce clause selecting Iran as the forum in view of the inadequacies of its judicial system and the hostilities and dangers in Iran. *See* PX A-1, A-2, A-3 (establishing the dangers in the current security environment in Iraq, and the absence of an effective, reliable or credible judicial system).

Secondly, there is simply no reason to conclude that the selection of Iraqi law implies the selection of an Iraqi arbitral forum. Courts routinely apply foreign law. *See, e.g.,* Fed.R.Civ.P. 44.1. Arbitrators should have no greater difficulty, even if they are not conducting hearings in Iraq.

Finally, the "Iraqi arbitral law and rules" are neither difficult to apply in any forum, nor uniquely suited to an Iraqi forum. *See* Iraqi Civil Procedure Code, Chapter II, Arbitration, Articles 251-276, appended to Jalili, Mahir *International Arbitration in Iraq* Journal of International Arbitration, 124-130, appended to defendant's Second Motion to Dismiss at Document 19-2. Those rules are no more complex or burdensome than the widely-utilized UNCITRAL Arbitration Rules, (1976), reprinted in 2 Yearbook Commercial Arbitration 167 (1977), or the *Rules of Conciliation and Arbitration of the International Chamber of Commerce* in Paris. *See.TermoRio S.A. E.S.P. v. Electranta S.P.* 487 F.3d 928, 931 (.D.C.,2007).

Because this court cannot conclude as a matter of law that the parties agreed that any arbitration had to be conducted only in Iraq, the FSIA's section 1605(a)(6)(B) must be deemed to be applicable. As result, Defendant does not enjoy the protection of sovereign immunity in this case.

## SECTION THREE: DISPOSITION OF AFFIRMATIVE DEFENSES IN ARBITRATION

In the event that the court determines that it has subject matter jurisdiction, the court must determine whether it should direct the parties to proceed to arbitration on all issues, including the affirmative defenses of statute of limitations and release.

In *Hanes Corp. v. Millard,* 531 F.2d 585, 599 (D.C., 1976), the District of Columbia Circuit determined that disposition of a statute of limitations defense – even if it was applicable to a challenge to the enforceability of the arbitration provision itself – was a matter to be left to the arbitrator. That approach has been consistently applied to all non-"gateway" defenses.

"The role of the court in the arbitration process is carefully circumscribed. The court at the outset is simply to decide whether a question of arbitrability exists and if it decides in the

24

affirmative, all other issues are for the arbitrator absent fraud." *Windward Agency, Inc. v. Cologne Life Reinsurance Co.*, 353 F.Supp.2d 538, 542 (E.D.Pa.,2003). "In the absence of any compelling need to intervene to protect the integrity of the arbitration process, the court will leave it to the arbitrator to decide the merits of the Union's grievances, as well as any defenses...." *AG Communications Systems Corp. v. International Broth. of Electrical Workers, Local Union No. 21,* 2005 WL 731026*12 (N.D.Ill.,2005).

Thus, issues other than the "...basic question of whether the parties have agreed to arbitrate the dispute...such as procedural questions, or ones which bear on the final disposition, including allegations of waiver, delay, or like defenses, are for the arbitrators to decide" *Walnut Street Securities, Inc. v. Lisk* --- F.Supp.2d ----, 2007 WL 2094902 (M.D.N.C.,2007). And *see Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1109 (11th Cir.2004) ("Arbitrators ... are empowered, absent an agreement to the contrary, to resolve disputes over whether a particular claim may be successfully litigated anywhere at all (due to concerns such as statute of limitations, laches, justiciability, etc.), or has any substantive merit whatsoever."). *See also Rollins, Inc. v. Foster,* 991 F.Supp. 1426, 1431 (M.D.Ala.1998) ("challenges to the validity of the contract as a whole must be presented to the arbitrator."); and *see Boateng v. General Dynamics Corp.,* 473 F.Supp.2d 241, 250 (D.Mass.,2007)("...defenses of waiver, estoppel, and material breach are matters for the arbitrator, rather than the Court, to decide.")

## SECTION FOUR:  THE COMPLAINT STATES A CLAIM

### A.  Defendant Failed To Meet Its Burden On the Affirmative Defense of the Statute of Limitations

In this Circuit, motions to dismiss based on a statute of limitations are disfavored, because an assessment of defendant's satisfaction of its burden of proof is necessarily fact-specific, as are principles of equitable tolling, waiver and estoppel. In this case, defendant has failed to meet its affirmative defense burden.

### 1.  Motions To Dismiss on Statute of Limitations Grounds Are Disfavored

In *Richards v. Mileski,* 662 F.2d 65, 72 (D.C.Cir.1981), the Court noted that:

> There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, *it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense.* The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal. We do not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise
>
> such an affirmative defense (emphasis added).

*Id.*, cited with approval in *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1117 (D.C. Cir.

1985)(Wald, dissenting). As Judge Urbina recently wrote in *Potts v. Howard University* 240

F.R.D. 14, 17-18 (D.D.C. 2007):

> Because statute of limitations issues often depend on contested questions of fact, however, the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C.Cir.1996). Rather, the court should   grant a motion to dismiss only if the complaint on its face is
> *conclusively time-barred.*(emphasis added)

### 2. Defendant Failed To Meet Its Burden of Proof On the Commencement and the Running of A Statute of Limitations

The statute of limitations is an affirmative defense which the party asserting it must

allege and prove. *Cunningham & Associates v. Dugan,* 909 A.2d 1001, 1006 (D.C., 1996).

"…(T)he statute of limitations begins to run when a claim accrues, and … a cause of action

accrues when its elements are present, so that the plaintiff could maintain a successful suit." *News*

*World Communications, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C., 2005).

Defendant's motion fails to meet that standard with respect to each of the elements of a

statute of limitations defense.

First, Defendant offers no rationale for its assertion that the court should look to the statute applicable to simple contracts, rather than contracts under seal.[27] The appropriate statute of limitations for actions on an instrument under seal is twelve years.

D.C.Code § 12-301(6).  And *see District of Columbia Water and Sewer Authority v. Delon Hampton & Associates,* 851 A.2d 410, 417 (D.C.,2004)(discussing indicia that contracts are under seal), and *Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.* 691 A.2d 1153, 1156 (D.C.,1997)(same).

Secondly, Defendant makes no serious attempt to define the actual date of accrual of the claim.

Count One of the Complaint alleges, without the inclusion of particular dates, that "Defendant has failed and refused to participate in the arbitration process set out in the Contract." Complaint, at ¶ 35.[28] The Contract Arbitration Clause sets out a multi-step procedure which can be commenced before or after termination, abandonment or breach of the Contract. Complaint, at ¶ 6.  Defendant, however, makes no reference at all to the time or the dates of their breach of the Contract Arbitration Clause.

As the District of Columbia Circuit stated in *Exxon Chemical Co. v. N.L.R.B.,*  386 F.3d 1160, 1164 (D.C. Cir., 2004):

> We address at the outset Exxon's contention that the unfair labor practice charge was barred by the six-month limitations period...The statute begins to run when the unfair labor practice occurs.... Here, the unfair labor practice is Exxon's refusal to arbitrate. As the record makes clear, the Union did not request, and the employer therefore could not have refused, arbitration until March 26, 1999, which was less than six months before the Union filed the charge. Therefore, the unfair labor practice charge is timely.

---

[27] A standard choice of law provision in a contract is "generally understood to incorporate only substantive law, not procedural law such as statutes of limitation." *Olivarius v. Stanley J. Sarnoff Endowment for Cardiovascular Science,* 858 A.2d 457, 463 (D.C., 2004), and *see* Complaint, at ¶ 6 (reciting contract provision selecting Iraqi law).

[28] In suits to compel arbitration, a federal district court borrows the applicable statute of limitations and tolling rules from the state in which it sits.  20 Williston on Contracts, § 56:63 (Fourth Ed. 2001).

And *see Williston, supra,* at § 56:63 (cause of action accrues when the grievance procedure is exhausted or breaks down). The statute of limitations applicable to Count One therefore begins to run only upon the refusal by Defendant to arbitrate the dispute between the parties as required by the Contract. Neither the Complaint nor the motion identifies that date.

Similarly, as to Count Two, Defendant fails to identify the accrual of the breach of contract cause of action. While Defendant takes pains to lay out some of the details surrounding the 1991 destruction of Plaintiff's equipment, it offers no facts of any kind to suggest, much less conclusively establish, that payment was due immediately thereafter.

"The general rule in the District is that a claim for breach of contract accrues 'when the contract is first breached.'" *Material Supply Intern., Inc. v. Sunmatch Indus. Co., Ltd.* 146 F.3d 983, 992 (D.C.,1998).

> It is fundamental that a cause of action in contract accrues at the time of the breach or failure to do the thing agreed to and that *in the case of contracts calling for the payment of money there can be no action at law commenced for the recovery of the money before it becomes payable* in accordance with the terms of the contract (Emphasis added).

*Werber v. Atkinson,* 84 A.2d 111, 114 (D.C.App. 1951).

As is discussed above, Defendant's payment obligations under the contract between the parties were affected by the banking arrangements between CBI and Bulbank. But Defendant does not point to the due dates for payments under those provisions. Defendant makes no attempt to identify "the terms of the contract" according to which money owed to Plaintiff "becomes payable." Defendant has thus failed to identify the date of its own breach of the Contract, and, as a consequence, cannot be found to have "conclusively" established the running of the statute of limitations.

It is not enough to argue in this case that a party must make a demand within a reasonable time. *See Nyhus v. Travel Mgmt. Corp.,* 466 F.2d 440, 452-53 (D.C.Cir. 1972). As the Complaint alleges:

On March 1, 2000, Iraq and Bulgaria agreed, in the form of Agreed Minutes, during discussions on "Iraqi debt obligations owed to Bulgaria...," that:

> ...crude oil shall be utilized for payment of the existing debts together with those becoming due until 31st December 1994....
>
> *To implement these Agreed Minutes, Banking Arrangements between (CBI) and (Bulbank) shall be concluded as soon as possible (*emphasis added). Compl., at 39, **PX J-3.**

Two years later, on February 16, 2002, CBI wrote to Bulbank, in part, as follows:

> With reference to your Statements dated 1/1/2002 and 24/1/2002.
> We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist, and the sanctions imposed on Iraq are lifted taking into consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled. Compl., at ¶ 40. **PX N.**

With a chronology that includes two wars, a sanctions regime imposed continuously between those wars on a government run by a brutal dictatorial regime, a UNCC process which commenced in 1991, United Nations Security Council Resolutions 687 (1991) and 692 (1991), and which resulted in a decision in 1999, Compl., at 22 , and an IDRO process that commenced no later than 2004 and ran through 2006, **DX B**, at p.2, Document 19-8, p.8, the court cannot on the record before it identify a reasonable continuous period of time over which even a three year statute can be said conclusively as a matter of law to have commenced, and run.

### 3. Principles of Equitable Tolling, Waiver and Estoppel Preclude Dismissal [29]

As Judge Roberts wrote in *Gupta v. Northrop Grumman Corp.*, 462 F.Supp.2d 56, 59(D.D.C., 2006):

> A requirement that Gupta file his administrative complaint in 300 days or his court complaint within three years is not a jurisdictional prerequisite to filing the action in court, however, and may be equitably tolled in extraordinary circumstances. *See Zipes v. TWA*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a

---

[29] As a general rule, federal courts do not apply state tolling rules when "it [is] more appropriate to use federal equitable tolling rules." Wright, Charles Alan, et.al., *Federal Practice and Procedure, §4519*

jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling."); *Chung v. Dep't of Justice,* 333 F.3d 273, 275-76 (D.C.Cir.2003) ("In litigation between private parties, courts have long invoked waiver, estoppel, and equitable tolling to ameliorate the inequities that can arise from strict application of a statute of limitations.").

The Complaint alleges the implementation of both the UNCC Claims procedure, Complaint, at ¶¶ 21-22, and the IDRO claims procedure, Complaint, ¶¶ 23-26, as well as the imposition of an international embargo. Complaint, at ¶ 14.[30]  In 2000 Defendant agreed to enter into banking arrangements for payment, and in 2002 Defendant claimed that sanctions made it impossible for defendant to meet its obligations. Each of these events provides a "state of facts" sufficient to preclude on this record and at this stage a conclusive determination as a matter of law that neither waiver, estoppel nor equitable tolling is applicable to the defendant's statute of limitations defense.

Moreover, the wars in Iraq and the associated hostilities, dangers and instability in the period of time between the wars, tolled the statute, particularly insofar as Iraq was the requisite forum.

"Federal courts have also applied a theory of equitable tolling similar to an `impossibility' doctrine. Where extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled until the barrier caused by these events is removed." *Forti v. Suarez-Mason,* 672 F.Supp. 1531, 1550 (N.D.Cal. 1987). Even though, nominally, the Argentine courts were open to the plaintiffs, the court in *Forti*

---

[30] United Nations Security Council Resolution 661, adopted on August 6, 1990, S/RES/0661(1990), precluded every state and its nationals from, *inter alia,* providing the Government of Iraq or to any commercial, industrial or public utility undertaking in Iraq or Kuwait, any funds or any other financial or economic resources and from remitting any other funds to persons or bodies within Iraq or Kuwait, except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs.

One commentator, perhaps broadly, observed that "(i)n the Iraq case, implementing a stay on the enforcement of creditor's rights to use litigation to collect unpaid sovereign debt was a major priority and was implemented by UNSCR 1483 shortly after the collapse of the Saddam regime" in the Spring of 2003. Weiss, Martin A., *Iraq's Debt Relief: Procedure and Potential Implications for International Debt Relief,* Congressional Research Service, RL33376, at CRS-11 (April 21, 2006).

recognized that "as a practical matter" the hostile military regime that controlled the courts made it impossible for the claimants to get a fair hearing. *Id.* at 1550.

The Supreme Court has long-recognized the principle that "to say that the courts were shut, is a good excuse on voucher of record." *Hanger v. Abbott*, 73 U.S. 532, 541 (1867). Although it lacked a legislated exception, the *Hanger* Court refused to allow a three year statutory period to operate on a claim in debt that accrued immediately preceding the outbreak of the Civil War, which had closed the court to actions between belligerents for at least three years. *See Hanger*, 73 U.S. at 541-42; *See also The Protector*, 76 U.S. 687 (1869) (tolling limitations period for appeal claim for the length of the Civil War); *see also United States v. Wiley*, 78 U.S. 508, (1870) ("[Statutes of limitations] are enacted upon the presumption that one having a well-founded claim will not delay enforcing it beyond a reasonable time...[b]ut the basis of the presumption is gone whenever the ability to resort to the courts has been taken away.").

During World War II, the impossibility rule was applied in the context of a maritime negligence claim brought by a sailor against a merchant vessel-the ship was captured and the plaintiff spent the duration of the war in a Japanese prison camp. *See Osbourne v. United States*, 164 F.2d 767, 767-68 (2d Cir. 1947). The Second Circuit applied *Hanger* to toll the limitations period for the duration of the war due to the "extraordinary circumstance that throughout the period when he ought to have brought suit, the courts were unavailable to him as a prisoner in the hands of the enemy." *Id.* at 768. In 1987, the *Hanger* doctrine was further extended in *Forti* to apply to claims by aliens so that the limitations period was tolled for more than a decade.

The impossibility rule applies with equal force to the facts of this case, and operates to toll the statute of limitations.

## B.  Defendant Failed To Meet Its Burden On the Affirmative Defense of Release

### 1.  Defendant Does Not Meet the Standard Applicable to Disposition on A Motion to Dismiss of A Contractual Release Clause

Defendant relies on two IDRO documents[31] -- --the Invitation to Tender Claims, **DX B** and the Tender itself, **DX C** [32] -- to support its claim that Plaintiff has released the claims essential in this case.  But both of these documents repeatedly make absolutely clear that any release or discharge was limited to claims which were "eligible" under the IDRO process.[33]

Moreover, the IDRO procedures and the documents setting out those procedures establish that defendant did not seek, nor did it obtain, releases that covered claims which were not eligible for reconciliation and payment in IDRO.

Applying New York law, as is required by Section 17 of the Invitation, "(a) release is a contract that, unless its language is ambiguous, must be interpreted to give effect to the intent of parties as indicated by the language they utilized." (*J & A Bayly Construction Company, Inc. v. Village of Castleton-on-Hudson,* 248 A.D.2d 766, 767.

In the event that the contract language is ambiguous, the ambiguity must be resolved against Defendant as the drafter of the contract. *Burgos v. Metro-North Commuter R.R.* ---- N.Y.S.2d ----, 2007 WL 1412548 *1 (N.Y.A.D. 1 Dept., 2007).

The release language upon which Defendant relies is limited, rather than general, *see Record v. Royal Globe Ins. Co.,* 83 A.D.2d 154, 443 N.Y.S.2d 755 (N.Y.A.D.,1981), and that

---

[31] But *see* discussion in paragraph I.C.2.on the requirement that the court convert the motion to dismiss into a motion for summary judgment.

[32] Defendant identifies generally three sections of the Invitation but the only actual language to which it refers is a snippet from section 8(ii). Defendant points to no specific language in the Tender; instead defendant only refers to the Tender "at 2".

[33] Defendant does not contend that the claims in this case were "eligible" under IDRO. The IDRO process is discussed in detail below.

language explicitly and clearly limited the scope of any discharge or release to eligible claims that completed the reconciliation process.

At the very most from Defendant's perspective, the release language upon which it relies is ambiguous, precluding in any event grant of a motion to dismiss. *See, e.g., American Postal Workers Union AFL-CIO v. U.S. Postal Service,* 254 F.Supp.2d 12, 15 (D.D.C. 2003)(because the language of an arbitration award was "ambiguous," defendant would not be entitled to either a 12(b)(6) dismissal or summary judgment); and *see Stoney Run Co. v. Prudential-LMI Commercial Insurance Co.,* 47 F.3d 34, 1163 (2d Cir. 1995) (reversing grant of motion to dismiss where the clause in an insurance policy was "ambiguous."); *Cushing v. City of Chicago,* 3 F.3d 1156, 1163 (7th Cir. 1993)( where a provision in a collective bargaining agreement was ambiguous, and because as a result construction of the provision involved issues of fact, disposition under 12(b)(6) would be inappropriate); *Dawson v. General Motors Corp.,* 977 F.2d 369, 373 (7th Circuit)(: "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a (court) cannot properly determine on a motion to dismiss"); *Essex Insurance Co. v. Lutz,* 2007 WL 844914*4 (S.D.Ill. 2007) ( it is not appropriate to dispose of a claim on a motion to dismiss if the contract clause in issue is ambiguous); and *Ventana Hotels & Resorts, L.L.C., v. Habana Libre Hotel, L.L.C.* 2007 WL 2021940*2 (S.D. Fla. 2007)(dismissal where the contract is ambiguous is "inappropriate.")

If the provision in issue is ambiguous, the trial court cannot, in disposing of a motion to dismiss, look to parol evidence to support movant's proposed construction. As the court explained in *DC USA Operating Co, L.L.C., v. Indian Hargor Insurance Co.,* 2007 WL 945016*8 (S.D.N.Y. 2007): "Although courts may review extrinsic evidence to ascertain the intended meaning of an otherwise ambiguous contract ... when considering a motion to dismiss courts should resolve any factual ambiguities in favor of the plaintiff without resorting to parol evidence (internal citations omitted)."

As is discussed in paragraph I.C.2 above, courts routinely deny motions to dismiss based on the affirmative defense of release. Neither of the cases upon which Defendant relies suggests that the court, in this case, should consider the release defense on a motion to dismiss. In *Mwabira-Simera v. Sodexho Management Services*, 2005 WL1541041 (D.D.C. 2005), Judge Bates granted a motion to dismiss because there was absolutely no colorable dispute over the construction and the scope of the release. The court rejected plaintiff's "public policy" argument, and rejected as a matter of law plaintiff's patently groundless assertion that the "broad and unambiguous" release was inapplicable because it did not expressly release the specific claims re-asserted by plaintiff. At 2. In *Mikkileni v. Commonwealth of Pennsylvania*, 2003 WL 21854754 (D.D.C. 2003), summary affirmance was granted against a *pro se* plaintiff-appellant without any suggestion that a challenge of any kind was made to the release.

In stark and dispositive contrast, the documents on which Defendant relies here not only fail to unambiguously support Defendant's construction, those documents, as well as the related IDRO documents, mandate the conclusion that the limited release did not cover the claims asserted in this case.

### 2. The Invitation and the Tender Show That the Release Did Not Cover the Claims In This Case

The Tender states unequivocally "the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI." **DX C**, at p.2, paragraph (viii). An identical statement was made in the Invitation, **DX B** at page 2, subsection 7(viii).

The Invitation, in its explanation on the meaning of the tender offer, states that "(t)he holder shall note that,…payment of the purchase price…will effect the unconditional and irrevocable purchase of cancellation of all amounts…payable in receipt of such Reconciled Eligible Claims and will release Iraq…from any obligation of the Reconciled Eligible Claims.(emphasis in original)." **DX B**, at p.3, Section 5.

34

Moreover, a full panoply of the operative provisions of each document conform with the understanding that Defendant sought and obtained only a release of "eligible claims". The Tender, sought and obtained, representations that Plaintiff had the authority to release "all amounts related[34] to such Reconciled Eligible Claims, **DX C** at p. 2, Section (i), but Defendant sought no similar representation with respect to the ineligible claims which are the subject of this litigation.

The Tender also required the production of documents related to any judgment or litigation related to Reconciled Eligible Claims or Unreconciled Claims, *id*, at 3, but sought no such documentation with respect to ineligible claims.

Similarly, the Invitation made clear that it was designed to enable Iraq to "purchase" Reconciled Eligible Claims. **DX B** at p. 1, Sections 1,4 (treating as synonymous "Reconciled Eligible Claims" and "claims tendered"). The Invitation described an indemnification and hold harmless requirement, but it was restricted to future claims made with respect to Reconciled Eligible Claims. *Id*., at p. 4, Section 6.

The Invitation's representation requirements with respect to authority to release, as with the Tender, were limited to Reconciled Eligible Claims, and it demanded judgment documents and litigation documents only with respect to Reconciled Eligible Claims and Unreconciled Claims. *Id*, at p. 10, Section 13. In fact, the Invitation's formulation of a category or claims called "inessential claims", *id*., at Section 14, would have been entirely unnecessary if, as defendant insists, all claims, including both eligible and ineligible claims, were to be released.

The single clause to which Defendant specifically points is bracketed by phrases making clear that Defendant was acquiring release only of eligible claims. The reference to "contract" was preceded by and followed by these modifiers: "…sale to Iraq and cancellation of Reconciled Eligible Claims;" "full discharge and release of satisfaction of all claims…due in receipt of the

---

[34] Referring to "principal, contracted interest, late penalty interest, indemnitier, and any other amounts…then due. See DX B at p. 12 subsection 8 (ii)

Reconciled Eligible Claims"; "release and indemnify Iraq…in respect thereof"; "arising under

such Reconciled Eligible Claims…," and, "evidencing such Reconciled Eligible Claims."

The explicit language of the two documents upon which Defendant relies, as well as the

full text surrounding the single phrase upon which Defendant relies, as well as a multitude of

related provisions, as well as the architecture and expressed purpose of the Invitation and the

Tender, as well as Defendant's own explanation of and notice to Plaintiff of the limited scope of

the release, compel the conclusion that the release did not include, nor was it intended to include,

the IDRO ineligible claims in this case.

### 3.  IDRO's Procedures Show That the Release Did Not Cover the Claims In This Case

The final portion of Iraq's debt are commercial claims estimated around $20 billion.  These are outstanding commercial claims against various Iraqi guarantors that arose prior to the August 6, 1990 U.N. sanctions imposed when Iraq invaded Kuwait.  The Iraqi government retained two U.S. companies, Ernst & Young and Citigroup, to adjudicate these debt claims and to help negotiate various settlements with small and large Iraqi creditors. The Iraq Debt Reconciliation Office was established in Amman, Jordan in May 2004.  On December 9, 2004, Iraq's Ministry of Finance posted an official query seeking information about commercial claims, including claims held by financial institutions, outstanding against the Iraqi government.

