IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AGROCOMPLECT, AD,                    )
                                     )
                  Plaintiff,         )
                                     )          Case No. 1:07CV00165 (RBW)
       v.                            )          **ORAL ARGUMENT**
                                     )          **REQUESTED**
THE REPUBLIC OF IRAQ                 )
                                     )
                  Defendant.         )
                                     )
_____  )

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE
DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Matthew D. Slater
D.C. Bar No. 386986
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
Tel.:  202 974-1500
Fax:  202 974-1999

Jonathan I. Blackman
Lisa Coyle
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel:  212-225-2000
Fax:  212-225-3999

Attorneys for Defendant The Republic of Iraq

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ....................................................................... 1

ARGUMENT ................................................................................................... 2

I.  THE COURT LACKS SUBJECT MATTER JUSRIDICTION
    UNDER THE FSIA AS A MATTER OF LAW.................................... 2

   A.  The Facts Alleged In The Amended Complaint Are Insufficient
       To Meet The Direct Effect Test Under § 1605(a)(2) Of The FSIA ............... 3

       1. Plaintiff's Alleged Use Of United States Goods And Services Does
          Not Meet The Direct Effect Test ................................................. 3

       2. Intended Payments Alleged By Plaintiff Do Not Constitute
          A Direct Effect............................................................................ 7

          a. The Discovery Motion Exhibits Are Largely Irrelevant On
             Their Face........................................................................... 8

          b. Even If The Discovery Motion Exhibits Applied To The Contract,
             The Trade Financing Agreements They Evidence Could Not
             Establish Jurisdiction Over The Republic In This Action..................... 9

          c. An Inevitable Consequence Of Agrocomplect's Argument Is That
             It Has No Standing In The Present Action .............................................. 12

       3. The Alleged Destruction Of Construction Projects By The United
          States Military Does Not Meet The Direct Effect Test............................... 13

   B.  The Arbitration Clause In The Contract Did Not Constitute A
       Waiver Of Iraq's Sovereign Immunity In The United States
       Under § 1605(a)(6) Of The FSIA ................................................. 13

II.  AGROCOMPLECT'S CLAIMS ARE CONTRACTUALLY
     COMMITTED TO ARBITRATION........................................................ 16

III. AGROCOMPLECT'S CLAIMS ARE TIME-BARRED
     AND HAVE BEEN RELEASED............................................................ 16

   A.  The Court Can Consider The IDRO Documents And The UNCC
       Panel Report In Deciding This Motion To Dismiss ........................................ 17

B.   Agrocomplect's Claims Are Time-Barred ......................................................   18

1.  The Complaint Is Time-Barred On Its Face ..............................................   18

2.  Agrocomplect Fails To Allege Facts That If True Would Demonstrate That The Statute Of Limitations Was Tolled .......................   21

C.   Agrocomplect's Claims Have Been Released ...............................................   23

CONCLUSION .........................................................................................................   25

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

28 U.S.C. § 1603(b) ........................................................................................... 9

28 U.S.C. § 1605(a)(2) ...................................................................................... 3, 9

D.C. Code § 12-301(7) (2007) .......................................................................... 19


**Cases**

*Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank,
251 F. Supp. 2d 126 (D.D.C. 2003) .................................................................. 4

Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio,
446 U.S. 478 (1980) .......................................................................................... 21

Berry v. Chrysler Corp.,
150 F.2d 1002 (6th Cir. 1945) .......................................................................... 19

Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.,
691 A.2d 1153 (D.C. 1997) .............................................................................. 19

Cargill Int'l S.A. v. M/T Pavel Dybenko,
991 F.2d 1012 (2d Cir. 1993) ........................................................................... 15

Commercial Bank of Kuwait v. Rafidain Bank,
15 F.3d 238 (2d Cir. 1994) ............................................................................... 7, 12

*Creighton Ltd. v. Gov't of the State of Qatar,
181 F.3d 118 (D.C. Cir. 1999) ......................................................................... 15

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,
212 F. Supp. 2d 30 (D.D.C. 2002) .................................................................... 10-11

*Dole Food Co. v. Patrickson,
538 U.S. 468 (2003) .......................................................................................... 9

Donahue v. Uno Restaurants, LLC,
No. 3:06-CV-53, 2006 WL 1373094 (N.D.N.Y. May 16, 2006) ...................... 18

East v. Graphic Arts Indus. Joint Pension Trust,
718 A.2d 153 (D.C. 1998) ............................................................................ 21-22

Fin. Sec. Assurance, Inc. v. Stephens, Inc.,
450 F.3d 1257 (11th Cir. 2006) ................................................................... 18

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,
462 U.S. 611 (1983).................................................................................... 10

Fitzpatrick v. Queen,
No. Civ.A. 03-4318, 2005 WL 1172376 (E.D. Pa. May 16, 2005) ................... 18

Forti v. Suarez-Mason,
672 F. Supp. 1531 (N.D. Cal. 1987) .............................................................. 21

Goodman Holdings v. Rafidain Bank,
26 F.3d 1143 (D.C. Cir. 1994)...................................................................... 4-5, 6

Gupta v. Northrop Grumman Corp.,
462 F. Supp. 2d 56 (D.D.C. 2006)................................................................ 21

Honduras Aircraft Registry, Ltd. v. Gov't of Honduras,
129 F.3d 543 (11th Cir. 1997) ..................................................................... 7

Huntley v. Bortolussi,
667 A.2d 1362 (D.C. 1995) .......................................................................... 19

I.T. Consultants, Inc. v. Islamic Republic of Pakistan,
351 F.3d 1184 (D.C. Cir. 2003)..................................................................... 9, 11

*IDAS Res. N.V. v. Empresa Nacional de Diamentes de Angola E.P.,
No. 06-00570, 2006 WL 3060017 (D.D.C. Oct. 26, 2006) .............................. 4-5, 6

*Letelier v. The Republic of Chile,
748 F.2d 790 (2d Cir. 1984)......................................................................... 10

Levine v. Columbia Laboratories Inc.,
No. 03 Civ. 8943, 2004 WL 1392372 (S.D.N.Y. June 22, 2004)...................... 18

Libyan Am. Oil Co. v. Socialist People's Libyan Arab Jamahirya,
482 F. Supp. 1175 (D.D.C. 1980).................................................................. 14

Maritime Int'l Nominees Establishment v. Republic of Guinea,
693 F.2d 1094 (D.C. Cir. 1983)..................................................................... 6-7

Mavrovich v. Vanderpool,
427 F. Supp. 2d 1084 (D. Kan. 2006)........................................................... 17

iv

McBride v. Merrell Dow & Pharm., Inc.,
800 F.2d 1208 (D.C. Cir. 1986) ............................................................................. 3

Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,
995 F. Supp. 14 (D.D.C. 1998) .............................................................................. 6

Morris v. People's Republic of China,
478 F. Supp. 2d. 561 (S.D.N.Y. 2007) .................................................................. 7

Munno v. Town of Orangetown,
391 F. Supp. 2d 263 (S.D.N.Y. 2005) .............................................................. 17-18

Nyhus v. Travel Mgmt. Corp.,
466 F.2d 440 (D.C. Cir. 1972) ............................................................................. 20

Panhandle E. Pipe Line Co. v. Parish,
168 F.2d 238 (10th Cir. 1948) ............................................................................. 19

Perkins v. Ottershaw Investments Ltd.,
No. 04-22869-CIV, 2005 WL 3273747 (S.D. Fla Sept. 30, 2005) ...................... 18

Peterson v. Royal Kingdom of Saudi Arabia,
416 F.3d 83 (D.C. Cir. 2005) ................................................................................ 2

Phillips v. Bureau of Prisons,
591 F.2d 966 (D.C. Cir. 1979) ............................................................................. 17

Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992) ............................................................................................. 11

Saltz v. Lehman,
672 F.2d 207 (D.C. Cir. 1982) ............................................................................. 21

Taylor v. Houston,
211 F.2d 427 (D.C. Cir. 1954) ............................................................................. 19

*Termorio S.A. E.S.P. v. Electrificadora del Atlantico S.A. E.S.P.,
421 F. Supp. 2d 87 (D.D.C. 2006) ......................................................................... 6

*Transamerica Leasing, Inc. v. La Republica de Venezuela,
200 F.3d 843 (D.C. Cir. 2000) ............................................................................. 10

United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,
33 F.3d 1232 (10th Cir. 1994) ............................................................................ 2, 6

Vermeulen v. Renault, U.S.A., Inc.,
985 F.2d 1534 (11th Cir. 1993) ............................................................................. 5

**Other Authorities**

51 Am. Jur. 2d Limitation of Actions § 162 (2006) ............................................................. 20

Mahir Jalili, International Arbitration in Iraq, 4 J. Int'l Arb. 109 (1987) ........................... 16

Restatement (Second) of Contracts § 202 ........................................................................... 15

U.N. Comm'n on Int'l Trade Law, Status, 1985 UNCITRAL Model Law on
International Commercial Arbitration (Sept. 10, 2007), http://www.uncitral.org/
uncitral/en/uncitral_texts/arbitration/1985Model_arbitration_status.html. ......................... 14

Defendant The Republic of Iraq ("Iraq" or the "Republic") submits this Reply

Memorandum in Further Support of its Motion to Dismiss the First Amended Complaint.

## PRELIMINARY STATEMENT

The issues here are straightforward: this Court lacks subject matter jurisdiction to hear

Agrocomplect's claims because the Amended Complaint fails to allege facts sufficient to

demonstrate that any exception to Iraq's sovereign immunity applies under the Foreign

Sovereign Immunities Act (the "FSIA"). The plaintiff's claims are not based upon any act that

occurred outside the United States in connection with Iraq's commercial activity and that caused

a direct effect in the United States, as the statute requires. Nor has the plaintiff demonstrated

that, even if Iraq had refused to arbitrate with plaintiff – which is not the case – the arbitration

clause in the parties' Contract is subject to enforcement in a United States court.

Agrocomplect's attempt to avoid these conclusions is unavailing. It discusses at length

trade financing agreements between the Central Bank of Iraq ("CBI") and the Bulgarian Foreign

Trade Bank ("Bulgarian Bank") – neither of which are parties to the Contract – which even if

applicable to the Contract would show only that CBI may have obligations to pay Bulgarian

Bank in New York under their lending arrangement, not that the Republic was obligated to pay

plaintiff in New York under the Contract at issue in this case. Moreover, if these trade financing

agreements were applicable, they would necessarily mean that Agrocomplect had already been

paid, and that any remaining obligation (even if it had not already been released by

Agrocomplect) was owed to Bulgarian Bank by CBI, not by the Republic to Agrocomplect,

meaning that Agrocomplect has no standing to pursue this claim.

In any event, even if this Court had subject matter and personal jurisdiction over the

Republic, Agrocomplect concedes that the current dispute is governed by the arbitration clause to

which the parties agreed in writing. Its continuing assertion that this Court may hear its breach of contract claim is utterly inconsistent with this concession. If this Court had jurisdiction – which it does not – the Court would therefore be required to refer the parties to arbitration and stay or dismiss the present action.

Finally, in the unlikely event the Court determined that it possesses jurisdiction over the Republic under the FSIA, and that the claims are not contractually committed to arbitration, it would be separately bound to dismiss them for failure to state a claim upon which relief can be granted, because such claims are time-barred and have already been released.

## ARGUMENT

### POINT I

### THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE FSIA AS A MATTER OF LAW

As the Court of Appeals has observed, "there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one – the FSIA." Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C. Cir. 2005). Contrary to Agrocomplect's arguments, "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n, 33 F.3d 1232, 1238 (10th Cir. 1994). Rather, a foreign state is immune from the jurisdiction of United States courts unless one of the exceptions to immunity in the FSIA applies. Here, neither of the exceptions Agrocomplect seeks to invoke – the "direct effect" prong of the commercial activities exception of § 1605(a)(2) or the arbitration exception of § 1605(a)(6)[1] – defeats the Republic's immunity.

---

[1]    Although Agrocomplect states that "the contract's arbitration clause is a waiver of [the Republic's sovereign] immunity under 28 U.S.C. 1605 §§(a)(1) and (6) [sic]," Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss the First Amended Complaint ("Opp'n Br.) at 5, its

**A.    The Facts Alleged In The Amended Complaint Are Insufficient To Meet The Direct Effect Test Under § 1605(a)(2) Of The FSIA**

The third prong of § 1605(a)(2) of the FSIA grants United States courts jurisdiction over actions against foreign sovereigns that are "based upon… an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere… that… causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Agrocomplect claims that performance by subcontractors it allegedly hired, and payment obligations that allegedly existed between two non-parties to the Contract, constitute direct effects in the United States for purposes of § 1605(a)(2). But these assertions, which are unsupported by any legal authority that Agrocomplect cites, ignore the statutory text: the "act" for purposes of § 1605(a)(2) must be what the plaintiff's claim is "based upon," and must therefore be the act of the defendant; a claim cannot be "based upon" the plaintiff's own conduct or obligations, or those of a third party. Plaintiff has identified no "act" by Iraq that caused a "direct effect" in the United States within the meaning of well-established FSIA jurisprudence, and its attempt to found jurisdiction under the direct effect test of §1605(a)(2) must therefore be rejected.

**1.    Plaintiff's Alleged Use Of United States Goods And Services Does Not Meet The Direct Effect Test**

Plaintiff first mistakenly argues that "the considerable undertakings in the United States by the [plaintiff's] suppliers and contractors in order to satisfy the requirements of defendant's commercial contract" constitute direct effects in the United States for purposes of satisfying § 1605(a)(2) of the FSIA. Opp'n Br. at 19. But even if such undertakings occurred, they do not satisfy the direct effect test for several reasons. First, plaintiff does not allege that the use of

opposition brief contains no argument with respect to waiver of immunity under § 1605(a)(1) of the FSIA, and it has therefore itself waived any such argument. See McBride v. Merrell Dow & Pharm., Inc., 800 F.2d 1208, 1210-11 (D.C. Cir. 1986). And, as discussed in our Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss the First Amended Complaint ("Opening Br.") at 17-19, Agrocomplect could not meet the § 1605(a)(1) standard in any case.

United States suppliers or other entities was required under the Contract, and Agrocomplect's

contention that such a contractual obligation is unnecessary under the direct effect test is simply

wrong.  Courts that have considered the direct effect test have "interpreted [it] to require a clause

in a contract ***mandating the fulfillment of contractual obligations in the United States***."  Atl.

Tele-Network Inc. v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126, 134 (D.D.C. 2003) (emphasis

supplied in part).  While plaintiff asserts that Atl. Tele-Network "simply overstates the direct

effects requirements," on the basis of then-Chief Judge Wald's concurring opinion in Goodman

Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994) (Wald, J., concurring), Opp'n Br. at

18, Agrocomplect fails to meet even the more lenient standard suggested by Judge Wald in that

concurrence.

     Goodman Holdings held that the defendant's nonpayment did not constitute a direct

effect where there was no contractual provision requiring that such payment be made in the

United States, even though some payments under the contract had previously been made here.

