# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AGROCOMPLECT, AD,                    ) | |
| )                                    | |
| Plaintiff          ) | |
| )                                    | |
| v.                                   )                    Civil Action No. 07-0165(RBW) | |
| )                                    | |
| REPUBLIC OF IRAQ,                    ) | |
| )                                    | |
| Defendant.         ) | |
| )                                    | |
| _____ ) | |

## MEMORANDUM OPINION

Agrocomplect AD, the plaintiff in this civil suit, seeks $47,000,000 in compensatory

damages from the Republic of Iraq for the alleged breach of a construction contract entered into

by the plaintiff and the defendant in the early 1980s (the "Contract").[1]  First Amended Complaint

at 11 (the "Amended Complaint" or "Am. Compl.").  The plaintiff further requests that the Court

enter an order directing the parties to arbitrate its breach of contract claim in the first instance

pursuant to the terms of the Contract.  Id.  Currently before the Court is the Defendant's Motion

to Dismiss the First Amended Complaint (the "Def. Mot.") and the Plaintiff's Motion for Leave

to Conduct Limited Discovery on Motion to Dismiss First Amended Complaint (the "Pl.

Discovery Mot.").  After carefully reviewing the Amended Complaint, the parties' motions, and

---

[1]  The Contract is attached as Exhibit A to the Defendant's Motion to Dismiss the First Amended
Complaint.

all memoranda relevant thereto,[2] the Court concludes that it must grant the defendant's motion to

dismiss and deny the plaintiff's discovery motion as moot for the reasons that follow.

## I. Background

The following facts are either alleged or incorporated by reference in the plaintiff's

Amended Complaint. The plaintiff "is a corporation organized under the laws of the Republic of

Bulgaria." Am. Compl. ¶ 2. At some point in 1984,[3] the plaintiff entered into the Contract with

the defendant, whereby the plaintiff agreed "to perform work, inter alia, on the Hilla-Diwaniya 4

Land Reclamation Project for the State Organization for Land Reclamation [the 'Project'],

operating under the authority of Iraq's Ministry of Agriculture and Irrigation of the Republic of

Iraq." Id. ¶¶ 4-5. The construction work awarded to the plaintiff by the Contract covered

"102,000 donum,"[4] which were "divided initially into [eight] zones." Id. ¶ 10. A ninth zone was

later added. Id.

---

[2] In addition to the Amended Complaint, the defendant's motion to dismiss, and the plaintiff's discovery motion, the Court considered (1) the Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss the First Amended Complaint (the "Def. Mem."), (2) the Plaintiff's Opposition to Defendant's Motion to Dismiss the First Amended Complaint (the "Pl. Opp'n"), (3) the Reply Memorandum in Further Support of the Defendant's Motion to Dismiss the First Amended Complaint (the "Def. Reply"), (4) the Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss First Amended Complaint, (5) the Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss First Amended Complaint, and (6) the Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss First Amended Complaint (the "Pl. Discovery Reply").

[3] The date on which the parties entered into the Contract is not alleged in the Amended Complaint, but a letter from the Iraqi Ministry of Irrigation (the "Ministry") dated September 2, 1984, and attached to the Contract, states that the Ministry approved the plaintiff's bid for the Project on September 1, 1984, Contract at 260-62 (Letter from Ministry of Irrigation, the Public Authority for Land Reclamations, Republic of Iraq to Bulgarian Company Agrocomplect (Sept. 2, 1984)) at 1(the "Ministry Letter"), and directed "a representative from [the plaintiff's] side[] with the authority to sign the contract by an official authorization[] [to come] to the headquarters of this establishment['s] legal department within tend days . . . for the purpose of signing the contract," id. at 2. The Court therefore infers that the Contract was executed on or about September 12, 1984.

[4] As alleged by the plaintiff, one donum is "equal to 1338 square meters." Am. Compl. ¶ 10.

As reflected in a document attached to the Contract entitled "Memorandum No. 2," Contract at 248-51 (the "Mem. No. 2"),[5] payment to the plaintiff was to be made in the form of "monthly certificates" redeemable in part in Iraqi dinars (45%) and in part in United States dollars (55%), Mem. No. 2 ¶¶ 11(B), 14-15.  Memorandum No. 2 specified that the defendant would make a down payment equal to eight percent of the contract price in three installments, id. ¶ 11(A), which would then be deducted "from the Iraqi [d]inar portion of the monthly certificates," id. ¶ 11(B).  It further provided that the dollar portion of the contract price could be transferred abroad by the plaintiff for various uses, "including payment for the personnel engaged in the Project's execution, in accordance with the minutes of the Extraordinary Session [of the] Iraqi-Bulgarian Joint Committee for Economic, Scientific[,] and Technical Cooperation, signed on January 13, 1983[,] in Baghdad, Republic of [Iraq]."  Id. ¶ 15.

The minutes referenced in Memorandum No. 2 appear to reflect a financing arrangement between the Bulgarian Foreign Trade Bank (the "Bulbank"), the national bank for the People's Republic of Bulgaria ("Bulgaria"), and the Central Bank of Iraq (the "CBI") reached at a session held by the Bulgarian-Iraqi Joint Committee for Economic, Scientific, and Technical Cooperation (the "Joint Committee") whereby the Bulbank would finance the dollar portion of the contract price pursuant to certain "deferred payment arrangements agreed upon" by the defendant and Bulgaria.  Def. Mem., Ex. D (Agreed Minutes of the Fifteenth Regular Session of

---

[5]  It is not entirely clear to the Court whether the plaintiff agrees that all of the documents appended to the Contract by the defendant should be considered part of that document.  Although the plaintiff hints that "there [is] cause for prudence in asserting that one or more documents constituted the full agreement between the parties," Pl. Opp'n at 2 n.3, it does not explain the nature of this "cause," nor does it object to the defendant's characterization of Memorandum No. 2 and the Ministry Letter as part of the overall Contract between the parties.  The Court will therefore treat these latter documents as appendices or supplements to the original Contract between the parties in deciding the motions before it.

the Bulgarian-Iraqi Joint Committee for Economic, Scientific[,] and Technical Cooperation) (the "Fifteenth Session Minutes") at 2; see also Mem. No. 2 ¶¶ 15-16 (referencing this arrangement), Ministry Letter at 1 (same).[6]  "The utili[z]ed credit principle amount [would] be repaid in [four] equal yearly installments," with five percent interest on the principle to be paid within three months "following its charging."  Mem. No. 2 ¶ 16(B).

The plaintiff commenced work on the Project on March 12, 1985.  Am. Compl. ¶ 11.  "[T]o perform under the terms of the Contract, [the p]laintiff . . . enter[ed] into agreements with suppliers and others in the United States."  Id. ¶ 8.  The plaintiff completed work on the Project zone-by-zone, handing over each zone to the Iraqi government upon completion.  Id. ¶ 11.  "By August 2, 1990, eight zones were completed and handed over."  Id. ¶ 12.

The defendant invaded Kuwait on August 2, 1990, id. ¶ 13, leading to an international embargo that lasted from August 6, 1990, through 2003, id. ¶ 14.  At some point in January of 1991, "[the p]laintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the [defendant's] invasion and occupation of Kuwait." Id. ¶ 15.  As alleged in the Amended Complaint, the plaintiff suffered contract losses totaling approximately $17,000,000, the loss of tangible property totaling approximately $38,000,000, third-party expenses totaling approximately $188,000, and loss of business reputation totaling approximately $483,000.  Id. ¶ 17.

