# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD                        :
                                        :
                Plaintiff,              :        Case No. 1:07-cv-00165 (RBW)
                                        :
                                        :
         vs.                            :
                                        :
THE REPUBLIC OF IRAQ                    :
                Defendant.              :

## PLAINTIFFS' MOTION TO VACATE JUDGMENT AND TO AMEND FIRST AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, FOR A STATEMENT UNDER *SMITH v. POLLIN*

COMES NOW Plaintiff Agrocomplect, AD (hereinafter "Plaintiff" or "Agrocomplect"), by and through undersigned counsel, and, pursuant to Fed.R.Civ.P. 59, 60, 15(a), and *Smith v. Pollin,* 194 F.2d 349 (D.C. Cir. 1952) moves this Honorable Court to vacate its Order and judgment entered November 30, 2007, granting the motion of Defendant Republic of Iraq ("defendant" or "Iraq") to dismiss the case for lack of subject matter jurisdiction (the "Judgment") and for leave to amend its First Amended Complaint to address the concerns raised in the Judgment, or, in the alternative, for a statement under *Smith v. Pollin, supra,* and respectfully refers this Honorable Court to the annexed memorandum of points and authorities and exhibits.

WHEREFORE, by all these presents, counsel for Plaintiff prays that the instant motion be granted.

## CERTIFICATE OF COUNSEL

I, Philip M. Musolino, certify that I sought consent to the instant motion on December 14, 2007. Counsel for Defendant advised undersigned that Defendant will oppose the motion.

Respectfully submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:     (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:     (240) 632-0906
*Email*: srolinski@rolinski.com

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD           :

          Plaintiff,         :       Case No. 1:07-cv-00165 (RBW)

                             :

      vs.                   :

THE REPUBLIC OF IRAQ      :
          Defendant.     :

## ORDER

     This matter having come before this Court on Plaintiff's Motion to Amend First Amended Complaint, and opposition thereto, it is, for good cause shown this _____ day of _____, 2008:

     ORDERED, that the instant motion be and is hereby GRANTED to the extent set forth below, and it is

     FURTHER ORDERED, that this Court's order entered November 30, 2007 be and is hereby vacated and it is

     FURTHER ORDERED, that plaintiff is granted leave to file its Second Amended Complaint, and it is

     FURTHER ORDERED that, in the event that the United States Court of Appeals for the District of Columbia Circuit remands this case, this court will vacate its order entered November 30, 2007 and will grant plaintiff leave to file its Second Amended Complaint.

                  SO ORDERED.


                _____

                Reggie B. Walton, Judge
                United States District Court for the
                District of Columbia

Philip M. Musolino, Esq.
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski, Esq.
Danielle M. Espinet, Esq.
*Rolinski, & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854

Matthew D. Slater, Esq.
*Cleary Gottlieb Steen & Hamilton, LLP*
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006

Jonathan I. Blackman, Esq.
Lisa M. Coyle, Esq.
*Cleary, Gottlieb, Steen & Hamilton, LLP*
One Liberty Plaza
New York, NY 10006

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD          :

          Plaintiff,       :     Case No. 1:07-cv-00165 (RBW)

                     :

      vs.                :

THE REPUBLIC OF IRAQ     :
          Defendant.    :

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND FIRST AMENDED COMPLAINT

Plaintiff Agrocomplect, A.D. ("Agrocomplect" or "Plaintiff") seeks an Order granting Plaintiff leave to file a Second Amended Complaint, and vacating the Court's Order and Judgment entered November 30, 2007 ("Judgment"), which granted the motion of Defendant Republic of Iraq ("Iraq" or "Defendant") to dismiss the case for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). In the alternative, plaintiff seeks a statement of intent to grant the requested relief under *Smith v. Pollin,* 194 F.2d 349 (D.C. Cir. 1952) .

For the reasons set forth below, the instant motion should be granted.

### I.  THE STANDARDS AND PROCEDURES APPLICABLE TO THE INSTANT MOTION

### A.  Standards Applicable to Rule 15(a) Motions Made After Rule 59(e) Motion

On December 14, 2007, plaintiff filed a Motion for Reconsideration and to Alter or Amend Order and Judgment pursuant to Fed.R.Civ.P. 59(e).  Docket # 29.  That motion is directed at the trial court's determination that provisions in certain documents for payment in New York did not satisfy the "direct effect" exception to the sovereign immunity set out in the Foreign Sovereign Immunities Act ("FSIA").

Plaintiff now seeks, *inter alia*, leave to file a Second Amended Complaint which addresses the court's determination that the documents providing for payment in New York did not satisfy the direct effect test, as well as the court's determination that the plaintiffs did not allege that goods and services were "supposed" to come from the United States pursuant to the Contract or based on the past practices of the parties. Memorandum Opinion, docket # 27, at 24.

Following grant of a motion to dismiss a complaint, a plaintiff may seek to amend its Complaint by filing a Rule 59(e) motion to alter or amend a judgment, combined with a Rule 15(a) motion requesting leave of court to amend their complaint. *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C. Cir. 1996); *and see Confederate Memorial Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993). The instant motion, accompanied by a request for relief under Fed.R.Civ.P. 59(e), comports with the procedural requirements of *Firestone, supra,* and *Confederate Memorial Ass'n, Inc., supra.*

The standards for amendment set out in Fed.R.Civ.P. 15, discussed below, apply once the court has vacated the judgment. *Firestone* at 1208.

## B. The Amendment Of Jurisdictional Allegations

Pursuant to 28 U.S.C.A. § 1653, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." *See also, USX Corp. v. Adriatic Ins. Co.,* 345 F.3d 190, 204 (3rd Cir. 2003) (allowing amendment of FSIA jurisdictional allegations); *Simpson v. Socialist People's Libyan Arab Jamahiriya,* 326 F.3d 230, 233 (D.C. Cir. 2003) (a plaintiff may amend a complaint to remedy a jurisdictional defect even as late as the appellate stage of proceedings). Section 1653 is to be construed

2

liberally to determine if jurisdiction exists. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 477 F.Supp. 615, 618 (D.C.N.Y. 1979).

## C.  The Standards For Amendment of A Complaint

Leave to amend a complaint under Rule 15(a) "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *see Foman v. Davis,* 371 U.S. 178, 182 (1962). Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as "undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment." *Foman,* 371 U.S. at 182.

In *Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.* 148 F.3d 1080 (D.C. Cir.1998) the Court of Appeals reversed a trial court's denial of leave to file a Second Amended Complaint curing jurisdictional defects, and explained:

> Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading once as a matter of course and thereafter by leave of court, which "leave shall be freely given when justice so requires.... *see also Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991) (noting that district court's discretion to dismiss without leave to amend is "severely restricted" by command of Rule 15(a) that such leave be "freely given")....
>
> First, the amendment would not have been "futile" because, as explained below, the allegations of the second amended complaint support subject matter jurisdiction. Second, there is no indication that the amendment was in any cognizable way "untimely." The statute of limitations had not run, nor was there any prejudice to the defendants by reason of the timing. *See, e.g., Confederate Memorial Ass'n v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993) (noting that Fed.R.Civ.P. 15(a) gives court power to grant leave to amend complaint even after case is dismissed); 6 Charles Alan Wright Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 1488, at 652, 659, 662-69 (1990 & Supp.1997) ("Rule 15(a) does not prescribe any time limit within which a party may apply to the court for leave to amend .... In most cases delay alone is not a sufficient reason for denying leave.... If no prejudice [to the non-moving party] is

3

found, the amendment will be allowed")(internal citations omitted). At 1083-84.

### D. The *Smith v. Pollin* Procedures

Plaintiff timely noted on December 28, 2007, its appeal of the Judgment. Docket

# 31. Whether the Notice of Appeal was premature in view of the timely filing of a

motion pursuant to Rule 59(e),[1] the Circuit Court approved in *Smith v. Pollin, supra*, a

procedure which addresses the allocation of jurisdiction over a case in which issues are

arguably pending in the trial court while an appeal is also pending. As the Court wrote:

> (W)hen an appellant in a civil case wishes to make a motion for a new trial
> on the ground of newly discovered evidence while his appeal is still
> pending, the proper procedure is for him to file his motion in the District
> Court. If that court indicates that it will grant the motion, the appellant
> should then make a motion in this court for a remand of the case in order
> that the District Court may grant the motion for new trial. At 350.

The United States Court of Appeals for the District of Columbia Court reiterated

its approval of the *Smith v. Pollin* procedure in *United States v. Quinn* 475 F.3d 1289,

1290-91 (D.C.Cir. 2007), writing:

> Given counsel's indication that a Rule 33 motion will be filed with the
> District Court, we will hold the case in abeyance until the District Court
> either denies the Rule 33 motion, or certifies "its intention to grant the
> motion." *See id.;Smith v. Pollin,* 194 F.2d 349, 349-50 (D.C.Cir.1952)
> (per curiam). If the District Court "indicate[s] willingness to grant a new
> trial," Quinn may then file a motion in this court requesting remand of the
> case.... If, however, the District Court denies the Rule 33 motion, then
> Quinn may appeal the denial, and that appeal will be consolidated with the

---

[1] As plaintiff noted in its Reply to defendant's opposition to plaintiff's motion for reconsideration or to alter or amend order and judgment, docket # 32, Judge Collyer, in *Brown v. Wachovia Bank* 244 F.R.D. 16, 19, n.1 (D.D.C.,2007), noted that "(a) district court has jurisdiction to deny, but not grant, a Rule 59(e) motion while an appeal is pending. *Leadership Conference on Civil Rights v. Gonzales,* 421 F.Supp.2d 104, 107 (D.D.C.2006). Moreover, a Rule 59(e) motion renders ineffective any notice of appeal filed before its disposition. *Hoai v. Vo,* 935 F.2d 308, 312 (D.C.Cir.1991); *see* Fed.R.App. P. 4(a)(4)(A) (time to appeal runs from entry of order disposing of motion to alter or amend under Rule 59)." But *see* Fed.R.App.P. 4(a)(4)(B)(i)(notice of appeal filed after court enters judgment but before disposition of motion under Fed.R.Civ.P. 59 "becomes effective ... when the order disposing of the last such remaining motion is entered.")

