**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AGROCOMPLECT, AD,

Plaintiff,

v.

THE REPUBLIC OF IRAQ,

Defendant.

Civil Action No. 07-0165 (RBW)

**MEMORANDUM OPINION**

Agrocomplect AD, the plaintiff in this civil suit, seeks $47,000,000 in compensatory damages from the Republic of Iraq for the alleged breach of a construction contract entered into by the plaintiff and the defendant in the early 1980s (the "Contract").[1] First Amended Complaint (the "Am. Compl.") at 11. On November 14, 2007, the Court issued a memorandum opinion addressing the motion to dismiss filed by the Republic of Iraq in which the Court concluded that the defendant's motion had to be granted and the plaintiff's amended complaint "dismissed in its entirety." Agrocomplect, AD v. Republic of Iraq, Civil Action No. 07-0165 (RBW), slip op. at 32, 2007 WL 4218928, at *16 (D.D.C. Nov. 14, 2007) (Walton, J.),[2] and the order dismissing the

[1] The Contract is attached as Exhibit A to the Defendant's Motion to Dismiss the First Amended Complaint.

[2] The Court also addressed the merits of a related motion filed by the plaintiff requesting leave to take limited jurisdictional discovery in this case. See Agrocomplect, slip op. at 31, 2007 WL 4218928, at *16 (addressing this motion). The Court found this motion to be moot in light of the Court's conclusion that it had to grant the defendant's motion to dismiss, id., but noted in a footnote that it likely would have denied the plaintiff's motion on the merits in any event because the plaintiff's motion did not satisfy the requirements for conducting (continued...)

plaintiff's amended complaint and closing this case (the "Dismissal Order"), Dismissal Order at 1. Currently before the Court is the plaintiff's motion to alter or amend the Dismissal Order pursuant to Federal Rule of Civil Procedure 59(e). Plaintiff['s] Motion for Reconsideration and to Alter or Amend Order and Judgment (the "Pl.'s Mot.") at 1.[3] After carefully reviewing the Court's prior memorandum opinion, the plaintiff's motion, and all memoranda and exhibits relevant thereto,[4] the Court concludes for the reasons that follow that it must deny the plaintiff's motion.

As this Court has noted in the past, motions for reconsideration under Rule 59(e) are "disfavored" and "should be granted only under extraordinary circumstances." Ctr. for Sci. in the Pub. Interest v. FDA, No. Civ. A. 03-1962, 2004 WL 2218658, at *2 (D.D.C. Sept. 17, 2004)

---

[2](...continued)
jurisdictional discovery, see id. at 31 n.17, 2007 WL 4218928, at *16 n.17 (explaining why "jurisdictional discovery is not appropriate in this case").

[3] Subsequent to the filing of the plaintiff's motion for reconsideration, the plaintiff filed a motion for leave to file a second amended complaint. See Plaintiff['s] Motion to Vacate Judgment and to Amend First Amended Complaint[] or, in the Alternative, for a Statement under Smith v. Pollin at 1(requesting "leave to amend [the plaintiff's] [f]irst [a]mended [c]omplaint to address concerns raised in the [Court's] judgment"). (Although the caption of the motion formally requests that the Court vacate its prior order dismissing the plaintiff's first amended complaint in its entirety, the gravamen of the plaintiff's request is that it should be allowed to file a second amended complaint that would remedy the jurisdictional defects identified by the Court in its prior memorandum opinion, not that the reasoning in the Court's prior memorandum opinion was in any way flawed. The Court therefore construes the motion as one for leave to file an amended complaint, and not as a second motion for reconsideration.) The Court does not address this new motion in the instant memorandum opinion, but rather will resolve the plaintiff's motion for leave to file an amended complaint in a separate order or memorandum opinion after briefing from the parties has closed. The memorandum opinion entered today and the order accompanying it are therefore applicable solely to the plaintiff's motion for reconsideration filed on December 14, 2007.

