**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AGROCOMPLECT, AD            : | |
|                             : | |
|    Plaintiff,               : | Case No. 1:07-cv-00165 (RBW) |
|                             : | |
|                             : | |
| v.                          : | |
|                             : | |
| THE REPUBLIC OF IRAQ        : | |
|    Defendant.               : | |

**PLAINTIFF'S REPLY TO**
**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO VACATE**
**JUDGMENT AND TO AMEND FIRST AMENDED COMPLAINT, OR, IN THE**
**ALTERNATIVE, FOR A STATEMENT UNDER *SMITH v. POLLIN***

Plaintiff Agrocomplect AD ("Plaintiff" or Agrocomplect"), by and through undersigned counsel, and pursuant to L.Cv.R. 7 replies to Defendant's Opposition ("Defendants' Opposition") to Plaintiff's Motion to Vacate Judgment and to Amend First Amended Complaint, or, In the Alternative, For a Statement Under *Smith v. Pollin* ("the Vacate Motion") as follows:

**INTRODUCTION**

On November 30, 2007, this Court granted the motion of Defendant the Republic of Iraq ("Defendant" or "Iraq") to dismiss Plaintiff's First Amended Complaint ("the Judgment").

On December 14, 2007, Plaintiff filed a Motion for Reconsideration and to Alter or Amend Order and Judgment pursuant to Fed.R.Civ.P. 59(e) ("the Reconsideration Motion"). Docket # 29.

On January 24, 2008, while Plaintiff's Reconsideration Motion was pending, Plaintiff filed its Vacate Motion. That motion was accompanied by a proposed Second Amended Complaint, and a "redline" version identifying the amendments made to the

First Amended Complaint. In particular, the Second Amended Complaint added extensive details to paragraphs 29 and 39 of the First Amended Complaint. *See* Vacate Motion, at pp. 5-7. Those paragraphs were directed at the so-called "direct effect" test of the Foreign Sovereign Immunities Act ("FSIA").

The Vacate Motion was also accompanied by the declarations of Slav Stoychev Slavov, an employee of Agrocomplect ( the "Slavov decl."), the Hon. Belcho Belchev , the former Bulgarian Minister of Finance ( the Belchev decl."), Hristo Dimitrov Lacthev, an officer of Bulgarian company Bulgartabac ( the "Lacthev decl.") and Zahari Zheliazkov Tomov ( the "Tomov decl."). The Slavov, Belchev and Lacthev declarations attested to the new averments of the Second Amended Complaint.[1] The Tomov declaration set out the steps taken by Plaintiff's Bulgarian counsel to investigate the facts relevant to the direct effect test.

Defendant contends that: Plaintiff's only procedural avenue for redress is pursuant to Fed.R.Civ.P. 60(b)(2)[2]; Plaintiff's motion does not satisfy the standards applicable to 60(b)(2); the new averments would not change the outcome of the Motion to Dismiss; and, the Vacate Motion does not meet the more lenient standards of Fed.R.Civ.P. 15.

For the reasons set out in the Vacate Motion, and below, Defendant's arguments must be rejected and the instant motion granted.

---

[1] The only challenges made to the complaints in this case have been facial challenges.   As Plaintiff wrote in the Vacate Motion, the declarations were  provided to show Plaintiff's good faith, and to ensure to the extent possible at this stage of the litigation  the accuracy of the new averments. Vacate Motion, at pp. 7-8.
[2] "On motion and on such terms as are just, the court may relieve a party or the party's legal representative form a final judgment, order, or proceeding for the following reasons: … (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)…."

**ARGUMENT**

## I. PLAINTIFF SATISFIES THE PROCEDURAL REQUIREMENTS APPLICABLE TO THE RELIEF IT REQUESTS

### A. There Are Four Separate But Related Procedural Vehicles For Disposition of the Requested Relief

There are four procedures which provide arguable vehicles for consideration and disposition of the relief sought by Plaintiff: 28 U.S.C. § 1653[3]; Fed.R.Civ.P. 59; Fed.R.Civ.P. 60(b), and Fed.R.Civ.P. 15(a).[4] Plaintiff is entitled to the requested relief under each procedure.