On July 26, 2005, Iraq announced the terms for its commercial settlement negotiation.  For small creditors (less than $35 million) Iraq would settle claims through a cash buyback and cancellation.  For larger claims, Iraq would seek a debt-for-debt swap.  For small creditors, the cash purchase price would equal 10.25% of the outstanding claim up to a maximum of $4.3 million.  Larger creditors would receive … new bonds carrying a face value of $200 for every $1000 of old debt.

*Weiss, supra*, at CRS-10.

The IDRO process involved three stages: a preliminary determination of eligibility;

submission of eligible claims to an auditing process which undertook to reconcile the claimant's

documentation with Iraqi records; and an arbitration of eligible claims which went through the reconciliation process but which could not be reconciled.

Ernst & Young issued in July 2005 its Reconciliation Methodology,[36] which stated, *inter alia,* that "1. Confirmation of Eligibility   Only those claims that meet the criteria of Specified Debt will be reconciled and deemed eligible for the next step in this process." **PX B**, at 1.

Specified Debt, in turn was defined according to five required criteria,[37] including a specific and defined type of debt, and a requirement that the debt be "denominated, or at the option of the Holder payable, in a currency other than Iraqi dinars." **PX B** at 11.

The Reconciliation Methodology then sets out the procedure for submitting eligible claims for reconciliation, the determination of whether the claim is "reconciled," and the methods for calculation of the sum, if any, that is due to the creditor.  As the reconciliation Methodology stated:

> Upon receipt of sufficient information from the Holder concerning claims that are eligible for reconciliation, the Reconciliation Agent will proceed to compare the information provided in respect of each submitted Item against the corresponding Iraqi records....
>
> The Reconciliation Agent will classify each item as either reconciled or not reconciled. An Item will be classified as reconciled when it is matched to Iraqi records. An Item will be classified as not reconciled if ... the Reconciliation Agent is unable to confirm one or more of: (1) the claim's existence; (2) the outstanding principal amount claimed; or, (3) the maturity date claimed.
>
> The Reconciliation Agent will deliver to the Holder: (i) a notice of reconciled eligible claims, and (ii) a notice of claims not reconciled....

**PX B** at 2. The Reconciliation Methodology did not address the arbitration stage.

On February 9, 2006, Iraq issued its Invitation to Tender Claims for Cash Purchase and Cancellation (the "Invitation"). **PX C**. The Invitation provided, in pertinent part, as follows:

---

[36] Plaintiff appends hereto as Plaintiff's Exhibit B ("**PX B**") a copy of the Reconciliation Methodology, but notes that **PX B**, and the exhibits which follow, are included herein only in response to the attachments to the Defendant's Motion to Dismiss, and without prejudice to Plaintiff's procedural challenge to Defendant's Exhibits. *See* discussion at Subsection D below.

[37] The definition conformed to the definition in the Request for Information ("RFI")

**3. Reconciliation; Interest Calculation**

This Invitation has been preceded by a debt reconciliation process **The Reconciled Eligible Claims set out in Schedule I to this Invitation reflect claims meeting the eligibility criteria** described in the RFI that were submitted by the Holder and successfully reconciled by the Reconciliation Agent ...

**If any claims meeting the eligibility criteria of the RFI were submitted by the Holder in response to the RFI but could not be reconciled by the Reconciliation Agent by the date of this Invitation, these are listed on Schedule II** to this Invitation ("Unreconciled Claims")....

By submitting the Tender, the Holder represents and warrants as follows: ...

> (viii)    **the claims that are tendered meet the criteria for eligibility set forth in the RFI;**

By Submitting the Tender, the Holder irrevocably agrees to the terms and conditions of this Invitation.  As part hereof, the Holder: ...

> (ix)  agrees (subject only to the resolution of any Unreconciled Claims in accordance with Section 15 below) that the receipt of the Purchase Price with respect to the Reconciled Eligible Claims that are the subject of the Tender on the Closing Date **will fully discharge and satisfy any and all claims for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due, or thereafter falling due, in respect of any Unasserted Claims (as defined in Section 14 below) and will release Iraq or such obligor or guarantor of any Unasserted Claim from such obligation as provided in Section 14 below;**

> (ix)    agrees that any claim that remains unreconciled and is shown as such on the Holder's Statement of Unreconciled Claims will, no later than the Tender Due Date, <u>either</u> be submitted by the Holder to the Arbitration Mechanism described in Exhibit A hereto (the "<u>Arbitration Mechanism</u>") pursuant to Section 15 below, or be withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release contained in Section 8(ix) above; and

**14.  <u>Unasserted Claims</u>**

**The RFI to which the Holder responded asked the Holder to identify all claims owned by it that meet the eligibility criteria set out in the RFI. In processing responses to the RFI, Iraq and the Reconciliation Agent have assumed that the Holder complied with this request and that, to the extent any claims meeting the eligibility criteria of the RFI held by the Holder on the date of its response to the RFI (or any supplement thereto) were not identified in its response to the RFI, or were initially identified but were subsequently withdrawn from the Holder's submission to the Reconciliation Agent, the Holder has decided to waive its right to assert a**

claim for payment or settlement of those amounts. **Such unasserted claims are referred to herein as "Unasserted Claims".**

Accordingly, if a Holder's Tender of Reconciled Eligible Claims pursuant to this Invitation is accepted by Iraq and the Holder receives the Purchase Price corresponding to those Reconciled Eligible Claims on the Closing Date then, pursuant to Section 8(ix), the Holder (i) shall be deemed to have simultaneously cancelled and discharged in full all amounts (of whatever description) that may be payable in respect of any Unasserted Claims ....

15.   Unreconciled Claims; Arbitration Mechanism

Schedule II to this Invitation lists any claims submitted for reconciliation by the Holder in response to the RFI that could not be successfully reconciled by the Reconciliation Agent by the date of this Invitation. Any claim that is identified on the Holder's Statement of Unreconciled Claims will, by the Tender Due Date, at the Holder's election, either be submitted to the Arbitration Mechanism or withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.

17.   Governing Law; Submission to Jurisdiction; Waiver of Immunity

This Invitation, the Tender, and any acceptance or rejection thereof by Iraq, shall be governed by and construed in accordance with the law of the State of New York.

(Emphasis added). **PX C**, at 2, 4, 5, 6, 8, 11 and 17. As was discussed in the preceding

subsection, the Invitation contained no provisions for release or discharge of ineligible

claims. **PX C.** Rather, the Invitation explicitly and purposefully contemplated a release only

of all eligible claims that went through the reconciliation process, whether or not the claims

were eventually reconciled with the Iraqi records, and whether nor not claims identified as

unreconciled were pursued in arbitration.

The claims in this case were not IDRO eligible claims, never went through the

reconciliation process, were never treated as either reconciled or unreconciled, and cannot be

construed to be "Unasserted Claims" within the meaning of the IDRO documents themselves, and

in particular the release language of those documents.

In written and oral exchanges between Plaintiff and IDRO, IDRO insisted that the claims

now asserted in this case were not Specified Debt, because the obligations did not arise from the

type of debt described in paragraph (iii) of the definition of Specified Debt, **PX B** at 11, and

because the obligation arose out of a debt denominated in dinars. The claims asserted herein

were, therefore, deemed ineligible, Compl., at ¶¶ 23-27, and were never submitted by IDRO for

reconciliation.

On February 22, 2006, IDRO issued to Plaintiff a Schedule I Statement of Reconciled

Eligible Claims, **PX D**, and a Schedule II Statement of Unreconciled Claims. **PX E**. Schedule I

stated: "The Reconciliation Agent was unable to reconcile any of the claims registered by the

Holder." **PX E**. Schedule II listed the claimed principal as $7,505,203.20, and stated that "The

Reconciliation Agent is unable to confirm: existence." **PX E**.

On March 9, 2006, Plaintiff delivered to IDRO its Tender. **PX F**. As is discussed in the

preceding subsection, the Tender provided, *inter alia*, that:

> The above-named Holder … hereby offers each …Reconciled Claim for
> purchase by Iraq and simultaneous cancellation on the terms, and subject to the
> conditions, set out in the Invitation….
>
> The Holder is the holder of the Unreconciled Claims specified in the Schedule II
> attached hereto and irrevocably agrees that if the Chairperson for the Arbitration
> Mechanism does not receive a written notice from the Holder specifying its
> election with respect to each Unreconciled Claim pursuant to the Arbitration
> Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any
> Unreconciled Claim not covered by such an election will be cancelled effective
> on the Closing Date, and the Holder irrevocably agrees that such claim will be
> treated as an Unasserted Claim covered by the discharge and release set out in
> Section 14 of the Invitation. …
>
> …Holder represents and warrants … as follows:… (viii)   the claims that are
> tendered hereby meet the criteria for eligibility set forth in the RFI…

**PX F**. Nothing in the Tender contained a discharge or release of ineligible claims, or of claims

that did not meet the definition of Specified Debt. To the contrary, the discharge and release was

explicitly limited to the Unreconciled Claims set out in Schedule II.

Plaintiff submitted to arbitration the Unreconciled Claim of $7,505,203.20 in its entirety.

**PX G**. On June 28, 2006, Plaintiff prevailed in full in the arbitration. **PX H**.

40

The claims in this case were not treated as eligible. IDRO's own Schedules establish beyond any challenge that the only claims that were submitted by IDRO to its Reconciliation Agent were certain of the contract claims in the amount of $7,505,203.20. **PX D, PX E, PX G**.

The claims in this case cannot be construed to have been "Unreconciled Claims," **PX C** at 8, 9, 11, **PX B** at 2, 11, and they were not characterized as such. Because they were treated as neither "eligible" nor "unreconciled," they fall outside the definition of "unasserted claims." **PX C**, at 8, 10-11, **PX F** at 1. Other than the sale and the transfer of the Reconciled Claims, and the discharge and release of the "unasserted claims," there are no other provisions in any of the IDRO documents which can be construed to effect any kind of release or discharge of the claims in this case.

Iraq negotiated for and received a surrender and release of that portion of any eligible reconciled claim or arbitration award which was not paid as a consequence of the acceptance of the 10.25% offer, **PX C** at 3[38], and it received a discharge and release of eligible claims which were not reconciled and either were not pursued in arbitration or which were unsuccessful in arbitration. It never sought, and it never received, a release of claims which were ineligible for IDRO processing and which never were reconciled in the IDRO process.

As with the two documents upon which defendant relies, the IDRO procedures themselves preclude any determination as a matter of law that the limited release covered the claims made in this case.

## CONCLUSION

For the reasons set forth herein, the instant motion should be denied.

---

[38] As is noted above, that proposal was available for "small creditors" with claims of less than $35 million.

41

Respectfully submitted,

_____

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*:  pmusolino@musolinoanddessel.com

_____

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*:  srolinski@rolinski.com

42

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD     :
            :
    Plaintiff,    :   Case No. 1:07-cv-00165 (RBW)
            :
            :
   v.       :
            :
THE REPUBLIC OF IRAQ   :
    Defendant.   :

## EXHIBITS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT

**A-1**  U.S. State Department Travel Warning (August 28, 2006)

**A-2**  Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues, GAO-04-902R (June 28, 2004)

**A-3**  Judicial Reform Index for Iraq (July 2006)

**B**  Ernst & Young Reconciliation Methodology Memorandum (July 6, 2005)

**C**  Invitation to Tender Claims (February 9, 2006)

**D**  Schedule I:  Statement of Reconciled Eligible Claims (February 22, 2006)

**E**  Schedule II:  Statement of Unreconciled Claims (February 22, 2006)

**F**  Tender (March 9, 2006)

**G**  Statement of Claims Submitted to Arbitration (July 6, 2006)

**H**  Notice of Award (June 28, 2006)

**I**  Agreed Minutes of the Fifteenth Regular Session of the Bulgarian-Iraqi Joint Committee

**J-1**  Protocol of the Working Group on Trade and Financial Cooperation

**J-2**  Protocol of the Working Group for Scientific and Technical Cooperation

**J-3**  Protocol of the Workgroup on Economic Partnership

**K**  Protocol of the Eighteenth Regular Session of the Bulgarian-Iraqi Combined Committee

**L-1**  Banking Arrangement No. 1

**L-2**    Banking Arrangement No. 3

**M**    Agreed Minutes (March 1, 1990)

**N**    Letter Central Bank of Iraq to Bulgarian Foreign Trade Bank (February 16, 2002)

**O**    Press Release (July 18, 2006)

Respectfully submitted,

Philip M. Musolino, Esq. #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski, Esq. # 430573
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:   (240) 632-0906
*Email*: srolinski@rolinski.com

# EXHIBIT A

Bureau of Consular Affairs
Washington, DC 20520

... information is current as of today, Mon Jun 04 14:04:00 2007.

# IRAQ

**August 28, 2006**

International Travel Home

New Requirements for U.S. Citizens

International Travel Information

Tips for Traveling Abroad

Document Requirements

Living Abroad Tips

Additional Resources

About Overseas Citizens' Services

This Travel Warning updates the current security situation and reiterates the dangers of the use of civilian aircraft and road travel within Iraq. This supersedes the Travel Warning of December 29, 2005 and the Public Announcement dated March 24, 2006.

The Department of State continues to strongly warn U.S. citizens against travel to Iraq, which remains very dangerous. Remnants of the former Ba'ath regime, transnational terrorists, criminal elements and numerous insurgent groups remain active. Attacks against military and civilian targets throughout Iraq continue, including in the International (or "Green") Zone. Targets include convoys en-route to venues, hotels, restaurants, police stations, checkpoints, foreign diplomatic missions, international organizations and other locations with expatriate personnel. These attacks have resulted in deaths and injuries of American citizens, including those doing humanitarian work. In addition, there have been planned and random killings, as well as extortions and kidnappings. U.S. citizens have been kidnapped and several were subsequently murdered by terrorists in Iraq. U.S. citizens and other foreigners continue to be targeted by insurgent groups and opportunistic criminals for kidnapping and murder. Military operations continue. There are daily attacks against Multinational Forces - Iraq (MNF-I), Iraqi Security Forces and Iraqi Police throughout the country.

There is credible information that terrorists are targeting civil aviation. Civilian and military aircraft arriving at and departing from Baghdad International Airport (or other major cities in Iraq) have been subjected to small arms and missiles. Civilian aircraft do not generally possess systems, such as those found on military aircraft, capable of defeating man-portable, surface-to-air missiles (MANPADS). Anyone choosing to utilize civilian aircraft to enter or depart or travel within Iraq should be aware of this potential threat, as well as the extremely high risk to road transportation described below. As a result of a recent security incident at the Baghdad International Airport (BIAP), the U.S. Embassy is prohibiting all U.S. government employees from departing BIAP on commercial airlines until further notice.

All vehicular travel in Iraq is extremely dangerous. There have been numerous attacks on civilian vehicles, as well as military convoys. Attacks occur throughout the day, but travel at night is exceptionally dangerous. Travel in or through Ramadi and Fallujah; in and between al-Hillah, al-Basrah, Kirkuk, and Baghdad; between the International Zone and Baghdad International Airport; and from Baghdad to Mosul is particularly dangerous.

Occasionally, U.S. Government personnel are prohibited from traveling to certain areas depending on prevailing security conditions. There continues to be heavy use of Improvised Explosive Devices (IEDs), (especially new-type Explosively Formed Penetrators (EFP), and/or mines on roads, concealed in plastic bags, boxes, soda cans, dead animals, and in other ways to blend with the road. Grenades and explosives have been thrown into vehicles from overpasses, particularly in crowded areas. Overland travel should be undertaken only when absolutely necessary and with the appropriate security.

The U.S. Embassy is located in the International Zone. The Embassy can provide only limited emergency services to U.S. citizens in Iraq. At present, travel to and from the International Zone is extremely limited. The U.S. Embassy does not provide visa services to the general public. American citizens who choose to visit or reside in Iraq despite this Travel Warning are urged to pay close attention to their personal security, avoid crowds, especially rallies or demonstrations, and to inform the U.S. Embassy of their presence in Iraq. All Americans in Baghdad are strongly encouraged to register with the Embassy at the following website: https://travelregistration.state.gov/ibrs/home.asp.

American citizens may obtain the latest security information or other information about Iraq by calling the U.S. Embassy, located in the International Zone, via landline at: 1-240-553-0584 x5340 or x5346, via Iraqna cellular phones at 07901-732-134 or 07901-168-383, via e-mail to usconsulbaghdad@state.gov, or via the U.S. Embassy's website at http://iraq.usembassy.gov. The after-hours number in case of extreme emergency is 1-914-822-5493.

Updated information on travel and security in Iraq may be obtained from the Department of State by calling 1-888-407-4747 within the United States, or, from overseas, 1-202-501-4444. For further information, please consult the Consular Information Sheet for Iraq, the current Worldwide Caution and the Middle East and North Africa Public Announcements, all of which are available on the Bureau of Consular Affairs Internet website at http://travel.state.gov.



PLAINTIFF'S EXHIBIT
A-1

6/4/2007

# GAO

Keyword or Report #                                    **Go**

Home   |   About GAO   |   Contact GAO   |   Site Map   |   Help

## Abstract

**Browse by**

**Date**

Rebuilding Iraq: Resource, Security, Governance, Essential
Services, and Oversight Issues, GAO-04-902R, June 28, 2004
PDF   Accessible Text

**Topic**

**Agency**

Rebuilding Iraq is a U.S. national security and foreign policy
priority. According to the President, the United States intends to
help Iraq achieve democracy and freedom and has a vital national
interest in the success of free institutions in Iraq. As of April 30,
2004, billions of dollars in grants, loans, assets, and revenues from
various sources have been made available or pledged to the
reconstruction of Iraq. The United States, along with its coalition
partners and various international organizations and donors, has
embarked on a significant effort to rebuild Iraq following multiple
wars and decades of neglect by the former regime. The Coalition
Provisional Authority (CPA), established in May 2003, was the U.N.-
recognized coalition authority led by the United States and the
United Kingdom that was responsible for the temporary governance
of Iraq. Specifically, the CPA was responsible for overseeing,
directing, and coordinating the reconstruction effort. On June 28,
2004, the CPA transferred power to a sovereign Iraqi interim
government, and the CPA officially dissolved. To pave the way for
this transfer, the CPA helped the Iraq Governing Council develop
the Law of Administration for the State of Iraq for the Transitional
Period in March 2004. The transitional law provides a framework
for governance of Iraq while a permanent government is formed.
In June 2004, U.N. Security Council Resolution 1546 provided
international support to advance this process, stating that, by June
30, CPA will cease to exist and Iraq will reassert full sovereignty.
Resolution 1546 also endorsed the formation of a fully sovereign
Iraqi interim government; endorsed a timetable for elections and
the drafting of an Iraqi constitution; and decided that the United
Nations, at the Iraq government's request, would play a leading
role in establishing a permanent government. Resolution 1546
further noted the presence of the multinational force in Iraq and
authorized it to take all necessary measures to contribute to
security and stability in Iraq, in accordance with letters annexed to
the resolution. Such letters provide, in part, that the multinational
force and the Iraqi government will work in partnership to reach
agreement on security and olicy issues, including policy on
sensitive offensive operations. Resolution 1546 stated that the
Security Council will review the mandate of the multinational force
in 12 months or earlier if requested by the government of Iraq and
that it will terminate the mandate if requested by the government
of Iraq. As part of our broad effort to monitor Iraq reconstruction,
which we undertook at the request of Congress, this report
provides information on the status of the issues we have been
monitoring, as well as key questions that will assist Congres in its
oversight responsibilities. Specifically, this report focuses on issues

**Reports and Testimony**

**Legal Products**

**Topic Collections**

**From the Comptroller
General**

**Careers at GAO**

**Subscribe to Updates**

**FraudNET (Report
Fraud, Waste and
Abuse)**



PLAINTIFF'S
EXHIBIT
A-2

associated with (1) resources, (2) security, (3) governance, and (4) essential services. For the essential services issue, we focused on the Army Corps of Engineers' Restore Iraqi Electricity project, a major component of the U.S. assistance effort to rebuild the power sector.

As of the end of April 2004, about $58 billion in grants, loans, assets, and revenues from various sources had been made available or pledged to the relief and reconstruction of Iraq. Resource needs are expected to continue after the transfer of power to a sovereign Iraqi interim government. Of the funds available, the United States obligated about $8 billion of the available $24 billion in U.S. funds. The CPA obligated about $15.5 billion of the nearly $21 billion in available Iraqi funds. The international community pledged nearly $14 billion. In December 2003, the CPA put into effect an Iraqi-led process to coordinate reconstruction efforts. An October 2003 U.N./World Bank assessment noted that Iraq's ability to absorb resources as the country gains sovereignty and decision-making authority will be one of the most significant challenges to reconstruction. The security situation in Iraq has deteriorated since June 2003, with significant increases in attacks against the coalition and coalition partners. The increase in attacks has had a negative impact on military operations and the work of international civilian organizations in Iraq. As part of the effort to provide stability, the coalition plans to transfer security responsibilities from the multinational force to Iraqi security forces and to dissolve Iraqi militias operating outside the central government's control. During the escalation of violence that occurred during April 2004, these security forces collapsed in several locations. However, key elements of the CPA's transition and reintegration process remain to be finalized. With U.S. and others' assistance, Iraqis have taken control of government institutions at the national and subnational levels. National ministries are providing some services to citizens as their facilities are being rebuilt, reforms are being introduced, and their staffs trained. According to the head of the now-dissolved CPA, all ministries were under Iraqi authority as of the transfer of power on June 28, 2004. However, the security situation hinders the ability of the ministries to provide needed services and maintain daily operations. To reform the rule of law, ongoing efforts have begun to establish a functioning independent judiciary, although courts are not at their pre-war capacity. However, efforts to rebuild Iraq's judicial system and restore the rule of law face multiple challenges. U.S. officials said that rehabilitating and reforming Iraq's judicial system will likely take years. The Coalition considers reconstruction of the power sector critical to reviving Iraq's economy, supporting essential infrastructure, improving daily well-being, and gaining local support for the coalition presence in Iraq. The CPA set a goal of 6,000 megawatts of generating capacity by June 30, 2004, in anticipation of the higher demand for power during the summer months. As part of the overall effort to achieve this goal, the U.S. Army Corps of Engineers (Corps) has undertaken $1.4 billion in work under the Restore Iraqi Electricity (RIE) program. As of late May, the Corps anticipated that 59 of the 66 RIE projects expected to help meet the goal would be completed by June 30. However, electrical service in the country as

a whole has not shown a marked improvement over the immediate
postwar levels of May 2003 and has worsened in some
governorates. RIE contractors report numerous instances of project
delays due to difficulties in getting employees and materials safely
to project sites. Further, the security environment continues to
affect the cost of rebuilding the power sector.

### Subject Terms

Electric power generation
Employee training
Federal aid to foreign countries
Foreign governments
International cooperation
International organizations
International relations
Judicial reform
Physical security
Iraq War and reconstruction
Army Corps of Engineers Restore Iraqi Electricity Project
Iraq

*Accountability    Integrity    Reliability*



**Iraq Legal Development Project**
مشـــروع تطـــوير القـــانـــون في العـــراق

# JUDICIAL REFORM INDEX

## FOR

# IRAQ

*July 2006*

© American Bar Association



PLAINTIFF'S
EXHIBIT
A-3

The statements and analysis contained in this report are the work of the American Bar Association's Iraq Legal Development Project (ABA/ILDP), which is solely responsible for its content. The Board of Governors of the American Bar Association has neither reviewed nor sanctioned its contents. Accordingly, the views expressed herein should not be construed as representing the policy of the ABA. Furthermore, nothing contained in this report is to be considered rendering legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This publication was made possible through support provided by the U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs (INL) and the U.S. Department of Justice (DOJ). The opinions expressed herein are those of the author(s) and do not necessarily reflect the view of either the INL or the DOJ.