See Goodman Holdings, 26 F.3d at 1146-47.  While Judge Wald's concurring opinion

theoretically "left open the possibility that a court could find a 'direct effect' based upon a ***non-

express agreement*** to pay in the United States …'[a]s a factual matter… in almost every case, in

this circuit and others, involving the direct effect exception, the existence or absence of an

expressly designated place of payment has been decisive.'"  IDAS Res. N.V. v. Empresa

Nacional de Diamentes de Angola E.P., No. 06-00570, 2006 WL 3060017, at *9 (D.D.C. Oct.

26, 2006) (emphasis supplied).  Indeed, in the absence of an express contractual obligation to

make a payment in the United States, "the ***only possible*** way of establishing a direct effect by

nonpayment that courts of this circuit have ***even considered*** is a consistent history of payment in

the United States."  Id. (internal quotation marks omitted) (original brackets omitted) (emphasis

supplied); see also Goodman Holdings, 26 F.3d at 1147 (Wald, J., concurring) ("if the

***longstanding consistent customary practice*** between [the parties] had been for [the defendant]

to pay [the plaintiff] from its New York accounts, the breach… ***might*** well have had a direct and

immediate consequence in the United States." (emphasis supplied)).

Here, Agrocomplect has alleged no such "longstanding consistent customary practice"

between itself and the Republic that United States subcontractors be used to meet

Agrocomplect's obligations under the Contract, nor could it do so.  Am. Compl.; see also

Opening Br. Ex. A.  Nor has it alleged any other agreement – express ***or*** implied – that United

States subcontractors be used.  The alleged hiring of such subcontractors – by plaintiff, not the

Republic, and not pursuant to any contract or practice between plaintiff and the Republic –

cannot, therefore, constitute a direct effect under § 1605(a)(2) of the FSIA.[2]

Agrocomplect next relies on an Eleventh Circuit tort case, Vermeulen v. Renault, U.S.A.,

Inc., 985 F.2d 1534, 1537 (11th Cir. 1993), as support for its argument that its alleged unilateral

decision to use United States subcontractors did not necessarily constitute an intervening element

between any alleged act of the Republic and any alleged effect in the United States.  See Opp'n

Br. at 19.  This argument is wholly misplaced.  Vermeulen is a classic example of a "direct

effect" in the tort context, where the FSIA test is very much like that of a state long-arm statute:

the French government-owned corporate defendant negligently designed a car in France and

deliberately marketed it in the United States, where its defective design caused the plaintiff's

physical injuries.  This scenario has nothing to do with the present case, in terms of "intervening

---

[2]        The two additional cases on which plaintiff relies do not support plaintiff's proposition that there is no
requirement of an express or implied agreement that payment be made in the United States by the defendant.  See
Opp'n Br. at 16-17 (discussing Hanil Bank v. PT. Bank Negara Indonesia, (Persero), 148 F.3d 127, 132 (2d Cir.
1988) (letter of credit specifically stated plaintiff could choose place of payment and plaintiff chose New York); and
Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 236, 239 (2d Cir. 2002) (court finds no direct
effect, but notes that direct effect will be found where "performance could have been required in the United States
and then was requested there.")).

element" or anything else:  here, unlike the defendant in <u>Vermeulen</u>, the Republic did ***not***

deliberately engage in or direct ***any*** activity related to the Contract in the United States.  Rather,

as plaintiff apparently concedes, <u>see</u> Opp'n Br. at 19, any alleged hiring of United States

subcontractors was purely the result of the exercise of ***Agrocomplect's*** discretion.  Where

performance of a contract "might well have" involved United States subcontractors, but "might

just as well have" involved non-United States subcontractors, the direct effect test is not

satisfied.  <u>Goodman Holdings</u>, 26 F.3d at 1146-47.

Finally, Agrocomplect asserts that an effect on an entity other than the plaintiff is

sufficient in itself to constitute a direct effect under § 1605(a)(2) of the FSIA, Opp'n Br. at 15,

19, but fails to cite a single case in this circuit in support of this proposition.  Indeed, it simply

ignores precedent from this Court stating precisely the opposite.  <u>See</u> <u>Termorio S.A. E.S.P. v.</u>

<u>Electrificadora del Atlantico S.A. E.S.P.</u>, 421 F. Supp. 2d 87, 95 (D.D.C. 2006) (holding that

effects on non-plaintiff entity lacking standing to sue are irrelevant for purposes of direct effect

test), <u>aff'd on other grounds</u>, 487 F.3d 928 (D.C. Cir. 2007); <u>see also</u> <u>Millicom Int'l Cellular,</u>

<u>S.A. v. Republic of Costa Rica</u>, 995 F. Supp. 14, 22 (D.D.C. 1998) (holding plaintiff "cannot rely

on any repercussion felt by [its]… creditors to establish 'direct effects' under [§ 1605(a)(2) of

the FSIA] because any derivative harm would be too indirect to qualify as an 'immediate

consequence' of the defendant['s] conduct").

Ironically, the cases Agrocomplect cites in ostensible support of this argument are mostly

decisions in which effects on non-parties were ***not*** held to meet the direct effect test.  <u>See</u> <u>United</u>

<u>World Trade</u>, 33 F.3d 1232; <u>IDAS</u>, 2006 WL 3060017; <u>Maritime Int'l Nominees Establishment</u>

<u>v. Republic of Guinea</u>, 693 F.2d 1094 (D.C. Cir. 1983) (declining to decide whether FSIA could

ever confer subject matter jurisdiction based on losses to nonparties, but finding alleged losses to

nonparties in instant case were not direct effects); <u>Morris v. People's Republic of China</u>, 478 F.

Supp. 2d 561 (S.D.N.Y. 2007) (no direct effect where plaintiffs had purchased bonds on which

foreign state had defaulted forty years earlier and contractually designated payment locations

were all outside the U.S.).[3]  Nor does <u>Commercial Bank of Kuwait v. Rafidain Bank</u>, 15 F.3d

238 (2d Cir. 1994), help plaintiff:  in contrast with <u>Termorio</u>, the alleged effect in <u>Commercial</u>

<u>Bank of Kuwait</u> was on an agent of the plaintiff who also would have had standing to bring the

action against the foreign state instrumentality defendant.  <u>See</u> <u>Commercial Bank of Kuwait</u>, 15

F.3d at 241, 242.[4]  In sum, there is simply no legal support in this circuit for Agrocomplect's

contention that performance by United States subcontractors, even if it occurred, constitutes a

direct effect of its Contract with Iraq, which did not require or refer to any such subcontracts.

### 2.    Intended Payments Alleged By Plaintiff Do Not Constitute A Direct Effect

Agrocomplect next argues that the trade financing agreements between CBI and

Bulgarian Bank evidenced by the Discovery Motion Exhibits satisfy the direct effect test of the

FSIA.  Agrocomplect is wrong.  As an initial matter, Agrocomplect's argument proceeds on the

assumption that the Discovery Motion Exhibits are applicable to the Contract on which its claim

is based, although it is evident from the face of such documents that they are not.  More

important, plaintiff's attempt to shield itself from the consequences of the indisputable fact that

the agreements on which it relies are between CBI and Bulgarian Bank, rather than

Agrocomplect and the Republic, is based solely on its erroneous conflation of principles of

agency law with the concept of an "agency or instrumentality" of a foreign state under the FSIA.

---

[3]      To the extent the <u>Morris</u> court hypothesized about whether effects on non-parties could ever be considered for purposes of the direct effect test, such discussion constitutes dicta in light of the court's ultimate determination that the direct effect test had not been met, and runs counter to the case law in this circuit.

[4]      The only case cited by plaintiff in which effects on non-parties were found to be direct is an Eleventh Circuit decision that is distinguishable on its facts because the contract ***required*** the performance in the United States of the activities that were held to constitute direct effects.  <u>See</u> <u>Honduras Aircraft Registry, Ltd. v. Gov't of Honduras</u>, 129 F.3d 543, 545-46 (11th Cir. 1997).