---

[6]  The Court is rather cautious when describing the Fifteenth Session Minutes because the parties have submitted only a portion of those minutes, and that excerpt does not detail the "deferred payment arrangements" referenced in Memorandum No. 2 and the Ministry Letter.  The Court is therefore left to infer the contents of the missing provisions of the minutes based upon other language regarding the minutes in Memorandum No. 2, the Ministry Letter, and the available portions of the minutes themselves.

Based on the defendant's failure to "pay to [the p]laintiff the sums due and owing under the Contract," id. ¶ 18, or enter into arbitration pursuant to the terms of the Contract, id. ¶ 19, the plaintiff "timely exhausted its claims under the Contract to the United Nations Compensation Commission (the 'UNCC[]')," id. ¶ 21.  On March 19, 1999, the UNCC awarded the plaintiff $150,790 "for the cost of air evacuation of 368 company employees and 56 family members." Id. ¶ 22.  Thereafter, the plaintiff pursued the balance of its claim before the Iraqi Debt Reconciliation Office (the "IDRO"), which was established by the interim Iraqi government "for the expressed purpose of resolving certain debts on certain pre-established terms, including discounts and structured payment schedules."  Id. ¶ 23.  The IDRO "rejected certain of [the p]laintiff's [c]laims as outside of its jurisdiction," id. ¶ 25, but agreed to pay $7,505,203.20 "on certain of [the p]laintiff's claims, plus accrued interest at the IDRO rate," id. ¶ 26.  The IDRO then reduced its award "to 10.25% of the total amount of the claim plus interest," resulting in a net payment of $1,761,875.12.  Id.

The plaintiff filed its initial complaint with this Court on January 23, 2007.  After the defendant filed a motion to dismiss the plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and the plaintiff filed a motion for limited jurisdictional discovery, the plaintiff filed its Amended Complaint on July 16, 2007, thereby rendering both motions moot.  The defendant filed its motion to dismiss the Amended Complaint on August 6, 2007, once again citing Rules 12(b)(1) and 12(b)(6).  The plaintiff filed its new motion for leave to take jurisdictional discovery on September 13, 2007.

The defendant seeks to dismiss the Amended Complaint on two grounds.  First, it argues that the Court lacks subject-matter jurisdiction over this dispute under the doctrine of sovereign

immunity as codified in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391, 1441, 1602-11 (2001) (the "FSIA" or the "Act").  Def. Mem. at 1-3, 7-22; Def. Reply at 1-16.  Second, the defendant argues that the plaintiff has failed to state a claim for which relief can be provided because (1) the plaintiff's complaint must be referred to arbitration in the first instance, Def. Mem. at 23-24; Def. Reply at 16, (2) the plaintiff's suit is barred by the applicable statute of limitations, Def. Mem. at 24-26; Def. Reply at 16, 18-23, and (3) the plaintiff has released its claims against the defendant by participating in the IDRO process, Def. Mem. at 24, 26-29; Def. Reply at 16, 23-25.  In raising this last argument, the defendant relies heavily on documents generated as part of the IDRO review process.  Def. Mem. at 26-29; Def. Reply at 23-25.

The plaintiff argues in its opposition to the defendant's motion to dismiss that this suit falls within two of the statutory exceptions to a foreign nation's sovereign immunity provided by the FSIA: the exception for actions based upon a foreign nation's commercial activity outside the United States that has a "direct effect" within the United States set forth in 28 U.S.C. § 1605(a)(2), Pl. Opp'n at 4-5, 10-20, and the exception in § 1605(a)(6) for actions brought to enforce an arbitration agreement capable of enforcement in the United States, id. at 5, 20-24.[7] The plaintiff further argues that the defendant's timeliness argument cannot be resolved on a motion to dismiss under Rule 12(b)(6), id. at 25-31, and that the plaintiff's release of any claims

---

[7] The plaintiff makes a passing reference to 28 U.S.C. § 1605(a)(1), which excepts from the general immunity provided by the FSIA those cases "in which a foreign state has waived its immunity either explicitly or by implication," see Def. Opp'n at 5 ("Sovereign immunity is also unavailable to the [d]efendant because the [C]ontract's arbitration clause is a waiver of that immunity under 28 U.S.C. §§ (a)(1) and (6)."), but it does not discuss this exception or its application anywhere else in its opposition.  The Court cannot "act as an advocate for [] the parties and construct their legal arguments on [their] behalf in order to counter those in the motion to dismiss." United States v. Real Property, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.).  In any event, the only theory of waiver advanced by the plaintiff is the defendant's supposed agreement to arbitrate any disputes arising out of the Contract in another country, which essentially collapses any inquiry under § 1605(a)(1) into the Court's analysis under § 1605(a)(6)(B) below.

in the IDRO process was a limited one that does not cover the claims at issue in this suit, id. at

32-41. The plaintiff also seeks discovery with respect to its "direct effect" argument on the issue

of sovereign immunity and with respect to the defendant's affirmative defenses. Pl. Discovery

Mem. at 4-6.

The parties agree that the defendant's affirmative defenses of timeliness and release

should be addressed in arbitration in the first instance, but they arrive at different results based on

this conclusion. The plaintiff asserts that the Court should enter an order directing the parties to

arbitrate their dispute pursuant to the terms of the Contract. Pl. Opp'n at 24-25. The defendant,

on the other hand, argues that the Contract's arbitration clause requires dismissal of the

plaintiff's suit because the plaintiff has not made a demand on the defendant for arbitration. Pl.

Reply at 16. Under either approach, the defendant's arguments regarding timeliness and release

cannot be considered by the Court at this time because the parties have not yet attempted to

resolve those defenses through the arbitration process. See Def. Mem. at 23 ("Even if the Court

had subject matter jurisdiction under the FSIA, . . . it could not reach the [defendant's] alternate

grounds for dismissal under Rule 12(b)(6), but rather would be required to refer the matter to

arbitration . . . ."); Pl. Opp'n at 25 ("issues other than the '[]basic question of whether the parties

have agreed to arbitrate the dispute [. . .] including allegations of waiver, delay, or like defenses,

are for the arbitrators to decide'" (quoting Walnut Street Sec., Inc. v. Lisk, 497 F. Supp. 2d 714,

719 (M.D.N.C. 2007))).

## II. Standard of Review

As the Court previously noted, the defendant seeks to dismiss the Amended Complaint

under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. "Rule

12(b)(1) presents a threshold challenge to the [C]ourt's jurisdiction, whereas 12(b)(6) presents a

ruling on the merits with res judicata effect." Al-Owhali v. Ashcroft, 279 F. Supp. 2d 13, 20

(D.D.C. 2003). Because the Court is obligated to determine whether it has subject-matter

jurisdiction in the first instance, see Abu Ali v. Gonzalez, 387 F. Supp. 2d 16, 17 (D.D.C. 2005)

(recognizing the "affirmative obligation" of a district court "to ensure that it is acting within the

scope of its jurisdictional authority" (internal quotation omitted)), and because the Court

concludes for the reasons that follow that it lacks subject-matter jurisdiction in this case, the

Court will limit its discussion of the governing standard of review to that applicable to Rule

12(b)(1).

Broadly speaking, there are two types of Rule 12(b)(1) motions. "A facial challenge

attacks 'the factual allegations of the complaint' that are contained on 'the face of the complaint,'

while a factual challenge is addressed to the underlying facts contained in the complaint." Al-

Owhali, 279 F. Supp. 2d at 13 (quoting Loughlin v. United States, 230 F. Supp. 2d 26, 35-36

(D.D.C. 2002) (citations omitted)). Where a defendant makes a facial challenge, "the [C]ourt

must accept as true the allegations in the complaint and consider the factual allegations of the

complaint in the light most favorable to the non-moving party," Erby v. United States, 424 F.