4

case now held in abeyance.... following this procedure, we conserve judicial resources-neither needlessly remanding the case, *see Smith v. Pollin,* 194 F.2d at 350, nor addressing issues on appeal that may ultimately be mooted by the grant of a new trial (internal citations omitted).

## II.  THE SECOND AMENDED COMPLAINT MEETS THE APPLICABLE STANDARDS

### A.  The Second Amended Complaint Is Not Futile

The Second Amended Complaint, annexed hereto as **Plaintiff's Exhibit ("PX")**

**1A**,[2] is directed at the court's determination that the documents providing for payment in

New York did not satisfy the direct effect test, as well as the court's determination that

the plaintiffs do not allege that goods and services were "supposed" to come from the

United States pursuant to the Contract or based on the past practices of the parties.

Paragraph 39 provides:

39.    During the term of the Contract, the following conditions and arrangements existed with respect to payment of Bulgarian companies for work done in Iraq, and in particular with respect to payment under the Contract:

a.    At the time that the Contract was signed, and at all times pertinent hereto, plaintiff  was a wholly-owned state corporate agency of the People's Republic of Bulgaria and Bulgaria was a centrally controlled and planned economy communist country;

b.    At the time that the Contract  was signed, and at ball times pertinent hereto, Bulgarian currency (the lev) was not freely traded internationally.  Possession of foreign currency in Bulgaria was illegal. Therefore, all foreign currency transactions in Bulgaria were required by law and therefore necessarily conducted through Bulbank;

c.    The then Bulgarian Foreign Trade Bank ("BulBank") played a role in those contracts to the extent that those contracts required payments in foreign currency and BulBank had the monopoly and sole legal mandate to make foreign currency payments.

---

[2] The Second Amended Complaint is annexed hereto as **PX 1A**.  The changes are set out in bold in annexed **PX 1B**.

d.     BulBank was the only Bulgarian financial institution with the capability to handle foreign currency transactions.

e.     In the 1980's when the foreign currency transactions were in American dollars it was required that the payments be handled through American banks.  Thereafter, funds were credited to the individual state owned corporate accounts held with BulBank for the government companies doing business abroad which had a foreign currency component.

f.     The payment arrangements for plaintiff were typical of the payment arrangements between Bulgarian companies and Iraq.  Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.- New York; and Morgan Guarantee Trust Co., New York.  In plaintiff's case, Credit Lyonnais-New York was utilized.  These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at Bulbank;

g.     When Iraq ceased payments through the American banks no further payments or credits were made to the Bulgarian company;

h.     The Bulgarian companies did not surrender their contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own name even in light of privatization from a government owned corporate entity to a privately owned corporate entity; and

i.     Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency intermediary on behalf of the Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plan per the multiple contracts.

j.     All contract payment arrangements in foreign currency were processed through Bulbank.  Those arrangements were described and modified in the various Banking Arrangements, as well as, the annual governmental joint sessions, and Memorandum No. 2;

k.     Subject to those documents, the payment arrangements under the Contract  worked as follows: plaintiff performed work under the contract according to a schedule set forth in the contract;  upon completion of each stage of work plaintiff would obtain from the Iraqi Ministry of Irrigation a

6

certificate of completion for that work; plaintiff would submit the approved certificate, which articulated a dollar amount for the completed work, to the Bulgarian Ministry of Finance; the Ministry would instruct Bulbank to pay Agro in accordance with the banking agreements from funds sent by CBI to Bulbank's bank account with Credit Lyonnais, New York. Bulbank thereafter credited plaintiff's account at Bulbank in Sofia, Bulgaria; When Iraq declared that it would not honor its payment obligations, including its obligations for payment to accounts at Credit Lyonnais in New York, New York, BulBank ceased payments to plaintiff; all dollar transactions with plaintiff in the 1980's were processed through American/New York banks; and, Iraq has never denied its Contract obligations to plaintiff.

Paragraph 29 provides:

29.    The obligations set out in the Contract had a direct effect in the United States, in that goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States. The parties anticipated that American construction equipment would be acquired and utilized to perform under the contract, and it was the custom and practice for plaintiff to acquire and use American construction equipment for similar construction projects in Iraq. Plaintiff had six (6) large scale construction contracts with Iraq. They were: Suara Project (contract 25); Ishaki 11 Project (contract 40); Ishaki 14 Project (contract 37); Shehamir Project (contract 22); Keseba Project (contract 63) and the Hilla Diwaniya Contract (contact 65).. The Contract was the last of these six contracts. In the previous five (5) contracts, Agro regularly and customarily used construction equipment purchased in the United States from American companies. That equipment included concrete lining machinery from an American company and various types of heavy construction equipment from Caterpillar USA. For the Contract, similar construction equipment was required. Agro purchased ten (10) pieces of heavy equipment from the Caterpillar USA company for the Contract, and used the same type of equipment, such as concrete lining machinery used in the first five (5) contracts.

Those averments eliminate two of the jurisdictional hurdles upon which the court

based its conclusion.

**B.    The Second Amended Complaint Is Tendered In Good Faith and Without Undue Delay**

Plaintiff and counsel have diligently taken reasonable steps to ensure the accuracy

7

of the new averments.  Prior to filing the Second Amended Complaint, plaintiff and

counsel secured the declarations of Slav Stoychev Slavov, an employee of plaintiff, **PX**

**2A,** the Hon. Belcho Belchev , the former Bulgarian Minister of Finance, **PX 2B,** and

Hristo Dimitrov Latchev, an officer of another Bulgarian company which did business

with Iraq during the pertinent time.  **PX 2C.**   Those declarations support with specificity

the new averments in the Second Amended Complaint.

      Nor was there undue delay in securing the new information or in presenting the

new pleading to the court.  As plaintiff's Bulgarian attorney declares:

> 4.    I am familiar with this current American litigation.  Prior to the
> filing of this lawsuit in 2007, in or around August 2006, on behalf of
> Agro, I began a fact investigation with respect to the "direct effect"
> requirement of the American Foreign Sovereign Immunities Act;
>
> 5.    In this capacity and on the basis of a one and a half year
> examination of Contract No 65, I declare the following circumstances;
>
> 6.    The investigation was undertaken by me personally and by my
> assistants, Miss Daniela Ganeva and Mr. Dimitar Ianakiev;
>
> 7.    During the course of my investigation I reviewed documents that
> were presented by Agro to the both the UNCC and IDRO;
>
> 8.    Based on my review of the documents described in paragraph 7,
> and my interviews of Agro representatives,  I planned  further
> investigation on the requisite direct effect as contemplated by the FSIA;
>
> 9.    My further investigation was conducted at the following private
> and public institutions: Bulbank AD /formerly Bulgarian Foreign Trade
> Bank/; Ministry of Finance of the Republic of Bulgaria; Ministry of
> Foreign Affairs of the Republic of Bulgaria; National Central Archives
> office of the Republic of Bulgaria; the Fire Safety Department of the
> Republic of Bulgaria; and private and government owned corporate
> entities archives;
>
> 10.    During the investigation I encountered numerous difficulties in the
> search for the additional documents. This was due, among other things, to
> the pillage of Agro's camp in Iraq; a fire in Bulbank's archive; the
> privatization of Bulbank by UniCredito Italiano SPA (Italy) on

01/20/2000, the non-systematic exchange of documents between Bulgaria and Iraq with regard to the Agreement between the People's Republic of Bulgaria (at the time a communist centrally planned economy regime) and the Republic of Iraq signed on 08/06/1967; and the amendments, memoranda, joint working group decisions related thereto. As a result, many of the main documentary records for Contract 65 have disappeared;

11.    Despite the difficulties, between on or around the middle of November until on or around the middle of December, 2007, I was able to find, as a result of my systematic and multi-level investigation, additional documents and information concerning Contract 65;

12.    Since the beginning of the investigation in August 2006, I have tried to meet and/or speak with the Minster of Finance for the relevant period, H.E. Belcho Belchev, and or his deputies. Finally, I met with success in that H.E. Belcho Belchev indicated a willingness to meet with me. After several weeks of trying to establish a face to face meeting, I met with H.E. Belcho Belchev the first week in December 2007. Based on my discussion with him corroborating and additional pertinent and significant facts germane to the issues in the American litigation came to light; and

13.    Finally, during the course of my investigation, I discovered that there are other documents that are relevant to Agro's claims in the American litigation but they are "classified": and there is no mechanism under Bulgarian law which allows for release or declassification of same similar to the US Freedom of Information Act requests.

Declaration of Zahari Zheliazkov Tomov, appended hereto as **PX 3**. As Mr. Tomov's declaration establishes, plaintiff has diligently investigated, under challenging conditions, the facts pertinent to the direct effect test. Moreover, plaintiff has taken prudent steps to secure the sort of corroboration appropriate to its jurisdictional claims. There was no undue delay, or bad faith, and there will be no prejudice to defendant as a consequence of grant of the instant motion.

Indeed, delay alone does not suffice as a ground for denying leave. *Atchinson v. District of Columbia,* 73 F.3d 418, 426 (D.C.Cir.1996) (citing *Foman,* 371 U.S. at 182).; *see also Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987).