[4] In addition to the Court's prior memorandum opinion (and the underlying documents considered by the Court in rendering that opinion, see Agrocomplect, slip op. at 2 n.2, 2007 WL 4218928, at *1 n.2 (listing those documents)) and the plaintiff's motion, the Court considered the following documents in reaching its decision: (1) the plaintiff's Memorandum of Points and Authorities in Support of Plaintiff['s] Motion for Reconsideration and to Alter or Amend Order and Judgment (the "Pl.'s Mem."), (2) the Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Reconsideration and to Alter or Amend Order and Judgment (the "Def.'s Opp'n"), and (3) the Plaintiff['s] Reply to Defendant's Opposition to Plaintiff's Motion for Reconsideration and to Alter or Amend Order and Judgment (the "Pl.'s Reply").

(Walton, J.) (citation omitted). Indeed, such a motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Messina v. Krakower, 439 F.3d 755, 758 (D.C. Cir. 2006) (internal quotation and citation omitted). The plaintiff does not contend that there has been a "change of controlling law" since the Court entered its Dismissal Order, that there is "new evidence" that merits the Court's attention,[5] or that some other form of "manifest injustice" will result from the Court's order. Thus, the only possible basis for reconsideration of the Court's Dismissal Order would be "a clear error" in the legal reasoning leading to the entry of the order.

In its prior memorandum opinion, the Court held that the plaintiff's amended complaint had to be dismissed for lack of subject-matter jurisdiction because the allegations in the amended complaint did not satisfy the requirements for any of the exceptions to the defendant's sovereign immunity set forth in § 1605 of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391, 1441, 1602-11 (2001) (the "FSIA"). See Agrocomplect, slip op. at 31-32, 2007 WL 4218928, at *16 (concluding that the plaintiff "failed to allege facts that satisfy any of the exceptions set forth in § 1605").[6] In reaching that conclusion, the Court specifically rejected the plaintiff's argument that its breach of contract claim against the defendant fell within "the exception for actions based

---

[5] The plaintiff has attached a letter to its motion that was not a part of the record before the Court when it entered its Dismissal Order. See Pl.'s Mot. at Ex. A (Letter from Council of Ministers Legal Affair Department to Ministry of Irrigation (Jan. 15, 2003)). But as the defendant correctly notes, this letter is "not new evidence." Def.'s Opp'n at 4 n.3. Rather, the plaintiff had "consider[ed] moving to supplement or amend [its] pending discovery motion" with the letter as late as November 8, 2007, but chose not to do so. Pl.'s Mem. at 4 n.4.

[6] For purposes of brevity, the Court will refrain from recapitulating the factual and procedural background of this case. A full accounting of these details is set forth in the Court's prior memorandum opinion. See Agrocomplect, slip op. at 2-7, 2007 WL 4218928, at **1-3 (setting forth the factual and procedural background of this case).

upon a foreign nation's commercial activity outside the United States that has a 'direct effect' within the United States set forth in 28 U.S.C. § 1605(a)(2)," id. at 6, 2007 WL 4218928, at *3, notwithstanding the plaintiff's allegation in its amended complaint that "payment was to be made at least in part by and through banking institutions in the United States," Am. Compl. ¶ 30.[7] The Court reasoned that this allegation was insufficient in light of the terms of the parties' contract (the "Contract") and several documents attached to it (all of which were incorporated into the amended complaint) because "[t]he defendant was not 'supposed' to pay the plaintiff in the United States" under the terms of those documents, and because the plaintiff's claim was "not 'based upon' the commercial activities contemplated" in certain other documents (also incorporated in the amended complaint) reflecting banking arrangements between the People's Republic of Bulgaria ("Bulgaria") (through the Bulgarian Foreign Trade Bank (the "Bulbank")) and the Central Bank of Iraq (the "CBI") that did call for payment into New York accounts (the "Banking Arrangements"). Agrocomplect, slip op. at 27, 2007 WL 4218928, at *14.[8]