#### 1. Plaintiff Is Entitled to Proceed Under 28 U.S.C. § 1653

Defendant, relying on *Newman-Green Inc.v. Alfonzo-Larrain,* 490 U.S. 826, 831 (1989) argues that 28 U.S.C. § 1653 is inapplicable because Plaintiff is "attempting to cure 'defects in the jurisdictional facts' by new allegations that are themselves inconsistent with the documents on which it previously relied in its pleadings…."[5] Defendant's Opposition, at pp.2-3, n. 2.

In *Newman-Green,* plaintiff sought to amend a complaint by dropping a non-diverse party in order to preserve statutory jurisdiction. *Id.,* 490 U.S. at 831. The Court wrote that:

> But § 1653 speaks of amending "*allegations* of jurisdiction," which suggests that it addresses only incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves. Under this reading of the statute, which we believe is correct, § 1653 would apply if Bettison were, in fact, domiciled in a State other than Illinois or was, in fact, not a United States citizen, but the complaint did

---

[3] "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."
[4] As Defendant observes, the court wrote on January 25, 2008, that it construes the Vacate Motion "as one for leave to file an amended complaint, and not as a second motion for reconsideration." January 25, 2008 Order, at 2, n.3.
[5] Presumably, the "Banking Arrangements," *see* Defendant's Opposition, at p.8. Plaintiff addresses below Defendant's assertions of inconsistency.

3

not so allege. It does not apply to the instant situation, where diversity jurisdiction does not, in fact, exist. *Id.*

Defendant's contention that the ostensible inconsistencies between the new averments and the Banking Arrangements precludes resort to § 1653 ignores entirely the very point of *Newman-Green*, which concluded that the section did not apply because the averments in the complaint about Bettison's domicile were in fact correct. To the extent, therefore, that the former averments were "incorrect," § 1653 applies according to *Newman-Green.*

The *Newman-Green* decision did not limit the applicability of §1653 to those instances where the proposed amendment corrected inaccurate jurisdictional allegations. As the Court explained:

> … (T)he only legislative guide available …explains that the predecessor statute was changed solely to expand the power to cure defective allegations of jurisdiction from diversity cases to all cases….Furthermore, every Court of Appeals that has considered the scope of § 1653 has held that it allows appellate courts to remedy inadequate jurisdictional allegations, but not defective jurisdictional facts. We decline to reject this longstanding interpretation of the statute. 490 U.S. at 831-832.

The "defective jurisdictional fact" in *Newman-Green* was the inclusion of a non-diverse party in a case that relied on diversity jurisdiction. His dismissal through amendment, therefore, would not "remedy inadequate jurisdictional allegations," but would improperly "produce jurisdiction where none existed before." *Id.*, at 831.

Plaintiff's new averments, whether or not consistent with earlier averments, remedy ostensibly inadequate jurisdictional allegations. They cannot "produce jurisdiction where none existed before," because the facts, as they are ferreted out, cannot be compared to the effect of the dismissal of a non-diverse party.

Under *Newman-Green*, therefore, Plaintiff is entitled to seek relief by means of § 1653.

4

**2. Plaintiff May Be Entitled or Required to Proceed Under Fed.R.Civ.P. 59**

Defendant's contention that Rule 59 is unavailable because the Vacate Motion was not filed within 10 days of the November 30, 2007, Judgment does not take into account the effect, if any, of the Reconsideration Motion on the Rule 59(e) requirement that "(a)ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." But, a "timely and proper motion brought under Rule 59(e) to alter or amend a judgment suspends the finality of the district court judgment." *Willie v. Continental Oil Co.,* 746 F.2d 1041, 1044-45 (5th Cir. 1984).

At least for purposes of the noting of an appeal, the deadline is suspended until disposition of the motion. *See* FRAP Rule 4(a)(4)(A)(iv). But no similar rule explicitly extends the time for filing a second or successive motion under Rule 59.