ISBN:  978-1-59031-813-3

Printed in the United States of America

Copyright © 2006 by the American Bar Association
740 15th Street NW, Washington, DC  20005

# TABLE OF CONTENTS

**Introduction** ....................................................................................................................... i

**Executive Summary** ........................................................................................................ 1

**Iraq Background** ............................................................................................................. 5

Legal Context.................................................................................................................... 5
History of the Judiciary ..................................................................................................... 6
Structure of the Courts ..................................................................................................... 7
Conditions of Judicial Service.......................................................................................... 10
    *Qualifications* ............................................................................................................... 10
    *Appointment and Tenure* ............................................................................................. 10
    *Training*......................................................................................................................... 11

**Iraq JRI 2006 Analysis**

**Table of Factor Correlations** ......................................................................................... 13

**I.**     **Quality, Education, and Diversity**............................................................................ 14
**1.**     Judicial Qualification and Preparation ........................................................................ 14
**2.**     Selection/Appointment Process.................................................................................. 15
**3.**     Continuing Legal Education........................................................................................ 16
**4.**     Minority and Gender Representation .......................................................................... 17

**II.**    **Judicial Powers**........................................................................................................ 18
**5.**     Judicial Review of Legislation..................................................................................... 18
**6.**     Judicial Oversight of Administrative Practice ............................................................. 20
**7.**     Judicial Jurisdiction over Civil Liberties ..................................................................... 21
**8.**     System of Appellate Review....................................................................................... 22
**9.**     Contempt/Subpoena/Enforcement ............................................................................ 24

**III.**   **Financial Resources**................................................................................................. 25
**10.**   Budgetary Input ......................................................................................................... 25
**11.**   Adequacy of Judicial Salaries.................................................................................... 26
**12.**   Judicial Buildings ....................................................................................................... 27
**13.**   Judicial Security......................................................................................................... 28

**IV.**   **Structural Safeguards**............................................................................................. 29
**14.**   Guaranteed Tenure ................................................................................................... 29
**15.**   Objective Judicial Advancement Criteria ................................................................... 30
**16.**   Judicial Immunity for Official Actions ......................................................................... 31
**17.**   Removal and Discipline of Judges ............................................................................. 32
**18.**   Case Assignment ...................................................................................................... 33
**19.**   Judicial Associations ................................................................................................. 34

| V. | **Accountability and Transparency** | 34 |
|---|---|---|
| 20. | Judicial Decisions and Improper Influence | 34 |
| 21. | Code of Ethics | 36 |
| 22. | Judicial Conduct Complaint Process | 37 |
| 23. | Public and Media Access to Proceedings | 38 |
| 24. | Publication of Judicial Decisions | 39 |
| 25. | Maintenance of Trial Records | 40 |
| | | |
| VI. | **Efficiency** | 40 |
| 26. | Court Support Staff | 40 |
| 27. | Judicial Positions | 41 |
| 28. | Case Filing and Tracking Systems | 42 |
| 29. | Computers and Office Equipment | 43 |
| 30. | Distribution and Indexing of Current Law | 44 |
| | | |
| | **List of Acronyms** | 45 |

/ABA
ILDP
Iraq Legal Development Project
مشروع تطوير القانون العراقي

## Introduction

The Judicial Reform Index (JRI) is an assessment tool implemented by the American Bar Association's (ABA) Rule of Law Initiative through the Iraq Legal Development Project (ILDP). It was developed by the American Bar Association's Central and East European Law Initiative (ABA/CEELI), with the purpose to assess a cross-section of factors important to judicial reform in emerging democracies. In an era when legal and judicial reform efforts are receiving more attention than in the past, the JRI is an appropriate and important assessment mechanism. The JRI will enable the ABA, its funders, and the emerging democracies themselves, to better target judicial reform programs and monitor progress towards establishing accountable, effective, independent judiciaries.

The ABA embarked on this project with the understanding that there is not uniform agreement on all the particulars that are involved in judicial reform. In particular, the ABA acknowledges that there are differences in legal cultures that may make certain issues more or less relevant in a particular context. However, after a decade of working in the field on this issue, the ABA has concluded that each of the thirty factors examined herein may have a significant impact on the judicial reform process. Thus, an examination of these factors creates a basis upon which to structure technical assistance programming and assess important elements of the reform process.

The technical nature of the JRI distinguishes this type of assessment tool from other independent assessments of a similar nature, such as the U.S. State Department's *Human Rights Report* and Freedom House's *Nations in Transit*. This assessment will *not* provide narrative commentary on the overall status of the judiciary in a country. Rather, the assessment will identify specific conditions, legal provisions, and mechanisms that are present in a country's judicial system and assess how well these correlate to specific reform criteria at the time of the assessment. In addition, this analytic process will not be a scientific statistical survey. The JRI is first and foremost a legal inquiry that draws upon a diverse pool of information that describes a country's legal system.

## Assessing Reform Efforts

Assessing a country's progress towards judicial reform is fraught with challenges. No single criteria may serve as a talisman, and many commonly considered factors are difficult to quantify. For example, the key concept of an independent judiciary inherently tends towards the qualitative and cannot be measured simply by counting the number of judges or courtrooms in a country. It is difficult to find and interpret "evidence of impartiality, insularity, and the scope of a judiciary's authority as an institution." Larkins, *Judicial Independence and Democratization: A Theoretical and Conceptual Analysis*, 44 AM. J. COMP. L. 611 (1996). Larkins cites the following faults in prior efforts to measure judicial independence:

> (1) the reliance on formal indicators of judicial independence which do not match reality, (2) the dearth of appropriate information on the courts which is common to comparative judicial studies, (3) the difficulties inherent in interpreting the significance of judicial outcomes, or (4) the arbitrary nature of assigning a numerical score to some attributes of judicial independence.

*Id.* at 615.

Larkins goes on to specifically criticize a 1975 study by David S. Clark, which sought to numerically measure the autonomy of Latin American Supreme Courts. In developing his "judicial effectiveness score," Clark included such indicators as tenure guarantees, method of removal, method of appointment, and salary guarantees. Clark, *Judicial Protection of the Constitution in Latin America*, 2 HASTINGS CONST. L. Q. 405 – 442 (1975).



The problem, though, is that these formal indicators of judicial independence often did not conform to reality. For example, although Argentine justices had tenure guarantees, the Supreme Court had already been purged at least five times since the 1940s. By including these factors, Clark overstated . . . the independence of some countries' courts, placing such dependent courts as Brazil's ahead of Costa Rica's, the country that is almost universally seen as having the most independent judicial branch in Latin America.

Larkins, *supra*, at 615.

Reliance on subjective rather than objective criteria may be equally susceptible to criticism. *E.g.*, Larkins, *supra*, at 618 (critiquing methodology which consisted of polling 84 social scientists regarding Latin American courts as little more than hearsay). Moreover, one cannot necessarily obtain reliable information by interviewing judges: "[j]udges are not likely to admit that they came to a certain conclusion because they were pressured by a certain actor; instead, they are apt to hide their lack of autonomy." Larkins, *supra*, at 616.

## Methodology

The ABA sought to address these issues and criticisms by including both subjective and objective criteria and by basing the criteria examined on some fundamental international norms, such as those set out in the *United Nations Basic Principles on the Independence of the Judiciary; Council of Europe Recommendation R(94)12 "On the Independence, Efficiency, and Role of Judges"; Council of Europe's European Charter on the Statute for Judges;* as well as the 1999 *Beirut Declaration* and the 2003 *Cairo Declaration on Judicial Independence.* Reference was also made to a Concept Paper on Judicial Independence prepared by ABA/CEELI and criteria used by the International Association of Judges in evaluating membership applications. The ABA has continually integrated new standards and guidelines into its JRI process, such as the *Bangalore Principles on Judicial Conduct.*

Drawing on these norms, the ABA compiled a series of 30 statements setting forth factors that facilitate the development of an accountable, effective, independent judiciary. To assist assessors in their evaluation of these factors, the ABA developed corresponding commentary citing the basis for the statement and discussing its importance. A particular effort was made to avoid giving higher regard to American, as opposed to European or other regional concepts, of judicial structure and function. Thus, certain factors are included that an American or a European judge may find somewhat unfamiliar, and it should be understood that the intention was to capture the best that leading judicial cultures have to offer. Furthermore, the ABA reviewed each factor in light of its decade of experience and concluded that each factor may be influential in the judicial reform process. Consequently, even if some factors are not universally accepted as basic elements, the ABA determined their evaluation to be programmatically useful and justified. The categories incorporated address the quality, education, and diversity of judges; jurisdiction and judicial powers; financial and structural safeguards; accountability and transparency; and issues affecting the efficiency of the judiciary.

The question of whether to employ a "scoring" mechanism was one of the most difficult and controversial aspects of this project, and the ABA debated internally whether it should include one at all. During the 1999-2001 time period, the ABA tested various scoring mechanisms. Following a spirited discussion with members of the ABA/CEELI's Executive and Advisory Boards, as well as outside experts, the ABA decided to forego any attempt to provide an overall scoring of a country's reform progress to make absolutely clear that the JRI is not intended to be a complete assessment of a judicial system.

Despite this general conclusion, the ABA did conclude that qualitative evaluations could be made as to specific factors. Accordingly, each factor, or statement, is allocated one of three values: *positive, neutral, or negative.* These values only reflect the relationship of that statement to that



country's judicial system. Where the statement strongly corresponds to the reality in a given country, the country is to be given a score of "positive" for that statement. However, if the statement is not at all representative of the conditions in that country, it is given a "negative." If the conditions within the country correspond in some ways but not in others, it will be given a "neutral." *Cf.* Cohen, *The Chinese Communist Party and 'Judicial Independence': 1949-59*, 82 HARV. L. REV. 972 (1969), (suggesting that the degree of judicial independence exists on a continuum from "a completely unfettered judiciary to one that is completely subservient"). Again, as noted above, the ABA has decided not to provide a cumulative or overall score because, consistent with Larkin's criticisms, the ABA determined that such an attempt at overall scoring would be counterproductive.

Instead, the results of the 30 separate evaluations are collected in a standardized format in each JRI country assessment. Following each factor, there is the assessed correlation and a description of the basis for this conclusion. In addition, a more in-depth analysis is included, detailing the various issues involved. Cataloguing the data in this way facilitates its incorporation into a database, and it permits end users to easily compare and contrast performance of different countries in specific areas and – as JRIs are updated – within a given country over time.

Social scientists could argue that some of the criteria would best be ascertained through public opinion polls or through more extensive interviews of lawyers and court personnel. Sensitive to the potentially prohibitive cost and time constraints involved, the ABA decided to structure these issues so that they could be effectively answered by limited questioning of a cross-section of judges, lawyers, journalists, and outside observers with detailed knowledge of the judicial system. Overall, the JRI is intended to be rapidly implemented by one or more legal specialists who are generally familiar with the country and region and who gather the objective information and conduct the interviews necessary to reach an assessment of each of the factors.

One of the purposes of the assessment is to help the ABA – and its funders and collegial organizations – determine the efficacy of their judicial reform programs and help target future assistance. Many of the issues raised (such as judicial salaries and improper outside influences), of course, cannot necessarily be directly and effectively addressed by outside providers of technical assistance. The ABA also recognizes that those areas of judicial reform that can be addressed by outsiders, such as judicial training, may not be the most important. Having the most exquisitely educated cadre of judges in the world is no guarantee of an accountable, effective, or independent judiciary; and yet, every judiciary does need to be well-trained. Moreover, the nexus between outside assistance and the country's judiciary may be tenuous at best: building a truly competent judiciary requires real political will and dedication on the part of the reforming country. Nevertheless, it is important to examine focal areas with criteria that tend toward the quantifiable, so that progressive elements may better focus reform efforts. The ABA offers this product as a constructive step in this direction and welcomes constructive feedback.

## Acknowledgements

Lisa Dickieson, Director, Judicial Reform Programs, the American Bar Association's Central and East European Law Initiative (ABA/CEELI) (1995 to 2000), and Mark Dietrich, Member, New York State Bar and Advisor to ABA/CEELI developed the original concept and design of the JRI. Scott Carlson, Director, Judicial Reform Programs at ABA/CEELI (2000-2003), directed the finalization of the JRI. Assistance in research and compilation of the JRI was provided by Jenner Bryce Edelman, Program Associate at ABA/CEELI, and James McConkie, Student Intern, ABA/CEELI.

During the course of developing the JRI, the ABA benefited substantially from two expert advisory groups. The ABA would like to thank the members of ABA/CEELI's First Judicial Advisory Board, including Tony Fisser, Marcel Lemonde, Ernst Markel, Joseph Nadeau, Mary Noel Pepys, and Larry Stone, who reviewed earlier versions of this index. Additionally, the ABA would like to thank the members of the Second Judicial Advisory Board, including Luke Bierman, Macarena Calabrese, Elizabeth Dahl, Elizabeth Lacy, Paul Magnuson, Nicholas Mansfield, Aimee Skrzekut-

**ABA**
**ILDP**
Iraq Legal Development Program
برنامج تطوير القضاء العراقي

Torres, Roy T. Stuckey, Robert Utter, and Russell Wheeler, who stewarded its completion. Finally, the ABA also expresses its appreciation to the experts who contributed to the ABA/CEELI Concept Paper on Judicial Independence: James Apple, Dorothy Beasley, Nicholas Georgakopolous, George Katrougalos, Giovanni Longo, Kenneth Lysyk, Roy Schotland, Terry Shupe, Patricia Wald, and Markus Zimmer.

## Assessment Team

The Iraq JRI 2006 analysis assessment was conducted by Dr. Sami Shubber and Dr. Aziz Al-Okaily. The team received strong support from the ABA and ILDP staff in Iraq, Jordan, and Washington, including Iraq Country Director Alexander A. Kravetz, Attorneys Jaleel Al Saidi, Riyadh Adnan, and Sarab Hassan, Middle East Programs Director Angela Conway, Research and Program Development Deputy Director Simon R. Conté, Middle East Program Managers Clara Mathieu and Jenna Mace, Deputy Regional Director for Gender Programs Aline Matta, and Regional Judicial Advisor Frank McLoughlin. Thomas F. Cope served as editor, and Olga Ruda, the ABA Rule of Law Initiative's Judicial Reform Focal Area Co-Coordinator, provided guidance throughout the assessment process, edited the report and prepared it for publication. The conclusions and analysis are based on interviews with 34 stakeholders in the Iraqi judiciary conducted in Iraq and Jordan during May and June, 2006, and relevant documents that were reviewed at that time. Records of relevant authorities and individuals interviewed (whose names are kept confidential) are on file in the Washington, DC office of the ABA. A supplemental report that focuses on the Kurdish judiciary in Iraq will be produced in the fall of 2006.

The interviews conducted in Iraq took place under extremely difficult security conditions. In some instances, the assessment team could only travel to courthouses in cars belonging to the High Judicial Council. At least one interview could not be conducted on site in Baghdad because of the deteriorating security situation in that part of the city. This security situation may have affected the interviewees' provision of information. We are extremely grateful for the time and assistance rendered by those who agreed to be interviewed for this project.



## Executive Summary

### Brief Overview of the Results

The 2006 Judicial Reform Index (JRI) for Iraq[1] was conducted in May and June, 2006 during a period of extreme turmoil and violence. The security situation has greatly hindered the operation for the courts. Despite all, since the fall of the Baath regime, the judiciary has made some significant advances, particularly in the areas of enhancement of the judiciary's role in managing its own affairs and in the expansion of its role in oversight of civil rights and liberties and government actions. Overall, Iraq received a positive correlation on 7 out of 30 JRI factors, a negative correlation on 12 factors, and a neutral correlation on the remaining 11 factors. The results reveal an important dichotomy. There are positive correlations on many factors related to the legal reform of the judiciary's role and structure, but primarily negative correlations for many of the factors related to how the courts operate day-to-day. In many instances, neutral correlations indicate that, as a matter of law, the Iraqi judiciary has made great strides, but that it is too soon to determine whether these legal advances will be put into practice. The legacy of Saddam Hussein's rule is a major factor in many of the negative correlations identified in this JRI. It will take more years and a concerted long-term effort by Iraq's current and future judicial leadership to address the lack of balanced gender, ethnic, and religious representation in the courts and the inadequacy of court buildings, to name but two prominent issues. Much will depend on whether Iraq becomes stable within the near future and, if it does, whether the Iraqi government that emerges will respect the principle of judicial independence set forth in the 2005 Constitution of Iraq and will accept a judiciary that is empowered to act independently of the government.

### Significant Reforms and Improvements Identified in the 2006 Iraq JRI

A number of key reforms in the Iraqi judiciary, such as greater structural judicial independence, occurred during the period in which Iraq was governed by the Coalition Provisional Authority (CPA). These include the creation of the High Judicial Council (HJC), composed exclusively of judges, that operates the judiciary with substantial independence from the Ministry of Justice (MOJ) and the government. Other reforms, such as the development of broader judicial oversight, came about as a result of the ratification of the new Constitution in 2005.

Examples of specific strengths and achievements include:

- The judiciary as a unit has achieved **substantial structural independence from the MOJ and from the executive branch** of government in general. The **newly formed HJC** has been empowered to manage court employees and to develop an annual budget independently of the MOJ. Interviews with both judges and other legal system stakeholders indicate widespread support for judicial independence within the legal community. A **serious concern remains, however, about the independence of individual judges** from political, religious, and personal influences.

- **Judicial salaries have been increased significantly** since the fall of the Baath regime. It appears that this has been a factor in attracting many well-qualified applicants for judicial positions. Concerns remain, however, about how evenly non-monetary benefits, such as the use of government vehicles, are distributed among judges.

---

[1] The 2006 Iraq JRI does not include an analysis of the Kurdistan Region of Iraq. A supplement to this JRI covering the Kurdistan Region will be completed by the end of November 2006.



- The formation in June 2006 of an *independent, non-political, voluntary Judicial Association*, which would include both judges and prosecutors, potentially will enable the judges to address issues of concern to the judiciary as a whole.

- The 2005 Constitution greatly *enhanced the role of the judiciary in overseeing civil rights and liberties, as well as government administrative practices*. The courts now have extensive authority over the review of laws and governmental actions and the power to nullify or overturn decisions that violate the Constitution or relevant laws. Early cases involving the newly created Federal Supreme Court appear to *indicate that the Iraqi Government will accept adverse rulings*, perhaps signifying a broader acceptance of the principle of judicial review of executive actions. It remains to be seen, however, whether acceptance of this exercise of authority by the courts will become the norm.

## Major Concerns Identified in the 2006 Iraq JRI

- *Safety and security remains the fundamental issue* for Iraqi judges and their families. Indeed, the most serious issue facing Iraqi judges today is survival. The growing insurgency has made *judges and courthouses a centerpiece of attack.* Several judges and their family members have been assassinated since 2003, and many more have been threatened and have gone into hiding when not at the courthouse. Although judges are provided with bodyguards and other security measures, they remain at serious risk. Until security is restored to Iraq, judicial improvements of any sort will be difficult or impossible to implement.

- Despite advances related to structural independence of the judiciary, the *independence of individual judges remains a concern. Judges face intense pressure from external forces and individuals*, often for reasons related to strong family, tribal, ethnic, and religious loyalties. *Wasta,* the *practice of doing favors for persons with whom you have a family or other personal connection,* remains widespread. Although judges frequently rebuff these improper advances, it is impossible to measure how frequently *wasta* affects judicial actions. Given the polarization currently occurring in Iraqi society, it is likely that *pressure from religious and political leaders of various sects and factions* on judges who belong to the same sect or faction has grown. Furthermore, threats against judges and their families from individuals or groups connected to violent factions in Iraqi society have clearly increased.

- A number of problems in the Iraqi judiciary relate to an ongoing *lack of respect for the courts' authority by other parts of government*. For instance, there have been reports that the Ministry of Interior has *detained individuals in non-exigent circumstances without court authorization*, despite legal requirements to the contrary. Furthermore, there is frequently a *lack of enforcement of judicial decisions* by the police, who are charged with enforcing court judgments. Weak enforcement is due to a lack of coordination between the courts and the police, as well as the security situation and a lack of resources.

## Concerns Related to Lack of Accountability, Transparency, and Efficiency of the Judiciary

- Unless they are parties to the case at issue, Iraqi citizens have *little ability to hold judges accountable* or *to access information on the activities of the courts*. For instance, ordinary citizens have *no right to file a complaint against a judge* for misconduct, unless they are also a party to the case at issue. The invasion of Iraq in 2003 resulted in extensive damage to court files. Members of the public are *unable to examine court records* without special permission of the court, nor is there a public method for them to obtain judicial decisions of Iraqi courts. The poor condition of court



buildings, which results in some judges conducting civil trials in their offices, means that the public and the media often have *inadequate access to courtroom proceedings*.

- There is *no continuing legal education system* for Iraqi judges, which hinders judges from keeping up with developments in the law. Attempts by foreign governments and international NGOs to train Iraqi judges on cutting-edge issues have occurred, but it is impossible to gauge the sustainability of these efforts. Many of these courses involve flying Iraqi judges out of the country for short periods of time, with little or no follow-up.

- A related concern is that Iraqi judges are *unable to access information easily*. Judges and court employees have *no formal means of learning about court decisions* promulgated elsewhere in Iraq. *Law libraries have been devastated* in many parts of the country by post-invasion looting. Secondary source legal materials are difficult to find. Most judges and court employees *are unable to access the Internet for legal information*, due either to lack of adequate computer equipment, lack of training on how to use this equipment, or lack of steady electricity supply in some instances.

## Concerns Related to Gender, Ethnic, and Religious Imbalance in the Courts

- Despite some progress in achieving gender balance within Iraqi courts, *women still represent less than two percent of the judiciary* (13 women out of 738 sitting judges). The main reason for this disparity is the legacy of the Baath regime, when women were banned from the bench for nearly 20 years during 1984-2003. The current *judicial leadership is making strides in addressing this imbalance*. For instance, more than 10% of students presently enrolled at the Judicial Institute are women. However, a greater effort will need to be made to address this imbalance, particularly given the rise of religious parties and factions in Iraq that are opposed to women serving in the judiciary.

- Similarly, it appears that *full representation for all ethnic and religious groups in the judiciary has not yet been attained*, due mainly to decades of Baath domination of the courts, which favored Sunni Arabs over other minorities. Although the present ethnic composition of the courts is harder to measure, there are judges of various ethnic and religious backgrounds, including the current Chief Justice, who is a Shi'a Muslim. However, there are no formal programs aimed at stimulating the training, placement, and advancement of ethnic and religious minorities in the Iraqi judiciary.

# EXHIBIT B

**≡‖ ERNST & YOUNG**

**EY Iraq Debt Reconciliation Office**
Ernst & Young
5th . Circle
7 Kindi Street
Off Mecca Street
P.O. Box 5552                          Phone: +962 6 550 9001
Amman 11183
Jordan                                 Fax:    +962 6 551 0552

Website                                www.eyidro.com
E-Mail                                 idro@ammrsiesd.com

## Reconciliation Methodology

       This memorandum describes the steps that Ernst & Young, in its capacity as the Republic of Iraq's debt reconciliation agent (the "Reconciliation Agent"), have been instructed by the Iraqi authorities to follow in reconciling claims submitted for reconciliation pursuant to the Request For Information ("RFI") dated 9 December 2004 and posted on the Reconciliation Agent's website (www.eyidro.com).[1]

       Capitalized terms used but not otherwise defined in the body of this memorandum are listed in the Index of Defined Terms in the attached Exhibit A.

### 1.    Confirmation of Eligibility

       Only those claims that meet the criteria of Specified Debt will be reconciled and deemed eligible for the next step in this process. In brief (the attached Index of Defined Terms should be consulted for a complete definition), such claims are defined as outstanding contractual claims:

      (i)     against certain Iraqi governmental obligors or guarantors, as well as Rafidain Bank and Rasheed Bank;

      (ii)    that arose prior to 6 August 1990 (the date of United Nations Security Council Resolution 661 imposing sanctions prior to the first Gulf War);

      (iii)   that are now held by non-governmental creditors not resident in Iraq; and

      (iv)   that have not otherwise been nor will be submitted as part of a claim by a governmental creditor.