Far from establishing jurisdiction over Agrocomplect's claim against the Republic, these documents, if applicable to the parties' Contract, would necessarily establish that Agrocomplect lacks standing to pursue this action.

        **a.**      **The Discovery Motion Exhibits Are Largely Irrelevant On Their Face**

Agrocomplect does not address the fact that all but one of the Discovery Motion Exhibits have no apparent connection to the Contract. <u>Compare</u> Opening Br. at 12-13 <u>with</u> Opp'n Br. at 11-18. The Fifteenth Session Minutes is the ***only*** document among the Discovery Motion Exhibits that is referred to in the Contract. <u>Compare</u> Opening Br. Exs. D, E, F, G, H, I, J, K, L <u>with</u> Opening Br. Ex. A. Although this document states that "amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between [CBI and Bulgarian Bank] in the present Agreed Minutes," the document contains no description of these payment arrangements, and no reference to any payments in the United States. Opening Br. Ex. D. The other Discovery Motion Exhibits are not referenced in the Contract, and do not, on their face, purport to apply to the Contract. <u>Compare</u> Opening Br. Exs. D, E, F, G, H, I, J, K, L <u>with</u> Opening Br. Ex. A.

Agrocomplect simply ignores this inconvenient fact and proceeds with its argument as though the Discovery Motion Exhibits applied to the Contract. After discussing the above-quoted language from the Fifteenth Session Minutes, Agrocomplect immediately goes on to quote language from the ***Seventeenth Session Banking Arrangements***, implying that these banking arrangements were entered into pursuant to the agreed minutes of the Fifteenth – rather than the Seventeenth – Session. Opp'n Br. at 12. Plaintiff offers no explanation why these later agreements between CBI and Bulgarian Bank apply to the Contract, and its assumption that they do is speculation.

      **b.**    **Even If The Discovery Motion Exhibits Applied To The Contract, The Trade Financing Agreements They Evidence Could Not Establish Jurisdiction Over The Republic In This Action**

More important, even if the Discovery Motion Exhibits applied to the Contract, the trade financing agreements they evidence would not provide a basis for jurisdiction over the Republic in this action under the direct effect test. Pursuant to the statutory text of § 1605(a)(2), the "act" that causes the direct effect must be what the plaintiff's claim is "based upon," and must therefore be an act of the defendant; a claim cannot be "based upon" the conduct of a third party. The Discovery Motion Exhibits at most establish that **CBI** – not the Republic – had an obligation to make payments to **Bulgarian Bank** – not Agrocomplect – in the United States. Agrocomplect's claim against the Republic cannot be "based upon" the alleged failure of a third party to meet its obligations to another third party. [5] To avoid the inevitable consequences of this fact, Agrocomplect makes the **ipse dixit** claim that because state-owned central banks are included in the FSIA's definition of "agency or instrumentality," and CBI is a state-owned bank, CBI "acted as agent for defendant" in making payments under the Contract. Opp'n Br. at 11, n. 14. This argument is frivolous.

"Agency or instrumentality" under the FSIA is a term of art which means an entity majority-owned by a foreign state. 28 U.S.C. § 1603(b); Dole Food Co. v. Patrickson, 538 U.S. 468, 473 (2003). It does not imply a legal relationship of principal and agent; on the contrary, it is well settled that "duly created instrumentalities of a foreign state are to be accorded a

---

[5]    Plaintiff's reliance on I.T. Consultants, Inc. v. Islamic Republic of Pakistan, 351 F.3d 1184 (D.C. Cir. 2003), is therefore entirely misplaced. See Opp'n Br. at 15-18. In I.T. Consultants, the **foreign state defendant** was obligated to make payments **to the plaintiff** in the United States. See 351 F.3d at 1186-87. Here, CBI – not the Republic – was required to make payments to Bulgarian Bank – not Agrocomplect – in the United States. Although Agrocomplect claims that it is "certainly prepared to amend the complaint so that… [it] avers that the payments to which paragraph 30 refers…were payments due from defendant to plaintiff," Opp'n Br. at 14, n. 16, it cannot plead around the Discovery Motion Exhibits, which are agreements between CBI and Bulgarian Bank – **not** the Republic and Agrocomplect.

presumption of independent status." First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"). Although the issue in Bancec was whether a foreign sovereign could be held liable for the acts of its instrumentality, the presumption of separateness applies equally to the issue of whether a foreign sovereign is amenable to suit in the United States under the FSIA based upon the acts of its instrumentality. See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847-48 (D.C. Cir. 2000).

Agrocomplect bears the burden of overcoming the presumption of separateness, Letelier v. The Republic of Chile, 748 F.2d 790, 795 (2d Cir. 1984), and may do so only by invoking traditional principles of agency law or the law governing corporate veil-piercing in the private context. See Transamerica, 200 F.3d at 847-48. It has not done so: the Amended Complaint does not allege that CBI was either an agent or a mere alter ego of the Republic, nor does it allege any facts that could support such a conclusion. Nor is there any allegation that Bulgarian Bank, to which any obligations of CBI were owed, was an agent or alter ego of Agrocomplect. The Republic may therefore not be held amenable to suit in the United States under the FSIA based on CBI's alleged obligations to make payments to Bulgarian Bank.[6]

The financing of the Republic's debts evidenced by the Discovery Motion Exhibits, as well as any breach of CBI's resulting obligations to Bulgarian Bank, would also necessarily constitute intervening elements for purposes of analyzing whether any alleged breach by the Republic of its Contract with Agrocomplect had a direct effect in the United States within the meaning of § 1605(a)(2). See Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, 212 F. Supp. 2d 30, 35-36 (D.D.C. 2002) (interpreting the immediacy requirement of

---

[6]    Nor does Agrocomplect's off-handed reference to the "third party beneficiary relationships which can flow from the trade financing agreements" Opp'n Br. at 18, n. 18, help its argument. Agrocomplect has not alleged that it was a third party beneficiary of any agreement between CBI and Bulgarian Bank to make payment to plaintiff in New York, nor has it alleged any facts that could support such a conclusion.

Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992), to mean "an effect is direct if it 'has *no intervening element*, but rather, flows in a straight line without deviation or interruption'" from the defendant's activity (emphasis supplied)).  Agrocomplect's argument that such financing is analogous to "each bank's likely agreements in Weltover and I.T. Consultants to follow the instructions of its customer and to deliver to the customer payments directed to the customer's account," Opp'n Br. at 18, is unavailing.  In Weltover, *plaintiffs* had the right pursuant to their agreement with the defendant to designate the place of defendant's payments to them, and *plaintiffs* designated New York.  Weltover, 504 U.S. 607.  Similarly, the parties in I.T. Consultants, Inc. v. Islamic Republic of Pakistan, 351 F.3d 1184 (D.C. Cir. 2003) agreed that defendant's payments to *plaintiff* would be made in the United States.  Here, the parties to the Contract did *not* agree that any payments from the Republic to Agrocomplect would be made in the United States; nor did they agree that Agrocomplect could designate the place where it would receive the Republic's payments.  Rather, the Discovery Motion Exhibits, if applicable to the Contract, indicate that the Republic's obligations under the Contract would be financed by Bulgarian Bank's funding an account of CBI at Bulgarian Bank in Bulgaria to pay letters of credit issued by CBI to Bulgarian suppliers such as Agrocomplect, and CBI would later repay Bulgarian Bank for these advances.  See Opening Br. Ex. E at 1-3; see also Opening Br. at 15-16.  This typical trade financing scenario would interpose CBI's obligation to Bulgarian Bank between the Republic's obligation to Agrocomplect, and constitute an intervening element for purposes of the direct effect test of the FSIA as a basis for jurisdiction over the Republic in an action by Agrocomplect.

c.    **An Inevitable Consequence Of Agrocomplect's Argument Is That It Has No Standing In The Present Action**

Finally, if the Court accepts Agrocomplect's argument that the Republic's payments under the Contract were governed by the Discovery Motion Exhibits, the necessary conclusion would be that Agrocomplect lacks standing to bring the present action. The Discovery Motion Exhibits do not mention Agrocomplect at all, but rather unambiguously require payments to be made by CBI ***to Bulgarian Bank***. Agrocomplect fails to explain how – if indeed the Republic's payment obligations under the Contract flowed to Bulgarian Bank – ***it*** has standing to assert a claim for such amounts.