Supp. 2d 180, 182 (D.D.C. 2006) (citations omitted), just as it would on a motion to dismiss

under Rule 12(b)(6), see Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93

(D.C. Cir. 2002) (noting that the standard for facial challenge to subject-matter jurisdiction "is

similar to that of Rule 12(b)(6)"). Where a factual challenge is made, the Court "may consider

materials outside the pleadings" to determine whether it has subject-matter jurisdiction over the

challenged case or claims, Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir.

2005) (citation omitted), and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," Erby, 424 F. Supp. 2d at 182 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)) (other citations omitted).[8]

### III. Legal Analysis

Given the parties' agreement that the defendant's affirmative defenses of timeliness and release must be arbitrated before they can be raised in this Court, the only issues remaining before the Court are (1) whether the Court has subject-matter jurisdiction over the plaintiff's suit and (2) whether, based on the allegations in the plaintiff's Amended Complaint, the Court must order the parties to attend arbitration or dismiss this suit based on the plaintiff's failure to demand arbitration. The Court's first obligation is to determine whether it has subject-matter jurisdiction in this case. The question of subject-matter jurisdiction, in turn, depends upon whether the defendant is entitled to invoke sovereign immunity under the FSIA.

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Permanent Mission of India to the United Nations v. City of New York, ___ U.S. ___, ___, 127 S. Ct. 2352, 2355 (2007) (internal quotation omitted). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."

---

[8]  The plaintiff asserts that the "defendant bears the burden of proof on the inapplicability of the exceptions" set forth in § 1605(a). Pl. Opp'n at 10. This formulation is not quite correct. While it is true that "[f]oreign defendants challenging a U.S. court's subject[-]matter jurisdiction bear the ultimate burden of proving immunity," Idas Resources N.V. v. Empresa Nacional de Diamantes de Angola E.P., Civil Action No. 06-00570 (ESH), 2006 WL 3060017, *3 (D.D.C. Oct. 26, 2006) (emphasis added), the plaintiff bears the initial "burden of producing evidence to show that the foreign sovereign defendant does not enjoy immunity and that one or more of the nine exemptions to [the] FSIA constitutes a waiver of the defendant's sovereign immunity[,] thereby conferring federal court jurisdiction over the plaintiff's claims," Youming Jin v. Ministry of State Security, 475 F. Supp. 2d 54, 61 (D.D.C. 2007). With respect to the defendant's facial challenge to the Court's subject-matter jurisdiction, this means that the plaintiff's allegations in the Amended Complaint, if true, must show that the defendant's conduct falls within the ambit of at least one of the FSIA's exceptions to sovereign immunity.

9

<u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993).  Until the passage of the FSIA in 1976,

however, "American courts had generally regarded foreign sovereigns as absolutely immune

from suit (with exceptions where the political branches made case-specific recommendations to

suspend immunity)."  <u>El-Hadad v. United Arab Emirates</u>, 496 F.3d 658, 662 (D.C. Cir. 2007).

"So while the Act announces that foreign states 'shall be immune from the jurisdiction of the

courts of the United States and of the States,' . . . the Act's principle effect is in the list of

exceptions that follows."  <u>Id.</u> at 663 (quoting 28 U.S.C. § 1604).

     The plaintiff contends that the Court has subject-matter jurisdiction in this case based on

the second and sixth exceptions to the FSIA.  These provisions state that

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
> > (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;
>
> > . . .
>
> > (6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the

> recognition and enforcement of arbitral awards, (C) the
> underlying claim, save for the agreement to arbitrate, could
> have been brought in a United States court under this section
> or section 1607, or (D) paragraph (1) of this subsection is
> otherwise applicable . . . .

28 U.S.C. §§ 1605(a)(2), 1605(a)(6).

The plaintiff first contends that the Court has subject-matter jurisdiction over this dispute pursuant to the third clause of § 1605(a)(2), Pl. Opp'n at 4, 10-20, which "allow[s] for jurisdiction where an action 'is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States,'" Nelson, 507 U.S. at 357 (quoting 28 U.S.C. § 1605(a)(2)). Alternatively, the plaintiff asserts that the Court has subject-matter jurisdiction under § 1605(a)(6)(B) because "an arbitration proceeding conducted in a country which is a signatory to the New York Convention is 'governed' by the New York Convention within the meaning of [§] 1605(a)(6)(B)" and the arbitration clause in the Contract "does not specify a venue." Pl. Opp'n at 21.[9] The defendant argues that these positions cannot be sustained based on the allegations in the Amended Complaint. See Def. Mem. at 7-22 ("[the] plaintiff, even after amending its complaint, has failed to allege facts that, if true, would be sufficient to demonstrate jurisdiction under either of these provisions"); Def. Reply at 2-16 ("neither of the exceptions [the plaintiff] seeks to invoke . . . defeats the [defendant's] immunity"). The Court therefore assesses the defendant's motion under the standards applicable to a "facial" challenge under Rule 12(b)(1). See part II, supra.

---

[9] The plaintiff also invokes § 1605(a)(6)(C), but as the plaintiff correctly observes, that section "is co[-]terminous with § 1605(a)(2)" in this instance. Pl. Opp'n at 20 n.22.

A.      "Direct Effect" Exception

The "FSIA's commercial activity exception provides that a foreign state is not immune

from suit in a U.S. court if its challenged act is 'based upon . . . an act outside the territory of the

United States in connection with a commercial activity of the foreign state elsewhere and that act

causes a direct effect in the United States.'"  Rong v. Liaoning Province Gov't, 452 F.3d 883,

888 (D.C. Cir. 2006) (quoting 28 U.S.C. § 1605(a)(2)).  The phrase "commercial activity" refers

to "the character of the foreign state's exercise of power rather than its effects."  Id.  Thus, "the

question is not whether the foreign government is acting with a profit motive or instead with the

aim of fulfilling uniquely sovereign objectives," but rather "whether the particular actions that

the foreign state performs (whatever the motive behind them) are the type of actions by which a

private party engages in 'trade and traffic or commerce.'"  Republic of Argentina v. Weltover,

Inc., 504 U.S. 607, 614 (1992) (emphasis in original).  "[A]n effect is 'direct' if it follows as an

immediate consequence of the defendant's activity."  Id. at 618 (internal quotation and citation

omitted).

The defendant does not dispute that its agreement with the plaintiff to enter into the

Contract constitutes "commercial activity" within the meaning of § 1605(a)(2).  Rather, it asserts

that the "plaintiff has identified no 'act' by [the defendant] that caused a direct effect in the

United States within the meaning of well-established FSIA jurisprudence."  Def. Mem. at 8.

The plaintiff responds that it has identified three such effects: (1) that "payment was to be made

at least in part by and through banking institutions in the United States," Pl. Opp'n at 11 (citing

Am. Compl. ¶¶ 30-40); (2) that "goods and services to be provided pursuant to the Contract were

to be supplied in part by commercial entities in the United States," id. (citing Am. Compl. ¶ 29);

and (3) that "the construction projects became foreseeable targets of opportunity and necessity for the United States military," id. (citing Am. Compl. ¶ 41).

The plaintiff's first proffered "direct effect;" i.e., that "payment was to be made at least in part by and through and into banking institutions in the United States," Am. Compl. ¶ 30, implicates the Supreme Court's ruling in Weltover.  In that case, the Republic of Argentina and its central bank (collectively "Argentina") "instituted a foreign exchange insurance contract program (FEIC), under which Argentina effectively agreed to assume the risk of currency depreciation in cross-border transactions involving Argentine borrowers."  Weltover, 504 U.S. at 609.  When Argentina was unable to cover its FEIC contracts as they came due in 1982, it "adopted certain emergency measures, including refinancing of the FEIC-backed debts by issuing to the creditors government bonds," which it called "Bonods."  Id.  The Bonods "provide[d] for payment of interest and principal in United States dollars," id., with payment to be made "through transfer on the London, Frankfurt, Zurich, or New York market, at the election of the creditor," id. at 609-10.