9

"Consideration of whether delay is undue, however, should generally take into account the actions of other parties and the possibility of any resulting prejudice." *Atchinson,* 73 F.3d at 426.  To determine if the threat of prejudice to the opposing party is great enough to warrant denying leave to amend, courts consider " 'the hardship to the moving party if leave to amend is denied, the reasons for the moving party failing to include the material to be added in the original pleading, and the injustice resulting to the party opposing the motion should it be granted." ' *Childers v. Mineta,* 205 F.R.D. 29, 32 (D.D.C.2001). (quoting 6 Wright, Miller, and Kane, Federal Practice & Procedure, § 1487 at 621, 623 (3d ed.2001)).

To demonstrate such prejudice, the opposing party "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely." *Dooley v. United Techs. Corp.,* 152 F.R.D. 419, 425 (D.D.C.1993) (quoting *Foremost-McKesson Inc. v. Islamic Rep. of Iran,* 759 F.Supp. 855, 858 (D.D.C.1991)).  For example, prejudice may exist when allowing an amendment would necessitate reopening discovery at a relatively late stage in the proceedings. *E.g., Societe Liz, S.A. v. Charles of the Ritz Group, Ltd.,* 118 F.R.D. 2, 4 (D.D.C.1987) (finding prejudice when the motion to amend was filed just prior to the close of discovery, with trial fast approaching); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 1987 WL 9232, at *2 (D.D.C. March 25, 1987) (finding prejudice when the proposed amendment would prolong discovery after the previously announced deadline). In addition, an amendment may cause prejudice if it bears only a tangential relationship to the complaint or changes the character of the litigation. *Nat'l Treasury Employees Union v. Helfer,* 53 F.3d 1289, 1295 (D.C.Cir.1995); *Deasy v. Hill,* 833 F.2d 38, 42 (4th

10

Cir.1987). Finally, prejudice may exist "when the effect of the amendment is to impair the opposing party's ability to present evidence." *Prince v. Suffolk County Dep't of Health Servs.*, 1995 WL 144782, at *6 (S.D.N.Y. Apr.3, 1995). None of those circumstances exists here.

Accordingly, the instant motion should be granted.

Respectfully submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

11

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD          :
**A Bulgarian Corporation**      :
**54 Dondukov Blvd**          :
**Sofia 1000, Bulgaria**        :
                               :

           **Plaintiff,**       :     **Case No.** 1:07-cv-00165 (RBW)
                               :
                               :
                               :

       **vs.**                      :
                               :

**THE REPUBLIC OF IRAQ**     :
**A Foreign State**            :
**1801 P Street, NW**         :
**Washington, DC 20036**     :
                               :

         **Defendant.**      :

## SECOND AMENDED COMPLAINT

COMES NOW plaintiff, AGROCOMPLECT AD (hereinafter, including any predecessor in interest, referred to as "Agrocomplect" or "Plaintiff"), by and through undersigned counsel, and, pursuant to F.R. Civ. Proc. 7, and F.R.Civ.P. 15(a), and for a demand states and avers as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction is founded on 28 USC §§ 1330 and 1605(a)(2), (6). Venue is proper pursuant to 28 USC § 1391(d) and (f)(4).

### NATURE OF THE CLAIM

**The Parties**

2.      Plaintiff Agrocomplect is a corporation organized under the laws of the Republic of Bulgaria.

3.      Defendant the Republic of Iraq (hereinafter "Iraq") is a foreign state.



**EXHIBIT**

1A

**The Contract**

4.      Defendant entered into a certain written contract (the "Contract") with Plaintiff

for the provision of engineering and construction services to be performed by Plaintiff

in Iraq.

5.      The Contract required Plaintiff to perform work, *inter alia*, on the Hilla-

Diwaniya 4 Land Reclamation Project for the State Organization for Land Reclamation,

operating under the authority of Iraq's Ministry of Agriculture and Irrigation of the

Republic of Iraq.

6.      The Contract provided, *inter alia*, that:

> If any dispute or difference of any kind whatsoever
> shall arise between the Employer and the Contractor in
> connection with or arising out of the contract or the
> carrying out of the Works (whether during the progress of
> the Works or after their completion and whether before or
> after the termination abandonment or breach of the
> contract) it shall in the first place be referred to and settled
> by the Engineer who shall give notice of his decision to the
> Employer and the Contractor... If the Employer or the
> Contractor be dissatisfied then with any such decision and
> in any such case either the Employer or the Contractor may
> within 30 days after receiving notice of such decision
> require that the matter be referred to a Committee of
> Arbitration to be formed in the following manner:

> The Employer and the Contractor shall each appoint
> one member to the Committee and the two members thus
> appointed shall agree upon a third member to act as a
> Chairman of the Committee.   If agreement on the
> appointment of Chairman cannot be reached within 14 days
> from the last date of their appointment then the Employer
> or the Contractor shall each have the right to ask a
> competent court to appoint the third member in accordance
> with any proceedings provided in a special law of
> arbitration.

> ... All fees and other costs shall be paid to arbitrators
> by the party requiring arbitration provided that such fees

and costs shall be payable by the party against whom the award has been pronounced.

The Contract shall be subject to and construed according to the Iraqi Laws regulations and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract.

(the "Contract Arbitration Clause").

7.    Plaintiff performed pursuant to the terms of the Contract.

8.    In order to perform under the terms of the Contract, Plaintiff was required to and did in fact enter into agreements with suppliers and others in the United States.

9.    The contract time for drafting of design and completion of construction was 44 calendar months.

10.    The gross area was approximately 102,000 donum, one donum equal to 1338 square meters, divided initially into 8 zones. Subsequently, the contract was amended adding a ninth zone.

11.    The project commenced on March 12, 1985, and the execution and handover was effectuated zone by zone.

12.    By August 2, 1990, eight zones were completed and handed over.

13.    Iraq invaded Kuwait on August 2, 1990.

14.    An international embargo was enacted effective August 6, 1990, and remained in effect through April 3, 1991, and was thereafter extended through 2003.

15.    On or about January 1991, Plaintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the Iraqi invasion and occupation of Kuwait.

16.    The assault by, *inter alia*, American military on the machinery, production base,

and camp facilities was foreseeable by Defendant.

17.    As a result of breach of the Contract by Defendant, Plaintiff sustained actual,
foreseeable and consequential damages in the approximate amount of US$56,000,000,
including: contract losses of approximately US$17,000,000; loss of tangible property of
approximately US$38,000,000; payment of third party expenses of approximately
US$188,000; and, loss of business reputation of approximately US$483,000.00 in
interest.

18.    Notwithstanding repeated notice and demand, Iraq has failed and refused to pay to
Plaintiff the sums due and owing under the Contract.

19.    Notwithstanding notice and demand, Iraq has failed and refused to comply with
the Contract Arbitration Clause.

**Administrative Debt Recovery Procedures**

20.    Plaintiff has exhausted administrative remedies.

21.    Plaintiff timely submitted its claims under the Contract to the United Nations
Compensation Commission (the "UNCC Claims").

22.    On March 19, 1999, the Governing Council of the UNCC, adopting the Report
and Recommendations made by the Panel of Commissioners, rejected on jurisdictional
grounds the UNCC Claims other than US$150,790 for the cost of air evacuation of 368
company employees and 56 family members.

23.    The Interim Iraqi Government formed the Iraqi Debt Reconciliation Office
(hereinafter "IDRO") for the expressed purpose of resolving certain debts on certain pre-
established terms, including discounts and structured payment schedules.

24.    Plaintiff timely submitted its claims to IDRO.

25.   IDRO rejected certain of Plaintiff's Claims as outside of its jurisdiction, including claims where payments were required to be made in local currency.

26.   IDRO agreed to pay $US 7,505,203.20 on certain of Plaintiff's claims, plus accrued interest at the IDRO rate, reduced to 10.25% of the total amount of the claim plus interest. The net payment received by Plaintiff from and through IDRO was $1,761,875.12.

27.   Defendant remains indebted on the Contract to Plaintiff in the amount of $US 48,500,000, plus accrued interest at the annual rate of no less than the IDRO rate.

**Sovereign Immunity**

28.   The Contract, and performance thereunder, was a commercial activity.

29.   The obligations set out in the Contract had a direct effect in the United States, in that goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States. The parties anticipated that American construction equipment would be acquired and utilized to perform under the contract, and it was the custom and practice for plaintiff to acquire and use American construction equipment for similar construction projects in Iraq. Plaintiff had six (6) large scale construction contracts with Iraq. They were: Suara Project (contract 25); Ishaki 11 Project (contract 40); Ishaki 14 Project (contract 37); Shehamir Project (contract 22); Keseba Project (contract 63) and the Hilla Diwaniya Contract (contact 65).. The Contract was the last of these six contracts. In the previous five (5) contracts, Agro regularly and customarily used construction equipment purchased in the United States from American companies. That equipment included concrete lining machinery from an American company and various types of heavy construction equipment from Caterpillar

USA. For the Contract , similar construction equipment was required. Agro purchased

ten (10) pieces of heavy equipment from the Caterpillar USA company for the Contract,

and used the same type of equipment, such as concrete lining machinery used in the first

five (5) contracts.

30.    The obligations set out in the Contract had a direct effect in the United States, in

that payment was to be made at least in part by and through and into banking institutions

in the United States.