---

[7] The Court also held that "the plaintiff's use of American sub-contractors and American supplies is not a 'direct effect' of the defendant's commercial activities and the destruction of American property abroad does not constitute a 'direct effect' in the United States," Agrocomplect, slip op. at 27, 2007 WL 4218928, at *14, and rejected the plaintiff's argument that its breach of contract suit fell within "the exception in § 1605(a)(6) for actions brought to enforce an arbitration agreement capable of enforcement in the United States," id. at 6, 2007 WL 4218928, at *3, because the arbitration clause in the Contract "could only be enforced in Iraq under the provisions of the Iraqi Civil Procedure Code and the terms of the Contract" and "Iraq was not a signatory to . . . any . . . 'treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards' when it entered into the Contract with the plaintiff," id. at 30, 2007 WL 4218928, at *16 (quoting 28 U.S.C. § 1605(a)(6)(B)). The plaintiff does not challenge any of these conclusions in its motion for reconsideration. See Pl.'s Mem. at 1-6 (challenging only the Court's holding with respect to whether the Contract and its attendant and subsequent documents created a payment obligation in the United States that satisfied the "direct effect" exception found in § 1605(a)(2)); Def.'s Opp'n at 1 n.1 ("[The plaintiff's] argument relates solely to the Court's determination that the 'direct effect' test of the FSIA was not satisfied based on payments allegedly due in connection with the [C]ontract . . . . [The plaintiff] has not challenged any other portion of the Court's decision in its [motion for reconsideration].").

[8] In its memorandum of law in support of its motion for reconsideration, the plaintiff asserts for the first time that the references to Bulgaria in the Banking Arrangements are actually shorthand references for the National (continued...)

It is this latter conclusion that the plaintiff challenges in its motion for reconsideration. The plaintiff contends that the Court erred in concluding that the collective impact of the Banking Arrangements was that "Bulgaria . . . agreed to 'cover' the defendant's obligations to Bulgarian companies like the plaintiff with respect to the United States dollar portion of the contract price," which, the Court speculated, could mean that "[t]he defendant remained liable to Bulgarian companies only with respect to the Iraqi component of the contract price." Id. at 19, 2007 WL 4218928, at *10. According to the plaintiff, "[e]ven if [the] Bulbank . . . could be construed to be a new obligor of [the] plaintiff, the absence of any proof of a release of [the] defendant's contractual obligations to [the] plaintiff precludes any determination that [the] plaintiff lacks standing to assert contractual claims against [the] defendant." Pl.'s Mem. at 5.

As the defendant correctly notes, this issue is "entirely irrelevant" to the Court's analysis. Def.'s Opp'n at 5. As the Court explained in some detail in its earlier memorandum opinion, neither the Contract nor any of the documents attached to or incorporated in the Contract "either require or give the party receiving the payment discretion to require that payment be made 'through and into' United States banks," nor is there any allegation in the amended complaint of a "subsequent arrangement" between the parties to that effect. Agrocomplect, slip op. at 16, 2007 WL 4218928, at *8. Thus, the plaintiff's only basis for asserting that the defendant was

[8](...continued)
Bank for the People's Republic of Bulgaria (the "National Bank"), a separate bank from the Bulbank. Pl.'s Mem. at 1-2. The plaintiff does not explain how it knows this information, nor does it clarify whether the National Bank was acting solely as an agent of Bulgaria or independently when it entered into the Banking Arrangements. Given the Court's assumption in its memorandum opinion that the Banking Arrangements were between representatives from the Bulgarian government and the CBI, and the absence of any disputation of that assumption by the plaintiff, the Court is left with little choice but to assume that the National Bank was acting on behalf of Bulgaria when it entered into the Banking Arrangements if, as the plaintiff now asserts, it was the National Bank and not representatives from the Bulgarian government itself that entered into those arrangements.

obliged to pay the plaintiff in the United States is the Banking Arrangements, which require the CBI to make payments into a Credit Lyonnais account in New York City. Id. at 16-17, 2007 WL 4218928, at *8.

Unfortunately for the plaintiff, the Banking Arrangements at best relate to the advancement and repayment of the financing for the defendant's obligations under the Contract, not the obligations themselves. See Agrocomplect, slip op. at 18-19, 2007 WL 4218928, at *9 (holding that one of the two Banking Arrangements "memorializes a financing agreement between Bulgaria and the defendant whereby the Bulbank would advance the CBI credit to cover the foreign currency of all Iraqi construction contracts with Bulgarian companies," and that the second one "memorializes a refinancing agreement between the same two countries that would permit the defendant to defer half of the amount due to the Bulbank in 1986 for one year").[9] The plaintiff is thus left in a proverbial "Catch-22" situation: either Bulgaria assumed the defendant's payment obligations under the Contract, in which case "the plaintiff has sued the wrong party," id. at 23, 2007 WL 4218928, at *12, or the defendant remained obligated to pay the plaintiff under the Contract, which does not specify a place of performance, and was separately obligated to repay the Bulbank–not the plaintiff–by telexing funds to the Bulbank's Credit Lyonnais account in New York City, see id. at 24, 2007 WL 4218928, at *12 ("Either way, the 'direct effect' requirement of § 1605(a)(2) . . . is not satisfied."). The plaintiff's protestation that it "had