If, therefore, Rule 59(e) addresses only "final" judgments, it is at least arguable that the suspension of finality by the filing of a "10 day" motion under Rule 59(e) suspends the deadline for filing a second "10 day motion" until disposition of the first motion.

"[I]t is well established that a district court has the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment." *See United States v. Rezaq,* 899 F.Supp. 697, 701 (D.D.C. 1995). As Judge Urbina pointed out in *Reed v. Islamic Republic of Iran,* 242 F.R.D. 125 (D.D.C. 2007): "(b)ecause the plaintiff seeks reconsideration of an interlocutory judgment … the defendant actually asks the court to alter or amend the interlocutory judgment under Federal Rule of Civil

Procedure 54(b)." *Id.,* 242 F.R.D at 126, n.1. The time limits of Rule 59(e), therefore, may not be applicable to a "suspended" final judgment.[6]

Moreover, there is considerable authority for the proposition that a post-judgment motion to amend triggers Rule 59(e) standards. "[O]nce a final judgment has been entered, a court cannot permit an amendment [of the complaint under Rule 15(a) of the Federal Rules of Civil Procedure] unless the plaintiff 'first satisfies Rule 59(e)'s more stringent standard' for setting aside that judgment.' " *Ciralsky v. CIA,* 355 F.3d 661, 673 (D.C.Cir.2004) (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996)). The trial court can grant Rule 59(e) motions if it "finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear legal error or prevent manifest injustice." *Id.,* 355 F.3d at 671.

### 3. Plaintiff Is Entitled to Proceed Under Fed.R.Civ.P. 60(b)

In *FG Hemisphere Associates, LLC v. Democratic Republic of Congo,* 447 F.3d 835 (D.C.Cir. 2006), the District of Columbia Circuit set out the standard for relief under Fed.R.Civ.P. 60(b)(1) as follows:

> Rule 60(b)(1) provides that a court may relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect." FED. R. CIV. P. 60(b)(1)**.** In *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380 (1993), the Supreme Court held that the determination of excusable neglect is an equitable matter and identified several relevant factors: the risk of prejudice to the non-movant, the length of delay, the reason for the delay, including whether it was in control of the movant, and whether the movant acted in good faith. *Id.,* 447 F.3d at 838.

Examining Rule 60(b)(2), the court in *International Center for Technology Assessment v. Leavitt,* 468 F.Supp.2d 200 (D.D.C. 2007) wrote:

---

[6] But *see* Rule 60(b), which refers explicitly to final judgments.

For newly discovered evidence to meet the requirements of Rule 60(b)(2), the evidence: (1) must have been in existence at the time of the disputed judgment; (2) "could not by the exercise of due diligence have been discovered in time to present it in the original proceeding;" (3) "must not be merely cumulative or impeaching;" and (4) "must be admissible and credible, and of such a material and controlling nature as will probably change the outcome."

Examining Rule 60(b)(6), the District of Columbia Circuit in *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243 (D.C.Cir.1987), observed that: "Rule 60(b)(6) permits a court to grant relief from a final judgment for "any *other* reason justifying relief...." (Emphasis added.) The courts have universally interpreted "other" to mean other than the reasons specified in subsections 60(b)(1)-60(b)(5)...." *Id.,* 810 F.2d at 249. Using this final catch-all reason sparingly, courts apply it only in "extraordinary circumstances." *Pioneer Inv. Servs.,* 507 U.S. at 393.

### 4. Plaintiff Is Entitled to Proceed Under Fed.R.Civ.P. 15(a).

Plaintiff set out in its Vacate Motion, at pp. 9-11, the standards for relief under Rule15(a), and incorporates those standards herein.