---

[1] Also posted on the www.eyidro.com website is the presentation made at the Dubai forum on 4 May 2005. That presentation outlined potential approaches to parts of this methodology (for example, with respect to interest calculation). In addition, comments made by claimants during and after the forum informed this methodology.

PLAINTIFF'S
EXHIBIT
B

**≡Ⅱ ERNST & YOUNG**

Such claims include any Items of Specified Debt that have been reduced to court judgments or arbitral awards. These will be reconciled as if the underlying claims had not been reduced to a judgment or award.

All claims that were or are eligible for consideration by the United Nations Compensation Commission (UNCC) will not be considered in this reconciliation process.

A Holder will be informed by the Reconciliation Agent if a claim is not eligible for reconciliation under these procedures.

In addition, Iraq reserves the right, in its sole discretion, to exclude from the reconciliation process any claims submitted by Holders that are located in jurisdictions subject to applicable sanctions or are otherwise deemed by Iraq or its advisers not to be eligible to participate in this process.

## 2.   Matching of Records

In the RFI, the Reconciliation Agent has asked Holders to provide certain information in respect of each Item of Specified Debt, including the name of the Holder, the name of the borrower and (where applicable) the guarantor, the caption of the governing instrument or contract (the "Instrument"), the date of the Instrument, the total original principal amount and currency of the claim, the outstanding principal amount of the claim and any details respecting the purpose of the Instrument or underlying transaction.

Upon receipt of sufficient information from the Holder concerning claims that are eligible for reconciliation, the Reconciliation Agent will proceed to compare the information provided in respect of each submitted Item against the corresponding Iraqi records. If the Holder has not submitted adequate information to begin this process, the Reconciliation Agent will contact the Holder requesting supplemental or clarifying information, including, where appropriate, supporting documentation.

The Reconciliation Agent will classify each Item as either reconciled or not reconciled. An Item will be classified as reconciled when it is matched to Iraqi records. An Item will be classified as not reconciled if, in light of the Reconciliation Agent's review of both the available Iraqi records and all of the information submitted by the Holder, the Reconciliation Agent is unable to confirm one or more of:

(1)   the claim's existence;

(2)   the outstanding principal amount claimed; or

(3)   the maturity date claimed.

The Reconciliation Agent will deliver to the Holder: (i) a notice of reconciled eligible claims, and (ii) a notice of claims not reconciled identifying

2

**ELI ERNST&YOUNG**

Items that cannot be reconciled because of one or more of the reasons set forth above (see Section 8, "Reconciliation Statements", below). However, throughout the reconciliation process, the Reconciliation Agent will continue to communicate with Holders who have submitted claims in order to facilitate the proper submission and rapid reconciliation of Items of Specified Debt.

3.    Reconciliation of Principal

The total unpaid principal of an Item of Specified Debt as of 1 December 2004 will be reconciled. Claims consisting solely of late interest will not be taken into account and will not be reconciled. However, to the extent that partial payments have been made in respect of claims including both principal and interest (late or otherwise) components, such payments will, for purposes of this reconciliation process, be applied to interest before principal.

4.    Calculation of Interest

    (a)    Interest Accrual Date

Interest (whether unpaid contractual interest or late interest) on the total reconciled unpaid principal of an Item of Specified Debt will not be reconciled according to the contractual provisions of the Instrument but will instead be calculated in the manner described below from the earliest of:

        (i)    the principal maturity date of that Item (where that Item has been rescheduled, the most recent rescheduled maturity date);

        (ii)    for interest-bearing Instruments, the last date on which a payment of interest was due for that Item and paid in full, regardless of actual date of payment (except where no interest payments were made, in which case the date from which interest began to accrue under the Instrument); and

        (iii)    6 August 1990

(the "Interest Accrual Date"). Any Item for which no date corresponding to (i) or (ii) above is specified in its Instrument will be deemed to have an Interest Accrual Date of 6 August 1990.

Partial payments will be assumed to have occurred as of the Interest Accrual Date unless the Holder establishes otherwise, in which case the calculation of interest will be adjusted accordingly, consistent with this methodology.

For Instruments that provide only for a lump sum payment due at maturity (and which do not specify a contractual rate of interest), the unpaid

3

**≡ll ERNST & YOUNG**

principal amount of the relevant Item as of the Interest Accrual Date will be assumed to include all accreted interest.

For the avoidance of doubt, this methodology for calculating interest accruals on Items of Specified Debt will supercede, for purposes of this reconciliation, any provisions for calculating unpaid contractual and late interest in the relevant Instrument. If an Instrument does not expressly contemplate the accrual of late interest on an Item after its scheduled principal maturity date, that Item will nonetheless be deemed for purposes of this reconciliation to have accrued late interest according to this methodology.

(b)    Interest Prior to 6 August 1990 -- Original Currency

Where the Interest Accrual Date for an Item occurs before 6 August 1990, interest will be deemed to have accrued on that Item from and including the Interest Accrual Date to but excluding 6 August 1990 at the Uniform Accrual Rates (defined in paragraph (d) below) corresponding to the original currency under the Instrument.[2] The Uniform Accrual Rate prevailing on each February 6, May 6, August 6 and November 6 (each, an "Interest Reset Date") will apply during the period from and including that date until it is reset as of the next Interest Reset Date.

If the Interest Accrual Date is not itself an Interest Reset Date, interest will be deemed to accrue for the period between the Interest Accrual Date and the immediately succeeding Interest Reset Date at the simple average of the Uniform Accrual Rates prevailing on (i) the Interest Reset Date immediately preceding the Interest Accrual Date and (ii) the Interest Reset Date immediately succeeding the Interest Accrual Date. For example, if the Interest Accrual Date is 1 November 1987, interest under this paragraph (b) will accrue from and including 1 November 1987 to but excluding 6 November 1987 at the average of two Uniform Accrual Rates, i.e., that prevailing on 6 August 1987 and that prevailing on 6 November 1987. From and including 6 November 1987 to but excluding 6 February 1988, interest will accrue at the Uniform Accrual Rate prevailing on 6 November 1987, and so forth.

All accrued but unpaid interest calculated pursuant to this Section 4 will be treated for these purposes as capitalized and compounded on each Interest Reset Date. The sum, in each currency, of the reconciled unpaid principal due as of the Interest Accrual Date plus the capitalized interest accrued pursuant to this paragraph (b) (together, the "Original Currency

---

[2] For certain currencies (for example, Austrian Shillings, Belgian Francs and Indian Rupees), published interbank rates are not available for some or all of the period preceding 6 August 1990. In such circumstances, the reconciled unpaid principal due as of the Interest Accrual Date will be converted as of that date into the applicable standard currency (as set forth in Section 4(c) below), and interest will be deemed to have accrued from the Interest Accrual Date to but excluding 6 August 1990 at the Uniform Accrual Rates corresponding to that standard currency.

4

**EY ERNST & YOUNG**

Sum") will be converted to a standard currency and bear interest as provided below.

    (c)    <u>Interest After 6 August 1990 -- Standard Currencies</u>

As of 6 August 1990, the Original Currency Sum will be converted (where necessary) to:

    (i)    Deutsche Marks ("<u>DEM</u>"), for Instruments denominated in the currency of any member of the European Economic Area and Switzerland; or

    (ii)    United States Dollars ("<u>USD</u>"), for Instruments denominated in all other currencies,

**except that** all amounts under Instruments denominated in Japanese Yen ("**JPY**") will remain in JPY. Conversion will occur into either DEM or USD at the exchange rate prevailing for the respective original currencies as of 6 August 1990 as set forth in Exhibit B attached to this memorandum.

For each Item, interest will be deemed to accrue on each converted Original Currency Sum from and including 6 August 1990 to but excluding the date of the closing for that Item under any future restructuring proposal that Iraq may elect to make, at the Uniform Accrual Rates corresponding to DEM, USD or JPY, as the case may be. As of 6 February 1999, each Original Currency Sum that had been converted to DEM plus all interest accrued thereon pursuant to this paragraph (c) will be converted to Euros ("**EUR**") at the exchange rate of EUR 1: DEM 1.955830, and interest will then continue to accrue on the resulting converted sum from and including 6 February 1999 at the Uniform Accrual Rates applicable to EUR.

    (d)    <u>Uniform Accrual Rates</u>

Interest deemed to accrue under paragraphs (b) and (c) above will be calculated for purposes of this reconciliation using the applicable Uniform Accrual Rates set out in Exhibit C attached to this memorandum.

The Uniform Accrual Rates reflect the 3-month currency interbank rate (London Interbank Offer Rate or comparable) prevailing as of each Interest Reset Date (adjusted as necessary to reflect a 30/360 day-count convention where the applicable currency's interbank rate follows an actual/360 (or other) money market convention), plus a margin of 0.75% p.a. (For purposes of illustration only, between 6 August 1990 and 30 June 2005, the Uniform Accrual Rates for USD indicate an interest factor of 2.17.)

5

**ΞΙΙ ERNST & YOUNG**

(e)    <u>Illustrative Example</u>

By way of illustration, assume 100,000 French Francs ("<u>FRF</u>") in unpaid principal due on 1 May 1988, together with FRF 3,000 of unpaid accrued interest (claimed as pursuant to the contractual rate specified in the relevant Instrument for the period 1 November 1987 through 1 May 1988), the last interest payment having been made on 1 November 1987.

Applying the reconciliation methodology set out in this memorandum:

(i)    the Interest Accrual Date is 1 November 1987, which is the last date of an interest payment (and earlier than the maturity date);

(ii)    interest will be calculated and deemed to accrue as follows:

(a)    from and including 1 November 1987 to but excluding 6 November 1987, at 9.5325%, which is the simple average of the Uniform Accrual Rates for FRF, as set out in the attachment, prevailing on 6 August 1987 (9.0569%) and 6 November 1987 (10.0081%), resulting in FRF 132.40 accrued and capitalized interest for those five days; and

(b)    from and including 6 November 1987 to but excluding 6 August 1990 (capitalized and compounded quarterly), at the Uniform Accrual Rates for FRF reset at each Interest Reset Date, resulting in further interest of FRF 30,625.69;

(iii)    the resulting Original Currency Sum of FRF130,758.09, representing outstanding principal plus interest accrued until 6 August 1990, will be converted on that date to DEM 38,960.16 at the exchange rate set out in the attachment;

(iv)    interest will be deemed to accrue (capitalized and compounded quarterly) on the converted Original Currency Sum from and including 6 August 1990 to but excluding 6 February 1999, at the Uniform Accrual Rates for DEM reset at each Interest Reset Date, and the resulting total of DEM 68,853.35 will on the latter date be converted to EUR 35,204.16 at the exchange rate set forth above; and

6

**ΞリERNST&YOUNG**

(v)    interest will thereafter be deemed to accrue (capitalized and compounded quarterly) from and including 6 February 1999, to but excluding the date on which that Item is restructured, at the Uniform Accrual Rates for EUR reset at each Interest Reset Date.

5.    <u>Fees, Liquidated Damages, etc.</u>

For purposes of this reconciliation, any amounts (such as fees, indemnities, liquidated damages and so forth) due in respect of an Item of Specified Debt other than principal or interest (reconciled as described in Section 3, "Reconciliation of Principal" and Section 4, "Calculation of Interest", above) will not be taken into account and will not be reconciled.

6.    <u>Treatment of Set-Offs</u>

The RFI asks Holders to identify whether they have exercised any set-off or other debit against the amount of an Item of Specified Debt (each, a "<u>Set-Off</u>"). In addition, if Iraqi records indicate an otherwise unexplained disposition of any Iraqi assets that were or are held by a Holder, the Reconciliation Agent will presume that a Set-Off has been effected in the absence of evidence to the contrary produced by the Holder.

If a Holder, or any predecessor in title of a Holder, has effected a Set-Off, the amount of that Set-Off will be treated for purposes of this reconciliation (without making a determination as to the validity of the Set-Off) as follows:

(a)    <u>Contractual Set-Offs</u>

A Set-Off or foreclosure against collateral security effected pursuant to provisions in the Instrument (or any related collateral security agreement) will be treated as having reduced the outstanding principal amount of the Item to the extent of the Set-Off or foreclosure, effective as of the Interest Accrual Date unless the Holder provides the date of its constructive receipt of the funds. Interest accruals will be adjusted accordingly to reflect that reduction.

(b)    Set-Offs Against
       <u>Property of the Specified Obligor</u>

A Set-Off in respect of an Item that was effected pursuant to provisions of statutory or common law against property owned, as of the date of the Set-Off, by the Specified Obligor (including any guarantor) for that Item, will be treated for purposes of this reconciliation as having reduced the outstanding amount of the Item to the extent of the Set-Off, effective as of the Interest Accrual Date unless the Holder provides the date of its constructive receipt of the funds. Interest accruals will be adjusted accordingly to reflect that reduction.

7

**＝Ⅱ ERNST & YOUNG**

(c)    Set-Offs Against
Property of Third Parties

A Set-Off in respect of an Item that was effected against property owned, as of the date of the Set-Off, by any person or entity <u>other than</u> the Specified Obligor (including any guarantor) for that Item will be treated as a constructive receipt by the Holder of all or a portion of the consideration payable to that Holder pursuant to any future restructuring proposal that Iraq may elect to make.

For purposes of illustration, if a Holder (or its predecessor in title) had applied $1,000 held in a bank account in the name of the Republic of Iraq against an Item of Specified Debt for which Rafidain Bank was the sole Specified Obligor, that $1,000 will be debited from the aggregate value of the consideration payable to that Holder in connection with any future restructuring proposal that Iraq may elect to make.

7.    <u>Assignments</u>

A claim otherwise meeting the criteria of Specified Debt will not be excluded from reconciliation merely because the Specified Obligor (including any guarantor) for that claim did not respond to a request for consent to a prior assignment of the claim.

For the sake of efficiency, however, the reconciliation process will proceed only with the Holder of an Item of Specified Debt as registered with the Reconciliation Agent pursuant to a Submission as of April 15, 2005 (the previously announced deadline for receipt of Submissions). Registered Holders (as of April 15, 2005) that have subsequently assigned legal title to any of their reconciled claims will, at or prior to the time of receiving any future restructuring proposal that Iraq may elect to make in respect of those claims, be asked to identify the assignee(s) of those claims. Each such assignee, assuming it meets the eligibility criteria referred to in Section 1 above ("Confirmation of Eligibility"), will separately receive any such restructuring proposal for the assigned reconciled claims.

8.    <u>Reconciliation Statements</u>

Following the reconciliation of a substantial amount (to be determined in Iraq's discretion upon consultation with the Holder) of the Items of Specified Debt submitted by a Holder for reconciliation pursuant to the methodology described in this memorandum, the Reconciliation Agent will send back to that Holder a Statement of Reconciled Eligible Claims substantially in the form attached as Exhibit D to this memorandum. The statement will list all of the Holder's reconciled Items.

If the Reconciliation Agent is unable to reconcile some or all of the claims submitted by a Holder for reconciliation, the Reconciliation Agent will send back to that Holder a Statement of Unreconciled Claims substantially in the form attached as Exhibit E to this memorandum. The statement will list all such

8

**≡ ERNST & YOUNG**

unreconciled claims and identify one or more of the reasons listed in Section 2, "Matching of Records", above for each unreconciled claim.

9.    Supplements and Clarifications

Any supplements to, or clarifications of, the reconciliation methodology described in this memorandum will be posted on this website (www.eyidro.com).

10.    Preservation of Defenses

Some or all of the claims submitted for reconciliation by a Holder may not be enforceable against the obligor or any guarantor thereof as a result of the operation of a statute of limitations, or the obligor or guarantor thereunder may have available other defenses to the legal enforcement of such claim. Nothing in this memorandum, or in any communication from the Reconciliation Agent or Iraq relating to this memorandum or the reconciliation process described herein, constitutes an admission of any such claim, an acknowledgment that any such claim has been revived or reinstated, or an express or implied promise to pay any such claim (or part thereof). All defenses available to Iraq or an obligor or guarantor of such a claim relating to any applicable statute of limitations or otherwise are expressly preserved.

This memorandum may not be relied upon as evidence of the willingness or ability of Iraq or any such obligor or guarantor to pay any such claim.

\*        \*        \*        \*        \*

By participating in this reconciliation process, each Holder agrees that the Reconciliation Agent shall be indemnified and held harmless for any and all claims, liabilities, suits, proceedings, judgments, costs and expenses to which the Holder or any related party may become subject arising from or in connection with any item of Specified Debt submitted for reconciliation in response to the Government of Iraq's RFI.

July 6, 2005          Ernst & Young,
                              as Reconciliation Agent for the Republic of Iraq

| | |
|---|---|
| Exhibit A | Index of Defined Terms |
| Exhibit B | Tables of Exchange Rates |
| Exhibit C | Tables of Uniform Accrual Rates |
| Exhibit D | Form of Statement of Reconciled Eligible Claims |
| Exhibit E | Form of Statement of Unreconciled Claims |

9

### Index of Defined Terms

For purposes of this reconciliation:

"<u>DEM</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>EUR</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>FRF</u>" has the meaning set forth in Section 4(e) on page 6 of the Reconciliation Methodology.

"<u>Holder</u>" (page 2) has the meaning set forth in the RFI and means a corporation, partnership, business trust, joint stock company, trust, unincorporated association, joint venture or other legal entity, other than:

> (i)  any of the foregoing resident in, or having its principal place of business in, the Republic of Iraq (as of 1 December 2004);
>
> (ii) a multilateral financial institution (such as the IMF and the World Bank); and
>
> (iii) a foreign government (including a foreign export credit agency).

"<u>Instrument</u>" has the meaning set forth in Section 2 on page 2 of the Reconciliation Methodology.

"<u>Interest Accrual Date</u>" has the meaning set forth in Section 4(a) on page 3 of the Reconciliation Methodology.

"<u>Interest Reset Date</u>" has the meaning set forth in Section 4(b) on page 4 of the Reconciliation Methodology.

"<u>Item</u>" has the meaning set forth under the definition of "<u>Specified Debt</u>" below.

"<u>JPY</u>" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

"<u>Original Currency Sum</u>" has the meaning set forth in Section 4(b) on pages 4 and 5 of the Reconciliation Methodology.

10

"Reconciliation Agent" has the meaning set forth on page 1 of the Reconciliation Methodology.

"RFI" has the meaning set forth on page 1 of the Reconciliation Methodology.

"Set-Off" has the meaning set forth in Section 6 on page 7 of the Reconciliation Methodology.

"Specified Debt" (page 1) has the meaning set forth in the RFI and means each outstanding contractual claim (each, an "Item") against a Specified Obligor (as defined below), in its capacity as obligor, issuer, guarantor, surety or, in the case of non-financial claims, as a contractual counterparty, that represents a claim:

> (i)   evidenced by a written agreement or financial instrument;
>
> (ii)  incurred or contracted for prior to 6 August 1990;
>
> (iii) for borrowed money, the advance of credit, the deferred purchase price of goods or services, balances due under letters of credit or financial guarantees, a conditional sale or a transfer with recourse or with an obligation to repurchase, interbank lines or placements, unpaid amounts due under commercial contracts with a Specified Obligor, and the uninsured portion of debts guaranteed by a foreign export credit agency if the claimant holds that portion in its own name and not through the foreign export credit agency;
>
> (iv)  denominated, or at the option of the Holder payable, in a currency other than Iraqi Dinars; and
>
> (v)   shown on the records of the Holder as being outstanding and owing as of 1 December 2004;

including any court judgments or arbitral awards rendered in respect of any Item of Specified Debt.

"Specified Obligor" (page 8) has the meaning set forth in the RFI and means:

> (i)   the Republic of Iraq;
>
> (ii)  the Central Bank of Iraq;

11

(iii)   other agencies or instrumentalities of the Republic of Iraq;

(iv)   legal entities more than 50% of whose capital stock (or equivalent ownership interest) is owned (as of 1 December 2004) by the Republic of Iraq or any of its agencies and instrumentalities;

(v)   Rafidain Bank, including branches and departments thereof; and

(vi)   Rasheed Bank, including branches and departments thereof.

Claims against private sector Iraqi obligors do not constitute Specified Debt.

"Submission" (page 8) has the meaning set forth in the RFI and means a properly completed Cover Sheet, Summary of Claim Forms, Claim Forms (as applicable, Trade Finance Claim Forms) and, if necessary, a Claim Adjustment Form.

"Uniform Accrual Rate" has the meaning set forth in Section 4(d) on page 5 of the Reconciliation Methodology, and each applicable Uniform Accrual Rate is set forth in Exhibit C to the Reconciliation Methodology.

"USD" has the meaning set forth in Section 4(c) on page 5 of the Reconciliation Methodology.

The Republic of Iraq reserves the right to revise any of the above definitions as additional information becomes available.

# EXHIBIT C





# THE REPUBLIC OF IRAQ

## INVITATION TO TENDER CLAIMS FOR CASH PURCHASE AND CANCELLATION

**February 9, 2006**

Citigroup Global Markets Inc.
J.P. Morgan Securities Inc.,
as Global Coordinators



PLAINTIFF'S
EXHIBIT
C

You are reminded that this Invitation has been delivered to you on the basis that you are a person into whose possession this Invitation may lawfully be delivered in accordance with the laws of the jurisdiction in which you are located, and you may not, nor are you authorized to, deliver this Invitation to any other person if doing so would result in a violation of the applicable laws of such jurisdiction. This Invitation does not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law.

# THE REPUBLIC OF IRAQ

## INVITATION TO TENDER CLAIMS
## FOR CASH PURCHASE AND CANCELLATION

### TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 1. | Invitation to Tender | 1 |
| 2. | Settlement Agent | 1 |
| 3. | Reconciliation; Interest Calculation | 2 |
| 4. | Currencies | 2 |
| 5. | Purchase Price | 3 |
| 6. | Tender Procedures and Acceptance by Iraq of a Tender | 4 |
| 7. | Holder Representations and Warranties | 4 |
| 8. | Effect of the Tender | 6 |
| 9. | Indemnity for Failure to Deliver Negotiable Instruments | 8 |
| 10. | Closing | 8 |
| 11. | Regulatory, Accounting and Tax Consequences | 9 |
| 12. | Preservation of Defenses | 9 |
| 13. | Litigated Claims | 10 |
| 14. | Unasserted Claims | 10 |
| 15. | Unreconciled Claims; Arbitration Mechanism | 11 |
| 16. | More Information | 12 |
| 17. | Governing Law; Submission to Jurisdiction; Waiver of Immunity | 12 |

EXHIBIT A:      ARBITRATION PROCEDURES
EXHIBIT B:      FORM OF TENDER
EXHIBIT C:      FORM OF ACCEPTANCE OF TENDER
SCHEDULE I:     STATEMENT OF RECONCILED ELIGIBLE CLAIMS
SCHEDULE II:    STATEMENT OF UNRECONCILED CLAIMS

iii

## Guide to Defined Terms

Defined terms used in this Invitation are first defined in the Section of the Invitation identified below.

| Term | Defined in Section |
|---|---|
| Acceptance Date | 6 |
| Arbitrated Claims Closing Date | 10 |
| Arbitration Mechanism | 8(x) |
| Closing Date | 10 |
| Dollars | 4 |
| Invitation | 1 |
| Iraq | 1 |
| Judgment | 13 |
| Pending Litigation | 13 |
| Purchase Price | 5 |
| Purchased Claims | 10 |
| Reconciled Eligible Claims | 1 |
| Reconciliation Agent | 3 |
| Reconciliation Methodology | 3 |
| RFI | 3 |
| Settlement Agent | 2 |
| Settlement Currency | 4 |
| Syndicate Agent | 8(iii) |
| Tender | 1 |
| Tender Due Date | 6 |
| Unasserted Claims | 1 |
| UNCC | 7(xiv) |
| Unreconciled Claims | 3 |
| Website | 3 |
| Yen | 4 |

iv

The following defined terms used in this Invitation are defined in the paragraph of the document captioned "Reconciliation Methodology" available at www.eyidro.com:

**<u>Term</u>**

Holder

Interest Accrual Date

Set-Off

Specified Obligor

**THE REPUBLIC OF IRAQ**

**INVITATION TO TENDER CLAIMS
FOR CASH PURCHASE AND CANCELLATION**

1.    Invitation to Tender

On the terms and subject to the conditions set forth in this invitation (the "Invitation"), the Republic of Iraq, acting through its Ministry of Finance ("Iraq"), hereby invites the entity identified as the Holder in Schedule I attached to this Invitation to tender for cash all of the Reconciled Eligible Claims listed in Schedule I (the "Reconciled Eligible Claims") for purchase by Iraq and simultaneous cancellation, at the Purchase Price described below (the "Tender").