Nor does <u>Commercial Bank of Kuwait</u> help plaintiff. The payment under the contract there was required to be made to ***an agent*** of the plaintiff in the United States. <u>See</u> <u>Commercial Bank of Kuwait</u>, 15 F.3d at 241, 242. Agrocomplect does not allege that Bulgarian Bank was its agent for purposes of receiving payments from the Republic under the Contract; nor does it allege any facts that could support such a conclusion.[7]

Indeed, although Agrocomplect dismisses the Republic's concerns about the legitimacy of its claims – as tendered in the IDRO process and asserted before this Court – as "groundless rumblings," Opp'n Br. at 5, it nowhere addresses the substance of those concerns: if, as Agrocomplect contends, the trade financing agreements evidenced by the Discovery Motion Exhibits applied to the Contract, then the payments due ***to Agrocomplect*** for work performed under the Contract were to be paid ***by Bulgarian Bank's*** advances to CBI, and Bulgarian Bank

---

[7]    Plaintiff's vague assertion that "there [can] be [no] legitimate claim that CBI and Bulbank were not acting as agents for their respective governments, and their respective government companies and ministries, for purposes of making payments required under the Contract," Opp'n Br. at 12, together with its reference to the Republic's characterization of Agrocomplect as "'a Bulgarian company under a communist regime,'" <u>id.</u> at 12, n. 15, fares no better than plaintiff's argument that CBI was acting as an agent for the Republic. Assuming Agrocomplect was a state-owned entity at the time the Contract was formed, it would be subject to a presumption of separateness from its government – and from any other state-owned entities such as Bulgarian Bank.

was to be repaid at a later date by CBI.  If any sums were in fact owed by CBI to Bulgarian Bank

on account of such advances, it would mean that Agrocomplect was paid years ago, making

Agrocomplect's claims fraudulent.

### 3. The Alleged Destruction Of Construction Projects By The United States Military Does Not Meet The Direct Effect Test

Agrocomplect argues that the alleged destruction of its construction sites by the United

States military in Iraq constitutes a direct effect in the United States because "[i]n the absence of

the Contract, there would have been no construction project, and thus, no military attack on the

construction project."  Opp'n Br. at 20.  This "but for" argument is entirely irrelevant to the

direct effect test, which Agrocomplect grossly misinterprets.  Obviously, if the construction sites

were not built, they could not be destroyed.  But Agrocomplect's theory that this constituted a

direct effect in the United States – because of the cost to U.S. taxpayers of  "the commitment of

American military time, equipment, resources and, in particular, personnel, and the planning

associated with the undertaking," id. – ignores the fact that the United States went to war with

Iraq in 1991 for reasons that had nothing whatever to do with whether the Republic entered into

the Contract or performed under it.  Indeed, under Agrocomplect's theory, ***any foreign entity***

injured by U.S. military activity in either Gulf War could bring an action against the ***Republic*** in

the United States.  This clearly was not Congress's intention in enacting the direct effect test for

jurisdiction under FSIA.

### B. The Arbitration Clause In The Contract Did Not Constitute A Waiver Of Iraq's Sovereign Immunity In The United States Under § 1605(a)(6) Of The FSIA

Plaintiff argues that § 1605(a)(6) of the FSIA is applicable because the Arbitration Clause

does not explicitly state that arbitration was required to be held in Iraq, and therefore such Clause

"may be" governed by the New York Convention within the meaning of § 1605(a)(6)(B).  Opp'n Br. at 22.[8]  This argument misreads the statute, the case law and the Arbitration Clause itself.

First, plaintiff claims the provision in the Arbitration Clause granting each party the right to choose ***an arbitrator*** to serve on the arbitration committee implies that the parties left open the choice of ***the location*** of the arbitration.  See Opp'n Br. at 22-23.  But plaintiff cites no provision of the Arbitration Clause indicating that the parties left open the location of the arbitration or delegated the choice of location to their chosen arbitrators, and indeed, no such provision existed.  Am. Compl. ¶ 6; see also Opening Br. Ex. A at 218-219.  Plaintiff's reliance in this connection on Libyan Am. Oil Co. v. Socialist People's Libyan Arab Jamahirya, 482 F. Supp. 1175 (D.D.C. 1980) – a case that did not involve § 1605(a)(6) and was subsequently vacated, 684 F.2d 1032 (D.C. Cir. 1981) – is therefore entirely misplaced.  Unlike the Arbitration Clause here, the contract in Libyan Am. Oil Co. stated that the "arbitration should take place ***either where the parties agreed, or where the arbitrators might agree***." Libyan Am. Oil Co., 482 F. Supp. at 1178 (emphasis supplied).  Here, the Arbitration Clause contains no such provision.[9]

Plaintiff further argues that "unless the arbitration agreement itself requires that the arbitration proceeding take place in a jurisdiction which is not a signatory to the New York Convention, section 1605(a)(6)(B) will preclude the assertion of sovereign immunity" by the foreign state in the courts of the United States.  Opp'n Br. at 22.  Plaintiff cites no authority in

---

[8]    Agrocomplect asserts without argument that § 1605(a)(6)(C) is applicable.  Opp'n Br. at 21.  This argument is meritless:  for all the reasons previously discussed, this Court would not possess subject matter jurisdiction over Agrocomplect's underlying breach of contract claim pursuant to any other provision of the FSIA.

[9]    Agrocomplect's reliance on the UNCITRAL Model Law on International Commercial Arbitration, which has not been enacted in Iraq or the United States, is equally misplaced.  See U.N. Comm'n on Int'l Trade Law, Status, 1985 UNCITRAL Model Law on International Commercial Arbitration (Sept. 10, 2007), http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/1985Model_arbitration_status.html.

support of this proposition, and indeed, such an expansive reading of the statute is unfounded.[10]

Moreover, even if plaintiff's expansive reading of § 1605(a)(6) were correct, the exception

would still not apply here, because the Arbitration Clause, when read in conjunction with the

Contract's other clauses, shows the parties intended any arbitration to take place in Iraq.

As plaintiff concedes, the Contract contained a Forum Selection Clause granting Iraqi

courts *exclusive jurisdiction* over any suits arising under the Contract.  Am. Compl. ¶ 6; see also

Opening Br. Ex. A at 220.  If the Contract were interpreted to permit arbitration outside Iraq,

both the agreement to arbitrate and the resulting arbitral award would be subject to enforcement

in courts outside Iraq, which would render the existence of the exclusive Forum Selection Clause

meaningless. These provisions of the Contract would make no sense unless the parties intended

that Iraq be the situs of their arbitration.  See Restatement (Second) of Contracts § 202

("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement

are interpreted as consistent with each other").