"When the Bonods began to mature in May [of] 1986, Argentina concluded that it lacked sufficient foreign exchange to retire them," so it "unilaterally extended the time for payment and offered bondholders substitute instruments as a means of rescheduling the debts."  Id. at 610.  Two Panamanian corporations and a Swiss bank holding a collective $1.3 million in Bonods "refused to accept the rescheduling and insisted on full payment, specifying New York as the place where payment should be made."  Id.  When Argentina refused to pay the amounts owed on the Bonods, the bondholders sued in the United States District Court for the Southern District of New York.  Id.  Both the district court and the Second Circuit Court of Appeals held that

13

Argentina could not invoke sovereign immunity as a jurisdictional defense under § 1605(a)(2)'s "direct effect" test.  Id. at 610-11.

Upon review of the Second Circuit's affirmance, the Supreme Court held that the Argentine government's unilateral rescheduling of payments on the Bonods had a "direct effect" on the United States.  Weltover, 504 U.S. at 617-20.  The Supreme Court based its determination on the fact that the "[r]espondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments."  Id. at 619.  "Because New York was thus the place of performance for Argentina's ultimate contractual obligations," and because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming," id. at 619, the Supreme Court "ha[d] little difficulty concluding that Argentina's unilateral rescheduling of the maturity dates on the Bonods had a 'direct effect' on the United States," id. at 618-19.

Barely two years after Weltover was decided, a three-judge panel of the District of Columbia Circuit Court of Appeals held in Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994), that the refusal of Rafidain Bank, an Iraqi bank operating as an arm of the Republic of Iraq, to pay the final installment on a series of irrevocable letters of credit issued to Goodman Holdings ("Goodman"), an Irish corporation, and its subsidiary corporation (also Irish) did not have a "direct effect" in the United States under Weltover even though Rafidain Bank had previously "paid on the letters, mostly from accounts in United States banks."  Goodman Holdings, 26 F.3d at 1144.  The District of Columbia Circuit reasoned that the situation before it was "quite different" from that before the Supreme Court in Weltover because "[n]either New

York nor any other United States location was designated as the 'place of performance' where money was 'supposed' to have been paid by Rafidain [Bank] or to Goodman." Id. at 1146.  In a concurring opinion in Goodman Holdings, Judge Wald emphasized that "there is no prerequisite that the United States be contractually designated as the place of performance," and that the breach of the letters of credit by the Iraqi bank could have had a "direct effect" in the United States "even absent a contractual provision mandating the involvement of U.S. banks[] if the longstanding consistent customary practice between Rafidain [Bank] and Goodman had been for Rafidain [Bank] to pay Goodman from its New York accounts." Id. at 1147.  "[H]owever, Goodman's complaint failed to allege such a longstanding and consistent practice," which led Judge Wald to "agree with [her] colleagues that in this case there was no direct effect in the United States within the meaning of 28 U.S.C. § 1605(a)(2)." Id.

Following Weltover and Goodman Holdings, other members of this Court have uniformly concluded that there "is no direct effect unless payment was 'supposed' to have been made in the United States." Global Index, Inc. v. Mkapa, 290 F. Supp. 2d 108, 113 (D.D.C. 2003) (citing Goodman Holdings, 26 F.3d at 1146); see also Croesus EMTR Master Fund L. P. v. Federative Republic of Brazil, 212 F. Supp. 2d 30, 35-36 (D.D.C. 2002) ("in Goodman Holdings . . . , the [District of Columbia] Circuit clarified that a 'direct effect' in the United States occurs only where payment was 'supposed' to have been made or received in the United States").  Absent some obligation on the foreign sovereign to perform its contractual obligations in the United States, "[t]here is not a sufficient nexus between the [underlying contract giving rise to the plaintiff's claim] and the United States, . . . to sustain a direct effect in the United States from [the foreign sovereign's] alleged breach of [that contract]." Termorio S.A. E.S.P. v.

15

Elecrificadora Del Atlantico S.A. E.S.P., 421 F. Supp. 2d 87, 96 (D.D.C. 2006).  Consequently,

"in almost every case, in this [C]ircuit and others, involving the direct effect exception, the

existence or absence of an expressly designated place of payment has been decisive."  Global

Index, 290 F. Supp. 2d at 113; see also Atl. Tele-Network Inc. v. Inter-Am. Dev. Bank, 251 F.

Supp. 2d 126, 134 (D.D.C. 2003) ("In this jurisdiction, the direct effect test is interpreted to

require a clause in a contract mandating the fulfillment of contractual obligations in the United

States.").[10]

     Measured against this standard, the plaintiff's allegation that "payment was to be made at

least in part by and through and into banking institutions in the United States," Am. Compl. ¶ 30,

fails to adequately state a "direct effect" in the United States because it omits the required

element that the Contract (including Memorandum No. 2, the Minstry Letter, and the Fifteenth

Session Minutes) or a subsequent arrangement entered into by the parties either require or give

the party receiving the payment discretion to require that payment be made "through and into"

United States banks.  Instead, the plaintiff relies upon two financing agreements between

---

[10]  The plaintiff severely overstates the scope of the District of Columbia Circuit's ruling in I.T. Consultants, Inc. v. Islamic Republic of Pakistan, 351 F.3d 1184 (D.C. Cir. 2003), which the plaintiff describes as a "controlling decision," Pl. Opp'n at 17, because the court did not "insist that the contract documents" at issue in that case "contain an obligation for performance in the United States" to find that the defendant's commercial activity directly affected the plaintiff, id. at 16.  In point of fact, the District of Columbia Circuit found the timing and method of designating a place of payment irrelevant in that case because the defendant "elected not to challenge what [the court] at oral argument described as 'the assumption the district court was operating on – that there was a contract obliging [the defendant] to pay the [plaintiff] in Virginia.'"  I.T. Consultants, 351 F.3d at 1189 (citation omitted in original).  "Having permitted that assumption," the court held, "it [was] no use for [the defendant] to quibble over . . . [inter alia, the fact that] the payee's specification of place of payment was also not contemporaneous with the signing of the underlying agreement giving rise to the obligation to pay."  Id. at 1190.  In any event, this Court need not consider whether it is necessary for parties to enter into an agreement designating a place for payment or vesting one party with complete discretion to name a place for payment contemporaneously with a contract giving rise to a breach of contract suit because the plaintiff's allegations and the documents incorporated in the Amended Complaint do not state facts sufficient to give rise to the inference that an agreement designating a place of payment or vesting one party with discretion to name a place of payment existed between the plaintiff and the defendant.

16

Bulgaria and the defendant which provide for "the execution of all development projects in Iraq awarded to Bulgarian [o]rganizations on the principle of deferred payments."   Def. Mem., Ex. E (Banking Arrangement No. (1)) at 1; see also Def. Mem., Ex. F (Banking Arrangement No. (3)) at 1-2 (memorializing agreement whereby "all payments due or which will fall due to the Bulgarian side in [c]onvertible [c]urrency during 1986" would be paid in part through "[d]eferred payments" bearing five percent simple interest).   These agreements required the CBI to repay the credit extended by Bulgaria "by crediting the account of [the Bulbank] [w]ith Credit [L]yonnais, New York, under telex advice to the [Bulbank]."   Banking Arrangement No. (1) at 4; see also Banking Arrangement No. (3) at 4-5 ("On the respective maturity dates, [the CBI] shall credit the [a]ccounts of [the Bulbank] with Credit Lyonnaise, New[]York").