31.    A document titled Memorandum No. 2, between the Bulgarian Foreign Trade Bank

("Bulbank") and the Central Bank of Iraq ("CBI") provided in part that:

> 1.    The Contract for the construction of "Hilla-Diwaniya 4" Land Reclamation
> Project shall be covered by the provisions of Par.6, Item 1 of Law 157 of 1973
> that grants privileges to major development projects in Iraq....
>
> 13.    The provisions pf the Iterbank Agreement between the Central Bank of Iraq
> and the Bulgarian Foreign Trade Bank, signed on March 22, ___, [1] in Sofia,
> Bulgaria, shall be valid for this Contract, provided the Agreement is approved by
> the respective authorities of both _____ ....
>
> 15.    The Contractor shall have the right to transfer abroad 55% (fifty-five
> percent only) of the total Contract value, in free US Dollars, including payment
> for the personnel engaged in the Project's execution, in accordance with the
> minutes of the Extraordinary Session of the Iraqi-Bulgarian Joint Committee for
> Economic, Scientific and Technical Cooperation, signed on January 13, 1983, in
> Baghdad ....
>
> A.    Simple annual interest at a rate of 5 (five) percent in accordance with the
> Protocol of November 10, 1983 signed at the XV Session of the Bulgarian-Iraqi
> Joint Committee hold (sic) in Sofia Bulgaria shall be charged on the balance of
> the amount....
>
> B.    The utilized credit principle (sic) amount shall be paid in 4 (four) equal
> yearly installments ... The first installment for repayment shall fall due on the
> date of handing over the whole Project for operation through a certificate of
> substantial completion....
>
> 21.    This Memorandum shall be an integral part of the Contract for the
> construction of "Hillya-Diwaniya 4" Land Reclamation project.

---

[1] Portions of the Memorandum are cut off, and therefore not legible.

In a 1984 Letter, Iraq identified the following "conditions:"

> 55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between (CBI) and (Bulbank), signed by a protocol on 03/22/1983, and the delayed payment conditions mentioned in Paragraph Third/D of the meeting minutes of the Joint Iraqi Bulgarian Committee for Economic, Technical and Scientific Cooperation in its fifteenth session held in Sofia in the period from 5-10 November /3, and to pay 45% in Iraqi currency.

32. In the Agreed Minutes (the "Minutes") of the Fifteenth Regular Session (the "15th Session")

of the Bulgarian-Iraqi Joint Committee for Economic, Scientific and Technical Cooperation ( the

"Joint Committee"):

> Both sides agreed that the amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between the parties in the present Agreed Minutes. Amounts due in 1983 will be settled in accordance with the contract conditions not later than 31 December 1983.

**Plaintiff's Exhibit I**, appended to Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss Complaint ( hereinafter "**PX __**").

33.    The Minutes of the 15th Session of the Joint Committee noted that the agreed minutes of

the working groups were attached.

34.    The Bulgarian Foreign Trade Bank ("Bulbank") and the Central Bank of Iraq ("CBI")

entered into apparently undated Banking Arrangement No. (1) to undertake "implementation of

the Agreed Minutes on Trade and (F)inancial Cooperation of the 17th Session of the (Joint

Committee) on 13th February 1986 in Baghdad...." **PX L-1**. Banking Arrangement No. (1)

provided, in part as follows:

> In conformity with item I (page 6) of the (Agreed minutes) the Bulgarian prty shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments.    Banking Arrangement No.1 also provided that:
>
> (Bulbank) shall send to (CBI)  debit advises accompanied by interest tables for each interest calculation...The (CBI) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.
>
> *The latest by crediting the account of the Bul Bank (w)ith Credit lyonnais, New york (sic), under telex advice to the Bul Bank.*

Bul Bank shall send to (CBI) credit advices for each payment of interest. The calculation of interest shall stop on the day of final repayment of the utilized amounts under the credit.

The utilized credit under each project shall be repaid in eight equal subsequent semi-annual installments, the first of which shall fall due One year after the date of the final completion of the project, evidenced by the date of FAC....

Bul Bank shall prepare and send to (CBI) epayment (sic) schedules for each project, (CBI) shall confirm or advice its remarks, if any, with in (sic) 60 days after receipt. *On the respective maturity date (CBI) shall credit the account of the Bul Bank with Credit Lyonaisse, New york (sic) in convertible US. Dollars with the amount of principal, under telex advices to Bul Bank.* The latter shall send the credit advices to (CBI) for the respective payments.

(CBI) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective (Credit Account) as well as, the interest accrued under these amounts entered in the respective (Interest Account) mentioned in Article (1) above.(emphasis added).

35.    Banking Arrangement No. 1 appears to have been signed on "1.07.1986."

36.    Banking Arrangement No. 3, **PX L-2**, between Bulbank and CBI, also apparently signed

on "1.07.1986," was designed to implement the "trade and Financial Co. Operation" of the 17th

Session of the Joint Committee, and it provided in part as follows:

In confirmity [sic] with item 4 page 8 of the agreed Minutes, the Bulgarian Party responsed [sic] to the request of the Iraqi Party that all payments due or which will fall due to the Bulgarian side in Convartible [sic] Currency during 1986 under all existing Civilian and special Banking Arrangments [sic] and commercial Contracts shall be settled as follows:

A. 50% shall be paid in 1986 in accordance with relevant Contracts and Banking Arrangements.

B. 50% shall be paid one year from the dates of maturity in accordance with relevant contracts and Banking Arrangements.

C. Deferred payments bear simple interest rate of 5 (Five) percent annum....

On the respective maturity dates, *"CBI" shall credit the Accounts of "BulBank" with Credit Lyonnais, New - York, in convertible US. Dollars with amounts of due payments mentioned in article 1 above plus their interest,* advising Simultansusly [sic] the "BulBank" by telexes....

Interest shall be calculated from the date of deferring the amounts till [sic] the date of the acctual [sic] payment and shall be paid together with each respective principal.

CBI Guarntees [sic] with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 1 abovePlus [sic] its interest according to the Banking Arrangement dates 15th 5. 1985 and 13th October 1985.

The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment [sic] of all obligations, esusing [sic] thereform [sic].(emphasis added).

37.    At least three working groups issued protocols following the Joint Committee's 17th

Session: the Workgroup on Economic Partnership; the Working Group on Trade and Financial

Cooperation; and, the Working Group for Scientific and Technical Cooperation. **PX J-1, J-2, J-**

**3.** The Protocol of the Workgroup on Economic Partnership stated:

The Bulgarian party expressed their desire to participate in the irrigation activities in Iraq.

The Iraqi party declared their positive attitude towards the participation of the Bulgarian party in said field. The Bulgarian party took all necessary steps in the period between the Seventeenth and the Eighteenth Sessions of the Bulgarian - Iraqi (Joint Committee) enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hal-Davana-4'. These efforts would be continued and the Bulgarian aprty would intensify its work, in order to secure the successful completion of the project without any damages to the Iraqi party, in accordance with the agreements signed. ...

Outstanding payments of principal amounts, related to civil sector agreements, which 'had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity....

*(Bulbank) and (CBI) shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.* (emphasis added). **PX J-3.**

38.    The 18th Session of the Joint Committee was held in Sofia, Bulgaria in March 1987.

Along with the Joint Committee, three working groups issued protocols. **PX K.**

On March 1, 2000, Iraq and Bulgaria agreed, in the form of Agreed Minutes, during discussions

on "Iraqi debt obligations owed to Bulgaria...," that:

...crude oil shall be utilized for payment of the existing debts together with those becoming due until 31st December 1994....

*To implement these Agreed Minutes, Banking Arrangements between (CBI) and (Bulbank) shall be concluded as soon as possible (*emphasis added). **PX M**.

39.      During the term of the Contract, the following conditions and arrangements existed with respect to payment of Bulgarian companies for work done in Iraq, and in particular with respect to payment under the Contract:

   a.      At the time that the Contract was signed, and at all times pertinent hereto, plaintiff was a wholly-owned state corporate agency of the People's Republic of Bulgaria and Bulgaria was a centrally controlled and planned economy communist country;

   b.      At the time that the Contract was signed, and at ball times pertinent hereto, Bulgarian currency (the lev) was not freely traded internationally. Possession of foreign currency in Bulgaria was illegal. Therefore, all foreign currency transactions in Bulgaria were required by law and therefore necessarily conducted through Bulbank;

   c.      The then Bulgarian Foreign Trade Bank ("BulBank") played a role in those contracts to the extent that those contracts required payments in foreign currency and BulBank had the monopoly and sole legal mandate to make foreign currency payments.

   d.      BulBank was the only Bulgarian financial institution with the capability to handle foreign currency transactions.

   e.      In the 1980's when the foreign currency transactions were in American dollars it was required that the payments be handled through American banks. Thereafter, funds were credited to the individual state owned corporate accounts held with BulBank for the government companies doing business abroad which had a foreign currency component.

   f.      The payment arrangements for plaintiff were typical of the payment arrangements between Bulgarian companies and Iraq. Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.- New York; and Morgan Guarantee Trust Co., New York. In plaintiff's case, Credit Lyonnais-New York was utilized. These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at Bulbank;

   g.      When Iraq ceased payments through the American banks no further payments or credits were made to the Bulgarian company;

h.    The Bulgarian companies did not surrender their contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own name even in light of privatization from a government owned corporate entity to a privately owned corporate entity; and

i.    Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency intermediary on behalf of the Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plan per the multiple contracts.

j.    All contract payment arrangements in foreign currency were processed through Bulbank. Those arrangements were described and modified in the various Banking Arrangements, as well as, the annual governmental joint sessions, and Memorandum No. 2;

k.    Subject to those documents, the payment arrangements under the Contract worked as follows: plaintiff performed work under the contract according to a schedule set forth in the contract; upon completion of each stage of work plaintiff would obtain from the Iraqi Ministry of Irrigation a certificate of completion for that work; plaintiff would submit the approved certificate, which articulated a dollar amount for the completed work, to the Bulgarian Ministry of Finance; the Ministry would instruct Bulbank to pay Agro in accordance with the banking agreements from funds sent by CBI to Bulbank's bank account with Credit Lyonnais, New York. Bulbank thereafter credited plaintiff's account at Bulbank in Sofia, Bulgaria; When Iraq declared that it would not honor its payment obligations, including its obligations for payment to accounts at Credit Lyonnais in New York, New York, BulBank ceased payments to plaintiff; all dollar transactions with plaintiff in the 1980's were processed through American/New York banks; and, Iraq has never denied its Contract obligations to plaintiff.