[9] The Court's entire analysis of the substance of the Banking Arrangements hinges on the premise that the documents cover the payment obligations arising from the Contract, but as the Court noted in its prior memorandum opinion, these documents "could not have been incorporated into the Contract . . . [;] indeed, they were not in existence when the parties signed the Contract," and one of the documents "appears to cover contracts that would conclude in 1986 or 1987, whereas the Contract between the plaintiff and the defendant stretched into 1990." Agrocomplect, slip op. at 17-18, 2007 WL 4218928, at *9. It is therefore highly questionable whether the Banking Arrangements have anything to do with the Contract at all.

not extinguished its contract claims against [the defendant] in exchange for a promise by [the] Bulbank to assume the existing obligation," Pl.'s Mem. at 4, if correct, would mean only that the plaintiff's "direct effect" argument fails for the latter reason, not the former, Agrocomplect, slip op. at 24, 2007 WL 4218928, at *12 ("If . . . the defendant's obligations ran directly to the plaintiff, then there is no basis whatsoever for the plaintiff's assertions that the defendant was obligated to make payments to the plaintiff in New York.").

The Court noted in its prior memorandum opinion that the only conceivable way in which the plaintiff's claim could be "based upon" the defendant's credit repayment obligation to the Bulbank as required by the plain language of § 1605(a)(2) would be if Bulgaria had acted as an agent for the plaintiff in entering into the agreements set forth in the Banking Arrangement Documents. See id. at 19-21, 2007 WL 4218928, at **10-11 (recognizing possible authority for the proposition that "a missed payment that is 'supposed' to be made to a plaintiff's agent in the United States may satisfy the 'direct effect' requirement").[10] The Court recognized, however, that the plaintiff "d[id] not allege the facts necessary for the Court to infer" a principal-agent relationship between the plaintiff and the Bulgarian government. Id. at 23, 2007 WL 4218928, at *11. Undaunted by the Court's prior admonition not to raise new arguments after the close of briefing on dispositive motions,[11] the plaintiff now argues for the first time–in its reply

[10] As the Court explained in its earlier memorandum opinion, the commercial activity alleged to have had a "direct effect" in the United States must make up an element of the plaintiff's claim to satisfy § 1605(a)(2)'s requirement that a plaintiff's action be "'based . . . upon an act . . . in connection with a commercial activity of the foreign state . . . and that act causes a direct effect in the United States.'" Agrocomplect, slip op. at 20, 2007 WL 4218928, at *10 (quoting 28 U.S.C. § 1605(a)(2)).

[11] The plaintiff submitted a declaration from Iskren Tsonev, its president, in support of its motion for jurisdictional discovery "in which Tsonev states that the payments to be made to the Bulbank account in New York were exclusively payments due to the plaintiff . . . and that the Bulbank served under those arrangements as the plaintiff's bank for purposes of receipt of the Contract payments." Agrocomplect, slip op. at 21-22, 2007 WL (continued...)

memorandum, no less–that the plaintiff, "at that time an agency of the Bulgarian government[,] would naturally be a principal . . . of the Bulgarian government bank which undertook to negotiate structured payments from Iraq on behalf of the various government agencies seeking payment from Iraq." Pl.'s Reply at 4.[12]

This argument is both procedurally infirm and substantively unavailing. First, "[a] Rule 59(e) motion is not a second opportunity to present arguments upon which the Court already has ruled or to present arguments that could have been presented earlier." Harrison v. Lappin, 510 F. Supp. 2d 153, 155 (D.D.C. 2007). There is no reason why the plaintiff could not have raised its agency argument in its opposition to the defendant's motion to dismiss, especially given that the case from which the Court inferred the possibility that payment that is "supposed to" be made to an agent in New York City might function as a waiver of sovereign immunity with respect to the principal of the agent as well, Commercial Bank of Kuwait v. Rafidain Bank and Cent. Bank of Iraq, 15 F.3d 238 (2d Cir. 1994) ("Commercial Bank"), was a case cited by the plaintiff in its opposition to the defendant's motion to dismiss. See Agrocomplect, slip op. at 19, 2007 WL 4218928, at *10 ("The plaintiff cites [Commercial Bank] for the proposition that the direct effect