### B. The History of this Litigation and the Tomov Declaration Satisfy Each of the Tests Arguably Applicable to Plaintiff's Request For Relief

Defendant, uniquely situated among the parties in this case to have come forward and explain to the Court in detail the payment procedures under the Contract, and the role of both the Central Bank of Iraq ("CBI") [7] and the government of Iraq with respect to the

---

[7] Defendant seeks to distance itself from CBI by arguing that Plaintiff "erroneously treats Iraq and CBI as interchangeable entities." Defendant's Opposition, at p.9, n.7. Plaintiff makes no such claim, but there can be no serious dispute that the CBI operates as the agent of Iraq for all purposes pertinent to this case, and its actions are the actions of Iraq. The Central Bank of Iraq is "the Iraqi central banking authority." *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 131 (2nd Cir. 1998). As such it is "…analogous to the Federal Reserve in the United States. Both entities [referring also to Rafidain Bank] are therefore "agenc[ies] or instrumentalit[ies] of a foreign state" under the FSIA, 28 U.S.C. § 1603." *Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 239 (2nd Cir. 1994). In *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC.*, 376 F.Supp.2d 617, 627, (E.D.Va. 2005), the Court noted that "(b)ecause the CPA [Coalition Provisional Authority] was the temporary governing authority in Iraq , (it) thereby controlled the

Contract and similar agreements, complains that Plaintiff did not act with sufficient diligence in discovering the procedures negotiated, and implemented by Defendant and CBI themselves. Having successfully prevented formal jurisdictional discovery, and having refused to engage in informal jurisdictional discovery, *see* Plaintiff's Motion for Leave to Conduct Limited Discovery On Motion to Dismiss Complaint, docket # 15, at p.9, n.7,[8] Defendant dismisses the declaration of a Bulgarian attorney as " an excuse … amidst his story of fires, pillage and other natural and manmade catastrophes." Defendant's Opposition, at 7.

But it is here that Defendant overlooks in the declarations the prudence which delayed the filing of the Vacate Motion until Plaintiff's could obtain independent and first-hand corroboration of the new averments. Defendant, after all, makes much of the "qualifying language" in Agrocomplect employee Slavov's declaration. Defendant's Opposition, at 7. [9] Defendant renews its attacks on Agrocomplect president Tsonev. *Id*., at n.8, and accompanying text, and insists that Bulgartabac officer Latchev's information contains the same qualifying language, and lacks any first hand knowledge. *Id*., at 6.

It should be clear that Plaintiff sought corroboration of Agrocomplect's personnel's version of events from a source – indeed, other than the Defendant itself, the source – with unchallengeable personal knowledge, and independence. Plaintiff obtained that corroboration from the former Bulgarian Minister of Finance from 1976 to 1990,

---

Central Bank of Iraq,…." And *see* Plaintiff's Opposition to Defendant's Motion to Dismiss First Amended Complaint, docket # 21, at p.11, n.24 (discussing CBI's status as Defendant's "agent.")

[8] Defendant was, of course, entitled to oppose formal and informal discovery, but the likelihood that Defendant is in full and ready possession of the facts pertinent to the Contract payments and the Banking Arrangements can be taken into account as the Court assesses relief under § 1653, "manifest injustice" under Rule 59(e), equitable considerations under Rule 60(b)(1), and extraordinary circumstances under Rule 60(b)(6).

[9] But *see Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir. 1985)( discussing non substantive requirements), and *Davis v. Frapolly,* 756 F.Supp. 1065, 1067 (N.D.Ill.1991)(discussing effect of unsworn declarations).

who testifies[10] that he is and was "personally familiar" with the procedures in issue, Belchev decl., at ¶2, and that the payments themselves required the approval of the Ministry of Finance. *Id.*, at ¶6.

Defendant, other than its incorrect claim of "qualifying language," makes no attempt to question the former Minister's detailed explanation of payment procedures.[11] Defendant does not offer a countervailing declaration from the Iraqi counterpart, or any knowledgeable aide or subordinate, notwithstanding that such a declarant would be readily available to Defendant.

Defendant instead questions the timing of the declaration. But the Vacate Motion was filed three days after the Minister's declaration was received. Plaintiff appreciates that this Reply is not a proper vehicle for providing additional details surrounding the diligence of Bulgarian attorney Tomov's efforts, but it is worth noting that Defendant has not sought discovery – formal or informal – to explore Mr. Tomov's explanations and his chronology.