This is the final Invitation you will receive in respect of your claims. No further work will be undertaken on the reconciliation of any claims of a Holder that elects to decline this Invitation, or does not tender its claims by the Tender Due Date (as defined below). No further offers to settle any such claims on different terms will be made or will be entertained. Pursuant to Section 12 below, all legal defenses (including statute of limitations defenses) that may be available to Iraq or any other obligor have been expressly reserved and will be vigorously asserted in any attempt to enforce any such claim at law.

2.    Settlement Agent

Iraq has engaged Citibank, N.A. to act as the Settlement Agent (the "Settlement Agent") for the purposes of this Invitation. The Settlement Agent will perform the functions ascribed to it in this Invitation. The Settlement Agent will perform its functions in connection with this Invitation principally through its office located at the following address:

Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
Citibank N.A. Agency and Trust
21st Floor
Citigroup Centre
33 Canada Square
London
E14 5LB
United Kingdom
Tel: +44 20 7508 3867
Fax: +44 20 7508 3866
Email: exchange.gats@citigroup.com

1

Citibank, N.A., in acting as the Settlement Agent, is acting solely as the agent of Iraq and does not assume any relationship of agency or trust with any Holder in connection with this transaction or assume any obligations to any Holder. The Settlement Agent shall not be liable for any recital or statement contained herein or in any other communication from Iraq regarding the Invitation.

3.    Reconciliation; Interest Calculation

This Invitation has been preceded by a debt reconciliation process performed by Ernst & Young, Iraq's debt reconciliation agent (the "Reconciliation Agent"). This process involved the solicitation by the Reconciliation Agent (on behalf of Iraq) of information concerning certain categories of claims against Iraq, other Iraqi public sector obligors and certain other parties as described in the Request for Information posted on the Ernst & Young website (www.eyidro.com) (the "Website") on December 9, 2004 (the "RFI"). The Reconciled Eligible Claims set out in Schedule I to this Invitation reflect claims meeting the eligibility criteria described in the RFI that were submitted by the Holder and successfully reconciled by the Reconciliation Agent (including any applicable adjustment for set-offs against the claims).

If any claims meeting the eligibility criteria of the RFI were submitted by the Holder in response to the RFI but could not be reconciled by the Reconciliation Agent by the date of this Invitation, these are listed on Schedule II to this Invitation ("Unreconciled Claims").

If any of the claims listed on either Schedule I or Schedule II to this Invitation seem inappropriately included, please contact the Settlement Agent at the address or telephone number set forth in Section 2 above.

Iraq will only recognize as interest for purposes of this Invitation the amounts shown opposite each Reconciled Eligible Claim in Schedule I to this Invitation. This calculation of interest has been carried out according to the methodology described in the document captioned "Reconciliation Methodology," dated July 6, 2005 (the "Reconciliation Methodology"), available on the Website. Such amounts may differ from amounts resulting from the formula for calculating contractual and late interest contained in the underlying contract, instrument or judgment evidencing the Reconciled Eligible Claim, if any.

4.    Currencies

For purposes of purchasing any Reconciled Eligible Claims that are tendered and accepted in connection with this Invitation, Iraq will make payments of the Purchase Price only in United States Dollars ("Dollars"), Euros or Japanese Yen ("Yen"), as applicable. Accordingly, Reconciled Eligible Claims submitted to the

2

debt Reconciliation Agent in a currency other than Dollars, Euros or Yen were translated from their original currencies into Euros or Dollars in accordance with the procedures set forth in the Reconciliation Methodology. The Purchase Price for claims tendered and accepted for purchase hereunder that are denominated in Dollars, Euros or Yen will be paid in their original currency. The currency you will receive is referred to herein as the "Settlement Currency".

5.    Purchase Price

The Purchase Price (the "Purchase Price") for all Reconciled Eligible Claims tendered and accepted in connection with this Invitation is an amount in the Settlement Currency equal to 10.25% of the aggregate amount of such Reconciled Eligible Claims (principal plus calculated interest accrued from and including the Interest Accrual Date to and excluding the Closing Date applicable to those Reconciled Eligible Claims specified in Schedule I (rounded to the nearest single currency unit). The Holder should note that although the Purchase Price is expressed as a fixed percentage of the reconciled principal and calculated interest amount of Reconciled Eligible Claims, payment of the Purchase Price by Iraq to the Holder will effect the unconditional and irrevocable purchase and cancellation of all amounts (including principal, contractual interest, late or penalty interest, fees, indemnities and any other amounts of whatever description) payable in respect of such Reconciled Eligible Claims and will release Iraq, any other obligors and any guarantors from any obligations on the Reconciled Eligible Claims.

As set forth in the Reconciliation Methodology, any Set-Off exercised by the Holder (or a predecessor in title) against the property of a party other than the Specified Obligor that reduced the amount of a Reconciled Eligible Claim prior to the purchase and simultaneous cancellation by Iraq of that claim, will reduce the Purchase Price payable to the Holder for that claim by an amount proportional to the amount of such Set-Off.

The Purchase Price for Reconciled Eligible Claims accepted for purchase in connection with this Invitation will be paid on the Closing Date in the Settlement Currency. The aggregate Purchase Price for all of the Holder's accepted Reconciled Eligible Claims denominated in each Settlement Currency shall be paid by a single wire transfer for each Settlement Currency in same-day funds to such bank account(s) as the Holder shall specify to the Settlement Agent in the Holder's Administrative Information accompanying the Holder's Tender or, at the Settlement Agent's option in the case of a payment of less than US$500,000 (or its equivalent in other currencies), by check mailed to such Holder at its address shown on the Holder's Administrative Information.

3

6.    Tender Procedures and Acceptance by Iraq of a Tender

If the Holder wishes to respond to this Invitation, it must do so by 5:00 P.M. (London time) on March 13, 2006 (the "Tender Due Date") by sending or delivering to the Settlement Agent a Tender in the form of Exhibit B hereto covering all, but not less than all, of the Reconciled Eligible Claims of such Holder listed on Schedule I together with all documentation required by Section 8(vii) and Section 13 below.

**If the Holder does not submit a Tender by the 5:00 P.M. (London time) on the Tender Due Date, Iraq shall deem this Invitation to have been rejected by the Holder in its entirety and no further Invitation or settlement offer will be sent to such a Holder. There is no option to defer this offer.**

Tenders that comply with the requirements of this Invitation will be accepted by Iraq. If the Tender does not strictly conform to those requirements it may be rejected by Iraq in its sole discretion. If any Tender is rejected, any negotiable instruments evidencing the Reconciled Eligible Claims that were delivered to the Settlement Agent pursuant to Section 8(vii) below will be promptly returned to the Holder.

The Settlement Agent shall confirm to the Holder the acceptance of the Tender by Iraq not later than March 27, 2006 (the "Acceptance Date") by sending a notice of acceptance in the form of Exhibit C. If the Holder submits the Tender but does not receive notice of receipt and acceptance from the Settlement Agent within fifteen calendar days after submission, the Holder should promptly contact the Settlement Agent.

Upon acceptance by Iraq of the Tender, such Tender will, together with the terms of this Invitation, constitute a binding contract between Iraq and the Holder for the sale, purchase and cancellation of the Reconciled Eligible Claims, enforceable in accordance with the terms hereof.

In the event any of the Reconciled Eligible Claims listed on Schedule I have been, or subsequently are, asserted against a Specified Obligor by a bilateral (governmental) creditor, by its acceptance of the Purchase Price on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

7.    Holder Representations and Warranties

By submitting the Tender, the Holder represents and warrants to each of Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of the Tender and as of the Closing Date, as follows:

4

(i)    it is the record holder of the Reconciled Eligible Claims identified in Schedule I (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)    it has the power and authority to submit the Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by the Tender;

(iii)    in submitting the Tender it will not, to its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal having jurisdiction over the Holder or any Reconciled Eligible Claim;

(iv)    it has taken all necessary action to authorize the execution and delivery of the Tender, and the performance of its obligations under the Tender and this Invitation;

(v)    the Tender, if accepted by Iraq in the manner described in Section 6 above, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of the Tender and this Invitation;

(vi)    any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under the Tender and this Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)    on the Closing Date, the Reconciled Eligible Claims covered by the Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)    the claims that are tendered meet the criteria for eligibility set forth in the RFI;

(ix)    it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)    the statements set forth in the Holder's response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

5

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claim;

(xii)    other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien, any other security interest or any other legal constraint) any Specified Obligor;

(xiii)    it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

(xiv)    none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the United Nations Compensation Commission (the "UNCC") established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

8.    Effect of the Tender

By submitting the Tender, the Holder irrevocably agrees to the terms and conditions of this Invitation.  As part thereof, the Holder:

(i)    agrees that it will continue to be the record holder of such Reconciled Eligible Claims (subject, where applicable, to the clarification in the parenthetical text in Section 7(i) above) from the date of the Tender to and including the Closing Date.  The Holder agrees that any purported transfer of any tendered Reconciled Eligible Claim in violation of the foregoing covenant will be void and of no effect;

(ii)    agrees to receive the applicable Purchase Price on the Closing Date as the full consideration for the sale to Iraq and cancellation of the Reconciled Eligible Claims listed in the Tender and in full discharge, release and satisfaction of all claims (including claims previously reduced to a Judgment (as defined in Section 13 below)) for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due in respect of the Reconciled Eligible Claims tendered by such Holder (regardless of whether any adjustment has been made to a claim or to the Purchase Price to account for a set-off effected by the Holder or a predecessor in title), and agrees to release and indemnify Iraq and any other obligor or guarantor in respect thereof from any and all claims by the Holder (or any other person claiming through the Holder) arising under such Reconciled Eligible Claims or any contract or Judgment evidencing such Reconciled Eligible Claims;

6

(iii)    agrees and authorizes the Settlement Agent to instruct the relevant syndicate agent (if any) under each syndicated contract relating to such Reconciled Eligible Claims (each a "Syndicate Agent") to mark its records to reflect the cancellation of the Reconciled Eligible Claims upon payment of the Purchase Price to the Holder on the Closing Date and agrees that the Settlement Agent in such capacity and the Syndicate Agent shall be fully indemnified by the Holder and held harmless for acting upon such instruction;

(iv)    agrees to provide the Settlement Agent with all relevant information (including addresses and fax numbers) pertaining to the Syndicate Agents so that the Settlement Agent may send notices to such Syndicate Agents confirming the instructions provided by the Holder in the above covenant (Section 8(iii));

(v)    agrees that Iraq and any other obligor or guarantor in respect of Reconciled Eligible Claims tendered hereunder, the Settlement Agent, the Global Coordinators and the Reconciliation Agent shall not, in any way, be liable to the Holder for any loss, liability, payment or expense incurred by such Holder as a result of any claim that may be brought against such Holder by any third party claiming to have an interest in such Reconciled Eligible Claims or the proceeds of the Purchase Price paid in respect thereof;

(vi)    confirms that in evaluating this Invitation and in making its decision whether to participate therein by submitting a Tender, the Holder has made an independent appraisal of the matters referred to herein and in any related communications from Iraq and is not relying on any statement, representation or warranty, express or implied, made to it by Iraq (other than as expressly set forth in this Invitation), the Settlement Agent, the Global Coordinators or the Reconciliation Agent, or by any of the partners, directors, officers, agents, employees or affiliates of any of them;

(vii)    warrants and agrees for each Reconciled Eligible Claim tendered that all negotiable instruments pertaining to such Reconciled Eligible Claim will have been delivered to the Settlement Agent prior to the Tender Due Date.  If the Holder fails, for any reason, to deliver any such negotiable instrument to the Settlement Agent prior to the Tender Due Date, the Holder shall be deemed to have given the indemnity set forth in Section 9 below;

(viii)    warrants and agrees for each Reconciled Eligible Claim tendered and each Unreconciled Claim that if any such claims are (i) covered by or merged into a Judgment (as defined in Section 13 below) or (ii) the subject of any Pending Litigation (as defined in Section 13 below), all documents required by Section 13 will have been delivered to the Settlement Agent prior to the Tender Due Date;

7

(ix)    agrees (subject only to the resolution of any Unreconciled Claims in accordance with Section 15 below) that the receipt of the Purchase Price with respect to the Reconciled Eligible Claims that are the subject of the Tender on the Closing Date will fully discharge and satisfy any and all claims for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due, or thereafter falling due, in respect of any Unasserted Claims (as defined in Section 14 below) and will release Iraq or such obligor or guarantor of any Unasserted Claim from such obligation as provided in Section 14 below;

(x)    agrees that any claim that remains unreconciled and is shown as such on the Holder's Statement of Unreconciled Claims will, no later than the Tender Due Date, either be submitted by the Holder to the Arbitration Mechanism described in Exhibit A hereto (the "Arbitration Mechanism") pursuant to Section 15 below, or be withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release contained in Section 8(ix) above; and

(xi)    agrees that the Tender will be irrevocable.

9.    Indemnity for Failure to Deliver Negotiable Instruments

If the instrument evidencing any Reconciled Eligible Claim is in the form of a negotiable instrument that the Holder fails, for any reason, to deliver to the Settlement Agent prior to the Tender Due Date as provided in this Invitation, the Holder thereof shall automatically be deemed to have given the following indemnity in respect of that instrument:

The Holder, by its acceptance of the Purchase Price on the Closing Date, hereby covenants and agrees to indemnify each of Iraq, the Specified Obligor under such instrument and the Settlement Agent, and to hold each of the foregoing harmless against, any loss, liability or expense (including legal expense) incurred by any of them arising out of, or in connection with, any subsequent assertion of a claim (including any exercise of a right of set-off or counterclaim) by any person based on that instrument or the underlying Reconciled Eligible Claim.

10.    Closing

A Closing in respect of this Invitation is expected to occur on or about March 30, 2006 (the "Closing Date"). Iraq may, in its sole discretion, revise the Closing Date, as it deems appropriate.

A final closing date for the settlement of commercial claims, following completion of the arbitration process, is expected to occur on or about July 15, 2006 (the "Arbitrated Claims Closing Date").

Upon acceptance of the Tender by Iraq, the Reconciled Eligible Claims covered by that Tender will be purchased by Iraq and simultaneously cancelled on the Closing Date.

Payment of the Purchase Price for the Reconciled Eligible Claims tendered and accepted in connection with this Invitation (the "Purchased Claims") will be made by the Settlement Agent on the Closing Date to the Holder of Purchased Claims in the manner described in Section 5 above. All such payments shall be made free and clear of any Iraqi taxes, including withholding taxes or similar levies.

At the time of the closing on the Closing Date, each tendering Holder (and any financial institution acting for the benefit of such Holder) shall be fully released and discharged by Iraq or any other Iraqi public sector obligor from any liability in connection with any performance bond, financial guarantee, counterguarantee or similar financial undertaking issued in respect of a project related to a Purchased Claim of that Holder.

11.    Regulatory, Accounting and Tax Consequences

The making of the Tender and the acceptance of payment for Purchased Claims may have accounting, tax and regulatory consequences to the Holder. This Invitation does not, and does not purport to, address these consequences, which may vary in different jurisdictions, and the Holder should consult its own independent accounting, tax and legal advisors in the relevant jurisdiction(s) concerning these matters.

12.    Preservation of Defenses

Some or all of the Reconciled Eligible Claims listed on Schedule I or Unreconciled Claims listed on Schedule II may not be enforceable against the obligor or any guarantor thereof as a result of the operation of a statute of limitations, or the obligor/guarantor thereunder may have available other defenses to the legal enforcement of such claim. Nothing in this Invitation, or in any communication from the Settlement Agent, the Reconciliation Agent or Iraq relating to this Invitation or the reconciliation process that preceded this Invitation, constitutes an admission of any such claim, an acknowledgment that any such claim has been revived or reinstated, or an express or implied promise to pay any such claim (or part thereof) other than, in the case of tendered and accepted Reconciled Eligible Claims, to pay the Purchase Price therefor in accordance with the terms of this Invitation. All defenses available to Iraq or an obligor or guarantor of a Reconciled Eligible Claim or an Unreconciled Claim relating to any applicable statute of limitations or otherwise are expressly preserved until such claim is fully discharged and cancelled in connection with this Invitation. This Invitation may not be relied upon as evidence of the willingness or ability of Iraq or any such obligor or

9

guarantor to pay Reconciled Eligible Claims or any other claims that are not tendered pursuant to this Invitation or are not accepted by Iraq for purchase hereunder.

13.    <u>Litigated Claims</u>

       If any Reconciled Eligible Claims or Unreconciled Claims are (i) covered by or merged into a court judgment or arbitral award (other than a UNCC award) (a "<u>Judgment</u>") or (ii) the subject of any pending litigation or arbitral proceeding in any jurisdiction ("<u>Pending Litigation</u>"), the Holder shall deliver to the Settlement Agent, not later than the Tender Due Date, all appropriate documents or court filings that will be required to discharge and cancel in full the Judgment corresponding to that Reconciled Eligible Claim or Unreconciled Claim (or that portion of the Judgment in which the Holder has an interest), or to withdraw, dismiss and discontinue with prejudice (with each party to bear its own legal costs and expenses) any Pending Litigation in full and final settlement thereof (to the extent that the Holder is a party thereto), together with the Holder's written authorization for Iraq (or its legal counsel) to file such documents with any court or tribunal that issued or recognized a Judgment, or before which a Pending Litigation is pending, following the closing on the Closing Date.

       The Holder agrees, promptly upon request of Iraq or the Settlement Agent, to take such other steps or give such other notifications as may be required to ensure that Iraq, or any Iraqi obligor or guarantor in respect of a Reconciled Eligible Claim or Unreconciled Claim, shall have no further liability to the Holder under a Judgment or in respect of a Pending Litigation.

14.    <u>Unasserted Claims</u>

       The RFI to which the Holder responded asked the Holder to identify all claims owned by it that meet the eligibility criteria set out in the RFI. In processing responses to the RFI, Iraq and the Reconciliation Agent have assumed that the Holder complied with this request and that, to the extent any claims meeting the eligibility criteria of the RFI held by the Holder on the date of its response to the RFI (or any supplement thereto) were <u>not</u> identified in its response to the RFI, or were initially identified but were subsequently withdrawn from the Holder's submission to the Reconciliation Agent, the Holder has decided to waive its right to assert a claim for payment or settlement of those amounts. Such unasserted claims are referred to herein as "<u>Unasserted Claims</u>".

       Accordingly, if a Holder's Tender of Reconciled Eligible Claims pursuant to this Invitation is accepted by Iraq and the Holder receives the Purchase Price corresponding to those Reconciled Eligible Claims on the Closing Date then, pursuant to Section 8(ix), the Holder (i) shall be deemed to have simultaneously cancelled and discharged in full all amounts (of whatever description) that may be

payable in respect of any Unasserted Claims, effective as of the Closing Date and (ii) shall have released Iraq and any obligor or guarantor of the Unasserted Claims from such obligation. The Holder further agrees not to attempt to sell, transfer or encumber any such Unasserted Claim following the date of Tender, or to take any action (including set-off and other similar self-help remedies) to enforce any such Unasserted Claim.

15.    Unreconciled Claims; Arbitration Mechanism

Schedule II to this Invitation lists any claims submitted for reconciliation by the Holder in response to the RFI that could not be successfully reconciled by the Reconciliation Agent by the date of this Invitation. Any claim that is identified on the Holder's Statement of Unreconciled Claims will, by the Tender Due Date, at the Holder's election, either be submitted to the Arbitration Mechanism or withdrawn by the Holder and treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.

This election may be made separately for each Unreconciled Claim shown on Schedule II.

**If the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim by the Tender Due Date, the Holder agrees that any Unreconciled Claim not covered by such an election will automatically be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 above.**

The arbitral award for any Unreconciled Claim that the Holder elects to refer to the Arbitration Mechanism will finally determine the existence, principal amount and maturity of such Unreconciled Claim and will be binding on both Iraq and the Holder, and shall not be subject to appeal. If that arbitral award is in favor of the Holder, the claim (as so awarded) shall thereafter be treated (without any action being taken by the Holder) for all purposes as a Reconciled Eligible Claim (with interest accrued to the Arbitrated Claims Closing Date) tendered by the Holder in accordance with its original Tender that has been accepted by Iraq and will be placed in line for purchase by Iraq on the Arbitrated Claims Closing Date pursuant to the terms, conditions and procedures set out in this Invitation. If the award is in favor of Iraq, the disallowed claim (or any disallowed portion thereof) shall be treated as an Unasserted Claim covered by the discharge and release contained in Section 14 above.

11

16.    More Information

Questions and requests for assistance may be directed to the Settlement Agent at its address and telephone number set forth in Section 2 of this Invitation. Additional copies of this Invitation and any related materials may be obtained from the Settlement Agent.

Holders with general enquiries relating to the terms of the Invitation may contact the Global Coordinators using the following contact details:

Citigroup Global Markets Inc.

Tel: +44 207 986 8969
Email: liabilitymanagement.europe@citigroup.com

J.P. Morgan Securities Inc.

Tel: +44 207 777 0600
Email: iraq.com.claims@jpmorgan.com

17.    Governing Law; Submission to Jurisdiction; Waiver of Immunity

This Invitation, the Tender, and any acceptance or rejection thereof by Iraq, shall be governed by and construed in accordance with the law of the State of New York.

The Holder, by submitting a Tender in response to this Invitation, and Iraq, each irrevocably submits to the jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, the City of New York, in any suit, action or proceeding relating to this Invitation or that Tender (it being understood, however, that disputes concerning Unreconciled Claims shall be resolved exclusively pursuant to the Arbitration Mechanism described elsewhere in this Invitation).

Iraq hereby waives irrevocably any immunity from jurisdiction (but not execution or attachment or process in the nature thereof) to which it might otherwise be entitled in any action arising out of or based on this Invitation that may be instituted by the Holder in any New York State or United States federal court sitting in the Borough of Manhattan, the City of New York. The submission to jurisdiction and waiver of immunity by Iraq contained herein is for the exclusive benefit of the Holder and shall not extend to any other person.

12

# ARBITRATION PROCEDURES

## Introduction

This Exhibit contains the procedures by which a determination as to the existence (including ownership), the principal amount and/or the maturity date (as the case may be) of one or more Unreconciled Claims may be submitted by a Holder (the "Claimant") for arbitration and final decision by an independent arbitrator. Capitalized terms used but not defined in this Exhibit have the meanings given to those terms in the Invitation.

Arbitration pursuant to these Arbitration Procedures is the sole remedy for a Claimant that wishes to pursue a claim in respect of one or more Unreconciled Claims. **If a Holder elects <u>not</u> to submit an Unreconciled Claim to arbitration pursuant to these Arbitration Procedures by the Tender Due Date, that Unreconciled Claim shall be deemed cancelled effective on the Closing Date as provided in Section 15 of the Invitation.**

It is anticipated by Iraq that arbitrations pursuant to these Arbitration Procedures will commence in approximately March, 2006.

## Arbitration Panel

Each arbitration pursuant to these Arbitration Procedures shall be conducted by a sole arbitrator chosen by the Chairperson from an Arbitration Panel of independent experts recommended by the Secretariat of the International Court of Arbitration of the International Chamber of Commerce (the "Panel"). The Chairperson shall be chosen by Iraq and shall not serve as an arbitrator.