Agrocomplect further misses the point by arguing that: (i) "the parties' decision to

identify a forum for judicial proceedings, but not for arbitration proceedings, weighs against

[this] construction," Opp'n Br. at 23; (ii) "[c]ourts routinely apply foreign law," id. at 24; and

(iii) "the 'Iraqi arbitral law and rules' are neither difficult to apply in any forum, nor uniquely

suited to an Iraqi forum." Id.  The Forum Selection Clause and the Arbitration Clause would be

inconsistent with one another *unless* they are construed together as a requirement that the Iraqi

---

[10]      Plaintiff's reliance on Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118 (D.C. Cir. 1999) for its
assertion that subject matter jurisdiction exists in the instant case under § 1605(a)(6), Opp'n Br. at 21, is entirely
misplaced.  The plaintiff in Creighton sought to enforce in the United States an arbitral award rendered in France, a
signatory to the New York Convention.  See Creighton, 181 F.3d at 120-21.  Similarly, the plaintiff in Cargill Int'l
S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1014 (2d Cir. 1993), on which Agrocomplect also mistakenly relies, see
Opp'n Br. at 22, sought to enforce an agreement to arbitrate in England, also a signatory to the New York
Convention.  Agrocomplect seeks neither to enforce an arbitral award rendered nor an agreement to arbitrate in a
signatory state, but rather to enforce an agreement to arbitrate that implicitly required arbitration in Iraq, a foreign
state that is *not* a signatory to the New York Convention.

courts have exclusive jurisdiction to supervise any arbitration between the parties. See Mahir

Jalili, International Arbitration in Iraq, 4 J. Int'l Arb. 109, 116 (1987) (attached to Opening Br.)

(explaining that the "arbitration clause provides the mechanism for the arbitration proceeding,

whereas the jurisdiction clause empowers the [Iraqi] courts to enforce the [Iraqi] Civil Procedure

Code under which the arbitration proceeding is conducted"). Such exclusive Iraqi judicial

supervision would only be possible if the arbitration were in Iraq, and would be utterly

inconsistent with any role of a United States court under the FSIA or the Federal Arbitration Act.

**POINT II**

**AGROCOMPLECT'S CLAIMS**
**ARE CONTRACTUALLY COMMITTED TO ARBITRATION**

In the unlikely event the Court determines it possesses subject matter jurisdiction over the

Republic under either § 1605(a)(2) or § 1605(a)(6), which it does not, the only course of action

available to it would be to refer the parties to arbitration pursuant to the Arbitration Clause.

Agrocomplect has not alleged that it has ever made a demand for arbitration against the

Republic, Am. Compl., and, as far as the Republic is aware, it has not, so that its claim for an

order compelling arbitration is non-justiciable. In any event, this is the sole remedy available to

Agrocomplect. Am. Compl. ¶ 6; Opening Br. Ex. A at 218-19.

**POINT III**

**AGROCOMPLECT'S CLAIMS ARE TIME-BARRED AND HAVE BEEN RELEASED**

In the unlikely event the Court determines that it possesses subject matter jurisdiction

over the Republic in this action, which it does not, and that Agrocomplect's underlying breach of

contract claim is not contractually committed to arbitration, which it is, the Court would, in the

alternative, be required to dismiss Agrocomplect's claims because they are time-barred on the

face of the Amended Complaint, and have been released.

16

**A.     The Court Can Consider The IDRO Documents And The UNCC Panel Report In Deciding This Motion To Dismiss**

Agrocomplect is wrong to argue that the Court may not consider the IDRO Documents and UNCC Panel Report unless it converts the Republic's motion to dismiss into a motion for summary judgment. See Opp'n Br. at 7-8. Although it concedes that "[c]onversion is not required where the trial court considers material which is 'integral' to the complaint," id. at 8, it argues that the exception is not met because it did not specifically rely on the documents in drafting the Amended Complaint. See id. at 8-10. This argument is unpersuasive. First, where a plaintiff refers in its complaint to previous cases in which it litigated the controversy at issue, a court may consider the documents and orders pertaining to the previous litigations on a Rule 12(b)(6) motion to determine whether plaintiff's claims were barred by *res judicata*. See Mavrovich v. Vanderpool, 427 F. Supp. 2d 1084, 1090 (D. Kan. 2006). Agrocomplect referred in its Amended Complaint to two fora in which it previously sought relief for its claims – the UNCC and the IDRO debt restructuring process. Am. Compl. ¶ 21-26.[11] Therefore, it is entirely reasonable for the Court to consider the documents relating to such processes in determining whether plaintiff's claims have been released. See Mavrovich, 427 F. Supp. 2d at 1090.

Moreover, plaintiff overstates the requirement that it refer to the specific documents in drafting the complaint. Where plaintiff has actual notice of all information in the movant's papers, it is only necessary that plaintiff relied upon the documents "in framing the complaint" in order for the court to consider them without converting the motion. See Munno v. Town of

---

[11]     Indeed, the Amended Complaint specifically refers to the UNCC Panel Report and its contents. Am. Compl. ¶ 22 ("On March 19, 1999, the Governing Council of the UNCC, adopting *the Report and Recommendations made by the Panel of Commissioners*, rejected on jurisdictional grounds the UNCC Claims other than US $150,890 for the cost of air evacuation of 368 company employees and 56 family members." (emphasis supplied)). Additionally, the UNCC Panel Report is a matter of public record, and may also be considered on that basis. See Phillips v. Bureau of Prisons, 591 F.2d 966, 969 (D.C. Cir. 1979) ("when passing on a motion attacking the legal efficacy of the plaintiff's statement of his claim, the court may properly look beyond the complaint… *to matters of general public record*." (emphasis supplied)).

Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005). Indeed, the court in Financial Security Assurance, Inc. v. Stephens, Inc., 450 F.3d 1257, 1264 (11th Cir. 2006), on which Agrocomplect relies, recognized that "the potential harm that courts are mindful of [when deciding whether to consider documents outside the complaint on a motion to dismiss] is the ***lack of notice*** that the attached document may be considered by the court." (emphasis supplied). Here, Agrocomplect specifically refers to the UNCC and the IDRO debt restructuring process, the purposes thereof, and the requirements for participation therein in its Amended Complaint. Am. Compl. ¶¶ 23-26. Agrocomplect therefore necessarily had actual notice of the operative documents governing the two procedures and relied upon them in "framing" its Amended Complaint.[12]

**B.    Agrocomplect's Claims Are Time-Barred**

Agrocomplect argues that the Complaint is not time-barred because: (i) a twelve-year statute of limitations may apply to the Contract; (ii) the Republic has not sufficiently identified the date of accrual of the plaintiff's claims; and (iii) there is a possibility that the claims may have been tolled, or that the doctrines of waiver or estoppel may apply. See Opp'n Br. at 27-31. None of these arguments has merit.

### 1.    The Complaint Is Time-Barred On Its Face

It is well established, in this circuit and elsewhere, that a complaint can be dismissed under Rule 12(b)(6) based on the expiration of the statute of limitations when it is clear from the

---

[12]    Nor is Agrocomplect aided by the other cases on which it relies. The plaintiff's complaint in Levine v. Columbia Laboratories Inc., No. 03 Civ. 8943, 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004) contained only a passing reference to the release agreement. In contrast, Agrocomplect devotes ***six paragraphs*** of its Amended Complaint to a discussion of its participation in the UNCC and the IDRO debt restructuring process. Am. Compl. ¶¶ 21-26. In Donahue v. Uno Restaurants, LLC, No. 3:06-CV-53, 2006 WL 1373094, at *1 (N.D.N.Y. May 16, 2006), the defendant conceded that plaintiff had not even signed the alleged release agreement, and in Perkins v. Ottershaw Investments Ltd., No. 04-22869-CIV, 2005 WL 3273747, at *3 (S.D. Fla. Sept. 30, 2005), the alleged release did not explicitly state that the plaintiff released the two defendants against whom the action was brought. The court in Fitzpatrick v. Queen, No. Civ.A. 03-4318, 2005 WL 1172376, at **3-4 (E.D. Pa. May 16, 2005), the final case on which Agrocomplect relies, acknowledged that "[d]ocuments 'integral to or explicitly relied upon in the complaint' and related matters of public record may be considered on a motion to dismiss" and permitted consideration of the documents at issue. The UNCC Panel Report and IDRO Documents meet this standard.

face of the complaint that the claims asserted are time-barred. See Taylor v. Houston, 211 F.2d 427, 427-28 (D.C. Cir. 1954); Berry v. Chrysler Corp., 150 F.2d 1002, 1003 (6th Cir. 1945); Panhandle E. Pipe Line Co. v. Parish, 168 F.2d 238, 240 (10th Cir. 1948).  Under the most liberal reading of the Amended Complaint, the claims alleged are time-barred.