Banking Arrangement No. (1) and Banking Arrangement No. (3) arose out of the seventeenth Joint Committee session, not the fifteenth session referenced in Memorandum No. 2. See Banking Arrangement No. (1) at 1 (implementing the "seventeenth [r]egular [s]ession" of the Joint Committee); Banking Arrangement No. (3) at 1 (same).   As the defendant correctly points out, this means that these documents could not have been incorporated into the Contract through Memorandum No. 2 (indeed, they were not in existence when the parties signed the Contract). See Def. Mem. at 12-13 (noting that Banking Arrangement No. (1) and Banking Arrangement No. (3) "are not referenced in the Contract at all" (emphasis added)); Def. Reply at 8 ("[The p]laintiff offers no explanation why these later agreements between [the] CBI and [the Bulbank] apply to the Contract, and its assumption that they do is speculation.").   Moreover, at least one of the banking arrangements appears to cover contracts that would conclude in 1986 or 1987, whereas the Contract between the plaintiff and the defendant stretched into 1990.   See Banking

Arrangement No. (1) at 1 ("The credits which the Bulgarian party shall grant to the Iraqi party shall cover . . . the contracts to be concluded . . . [f]rom 1st Jan. 1986 until 31st Dec. 1987."); Am. Compl. ¶ 12 (alleging that as of August 9, 1990, eight out of nine zones making up the Project "were completed and handed over").

But even if the Court were to conclude that the banking arrangements applied to the payments to be made to the plaintiff for work performed on the Contract, that conclusion would not advance the plaintiff's position in the slightest. Banking Arrangement No. (1) reflects an agreement between Bulgaria and the defendant for Bulgaria to "finance the execution of all development projects in Iraq awarded to Bulgarian [o]rganizations" by granting the defendant "credits" that would "cover 100% [of the] value of the foreign exchange currency portion" of contracts to be completed between 1986 and 1987. Id. at 1. Banking Arrangement No. (3) reflects a similar arrangement for "all existing [c]ivilian and special [b]anking [a]rrangements and [c]ommercial [c]ontracts," under which 50% of the amounts "due to the Bulgarian side in [c]onvertible [c]urrency during 1986" would "be paid in accordance with relevant [c]ontracts and [b]anking [a]rrangements," and the other 50% would "be paid one year from the dates of maturity in accordance with relevant contracts and [b]anking [a]rrangements." Banking Arrangement No. (3) at 1-2. In other words, Banking Arrangement No. (1), like the earlier banking arrangement referenced in Memorandum No. 2, memorializes a financing arrangement between Bulgaria and the defendant whereby the Bulbank would advance the CBI credit to cover the foreign currency component of all Iraqi construction contracts with Bulgarian companies, and Banking Arrangement No. (3) memorializes a refinancing arrangement between the same two

countries that would permit the defendant to defer half of the amount due to the Bulbank in 1986 for one year.

Read collectively, these documents indicate that any payments to be made in the Bulbank's Credit Lyonnaise account in New York City were owed to Bulgaria as the creditor of the defendant, not to the plaintiff.  Bulgaria, in turn, agreed to "cover" the defendant's obligations to Bulgarian companies like the plaintiff with respect to the United States dollar portion of the contract price.  The defendant remained liable to Bulgarian companies only with respect to the Iraqi component of the contract price, which could be used "solely in Iraq, and with no right to transfer [the Iraqi dinar] to another country or currency[] whatsoever."  Mem. No. 2 ¶ 14.  At no point was the defendant under any obligation to pay the plaintiff in the United States.

The plaintiff cites Commercial Bank of Kuwait v. Rafidain Bank and Central Bank of Iraq, 15 F.3d 238 (2d Cir. 1994), for the proposition that the "direct effect" required by § 1605(a)(2) "is not limited to effects on the plaintiff," Pl. Opp'n at 15, but that case is inapplicable here.  In Commercial Bank, the Commercial Bank of Kuwait ("Commercial Bank") joined a syndicate of banks that lent money to Rafidain Bank based in part on the CBI's guarantee.  Commercial Bank, 15 F.3d at 239.  Several of the agreements between the syndicate and the Iraqi banks "require[d] the Iraqi [b]anks to make payments in U.S. dollars into accounts in New York City."  Id. at 241.  The Iraqi banks argued that "the 'commercial activity' exception [to the FSIA] d[id] not apply" with respect to Commercial Bank "because the payments were to be made not directly to Commercial [Bank] but to New York bank accounts held by the lead banks of the various lending syndicates."  Id.  The Second Circuit concluded that "[t]he failure of the Iraqi [b]anks to remit funds in New York, as they were contractually bound to do, had a direct

effect in the United States under <u>Weltover</u>," and that the "requisite 'material connection' between Commercial [Bank's] cause of action and the 'commercial activity' that is the jurisdictional basis [was] met despite Commercial [Bank's] reliance on an agent to collect the sums due." <u>Id.</u> (emphasis added).

At best, <u>Commercial Bank</u> could be read to suggest that a missed payment that is "supposed" to be made to a plaintiff's agent in the United States may satisfy the "direct effect" requirement of § 1605(a)(2). It does not, as the plaintiff urges, remotely suggest that <u>any</u> payment owed to <u>any</u> entity in the United States satisfies that test. Such a result is foreclosed in breach of contract suits by the plain language of § 1605(a)(2), which excepts from the defense of sovereign immunity "action[s]" that are "<u>based</u> . . . <u>upon</u> an act . . . in connection with a commercial activity of the foreign state . . . and that act causes a direct effect in the United States." (Emphasis added.) As the Supreme Court explained in <u>Nelson</u>, the phrase "based upon" in § 1605(a)(2) "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." <u>Nelson</u>, 507 U.S. at 357. Clearly, a requirement to pay a third party in the United States would not constitute an element of a plaintiff's claim in most cases unless that third party was acting as an agent for the plaintiff, as was the case in <u>Commercial Bank</u>.

The Court recognizes that another member of this Court has concluded that "the plain language of [the] FSIA does not limit direct effects to effects suffered by plaintiffs." <u>Idas Resources, N.V. v. Empresa Nacional de Diamantes de Angola E.P.</u>, Civil Action No. 06-00570 (ESH), 2006 WL 3060017, *7 (D.D.C. Oct. 26, 2006); <u>see also</u> <u>Morris v. People's Republic of China</u>, 478 F. Supp. 2d 561, 569 (S.D.N.Y. 2007) ("Nothing in the commercial activity exception

20

expressly limits cognizable effects to those felt solely by [the] plaintiff.").  Strictly speaking, this observation is correct, but in the context of a breach of contract claim the phrase "based upon" in § 1605(a), as interpreted by the Supreme Court in <u>Nelson</u>, effectively requires that the foreign sovereign's commercial activity directly affect the plaintiff (whether actually or constructively, as was the case in <u>Commercial Bank</u>) to satisfy the requirements of § 1605(a)(2).  Otherwise, the plaintiff's claim would not be "based upon" the commercial activity allegedly having an effect within the United States.[11]

Perhaps in recognition of the precariousness of its legal position, the plaintiff has attached a declaration by its president, Iskren Tsonev, to its reply memorandum in support of its discovery motion in which Tsonev states that "the payments to be made to the Bulbank account in New York were exclusively payments due to [the plaintiff]," Pl. Discovery Reply, Ex. A (Declaration