40.    On February 16, 2002, CBI wrote to Bulbank, in part, as follows:

With reference to your Statements dated 1/1/2002 and 24/1/2002.
We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist, and the sanctions imposed on Iraq are lifted taking into consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled. **PX N**.

41.    Performance of the contract had a direct effect in the United States, in that the construction projects became foreseeable targets of opportunity and necessity for the United States military.

42.    Defendant is not entitled to sovereign immunity because the conduct in issue was a commercial activity with a direct effect in the United States.

43.    The Contract Arbitration Clause constituted a waiver of sovereign immunity.

## COUNT ONE
### (Enforcement Of Contract Arbitration Clause)

44.    Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 43 of the Complaint.

45.    Plaintiff and Defendant agreed in the Contract to submit "any dispute or difference of any kind whatsoever" arising out of the Contract to an arbitration process defined in the Contract.

46.    Defendant has failed and refused to participate in the arbitration process set out in the Contract.

47.    The Contract Arbitration Clause was a material provision of the Contract.

48.    Plaintiff has satisfied all of the conditions applicable to implementation of the Contract Arbitration Clause.

49.    Defendant's failure and refusal to participate in the arbitration process set out in the Contract is a material breach of the Contract.

50.    Defendant's failure and refusal to participate in the arbitration process set out in the Contract has caused, and continues to cause damage and injury to Plaintiff.

## COUNT TWO
### (Breach of Contract)

51.    Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 50 of the Complaint.

52.    The losses sustained by Plaintiff were the result and the consequence of "special risks," as that term is defined in Section 67 of the Contract.

53.    Unpaid contract amounts are due to be paid to Plaintiff by Defendant pursuant to the provisions of Sections 67 and 68 of the Contract.

54.    Section 67 is and was a material provision of the Contract.

55.    Section 68 is and was a material provision of the contract.

56.    Despite repeated notice and demand, defendant has failed and refused to pay to Defendant the sums required to be paid by the Contract.

57.    That failure is a material breach of the Contract.

58.    As a direct, foreseeable and consequential result of that breach, Plaintiff has sustained injury and damage.


WHEREFORE, by all these presents, counsel for plaintiff demands:

1.    Judgment in the amount of US$ 47,500,000 in favor of Plaintiff and against Defendant, plus an award of attorneys fees, interest and costs;

2.    Entry of an order, judgment and decree directing the parties to proceed to arbitration pursuant to the terms of the Agreement between the parties;

3.    Entry of an order, judgment and decree directing the parties to nominate one member; and

4.    Such other relief as may be just and proper.

Respectfully submitted,

_____

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

_____

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:   (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD                          :
A Bulgarian Corporation                   :
54 Dondukov Blvd                          :
Sofia 1000, Bulgaria                      :
                                          :
            Plaintiff,                    :    Case No.  1:07-cv-00165 (RBW)
                                          :
                                          :
                                          :
      vs.                                 :
                                          :
THE REPUBLIC OF IRAQ                      :
A Foreign State                           :
1801 P Street, NW                         :
Washington, DC 20036                      :
                                          :
            Defendant.                    :

SECOND AMENDED COMPLAINT

```
Deleted: FIRST
```

COMES NOW plaintiff, AGROCOMPLECT AD (hereinafter, including any

predecessor in interest, referred to as "Agrocomplect" or "Plaintiff"), by and through

undersigned counsel, and, pursuant to F.R. Civ. Proc. 7, and F.R.Civ.P. 15(a), and for a

demand states and avers as follows:

```
Deleted: Confederate Memorial Ass'n,
Inc. v. Hines 995 F.2d 295, 299 reh and
reh en banc den (D.C.Cir. 1993) and
```

### JURISDICTION AND VENUE

1.      Jurisdiction is founded on 28 USC §§ 1330 and 1605(a)(2), (6).  Venue is proper

pursuant to 28 USC § 1391(d) and (f)(4).

### NATURE OF THE CLAIM

**The Parties**

2.      Plaintiff Agrocomplect is a corporation organized under the laws of the Republic

of Bulgaria.

3.      Defendant the Republic of Iraq (hereinafter "Iraq") is a foreign state.



EXHIBIT

1B

**The Contract**

4.      Defendant entered into a certain written contract (the "Contract") with Plaintiff

for the provision of engineering and construction services to be performed by Plaintiff

in Iraq.

5.      The Contract required Plaintiff to perform work, *inter alia*, on the Hilla-

Diwaniya 4 Land Reclamation Project for the State Organization for Land Reclamation,

operating under the authority of Iraq's Ministry of Agriculture and Irrigation of the

Republic of Iraq.

6.      The Contract provided, *inter alia*, that:

> If any dispute or difference of any kind whatsoever
> shall arise between the Employer and the Contractor in
> connection with or arising out of the contract or the
> carrying out of the Works (whether during the progress of
> the Works or after their completion and whether before or
> after the termination abandonment or breach of the
> contract) it shall in the first place be referred to and settled
> by the Engineer who shall give notice of his decision to the
> Employer and the Contractor... If the Employer or the
> Contractor be dissatisfied then with any such decision and
> in any such case either the Employer or the Contractor may
> within 30 days after receiving notice of such decision
> require that the matter be referred to a Committee of
> Arbitration to be formed in the following manner:

> The Employer and the Contractor shall each appoint
> one member to the Committee and the two members thus
> appointed shall agree upon a third member to act as a
> Chairman of the Committee.   If agreement on the
> appointment of Chairman cannot be reached within 14 days
> from the last date of their appointment then the Employer
> or the Contractor shall each have the right to ask a
> competent court to appoint the third member in accordance
> with any proceedings provided in a special law of
> arbitration.

> ... All fees and other costs shall be paid to arbitrators
> by the party requiring arbitration provided that such fees

and costs shall be payable by the party against whom the award has been pronounced.

The Contract shall be subject to and construed according to the Iraqi Laws regulations and instructions and the Iraqi courts shall have exclusive jurisdiction to hear and determine all actions and proceedings arising out of the Contract.

(the "Contract Arbitration Clause").

7.      Plaintiff performed pursuant to the terms of the Contract.

8.      In order to perform under the terms of the Contract, Plaintiff was required to and did in fact enter into agreements with suppliers and others in the United States.

9.      The contract time for drafting of design and completion of construction was 44 calendar months.

10.     The gross area was approximately 102,000 donum, one donum equal to 1338 square meters, divided initially into 8 zones.  Subsequently, the contract was amended adding a ninth zone.

11.     The project commenced on March 12, 1985, and the execution and handover was effectuated zone by zone.

12.     By August 2, 1990, eight zones were completed and handed over.

13.     Iraq invaded Kuwait on August 2, 1990.

14.     An international embargo was enacted effective August 6, 1990, and remained in effect through April 3, 1991, and was thereafter extended through 2003.

15.     On or about January 1991, Plaintiff's machinery, production base, and camp facilities were destroyed by the American military as a consequence of the Iraqi invasion and occupation of Kuwait.

16.     The assault by, *inter alia*, American military on the machinery, production base,

and camp facilities was foreseeable by Defendant.

17.     As a result of breach of the Contract by Defendant, Plaintiff sustained actual, foreseeable and consequential damages in the approximate amount of US$56,000,000, including: contract losses of approximately US$17,000,000; loss of tangible property of approximately US$38,000,000; payment of third party expenses of approximately US$188,000; and, loss of business reputation of approximately US$483,000.00 in interest.

18.     Notwithstanding repeated notice and demand, Iraq has failed and refused to pay to Plaintiff the sums due and owing under the Contract.

19.     Notwithstanding notice and demand, Iraq has failed and refused to comply with the Contract Arbitration Clause.

**Administrative Debt Recovery Procedures**

20.     Plaintiff has exhausted administrative remedies.

21.     Plaintiff timely submitted its claims under the Contract to the United Nations Compensation Commission (the "UNCC Claims").

22.     On March 19, 1999, the Governing Council of the UNCC, adopting the Report and Recommendations made by the Panel of Commissioners, rejected on jurisdictional grounds the UNCC Claims other than US$150,790 for the cost of air evacuation of 368 company employees and 56 family members.

23.     The Interim Iraqi Government formed the Iraqi Debt Reconciliation Office (hereinafter "IDRO") for the expressed purpose of resolving certain debts on certain pre-established terms, including discounts and structured payment schedules.

24.     Plaintiff timely submitted its claims to IDRO.

25.    IDRO rejected certain of Plaintiff's Claims as outside of its jurisdiction, including

claims where payments were required to be made in local currency.

26.    IDRO agreed to pay $US 7,505,203.20 on certain of Plaintiff's claims, plus

accrued interest at the IDRO rate, reduced to 10.25% of the total amount of the claim

plus interest. The net payment received by Plaintiff from and through IDRO was

$1,761,875.12.

27.    Defendant remains indebted on the Contract to Plaintiff in the amount of

$US 48,500,000, plus accrued interest at the annual rate of no less than the IDRO rate.