---

[11](...continued)
4218928, at *11 (internal quotation and citation omitted). The plaintiff's decision to use this declaration "effectively convert[ed] [its] entire discovery motion into a sur-reply to the defendant's motion to dismiss," a situation that the Court found to be "even less appropriate" than the creation of a new argument in a party's reply brief, id. at 22 n.12, 2007 WL 4218928, at *11 n.12.

[12] The plaintiff's description of itself as an agency of the Bulgarian government appears for the first time in a passing reference in the plaintiff's memorandum of law in support of its motion for reconsideration, see Pl.'s Mem. at 4 ("[T]he Court's determination that the declaration of Iskren Tsonev could not be reconciled with the documents incorporated into the [plaintiff's amended complaint] . . . overlooks a . . . more plausible arrangement: one Bulgarian state agency undertook to assist another Bulgarian state agency in the collection of overdue debts."), and then re-appears in support of the plaintiff's newly-minted agency argument in the plaintiff's reply memorandum in support of that same motion, Pl.'s Reply at 4. In contrast, the plaintiff alleges in its amended complaint that it "is a corporation organized under the laws of the Republic of Bulgaria." Am. Compl. ¶ 2

required by § 1605(a)(2) is not limited to effects on the plaintiff . . . ." (internal quotation and citation omitted)). The plaintiff's agency argument could be rejected for this reason alone.

Second, even if the Court were to take at face value the plaintiff's description of itself as "an agency of the Bulgarian government" when the Banking Arrangements were written, it is far from self-evident that the plaintiff was therefore "naturally . . . a principal" of the entire Bulgarian government. The plaintiff itself suggests in its initial memorandum of law in support of its motion for reconsideration (and repeats again in its reply memorandum) that the Banking Arrangements reflect an instance in which "one Bulgarian state agency undertook to assist another Bulgarian state agency in the collection of overdue debts," Pl.'s Mem. at 4; see also Pl.'s Reply at 5 (quoting this statement with approval), an arrangement that hardly bespeaks a principal-agent relationship.[13] In any event, nothing in the plaintiff's amended complaint, opposition to the defendant's motion to dismiss, discovery motion and attendant memoranda, or memoranda in support of its motion for reconsideration suggests that the plaintiff exercised the type of control over Bulgaria (or the National Bank, for that matter) that is the hallmark of any principal-agent relationship. See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) ("The relationship of principal and agent depends . . . upon the

---

[13] The plaintiff's seemingly innocuous description of the Banking Arrangements as reflecting one Bulgarian agency's willingness to help another state agency is not accidental. As the Court pointed out in its earlier memorandum opinion, for the Court to accept that Bulgaria (either directly, or, as more recently asserted, through its agent, the National Bank) was acting as an agent for the plaintiff when it entered into the Banking Arrangements would require the Court to conclude that "the plaintiff agreed to finance its own services" several years after it entered into the Contract with the defendant, a proposition that strikes the Court as illogical. Agrocomplect, slip op. at 22, 2007 WL 4218928, at *11. Presumably, it was this incongruity that has led the plaintiff to argue that there was no principal-agent relationship at all between Bulgaria and the plaintiff in the first instance. See Pl.'s Mem. at 4 (describing the notion that "one Bulgarian state agency undertook to assist another Bulgarian state agency in the collection of overdue debts" as a "more plausible arrangement" than the Court's hypothetical formulation in which the plaintiff self-financed the majority of the Contract using the Bulgarian government as its agent).

principal 'having the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" (quoting Restatement (Second) of Agency § 14 (1958)).

In short, the plaintiff's arguments for reconsideration are deeply flawed as a matter of substance and, in some instances, untimely. The Court will therefore deny the plaintiff's motion for reconsideration. A separate order to that effect follows.

**SO ORDERED** this 25th day of January, 2008.

REGGIE B. WALTON
United States District Judge