Plaintiff is no longer an agency of the Bulgarian government. Plaintiff has no workable relationship with Bulbank. Iraq declined to cooperate. Mr. Tomov was diligent and resourceful. Faced with a statute of limitations defense, Plaintiff properly limited its allegations in earlier pleadings to the facts in which it had a good faith belief. Immediately upon receiving from the former Minister of Finance a comprehensive explanation of the payment procedures pertinent to the claims in this case, Plaintiff filed its Vacate Motion.

---

[10] Defendant incorrectly asserts that the declaration of former Finance Minister Belchev contained the "qualifying language" to which it objects. In fact, Mr. Belchev avers that "the information provided herein is accurate to the best of my personal knowledge." Vacate Motion, at page 48 of 53.

[11] As noted above, Defendants' broad brush claim that the procedures described in the new averments are inconsistent with the Banking Arrangements is discussed below.

That conduct supports the relief sought by Plaintiff herein.

## II. THE PROPOSED AMENDMENTS WOULD CHANGE THE OUTCOME OF THE MOTION TO DISMISS AND ARE NOT FUTILE

### A. The Payment Arrangements Satisfy the Direct Effect Test

The new payment averments are supported by Former Minister Belchev, who sets out in detail:

> "the mechanism utilized by Bulgaria for payment from Iraq for various international contracts with State owned Bulgarian companies, e.g., construction projects performed by Agrocomplect ("Agro"); tobacco trade performed by BulgarTabac ("BT"); heavy equipment export performed by MachinoExport ("MEx"); and electric grid construction projects performed by ElectroImpex ("EImpex")." Belchev decl., at ¶ 2.

By way of background he describes Bulbank's role in foreign currency transactions during the time when Bulgaria was a socialist state as follows:

> The then Bulgarian Foreign Trade Bank ("BulBank") played a role in those contracts to the extent that those contracts required payments in foreign currency and BulBank had the monopoly and sole legal mandate to make foreign currency payments.
>
> BulBank was the only Bulgarian financial institution with the capability to handle foreign currency transactions.
>
> Bulbank, as a coordinate agency of the then Communist Bulgarian government, was serving as a foreign currency intermediary on behalf of Agro, BT and other similarly situated Bulgarian companies and Iraq pursuant to government to government banking arrangements, addendums, memorandums and joint sessions on execution of payment plan per the multiple contracts.

Belchev decl., at ¶ ¶ 3, 4, 9. He explains the procedure for payment in American currency as follows:

> In the 1980's when the foreign currency transactions were in American dollars it was required that the payments be handled through banks in the United States. Thereafter, funds were credited to the individual state owned corporate accounts held with BulBank for the government

10

> companies doing business abroad which had a foreign currency component.
>
> The payment arrangements for Agro's construction Contracts, including, Contract 65, as well as the contracts of BT, MEx, EImpex were typical of the payment arrangements between Bulgarian companies and Iraq. Following approval by the Ministry of Finance, payments due in American dollars under these and other Bulgarian company contracts would be made thorough one of three or more United States banks: Credit Lyonnais-New York; Irving Trust Co.- New York; and Morgan Guarantee Trust Co., New York. In Agro's case, Credit Lyonnais-New York was utilized. In BT's case, all three of these New York banking institutions were used. These US dollars payments from Iraq would then be transferred to the respective company bank accounts held at Bulbank.

Belchev decl., at ¶¶5, 6. He addresses the dependence of the Bulgarian state companies on payment by defendant through Bulbank as follows:

> When Iraq ceased payments through the banks in the United States no further payments or credits were made to Agro, BT, MEx, EImpex or other similarly situated Bulgarian companies by BulBank;
>
> Neither Agro nor BT, MEx, or EImpex surrendered its contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own names even in light of privatization from a government owned corporate entity to a privately owned corporate entity.

Belchev decl., at ¶¶ 7, 8.