Members of the Panel will be chosen for their experience and independence. At least two members of the Panel shall be fluent in Arabic. All members of the Panel shall be fluent in English. At the request of the Chairperson, the Secretariat of the International Court of Arbitration of the International Chamber of Commerce shall be asked to recommend additional members of the Panel, or to fill any vacancies on the Panel, with similarly qualified individuals.

These Arbitration Procedures shall govern all arbitrations conducted by members of the Panel. The Chairperson, in consultation with the Panel, shall have the discretion to supplement these Procedures if he or she feels this would be in the best interest of an efficient arbitration process by posting such supplements on the Website.

## Notice of Arbitration

A Claimant wishing to commence an arbitration for one or more Unreconciled Claims held by that Claimant must, by the Tender Due Date, submit a written notice (a "Notice of Arbitration") to the Chairperson and the Reconciliation Agent containing the following information:

(i)     the name and contact details of the Claimant;

(ii)    a list of all Unreconciled Claims for which arbitration is sought, identified by the caption of the debt instrument(s) and the identification number assigned by the Reconciliation Agent to each such claim;

(iii)   a copy of the related Statement of Unreconciled Claims, together with the Reconciliation Agent's indication of the reason for its inability to reconcile;

(iv)    a statement as to whether the Claimant wishes the arbitration to be conducted in English or in Arabic;

(v)     a statement that the Claimant understands and accepts that the Award rendered by the Arbitrator in respect of each Unreconciled Claim submitted for arbitration shall be final, non-appealable and binding; and

(vi)    a statement that the Claimant agrees to participate in an arbitration in accordance with these Arbitration Procedures.

The Settlement Agent will contact each Holder prior to the Tender Due Date regarding the form of Notice of Arbitration, the form of list of all Unreconciled Claims for which arbitration is sought and the addresses of the Chairperson and the Reconciliation Agent for submissions.

Prior to the commencement of the arbitration period, the Chairperson shall assign each arbitration to a member of the Panel (for that arbitration, the "Arbitrator") who has certified to the Chairperson that he/she is independent of each of the parties to the Arbitration and intends to remain so; and to the best of his/her knowledge, there are no facts or circumstances, past or present, that need be disclosed because they might be of such nature as to call into question his/her independence in the eyes of any of the parties to the Arbitration. The Arbitrator shall promptly identify himself/herself to the parties by telephone, electronic mail or in writing, and shall provide the parties with the address and contact details of the Arbitrator.

A-2

## Parties

The only parties to an arbitration shall be Iraq and the Claimant. The Settlement Agent, the Global Coordinators, any Syndicate Agent and the Reconciliation Agent shall not be joined as parties or witnesses to any Arbitration.

## Written Submissions

Within 15 calendar days of being assigned an arbitration, the Arbitrator shall notify the Claimant and Iraq in writing of the date on which written submissions by the Claimant and Iraq are due (which date shall be approximately 45 days following the date of the Arbitrator's notice) (the "Submission Date").

Written submissions by Claimants and other communications to or from Iraq, the Arbitrator or Claimants may be made in English or Arabic, as specified by the Claimant in the Notice of Arbitration. A written submission by the Claimant shall be comprised of a brief statement of the Claimant's position, copies of relevant documents (translated into English if the arbitration is to be conducted in English; or into English or Arabic if the arbitration is to be conducted in Arabic) and (at the option of the Claimant) one or more sworn statements by individuals having personal knowledge of the relevant facts that bear upon the validity, principal amount or maturity date of the Unreconciled Claim (as the case may be).

The Claimant shall also include in its written submissions, if available, the originals (or certified copies) of the instruments evidencing the Unreconciled Claim. If such original or certified copies are not available, the Claimant shall include the best evidence the Claimant possesses concerning the Unreconciled Claim.

Iraq may, but shall not be obligated to, submit a written submission of the kind referred to in the prior two paragraphs.

One copy of each written submission shall be delivered to the Arbitrator and to the other party.

Within 15 calendar days of the Submission Date, either party may submit a rebuttal to the written submission of the other party by delivering a copy of that rebuttal to the Arbitrator and to the other party. Thereafter, no further written submissions of any kind will be entertained unless specifically requested by the Arbitrator.

At the Arbitrator's sole discretion, the Arbitrator may request additional documentary evidence and one or more conference telephone calls among the parties to discuss issues related to the arbitration or any questions that the Arbitrator may have arising from the written submissions or rebuttals. Both parties shall be entitled to have legal counsel participate in any such calls.

A-3

No party shall have any right of documentary discovery, or any right to depose or cross-examine witnesses, in respect of the other party.

Neither party may communicate with the Arbitrator verbally unless they have given notice to the other party of that intended communication and the other party has been furnished an opportunity to participate in the communication.

Any document or writing sent by either party to the Arbitrator shall be simultaneously copied to the other party.

Awards

Approximately 45 calendar days following the Submission Date, the Arbitrator shall send his/her written award to the parties, with a copy to the Chairperson and the Reconciliation Agent (each an "Award"), covering each Unreconciled Claim for which arbitration was requested, the final value of which shall be calculated by the Reconciliation Agent in accordance with the Reconciliation Methodology, as described below. The Award shall state, for each such Unreconciled Claim, whether the Claim is recognized as valid and, if so, the total principal amount and maturity date of that Unreconciled Claim.

Standard for Rendering Awards

An Arbitrator, acting in his or her sole discretion, shall recognize as valid an Unreconciled Claim submitted for arbitration, or shall determine the principal amount or maturity date thereof (as the case may be), if the Arbitrator finds that the existence, principal amount or maturity date, as the case may be, of that Unreconciled Claim has been, to the reasonable satisfaction of the Arbitrator, corroborated by credible documentary evidence, which may include historical documentary evidence (such as financial statements, annual reports, or copies of prior billings sent to an Iraqi counterparty) of the existence, principal amount or maturity date of the Unreconciled Claim, as the case may be. Under these circumstances, the Arbitrator shall render an Award in respect of that Unreconciled Claim in favor of the Claimant, even if Iraq presents no written submission in the arbitration.

If the Arbitrator fails to find such credible documentary evidence, it shall render the Award for that Unreconciled Claim in favor of Iraq.

If the Award is rendered in favor of the Claimant, the Reconciliation Agent shall proceed to calculate contractual and late interest thereon in accordance with the Reconciliation Methodology referred to in Section 3 of the Invitation. The aggregate amount of the claim (principal plus calculated interest) shall then be purchased by Iraq and simultaneously cancelled on the Arbitrated Claims Closing Date, on the terms set out in the Invitation.

A-4

The Arbitrator shall not be required to give a statement of the rationale or reasons for the Award.

**All Awards shall be final, non-appealable and binding on both parties. Neither party shall have any recourse to appeal an Award to any court or tribunal.**

### Indemnity and Release

The Claimant (by submitting one or more Unreconciled Claims for arbitration under these Arbitration Procedures) and Iraq each irrevocably agrees to indemnify, release and hold harmless the Chairperson and each member of the Panel from any loss, claim or liability arising from these Arbitration Procedures or from the conduct of, or the Award in, an Arbitration.

### Notices

Any Notice of Arbitration, written submission, rebuttal or Award or other document delivered in accordance with these Arbitration Procedures shall be sent by registered mail or receipted courier, in each case to arrive, to the extent possible, with the intended recipient no later than the second day following dispatch.

### Governing Law

These Arbitration Procedures, and each Arbitration conducted hereunder, shall be subject to the law of the State of New York.

A-5

## SUMMARY TIME SCHEDULE OF ARBITRATION PROCEDURES[*]

| Event | Date |
|---|---|
| Submission of Notice of Arbitration – Tender Due Date ............................................................ | March 13, 2006 |
| Assignment of Claims to Arbitrator by Chairperson............................................................... | March 14, 2006 through March 21, 2006 |
| Notification by Arbitrator of Deadline for Written Submissions ................................................................. | Not later than 15 calendar days from Assignment of Arbitration to Arbitrator |
| Submission Date ................................................................. | Approximately 45 calendar days from Notification |
| Deadline for Rebuttal Submissions.................................... | Not later than 15 calendar days from Submission Date |
| Arbitral Awards Rendered ................................................. | Approximately 45 calendar days from Submission Date |
| Arbitrated Claims Closing Date.......................................... | Not later than July 15, 2006 |

---

[*] These dates may be altered by Iraq in its sole discretion. Any changes to this schedule shall be posted on the Website.

A-6

FORM OF TENDER

**[Please complete by typing in the missing information and return this form together with its attachments, including your Statement of Reconciled Eligible Claims, to the Settlement Agent at the fax number shown below.]**

To:        Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
               Citibank N.A. Agency and Trust
               21st Floor
               Citigroup Centre
               33 Canada Square
               London
               E14 5LB
               United Kingdom
               Tel: +44 20 7508 3867
               Fax: +44 20 7508 3866
               Email: exchange.gats@citigroup.com

From:       _____
               (the "Holder")

Date:         _____

Re:         Iraq Invitation to Tender Claims for Cash Purchase and Cancellation
               dated February 9, 2006 (the "Invitation")

        We refer to the Invitation. Capitalized terms used herein have the meanings given to those terms in the Invitation.

        The above-named Holder is the holder of the Reconciled Eligible Claims specified in the schedule attached hereto (bearing the Holder Reference Number: _____) and hereby offers each such Reconciled Eligible Claim for purchase by Iraq and simultaneous cancellation on the terms, and subject to the conditions, set out in the Invitation. This Tender is irrevocable.

        The Holder is the holder of the Unreconciled Claims specified in the Schedule II attached hereto and hereby irrevocably agrees that if the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim pursuant to the Arbitration Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any Unreconciled Claim not covered by such an election will be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 of the Invitation.

B-1

By submitting this Tender, the Holder represents and warrants to Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of this Tender and the Closing Date, as follows:

(i)     it is the record holder of the Reconciled Eligible Claims identified in Schedule I to the Invitation (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)     it has the power and authority to submit this Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by this Tender;

(iii)     in submitting this Tender it will not, to the best of its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal of competent jurisdiction;

(iv)     it has taken all necessary action to authorize the execution and delivery of this Tender, and the performance of its obligations under this Tender and the Invitation;

(v)     this Tender, if accepted by Iraq in the manner described in Section 6 of the Invitation, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of this Tender and the Invitation;

(vi)     any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under this Tender and the Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)     on the Closing Date, the Reconciled Eligible Claims covered by this Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)     the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI;

(ix)     it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)     the statements set forth in the Holder's response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

Holder Reference Number: _____ __

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claims;

(xii)    other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien or any other security interest) any Specified Obligor;

(xiii)    it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

(xiv)    none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the UNCC established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

If any Reconciled Eligible Claims or Unreconciled Claims are covered by or merged into a Judgment (other than a UNCC award) or are the subject of any Pending Litigation in any jurisdiction (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), the Holder has delivered to the Settlement Agent the documentation required by Section 13 of the Invitation.

If any Reconciled Eligible Claims are evidenced by a negotiable instrument (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), those negotiable instruments have been delivered to the Settlement Agent, or the indemnity set forth in Section 9 of the Invitation is given.

Regards,


By:
_____
Name:
Title:
Name of Institution:

Attachments:    Holder's Administrative Information
Statement of Reconciled Eligible Claims


B-3

Holder Reference Number: _____

## ATTACHMENT TO TENDER

### HOLDER'S ADMINISTRATIVE INFORMATION

| | |
|---|---|
| **HOLDER'S NAME:** | |
| | |
| **STREET ADDRESS:** | |
| | |
| **CONTACT PARTY:** | |
| | |
| **PHONE:** | |
| | |
| **FACSIMILE NUMBER:** | |
| | |
| **ELECTRONIC MAIL ADDRESS:** | |

### SYNDICATE AGENT'S ADMINISTRATIVE INFORMATION (IF APPLICABLE)

| | |
|---|---|
| **SYNDICATE AGENT'S NAME:** | |
| | |
| **STREET ADDRESS:** | |
| | |
| **CONTACT PARTY:** | |
| | |
| **PHONE:** | |
| | |
| **FACSIMILE NUMBER:** | |
| | |
| **ELECTRONIC MAIL ADDRESS:** | |

B-4

Holder Reference Number: _____

PAYMENT INSTRUCTIONS

| CURRENCY: | U.S. DOLLARS |
|---|---|
| BANK NAME: | |
| ABA/FEDWIRE OR SWIFT (OR USD CORRESPONDENT BANK DETAILS, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | EURO |
|---|---|
| BANK NAME: | |
| SWIFT OR SORT CODE (OR EURO CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | JAPANESE YEN |
|---|---|
| BANK NAME: | |
| SWIFT (OR JPY CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

B-5

EXHIBIT C

## FORM OF ACCEPTANCE OF TENDER

| To: | [Holder] |
|---|---|
| Attn: | [Name] |
| From: | Citibank, N.A. |
| Date: | _____ |
| Re: | Iraq Debt Purchase Tender |

We refer to your Tender (the "Tender") dated _____ in response to the Republic of Iraq's ("Iraq") Invitation to Tender Claims for Cash Purchase and Cancellation dated February 9, 2006 (the "Invitation").

At the instruction of Iraq, we are writing to confirm Iraq's acceptance of the Tender on the terms and subject to the conditions of the Invitation.

Accordingly, Iraq has instructed us to inform you that the Reconciled Eligible Claims listed in the schedule to the Tender (Holder Reference Number_____) will be purchased by Iraq and cancelled on or about March 30, 2006 (the "Closing Date") at the Purchase Price calculated in the manner provided in Section 5 of the Invitation.

Regards,

By: Citibank, N.A.,_____
     as Settlement Agent

Name:_____

C-1

EY Iraq Debt Reconciliation Office

| Date of this Reconciliation Statement: | 09-Feb-2006 | Tender Due Date : | 13-Mar-2006 |
|---|---|---|---|
| Date Interest Calculated To: | 30-Mar-2006 | Closing Date : | 30-Mar-2006 |

## Schedule I: Statement of Reconciled Eligible Claims

**Name of Holder: Example COMMERCIAL Company**

**Holder Address: 25 Main St, Anytowen, Any Country**

**Holder Reference Number: CR999999**

**Holder Telephone: +49 111 222 4567**

**Holder Contact Person: Mr. Ralf Thomson**

**Holder Fax: +49 111 222 9988**

| | Our Reference | Your Booking Ref | Caption of, or description of, instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Principal in Original Currency | Standard Currency | Reconciled Outstanding Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 56021 0x00 | ABC 112233 | Letter of Credit 89-100166 | CENTRAL BANK OF IRAQ | FRF | 1,202,809.73 | EUR | 183,239.04 | 292,303.57 | 475,542.61 |
| 2 | 56023 0x00 | XYZ 987654 | Letter of Credit 100167 | CENTRAL BANK OF IRAQ | FRF | 467,682.00 | EUR | 71,247.84 | 109,675.63 | 180,923.47 |
| 3 | 56025 0x00 | FYH 123456 | Letter of Credit 204935509 | CENTRAL BANK OF IRAQ | FRF | 472,152.32 | EUR | 71,928.96 | 109,016.27 | 180,945.23 |

Aggregate Amount of Reconciled Eligible Claims    EUR    837,411.31

Purchase Price of Reconciled Eligible Claims (apply 10.25%)    EUR    85,834.66

Notes - 1. Where the number in the column "Our Reference" of this statement is followed by a letter, please refer to the appropriate note for that item as below:

(a) Contractual, statutory or common law Set-Offs effected against property of the Specified Obligor have been treated as having reduced the outstanding principal amount of the Item to the extent of the Set-Off. Holder must confirm and/or disclose full details of all set-offs exercised against Iraqi assets. Details to be disclosed include the type of set-off, the date set-off was exercised, the currency and amount.

(b) Indicates that the original negotiable instrument must be submitted pursuant to Section 6 of the Invitation.

(c) Indicates that all appropriate documents relating to Judgments and Pending Litigation must be submitted pursuant to Section 13 of the Invitation.

(d) Holder must confirm that claim was not eligible for consideration by the United Nations Compensation Commission (UNCC) pursuant to Section 7 of the Invitation. Indicates that official documents relating to compensation awards made by United Nations Compensation Commission (UNCC) must be submitted.

(e) Indicates that the Item may be a duplicate of an official claim. Holder must confirm and / or disclose full details of such duplication.

(f) Holder must provide details of all accounts (deposit accounts etc.) belonging to Specified Obligors (including the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, and the branches and offices of these banks) at the Holder institution. Details provided should include the name of the Specified Obligor(s), account number(s) and the current balance and currency for each account.

2. Set-Offs effected improperly against the property of third parties will be taken into account when calculating the consideration to which the tendering Holder is entitled.

3. Certain of the claims shown on this Statement may have been, or may subsequently be, asserted against a Specified Obligor by a bilateral (governmental) creditor. By its acceptance of the Consideration on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

EY Iraq Debt Reconciliation Office

Date of this Statement of Unreconciled Claims   09-Feb-2006

# Schedule II: Statement of Unreconciled Claims

**Name of Holder: Example COMMERCIAL Company**

**Holder Address: 35 Main St , Any City, Any Country**

**Holder Reference Number: CR999999**

**Holder Telephone: +49 111 222 4567**

**Holder Contact Person: Mr. Ralf Thomson**

**Holder Fax: +49 111 222 9988**

| | Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Unreconciled Claim | Specified Obligor | Currency | Amount of Principal claimed by Holder | The Reconciliation Agent is unable to confirm: |
|---|---|---|---|---|---|---|---|
| 1 | 57407 | XYZ 552243489 | Letter of Credit 000003-497560 | RAFIDAIN BANK | FRF | 1,062,671.46 | Existence |
| 2 | 57410 | XYZ 552454910 | Letter of Credit 000003-498303 | RAFIDAIN BANK | FRF | 302,835.90 | Existence |
| 3 | 57413 | XYZ 552454911 | Letter of Credit 000003-497559 | RAFIDAIN BANK | FRF | 52,745.47 | Existence |
| 4 | 57416 | XYZ 552454846 | Letter of Credit 000003-497561 | RAFIDAIN BANK | FRF | 900,194.75 | Existence |
| 5 | 57417 | XYZ 552454847 | Letter of Credit 000003-497562 | RAFIDAIN BANK | FRF | 335,729.44 | Existence |
| 6 | 57419 | XYZ 552454428 | Letter of Credit 000003-498303 | RAFIDAIN BANK | USD | 10,955.35 | Existence |

# EXHIBIT D

EY Iraq Debt Reconciliation Office

Date of this Reconciliation Statement: 22-Feb-2006          Tender Due Date : 13-Mar-2006

Date Interest Calculated To:          30-Mar-2006           Closing Date :      30-Mar-2006

## Schedule I: Statement of Reconciled Eligible Claims

Name of Holder: AGROCOMPLECT, EAD

Holder Address: 14915 River Road, Potomac, Maryland 20854, USA

Holder Reference Number: CR006097          Holder Contact Person: Attorney Sylvia J. Rolinski, Esquire

Holder Telephone: +1 240 632 0903          Holder Fax: +1 240 632 0906

| Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Principal in Original Currency | Standard Currency | Reconciled Outstanding Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|

The Reconciliation Agent was unable to reconcile any of the claims registered by the Holder.



PLAINTIFF'S EXHIBIT

Page 1 of 1

# EXHIBIT E

EY Iraq Debt Reconciliation Office

Date of this Statement of Unreconciled Claim    22-Feb-2006

## Schedule II: Statement of Unreconciled Claims

Name of Holder: AGROCOMPLECT, EAD

Holder Address: 14915 River Road, Potomac, Maryland 20854, USA

Holder Reference Number: CR006097

Holder Contact Person: Attorney Sylvia J. Rolinski, Esquire

Holder Telephone: +1 240 632 0903

Holder Fax: +1 240 632 0906

| Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Unreconciled Claim | Specified Obligor | Currency | Amount of Principal Claimed by Holder | The Reconciliation Agent is unable to confirm: |
|---|---|---|---|---|---|---|
| 1 | 57990 | CONTRACT NO. 65 | Other Debt: CONTRACT NO. 65 | RAFIDAIN BANK | USD | 7,550,203.20 | Existence |



PLAINTIFF'S
EXHIBIT

# EXHIBIT F

**TENDER**

To:     Settlement Agent, Agency and Trust – Mail Drop cgc-21-54
        Citibank N.A. Agency and Trust
        21ˢᵗ Floor
        Citigroup Centre
        33 Canada Square
        London
        E14 5LB
        United Kingdom
        Tel: +44 20 7508 3867
        Fax: +44 20 7508 3866
        Email: exchange.gats@citigroup.com

From:   Agrocomplect, EAD
        (the "Holder")

Date:   03/09/06

Re:     Iraq Invitation to Tender Claims for Cash Purchase and Cancellation
        dated February 9, 2006 (the "Invitation")

        We refer to the Invitation. Capitalized terms used herein have the meanings given to those terms in the Invitation.

        The above-named Holder is the holder of the Reconciled Eligible Claims specified in the schedule attached hereto (bearing the Holder Reference Number: - CR 006097       ) and hereby offers each such Reconciled Eligible Claim for purchase by Iraq and simultaneous cancellation on the terms, and subject to the conditions, set out in the Invitation. This Tender is irrevocable.

        The Holder is the holder of the Unreconciled Claims specified in the Schedule II attached hereto and hereby irrevocably agrees that if the Chairperson for the Arbitration Mechanism does not receive a written notice from the Holder specifying its election with respect to each Unreconciled Claim pursuant to the Arbitration Procedures set out in Exhibit A to the Invitation by the Tender Due Date, any Unreconciled Claim not covered by such an election will be cancelled effective on the Closing Date, and the Holder irrevocably agrees that such claim will be treated as an Unasserted Claim covered by the discharge and release set out in Section 14 of the Invitation.

        By submitting this Tender, the Holder represents and warrants to Iraq, the Global Coordinators, the Reconciliation Agent and the Settlement Agent, as of the date of this Tender and the Closing Date, as follows:



PLAINTIFF'S
EXHIBIT
E

Holder Reference Number: CR  006097

(i)     it is the record holder of the Reconciled Eligible Claims identified in Schedule I to the Invitation (or would be the record holder had all required consents to the assignment of the Reconciled Eligible Claims to the Holder been obtained) and has all legal right, title and authority to sell such claims free from all liens, encumbrances or rights of third parties therein and to give a full and complete discharge and release of all amounts relating to such Reconciled Eligible Claims;

(ii)    it has the power and authority to submit this Tender and to receive the Purchase Price as the full consideration for the sale and cancellation of all amounts relating to the Reconciled Eligible Claims covered by this Tender;

(iii)   in submitting this Tender it will not, to the best of its knowledge, contravene any applicable law, regulation or contractual restriction or any order by any tribunal of competent jurisdiction;

(iv)    it has taken all necessary action to authorize the execution and delivery of this Tender, and the performance of its obligations under this Tender and the Invitation;

(v)     this Tender, if accepted by Iraq in the manner described in Section 6 of the Invitation, constitutes the Holder's valid and binding obligation, enforceable against the Holder in accordance with the terms of this Tender and the Invitation;

(vi)    any governmental authorizations or approvals of any kind required for the validity or enforceability against the Holder of its obligations under this Tender and the Invitation have been obtained or performed and are valid and subsisting in full force and effect;

(vii)   on the Closing Date, the Reconciled Eligible Claims covered by this Tender will be sold to Iraq and cancelled free from all liens, encumbrances or rights of third parties therein;

(viii)  the claims that are tendered hereby meet the criteria for eligibility set forth in the RFI;

(ix)    it holds no claims meeting the eligibility criteria of the RFI that were not identified in its response to the RFI (including any supplement thereto);

(x)     the statements set forth in the Holder's  response to the RFI, as amended or supplemented, were true and accurate as of the date of such response or supplement;

(xi)    other than as previously disclosed to the Reconciliation Agent, neither the Holder nor, to the Holder's knowledge, any predecessor in title has exercised any set-off or other debit against the value of any Reconciled Eligible Claims;

2

Holder Reference Number: CR 006097

    (xii)   other than as previously disclosed to the Reconciliation Agent, the Holder does not hold any balances or other accounts for the benefit of (whether subject to a banker's lien or any other security interest) any Specified Obligor;

    (xiii)   it has not been charged with or convicted of terrorism or money laundering nor charged with or convicted of any crime with respect to the Reconciled Eligible Claims by any tribunal of competent jurisdiction; and

    (xiv)   none of the Reconciled Eligible Claims identified in Schedule I were eligible for consideration by the UNCC established pursuant to United Nations Security Council Resolution No. 692, dated as of May 20, 1991.