Plaintiff first suggests that the 12-year statute of limitations applicable to contracts "under seal" may apply here.  See Opp'n Br. at 27.  However, the Amended Complaint does not even allege that the Contract was "under seal," and the cases plaintiff cites in support of its argument demonstrate that the Contract possesses *none* of the attributes required of a contract under seal. "[C]ourts have been reluctant to declare a document to be sealed in the absence of evidence that the parties intended it to be under seal."  Burgess v. Square 3324 Hampshire Gardens Apartments, Inc., 691 A.2d 1153, 1155 (D.C. 1997); see also Huntley v. Bortolussi, 667 A.2d 1362, 1365 (D.C. 1995).  As evidence that the parties intended the contract to be "under seal," courts require "something more than a corporate seal, such as, for example, a recitation that the document is 'signed and sealed.'"  Burgess, 691 A.2d at 1156.  The Contract does not contain such a recitation of intent for it to be "under seal," and the statute of limitations for simple contracts, which requires that a claim be brought within three years from the date of accrual, therefore applies here.  D.C. Code § 12-301(7) (2007).

Plaintiff further argues that the failure to specify the exact date the plaintiff's claims allegedly accrued prevents the Court from finding that such claims are time-barred as a matter of law.  But its attempt to rely on the deliberate vagueness of the Amended Complaint in this regard is fruitless: any reasonable reading of the Amended Complaint reveals that all performance of the Contract ceased by January 1991 at the latest.  Am. Compl. ¶ 15; Opening Br. at 25-26.  Under the applicable law, Agrocomplect had three years from that date within which to make a demand

19

for payment, and another three years after that within which to file suit for any payments due but

not received.  See 51 Am. Jur. 2d Limitation of Actions § 162 (2006); Nyhus v. Travel Mgmt.

Corp., 466 F.2d 440, 452-53 (D.C. Cir. 1972); see also Opening Br. 25-26.  Thus, the statute of

limitations had necessarily run on Agrocomplect's claims by no later than January 1997.

      Agrocomplect offers no explanation or support for its conclusory assertion that "[i]t is not

enough to argue in this case that a party must make a demand within a reasonable time," Opp'n

Br. at 28, nor does it offer an argument why it should not be held to the requirement that demand

be made within a reasonable time.  Instead, Agrocomplect points to a set of agreed minutes of a

meeting between the Republic and the Government of the People's Republic of Bulgaria

("Bulgaria") dated March 1, 1990 (the "Agreed Minutes"),[13] and a letter from CBI to Bulgarian

Bank dated February 16, 2002 (the "CBI Letter").  The Agreed Minutes discuss the use of crude

oil by the Republic for satisfaction of certain debts owed to Bulgaria, and the CBI Letter informs

Bulgarian Bank that certain debts could not be paid because of the sanctions regime in place at

the time.  Neither the Agreed Minutes nor the CBI Letter mention Agrocomplect or the Contract.

Nor does either document indicate that the debts of the Republic to which it referred included

any debts related to the Contract.  More importantly, if, as Agrocomplect asserts, these

documents did encompass debts allegedly owed by the Republic under the Contract, the

inevitable conclusion to be drawn from such fact is that such debt was owed either to Bulgaria or

Bulgarian Bank – *not* to Agrocomplect.  In either event, these documents do nothing to relieve

Agrocomplect of its obligation to make a timely demand for payment of any amounts it was

allegedly owed by the Republic under the Contract.

---

[13]    Although Agrocomplect states that the Agreed Minutes were dated March 1, 2000, and cites to its Exhibit J-3, the Agreed Minutes are actually attached to its opposition brief as Exhibit M, and dated March 1, 1990.

### 2. Agrocomplect Fails To Allege Facts That If True Would Demonstrate That The Statute Of Limitations Was Tolled

Plaintiff argues that the record is inadequate to enable the court to assess whether principles of waiver, estoppel or equitable tolling limit or preclude the application of the statute of limitations to the claims in this case. See Opp'n Br. at 30. Because the Republic demonstrated that the Amended Complaint is time-barred on its face, it is plaintiff that has the burden of alleging facts demonstrating that an exception to the statute of limitations applies. See Saltz v. Lehman, 672 F.2d 207, 209 (D.C. Cir. 1982); Gupta v. Northrop Grumman Corp., 462 F. Supp. 2d 56, 59 (D.D.C. 2006). Plaintiff has failed to allege such facts.

Agrocomplect asserts that the statute of limitations may have been tolled by: (i) the state of hostilities previously and presently extant in Iraq; (ii) the imposition of an international embargo; (iii) the implementation of the UNCC and the IDRO; and (iv) the Agreed Minutes and the CBI Letter.[14] This argument is meritless. Under the law of the District of Columbia,[15] equitable tolling is generally not available as a defense to the expiration of the statute of limitations. See East v. Graphic Arts Indus. Joint Pension Trust, 718 A.2d 153, 156 (D.C. 1998) (noting that District of Columbia "has not adopted a general equitable 'saving' statute to toll statutes of limitations" and holding that "courts would exceed their prescribed role by providing a remedy where the legislature has determined that none should lie").[16]

---

[14] It is unclear how any of these facts could support a claim that Iraq waived, or is estopped from asserting, a statute of limitations defense. The Republic therefore addresses the relevance of these facts to a claim that the statute of limitations was tolled.

[15] The law of the District of Columbia must be applied to determine the availability of the defense of equitable tolling where, as here, such law is applied to determine the applicable statute of limitations. See Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio, 446 U.S. 478, 487 (1980) (state tolling law should be applied where not inconsistent with the Constitution or federal law). The underlying claim for breach of contract is not one that has been federally created. Therefore, the cases plaintiff cites in which a court has applied a federal standard regarding equitable tolling are inapplicable. See, e.g., Forti v. Suarez-Mason, 672 F. Supp. 1531 (N.D. Cal. 1987).

[16] Nor is Agrocomplect helped by any of the limited exceptions to this rule recognized in the District of Columbia. See East, 718 A.2d at 156-57 (stating tolling has been permitted where "it appears the defendant has done [something] that would tend to lull the plaintiff into inaction;" or "the *fact* of an injury is not readily apparent"

Moreover, even if the facts alleged by plaintiff could toll the statute of limitations, the Complaint would still be time-barred. Plaintiff claims that hostilities in Iraq may have constituted a basis for the tolling of the statute of limitations. The dates of such hostilities, however, do not comport with plaintiff's argument. The first Gulf War occurred between August 2, 1990 – the date on which Kuwait was invaded – and March 10, 1991 – the date on which coalition forces began to withdraw from Iraq. The second Gulf War did not begin until March 20, 2003 – the day the American-led coalition invaded Iraq. As plaintiff concedes, "[w]here extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled ***until the barrier caused by these events is removed.***" Opp'n Br. at 30 (emphasis supplied) (internal quotation marks omitted). Even if the first Gulf War had tolled the statute of limitations on plaintiff's claims, plaintiff would still have been required to assert such claims within three years of the end of the war, or by no later than March 10, 1994, long before the second Gulf War began.