---

[11]  The Court respectfully disagrees with the observation in <u>Idas Resources</u> that "the Tenth Circuit has considered the possibility of finding a direct effect based on losses to non[-]parties."  <u>Idas Resources</u>, 2006 WL 3060017, at *7.  The case cited in <u>Idas Resources</u> for that proposition, <u>United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n</u>, 33 F.3d 1232, 1238 (10th Cir. 1994), contains no discussion whatsoever with respect to whether a foreign sovereign's commercial activities must affect the plaintiff in a particular suit to qualify as a "direct effect" within the meaning of § 1605(a)(2).  Instead, the Tenth Circuit concluded that under <u>Weltover</u> there was no "direct effect" in the United States resulting from the defendant's breach of a contract that caused lost commissions to a bank in the United States because "no part of the contract in th[e] case was to be performed in the United States." <u>Id.</u> at 1237.  The Tenth Circuit's reliance on binding Supreme Court authority as the basis for affirming the district court's order of dismissal in that case is understandable, and, at least for this member of the Court, does not suggest in any way that the Tenth Circuit would have entertained the notion that losses suffered by non-parties could qualify as a "direct effect" under § 1605(a)(2) had the issue been squarely before it.  Indeed, the Tenth Circuit specifically rejected the notion that "any involvement in a commercial transaction by a United States bank means that a defendant's activity has had a 'direct effect' in the United States," <u>United World Trade</u>, 33 F.2d at 1238, and refused to "interpret § 1605(a)(2) in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state," <u>id.</u> at 1239.
     Similarly, the plaintiff's assertion that in <u>Maritime Int'l Nominees Establishment v. Republic of Guinea</u>, 693 F.2d 1094 (D.C. Cir. 1982), the District of Columbia Circuit "recognize[d] that [an] injury to [a] non-party could constitute [a] direct effect" under § 1605(a)(2), Pl. Opp'n at 15, is valid only if one infers that, based on the court's refusal in that case to apply the "direct effect" exception on grounds other than the fact that the alleged commercial activity affected a third party, the court <u>would</u> have applied the exception had this other defect in the plaintiff's argument not been apparent.  The reality is that the decision is silent with respect to whether a foreign sovereign defendant's commercial activity must directly affect the plaintiff to meet the requirements of § 1605(a)(2).  It does not hurt the plaintiff's position, but it does not help the plaintiff either.

of Iskren [Ts]onev T[s]onev) ¶ 8, and that the "Bulbank served under those arrangements as [the

plaintiff's] bank for purposes of receipt of the Contract payments," id. ¶ 9. Assuming that the

Court would be willing to consider this untimely submitted document at all,[12] it still does not

explain why the Bulbank "financed" the construction projects at issue in those documents by

"covering" the dollar component of the amounts due under the contracts relating to those

projects. Banking Arrangement No. (1) at 1. Moreover, Tsonev's statements would seem to

contradict the plaintiff's own assertion that that the CBI and Bulbank were "acting as agents for

their respective governments" when they entered into the banking arrangements incorporated in

the Amended Complaint. Pl. Opp'n at 12.[13]

Unless the plaintiff agreed to finance its own services using the entire Bulgarian

government as its agent – a proposition that might charitably be described as improbable – the

only way to interpret Tsonev's statements in a manner consistent with the documents

incorporated in the Amended Complaint and the plaintiff's own arguments would be to assume

that the plaintiff separately agreed to defer its right to payment with respect to the United States

dollar portion of its contract price until Bulgaria received its payment from the defendant. If that

is the case, the only conceivable claim that the plaintiff could assert "based upon" the failure of

---

[12] "Courts highly disfavor parties creating new arguments at the reply stage that were not fully briefed during the litigation." Bates v. Northwestern Human Servs., Inc., 466 F. Supp. 2d 69, 103 (D.D.C. 2006) (Walton, J.) (internal quotation and citation omitted). The plaintiff's decision to attach Tsonev's declaration to a reply memorandum in support of its ancillary discovery motion after the close of all briefing on the plaintiff's motion is even less appropriate because it effectively converts the plaintiff's entire discovery motion into a sur-reply to the defendant's motion to dismiss.

[13] The Court can only accept the statements made in Tsonev's declaration insofar as they are consistent with the allegations in the Amended Complaint. See Lindsey v. United States, 448 F. Supp. 2d 37, 43 (D.D.C. 2006) (Walton, J.) ("The [C]ourt may look beyond the allegations contained in the complaint to decide a facial challenge[] as long as it still accepts the factual allegations in the complaint as true." (Internal quotation and citation omitted (emphasis added).)).

the defendant to make its payment to the Bulbank in New York City would be against Bulgaria

(for its failure to pursue its claim against the defendant), not the plaintiff, and the only party

holding a claim against the defendant "based upon" the defendant's lack of payment in New

York City would be Bulgaria (for the unpaid portion of the Contract "covered" by the Bulbank),

not the plaintiff.[14]  In any event, the plaintiff does not allege the facts necessary for the Court to

infer that the Bulbank acted as the plaintiff's agent when the Bulbank entered into Banking

Arrangement No. (1) and Banking Arrangement No. (3), and the documents themselves argue

against such an interpretation.

        If, as Memorandum No. 2, the Fifteenth Session Minutes, and the banking arrangements

subsequently entered into by Bulgaria and the defendant indicate, Bulgaria agreed to finance and

then refinance the Project on the defendant's behalf, then the plaintiff has sued the wrong party

altogether and the case should be dismissed for lack of Article III standing.  See Raines v. Byrd,

521 U.S. 811, 818 (1997) ("To meet the standing requirements of Article III, a plaintiff must

allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to

---

[14]  The plaintiff cites in a footnote to Nat'l Westminster Bank PLC v. Grant Prideco, Inc., 261 F. Supp. 2d 265 (S.D.N.Y. 2003), for its purported discussion of "the third party beneficiary relationships which can flow from trade financing agreements."  Pl. Opp'n at 18 n.18.  Westminster Bank does not involve the FSIA or, for that matter, a foreign sovereign at all, and its discussion of third-party beneficiaries is with respect to New York contract law. See Westminster Bank, 261 F. Supp. 2d at 272-74 (discussing whether trade financing agreement intended to create third-party beneficiary under New York law).  The plaintiff provides no explanation as to how the decision is germane to this case, and "[d]istrict courts are not 'required to unearth theories and precedents not cited by a party.'" Pharm. Care Mgmt. Ass'n v. District of Columbia, 477 F. Supp. 2d 86, 95 n.4 (D.D.C. 2007) (quoting Bucheit v. Palestine Liberation Org., 388 F.3d 346, 352 (D.C. Cir. 2004)).  But if the plaintiff's intent is to leave the impression that any commercial activity directly affecting one party in the United States permits a third party that is indirectly affected by that same activity to sue the foreign sovereign engaging in such activity in a United States District Court, its point is not well taken. "In determining where [an] effect is directly felt, courts look to the place where legally significant acts giving rise to the claim occurred rather than to where merely incidental or eventual effects are felt." Youming Jin, 475 F. Supp. 2d at 63.   Cf. Millicom Int'l Cellular v. Republic of Costa Rica, 995 F. Supp. 14, 22 (D.D.C. 1998) (finding "too indirect" the "derivative harm" that a corporation might suffer if its shareholders and creditors are directly affected by a foreign sovereign's commercial activities).

be redressed by the requested relief." (Internal quotation and citation omitted (emphasis removed from original; additional emphasis added).)) If, on the other hand, the plaintiff's own proffered documents are not to be believed and the defendant's obligations ran directly to the plaintiff, then there is no basis whatsoever for the plaintiff's assertions that the defendant was obligated to make payments to the plaintiff in New York. Either way, the "direct effect" requirement of § 1605(a)(2) as interpreted by the Supreme Court in Weltover and the District of Columbia Circuit in Goodman Holdings is not satisfied.