**Sovereign Immunity**

28.    The Contract, and performance thereunder, was a commercial activity.

29.    The obligations set out in the Contract had a direct effect in the United States, in

that goods and services to be provided pursuant to the Contract were to be supplied in

part by commercial entities in the United States. **The parties anticipated that American**

**construction equipment would be acquired and utilized to perform under the**

**contract, and it was the custom and practice for plaintiff to acquire and use**

**American construction equipment for similar construction projects in Iraq.**

**Plaintiff had six (6) large scale construction contracts with Iraq. They were: Suara**

**Project (contract 25); Ishaki 11 Project (contract 40); Ishaki 14 Project (contract**

**37); Shehamir Project (contract 22); Keseba Project (contract 63) and the Hilla**

**Diwaniya Contract (contact 65).. The Contract was the last of these six contracts.**

**In the previous five (5) contracts, Agro regularly and customarily used construction**

**equipment purchased in the United States from American companies. That**

**equipment included concrete lining machinery from an American company and**

Deleted:

various types of heavy construction equipment from Caterpillar USA. For the

Contract , similar construction equipment was required.  Agro purchased ten (10)

pieces of heavy equipment from the Caterpillar USA company for the Contract, and

used the same type of equipment, such as concrete lining machinery used in the first

five (5) contracts.

30.     The obligations set out in the Contract had a direct effect in the United States,  in

that payment was to be made at least in part by and through and into  banking institutions

in the United States.

31.     A document titled Memorandum No. 2, between the Bulgarian Foreign Trade Bank

("Bulbank") and the Central Bank of Iraq ("CBI") provided in part that:

> 1.    The Contract for the construction of "Hilla-Diwaniya 4" Land Reclamation
> Project shall be covered by the provisions of Par.6, Item 1 of Law 157 of 1973
> that grants privileges to major development projects in Iraq....
>
> 13.    The provisions pf the Iterbank Agreement between the Central Bank of Iraq
> and the Bulgarian Foreign Trade Bank, signed on March 22,  ___ , [1]in Sofia,
> Bulgaria, shall be valid for this Contract, provided the Agreement is approved by
> the respective authorities of both  ___ ....
>
> 15.    The Contractor shall have the right to transfer abroad 55% (fifty-five
> percent only) of the total Contract value, in free US Dollars, including payment
> for the personnel engaged in the Project's execution, in accordance with the
> minutes of the Extraordinary Session of the Iraqi-Bulgarian Joint Committee for
> Economic, Scientific and Technical Cooperation, signed on January 13, 1983, in
> Baghdad ....
>
> A.    Simple annual interest at a rate of 5 (five) percent in accordance with the
> Protocol of November 10, 1983 signed at the XV Session of the Bulgarian-Iraqi
> Joint Committee hold (sic) in Sofia Bulgaria shall be charged on the balance of
> the amount....
>
> B.    The utilized credit principle (sic) amount shall be paid in 4 (four) equal
> yearly installments ... The first installment for repayment shall fall due on the
> date of handing over the whole Project for operation through a certificate of
> substantial completion....

---

[1] Portions of the Memorandum are cut off, and therefore not legible.

21.    This Memorandum shall be an integral part of the Contract for the construction of "Hillya-Diwaniya 4" Land Reclamation project.

In a 1984 Letter, Iraq identified the following "conditions:"

55% of the contract sum to be paid in foreign currency as per the agreed upon payment conditions in accordance with the banking arrangements between (CBI) and (Bulbank), signed by a protocol on· 03/22/1983, and the delayed payment conditions mentioned in Paragraph Third/D of the meeting minutes of the Joint Iraqi Bulgarian Committee for Economic, Technical and Scientific Cooperation in its fifteenth session held in Sofia in the period from 5-10 November /3, and to pay 45% in Iraqi currency.

32.  In the Agreed Minutes (the "Minutes") of the Fifteenth Regular Session (the "15th Session")

of the Bulgarian-Iraqi Joint Committee for Economic, Scientific and Technical Cooperation ( the

"Joint Committee"):

Both sides agreed that the amounts due in 1984 for development project contracts under execution will be covered by the deferred payment arrangements agreed upon between the parties in the present Agreed Minutes. Amounts due in 1983 will be settled in accordance with the contract conditions not later than 31 December 1983.

**Plaintiff's Exhibit I,** appended to Plaintiff's Motion for Leave to Conduct Limited Discovery on Motion to Dismiss Complaint ( hereinafter "**PX __**").

33.    The Minutes of the 15th Session of the Joint Committee noted that the agreed minutes of

the working groups were attached.

34.    The Bulgarian Foreign Trade Bank ("Bulbank") and the Central Bank of Iraq ("CBI")

entered into apparently undated Banking Arrangement No. (1) to undertake "implementation of

the Agreed Minutes on Trade and (F)inancial Cooperation of the 17th Session of the (Joint

Committee) on 13th February 1986 in Baghdad…." **PX L-1.** Banking Arrangement No. (1)

provided, in part as follows:

In conformity with item 1 (page 6) of the (Agreed minutes) the Bulgarian prty shall finance the execution of all development projects in Iraq awarded to Bulgarian Organizations on the principle of deferred payments.    Banking Arrangement No.1 also provided that:

(Bulbank) shall send to (CBI)  debit advises accompanied by interest tables for each interest calculation…The (CBI) shall pay the accrued interest in convertible US. Dollars on 15th March of each year.

*The latest by crediting the account of the Bul Bank (w)ith Credit Lyonnais, New york (sic), under telex advice to the Bul Bank.*

Bul Bank shall send to (CBI) credit advices for each payment of interest. The calculation of interest shall stop on the day of final repayment of the utilized amounts under the credit.

The utilized credit under each project shall be repaid in eight equal subsequent semi-annual installments, the first of which shall fall due One year after the date of the final completion of the project, evidenced by the date of FAC....

Bul Bank shall prepare and send to (CBI) epayment (sic) schedules for each project, (CBI) shall confirm or advice its remarks, if any, with in (sic) 60 days after receipt. *On the respective maturity date (CBI) shall credit the account of the Bul Bank with Credit Lyonaisse, New york (sic) in convertible US. Dollars with the amount of principal, under telex advices to Bul Bank.* The latter shall send the credit advices to (CBI) for the respective payments.

(CBI) guarantees with the present Arrangement irrevocably and unconditionally to repay on the maturity dates the amounts entered in the respective (Credit Account) as well as, the interest accrued under these amounts entered in the respective (Interest Account) mentioned in Article (1) above.(emphasis added).

35.    Banking Arrangement No. 1 appears to have been signed on "1.07.1986."

36.    Banking Arrangement No. 3, **PX L-2**, between Bulbank and CBI, also apparently signed

on "1.07.1986," was designed to implement the "trade and Financial Co. Operation" of the 17th

Session of the Joint Committee, and it provided in part as follows:

In confirmity [sic] with item 4 page 8 of the agreed Minutes, the Bulgarian Party responsed [sic] to the request of the Iraqi Party that all payments due or which will fall due to the Bulgarian side in Convartible [sic] Currency during 1986 under all existing Civilian and special Banking Arrangments [sic] and commercial Contracts shall be settled as follows:

A. 50% shall be paid in 1986 in accordance with relevant Contracts and Banking Arrangements.

B. 50% shall be paid one year from the dates of maturity in accordance with relevant contracts and Banking Arrangements.

C. Deferred payments bear simple interest rate of 5 (Five) percent annum....

On the respective maturity dates, *"CBI" shall credit the Accounts of "BulBank" with Credit Lyonnais, New - York, in convertible US. Dollars with amounts of due payments mentioned in article 1 above plus their interest,* advising Simultansusly [sic] the "BulBank" by telexes....

Interest shall be calculated from the date of deferring the amounts till [sic] the date of the actual [sic] payment and shall be paid together with each respective principal.

CBI Guarntees [sic] with the present Banking Arrangement Irrevocably and Unconditionally to repay all amounts due in accordance with item B Article 1 abovePlus [sic] its interest according to the Banking Arrangement dates 15th 5. 1985 and 13th October 1985.

The Present Banking Arrangement enters into force on the day of its signing and shall remain valid until the final settlment [sic] of all obligations, esusing [sic] thereform [sic].(emphasis added).

37.    At least three working groups issued protocols following the Joint Committee's 17th

Session: the Workgroup on Economic Partnership; the Working Group on Trade and Financial

Cooperation; and, the Working Group for Scientific and Technical Cooperation. **PX J-1, J-2, J-**

**3,** The Protocol of the Workgroup on Economic Partnership stated:

> The Bulgarian party expressed their desire to participate in the irrigation activities in Iraq.
>
> The Iraqi party declared their positive attitude towards the participation of the Bulgarian party in said field. The Bulgarian party took all necessary steps in the period between the Seventeenth and the Eighteenth Sessions of the Bulgarian - Iraqi (Joint Committee) enhanced the progress of their mutual activities, pertinent to the utilization of new lands in the 'Hal-Davana-4'. These efforts would be continued and the Bulgarian aprty would intensify its work, in order to secure the successful completion of the project without any damages to the Iraqi party, in accordance with the agreements signed. ...
>
> Outstanding payments of principal amounts, related to civil sector agreements, which had been due in 1986 and postponed for 1987, in compliance with paragraph 4.2 of the Section on Financial Cooperation of the Protocol dated February 13th 1986, shall be made in 1987 on maturity....
>
> *(Bulbank) and (CBI) shall enter into a relevant Bank Agreement, which would enforce the compliance with the above provisions, within 45 days after the date of this Protocol.* (emphasis added). **PX J-3.**

38.    The 18th Session of the Joint Committee was held in Sofia, Bulgaria in March 1987.

Along with the Joint Committee, three working groups issued protocols. **PX K.**

On March 1, 2000, Iraq and Bulgaria agreed, in the form of Agreed Minutes, during discussions

on "Iraqi debt obligations owed to Bulgaria...," that:

**Deleted:** ¶

**Deleted:** ¶ 38.

**Deleted:** 39

...crude oil shall be utilized for payment of the existing debts together with those becoming due until 31st December 1994....