Defendant argues both that the Banking Arrangements are unlikely to have had anything to do with the Contract, Defendants' Opposition, at 8, and that the Banking Arrangements are inconsistent with Mr. Belchev's description of the payment procedures. Setting aside the conflict between those two positions, Defendant's assertion of inconsistency is simply wrong.

At the time of the Contract, both Bulbank and Plaintiff were state agencies of the Bulgarian government. All American dollar payments to Bulgarian agencies – and, for that matter, anyone in Bulgaria, had to be made through Bulbank. Bulbank, in turn, processed payments from Iraq for various contracts through CBI. Whether, as Defendant

11

insists, and as the court surmised, the Banking Arrangements required Bulbank to advance "credit" to Plaintiff, and as Defendant insists, CBI would then "repay" Bulbank in New York, is irrelevant to the direct effect test, because Plaintiff's actual receipt of American currency payments under the Contract were contingent on Defendant's payments through CBI to Bulbank in New York. As Mr. Belchev attests: "(w)hen Iraq ceased payments through the banks in the United States no further payments or credits were made to Agro, BT, MEx, EImpex or other similarly situated Bulgarian companies by BulBank."

As Plaintiff has consistently alleged, Bulbank was indeed acting as Plaintiff's agent in receiving payments from CBI. That Plaintiff, rather than Bulbank, was entitled to the funds due in New York is evidenced from Defendant's payment to Plaintiff – and not Bulbank – in the IDRO procedure. Defendant has certainly not suggested that Bulbank asserted any claim of any kind to the proceeds due under Plainitff's Agro Contract, or under any contract covered by the Banking Arrangements. Thus, Mr. Belchev declares:

> Neither Agro nor BT, MEx, or EImpex surrendered its contract rights to Bulbank or to the Ministry of Finance. These companies have always retained their rights to seek relief under the contract under their own names even in light of privatization from a government owned corporate entity to a privately owned corporate entity.

**B**.  **The Custom and Practice of the Use of American Contractors And Suppliers Satisfies the Direct Effect Test**

Paragraph 29 of the proposed Second Amended Complaint provides:

> The obligations set out in the Contract had a direct effect in the United States, in that goods and services to be provided pursuant to the Contract were to be supplied in part by commercial entities in the United States. The parties anticipated that American construction equipment would be acquired and utilized to perform under the contract, and it was the custom and practice for plaintiff to acquire and use American construction

12

equipment for similar construction projects in Iraq. Plaintiff had six (6) large scale construction contracts with Iraq. They were: Suara Project (contract 25); Ishaki 11 Project (contract 40); Ishaki 14 Project (contract 37); Shehamir Project (contract 22); Keseba Project (contract 63) and the Hilla Diwaniya Contract (contact 65).. The Contract was the last of these six contracts. In the previous five (5) contracts, Agro regularly and customarily used construction equipment purchased in the United States from American companies. That equipment included concrete lining machinery from an American company and various types of heavy construction equipment from Caterpillar USA. For the Contract , similar construction equipment was required. Agro purchased ten (10) pieces of heavy equipment from the Caterpillar USA company for the Contract, and used the same type of equipment, such as concrete lining machinery used in the first five (5) contracts.

Those averments are directed at the Court's determination that the Plaintiffs did not allege that goods and services were "supposed" to come from the United States pursuant to the Contract or based on the past practices of the parties. Memorandum Opinion, docket # 27, at 24, and *see* discussion at 15. Plaintiff does not reargue here its position on *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993), or its contention that the direct effect need not affect Plaintiff. *See* discussion in Memorandum Opinion, at 19-21.

Accordingly, for the reasons set forth above, and all the reasons set forth therein, Plaintiff's Reconsideration Motion should be granted.

Respectfully submitted,

\_\_\_\_/s/ Danielle M. Espinet\_\_\_\_\_
Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:   (240) 632-0906
*Email*: srolinski@rolinski.com

      /s/ Philip M. Musolino
Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*:  pmusolino@musolinoanddessel.com