    If any Reconciled Eligible Claims or Unreconciled Claims are covered by or merged into a Judgment (other than a UNCC award) or are the subject of any Pending Litigation in any jurisdiction (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), the Holder has delivered to the Settlement Agent the documentation required by Section 13 of the Invitation.

    If any Reconciled Eligible Claims are evidenced by a negotiable instrument (which should previously have been indicated in the Holder's response to the RFI and, where known to the Reconciliation Agent, is noted in the attached Statement of Reconciled Eligible Claims), those negotiable instruments have been delivered to the Settlement Agent, or the indemnity set forth in Section 9 of the Invitation is given.

Regards,

By: _____

Name: Sylvia J. Rolinski, Esq.
Title: Attorney
Name of Institution: Agrocomplect, EAD

Attachments:  Holder's Administrative Information
                Statement of Reconciled Eligible Claims

3

Holder Reference Number: CR 006097

## ATTACHMENT TO TENDER

### HOLDER'S ADMINISTRATIVE INFORMATION

| HOLDER'S NAME: | Agrocomplect, EAD |
|---|---|
| | |
| STREET ADDRESS: | 61 Vitoshe Blvd. |
| | Sofia, Bulgaria 1000 |
| CONTACT PARTY: | Sylvia J. Rolinski, Esq. |
| | |
| PHONE: | 1-(240) 632-0903 |
| | |
| FACSIMILE NUMBER: | 1-(240) 632-0906 |
| | |
| ELECTRONIC MAIL ADDRESS: | SRolinski@Rolinski.com |

### SYNDICATE AGENT'S ADMINISTRATIVE INFORMATION (IF APPLICABLE)

| SYNDICATE AGENT'S NAME: | |
|---|---|
| | |
| STREET ADDRESS: | |
| | |
| CONTACT PARTY: | |
| | |
| PHONE: | |
| | |
| FACSIMILE NUMBER: | |
| | |
| ELECTRONIC MAIL ADDRESS: | |

4

Holder Reference Number: CR 006097

## PAYMENT INSTRUCTIONS

| CURRENCY: | |
|---|---|
| BANK NAME: | |
| ABA/FEDWIRE OR SWIFT (OR USD CORRESPONDENT BANK DETAILS, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | EURO |
|---|---|
| BANK NAME: | |
| SWIFT OR SORT CODE (OR EURO CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

| CURRENCY: | |
|---|---|
| BANK NAME: | |
| SWIFT (OR JPY CORRESPONDENT BANK, INCLUDING SWIFT, IF APPLICABLE): | |
| ACCOUNT NAME: | |
| ACCOUNT NUMBER: | |
| REFERENCE: | PROJECT 688 |

5

# EXHIBIT G

EY Iraq Debt Reconciliation Office

Date of this Reconciliation Statement: 06-Jul-2006

Date Interest Calculated To:    13-Jul-2006

Arbitrated Claims Closing Date: 13-July-2006

## Statement of Claims Submitted to Arbitration

**Name of Holder: AGROCOMPLECT, EAD**

**Holder Address: 14915 River Road,Potomac,Maryland 20854,USA**

**Holder Reference Number: CR006097**

**Holder Contact Person: Attorney Sylvia J. Rollneld, Esquire**

**Holder Telephone: +1 240 632 0903**

**Holder Fax: +1 240 632 0906**

| Our Reference | Your Booking Ref | Caption of, or description of, Instrument relating to Reconciled Eligible Claim | Specified Obligor | Original Currency | Claimed Principal in Original Currency | Awarded Principal in Original Currency (4) | Standard Currency | Awarded Principal Amount in Standard Currency | Calculated Amount of Interest in Standard Currency | Total Awarded Reconciled Principal and Interest in Standard Currency |
|---|---|---|---|---|---|---|---|---|---|---|
| 57850 (4) | CONTRACT NO. 65 | Other Debt: CONTRACT NO. 65 | RAFIDAIN BANK | USD | 7,505,203.20 | 7,505,203.20 | USD | 7,505,203.20 | 9,683,822.35 | 17,189,025.55 |

Aggregate Amount of Awarded Reconciled Eligible Claims    USD    17,189,025.55

Purchase Price of Reconciled Eligible Claims (apply 10.25%)    USD    1,761,875.12

Notes - 1. Where the number in the column "Our Reference" of this statement is followed by a letter, please refer to the appropriate note for that item as below.

(a) Contractual, statutory or common law Set-Offs effected against property of the Specified Obligor have been treated as having reduced the outstanding principal amount of the item to the extent of the Set-Off. Holder must confirm and/or disclose full details of all set-offs exercised against Iraqi assets. Details to be disclosed include the type of set-off, the date set-off was exercised, the currency and amount.

(b) Indicates that the original negotiable instrument must be submitted pursuant to Section 8 of the Invitation.

(c) Indicates that all appropriate documents relating to Judgments and Pending Litigation must be submitted pursuant to Section 13 of the Invitation.

(d) Holder must confirm that claim was not eligible for consideration by the United Nations Compensation Commission (UNCC) pursuant to Section 7 of the Invitation. Indicates that official documents relating to compensation awards made by United Nations Compensation Commission (UNCC) must be submitted.

(e) Indicates that the item may be a duplicate of an official claim. Holder must confirm and / or disclose full details of such duplication.

(f) Holder must provide details of all accounts (deposit accounts etc.) belonging to Specified Obligors (including the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, and the branches and offices of these banks) at the Holder institution. Details provided should include the name of the Specified Obligor(s), account number(s) and the current balance and currency for each account.

2. Set-Offs effected improperly against the property of third parties will be taken into account when calculating the consideration to which the tendering Holder is entitled.

3. Certain of the claims shown on this Statement may have been, or may subsequently be, asserted against a Specified Obligor by a bilateral (governmental) creditor. By its acceptance of the Consideration on the Closing Date, the Holder agrees to indemnify and hold that Specified Obligor harmless against any loss that may result therefrom.

4. Awarded Principal has been reduced by the amount of any contractual, statutory or common law Set-Offs effected against property of the Specified Obligor, in accordance with Sections 6(a) 6(b) of the Reconciliation Methodology



PLAINTIFF'S EXHIBIT

G

Page 1 of 1

# EXHIBIT H

## Dr. GHALEB S. MAHMASSANI

**AVOCAT - LAW CONSULTANT**

Serhal – Massabki Building
Cairo St.- Hamra
Beirut - Lebanon
Tel : (961.1)  349777 - 349988
Fax : (961.1)  349712
E-mail: ghmahmassani@terra.net.lb

### By E-Mail  and  Courier

28 June, 2006

### NOTICE OF AWARD

To:     AGROCOMPLECT, EAD
        C/o Rolinski and Suarez LLC
        14915 River Road
         Potomac, Maryland 20854
        U.S.A.

        ### Attention: Mrs.  Sylvia Rolinski, Esq

        ### e-mail: SRolinski@Rolinski.com

        ### (the "Holder")

To:     Iraq Debt Arbitration Desk
        c/o Ernst & Young
        7th Circle, 7 Kindi Street Off Mecca Street
        P.O. Box: 5552 Amman 11183 Jordan

        email: idebtarbitration@ammrsiesd.com

Cc:     Mr. E. Michael Hunter
        Chairperson
        Iraq Arbitration Office
        51 JFK Parkway
        First Floor West
        Short Hills, New Jersey 07078
        U.S.A.

        email: mhunter@comcast.net

PLAINTIFF'S
EXHIBIT
H
PENGAD 800-631-6989

Cc:      Iraq Debt Reconciliation Office
c/o Ernst & Young
7th Circle, 7 Kindi Street Off Mecca Street
P.O. Box: 5552 Amman 11183 Jordan

email: idro@ammrsiesd.com

From:    Dr. Ghaleb S. Mahmassani
Massabki-Serhal Bldg
Cairo Street-Hamra
Beirut Lebanon

email: ghmahmasani@terra.net.lb

2

**Holder: AGROCOMPLECT, EAD**

**Holder Reference Number :   CR 006097**

As you are aware, I have been appointed to determine the Holder's Unreconciled Claims against Iraqi public sector obligors that were submitted to the Arbitration Procedures accompanying Iraq's Invitation to Tender Claims for Cash Purchase and Cancellation dated 9 February 2006 (the "Invitation").

In Schedule 1 attached hereto I hereby render the award in respect of the individual claim presented for determination by the Holder.

With respect to such claim, I find that the existence of the Claim listed on Schedule 1 has been corroborated by credible documentary evidence, for the maturity date and principal amount specified in Schedule 1. That claim (to the extent of the amounts awarded) shall be treated for all purposes as Reconciled Eligible Claim tendered by the Holder in accordance with the Holder's original Tender accepted by Iraq. It will be placed in line for purchase by Iraq on the Arbitrated Claims Closing Date pursuant to the terms of the Invitation.

In making my determinations in respect of the Holder's Claim, I have reviewed the submissions and documents delivered by the Holder pursuant to my Notice of Deadline dated 7 April 2006.

Iraq did not exercise its right to deliver submissions or documents within the time limit established by my Notice of Deadline.

I do not propose to enter into correspondence with the Parties in connection with this Award, other than in relation to any purely typographical or computation errors; and I remind the parties that the terms of the Invitation provide that all awards rendered pursuant to the Invitation shall be final and binding on the parties; and that neither party shall be entitled to an appeal or other form of recourse to any court or tribunal.

Yours truly

Ghaleb Mahmassani

Date:    28 June, 2006

3

# SCHEDULE 1

## AGROCOMPLECT, EAD

### Holder Reference Number : CR 006097

| E&Y Ref. | Currency | Principal | Maturity Date |
|----------|----------|-----------|---------------|
| 57890 | USD | 7,505,203.20 | 01 January 1991 |

# EXHIBIT I

AGREED MINUTES

of the Fifteenth Regular Session of the Bulgarian-
Iraqi Joint Committee for Economic, Scientific and
Technical Cooperation

On the occasion of the visit of H.E. Ta
Yassin Ramadhan, First Deputy Prime Minister of the
Republic of Iraq, in response to the invitation of H.
Grisha Philipov, Prime Minister of the People's Reput
of Bulgaria, and in order to follow up and assess the
implementation of the Agreed Minutes of the talks hel
on further expansion of trade, economic, scientific and
technical cooperation between the People's Republic o
Bulgaria and the Republic of Iraq, signed in Baghdad
January 13, 1983, as well as to review and follow up t
implementation of the Agreed Minutes of the Extraordi
Session of the Joint Committee, signed in Baghdad on
January 13, 1983, the Bulgarian-Iraqi Joint Committee
Economic, Scientific and Technical Cooperation held it
Fifteenth Session in Sofia during the period from 5th
10th November, 1983.

The Bulgarian delegation was headed by
H.E. Hristo Hristov, Minister of Foreign Trade.

The Iraqi delegation was headed by H.E.S
Abdul Latif Younis, Minister of Agriculture and
Agrarian Reform

PLAINTIFF'S
EXHIBIT
I

PENGAD/800-631-6989

His Excellency Todor Zhivkov - General Secretary of the
Central Committee of the Bulgarian Communist Party and
President of the State Council of the People's Republic of
Bulgaria and His Excellency Saddam Hussein, President of the
Revolutionary Command Council , President of the Republic
of Iraq.

It was stated that inspite of the attained
success, the vast potentialities for further expansion of
trade   exchanges, economic,scientific and technical
cooperation had not been materialized to full extent.

A positive estimation was given to the
implemented   projects by the Bulgarian organisations in the
Republic of Iraq.

The Agreed Minutes of the working groups are
attached hereto as an integral part (Annexes No.No.1,2 and :

The discussions of the Fifteenth Session of the
Joint Committee were held in a friendly and constructive
spirit in accordance with the relations of friendship and
cooperation that exist between the two countries and reflec
ted their common determination and desire to strengthen
and develop their cooperation in various fields for their
mutual interest.

Both sides agreed that the amounts due in 1984
for development project contracts under execution will
be covered by the deferred payment arrangements agreed upon
between the two parties in the present Agreed Minutes.
Amounts due in 1983 will be settled in accordance with the
contract conditions not later than 31 December 1983.

**EXHIBIT J**

## PROTOCOL
### OF THE WORKING GROUP ON TRADE AND FINANCIAL COOPERATION

I.    **TRADE**

The representatives of the two countries made a review of the commodity exchange between the above countries over the period following the Seventeenth Session of the Combined Committee and were pleased to note the substantial progress made. Both parties believed, however, that further opportunities for the development and expansion of the range of commodity exchange were available, and the relevant organizations involved should put more efforts in order to take advantage of these opportunities. The two countries adopted a mutually beneficial trade plan for 1987, as follows:

1. The Bulgarian party stated their readiness to take all necessary measures allowing export of commodities and materials, as specified in Lists A1 and A2, attached herein, to Iraq, for the state-owned, the combined and the private sector, as well as any other kinds of goods and materials that might be subject of agreement in 1987, on the basis of facilitated rescheduling plan as agreed and set out in the Minutes of February 13th 1986.

2. Seeking mutual benefit the Iraqi party expressed their readiness to export for the Republic of Bulgaria the commodities and the materials, listed in List B, attached hereto.

The Bulgarian party expressed their unwavering intention and willingness to take all necessary measures for the expansion of the Bulgarian import of commodities and materials from Iraq.

3. Lists A and B would not limit the exchange of any other commodities, materials or quantities of the latter as might be negotiated between the relevant organizations in each country.

4. The Bulgarian party expressed their willingness to increase the delivery of electric trucks, engine-driven trucks, electric hoists, as well as agricultural machinery and facilities, other machine-engineering products and spare parts.



PLAINTIFF'S
EXHIBIT
— 1

PENGAD 800-631-6989

5. The Bulgarian party confirmed their readiness to increase the delivery of various Bulgarian products, including chemicals, cigarettes, industrial goods, foods and others. Both parties agreed to pay special attention to the delivery of the required quantities of tomato paste, eggs for breeding purposes and other goods as per List A1.

6. The Bulgarian Party undertook to place their orders for the available positions as included in the Lists within two weeks. These Lists showing the inquiry for medications for both humane and veterinary purposes, raw materials for the pharmaceutical industry, medical instruments and others as the per the attached lists under No.6, were prepared by the Iraqi party.

7. Both parties undertook to encourage their respective competent authorities to accelerate the signing of the relevant agreements, which would enforce this annual trade plan and would also encourage the signing of any long-term contracts, whenever possible.

8. Both parties agreed to meet again, whenever the need to do this might arise, in order to review the implementation of the trade plan and exchange information for any problem or obstacles that might prevent or hinder the process of commodity exchange between the two countries, and eventually rectify or remove these.

9. Both parties gave high praise of their participation in international fairs, organized by them and agreed to encourage the participation of a larger number of organizations in such events.

10. Both parties expressed their willingness to enter into a long-term Agreement for delivery of fertilized eggs.

The Iraqi party requested an increase in the quantities of fertilized eggs up to 150 million pieces during 1988.

The Bulgarian party undertook to reply within 45 days.


## II.   FINANCIAL COOPERATION

1. Both parties confirmed that the rescheduling payment provisions set forth in the Protocol of February 13th 1986 would apply for all contracts, which had been signed or would be signed in 1987, in compliance with Paragraph 3 of the Section

on Financial Cooperation. The relevant maturity dates would be revised according to paragraph 2.5. of the said Protocol.

2.1. Payments arising from the site contracts would be regulated by Bank Agreement No. 1 of 1 July 1986, dealing with contracts signed in 1987.

2.2. Payments arising from the commodity agreements, which had been signed by the parties within the period of January $1^{st} - 31^{st}$ December 1987, would be regulated by the provisions of the Protocol of the seventeenth Session of the Combined Committee dated 13th February 1986 (as mentioned in Paragraph 3 therein). An Annex to Bank Agreement No.2 of July 1st 1986, made by and between the Bulgarian Foreign Trade Bank and the Central Bank of Iraq, would be signed.

3. With regard to the request made by the Iraqi party all payments (principal amounts and interest), payable in convertible currency to the Bulgarian party for 1987, related to both civil and the military sector, would be settled in the following manner:

3.1. All interest shall be paid on maturity throughout 1987;

3.2. Principal amounts due for civil deliveries (Lists A1 and A2) shall be paid on maturity throughout 1987;

3.3. Principal amounts due for site contracts shall be paid on maturity throughout 1987;

3.4. Outstanding payment of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2. of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity.

3.5. Outstanding payment of principal amounts, related to military agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity and in 12 or 24 months respectively, as follows:

- 25% in 1987;

- 35% in 1988;

- 40% in 1989.

4. Principal amounts subject to rescheduled payment, as indicated in paragraph 3.5 above, shall accrue simple interest of 5% per annum, starting from the date the said rescheduling has come into effect. Interest shall be paid together with each relevant new principal amount.

5. The Bulgarian Foreign Trade Bank and the Central Bank of Iraq shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.

## PROTOCOL

### Of the working group for scientific and technical cooperation

Both sides made a review of the progress in the area of scientific and technical cooperation between the two countries in the period following the 17th session and discussed their means and methods for consolidating and expanding their cooperation, as well as matters related to specialized training.

The Iraqi party announced their needs for the training of specialists, of which the Bulgarian side was notifies during the previous session of the committee. The Bulgarian party promised to consider the matter once again and to reply to these inquiries during the second three months of 1987.

Both sides discussed the possibility of establishing bilateral cooperation between the relevant Iraqi and Bulgarian organizations, specialized in the following areas:

1. Conduction of joint scientific research in the breeding of sheep, cows and poultry.
2. Conduction of joint scientific research in the area of plant tissue cultures.
3. Exchange of specialists and visits (one scientific researcher, for two weeks) in the following areas:

A/ fodder processing

B/ protective cultivation

C/ live-stock breeding

D/ production of oil-bearing seeds and plant tissue cultures

E/ orchard growing technology, production and storage of fruit

F/ fruit growing

G/ food industry

4. The Iraqi side demonstrated their readiness to receive Bulgarian specialists in the above mentioned areas for a two week period with any specialization training. The Bulgarian party undertook to consider the matter and to notify the Iraqi party accordingly.

Both sides discussed the possibility of training the Iraqi specialists in the following areas:



PLAINTIFF'S EXHIBIT J-2

A/ fodder processing, one researcher for one month

B/ protective cultivation, two researchers for one month

C/ production of oil-bearing seeds and plant tissue cultures, two researchers for one month each

Both sides agreed to participate in scientific conferences, which would be held in one of the countries as well as to exchange of periodical scientific publications.

The Iraqi side requested that the Bulgarian side to provide the opportunities for training of Iraqi specialists in the area production and transfer of electric power, as follows:

1. Possibilities for training programs in facilities and security systems maintenance in electric power substations.

2. Teachings in residential area power network design, especially in the country, electric power substation maintenance and power network operation.

3. Training in electric power consumer data, user accounts data, management of electric power distribution and power plant spare parts storage control system.

4. Training in steam-boilers, steam, gas and water turbines, their accessory, and computer and control systems.

The Iraqi side informed the Bulgarian side of the request for technical support by the Ministry of Agriculture and Agrarian Reform, which would be given by the Bulgarian side on condition that the latter would cover the costs for training in the following areas:

1. One specialist in honey bee diseases, for the establishment of a special laboratory for honey bee diseases in Iraq

Apart from the above four further training opportunities would be available in the area of queen bee breeding, honey bee-hive maintenance, honey production, honey bee disease control.

2. Possibilities to provide for the training or make arrangements for a Bulgarian specialist to visit and train Iraqi personnel in the following areas:

- Cutting and packaging of fresh and frozen meat;(two people for one month)

- inspecting of meat that has been frozen by use of chemicals (two persons for a month each)

The Bulgarian side confirmed their readiness to provide assistance to the Iraqi Ministry of agriculture and Agrarian Reform in the abovementioned areas under the condition that the technical assistance and training costs would be at the expense of the Iraqi side.

Both sides agreed to proceed with the negotiations until an acceptable solution, which would take the Bulgarian viewpoint into consideration, was reached.

During the talks the Iraqi side submitted to the Bulgarian side a list of additional applications for training of specialist in 1987 and 1988 (Attachment 8).

The Iraqi side requested Bulgarian assistance in disabled people rehabilitation by commissioning Bulgarian experts to Iraq or by training of Iraqi specialists in Bulgaria. The Bulgarian side would revert with their opinion on this type of cooperation after the Iraqi side had provided additional details on the subject.

Apart from the above mentioned arrangements both parties agreed to expand the means and methods of their cooperation in the areas of agriculture, irrigation, construction, designing and further economic sectors, as well.

Both parties agreed to encourage the implementation of the Agreement for economic, scientific and technical cooperation signed by and between the government of the People's Republic of Bulgaria and the government of the Republic of Iraq, in compliance with Clauses 9 and 12 of the said Agreement, as well as create conditions for the implementation of the arrangements made in the area of scientific and technical cooperation as set out in the previous Protocol.

## PROTOCOL
### OF THE WORKGROUP ON ECONOMIC PARTNERSHIP

The workgroup reviewed the execution of the Protocol of the Seventeenth Session of the Combined Bulgarian-Iraqi Committee. There was an exchange of information pertinent to the progress of all projects in the period between the two sessions, and the two parties gave a favorable estimate of the progress achieved so far.

The two parties declared their will to promote the cooperation between the corresponding organizations in the sectors reviewed.

INDUSTRY

1. The Iraqi party invited the Bulgarian party to participate in the auction for the reconstruction of the Factory for liquid sugar in Hindya.

The Bulgarian party agreed to take part in this reconstruction and is ready to provide, within two weeks' time, a team of experts in order to analyze the prospects of its participation, and conduct negotiations on the terms of the execution of the current project.

The Iraqi party asked the Bulgarian party to participate in the following projects:

a) a line for the production of date syrup in Karbala, with annual capacity of 15 thousand tons, for the replacement of the old production line.

b) A line for the production of tomato purée in Duhok, with a daily capacity of 300 tons.

c) Two bottling lines, one for 'Seven Up', and the other one for 'Pepsi'. The specifications for these bottling lines will be the same as for the 'Pepsi' line in Bani Haylan.

d) Enlargement of the factory for the production of mineral water Bani Haylan.

The Bulgarian party agreed to participate in these projects and is ready to provide, within one month, a team of experts in order to conduct negotiations on the terms of the execution of these projects.

The two parties declared their will to finish the construction of the tomato purée project - the two production lines in Bakuba and Al-Hindya.

The Bulgarian party promised to reconsider the offer it has received from the corresponding Iraqi institution and to provide its representatives to continue the negotiations of said offer.

2. The two parties discussed their cooperative work on the tobacco fermentation factory in Suleimania. The Iraqi party asked the Bulgarian party to send their specialists back to work within two weeks. The two parties shall undertake all necessary measures in order to facilitate their work.

3. The two parties noted their mutual interest in the continuation of their cooperation in the field of tobacco production.

The Iraqi party asked the Bulgarian party to reconsider their own offer for the production of "Baghdad" cigarettes from 5 thousand tons of Iraqi tobacco.

The Bulgarian party agreed to reconsider their own offer and to conclude an agreement, based on a 15% advance payment and 85% in payments on terms, in accordance with the Protocol from 13 February 1986. The Bulgarian party also agreed to send their representatives to Baghdad within 10 days from



PLAINTIFF'S
EXHIBIT
J-3

the signing of the current Protocol for the negotiation and execution of the present agreement.

Enlargement of the factory for the production of starch and dextrin, the two parties expressed their satisfaction with the cooperation on said project. By the end of March 1987 the Bulgarian party shall deliver a preliminary offer for the enlargement, which shall be followed by negotiations and the presentation of a technical economic study on said matter.