The imposition of an international trade embargo against Iraq is similarly unhelpful to plaintiff's argument. While such embargo likely prevented plaintiff from initiating new business in the country, or further performing the Contract if any performance remained to be rendered by January 1991, it did not prevent Agrocomplect from seeking to collect a debt allegedly owed by the Republic. See Opp'n Br. at 30, n. 30 (discussing United Nations Security Council Resolution 661, S.C. Res. 661, U.N. Doc. S/RES/0661 (Aug. 6, 1990), which precluded states from providing any funds or economic resources to Iraq, but not from asserting claims against it).

---

to the plaintiff as a result of some wrongdoing on the part of the defendant; or plaintiff brought claim in one court and "could not have been expected to anticipate [a] subsequent unrelated case suggesting that review [of plaintiff's claim] was proper in [a different court]." (original brackets omitted)). Agrocomplect does not allege any facts that would support any of these exceptions. And, whatever difficulties there may have been in litigating a claim in Iraq, Agrocomplect does not explain how this would excuse it from earlier pursuing its claim in the District of Columbia, as it now seeks to do.

Nor does the implementation of the UNCC or the IDRO help plaintiff. Plaintiff alleges its claims were rejected by the UNCC on March 19, 1999, see Am. Compl. ¶ 22. Therefore, even if the UNCC proceedings tolled the statute of limitations, plaintiff would still have been required to assert any claims within three years after their rejection by the UNCC, or by no later than March 19, 2002. And because the statute of limitations expired before the implementation of the IDRO process, such implementation could not have further tolled the statute.[17]

## C.    Agrocomplect's Claims Have Been Released

It is indisputable that the release language contained in the IDRO Documents encompassed the claims Agrocomplect now asserts. The Tender Agrocomplect submitted to IDRO "constitute[d] [its] valid and binding obligation, enforceable against [it] in accordance with the terms of [the] Tender and the Invitation." Opening Br. Ex. C at 2. The Invitation, in turn, contains a section entitled "Effect of the Tender" which states:

> By submitting the Tender, [Agrocomplect] irrevocably agrees to the terms and conditions of this Invitation. As part thereof, [Agrocomplect]: ... (ii) agrees to receive the applicable Purchase Price on the Closing Date as the full consideration for the sale to Iraq and cancellation of the Reconciled Eligible Claims listed in the Tender and in full discharge, release and satisfaction of all claims (including claims previously reduced to a Judgment (as defined in Section 13 below)) for principal, contractual interest, late or penalty interest, indemnities, fees and any other amounts of whatever description then due in respect of the Reconciled Eligible Claims tendered by [Agrocomplect] (regardless of whether any adjustment has been made to a claim or to the Purchase Price to account for a set-off effected by [Agrocomplect] or a predecessor in title), *and agrees to release and indemnify Iraq* and any other obligor or guarantor in respect thereof *from any and all claims by [Agrocomplect]* (or any other person claiming through [Agrocomplect]) *arising under such Reconciled Eligible Claims or any contract* or Judgment *evidencing such Reconciled Eligible Claims*."

---

[17]    And for the same reasons that the Agreed Minutes and the CBI Letter do not permit Agrocomplect to avoid its obligation to demand any payments owed under the Contract within a reasonable period, see supra at 20, they do not provide a basis for tolling the statute of limitations applicable to Agrocomplect's claims.

(the "Release Agreement") Opening Br. Ex. B § 8(ii).  Agrocomplect does not dispute that the claims it now asserts arose under the same Contract it submitted to IDRO as evidence of the claims that it tendered.  See Opp'n Br. [18]  Instead, Agrocomplect simply states in conclusory fashion that the language of the Release Agreement "is ambiguous, precluding in any event grant of a motion to dismiss."  Opp'n Br. at 33.  But Agrocomplect fails to point to *any* specific language in the Release Agreement that is allegedly subject to multiple interpretations; nor does it point to any other section of the Invitation or Tender that is inconsistent with the Release Agreement.  Indeed, Agrocomplect offers *no* support whatsoever for its claim of ambiguity, and in fact, the Release Agreement is clear and unambiguous on its face

Agrocomplect further argues that: (i) the claims it now asserts were ineligible for the IDRO process and therefore were not covered by the Release Agreement which did not purport to encompass ineligible claims; and (ii) such claims do not fall under the Invitation's definition of "Unasserted Claims," which, they concede, the Release Agreement covers.  Opp'n Br. at 34-41.  Both of these arguments completely miss the point.

The Republic does not argue that *all* claims that were ineligible for tender in the IDRO process were released by virtue of a holder tendering *any* eligible claim in the IDRO process; nor does it argue that the claims Agrocomplect now asserts were encompassed by the release agreement *because* they fell under the Invitation's definition of "Unasserted Claims."  Rather, the plain language of the Release Agreement encompasses any claims – whether asserted or not, and whether eligible or not – which arise ***under a contract submitted to IDRO*** as evidence of a

_____

[18]     Agrocomplect states that the Contract attached to the Republic's Opening Brief demonstrates that "there was cause for prudence in asserting that one or more documents constituted the full agreement between the parties." Opp'n Br. at 2, n. 3.  But the copy of the Contract the Republic submitted to the Court is the copy that ***Agrocomplect submitted to IDRO*** as evidence of the claim it tendered.  Since Agrocomplect asserts that it "unhesitatingly stands by its IDRO claims," Opp'n Br. at 5, n. 8, there should be no question but that the copy of the Contract it submitted to IDRO in support of those claims accurately and completely reflected the agreement between the parties.

Reconciled Eligible Claim.  See Opening Br. Ex. B § 8(ii), Ex. C at 2.  Agrocomplect's

unsupported assertion that "[o]ther than the sale and the transfer of the Reconciled Claims, and

the discharge and release of the 'unasserted claims,' there are no other provisions in any of the

IDRO documents which can be construed to effect any kind of release or discharge of the claims

in this case," Opp'n Br. at 41, simply ignores the plain language of the Release Agreement and

the terms of the Invitation.

## <u>CONCLUSION</u>

For all the foregoing reasons and those stated previously, the Republic of Iraq

respectfully requests that this Court grant the Republic's motion to dismiss the First Amended

Complaint.

Dated: September 10, 2007

Respectfully submitted,

/s/ Matthew D. Slater
Matthew D. Slater (D.C. Bar # 386986)
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
Telephone:  (202) 974-1500
Facsimile:   (202) 974-1999

Jonathan I. Blackman
Lisa M. Coyle
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:   (212) 225-3999

Attorneys for Defendant The Republic of Iraq

CERTIFICATE OF SERVICE

I, Emily C. Capehart, assistant managing clerk at Cleary Gottlieb Steen & Hamilton LLP, hereby certify that:

On September 10, 2007, a copy of the foregoing Reply Memorandum in Further Support of Defendant's Motion to Dismiss the First Amended Complaint was served by electronic transmission through the Court's CM/ECF System on the following parties:

> Sylvia J. Rolinski
> Danielle M. Espinet
> Rolinski & Suarez, LLC
> 14915 River Road
> Potomac, Maryland 20854
> srolinski@rolinski.com
> Attorney for Agrocomplect, AD
>
> Philip M. Musolino
> Musolino & Dessel
> 1615 L Street, N.W., Suite 440
> Washington, D.C. 20036
> pmusolino@musolinoanddessel.com
> Attorney for Agrocomplect, AD

Dated: September 10, 2007                    /s/ Emily C. Capehart_____
                                             Emily C. Capehart