The plaintiff's additional allegation that "goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States," Am. Compl. ¶ 29, also fails the "direct effect" test. The plaintiff does not allege, and the Contract does not specify, that the "goods and services to be provided" to the plaintiff were "supposed" to come from the United States pursuant to the Contract (or, for that matter, based on the past practices of the parties). The plaintiff simply alleges that the plaintiff's sub-contractors, some of whom were based in the United States, were damaged as a consequence of the defendant's decision to invade Kuwait. "A financial loss in the United States, when all the acts giving rise to the claim occurred outside this country, is insufficient to show the 'direct effect' in the United States that [the] FSIA requires." BPA Int'l, Inc. v. Kingdom of Sweden, 281 F. Supp. 2d 73, 81 (D.D.C. 2003).

Nor does it matter "that the construction projects became foreseeable targets of opportunity and necessity for the United States military," as the plaintiff alleges, Am. Compl. ¶ 41, for "[t]he fact that a U.S. citizen or entity suffers a loss does not suffice to prove a direct effect in the United States." Global Index, 290 F. Supp. 2d at 115. As with the plaintiff's

24

allegation of lost "goods and services" provided by American sub-contractors, the effects felt in

the United States as a result of the United States military's destruction of property were not

"immediate" as required by Weltover because they were not caused directly by the defendant's

alleged breach of the Contract, see Weltover, 504 U.S. at 618 (agreeing with the Second Circuit

that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity"

(internal quotation and citation omitted)), but rather were created due to the "intervening

element" of the plaintiff's subsequent choice of sub-contractors and vendors, Princz v. Fed.

Republic of Germany, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (internal quotation and citation

omitted).

      The plaintiff cites Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534 (11th Cir. 1993), as

a counter-example to the "defendant's contention that [the] plaintiff's election to retain American

contractors or to use American supplies is an intervening element which interrupts the straight

line to the effect in the United States . . . ." Pl. Opp'n at 19. In that case, "Laura Ann Vermeulen

suffered an accident while driving her 1982 Renault LeCar near Lawrenceville, Georgia,"

sustaining "a spinal injury that left her a quadriplegic." Vermeulen, 985 F.2d at 1537. The car

was manufactured by Regie Nationale Des Usines Renault ("Renault"), "a corporation wholly

owned by the French government." Id. Renault distributed its 1982 Renault LeCar in the United

States pursuant to a distribution arrangement with American Motors Corporation ("AMC") and

its wholly-owned subsidiary, American Motor Sales Corporation ("AMSC"). Id. On appeal

from the district court's order of dismissal for lack of personal jurisdiction, the Eleventh Circuit

Court of Appeals considered sua sponte whether the plaintiff's suit was barred by the FSIA. Id.

at 1542-43. The court concluded that the plaintiff had satisfied the commercial activity exception

of § 1605(a)(2), id. at 1543-45, and specifically noted that "the act upon which Vermeulen's claim [was] based had a direct effect in the United States." Id. at 1545. Given that Vermeulen alleged in her complaint that the injuries she suffered "were the result of [Renault's] negligent design and manufacture of the LeCar passenger restraint system," the Eleventh Circuit could "hardly imagine a more immediate consequence of the defendant's activity." Id.[15]

The plaintiff suggests that "[u]nder [the] defendant's intervening element test, Vermeulen would lose[] because Vermeulen made the decision to purchase the car [and] drive the car on the roads of Georgia." Pl. Opp'n at 19. This argument is specious. By the time Vermeulen purchased the car, it had already been distributed in the United States by Renault through its distribution agreements with AMC and AMSC. See Vermeulen, 985 F.3d at 1537 (recounting how Renault sold various models, including LeCars, to AMSC for re-sale in the United States as part of its distribution agreement). Vermeulen's decision to drive the car in Georgia was not an "intervening event" in Renault's commercial activity because Renault had already engaged in commercial activity that directly affected the United States prior to the accident.

In contrast, the defendant in this case did nothing to involve the United States in the Project insofar as the provision of goods and equipment was concerned. The decision to use American sub-contractors and American supplies was the plaintiff's decision, and the plaintiff does not allege that its decision was mandated by the Contract or expected based on the customary practices of the parties. Yet, the plaintiff would have this Court deprive the defendant

---

[15] The Eleventh Circuit issued Vermeulen one day prior to the Supreme Court's decision in Nelson, so there is understandably no discussion in the Eleventh Circuit's decision as to whether Renault's distribution of its cars in the United States was an element of Vermeulen's tort claim. Nevertheless, it is readily apparent that this commercial activity was a necessary part of Vermeulen's claim, for if Renault had not distributed its cars in the United States, Vermeulen would never have purchased it.

of its sovereign immunity based on the plaintiff's own choices made after the parties entered into the Contract.  The Court declines to interpret § 1605(a)(2) in such an unduly expansive manner.

In sum, the plaintiff's allegations and the documents incorporated into the Amended Complaint, even if taken as true, do not satisfy the commercial activity exception found in § 1605(a)(2).  The defendant was not "supposed" to pay the plaintiff in the United States under the terms of the Contract, Memorandum No. 2, or the Fifteenth Session Minutes, the plaintiff's claim against the defendant is not "based upon" the commercial activities contemplated in Banking Arrangement No. (1) and Banking Arrangement No. (3) as required by the statute, the plaintiff's use of American sub-contractors and American supplies is not a "direct effect" of the defendant's commercial activities, and the destruction of American property abroad does not constitute a "direct effect" in the United States.  Section 1605(a)(2) is simply not applicable in this case.

B.    <u>Arbitration Exception</u>

Article Sixty-Nine of the Contract (the "Arbitration Clause") provides in pertinent part that

> If any dispute or difference of any kind whatsoever shall arise between the [defendant] and the [plaintiff] in connection with or arising out of the []Contract[] or the carrying out of the "Works" (whether during the progress of the Works or after their completion and whether before or after the termination, abandonment, or breach of the []Contract[])[,] it shall in the first place be referred to and settled by the "Engineer[,]" who shall give notice of his decision to the [defendant] and the [plaintiff.]  Such decision in respect of every matter so referred shall be final and binding upon the [defendant] and the [plaintiff] until the completion of the []Works,[] and shall forthwith be given effect to by the [plaintiff,] who shall proceed with the []Works[] with all due diligence, whether notice of dissatisfaction is given by him or by the [defendant] as hereinafter provided or not.

27

> If the [defendant] or the [plaintiff] be dissatisfied with any such decision, then in any such case the [defendant] or the [plaintiff] may within thirty (30) days after receiving notice of such decision require that the matter be referred to a "Committee of Arbitration" . . . .
>
> The []Committee of Arbitration[] shall have complete authority to review (reconsider), revise, and amend any decision, opinion, order, certificate, or [illegible] issued by the []Engineer.[] The ruling issued by the [Committee of Arbitration] shall be binding to both parties unless one adheres to its annulment in accordance with the provisions stated in the Civil Procedure Code.

Contract at 218-19 (quoted in part in Am. Compl. ¶ 6). The plaintiff argues that this language satisfies the exception to the FSIA's general grant of sovereign immunity set forth in § 1605(a)(6)(B) of the statute, which provides that an action may be brought "either to enforce an agreement . . . to submit to arbitration . . . or to confirm an award made pursuant to such an agreement . . . , if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." According to the plaintiff, "an arbitration proceeding conducted in a country which is a signatory to the New York Convention is 'governed' by the New York Convention," which "is a 'treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards.'" Pl. Opp'n at 21 (quoting § 1605(a)(6)(B)). "Thus, [argues the plaintiff,] unless the arbitration agreement itself requires that the arbitration proceeding take place in a jurisdiction which is not a signatory to the New York Convention, [§] 1605(a)(6)(B) will preclude the assertion of sovereign immunity." Id. at 22.