*To implement these Agreed Minutes, Banking Arrangements between (CBI) and (Bulbank) shall be concluded as soon as possible (*emphasis added)*. PX M.*

39.     During the term of the Contract, the following conditions and arrangements

existed with respect to payment of Bulgarian companies for work done in Iraq, and

in particular with respect to payment under the Contract:

   a.     At the time that the Contract was signed, and at all times pertinent hereto, plaintiff was a wholly-owned state corporate agency of the People's Republic of Bulgaria and Bulgaria was a centrally controlled and planned economy communist country;

   b.     At the time that the Contract was signed, and at ball times pertinent hereto, Bulgarian currency (the lev) was not freely traded internationally. Possession of foreign currency in Bulgaria was illegal. Therefore, all foreign currency transactions in Bulgaria were required by law and therefore necessarily conducted through Bulbank;

   c.     The then Bulgarian Foreign Trade Bank ("BulBank") played a role in those contracts to the extent that those contracts required payments in foreign currency and BulBank had the monopoly and sole legal mandate to make foreign currency payments.

   d.     BulBank was the only Bulgarian financial institution with the capability to handle foreign currency transactions.

   e.     In the 1980's when the foreign currency transactions were in American dollars it was required that the payments be handled through American banks. Thereafter, funds were credited to the individual state owned corporate accounts held with BulBank for the government companies doing business abroad which had a foreign currency component.

   f.     The payment arrangements for plaintiff were typical of the payment arrangements between Bulgarian companies and Iraq. Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.- New York; and Morgan Guarantee Trust Co., New York. In plaintiff's case, Credit Lyonnais-New York was utilized. These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at Bulbank;

g.     When Iraq ceased payments through the American banks no further payments or credits were made to the Bulgarian company;

h.     The Bulgarian companies did not surrender their contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own name even in light of privatization from a government owned corporate entity to a privately owned corporate entity; and

i.     Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency intermediary on behalf of the Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plan per the multiple contracts.

j.     All contract payment arrangements in foreign currency were processed through Bulbank. Those arrangements were described and modified in the various Banking Arrangements, as well as, the annual governmental joint sessions, and Memorandum No. 2;

k.     Subject to those documents, the payment arrangements under the Contract worked as follows: plaintiff performed work under the contract according to a schedule set forth in the contract; upon completion of each stage of work plaintiff would obtain from the Iraqi Ministry of Irrigation a certificate of completion for that work; plaintiff would submit the approved certificate, which articulated a dollar amount for the completed work, to the Bulgarian Ministry of Finance; the Ministry would instruct Bulbank to pay Agro in accordance with the banking agreements from funds sent by CBI to Bulbank's bank account with Credit Lyonnais, New York. Bulbank thereafter credited plaintiff's account at Bulbank in Sofia, Bulgaria; When Iraq declared that it would not honor its payment obligations, including its obligations for payment to accounts at Credit Lyonnais in New York, New York, BulBank ceased payments to plaintiff; all dollar transactions with plaintiff in the 1980's were processed through American/New York banks; and, Iraq has never denied its Contract obligations to plaintiff.

40.    On February 16, 2002, CBI wrote to Bulbank, in part, as follows:

With reference to your Statements dated 1/1/2002 and 24/1/2002.
We would like to inform you that due to the continued unjustified sanctions imposed on our country, which makes hindrances on our banking procedures, we inform you that the matter will be subject to reconsideration when the current situation cease to exist, and the sanctions imposed on Iraq are lifted taking into consideration that the figures of the principal debt and interest will not be considered as final figures unless all pending matters will be settled. PX N.

41.    Performance of the contract had a direct effect in the United States, in that the construction projects became foreseeable targets of opportunity and necessity for the United States military.

42.    Defendant is not entitled to sovereign immunity because the conduct in issue was a commercial activity with a direct effect in the United States.

43.    The Contract Arbitration Clause constituted a waiver of sovereign immunity.


**COUNT ONE**
**(Enforcement Of Contract Arbitration Clause)**

44.    Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 43 of the Complaint.

45.    Plaintiff and Defendant agreed in the Contract to submit "any dispute or difference of any kind whatsoever" arising out of the Contract to an arbitration process defined in the Contract.

46.    Defendant has failed and refused to participate in the arbitration process set out in the Contract.

47.    The Contract Arbitration Clause was a material provision of the Contract.

48.    Plaintiff has satisfied all of the conditions applicable to implementation of the Contract Arbitration Clause.

49.    Defendant's failure and refusal to participate in the arbitration process set out in the Contract is a material breach of the Contract.

50.    Defendant's failure and refusal to participate in the arbitration process set out in

the Contract has caused, and continues to cause damage and injury to Plaintiff.

## COUNT TWO
### (Breach of Contract)

51.    Plaintiff adopts and incorporates by reference as if specifically set forth herein the

averments of paragraphs one through 50 of the Complaint.

52.    The losses sustained by Plaintiff were the result and the consequence of "special

risks," as that term is defined in Section 67 of the Contract.

53.    Unpaid contract amounts are due to be paid to Plaintiff by Defendant pursuant to

the provisions of Sections 67 and 68 of the Contract.

54.    Section 67 is and was a material provision of the Contract.

55.    Section 68 is and was a material provision of the contract.

56.    Despite repeated notice and demand, defendant has failed and refused to pay to

Defendant the sums required to be paid by the Contract.

57.    That failure is a material breach of the Contract.

58.    As a direct, foreseeable and consequential result of that breach, Plaintiff has

sustained injury and damage.


WHEREFORE, by all these presents, counsel for plaintiff demands:

1.    Judgment in the amount of US$ 47,500,000 in favor of Plaintiff and

against Defendant, plus an award of attorneys fees, interest and costs;

2.    Entry of an order, judgment and decree directing the parties to proceed to

arbitration pursuant to the terms of the Agreement between the parties;

3.     Entry of an order, judgment and decree directing the parties to nominate

one member; and

4.     Such other relief as may be just and proper.

Respectfully submitted,

_____
Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

_____
Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD                          :

      Plaintiff                          :

    v.                                     :    Case No. 1:07-cv-00165-RBW

THE REPUBLIC OF IRAQ                      :

      Defendant                          :


Declaration of Slav Stoychev Slavov:

1.    I, Slav Stoychev Slavov, am over the age of majority and suffer no
    mental infirmity;

2.    I have worked for Agrocomplect, AD ("Agro") since 1980 to the
    present. I have been in management positions for all of the
    construction contracts in which Agro has been involved in Iraq from
    1980 to the present. In particular, I have traveled to Iraq
    extensively to manage Contract number 65;

3.    Agro has had six (6) large scale construction contracts with Iraq.
    They were: Suara Project --contract 25; Ishaki 11 Project --
    contract 40; Ishaki 14 Project -- contract 37; Shehamia Project --
    contract 22; Keseba Project -- contract 63; and, Hilodevini Project
    --contract 65. Contract 65 was the last of these six contracts;

4.    In the previous five (5) contracts, Agro regularly and customarily
    used construction equipment purchased in the United States from
    American companies. That equipment included concrete lining
    machinery from an American company and various types of heavy
    construction equipment from Caterpillar USA;

5.    For Contract 65, similar construction equipment was required, as
    each party anticipated. Agro purchased ten (10) pieces of heavy
    equipment from the Caterpillar USA for Contract 65, and used the
    same type of equipment, such as concrete lining machinery, used
    in the first five (5) contracts;

EXHIBIT

2A

PENGAD 800-631-6989

6.   At the time that Contract 65 was signed, Agro was a wholly-owned state corporate agency of the People's Republic of Bulgaria ("Bulgaria") and Bulgaria was a centrally controlled and planned economy communist country;

7.   Also at the time that Contract 65 was signed, Bulgarian currency (the lev) was not freely traded internationally. Possession of foreign currency in Bulgaria was illegal. Therefore, all foreign currency transactions in Bulgaria were required by law and therefore necessarily conducted through Bulgarian Foreign Trade Bank ("BulBank");

8.   Accordingly, all contract payment arrangements in foreign currency were processed through Bulbank. Those arrangements were described and modified in the various Banking Arrangements, as well as the annual governmental joint sessions, and Memorandum No. 2;

9.   Subject to those documents, the payment arrangements under Contract 65 worked as follows:

    i.   Agro performed work under the contract according to a schedule set forth in the contract;

    ii.   Upon completion of each stage of work Agro would obtain from the Iraqi Ministry of Irrigation a certificate of completion for that work;

    iii.   Agro would submit the approved certificate, which articulated a dollar amount for the completed work, to the Bulgarian Ministry of Finance;

    iv.   This Ministry would instruct Bulbank to pay Agro in accordance with the banking agreements from funds sent by CBI to Bulbank's bank account with Credit Lyonnais, New York. Bulbank thereafter credited Agro's account at Bulbank in Sofia, Bulgaria;

10.   When Iraq declared that it would not honor its payment obligations, including its obligations for payment to accounts at Credit Lyonnais in New York, New York, BulBank ceased payments to Agro;

11.   All dollar transactions with Agro in the 1980's were processed through American/New York banks; and

12.   Iraq has never denied its Contract 65 obligations to Agro. It made partial payments under the Government of Iraq Debt Reconciliation Office ("IDRO") process to Agro. Additionally, on January 15, 2003, Iraq wrote Agro a letter in which Iraq stated that it granted

Agro's it request for compensation and damages and that final settlement would follow the lifting of sanctions in effect at the time of the writing.