5. A factor for the extraction of lead from used batteries

The Bulgarian party informed the Iraqi party of the offer it had already presented, concerning the above mentioned project. The Iraqi party shall examine the opportunities and shall answer accordingly.

6. New projects for cooperation.

The Bulgarian party expressed its will to continue the cooperation with the Iraqi party in the field of building materials.

The Iraqi party welcomes the Bulgarian participation and shall inform the Bulgarian party about future opportunities.

7. Electrification.
        a) the two parties expressed their satisfaction with the cooperation in the field of electrification and noted the opportunities for the expansion of their cooperation in this area. On the basis of the revised offer for the transmission line 400 KW packet #3, which shall be delivered to Electroimpex by 15 March 1987. The final negotiations shall have to be conducted not later than the end of March 1987.

The Iraqi party confirmed its will to continue the cooperation with the corresponding Bulgarian organization in the field of electrification, and especially on the following projects:

        - a transmission line Diala Taameem 400 KW,
        - a transmission line 132 KW,
        - substations 132 KW
        The Bulgarian party  expressed their willingness to participate in the above mentioned auctions.

AGRICULTURE AND IRRIGATION

The two parties reviewed their cooperation and the progress of their mutual activities, executed by the Bulgarian party in the field of agriculture and irrigation in Iraq. They expressed their satisfacton and hope that this progress would continue to the benefit of the cooperation between the People's Republic of Bulgaria and the Republic of Iraq.

AGRICULTURE

The two parties agreed  that their cooperation in the field of green house utilization would continue.

To this effect the Bulgarian party shall provide an expert to help with the preparation of a list of the spare parts, needed for the 'Reshammiya' green house, with the corresponding offer and delivery deadlines. In addition, the two parties would examine the opportunities for cooperation in the reconstruction of 'Reshammiya' green house.

IRRIGATIONS

The Bulgarian party expressed their desire to participate in the irrigation
activities in Iraq.

The Iraqi party declared their positive attitude towards the participation
of the Bulgarian party in said field. The Bulgarian party took all
necessary steps and in the period between the Seventeenth and the
Eighteenth Sessions of the Bulgarian-Iraqi Committee for Economic,
Scientific and Technical Cooperation, enhanced the progress of their mutual
activities, pertinent to the utilization of new lands in the 'Hala Davana-
4'. These efforts would be continued and the Bulgarian party would
intensify its work, in order to secure the successful completion of the
project without any damages to the Iraqi party, in accordance with the
agreements signed.

The two parties discussed the irrigation project 'Sadam', contract 21, and
agreed that the project would be executed by the Bulgarian side.  The
Bulgarian party agreed to reduce the general cost of the agreement to 30
483 000 Iraqi Dinars and to finance the share of foreign currency in
accordance with the conditions of the payments on terms, agreed upon in the
Minutes from 13 February 1986. The competent authorities of the two parties
would take all necessary steps, in order to conclude the agreement as soon
as possible.

OIL
The Bulgarian party reiterated their desire to promote the cooperation with
the Iraqi party in the following fields: oil drill installations,
construction of oil and gas pipelines, pumping stations, river crossings.

The Bulgarian party also expressed their readiness to participate in the
construction of gas installations in Balaji and Ranadi, as well as interior
base communications in the Kut depot.

The Iraqi party took notice of the Bulgarian offer and undertook to inform
the corresponding Iraqi organizations thereof.


CONSTRUCTION
The two parties reiterated their readiness to cooperate in the following
fields:
        1. The reconstruction of the railway line Baghdad - Abu Ghraib,
        2. Construction of the Roula Bridge.

The two parties agreed upon the continuation of the negotiations pertinent
to the first project.  The Bulgarian party undertook to send their
representatives to Baghdad in order to successfully conclude the
negotiations and bring the matter to a conclusion.

As far as the second project was concerned, the Iraqi party declared their
positive attitude towards the Bulgarian participation and is ready  to
supply all necessary information and documentation.

TRANSPORTATION
The two parties expressed their satisfaction with the development of their
cooperation in the field of air transportation and agreed that their
competent air transport organizations need to meet, discuss and conclude a
business agreement, which would include all matters of mutual interest for
the benefit of the two countries.

# EXHIBIT K

PROTOCOL
OF THE EIGHTEENTH REGULAR SESSION OF THE BULGARIAN-IRAQI
COMBINED COMMITTEE FOR ECONOMIC, SCIENTIFIC AND TECHNICAL
COOPERATION

The session of the Combined Bulgarian-Iraqi Committee for Economical, Scientific, and Technical Cooperation was held in Sofia within the period of March, 2nd-7th 1987, in connection with His Excellency Taha Iasin Ramadan's visit, First Vice Chairman of the Council of Ministers of the Republic of Iraq, in response to the invitation of His Excellency George Atanasov, Chairman of the Council of Ministers of the Republic of Bulgaria, for further development of the commercial, economical and technical cooperation between the two countries.

His Excellency Hristo Hristov, Trade Minister, led the Bulgarian Delegation

His Excellency Al-Nyman, Minister for Agriculture and Land Reform, led the Iraqi delegation.

Members of both delegations are listed in Appendixes №1 and 2.

The Combined Committee adopted the following agenda:
1. Review and analysis of the commodity exchange between the two countries on the basis of the Protocol of the 17th Regular Session of the Combined Committee, held in Bagdad; February 1986. Development of new commercial schedule for 1987.
2. Review and analysis of the current economical cooperation and opportunities.
3. Discussion on financial cooperation for 1987 and 1988.
4. Discussion on proposals for scientific and technical cooperation
5. Scheduling the time and the place for the19th session of the Combined Committee.

The Combined Committee decided to create three working groups in the following areas:
- commercial and financial cooperation
- economic cooperation
- scientific and technical cooperation

Both parties made an elaborate review of the commodity exchange and an assessment of their economical, scientific and technical cooperation over the period following the 17th Session of the Combined Committee.

They expressed their satisfaction with the results achieved till that time and stated that wider opportunities existed for the development of their future cooperation. It was emphasized that the trade and economic relations between the two countries were progressing in the direction for cooperation given by His Excellency Todor Jivkov, chairman of the State Council of the Peoples Republic of Bulgaria and His Excellency Saddam Hussein, President of the Republic of Iraq.

Both parties analyzed and outlined the specific prospects for economic cooperation according to their own needs and abilities in 1987. With regard to this they discussed the methods and


PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

means for overcoming the difficulties and the obstacles standing in the way of their future cooperation.

The protocols of the working groups are attached hereto and are an integral part of it.

Both sides were pleased to note that the talks proceeded in an amicable atmosphere and full understanding in compliance with the good relationship between both countries and their willingness to consolidate their cooperation in different areas.

The 19th session of the Combined Committee was agreed to take place in Bagdad, during the first three months of 1988, while the date would be specified through diplomatic channels.

This Protocol was drawn on March 7th 1987 in Sofia in two original copies in English, both of which were of equal force.

For the Bulgarian Delegation
Hristo Hristov

For the Iraqi Delegation
Al Numan

**EXHIBIT L**

BANKING ARRANGEMENT NO. ( 1 )

Between

The Bulgarian Foreign Trade Bank, Sofia here in after refrred to as ( Bul Bank ) and Central Bank of Iraq, Baghdad here in after referred for to as (C.B.I..) implementation of the Agreed Minutes on t Trade and financial Cooperation of the seventeenth Regular Session of the Bulgarian-Iraqi Joint committee for Economic Scientific and Technical cooperation on 13th February, 1986 in Baghdad reperred to Agreed Minutes).

In conformity with item I (page 6 ) of the (Agreed minutes) the Bulgarian party Shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments. The credits which the Bulgarian party shall grant to the Iraqi party shall cover 100% value of the foreign exchange currency portion of the contracts to be concluded between the competent Organizations of the two countries From 1st Jan. 1986 untill 31st. Dece. 1987.

The portion in Iraqi Dinars shall be effected in cash in conformity with the contracts concluded between the Buglarian and Iraqi Organizati.....,

The two sides may agree on the implementation of other development projects, on the same principles of deferred payments stipulated on the Agreed Minutes .

In implementation of the above mentioned agreed minutes, the " Bul Bank " and " C.B.I. " have agreed upon the following:

Cont.../

PLAINTIFF'S
EXHIBIT

L -1

PENGAD 800-631-6989


ARTICLE ( 1 )
----------------

"Bul Bank " shall opend in its books the following accounts in US. Dollars in the name of the (C.B.I.):-

1- Interest-bearing account entitled (.C.B.I. credit Agreed Minutes 13.2.1986) for Accounting of 100% value of the foreign currency portion of all projects here in after refrred to as (Credit Account), Sub-account . : . _ _ shall be opend for each project.

2- Anon interest bearing Account entitled (C.B.I." Interest credit Agreed minutes 13.2.1986) for accounting of the interest accrued under the utilized credit, hereinafter refereed to us (( Interest Account )).

The (C.B.I.) shall opend corresponding Accounts in the name of the Bul Bank. The Accounts shall be kept free of commissions and charges for both Banks.

The payments ⸗ shall be effected by, means of irrevocable Documentary letters of credit opened by the (C.B.I.) or Rafidain Bank with the Bul Bank in favour of the bulgarian exporters, or by any other means of payment stipulated in the contracts.

Upon presention of documents in order by the respective Bulg arian Organizations for deliveries and services under opened letters of credit, or any other means of payment stipulated in the contracts, the Bul Bank shall enter 100% of their value of the foreign currency portion to the debit of the ( Credit Account ) . The date of the shipping documents, or the date of approval by Iraqi authority of the respective invoices for rendered sevices shall appear as value date. The Bul Bank shall send advices for each entry

Cont ... /

to these accounts to the (C.B.1.) Upon *receipt* of the advices (CBI) shall credit the ( Credit Account )),

Opened in the name of the Bul Bank for the respective project, The shipment conditions ( FOB or C and F, ect...) shall be in accordance with contracts concluded between the Bulganian and Iraqi orgnizations .

Transport costas of the exported goods shall be paid by Iraqi side in accordance with . relevant.conttact. .... . ...

### ARTICE ( 2 )

On the utilized part of the credit under " Credit Account " as at 31 December each your the Bul Bank :· · · · · · · till 15th January each year shall calculate simple annual interest at the rate of the 5% p. a. on the basis of 360/360 days.

The interest shall be calcuated from ths date of the shipping documents, ~or~ ·· ·· · · from the date of approval by Iraqi *or certificate* Organizations the respective invoice for rendered services. the accrued interest shall be entered to the debit of respective interest Account,

The Bulgarian Foreign Trade Bank shall send to the(C.B.1.) debit advices accompanied by interest tables for each interest calcuation. The latter shall advice isremarks, if any with in 30 days after their receipt. The (C,B.1) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.

The latest by crediting the account of the Bul Bank With Credit lyonnats , New York, under . telax advice . to the Bul Bank,

Cont.../

Bul Bank shall send to (C. B. I.) credit advices for each payment of interest . The calcuation of interest shall stop on the day of final repayment of the utilized amounts under the credit.

## ARTICLE ( 3 )

The utilized credit under each project shall be repaid in eight egual subequent semi-annual instalments , the first of which shall fall due One year after the adate of the final completion of the project, evidenced by the date of F A C. provided that the peried between the date of . PAC shall not exceed one year and in accordance with the provisions of the special contract related to such project.

Bul Bank shall prepare and send to (C. B. I.) epayment schedules for each project,(C. B. I.) shall corfirm or advice its remarks, if any with in 60 days after receipt. On the respective maturity date (C. B. I.) shall credit the account of the Bul Bank with Credit Lyonnais, New york in convertible US. Dollars with the amount of principal, under telex advice to Bul Bank. The latter shall send the credit advices to (C. B. I.) for the respective payments.

## ARTICLE ( 4 )

Omitted

Cont.../

ARTICLE ( 5 )
----------------

. . . . . . C.B.I.) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective ( Credit Account ) as, well as, the interest accrued under these amounts entered in the respective ( Interest Account) Mentioned in article (1) above.

ARTICLE ( 6 )
------------------

All documents concerning the implementation of the present Arrangement. shall be expressed in US.Dollars and shall bear the stipulation " Credit Iraq 13.02.1986.ⁱ

ARTICLE ( 7 )
----------------

Bul Bank shall send to (C.B.I.) daily statements ( upon each entry ) of the Accounts opened in conformity with Article (1) of the present Arrangement.

(C.B.I.) shall advice its remarks, if any, with in 30 days after their receipt.

ATRICLE ( 8 )
----------------

All Banking commissions and charges under the present Arrangement in Iraq shall be for the account of the Iraqi party and in Bulgaria shall be fo the account of the Bulgarian party.

ATRICLE ( 9 )
------------------

All payments concerning the repayment of the amount and the interests entered in the Accounts as per Article (1) shall be free of taxes and fees in Iraq, present, of which may be introduced in the future.

Cont...  /

ARTICLE ( 10 )
--------------------

Any amendments to the present Arrangement may be done only by the mutual written consent of the two Banks.

ARTICLE ( 11 )
--------------------

The correspondence in implementation of the present Arrangement will be in the English language.

ARTICLE ( 12 )
--------------------

The present Arrangement enters in to force on the day of its signing and shall remain valid until the fianl settlement of all obigations, ensuing thereform.

Done and signed in Baghdad. 1.07. 19.56 ......in two copies in the English language, both being equally authentic.


For                                                    For
Bulgarian Foreign Trade Bank                          Central Bank Of Iraq.

BANKING ARRANGEMENT NO. (3)

Between the Bulgarian Foreign Trade Bank, Sofia

here in after referred as to ( Bul Bank ) and the Central Bank

of Iraq Baghdad here in after referred to as ( CBI )  for

implementation of the Agreed Minutes on the trade and Financial

Co. Operation of the 17th regular session of the Bulgarian-Iraqi

joint committee for Economic, Scientific and  Technical Co-

operation of 13th February 1986/ Here inafter referred to as

the " Agreed Minutes "

In the Implementation of the above mentioned Agreed

Minutes the " Bul Bank " and the CBI have agreed upon the

following:

### ARTICLE (1)

In confirmity with item 4 page 8 of the agreed Minutes,

the Bulgarian Party responsed to the  request of the Iraqi Party

that all payments due or which will fall due to the Bulgarian

side in Convertible Currency during1986 under all existing

Civilian and special Banking Arrangments and commercial Contracts

Cont../2



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
_2_

- 2 -

shall be setteled as follows:

A.          50% shall be paid in 1986 in accordance with relevant

Contracts and Banking Arrangements.

B.          50% shall be paid one year from the dates of maturity

in accordance with relevant contracts and Banking Arrangements.

C.          Deferred payments bear simple interest rate of 5 (Five)

percent annum.

### ARTICLE (2)

The "BulBank" shall open in its books the following

Accounts, kept in US. Dollars in the name of the (CBI) as follows:

A.          The interest bearing account entitled " Account No. 1 -

CBI - re - deferred payments, Agreed Minutes of 13-2-86" for

accounting of 50% of the re- payment of all payments due including

the interest to Bulgarian side during 1986, concerning the civilian

sector on the respective intial maturity dates.

B.          A non interest bearing Account entitled "Account

No.2-CBIinterestredeferred payments" for accounting the interest

calculated on the amounts entered to the Account No.1 above.

Cont../3

C.        An interest bearing account entitled (Account No. 3 –
CBI redeferred payments, Agreed Minutes of 13-2-1986) for
accounting of 50% of the re-payment of all payments due including
the interest to Bulgarian side during 1986 under special Banking
Arrangements and contracts, on the respective intial maturity
dates.

.d.        A non interest bearing account entitled ( Account No.4-
CBI interest re-deferred payments) for accounting the interest
calculated on the amount, entered to the Account No. 3 above.

"CBI" shall open correspondent Accounts in the name of "BulBank".

ARTICLE (3)

"BulBank" shall send to (CBI) monthly statements of the
deferred payments.

"CBI" shall confirm them or shall advise its remarks if any, within
30 days from their receipt.

On the respective maturity dates, "CBI" shall credit
the Accounts of "BulBank" with Credit Lyonnais, New – York, in
inconvertible US. Dollars with amounts of due payments mentioned

Cont../4



in article 1 above plus their interest, advising Simultaneusly the "BulBank" by telexes.

## ARTICLE (4)

The "BulBank" shall calculate simple annual interest at the rate of 5% per annum on 360/360 days basis on each amount credited to the accounts mentioned in Article. 2 above. Interest shall be calculated from the date of deferring the amounts till the date of the acctual payment and shall be paid together with each respective principal.

## ARTICLE (5)

All payments concerning the repayment of the amounts and the interest entered in the accounts as per Article 2 above shall be free of taxes and fees in Iraq, present, or which may be introduced in the future.

## ARTICLE 6

CBI Guarntees with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 5above Plus its interest according to the Banking Arrangement dated 15th 5.1985 and 13th October 1985.



## ARTICLE (7)

Any amendment to the present Banking Arrangement may be done by the mutual written consent of the two Banks.

## ARTICLE (8)

The Correspondence in the implementation of the present Banking Arrangement shall be in the English Language.

## ARTICLE (9)

The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment of all obligations, esusing therefrom.

Done and signed in Baghdad on 1.07.1986 in two copies in the English Language, both being equally authentic.

For. the Bulgarian          For. Central Bank
Foreign Trade Bank              of Iraq.

# EXHIBIT M

as a Speicil Envoy from H.E. Petar Mladenov President of
the People Republic of Bulgaria to H.E. Saddam Hussien
President of the Republic of Iraq during the period 28th
February to 1st March 1990, The Iraqi debt obligations owed
to Bulgaria as well as the promotion of future bilateral
trade and economic cooperation between the two countries were
discussed with H.E.Or. Mohammed Mehdi Saleh Minister of
Trade, Acting Minister of Finance, Co-chairman of the Iraqi -
Bulgarian Joint Committee .

Both Sides agreed on the following:-

1.  The Iraqi Side shall make available the quantity of 4.75
    Million (four million seven hundred and fifty
    thousand)Metric Tons of crude oil in the course of the
    years 1990 - 1994 . This quantity of crude oil shall be
    utilised for payment of the existing debts together with
    those becoming due until 31st of December 1994 and to be
    delivered in accordance with the following programe:-

| Year | Quantity in tons |
|------|------------------|
| 1990 | 1 000 000 |
| 1991 | 750 000 |
| 1992 | 750 000 |
| 1993 | 750 000 |
| 1994 | 1 500 000 |

- 1 -



PLAINTIFF'S
EXHIBIT
M

Case 1:07-cv-00165-RBW   Document 72   Filed 02/22/2008   Page 159 of 165

The statement of the foreign trade shall settle
in cash or in kind in accordance with the outcome of the
negotiations to be initiated in the early part of 1995.

2.     Oil prices, delivery schedules and any other relevant
details shall be agreed upon by the specilazed
organizations tions of the two countries.

3.     To implement these Agreed Minutes, Banking
Arrangements between the Central Bank of Iraq and the
Bulgarian Foreign Trade Bank shall be concluded as soon
as possible.

4.     With the aim of the further expanding and
diversifying the Trade Exchange between the two
countries, The Bulgarian Side expressed his rediness to
make available to the Iraqi Side export credit
facilities for financing Bulgaria's exported goods to
Iraq . The relevant details including amounts, terms
and conditions as well as coverage shall be discussed
in the next Session of the Joint Committee.

- 2 -

These Agreement shall enter into force from the date of exchanging diplomatic notes confirming its approval by the relevant authorites of both Sides.

Done and signed in Baghdad on 1st, March, 1990 in two originals in English language.

For the Government of the
Republic of Iraq

Dr.Mohammed M.Saleh
Minister of Trade
Acting Minister of Finance

For the Government of the
People's Republic of Bulgaria

Christo Christov
Presidential Special Envoy

- 3 -

# EXHIBIT N

 

Ref.NO.: 6/157    العدد :

:NTRAL BANK OF IRAQ                    Date: 16/2/2002    التاريخ :

Agreements & Loans

الى :

To: Bulgarian Foreign Trade Bank,
    7,sveta nedelya sq. sofia 1000, Bulgaria,.

---

Re.:Statements of the Accounts opened under
the Banking Arrangements signed between
our two Banks.

---

Dear sirs,

With reference to your Statements dated 1/1/2002 and 24/1/2002.

We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist , and the sanctions imposed on Iraq are lifted taking into your consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled .

This reply should not be interpreted and /or considered as a confirmation to the contents of said Statements .

Thank you for your co-operation.

We remain,

Yours faithfully
For Central Bank of Iraq

D.G.
AHMED S. MOHAMAD

Alla

---

< CENTER:RASHED ST. BAGHDAD - IRAQ
8484115 - 8445175 P. O.Box 64
X: 212203 - 212556 212296 CN BK IK
f: <ccbi@niadiraq.net>

مركز البنك : شارع الرشيد ، بغداد ، العراق
هاتف : ٨٤٨٤١١٥-٨٤٤٥١٧٥
ص ب : ٦٤ تلكس : ٢١٢٢٩٦ ٢١٢٢٤٨ ٢١٢٢٩٦
البريد الالكتروني : <ccbi@niadiraq.net>



# EXHIBIT O

  **REPUBLIC OF IRAQ**
MINISTRY OF FINANCE

وزارة المــالية

**Press Release**                                      **For Immediate Release**

July 18, 2006

### Iraq Announces Conclusion of Commercial Debt Settlement

**Baghdad, Iraq**: The Republic of Iraq today announced the conclusion of its program to restructure Saddam-era commercial debt with payments that were made to holders of small claims against Iraq and Iraqi public sector entities.

Holders that received payments include those who tendered in response to a final round of cash buyback invitations, as well as those who previously tendered and received awards in the arbitration process that addressed their unreconciled claims.

A total of $19.7 billion of commercial claims against Iraq have been settled over the past eleven months as part of the Government of Iraq's program to address the huge debt stock accumulated by the Saddam regime.

As a result of the two rounds of Iraq's debt-for-debt exchange offer, the four rounds of its cash buyback offer and the arbitration process:

- 11,776 individual Saddam-era commercial claims have been cancelled, including 817 following the arbitration process;

- 491 commercial claimants participated in the program;

- The aggregate amount of commercial claims retired under this program exceeds $19.7 billion; and

- The holders of approximately 96% (by value) of the eligible claims that received invitations to settle their Saddam-era claims agreed to do so.


**PLAINTIFF'S EXHIBIT**

"The success of Iraq's commercial debt restructuring program represents a crucial milestone in Iraq's return to normal relations with the international financial community," said Bayan Jabr, Iraq's Minister of Finance.  "The pace and scale of this debt restructuring program is unprecedented in the history of sovereign finance."

Sinan Al-Shabibi, Governor of the Central Bank of Iraq, added, "The enormous and unsustainable debt stock accumulated by the Saddam regime has now been reduced to the point that it will not deter the new investment needed to finance Iraq's economic reconstruction.  This was one of the major objectives that the Government of Iraq identified in June, 2004.  It is an objective that has now been accomplished."

*     *     *     *     *

This communication is not an offer of securities for sale in the United States.  Securities may not be offered or sold in the United States absent registration or an exemption from registration under the Securities Act of 1933, as amended. Any public offering of securities to be made in the United States will be made by means of a prospectus that may be obtained from the issuer or selling security holder and that will contain detailed information about the Republic of Iraq.  No public offering of securities in the United States is contemplated by the Republic of Iraq at this time.

Neither this release nor any of the documents referred to herein constitute an offer by the Republic of Iraq or by any other party to settle or exchange any outstanding claims, nor do they constitute an admission or acknowledgement of any such claim, or an acknowledgement that any such claim exists or has been revived or reinstated, or an express or implied promise to pay any such claim or any part thereof.  This release and the documents referred to herein are expressly published without prejudice.  All defenses available to the Republic of Iraq and any other party based upon any applicable statute of limitations or otherwise are expressly preserved.  Neither this release nor the documents referred to herein may be relied upon as evidence of the existence of any claim or the willingness or ability of the Republic of Iraq or any party to pay any such claim.

2