The Court finds no fault in the plaintiff's logic, but its reasoning is inapplicable in this case because, as indicated below, the Contract itself mandates that any arbitration take place in Iraq, which is (according to the unrebutted assertion of the defendant) not a signatory to the New

York Convention.  See Def. Mem. at 18 ("Iraq is not a signatory to the [New York

Convention]"); Def. Opp'n at 21-24 (arguing that § 1605(a)(6) is applicable "[b]ecause th[e]

[C]ourt cannot conclude as a matter of law that the parties agreed that any arbitration had to be

conducted only in Iraq," and not on the grounds that Iraq is a signatory to the New York

Convention). Article Seventy-Two of the Contract plainly states that "[t]he Contract[] shall be

subject to and construed according to the Iraqi laws, regulations, and instructions[,] and the Iraqi

courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising

out of the [t]he Contract.[]"  Contract at 220.  Iraqi law in effect at the time of the Project, in

turn, provided that "all [arbitration] awards [we]re subject to the mandatory confirmation of Iraqi

courts prior to any enforcement thereof."  Mahir Jalili, International Arbitration in Iraq, 4 J. Int'l

Arb. 109, 112 (1987) (citing Iraq Civ. P. Code Art. 272(1)).  In other words, the Arbitration

Clause could not be enforced without a judicial proceeding, and both Iraqi law and the Contract

itself mandated that the judicial proceeding take place in Iraq.

    The plaintiff argues that "the parties' decision to identify . . . a forum for judicial

proceedings, but not for arbitration proceedings, weighs against" the notion that arbitration of

any disputes over the Contract were required to take place in Iraq.  Pl. Opp'n at 28.  But the

Arbitration Clause itself states that any arbitration between the parties would be binding "in

accordance with the provisions stated in the [Iraqi] Civil Procedure Code," Contract at 219,[16] and

---

[16]  The specific reference to the Iraqi Civil Procedure Code in the Arbitration Clause renders moot the
plaintiff's argument that the "arbitral tribunal" convened pursuant to that clause would have the right to determine
the site of arbitration under the Model Law on International Commercial Arbitration promulgated by the United
Nations Commission on International Trade Law ("UNCITRAL").  Pl. Opp'n at 22 (quoting Article 20(1) of
UNCITRAL's Model Law).  As Mr. Jalili notes in his incisive discourse on Iraqi arbitration law as it existed in
1987, "the main disadvantage to a foreign contractor [was] that the arbitration [was] conducted under Iraqi
arbitration rules rather than [international arbitration] rules."  Jalili, 4 J. Int'l Arb. at 116.  Mr. Jalili goes so far as to
(continued...)

the Iraqi Civil Procedure Code required "the defendants in a judicial action [to] apply for a stay hearing at the first hearing" to enforce a contract's arbitration clause, or else "the action w[ould] proceed and the arbitration agreement w[ould] be deemed null and void." Jalili, 4 J. Int' Arb. at 110. Indeed, Article Seventy-Two of the Contract, which tracks exactly the generic language used in construction contracts by the Iraqi Ministry of Planning at this time, see id. at 115-16 (reprinting Clause 71 of the General Conditions for Contracts of Civil Engineering Works, entitled "Law Applicable to the Contract"), is "not inconsistent" with the Arbitration Clause, which also tracks the generic language used in Iraqi construction contracts, see id. at 114-15 (reprinting Clause 69 of the General Conditions for Contracts of Civil Engineering Works, entitled "Settlement of Disputes – Arbitration"), precisely because "the [A]rbitration [C]lause provides the mechanism for the arbitration proceeding, whereas the jurisdiction clause [(i.e., Article Seventy-Two)] empowers the courts to enforce the Civil Procedure Code under which the arbitration proceeding is conducted." Id. at 116.

The Arbitration Clause could only be enforced in Iraq under the provisions of the Iraqi Civil Procedure Code and the terms of the Contract. Iraq was not a signatory to the New York Convention or (to the best of the Court's knowledge) any other "treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards" when it entered into the Contract with the plaintiff. 28 U.S.C. § 1605(a)(6)(B).

---

[16](...continued)

recommend that foreign contractors "internationali[ze] the arbitration clause by adopting the UNCITRAL rules" as a means of avoiding the arbitration rules set forth in the Iraqi Civil Procedure Code. Id. at 116. Mr. Jalili would not have made this recommendation if the UNCITRAL model rules of arbitration and the Iraqi Civil Procedure Code arbitration rules in effect in the 1980s were one and the same.

Therefore, the exception to the FSIA's general grant of sovereign immunity set forth in

§ 1605(a)(6)(B) does not apply.

C.    <u>Motion for Jurisdictional Discovery</u>

Finally, the plaintiff's motion for limited discovery on the question of subject-matter

jurisdiction must be denied as moot.  For the reasons discussed above, the plaintiff has failed to

allege facts sufficient to form a basis for the Court to have subject-matter jurisdiction in this case.

"Jurisdictional discovery is not warranted when [the] plaintiff['s] allegations, even if

supplemented or verified, would remain insufficient to establish a FSIA exception."  <u>Idas</u>

<u>Resources</u>, 2006 WL 3060017, at *11; <u>see also</u> <u>BPA Int'l</u>, 281 F. Supp. 2d at 86 (declining to

permit jurisdictional discovery when "nothing in the record" suggested that more discovery

"would or could be helpful to establish jurisdiction").  Therefore, the plaintiff's motion must be

dismissed as moot.[17]

**IV. Conclusion**

"[T]here is only one way for a court to obtain jurisdiction over a foreign state and it is not

a particularly generous one – the FSIA."  <u>Peterson v. Royal Kingdom of Saudi Arabia</u>, 416 F.3d

---

[17]  Even if the plaintiff's discovery motion were not moot, the Court would be inclined to deny it. "Typically, the discretion of a district court to allow jurisdictional discovery in FSIA cases is limited to those instances where the facts sought are peculiarly within the knowledge of the party against whom discovery is sought." <u>Crist v. Republic of Turkey</u>, 995 F. Supp. 5, 12 (D.D.C. 1998).  Here, the plaintiff has not demonstrated why the documents it seeks – presumably, documents establishing a direct connection between the defendant's contractual obligations to the Bulbank and the defendant's contractual obligations to the plaintiff – are "peculiarly" within the defendant's control.  It purports to require discovery because "the record of [the] Bulbank have been burned in a fire."  Pl. Discovery Reply at 7 (quoting Tsonev Decl. ¶ 7).  But any documents relating to contractual arrangements between the plaintiff and the defendant or the plaintiff and the Bulbank should be within the plaintiff's possession, and any documents relating solely to the defendant's relationship with the Bulbank would only buttress the Court's conclusion that the banking arrangements incorporated in the Amended Complaint are between Bulgaria and the defendant.  Moreover, the difficulties inherent in requiring the defendant to produce documents, some of which may have been created more than twenty years ago, given the Iraqi nation's current state of affairs are all too obvious. Thus, jurisdictional discovery is not appropriate in this case.

83, 86 (D.C. Cir. 2005). And the plaintiff having failed to allege facts that satisfy any of the

exceptions set forth in § 1605 of the Act, that congressional grant of generosity does not provide

a means for the plaintiff to gain access to this Court. The Amended Complaint must therefore be

dismissed in its entirety for lack of subject-matter jurisdiction and the plaintiff's motion for

limited jurisdictional discovery must also be dismissed as moot.

**SO ORDERED** this 30th day of November, 2007.[18]


REGGIE B. WALTON
United States District Judge

---

[18] An order granting the defendant's motion to dismiss the Amended Complaint for lack of subject-matter jurisdiction, dismissing the plaintiff's discovery motion as moot, and closing this case follows.