I, Slav Stoychev Slavov, this _2/_ day of January, 2008, declare under penalty under the laws of the United States of America of perjury that the information provided herein is accurate to the best of my personal knowledge and belief.

_____
Slav Stoychev Slavov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AGROCOMPLECT, AD          :

      Plaintiff           :

      v.                    :    Case No. 1:07-cv-00165-RBW

THE REPUBLIC OF IRAQ     :

      Defendant       :

Declaration of Blecho Belchev:

1.    I, Blecho Belchev, am over the age of majority and suffer no mental infirmity;

2.    I was Finance Minister to the then People's Republic of Bulgaria ("Bulgaria") from 1976-1990. As a consequence of that position, I am personally familiar with the mechanisms utilized in Bulgaria for commercial foreign currency transactions. In particular, I am familiar with the mechanism utilized by Bulgaria for payment from Iraq for various international contracts with State owned Bulgarian companies, e.g., construction projects performed by Agrocomplect ("Agro"); tobacco trade performed by BulgarTabac ("BT"); heavy equipment export performed by MachinoExport ("MEx"); and electric grid construction projects performed by ElectroImpex ("EImpex");

3.    The then Bulgarian Foreign Trade Bank ("BulBank") played a role in those contracts to the extent that those contracts required payments in foreign currency and BulBank had the monopoly and sole legal mandate to make foreign currency payments.

4.    BulBank was the only Bulgarian financial institution with the capability to handle foreign currency transactions.

5.    In the 1980's when the foreign currency transactions were in American dollars it was required that the payments be handled through banks in the United States. Thereafter, funds were credited to the individual state owned corporate accounts held with BulBank for the government companies doing business abroad which had a foreign currency component.

PENGAD 800-631-6989

EXHIBIT

2B

6.   The payment arrangements for Agro's construction Contracts, including, Contract 65, as well as the contracts of BT, MEx, Elmpex were typical of the payment arrangements between Bulgarian companies and Iraq.  Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.-New York; and Morgan Guarantee Trust Co., New York.  In Agro's case, Credit Lyonnais-New York was utilized.  In BT's case, all three of these New York banking institutions were used.  These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at Bulbank;

7.   When Iraq ceased payments through the  banks in the United States no further payments or credits were made to Agro, BT, MEx, Elmpex or other similarly situated Bulgarian companies by BulBank;

8.   Neither Agro nor BT, MEx, or Elmpex surrendered its contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own names even in light of  privatization from a government owned corporate entity to a privately owned corporate entity; and

9.   Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency intermediary on behalf of Agro, BT and other similarly situated Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plan per the multiple contracts.

I, Blecho Belchev, declare this __21__ day of January 2008, under penalty under the laws of the United States of America of perjury that the information provided herein is accurate to the best of my personal knowledge .

Blecho Belchev

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re:  Bulgartabac Holding, AD
        Sofia, Bulgaria

## DECLARATION

Declaration of Hristo Dimitrov Lacthev:

1.  I, Hristo Dimitrov Latchev, am over the age of majority and suffer no mental infirmity;

2.  I am the Executive Director of Bulgartabac Holding, AD ("BT") until presently, with its head office in Sofia, Bulgaria. I have held this position since 22.12.2005.  As a consequence of my position, I am personally familiar with the mechanisms utilized in Bulgaria for payments in commercial foreign currency transactions during and after the communist era government.  Presently, BT is only partially privatized while the non-privatized interest is still wholly-owned by the now Republic of Bulgaria

3.  Upon my request, Unicredit-Bulbank, previously named The Bulgarian Foreign Trade Bank ("BulBank"), provided an explanation of the mechanism utilized by Bulgaria for payment from Iraq for various international contracts with State owned Bulgarian companies. The range was extensive, for example tobacco trade by BT

4.  BulBank had the mandate and monopoly on making foreign currency payments. Therefore, it handled all foreign currency contract transactions;

5.  BT's banking arrangements regarding its Iraq contracts were the same as that of other Bulgarian state owned companies.  All Iraq payments were predicated on the government to government banking arrangements, addendums, memorandums and joint sessions conducted over the years with the two governments and the government banks.  Then, following approval by the Ministry of Finance, payments due BT in American dollars were made thorough one of three United States banks as specifically articulated in the contracts and credit agreements between BT and Iraq.  These banks were Credit Lyonnais-New York; Irving Trust Co. - New York; and Morgan Guarantee Trust Co., New York. These American dollar payments from Iraq would then be

PENGAD 800-631-6989

EXHIBIT

2C

transferred to BT's individual corporate bank accounts held with Bulbank-Sofia, Bulgaria;

6.     When Iraq ceased payments through the American banks no further payments or credits were made to BT by BulBank; and

7.      BT has not surrendered its contract rights or debt and damage claims to Bulbank or the Ministry of Finance.

I, Hristo Dimitrov Latchev, declare under penalty under the laws of Bulgaria of perjury that the information provided herein is accurate to the best of my personal knowledge and belief.

_____
Hristo Dimitrov Latchev

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AGROCOMPLECT, AD          :

            :

      Plaintiff,       :     Case No. 1:07-cv-00165 (RBW)

            :

            :

      vs.           :

            :

THE REPUBLIC OF IRAQ      :

      Defendant.     :

### DECLARATION OF ZAHARI ZHELIAZKOV TOMOV

     I, Zahari Zheliazkov Tomov, do hereby declare and swear under penalty of perjury under the laws of the United States of America that the following is true and accurate:

1.    I am an attorney at law and I am admitted to practice with full legal capacity in Bulgaria. I am certified in the city of Varna, Bulgaria, and my office address is 4 Paraskeva Nikolau Street, Varna, Bulgaria;

2.    I have been retained by Agrocomplect, AD, ("Agro") to assist Agro with its claims against Iraq arising out of the Hilla- Diwaniya 4 Land Reclamation Project (the "Project") and in particular with respect to Contract No. 65 ( the "Contract");

3.    I am familiar with Agro's claims before the United Nations Compensation Commission, ("UNCC") and before the Iraq Debt Reconciliation Office, ("IDRO") and I assisted with both claims;

4.    I am familiar with this current American litigation. Prior to the filing of this lawsuit in 2007, in or around August 2006, on behalf of Agro, I began a fact investigation with respect to the "direct effect" requirement of the American Foreign Sovereign Immunities Act;

5.    In this capacity and on the basis of a one and a half year examination of Contract No 65, I declare the following circumstances;

6.    The investigation was undertaken by me personally and by my assistants, Miss Daniela Ganeva and Mr. Dimitar Ianakiev;

7.    During the course of my investigation I reviewed documents that were presented by Agro to the both the UNCC and IDRO;

8.    Based on my review of the documents described in paragraph 7, and my interviews of Agro representatives, I planned further investigation on the requisite direct effect as contemplated by the FSIA;

9.    My further investigation was conducted at the following private and public institutions: Bulbank AD /formerly Bulgarian Foreign Trade Bank/; Ministry of Finance of

1

PENGAD 800-631-6989

EXHIBIT

3

the Republic of Bulgaria; Ministry of Foreign Affairs of the Republic of Bulgaria; National Central Archives office of the Republic of Bulgaria; the Fire Safety Department of the Republic of Bulgaria; and private and government owned corporate entities archives;

10.     During the investigation I encountered numerous difficulties in the search for the additional documents.  This was due, among other things, to the pillage of Agro's camp in Iraq; a fire in Bulbank's archive; the privatization of Bulbank by UniCredito Italiano SPA (Italy) on 01/20/2000, the non-systematic exchange of documents between Bulgaria and Iraq with regard to the Agreement between the People's Republic of Bulgaria ( at the time a communist centrally planned economy regime) and the Republic of Iraq signed on 08/06/1967; and the amendments, memoranda, joint working group decisions related thereto. As a result, many of the main documentary records for Contract 65 have disappeared;

11.     Despite the difficulties, between on or around the middle of November until on or around the middle of December, 2007, I was able to find, as a result of my systematic and multi-level investigation, additional documents and information concerning Contract 65;

12.     Since the beginning of the investigation in August 2006, I have tried to meet and/or speak with the Minster of Finance for the relevant period, H.E. Belcho Belchev, and or his deputies.  Finally, I met with success in that H.E. Belcho Belchev indicated a willingness to meet with me.  After several weeks of trying to establish a face to face meeting, I met with H.E. Belcho Belchev the first week in December 2007.  Based on my discussion with him corroborating and additional pertinent and significant facts germane to the issues in the American litigation came to light; and

13.     Finally, during the course of my investigation, I discovered that there are other documents that are relevant to Agro's claims in the American litigation but they are "classified": and there is no mechanism under Bulgarian law which allows for release or declassification of same similar to the US Freedom of Information Act requests.

THE  REMAINDER  OF  THIS  PAGE  IS  DELIBERATELY  LEFT  BLANK.

I, Zahari Zheliazkov Tomov, declare under penalty of perjury under the laws of the United States of America that the information provided herein is accurate to the best of my personal knowledge and belief.


_____
Zahari Zheliazkov Tomov



Dated: This _____ day of _____, 2008

G:\Legal Doets\Civil\Agrocompfect\Iraq\Agro v. Iraq (USDC-DC)\Declarations\07-12-29 Declaration of Zahari D3.doc

3